UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROOFERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>PERRIGO COMPANY PLC, *et al.*,<br><br>                    Defendants. | Civil Action No. 2:16-cv-02805-MCA-LDW<br><br>ECF Case<br>Document Electronically Filed<br><br>**Motion Day**: November 20, 2017 |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

GREENBAUM, ROWE, SMITH & DAVIS LLP
Alan S. Naar
99 Wood Avenue South
Iselin, New Jersey 08830
(732) 476-2530

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
James D. Wareham (*pro hac vice*)
James E. Anklam (*pro hac vice*)
801 17th Street, NW
Washington, DC 20006
(202) 639-7000

Samuel P. Groner (*pro hac vice*)
One New York Plaza
New York, New York 10004
(212) 859-8000

*Attorneys for Defendant Perrigo Company plc*

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky (*pro hac vice*)
Aric H. Wu (*pro hac vice*)
Goutam U. Jois
200 Park Ave
New York, New York 10166
(212) 351-4000

*Attorneys for Defendant Joseph Papa*

SULLIVAN & CROMWELL LLP
John L. Hardiman (*pro hac vice pending*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice pending*)
125 Broad Street
New York, New York 10004
(202) 558-4000

*Attorneys for Defendant Judy Brown*

SKOLOFF & WOLFE, PC
Jonathan W. Wolfe
Jane J. Felton
293 Eisenhower Parkway
Livingston, NJ 07039
(973) 232-2988

MILBANK, TWEED, HADLEY, & McCLOY
LLP
Alan J. Stone (*pro hac vice application to be submitted*)
28 Liberty Street
New York, New York 10005
(202) 530-5000

*Attorneys for Defendants Laurie Brlas, Gary M. Cohen, Jacqualyn A. Fouse, Ellen R. Hoffing, Michael Jandernoa, Gerald K. Kunkle, Jr., Herman Morris, Jr., and Donal O'Connor*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

TABLE OF ABBREVIATIONS ................................................................................. x

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND .................................................................................................... 4

ARGUMENT ...................................................................................................... 12

I.     THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER ....................... 13

      A.    Plaintiffs' Stringent Pleading Burden .................................................. 13

      B.    The Complaint Fails to Plead Particularized Facts Giving Rise to a
Strong Inference That Defendants Were Motivated to Defraud
Investors ....................................................................................... 14

            1.    Examination of the Individual Defendants' Motives in
Connection with the Mylan Tender Offer Rebuts All Inferences
of Scienter ............................................................................. 15

            2.    The Increases in Mr. Papa's and Ms. Brown's Stock Holdings
During the Class Period Undermine All Conceivable
Inferences of Fraud ................................................................ 17

      C.    The Complaint Fails to Plead Particularized Facts Giving Rise to a
Strong Inference of Conscious Misbehavior or Recklessness ............... 22

            1.    The Complaint Fails to Adequately Plead Scienter Regarding
Statements and Omissions about Omega ..................................... 22

            2.    The Complaint Fails to Adequately Plead Scienter Regarding
the Tysabri® Royalty Stream Allegations ..................................... 29

            3.    The Complaint Fails to Adequately Plead Scienter Regarding
Statements or Omissions about Organic Growth .......................... 34

            4.    The Complaint Fails to Adequately Plead Scienter Regarding
the Anti-Competitive Pricing Practices Allegations ...................... 35

            5.    The Remaining Allegations Fail to Adequately Plead Scienter ....... 36

      D.    Collectively, the Allegations Fail to Raise an Inference of Scienter ..... 37

      E.    Plaintiffs' Challenges Are Nothing More Than Inactionable
Allegations of Mismanagement ......................................................... 38

i

II.   THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE
      MISSTATEMENT OR OMISSION ...................................................................39

      A.   Plaintiffs Fail to Plead Any False Statement or Omission Regarding
           Omega ...........................................................................................................39

      B.   Statements and Omissions Regarding the Tysabri® Royalty Stream Are
           Inactionable .................................................................................................43

      C.   Plaintiffs Fail To Plead Any False Statement or Omission Regarding
           Historical Organic Growth .........................................................................47

      D.   Plaintiffs Fail To Plead Any False Statement or Omission Regarding
           the Anti-Competitive Pricing Practices Allegations ...............................48

      E.   Forward-Looking Statements Are Protected by the PSLRA's Safe
           Harbors .........................................................................................................52

           1.   The Challenged Statements Are Protected by the First Safe
                Harbor ..................................................................................................52

           2.   The Challenged Statements Are Protected by the Second Safe
                Harbor ..................................................................................................56

III.  THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE
      DISMISSED ............................................................................................................57

IV.   THE CONTROL PERSON CLAIM (COUNT II) MUST BE DISMISSED ...................59

V.    THE ISRAELI LAW CLAIM (COUNT IV) MUST BE DISMISSED ...........................60

CONCLUSION.............................................................................................................60

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Adolor Corp. Sec. Litig.,*
   616 F. Supp. 2d 551 (E.D. Pa. 2009) ........................................................................ *passim*

*Alaska Elec. Pension Fund v. Adecco S.A.,*
   434 F. Supp. 2d 815 (S.D. Cal. 2006), *aff'd*, 256 F. App'x 74 (9th Cir. 2007) ...................23

*In re Amarin Corp. PLC, Sec. Litig.,*
   2015 WL 3954190 (D.N.J. June 29, 2015) (Wolfson, J.) ...................................35, 37

*In re Anadigics, Inc., Sec. Litig.,*
   2011 WL 4594845 (D.N.J. Sept. 30, 2011) (Cooper, J.), *aff'd*, 484 F. App'x
   742 (3d Cir. 2012) ...........................................................................................13, 14

*Andropolis v. Red Robin Gourmet Burgers, Inc.,*
   505 F. Supp. 2d 662 (D. Colo. 2007) ..........................................................................38

*In re AXIS Capital Holdings Ltd., Sec. Litig.,*
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ....................................................................50, 51

*Barnard v. Verizon Comm's, Inc.,*
   451 F. App'x 80 (3d. Cir. 2011) ...................................................................................57

*In re Bausch & Lomb, Inc. Sec. Litig.,*
   592 F. Supp. 2d 323 (W.D.N.Y. 2008) .........................................................................25

*Belmont v. MB Inv. Partners, Inc.,*
   708 F.3d 470 (3d Cir. 2013) ........................................................................................59

*In re Bio-Tech. Gen. Corp. Sec. Litig.,*
   380 F. Supp. 2d 574 (D.N.J. 2005) (Ackerman, J.), *aff'd sub nom.*, *In re*
   *Savient Pharm. Inc. Sec. Litig.*, 283 F. App'x 887 (3d Cir. 2008) ...........................24

*In re Bristol-Myers Squibb Sec. Litig.,*
   312 F. Supp. 2d 549 (S.D.N.Y. 2004) ....................................................................17, 18

*In re Burlington Coat Factory Sec. Litig.,*
   114 F.3d 1410 (3d Cir. 1997) .......................................................................................17

*Burtch v. Milberg Factors, Inc.,*
   662 F.3d 212 (3d Cir. 2011) ........................................................................................49

*California Pub. Emps. Ret. Sys. v. Chubb Corp.,*
   394 F.3d 126 (3d Cir. 2004) ...............................................................................26, 27, 28

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,*
   114 F. Supp. 2d 316 (D.N.J. 2000) (Hochberg, J.) ...................................................56

*In re Citigroup, Inc. Sec. Litig.,*
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).................2, 51

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
   856 F.3d 605 (9th Cir. 2017) ..............................................................37

*City of Edinburgh Council v. Pfizer, Inc.,*
   754 F.3d 159 (3d Cir. 2014)......................................................... *passim*

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014)................................................................3

*City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.,*
   713 F. Supp. 2d 378 (D. Del. 2010).......................................................37

*City of Roseville v. Horizon Lines, Inc.,*
   442 F. App'x 672 (3d Cir. 2011) ..........................................................37

*Dempsey v. Vieau,*
   130 F. Supp. 3d 809 (S.D.N.Y. 2015)......................................................22

*In re Digital Island Sec. Litig.,*
   357 F.3d 322 (3d Cir. 2004)..........................................................12, 13, 14

*In re Discovery Labs. Sec. Litig.,*
   2006 WL 3227767 (E.D. Pa. Nov. 1, 2006) ...............................................21, 45

*Empagran, S.A. v. F. Hoffman-La Roche Ltd.,*
   453 F. Supp. 2d 1 (D.D.C. 2006) .........................................................60

*In re eSpeed, Inc. Sec. Litig.,*
   457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................................18

*Financial Acquisition Partners LP v. Blackwell,*
   440 F.3d 278 (5th Cir. 2006) ............................................................50

*In re First Union Corp. Sec. Litig.,*
   128 F. Supp. 2d 871 (W.D.N.C. 2001) .....................................................21

*Freed v. Universal Health Servs. Inc.,*
   2005 WL 1030195 (E.D. Pa. May 3, 2005)...................................................27

*Galati v. Commerce Bancorp, Inc.,*
   220 F. App'x 97 (3d Cir. 2007) ..........................................................47

iv

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
  1993 WL 130381 (E.D. Pa. April 22, 1993) ..................................................15

*In re Guidant Corp. Sec. Litig.*,
  536 F. Supp. 2d 913 (S.D. Ind. 2008) ..................................................34

*In re Hansen Nat'l Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..................................................31

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
  2009 WL 4798148 (D.N.J. Dec. 7, 2009) (Thompson, J.) ..................................................29

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) (Arleo, J.) ..................................................*passim*

*In re Hertz Global Holdings, Inc., Sec. Litig.*,
  2015 WL 4469143 (D.N.J. July 22, 2015) (Arleo, J.) ..................................................38, 56

*Hoffman v. Authentec, Inc.*,
  2009 WL 3109860 (M.D. Fla. Sept. 24, 2009) ..................................................39

*Hong v. Extreme Networks, Inc.*,
  2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ..................................................32, 40, 41, 42

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ..................................................51

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) (Brown, J.) ..................................................28, 32, 34

*In re Interpool, Inc. Sec. Litig.*,
  2005 WL 2000237 (D.N.J. Aug. 17, 2005) (Chesler, J.) ..................................................2

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ..................................................57

*Kaplan v. Central Bank of Islamic Republic of Iran*,
  961 F. Supp. 2d 185 (D.D.C. 2013) ..................................................60

*Karacand v. Edwards*,
  53 F. Supp. 2d 1236 (D. Utah 1999) ..................................................53

*In re Keryx Biopharm., Inc., Sec. Litig.*,
  2014 WL 585658 (S.D.N.Y. Feb. 14, 2014) ..................................................44

*In re Key Energy Servs., Inc. Sec. Litig.*,
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ..................................................51

*Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*,
   2005 WL 3263865 (D.N.J. Nov. 30, 2005) (Cavanaugh, J.), *aff'd*, 246 F.
   App'x 780 (3d Cir. 2007) .................................................................................56

*LC Capital Master Fund, Ltd. v. James*,
   990 A.2d 435 (Del. Ch. 2010) ..........................................................................21

*In re LeapFrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016) .............................................................40

*Leder v. Shinfeld*,
   2008 WL 2165097 (E.D. Pa. May 22, 2008) ...................................................16

*Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc.*,
   140 F. Supp. 3d 120 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016).............33

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ....................36

*Mauss v. NuVavsive, Inc.*,
   2014 WL 6980441 (S.D. Cal. Dec. 9, 2014) ...................................................50

*In re Medicis Pharm. Corp. Sec. Litig.*,
   689 F. Supp. 2d 1192 (D. Ariz. 2009) ........................................................30, 46

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   164 F. Supp. 3d 568 (S.D.N.Y. 2016)........................................................2, 51

*In re Merck & Co. Sec. Litig.*,
   2012 WL 3779309 (D.N.J. Aug. 29, 2012) (Chesler, J.) ..............................59, 60

*Messner v. USA Techs., Inc.*,
   2016 WL 1466543 (E.D. Pa. Apr. 13, 2016) ...................................................32

*In re Metawave Commc'ns Corp. Sec. Litig.*,
   298 F. Supp. 2d 1056 (W.D. Wash. 2003) .......................................................35

*In re Mirant Corp. Sec. Litig.*,
   2009 WL 48188 (N.D. Ga. Jan. 7, 2009) .....................................................50, 51

*In re NAHC, Inc. Sec. Litig.*,
   306 F.3d 1314 (3d Cir. 2002)......................................................................1, 2, 4

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007) ...........................................................58

*National Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) (Wolfson, J.) ........................................26, 30

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)........................................................15

*OFI Asset Mgmt. v. Cooper Tire & Rubber Co.*,
    834 F.3d 481 (3d Cir. 2016).................................................................52

*P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp.*,
    47 F. Supp. 2d 546 (D.N.J. 1999) (Walls, J.).................................12, 13

*In re Par Pharm. Sec. Litig.*,
    2008 WL 2559362 (D.N.J. June 24, 2008) (Sheridan, J.).....................59

*Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*,
    2009 WL 4250061 (D.N.J. Nov. 25, 2009) (Martini, J.)......................13

*In re PDI Sec. Litig.*,
    2006 WL 3350461 (D.N.J. Nov. 16, 2006) (Brown, J.)......................4, 21

*Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*,
    2017 WL 3085083 (E.D. Wis. Jul. 20, 2017)....................................31

*Phillips v. Harvest Nat. Res., Inc.*,
    2016 WL 4523849 (S.D. Tex. Aug. 25, 2016)..............................29, 31

*In re Pixar Sec. Litig.*,
    450 F. Supp. 2d 1096 (N.D. Cal. 2006).........................................19

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998).............................................15

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of
    Commerce*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010)............................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    2012 WL 1868874 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1051 (9th Cir.
    2014)....................................................................................19

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) (Lechner, J.).........................20, 21, 35

*In re Radian Sec. Litig.*,
    2010 WL 1767195 (E.D. Pa. Apr. 30, 2010)...................................20

*Rahman v. Kid Brands, Inc.*,
    2012 WL 762311 (D.N.J. Mar. 8, 2012) (Linares, J.).......................34, 58

*Rahman v. Kid Brands, Inc.,*
  736 F.3d 237 (3d Cir. 2013)........................................................................15, 29

*In re REMEC Inc. Sec. Litig.,*
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................................................31

*Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.,*
  2013 WL 3087078 (D.N.J. June 14, 2013) (Walls, J.) ....................................58, 59

*Roach v. SCI Graterford Med. Dep't,*
  178 F. App'x 181 (3d Cir. 2006) ...........................................................................60

*Roman y Gordillo, S.C. v. Bank of N.Y. Mellon Corp.,*
  2015 WL 5786460 (S.D.N.Y. Sept. 29, 2015).......................................................60

*In re Sanofi Sec. Litig.,*
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................51

*Santa Fe Industries, Inc.. v. Green,*
  430 U.S. 462 (1977)...............................................................................................1, 38

*Shalala v. Guernsey Mem. Hosp.,*
  514 U.S. 87 (1995).................................................................................................46

*In re Silicon Storage Tech., Inc. Sec. Litig.,*
  2007 WL 760535 (N.D. Cal. Mar. 9, 2007)............................................................50

*In re Sofamor Danek Grp., Inc.,*
  123 F.3d 394 (6th Cir. 1997) .................................................................................47

*Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.,*
  2015 WL 3833849 (M.D. Pa. June 22, 2015).................................................31, 56

*In re Splash Tech. Holdings, Inc. Sec. Litig.,*
  2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .....................................................56

*Steinberg v. Ericsson LM Tel. Co.,*
  2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) .......................................................25

*Superior Offshore Int'l., Inc. v. Bristow Grp. Inc.,*
  738 F. Supp. 2d 505 (D. Del. 2010), *aff'd,* 490 F. App'x 492 (3d Cir. 2012)..................49, 51

*In re Synchronoss Sec. Litig.,*
  705 F. Supp. 2d 367 (D.N.J. 2010) (Brown, J.)........................................... *passim*

*Tabor v. Bodisen Biotech, Inc.,*
  579 F. Supp. 2d 438 (S.D.N.Y. 2008)....................................................................39

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.,*
   2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ..........................................................60

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ................................................................................... *passim*

*In re Tibco Software, Inc.,*
   2006 WL 1469654 (N.D. Cal. May 25, 2006) ......................................................22

*In re Tibco Software, Inc. Sec. Litig.,*
   2006 WL 2844421 (N.D. Cal. Sept. 29, 2006) ...............................................25, 29

*In re U.S. Aggregates, Inc. Sec. Litig.,*
   235 F. Supp. 2d 1063 (N.D. Cal. 2002) ..............................................................33

*Wilson v. Bernstock,*
   195 F. Supp. 2d 619 (D.N.J. 2002) (Irenas, J.) ...............................15, 16, 21, 28

*Winer Family Trust v. Queen,*
   2004 WL 2203709 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir.
   2007) ...........................................................................................................43, 57

*Witriol v. Conexant Sys. Inc.,*
   2006 WL 3511155 (D.N.J. Dec. 04, 2006) (Chesler, J.) ...............................25, 59

*Zucco Partners, LLC v. Digimarc Corp.,*
   445 F. Supp. 2d 1201 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009).................26, 36

## Statutes and Rules

Fed. R. Civ. P. 9(b) ...........................................................................................1, 60

Fed. R. Civ. P. 12(b)(6)...........................................................................................60

H.R. Conf. Rep. No. 104-369 at 46 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 745....................56

Securities Exchange Act of 1934, § 10, 15 U.S.C. § 78j ..................................... *passim*

Securities Exchange Act of 1934, § 14, 15 U.S.C. § 78n ...................................12, 13

Securities Exchange Act of 1934, § 20, 15 U.S.C. § 78t.......................................59, 60

Securities Exchange Act of 1934, § 21D, 15 U.S.C. § 78u-4 *et seq.* ..................... *passim*

Securities Exchange Act of 1934, § 21E, 15 U.S.C. § 78u-5 *et seq* ..................... *passim*

SEC Rule 10b-5, 17 CFR 240.10b-5 ......................................................................12

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| **Perrigo Company plc Exchange Act Filings** | | |
| 12/13/13 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on December 13, 2013 | 2 |
| 2/6/14 10-Q | Perrigo Company plc Quarterly Report for the quarter ending December 28, 2013, filed with the SEC on Form 10-Q on February 6, 2014 | 3 |
| 2/18/14 8-K/A | Perrigo Company plc Current Report, filed with the SEC on Form 8-K/A on February 18, 2014 | 4 |
| 11/12/14 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on November 12, 2014 | 5 |
| 12/22/14 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on December 22, 2014 | 6 |
| 2/5/15 10-Q | Perrigo Company plc Quarterly Report for the quarter ending December 27, 2014, filed with the SEC on Form 10-Q on February 5, 2015. | 7 |
| 3/30/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on March 30, 2015 | 8 |
| 4/9/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 9, 2015 | 9 |

---

\*     The documents listed in this table are attached to the accompanying Declaration of Samuel P. Groner, dated August 21, 2017.

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| 4/21/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 21, 2015 | 10 |
| 4/21/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 21, 2015 | 11 |
| 4/24/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 24, 2015 | 12 |
| 4/29/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 29, 2015 | 13 |
| 4/29/15 10-Q | Perrigo Company plc Quarterly Report for the quarter ending March 28, 2015, filed with the SEC on Form 10-Q on April 29, 2015 | 14 |
| 8/6/15 Schedule 14D-9 | Perrigo Company plc Solicitation/Recommendation Statement, filed with the SEC on Schedule 14D-9 on August 6, 2015 | 15 |
| 8/13/15 10-K | Perrigo Company plc Annual Report for the year ending June 27, 2015, filed with the SEC on Form 10-K on August 13, 2015 | 16 |
| 9/14/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on September 14, 2015 | 17 |
| 9/17/15 Schedule 14D-9 | Perrigo Company plc Solicitation/Recommendation Statement, filed with the SEC on Schedule 14D-9 on September 17, 2015 | 18 |
| 9/25/15 Def.14A | Perrigo Company plc Definitive 14A Proxy Statement, filed with the SEC on September 25, 2015 | 19 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| 10/22/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on October 22, 2015 | 20 |
| 11/10/15 Form 425 | Perrigo Company plc Prospectus Form, filed with the SEC on Form 425 on November 10, 2015 | 21 |
| 11/13/15 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on November 13, 2015 | 22 |
| 2/18/16 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on February 18, 2016 | 23 |
| 2/25/16 10-KT | Perrigo Company plc Annual Report for the year ending December 31, 2015, filed with the SEC on Form 10-KT on February 25, 2016 | 24 |
| 5/16/16 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on May 16, 2016 | 25 |
| 5/16/16 10-Q | Perrigo Company plc Quarterly Report for the quarter ending April 2, 2016, filed with the SEC on Form 10-Q on May 16, 2016 | 26 |
| 8/10/16 10-Q | Perrigo Company plc Quarterly Report for the quarter ending July 2, 2016, filed with the SEC on Form 10-Q on August 10, 2016 | 27 |
| 11/10/16 8-K | Perrigo Company plc Annual Report, filed with the SEC on Form 8-K on November 10, 2016 | 28 |
| 4/25/17 8-K | Perrigo Company plc Current Report, filed with the SEC on Form 8-K on April 25, 2017 | 29 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| 5/22/17 10-K | Perrigo Company plc Annual Report for the year ending December 31, 2016, filed with the SEC on Form 10-K on May 22, 2017 | 30 |
| 5/22/17 10-Q/A | Perrigo Company plc Quarterly Report for the quarter ending July 2, 2016, filed with the SEC on Form 10-Q/A on May 22, 2017 | 31 |
| **Conference Call & Investor Presentation Transcripts** | | |
| 7/29/13 Conf. Call Tr. | Transcript of the Perrigo Company plc conference call to discuss the Perrigo Company plc's acquisition of Elan Corp. plc, dated July 29, 2013 | 32 |
| 11/6/14 Conf. Call Tr. | Transcript of the Perrigo Company plc first quarter 2015 earnings conference call, dated November 6, 2014 | 33 |
| 2/5/15 Conf. Call Tr. | Transcript of the Perrigo Company plc second quarter 2015 earnings conference call, dated February 5, 2015 | 34 |
| 4/21/15 Conf. Call Tr. | Transcript of the Perrigo Company plc fifth quarter 2015 earnings conference call, dated April 21, 2015 | 35 |
| 5/6/15 Conf. Tr. | Transcript of the Joseph Papa and Gregg Gilbert management discussion from the Deutsche Bank Health Care Conference, dated May 6, 2015 | 36 |
| 5/12/15 Conf. Tr. | Transcript of the Joseph Papa and Sumant Kulkarni management discussion from the Bank of America Merrill Lynch Health Care Conference, dated May 12, 2015 | 37 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| 6/2/15 Conf. Tr. | Transcript of the Joseph Papa and David Michel Steinberg management discussion from the Jefferies Global Healthcare Conference, dated June 2, 2015 | 38 |
| 6/2/15 Conf. Call. Tr. | Transcript of the Perrigo Company plc conference call to discuss the Perrigo Company plc's acquisition of OTC Brands Portfolio, dated June 2, 2015 | 39 |
| 6/23/15 Conf. Tr. | Transcript of the Judy Brown and Henry Capellan management discussion from the Oppenheimer Consumer Conference, dated June 23, 2015 | 40 |
| 10/22/15 Conf. Call Tr. | Transcript of the Perrigo Company plc third quarter 2015 earnings conference call, dated October 22, 2015. | 41 |
| 1/5/16 Conf. Tr. | Transcript of the Joseph Papa management discussion from the Goldman Sachs Healthcare CEOs Unscripted Conference, dated January 5, 2016. | 42 |
| 2/18/16 Conf. Call Tr. | Transcript of the Perrigo Company plc fourth quarter 2015 earnings conference call, dated February 18, 2016 | 43 |
| 5/12/16 Conf. Call Tr. | Transcript of the Perrigo Company plc first quarter 2016 earnings conference call, dated May 12, 2016 | 44 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| **Forms 4** | | |
| Papa Forms 4 | Joseph Papa Forms 4, filed with the SEC on April 11, 2013; May 17, 2013; June 18, 2013; July 15, 2013; August 21, 2013; August 26, 2013; August 29, 2013; September 13, 2013; September 26, 2013; December 16, 2013; December 19, 2013; December 20, 2013; January 21, 2014; February 19, 2014; March 26, 2014; August 25, 2014; August 26, 2014; July 1, 2015; August 25, 2015; December 30, 2015; and March 1, 2016 | 45 |
| Brown Forms 4 | Judy Brown Forms 4, filed with the SEC on May 9, 2013; June 6, 2013; August 21, 2013; August 26, 2013; August 27, 2013; September 5, 2013; October 2, 2013; November 22, 2013; December 19, 2013; December 20, 2013; August 25, 2014; August 26, 2014; August 28, 2014; September 3, 2014; October 2, 2014; November 5, 2014; July 1, 2015; August 25, 2015; December 30, 2015; January 8, 2016; February 26, 2016; March 1, 2016; April 14, 2016; August 23, 2016; August 24, 2016; August 30, 2016; September 28, 2016; October 26, 2016; and November 28, 2016 | 46 |
| Brlas Forms 4 | Laurie Brlas Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; May 6, 2016; May 23, 2016; and June 23, 2016 | 47 |
| Cohen Forms 4 | Gary Cohen Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; May 6, 2016; and May 23, 2016 | 48 |
| Coucke Forms 4 | Marc Coucke Form 4, filed with the SEC on March 1, 2016 | 49 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| Fouse Forms 4 | Jacqualyn Fouse Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; and May 6, 2016 | 50 |
| Hoffing Forms 4 | Ellen Hoffing Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; May 6, 2016; and May 23, 2016 | 51 |
| Jandernoa Forms 4 | Michael Jandernoa Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; March 22, 2016; May 6, 2016; May 23, 2016; and November 17, 2016 | 52 |
| Kunkle Forms 4 | Gary Kunkle Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; May 6, 2016; May 23, 2016; and September 13, 2016 | 53 |
| Morris Forms 4 | Herman Morris Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; November 20, 2015; May 6, 2016; May 23, 2016; and September 9, 2016 | 54 |
| O'Connor Forms 4 | Donal O'Connor Forms 4, filed with the SEC on November 6, 2015; November 17, 2015; May 6, 2016; and May 23, 2016; Donal O'Connor Form 4/A filed with the SEC on November 17, 2014 | 55 |
| **Analyst Reports** | | |
| 8/22/16 Guggenheim Report | Analyst report published by Guggenheim Securities LLC, titled *PRGO - BUY - Reducing To The Lowest Common Denominator Doesn't Solve For The Answer*, dated August 22, 2016 | 56 |

| ABBREVIATION | DESCRIPTION | EXHIBIT* |
|---|---|---|
| 9/13/16 Deutsche Bank Report | Analyst report published by Deutsche Bank Securities Inc., titled *Activist has some relevant points*, dated September 13, 2016 | 57 |
| 9/19/16 Barclays Report | Analyst report published by Barclays Capital Inc., titled *Perrigo Co., Plc, Chartering a new course for PRGO?*, dated September 19, 2016 | 58 |
| 9/19/16 J.P. Morgan Report | Analyst report published by J.P. Morgan, titled *Perrigo Company, Takeaways From Mgmt Meetings*, dated September 19, 2016 | 59 |
| 9/19/16 RBC Capital Markets Report | Analyst report published by RBC Capital Markets, titled *Perrigo Company, Detailed analysis of potential value that could be un-locked in a "break up,"* dated September 19, 2016 | 60 |
| **Miscellaneous** | | |
| 2013 Omega Annual Report | The Omega Pharma NV Annual Report for the year ending 2013 | 61 |
| 4/27/16 Valeant 8-K | Valeant Pharmaceuticals International, Inc. Current Report, filed with the SEC on Form 8-K on April 27, 2016. | 62 |
| 9/12/16 Letter | 9/12/16 letter from Starboard Value LP to Perrigo Company plc | 63 |
| 11/9/16 Mylan 10-Q | Mylan N.V. Quarterly Report for the quarter ending September 30, 2016, filed with the SEC on Form 10-Q on November 9, 2016 | 64 |
| 12/21/16 Aceto 8-K | Aceto Corporation Current Report, filed with the SEC on Form 8-K on December 21, 2016 | 65 |

## PRELIMINARY STATEMENT

To adequately allege a securities fraud claim, a complaint must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Complaint[1] in this case falls far short of those stringent pleading requirements and instead aims—impermissibly—to dress up allegations of corporate mismanagement in securities fraud garb, in violation of the Supreme Court's directive in *Santa Fe Industries, Inc.. v. Green*, 430 U.S. 462, 478-79 (1977). Plaintiffs' core allegations are that management of Perrigo Company plc ("Perrigo" or the "Company"), a leading global over-the-counter consumer goods and specialty pharmaceutical company, (i) was ineffective at integrating a company it had acquired, Omega Pharma NV ("Omega"); (ii) was too optimistic about its growth prospects; and (iii) improperly accounted for a royalty stream for the multiple sclerosis drug Tysabri® it acquired as part of a transaction with Elan Corporation plc ("Elan"). None of these allegations are sufficient to state a claim against Perrigo or any Individual Defendant.

Plaintiffs do not point to any well-pleaded facts suggesting that any challenged statement or omission was misleading "at the time it was made . . . ." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Defendants' statements about the integration of Omega made clear that it would be a multi-year process that might prove unsuccessful; their statements about Perrigo's historical organic growth rates are not alleged to be inaccurate; and their statements about Perrigo's potential future organic growth rates are protected by the PSLRA's "safe harbors" for forward-looking statements.

Rather than plead contemporaneous facts suggesting that Perrigo's statements were false when made, Plaintiffs impermissibly attempt to rely on events that occurred after the challenged

---

[1] The term "Complaint" refers to the Amended Complaint, dated June 21, 2017 (Dkt. 89). Citations to paragraphs ("¶") are to paragraphs of the Complaint.

statements.  As the Third Circuit made clear in affirming the dismissal of a securities fraud

complaint, "liability cannot be imposed on the basis of subsequent events." *Id.*  Thus, neither the

impairment of assets acquired from Omega nor Perrigo's restatement to adjust how it accounted

for the Tysabri® royalty stream is sufficient to plead securities fraud.  *See In re Hertz Glob.*

*Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *8-12 (D.N.J. Apr. 27, 2017) (Arleo, J.)

(dismissing securities fraud claim and explaining that impairment charges do not mean prior

financial statements were false); *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *14-15

(D.N.J. Aug. 17, 2005) (Chesler, J.) (mere existence of an accounting restatement is insufficient

to state a securities fraud claim).

     Nor is it sufficient for Plaintiffs to speculate, with hindsight, that the management

practices related to the impairment and restatement were fraudulent.  "The securities laws were

not designed to provide an umbrella cause of action for the review of management practices, nor

is 'fraud by hindsight' a viable basis upon which to challenge management practices that

ultimately result in losses." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y.

2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).

     Plaintiffs also fail to plead a claim based on the Company's recent disclosure that the

Department of Justice ("DOJ") Antitrust Division executed search warrants at the Company's

corporate offices as part of an industry-wide probe.  Plaintiffs allege that Perrigo failed to

disclose its supposedly collusive activities, but the Complaint contains no well-pleaded facts

suggesting that Perrigo was involved in any such activities.  Perrigo's supposed failure to admit

(non-existent) wrongdoing was not misleading as a matter of law.  *See Menaldi v. Och-Ziff*

*Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("When a securities fraud

action rests on the failure to disclose uncharged illegal conduct, the complaint must state a

plausible claim that the underlying conduct occurred."). Although the DOJ has brought charges against other drug manufacturers, neither the DOJ nor any other government agency has brought civil or criminal charges against Perrigo or any Perrigo employee. Nor has the DOJ indicated it intends to bring any such charges. Even if wrongdoing were to exist, it is well established that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014).

Ultimately, the crux of any securities fraud claim is the intent to defraud, commonly referred to as scienter. The PSLRA mandates dismissal of a securities fraud complaint unless it pleads particularized facts giving rise to a "strong inference of scienter." This mandate requires courts to weigh competing inferences from the well-pleaded facts and the matters subject to judicial notice and to determine whether the inference that the defendants acted with scienter is both "cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 323 (2007).[2]

Here, the Complaint fails to plead facts giving rise to any inference—much less the requisite "strong inference"—of fraudulent intent. Not a single internal document reviewed by any Individual Defendant is cited in support of Plaintiffs' allegations, nor is a single source (unnamed or otherwise) identified who claims to have seen or heard anything communicated to, or by, any Individual Defendant suggesting they knowingly or recklessly made misleading statements. Indeed, the Complaint contains no allegations that any witness ever met with, spoke to, or had any contact with any Individual Defendant.

Nor do Plaintiffs plead facts that would provide a plausible rationale for why Defendants would have defrauded investors. Rather, Plaintiffs speculate that Defendants made the alleged

---

[2]     Unless otherwise noted, emphasis is added and citations are omitted throughout.

3

misstatements and omissions to "discourage Perrigo shareholders from accepting Mylan's [tender] offer" to acquire Perrigo. ¶ 1. Plaintiffs' speculation ignores the fact that Perrigo's executives would have profited far more handsomely had the Mylan tender offer been successful. As this District has explained, executives do not defraud investors "for the sheer joy of it rather than for profit." *In re PDI Sec. Litig.*, 2006 WL 3350461, at *16 (D.N.J. Nov. 16, 2006) (Brown, J.). Moreover, rather than engage in unusual stock sales, the Individual Defendants' stock holdings *increased* during the Class Period,[3] a fact that "raises a compelling inference *against* scienter." *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 572-73 (E.D. Pa. 2009).

## BACKGROUND[4]

***The Company***. Perrigo is the world's largest manufacturer of over-the-counter healthcare products and supplier of infant formulas for the store brand market. 5/22/17 10-K at 3. A predecessor to Perrigo operated as a U.S. company until 2013, when it combined with an Irish entity, Elan, and became Perrigo Company plc. 12/13/13 8-K, Ex. 99.1 at 1. Perrigo provides products across a wide variety of categories and geographies, primarily in North America, Europe and Australia, but also in Israel and China. 5/22/17 10-K at 3.

***The 11 Individual Defendants***. Joseph Papa served as Perrigo's President and CEO until April 25, 2016; Judy Brown was Perrigo's CFO from July 2006 until February 27, 2017; Laurie Brlas is the Chair of Perrigo's Board of Directors (the "Board") and has served on the Board since 2003 and as Chair since April 2016; Gary Cohen has served on the Board since January

---

[3]     The term "Class Period" refers to the period between April 21, 2015, and May 3, 2017, the putative class period alleged in the Complaint.

[4]     This Background is drawn from documents that may be considered on this motion, including: (i) the Complaint and documents referenced therein, (ii) the Company's SEC filings, and (iii) other published, historical information of which the Court may take judicial notice. *See Tellabs*, 551 U.S. at 322 (court "must consider" documents "incorporated into the complaint by reference" and "matters of which a court may take judicial notice"); *NAHC*, 306 F.3d at 1331.

2003; Marc Coucke was the co-founder, Chairman and CEO of Omega, served on the Board between November 2015 and April 2016, and served as the Executive Vice President and General Manager of Perrigo's Brand Healthcare ("BCH") division, which contained the Omega business, from the closing of the Omega acquisition until his resignation in April 2016; Jacqualyn Fouse, Ph.D. served on the Board from November 2012 until April 2016; Ellen Hoffing served on the Board from July 2008 until May 2, 2017; Michael Jandernoa served on the Board from January 1981 until February 2017; Gerald Kunkle served on the Board from October 2002 until February 2017; Herman Morris, Jr. served on the Board from December 1999 until February 2017; and Donal O'Connor has served on the Board since November 2014. ¶¶ 32-42.[5]

*The Tysabri® Royalty Stream*.  In December 2013, as part of the Elan transaction, Perrigo acquired assets that included a royalty stream for Tysabri®.  Tysabri® is a multiple sclerosis drug owned by another pharmaceutical company, Biogen Inc., which is responsible for marketing and selling Tysabri®.  2/6/14 10-Q at 41; 5/12/16 Conf. Call Tr. at 11.  Following the Elan transaction, Perrigo accounted for the Tysabri® royalty stream as an intangible asset within a separate reporting unit known as "Specialty Sciences" and disclosed that the asset was being amortized over 20 years.  2/18/14 8-K/A, Ex. 99.4 at 11; 2/6/14 10-Q at 9-10; ¶ 48; 5/16/16 10-Q at 36.  Ernst & Young ("EY"), the Company's auditor, issued unqualified audit opinions for each of three financial reporting periods—the fiscal year ended June 28, 2014; the fiscal year ended June 27, 2015; and the stub period ended December 31, 2015—in which the Tysabri® royalty stream was classified as an intangible asset.  4/25/17 8-K at 2-4.[6]

---

[5]     Defendants Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, O'Connor, and Papa are collectively referred to as the "Director Defendants."  Together with Ms. Brown and Mr. Coucke, the Director Defendants comprise the "Individual Defendants."

[6]     In December 2014, Perrigo announced it would change its fiscal year end from June to December.  The change was implemented in 2015, with a fiscal year ending June 2015 and a

*Perrigo Acquires Omega*.  On November 6, 2014, Perrigo entered into an agreement for the purchase of Omega, and the transaction closed on March 30, 2015.  Perrigo paid approximately €3.8 billion.  11/12/14 8-K, Ex. 99.1 at 1; 3/30/15 8-K, Ex. 99.1 at 1.  While Perrigo expressed optimism about its prospects in light of the acquisition, it also made clear to investors that potential obstacles abounded.  In particular, Perrigo disclosed the risks associated with integrating Omega, as the Omega acquisition represented a major shift in its business both geographically and operationally.  Perrigo made clear that it might not realize the benefits of the acquisition and that the expected synergies might never materialize, which could in turn have a material adverse effect on its operating results.  8/13/15 10-K at 23-24.  Perrigo repeatedly reiterated these clear and specific warnings to investors.  2/5/15 10-Q at 43-44; 4/29/15 10-Q at 45-46; 2/25/16 10-KT at 24-25.  Mr. Papa and Ms. Brown also stressed that it would take up to four years for synergies from the Omega acquisition to emerge.  11/6/14 Conf. Call Tr. at 11-12; 2/5/15 Conf. Call Tr. at 10-11.

*Perrigo's Organic Growth*.  Following the Omega acquisition, Perrigo began to take Omega's profitability into account in projecting its future organic growth and did so responsibly. Historically, the Company provided to the market rolling three-year organic-only compound annual growth rates.  2/5/15 Conf. Call Tr. at 7; 4/21/15 Conf. Call Tr. at 4.  For example, in 2015, the Company disclosed that, for the three-year period between 2011 and 2014, the Company's organic net sales grew by a compound annual growth rate of 7%.  4/21/15 8-K, Ex. 99.2 at 9.  Before the Omega acquisition, Perrigo "[had] a proven history of meeting [its] rolling three-year organic-only compound annual growth rate goals."  4/21/15 Conf. Call Tr. at 4; *see also* 8/6/15 Schedule 14D-9, Ex. 99.1 at 26 (stating that Perrigo had a "[p]roven history of

---

stub period ending December 2015.  12/22/14 8-K at Item 5.03; 2/25/16 10-KT at 1-2.

delivering growth" insofar as, between 2008 and 2015, it experienced a 15% compound annual growth rate of sales and a 28% compound annual growth rate of adjusted operating income).

Taking into account these historical growth rates and its assumption that synergies arising from the Omega acquisition would drive further growth, the Company set a "three-year compound annual growth rate [CAGR] goal" of 5-10% for consolidated organic net sales for calendar years 2014 to 2017.  4/21/15 8-K, Ex. 99.1 at 1; 4/21/15 8-K, Ex. 99.2 at 9; 4/21/15 Conf. Call Tr. at 7 ("We do believe that there are revenue synergies with the product portfolio that we have at Perrigo as we bring the 3,000 Perrigo products and help to bring them to Omega and look for ways that we could do line extensions of existing Omega brands. . . . We do believe that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate.").  That goal was consistent with Perrigo's historical performance during the prior three-year period.  4/21/15 8-K, Ex. 99.2 at 9; *see also* 9/17/15 Schedule 14D-9 at i ("We are confident in our 5-10% three-year organic revenue CAGR goal, as executed historically . . . .").

***Mylan's Failed Hostile Tender Offer for Perrigo***.  In early April 2015 and immediately following the closing of the Omega acquisition, Perrigo received an unsolicited, indicative proposal from Mylan, N.V. ("Mylan") to purchase Perrigo for a combination of cash and Mylan stock.  4/9/15 8-K at Item 8.01.  According to Mylan, the proposal was worth $205 per Perrigo share.  4/24/15 8-K, Ex. 99.1.  Perrigo's Board rejected the proposal because, in its view, Mylan "significantly undervalued the Company and its future growth prospects" and the potential acquisition "was not in the best interests of Perrigo's shareholders."  *Id.*

Following the Board's rejection of Mylan's proposal, Mylan announced its intention to launch a hostile tender offer.  ¶ 103; 4/24/15 8-K, Ex. 99.1 at 1.  Mylan revised its offer several times, eventually settling in late April 2015 on a mixture of $75 per share in cash and 2.3 Mylan

ordinary shares for each ordinary Perrigo share. 4/29/15 8-K, Ex. 99.1 at 1. Mylan formally

launched its tender offer on September 14, 2015. 9/14/15 8-K, Ex. 99.2 at 1. Mylan valued its

offer at approximately $179 per Perrigo share. 11/10/15 Form 425 at 1. Throughout the tender

process, Perrigo's Board and management continued to recommend the rejection of the proposal,

in part because the Board and management believed that Mylan's share price (a key factor in

valuing Mylan's offer) was overpriced.[7] On November 13, 2015, less than 50% of the holders of

Perrigo's shares tendered, and the tender offer failed. 11/13/15 8-K, Ex. 99.1 at 1.

 ***Perrigo's Share Buyback***.  On October 22, 2015, Perrigo announced that it was planning

to repurchase $500 million of its shares by the end of 2015 and expected to repurchase an

additional $1.5 billion of shares during the subsequent 24-36 months. 10/22/15 8-K, Ex. 99.2 at

1-2. In accord with those plans, during the last three months of 2015, Perrigo repurchased shares

totaling $500 million. 2/25/16 10-KT at 42.

 ***Impairment***.  During the Company's impairment testing for the stub period ended

December 31, 2015, the Company identified an impairment of certain indefinite-lived intangible

assets, acquired in conjunction with the Omega acquisition, based on management's expectations

for future revenues, profits and cash flows associated with these assets.  The impairment related

to the Company's conclusion that some of the intangible assets acquired from Omega were not

worth as much as originally calculated. 2/18/16 Conf. Call Tr. at 3-4.[8] The assessment resulted

---

[7] The Complaint asserts that Mylan's offers in late April 2015 gave Perrigo shareholders the opportunity to sell each Perrigo share for $227-$246, based on closing prices of $74.50-$76.06 for the Mylan shares that Perrigo shareholders would have received when Mylan first proposed the transaction. ¶¶ 92, 103, 104.  By the time Mylan formally launched its tender offer in September 2015, Mylan's shares had lost approximately one-third of their value—declining to less than $50.  Although in September 2015 Mylan's offer remained $75 in cash and 2.3 Mylan shares for each Perrigo share, the value of Mylan's offer was significantly lower, as Mylan conceded, and was worth at most about $179 per Perrigo share. 11/10/15 Form 425 at 1.

[8] Although "the fair value of other acquired intangibles improved," those "increases [we]re

in an impairment charge of $185 million, which Perrigo disclosed to its shareholders on February 18, 2016. 2/18/16 8-K, Ex. 99.1 at 4-5; 2/25/16 10-KT at 34-35. Perrigo announced additional impairments in May, August, and November of 2016 due to, among other things, a decline in Omega's short-term performance expectations and a reduction in Omega's long range revenue growth forecast, as well as additional goodwill impairments that impacted Omega's operations in nearly every geographical area in which it operated. 5/16/16 8-K, Ex. 99.1 at 7-8; 8/10/16 10-Q at 14-15; 11/10/16 8-K, Ex. 99.1 at 7-8.

*Revisions to Tysabri® Accounting.* In 2017, the Company changed its accounting treatment for the Tysabri® royalty stream. Following the Company's 2016 year-end financial statement close process, in connection with discussions of a potential sale of the Tysabri® royalty rights, EY notified Perrigo that it was reevaluating the historical accounting treatment of the Tysabri® royalty stream. 4/25/17 8-K at 3. After an extensive evaluation, it was determined that the Tysabri® royalty stream should be recorded in the Company's financial statements as a financial asset rather than an as an intangible asset. 5/22/17 10-K at 3-4.

Once that judgment was made, Perrigo issued an 8-K announcing to shareholders the withdrawal of its prior issued audited financial statements and Perrigo issued restated financial statements for FY 2014, FY 2015, and the stub period 2015. 4/25/17 8-K at 2-4; 5/22/17 10-K at 3-4; 5/22/17 10-Q/A at 2. As part of the restatement, Perrigo removed the Tysabri® royalty stream from the category of net sales in its Consolidated Statements of Operations; removed the amortization expense associated with recording the Tysabri® royalty stream as an intangible asset; and included the quarterly changes in fair value of the asset as a component of other non-operating income/expense. 5/22/17 10-K at 3-4, 112-13. In addition, the cash payments Perrigo

---

not recognized under accounting rules." 2/18/16 Conf. Call Tr. at 3-4.

received from the royalty stream were characterized in the restated financial statements as cash from investment rather than as cash from operations. *Id.*

**Antitrust Investigation**. On May 2, 2017, search warrants were executed at Perrigo facilities and other locations in connection with a DOJ Antitrust Division investigation relating to drug pricing in the generics pharmaceutical industry. 5/22/17 10-K at 44-45. The DOJ has been investigating pricing and sales within the U.S.-based generic pharmaceutical manufacturing industry since at least 2014, and has used the raid tactic at several pharmaceutical companies. *E.g.*, 11/9/16 Mylan 10-Q at 58; 12/21/16 Aceto 8-K, Ex. 99.5 at 16. No civil or criminal charges have been brought against Perrigo or any of its employees by any government agency in connection with any antitrust investigations. Nor has the DOJ accused Perrigo of wrongdoing.

**The Complaint**. On June 21, 2017, Plaintiffs filed the Complaint, which alleges that Defendants made material misstatements or omissions during the Class Period about "four key areas": (i) the Omega integration; (ii) the Tysabri® royalty stream; (iii) Perrigo's organic growth; and (iv) allegedly "collusive" pricing in connection with Perrigo's generic drugs division. ¶ 1.

*Omega Integration*. Plaintiffs allege that "Defendants touted synergies with Omega as central to Perrigo's growth claims, even though [Mr.] Papa, [Ms.] Brown and [Mr.] Coucke knew that there were deep problems with the Omega integration and the underlying assets . . . ." ¶ 5. The Complaint points to the following supposed "problems": "(a) a decentralized structure, disparate information technologies ('IT') and management resistance at Omega that made integration difficult; (b) regulatory hurdles to achieving claimed synergies; and (c) weakening sales in many of Omega's key markets, including Spain, Belgium, Italy and Turkey." *Id.* Plaintiffs further assert that these problems were "concealed" and were "so profound that the Company ultimately had to take impairment charges totaling more than $2 billion, or nearly half

of the total purchase price for Omega." *Id.* The Complaint points to statements such as Ms. Brown's statement in June 2015 that Perrigo was "in line" with its planned Omega integration process (¶¶ 139-40) and Mr. Papa's statement in August 2015 that Perrigo had "delivered on [its] Omega integration plans" (¶¶ 141-42) and asserts that those statements were misleading in light of the Individual Defendants' alleged awareness of the aforementioned problems with the Omega integration and with the underlying assets acquired from Omega.

*Tysabri® Royalty Stream*. Plaintiffs allege that Defendants "falsely presented an inflated value" for the Tysabri® royalty stream by accounting for it as an intangible asset rather than as a financial asset. ¶¶ 7, 122, 123. According to Plaintiffs, Defendants intentionally accounted for the Tysabri® royalty stream as an intangible asset rather than as a financial asset because that classification would prevent the Company from needing to record changes to the fair value of the Tysabri® royalty stream on a quarterly basis and thereby supposedly "hide billions of dollars in deterioration from investors." ¶ 7.

*Organic Growth*. Plaintiffs assert that Defendants "misleadingly claimed 7%-8% average historical growth" but failed to disclose that organic growth "had slowed to a trickle during the six quarters prior to the Class Period, and was even negative during some of those periods." ¶ 2. Plaintiffs also allege that Defendants' profit forecasts were "aggressive and unrealistic" because they allegedly "assumed an organic growth rate far higher than the Company had recently been able to achieve, assumed success in achieving Omega synergies despite knowledge of deep problems with the integration, and assumed that Perrigo could continue the collusive price hikes driving profits in its Generic Rx division even as generic drug pricing came under increased scrutiny." ¶ 4.

Supposedly "Collusive" Pricing. The Complaint alleges that Defendants "hid the fact

11

that results in Perrigo's most profitable division, Generic Rx, were significantly inflated by illegal price-fixing." ¶ 6. According to Plaintiffs, "[i]nstead of engaging in price competition that usually drives generic drug prices relentlessly downward toward the cost of production, Perrigo and other generics manufacturers colluded to raise contemporaneously prices for many generic products by 300%-500% or more." *Id.* Perrigo manufactures hundreds of generic pharmaceutical products; Plaintiffs allege that Perrigo engaged in anti-competitive practices by raising the prices of six products. ¶¶ 66-91. These supposed "price hikes" allegedly "allowed Perrigo to reap hundreds of millions of dollars in collusive revenues." ¶ 6. Plaintiffs assert that Defendants statements about its pricing strategy were misleading for failure to disclose the supposed collusion. ¶¶ 176-204.

**ARGUMENT**

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). The elements of a claim under Section 14(e) of the Exchange Act are "virtually identical." *P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp.*, 47 F. Supp. 2d 546, 560-61 (D.N.J. 1999) (Walls, J.); *see also In re Digital Island Sec. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004) (holding that "scienter is an element of a Section 14(e) claim" and explaining that "Section 14(e) is modeled on the antifraud provisions of § 10(b) of the [Exchange] Act and Rule 10b-5 . . ., which require proof of scienter").[9] Claims of securities fraud are also subject to the

---

[9]      In light of the statutory requirement that Section 14(e) claims must arise from material

12

PSLRA's heightened pleading standards, as explicated in the Supreme Court's *Tellabs* decision.

## I.   THE COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

To state a claim for securities fraud, plaintiffs must plead with particularity that each defendant acted with scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 313, 319; *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, 2009 WL 4250061, at *7 (D.N.J. Nov. 25, 2009) (Martini, J.).   Plaintiffs' scienter allegations fail.

### A.   Plaintiffs' Stringent Pleading Burden

The PSLRA requires securities fraud complaints to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind[,]" *i.e.*, scienter. *Hertz*, 2017 WL 1536223, at *15.  In making that determination, courts "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324.  "In this regard, the PSLRA alters the normal operation of inferences under Rule 12(b)(6), which requires that all reasonable inferences be construed in a light most favorable to plaintiffs." *Adolor*, 616 F. Supp. 2d at 564.

In the Third Circuit, "[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud." *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011) (Cooper, J.), *aff'd*, 484 F. App'x 742 (3d Cir. 2012). The term "recklessness" in this context means an "extreme departure from the standards of ordinary care," thereby presenting a danger of misleading investors that is "either known to [the] defendant or is so obvious that the [defendant] must have been aware of it." *Digital Island*, 357

---

misstatements or omissions made in connection with a tender offer (*see P. Schoenfeld*, 47 F. Supp. 2d at 560-61), alleged misstatements or omissions before April 8, 2015 (the date Mylan announced its intention to commence a tender offer) or after November 13, 2015 (the date the tender offer failed) cannot support the Section 14(e) claim.

F.3d at 332. A misrepresentation must be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception." *Id.* Regardless of the pleading method used, scienter allegations must be "*cogent and at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Stated differently, "an inference of scienter [must be] *at least as likely* as any plausible opposing inference." *Id.* at 328-29 (emphasis in original). These standards ensure that years of expensive and harmful litigation do not spew from every adverse corporate development.

Here, the Complaint lacks well-pleaded allegations giving rise to any inference that any Defendant acted with scienter.

**B.    The Complaint Fails to Plead Particularized Facts Giving Rise to a Strong Inference That Defendants Were Motivated to Defraud Investors**

"Motive" allegations are not considered in isolation because "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Tellabs*, 551 U.S. at 325. Moreover, "[a]fter *Tellabs*, . . . evidence of motive and opportunity is no longer an independent means of establishing scienter absent evidence of facts from which to infer defendants' knowing deceit or recklessness." *Anadigics*, 2011 WL 4594845, at \*32. Rather, "[t]he required state of mind is 'either reckless or conscious' behavior, which may be bolstered—but not shown solely—by allegations tending to show that defendants had the motive and opportunity to commit fraud." *Id.* at 14.

Here, Plaintiffs fabricate two supposed motives for the alleged fraud: (i) the Individual Defendants' desire to "discourage Perrigo investors from tendering shares to Mylan" and (ii) Mr. Papa's and Ms. Brown's supposed personal enrichment from allegedly "large and irregular insider [stock] sales." ¶¶ 4, 23, 272. But the facts underlying these allegations undermine, rather than bolster, any suggestion that the Individual Defendants had a motive to defraud investors.

14

*See Adolor*, 616 F. Supp. 2d at 572 ("absence of motive" was "significant").

> 1.     Examination of the Individual Defendants' Motives in Connection
>        with the Mylan Tender Offer Rebuts All Inferences of Scienter

Plaintiffs allege that Defendants' alleged misrepresentations and omissions were made

"[t]o discourage Perrigo shareholders from accepting Mylan's offer . . . ." ¶ 1.  However, that

motive does not contribute to an inference of scienter because it does not suggest any "concrete

and *personal* benefit to the individual defendants resulting from th[e] fraud[,]" as opposed to the

types of "motives that are generally possessed by most corporate directors and officers" that "do

not suffice." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245-46 (3d Cir. 2013).  Insofar as

"[m]ost, if not all publicly traded companies are interested in . . . avoiding hostile takeovers," the

allegation that executives sought "to avoid a hostile takeover[] falls woefully short of

demonstrating scienter under federal securities law." *In re Goodyear Tire & Rubber Co. Sec.*

*Litig.*, 1993 WL 130381, at *16 (E.D. Pa. April 22, 1993); *see also Plevy v. Haggerty*, 38 F.

Supp. 2d 816, 833 (C.D. Cal. 1998) (rejecting motive to "raise the price of [company] stock to

prevent a takeover" as "insufficient as a matter of law" to plead scienter).

Like other "allegations of scienter based on generalized theories of motive which are

widely held by corporations and their executives[,]" such as the desire "to increase performance-

based executive compensation or prolong the benefits of holding corporate office[,]" the desire to

fend off Mylan's tender offer is "not a sufficient motive for fraud for purposes of inferring

scienter." *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 634 (D.N.J. 2002) (Irenas, J.); *see also In*

*re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 296, 297, 304 n.24 (S.D.N.Y. 2009)

(rejecting the argument that the motive behind the supposed fraud was "to inflate [the

company]'s stock price to fend off [a] hostile takeover bid" because, although "[s]uch a motive

. . . could be understood as the desire to preserve one's career and compensation," desires of that

type are "insufficiently concrete and personal to qualify as a motive supporting the inference of scienter."); *Adolor*, 616 F. Supp. 2d at 573 n.21 ("[T]he allegation that the defendants artificially inflated [the company's] stock price in order to protect and enhance their executive positions . . . fail[s] to give rise to a strong inference of scienter. This motive has been rejected routinely.").

In fact, had Mr. Papa and Ms. Brown been interested in pursuing personal profits, they should have been in favor of the Mylan tender offer. The Company disclosed in September 2015 that, in the event of a change of control (as would have occurred had Mylan's tender offer been successful), Mr. Papa would have received over $30 million (taking into account his severance, stock, and stock options), and Ms. Brown would have received over $8 million. 9/25/15 Def. 14A at 35. "To find scienter under these circumstances is to assume that the Defendants intentionally defrauded the Plaintiffs to their own ultimate detriment. . . . As the Third Circuit noted, fraud without motive 'makes little economic sense.'" *Leder v. Shinfeld*, 2008 WL 2165097, at *6 (E.D. Pa. May 22, 2008) (quoting *Digital Island*, 357 F.3d at 331).

Plaintiffs cite the bonuses Mr. Papa and Ms. Brown received after the failure of the offer (of $2 million and $750,000, respectively) as supposed motives for fraud (¶¶ 113, 257), but the amounts of those bonuses pale in comparison to the potential profit each would have made had Perrigo agreed to Mylan's offer. In any event, Plaintiffs do not plead facts suggesting that Mr. Papa or Ms. Brown was aware, at the time they made the challenged statements in connection with the tender offer, that they might receive a bonus following the failure of the offer.

Moreover, "[i]ncentive compensation in the form of stock options and performance-based bonuses is very common. . . . [C]ourts have uniformly held that incentive compensation alone cannot provide a sufficient basis on which to support allegations of" scienter. *Wilson*, 195 F. Supp. 2d at 636. Indeed, in light of the ubiquity of performance awards as a method of

16

compensation for executives of public companies, "if performance-based compensation were a sufficient predicate for fraud, then virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004).

        2.     The Increases in Mr. Papa's and Ms. Brown's Stock Holdings During the Class Period Undermine All Conceivable Inferences of Fraud

Plaintiffs allege that Mr. Papa's and Ms. Brown's sales of 10,183 and 41,669 shares of Perrigo stock, respectively, were "large and irregular" and "further support an inference of scienter." ¶ 272.[10] In fact, though, analysis of these stock trades in the context of Mr. Papa's and Ms. Brown's stock trading history and practices establishes that neither the scope nor timing of these stock trades was unusual. Moreover, the supposed stock trading motive provides no explanation for why the other nine Individual Defendants would have been involved in the supposedly fraudulent scheme since not one of them are alleged to have traded in the Company's stock.

***The Stock Sales Were Not Suspicious.*** Plaintiffs point to stock sales by Mr. Papa and Ms. Brown but neglect to mention that many of those stock sales were accompanied by contemporaneous exercises of stock options in either the exact same amount, or greater amounts, on the exact same day.[11] Sales under those circumstances are hardly suspicious. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) ("A large number of

---

[10]    Paragraph 272 actually lists two different figures for the number of shares Ms. Brown sold during the Class Period: the text lists 33,289 shares, while the accompanying chart lists 41,669 shares. Review of Forms 4 shows that Ms. Brown sold 41,669 shares (excluding shares sold to pay tax liability). However, Plaintiffs' use of that figure is misleading because, as discussed below, it ignores that Ms. Brown's net stock ownership actually increased during the Class Period.

[11]    Papa Form 4 dated December 30, 2015; Brown Forms 4 dated January 8, 2016, February 26, 2016, and April 14, 2016.

today's corporate executives are compensated in terms of stock and stock options . . . . It follows then that these individuals will trade those securities in the normal course of events.").

In fact, both Mr. Papa's and Ms. Brown's net stock ownership *actually increased* during the Class Period: Mr. Papa owned 107,925 shares at the start of the Class Period and 118,515 shares when he left the Company in April 2016 to become CEO of Valeant Pharmaceuticals International Inc. ("Valeant"), and Ms. Brown owned 7,445 shares at the start of the Class Period and 10,007 shares on February 27, 2017, when she announced she was leaving the Company and taking a senior executive position at Amgen Inc. ("Amgen").[12] Unsurprisingly, "dozens of cases dismiss[] complaints on scienter grounds where . . . motive allegations were undermined by increases in total holdings." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 290 n.182 (S.D.N.Y. 2006). That is because where defendants "actually increased their holdings incrementally throughout the Class Period . . . [s]uch conduct raises a compelling inference *against* scienter." *Adolor*, 616 F. Supp. 2d at 572-73; *Bristol-Myers*, 312 F. Supp. 2d at 561 (noting that increase in defendants' stock holdings during class period was "wholly inconsistent with fraudulent intent").

Nor were Mr. Papa's or Ms. Brown's stock sales unusual compared to their pre-Class Period trading. The putative Class Period is 25 months long. Plaintiffs' misleadingly compare Mr. Papa's and Ms. Brown's Class Period stock trading to their trading in the 12 months prior to the Class Period (¶ 272) rather than to their trading in the 25 months prior to the Class Period. Looking at the 25-month pre-Class Period timeframe, and applying Plaintiffs' methodology of examining only sales, Mr. Papa and Ms. Brown sold greater or comparable amounts of Perrigo

---

[12]     Papa Forms 4 dated July 1, 2015 through March 1, 2016 (Mr. Papa's final Form 4 before he left the Company); Brown Forms 4 dated July 1, 2015 through November 28, 2016 (Ms. Brown's final Form 4 before she left the Company).

stock *prior to* the Class Period than they did during the Class Period.[13]   Those facts undercut all inferences of scienter. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at \*22 (N.D. Cal. May 22, 2012) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of [the] stock during the class period."), *aff'd*, 759 F.3d 1051 (9th Cir. 2014); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104-05 (N.D. Cal. 2006) (sale by insider of 150,000 shares during five month class period was not unusual because not "dramatically out of line with . . . prior trading practices," where insider sold 100,000 shares in the two quarters before the class period).

By retaining large Perrigo stock holdings, Mr. Papa and Ms. Brown were betting their own money on the future prospects of Perrigo.   Not only does this behavior negate any inference of scienter, it affirmatively establishes their good faith. *See Adolor*, 616 F. Supp. 2d at 572-73.

***The Stock Trading of the Other Nine Individual Defendants Further Negates Any Inference of Scienter***.   The Complaint does not allege any stock sales by the other nine Individual Defendants, which further undercuts any scienter argument on the basis of stock sales. *See Hertz*, 2017 WL 1536223, at \*22 (where plaintiff named five individuals as defendants but alleged that stock trading by only two of them was suspicious, failure to "make [any] mention of [the other defendants'] trading during the class period . . . cast[] doubt on their theory at the outset").   In fact, as demonstrated in the chart below, each of the Individual Defendants either did not trade Perrigo stock during the Class Period or increased his or her stock holdings, and,

---

[13]   *Compare* Papa Forms 4 dated April 11, 2013 through August 26, 2014 (showing sales of 152,832 shares) *with* Papa Forms 4 dated July 1, 2015 through March 1, 2016 (showing sales of 23,457 shares); *compare* Brown Forms 4 dated May 9, 2013 through November 5, 2014 (showing sales of 48,641 shares) *with* Brown Forms 4 dated July 1, 2015 through November 28, 2016 (showing sales of 50,673 shares).

collectively, they increased their aggregate stock holdings during the Class Period.[14]

| Defendant | Ownership at Beginning of Class Period | Ownership at End of Class Period | Change in Ownership | % Change |
|---|---|---|---|---|
| Papa | 107,925 shares | 118,515 shares | 10,590 shares | 9.81% |
| Brown | 7,445 shares | 10,007 shares | 2,562 shares | 34.41% |
| Brlas | 8,974 shares | 10,457 shares | 1,483 shares | 16.53% |
| Cohen | 11,868 shares | 13,351 shares | 1,483 shares | 12.50% |
| Coucke | 5,397,711 shares | 5,397,711 shares | 0 shares | 0.00% |
| Fouse | 2,433 shares | 3,916 shares | 1,483 shares | 60.95% |
| Hoffing | 7,601 shares | 9,084 shares | 1,483 shares | 19.51% |
| Jandernoa | 868 shares | 8,330 shares | 7,462 shares | 859.68% |
| Kunkle | 24,204 shares | 25,687 shares | 1,483 shares | 6.13% |
| Morris | 3,128 shares | 9,352 shares | 6,224 shares | 198.98% |
| O'Connor | 244 shares | 1,612 shares | 1,368 shares | 560.66% |
| Total | 5,572,401 shares | 5,608,022 shares | 35,621 shares | 0.64% |

These facts further undermine any inference that the Individual Defendants were

supposedly defrauding investors. *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313

(D.N.J. 2001) (Lechner, J.) ("Low aggregate sales and large retained aggregate holdings rebut an

inference of motive, even where some defendants have sold significant percentages."); *In re*

*Radian Sec. Litig.*, 2010 WL 1767195, at *12 (E.D. Pa. Apr. 30, 2010) (where individual

defendants collectively retained 88.6% of their stock holdings during class period, "to infer fraud

from their trading history would be to assume that the defendants intentionally defrauded the

plaintiffs to their own ultimate detriment"; "[c]ourts reject such an inference that makes little

economic sense").

"Far from supporting a 'strong inference' that defendants had a motive to capitalize on

artificially inflated stock prices, retained holdings suggest that they had every incentive to keep

---

[14]    Papa Forms 4 dated July 1, 2015 through March 1, 2016; Brown Forms 4 dated July 1, 2015 through November 28, 2016; Brlas Forms 4 dated November 6, 2015 through June 23, 2016; Cohen Forms 4 dated November 6, 2015 through May 23, 2016; Coucke Form 4 dated March 1, 2016; Fouse Forms 4 dated November 6, 2015 through May 6, 2016; Hoffing Forms 4 dated November 6, 2015 through May 23, 2016; Jandernoa Forms 4 dated November 6, 2015 through November 17, 2016; Kunkle Forms 4 dated November 6, 2015 through September 13, 2016; Morris Forms 4 dated November 6, 2015 through September 9, 2016; O'Connor Forms 4 dated November 6, 2015 through May 23, 2016.  The holdings represent the Individual Defendants' directly beneficially owned non-derivative and non-restricted securities.

[the company] profitable." *Party City*, 147 F. Supp. 2d at 313; *see also Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) (it was "nonsensical to impute dishonest motives" to individual defendants, where majority of them increased stock holdings during class period and "each of them suffered significant losses" when share price declined). In other words, the Individual Defendants' interests were aligned with those of the other stockholders. *See In re Discovery Labs. Sec. Litig.*, 2006 WL 3227767, at *14 (E.D. Pa. Nov. 1, 2006) (officers and directors "are frequently given stock options or stock grants" to "align[] their personal motivations with the shareholders"); *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010) (independent directors' ownership of "a meaningful, long-term common stock stake . . . would align [their] interests . . . with the common stockholders").

When these judicially-noticeable facts are considered, *see Wilson*, 195 F. Supp. 2d at 623-24, the bottom line is clear: not only is there no strong inference of scienter, but a finding of scienter is not permissible. *See PDI*, 2006 WL 3350461, at *16 ("This Court fails to perceive what possible *concrete and personal* benefits Defendants were trying to obtain by fraudulently inflating PDI's stock price if Defendants were not selling their shares.") (emphasis in original). In other words, "[i]f this Court were to conclude that Defendants meant to defraud investors, the Court would have to believe that they did so for the sheer joy of it rather than for profit." *Id.*

***The Company's Share Buyback Undermines Any Inference of Scienter.*** As the Complaint acknowledges, in October 2015 Perrigo announced a two-to-three year share buyback plan for an amount up to $2 billion. ¶ 109. Pursuant to that plan, Perrigo repurchased $500 million of its shares in the last three months of 2015. *See* 2/25/16 10-KT at 42. Stock repurchase programs suggest a company "believe[s] its stock [to be] undervalued," *In re First*

*Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001), and thus "*negate* a finding

of scienter." *In re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("It

would [make] no sense to purchase th[e] stock if defendants knew the prices to be inflated.").

### C.   The Complaint Fails to Plead Particularized Facts Giving Rise to a Strong Inference of Conscious Misbehavior or Recklessness

A complaint must contain allegations of "*strong* circumstantial evidence of either

conscious behavior or recklessness" for the case to proceed. *Hertz*, 2017 WL 1536223, at *15.

Further, inferences of scienter "may be made only when the fact pattern *unambiguously indicates*

that the defendant was acting with the requisite state of mind." *In re Synchronoss Sec. Litig.*,

705 F. Supp. 2d 367, 399 (D.N.J. 2010) (Brown, J.) (emphasis in original). Moreover, where, as

here, the motive behind the supposed fraud "is not apparent," the "strength of the circumstantial

allegations [of fraudulent intent] must be correspondingly greater." *Dempsey v. Vieau*, 130 F.

Supp. 3d 809, 814-15 (S.D.N.Y. 2015).

The Complaint fails to offer strong circumstantial evidence of either conscious behavior

or recklessness. Its fact patterns indicate that Defendants did not act with scienter.

#### 1.   The Complaint Fails to Adequately Plead Scienter Regarding Statements and Omissions about Omega

Plaintiffs allege that statements by Christine Kincaid (Perrigo's Global Cyber Security

Manager for the very short period of June 2015 through December 2015) and eight unnamed

former Perrigo or Omega employees (¶¶ 57-62, 258) support their allegations that Perrigo misled

investors about Omega's performance and the integration of Omega. For example, Plaintiffs

state that these witnesses support their allegations that Ms. Brown supposedly lied when she said

in June 2015 that the Company was "in line" with its planned Omega integration process (¶¶

139-40) and that Mr. Papa purportedly lied when he said during the Company's August 2015

earnings call that the Company had "delivered on our Omega integration plans." ¶¶ 141-42; *see*

22

*also* ¶ 147 (alleging it was false and misleading for Company's October 22, 2015 profit forecast to assume that the "integration and realization of synergies in relation to the acquisition of, Omega Pharma . . . will proceed as planned and will not be subject to unforeseen material delays."). According to Plaintiffs, interviews of these individuals show that Mr. Papa and Ms. Brown knew, when they made those statements and others like them, that "several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey" and that there were "serious . . . impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance." ¶¶ 140, 142.[15] There are numerous, independent reasons why these allegations fail to plead scienter.

   ***No Inconsistency between Kincaid's Allegations and Defendants' Statements***. Most fundamentally, the accounts given by Kincaid and the unnamed witnesses do not contradict Mr. Papa's and Ms. Brown's statements. As cited in the Complaint, Kincaid and the unnamed witnesses (¶¶ 57-62) principally discuss supposed problems the Company was having with its Omega integration efforts in the first few months after the closing of the transaction, but they do not address whether those alleged problems were so severe that the Company's multi-year plan for achieving synergies with Omega was no longer realistic. *See infra* Sec. II.A. Nor would these former employees have been able to address that issue because they were not privy to the information that Mr. Papa and Ms. Brown were relying on when making the challenged statements. *See Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 835 (S.D. Cal. 2006) ("Also undermining a strong inference of scienter is the lack of information indicating any of the confidential witnesses would have been in a position to know what Defendants knew during the relevant time period."), *aff'd*, 256 F. App'x 74 (9th Cir. 2007).

---

[15]   Notably, Plaintiffs allege only that a few of Omega's markets were underperforming.

***No Contact with the Individual Defendants***.  The Complaint contains no allegations that Kincaid or any of the unnamed witnesses ever met with, spoke to, or had any contact with Mr. Papa, Ms. Brown, or any other Individual Defendant.  Of those witnesses, Kincaid appears to have had the most senior position at Perrigo, and the closest she is alleged to have gotten to Perrigo's executive suite was that during "a portion of her tenure" at the Company (which lasted only six months), she reported to Perrigo Chief Information Officer Tom Farrington, who Mr. Papa had appointed to oversee the Omega integration.  ¶ 57.  But the Complaint does not claim that Kincaid reported to, or interacted with, Mr. Papa himself.

Rather, the Complaint alleges only that Kincaid and Mr. Farrington discussed issues that had arisen related to IT integration, and Mr. Farrington allegedly instructed Kincaid to reach out to her Omega counterpart to try to resolve them.  *Id.*  But the Complaint contains no well-pleaded allegations that Mr. Farrington (or anyone else) shared that information with any Individual Defendant.  *See In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. 2005) (Ackerman, J.) ("Mere allegations of knowledge on the part of subordinates do not provide a sufficient basis for imputing knowledge to executives."), *aff'd sub nom.*, *In re Savient Pharm. Inc. Sec. Litig.*, 283 F. App'x 887 (3d Cir. 2008).[16]

Kincaid and the unnamed witnesses' lack of interactions with the Individual Defendants is crucially important because "[t]o plead scienter, it is not sufficient to allege that the integration was problematic . . . . The key issue is what the [I]ndividual Defendants *knew* about the

---

[16]    Moreover, the Complaint suggests that IT integration might have been particularly difficult because "technology and infrastructure wasn't as much of a priority for Omega." ¶ 62(b).  The well-pleaded facts suggest that Kincaid, whose work focused on IT, had direct personal knowledge about, at most, how the IT integration was proceeding, not whether other aspects of the integration were proceeding as planned.  Indeed, none of the facts alleged suggest Kincaid had the experience necessary to make a credible judgment about whether or not the integration was going well.

24

integration problems . . ., or whether the[y] were so obvious that the Defendants must have been aware of them." *Witriol v. Conexant Sys. Inc.*, 2006 WL 3511155, at *4 (D.N.J. Dec. 04, 2006) (Chesler, J.) (emphasis in original). Here, as in *Witriol*, "[n]one of the allegations of statements by the confidential witnesses, separately or as a whole, gives rise to a strong inference that any particular [I]ndividual Defendant knew about the integration problem" in June-October 2015, when the statements at issue were made. *Id.*; *see also In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 2844421, at *2 (N.D. Cal. Sept. 29, 2006) (finding unreliable the suggestion by a confidential witness that executives knew of problems integrating two companies because the witness "[did] not have an apparently reliable basis for making statements about [executives'] responsibilities" where he "was several levels down the reporting structure" and "[i]t [was] not clear how [witness] would have known how [executives] were spending their time.").

Absent evidence of contact between these individuals and the Individual Defendants, their statements do not and cannot contribute to a finding of scienter. *See Steinberg v. Ericsson LM Tel. Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (no scienter where "[p]laintiff's confidential sources were mid-level managers in the United States who claim no contacts or communications with Defendants, or even with [the] European corporate headquarters."); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008) (no scienter where confidential witnesses had no "contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period").

That is why, whatever "discord" Kincaid was purportedly encountering in connection with IT integration in her capacity as the person supposedly responsible for IT integration projects in Europe (¶¶ 57-58), her story does not create any inference of scienter—none of the individuals she spoke to, heard from, or interacted with are named as defendants in this case.

***Failure to Plead with the Requisite Particularity.***  In light of Kincaid's lack of personal knowledge regarding what Mr. Papa and Ms. Brown knew about how the Omega integration was progressing, Plaintiffs fall back on conclusory allegations.  They point to Kincaid's statement that she heard from Omega's head of IT integration that "various issues" were causing "discord" between Omega's CEO and CFO, on the one hand, and "the top executives of Perrigo, including the Individual Defendants," on the other hand.  ¶ 58.  Integrating the IT systems of two large companies always creates "various issues," but the Complaint does not say (because Kincaid likely does not know) whether Omega's head of IT integration was passing along gossip he heard from third parties, how serious the discord was, whether the discord concerned only IT-related issues or other broader issues as well, or the "who, what, when, where, and how" of how the discord manifested itself.  *City of Edinburgh*, 754 F.3d at 166.  "Generic and conclusory allegations" such as these, which are "based upon rumor or conjecture," are "undisputedly insufficient to satisfy [the PSLRA's] heightened pleading standard . . . ."  *California Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004); *see also National Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 540 (D.N.J. 2010) (Wolfson, J.) (rejecting, as "speculative and conclusory[,]" reports from witnesses who lacked first-hand information); *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205-06 (D. Or. 2006) ("[T]hese allegations are based on hearsay rather than personal knowledge and, therefore, are not probative."), *aff'd*, 552 F.3d 981 (9th Cir. 2009).

If anything, Kincaid's second or third hand reports suggest that Mr. Papa and Ms. Brown were *not* aware of the supposed integration issues when they made the challenged statements.  According to Kincaid's account of what Omega's head of IT integration told her, Omega's senior executives tried to raise integration issues with Mr. Papa and Ms. Brown in July and

August 2015 (*subsequent* to many of the supposed misstatements, including the only one attributable to Ms. Brown), but were *unsuccessful* because Mr. Papa and Ms. Brown allegedly were distracted by the Mylan tender offer that continued until November 2015.[17]  Rather than press the issue, Omega's executives supposedly "put integration on hold" for the time being.  ¶¶ 59, 62(c), 62(d).

  ***Additional Problems with Allegations Based on Unnamed Witnesses.***  Allegations based on the unnamed witnesses—such as, for example, the allegations by a senior manager for marketing in Omega's Turkish division citing "abysmal performance" in Turkey and "high turnover, declining business, and lack of direction from Omega headquarters" (¶¶ 62(a), 62(e))— similarly do not suggest that Mr. Papa or Ms. Brown acted with scienter when they made the challenged statements.  Not only do these unnamed individuals lack knowledge about what Mr. Papa and Ms. Brown knew about Omega's performance, but there is *absolutely no allegation* that these individuals were privy to information about Omega's performance on a European-wide scale.  As the Court surely recognizes, these individuals would not be expected to have such knowledge given their non-executive level positions.  *See Chubb*, 394 F.3d at 148 (rejecting confidential witnesses' allegations where plaintiffs "heavily rel[ied] on former employees who worked in [company]'s local branch offices for information concerning [company]'s business on a national scale."); *Freed v. Universal Health Servs. Inc.*, 2005 WL 1030195, at *7-8 (E.D. Pa.

---

[17] In any event, this allegation cannot possibly support an inference that Ms. Brown acted with scienter.  Of the 17 alleged misstatements attributed to Ms. Brown, only one concerns the integration of Omega.  ¶ 139.  Ms. Brown allegedly made that statement on June 23, 2015, *before* Omega's executives allegedly "*tried . . .* to communicate" their concerns about Omega's integration "during July and August of 2015."  ¶ 59.  Indeed, Kincaid did not even join Perrigo until June 2015 (¶ 57)—only weeks (at most) before Ms. Brown's only alleged statement concerning the integration of Omega.  Because Plaintiffs do not allege anything about Ms. Brown's state of mind at the time she made her only alleged statement concerning the integration of Omega, all claims based on that statement should be dismissed.

May 3, 2005) (dismissing complaint that relied on former employees but did not say "how they would have had access to information regarding [defendant's] operations nationwide.").

Moreover, that a marketing director in Portugal suggested that "Belgium and Italy were also underperforming" (but not Portugal) and a brand manager for France and Belgium said that "Spain, in particular, was having trouble" (but not France and Belgium, despite the Portuguese manager's account) (¶ 62(e)) highlights that these reports were apparently based on hearsay rather than personal knowledge. *See Chubb*, 394 F.3d at 146-47 (allegations based on unnamed sources must contain particularized facts "to support the probability that a person in the position occupied by the source would possess the information"). In any event, there is *no well-pleaded allegation* that these reports made their way to any Individual Defendant. These allegations are the equivalent of water-cooler gossip and do not support a federal securities claim.

***No Internal Documents Cited***. The Complaint cites not a single document written, received, or reviewed by any Individual Defendant in support of these (or any other) allegations. "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 286 (D.N.J. 2007) (Brown, J.); *see also Wilson*, 195 F. Supp. 2d at 640 (no scienter where plaintiffs "[did] not allege that Defendants either reviewed or had access to specifically identified documents or memoranda discussing the problems" at issue).

Plaintiffs' failure to point to any documentary evidence to corroborate their allegations concerning the Individual Defendants' supposed knowledge of the alleged integration and underperformance issues shows that they have not sufficiently pled scienter.

***Management's Involvement Does Not Create an Inference of Scienter***. The allegations that Mr. Papa was knowledgeable about Omega's operations and performance, the Omega

integration was important to the Company, Mr. Papa and Ms. Brown played roles in the Omega

integration, and Mr. Papa and Ms. Brown were familiar with post-acquisition operational

synergies (¶¶ 253, 255-57) do not suggest an inference of scienter, much less a strong inference.

"[C]orporate management's general awareness of the day-to-day workings of the

company's business does not establish scienter—at least absent some additional allegations of

*specific information conveyed to management and related to fraud.*" *Rahman*, 736 F.3d at 247.

In particular, the mere fact that two executives "were closely involved in the . . . integration" of

two companies is insufficient to allege scienter without allegations that they "were aware that the

integration was not going well," *Tibco*, 2006 WL 2844421, at *1-2, or that they did not believe

that any integration issues were manageable.  As described above, Plaintiffs point to no specific

information conveyed to the Individual Defendants and related to fraud.  *See In re Heartland*

*Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *7-8 (D.N.J. Dec. 7, 2009) (Thompson, J.)

("[I]t is not automatically assumed that a corporate officer is familiar with certain facts just

because these facts are important to the company's business; there must be other, individualized

allegations that further suggest that the officer had knowledge of the fact in question.").

    2.    The Complaint Fails to Adequately Plead Scienter
        Regarding the Tysabri® Royalty Stream Allegations

Plaintiffs cite neither witnesses nor documents to support their allegation that Perrigo's

adjustment of the accounting treatment of the Tysabri® royalty stream was anything other than a

correction in accounting.

It has long been established that the mere fact that a company needed to restate its

financial statements does not suggest scienter.  *See Phillips v. Harvest Nat. Res., Inc.*, 2016 WL

4523849, at *3 (S.D. Tex. Aug. 25, 2016) ("Publication of inaccurate accounting figures, a

restatement, or a failure to follow generally accepted accounting principles do not alone support

a finding of recklessness.”); *Nat’l Junior Baseball League*, 720 F. Supp. 2d at 556-57 (“[C]ourts have uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless plaintiffs’ complaint alleges ‘more.’”); *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1203-04 (D. Ariz. 2009) (“[A]s a general rule, a restatement of financial data due to an accounting error, without more, is insufficient to create a strong inference of scienter.”).  As Plaintiffs concede, a restatement may be required where there has been “[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.”  ¶ 124.

  This restatement is particularly ill-suited to support a scienter claim because the Company’s accounting statements containing the asset classification at issue were audited multiple times over three different fiscal periods by a reliable and well-respected accounting firm, EY—which issued unqualified opinions in each instance (*see* 2/25/16 10-KT at 84-85)— and the asset classification was changed after EY “reevaluat[ed]” and “reassess[ed]” the accounting treatment.  4/25/17 8-K at 3; *see also id.* (the decision to account for the Tysabri® royalty stream as an intangible asset “was reviewed with EY and agreed to under EY’s audit opinions included in the Company’s Form 10-K filings . . . , with unqualified audit opinions in all periods”).

  Those facts also undermine Plaintiffs’ allegation that “the correct accounting treatment for the Tysabri royalty stream was clear and easy to apply” (¶ 269); the Complaint lacks well-pleaded facts suggesting why or how Perrigo executives “would have been so familiar” with the applicable accounting rules “so as to see a problem in the company’s accounting before

[Perrigo's] auditors did." *Pension Trust Fund for Operating Eng'rs v. Kohl's Corp.*, 2017 WL 3085083, at \*10 (E.D. Wis. Jul. 20, 2017).

"The independent auditor's approval . . . undercuts any claim by Plaintiffs" that the Individual Defendants "knew or should have known" of any need to correct the accounting for the Tysabri® royalty stream. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010). Courts have recognized that review and approval of an alleged misstatement by an outside auditor can defeat any inference of scienter. In *REMEC*, for example, the "Defendants showed that Ernst & Young had full access to conduct a thorough, professional, and independent audit[,]" and the court held that "the level of transparency . . . serves to negate an inference that [the CEO] had a scheme to defraud investors." *Id.*; *see also In re Hansen Nat'l Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) ("Deloitte & Touche LLP's unqualified opinion [is] highly probative of an absence of scienter."); *Phillips*, 2016 WL 4523849, at \*3 (fact that company's disclosures "were reviewed and approved by PricewaterhouseCoopers LLP" shows that "the errors were not so obvious that their publication demonstrates an intent to defraud").

In attempting to mischaracterize a correction in accounting as fraud, Plaintiffs point to the Company's supposed "admission" that it "had 'material weaknesses' in internal controls" and surmise that Mr. Papa and Ms. Brown intentionally or recklessly misled investors when they certified, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), that the Company's 10-Ks were not false or misleading. ¶ 270. However, "these allegations are improperly based on hindsight"—insofar as Plaintiffs plead no facts concerning the Individual Defendants' knowledge or conduct at the time the certifications were made—"and therefore are inactionable." *Southeastern Pa. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at \*46 (M.D. Pa. June 22, 2015) (subsequent recognition of ineffective internal controls did not establish that

when defendants stated internal controls were effective they knew otherwise); *see also Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at \*21 (N.D. Cal. Apr. 27, 2017) (assessing "whether a subsequent statement is sufficient to demonstrate the falsity of a prior statement" by considering whether the subsequent statement "is along the lines of 'I knew it all along.'").

Allegations "based on defendants' erroneous SOX certification cannot establish the requisite strong inference of scienter unless the complaint asserts facts indicating that, *at the time of certification*, defendants knew or consciously avoided any meaningful exposure to the information that was rendering their SOX certification erroneous." *Intelligroup*, 527 F. Supp. 2d at 289-90. The Complaint fails to plead any such facts.

The "timing and circumstances of [Ms.] Brown's departure" from the Company do not constitute evidence of scienter. ¶ 271; *see also* ¶¶ 19, 266. Tying Ms. Brown's decision to leave Perrigo to any wrongdoing is pure conjecture. Resignations "cannot amount to even a 'piece to the scienter puzzle'" unless they are "accompanied by an extraordinary corporate punishment measure" such as "denial of severance payment[s]" or "banishment of the defendant from corporate premises[.]" *Intelligroup*, 527 F. Supp. 2d at 347; *see also Messner v. USA Techs., Inc.*, 2016 WL 1466543, at \*10 (E.D. Pa. Apr. 13, 2016) (same).

Here, the Complaint does not allege anything of that nature, nor could it, because no such punishment was imposed on Ms. Brown. Ms. Brown hardly retreated from high-level public company service. Indeed, she left Perrigo to join Amgen, one of the world's leading biotechnology companies and, like Perrigo, an enterprise audited by EY. But even where an officer's resignation or termination is related to problems at the company—which is *not* the case here—that alone does not give rise to an inference of scienter. *See Hertz*, 2017 WL 1536223, at \*21 (when a company is having "serious problems[,]" the "resignations of those at the helm are

not particularly surprising or suspicious."); *see also In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073-74 (N.D. Cal. 2002) (similar).[18]

Indeed, the Complaint itself raises circumstantial evidence demonstrating that the competing inference of non-fraudulent intent is more compelling. Plaintiffs admit that during Perrigo's May 12, 2016 earnings call, Perrigo CEO John Hendrickson described the Tysabri® royalty stream as a "financial asset." ¶ 217. Plaintiffs suggest that statement shows the Company was aware it was improperly accounting for the Tysabri® royalty stream as an intangible (rather than financial) asset, but in fact Mr. Hendrickson's statement shows that there was no unlawful scheme afoot to hide from investors that Perrigo's interest in the Tysabri® royalty stream was financial in nature. The stronger inference is that this was a correction in accounting, not fraud. *See Local No. 8 IBEW Ret. Plan v. Vertex Pharm. Inc.*, 140 F. Supp. 3d 120, 132-33, 135 (D. Mass. 2015) (complaint pled negligence, not fraud, where it "contain[ed] no specific allegations (whether from a confidential witness, a document, or otherwise) that any defendant actually *knew* that the statements were false") (emphasis in original), *aff'd*, 838 F.3d 76 (1st Cir. 2016).[19]

---

[18]     Mr. Papa left Perrigo in April 2016 to become CEO of Valeant. ¶ 10. Plaintiffs refer in passing to an "investigat[ion]" of Valeant for potential "accounting violations" and "illegal practices," but do not allege that any of the potential wrongdoing occurred during Mr. Papa's tenure as CEO. ¶ 10 & n.3. Nor could they. As explained by Valeant's Chairman of the Board, Mr. Papa was hired in the wake of the allegations of wrongdoing because of "his ability to lead companies through times of transition" and because "fostering an ethical culture . . . ha[s] always been [a] high priorit[y] for Joe [Papa]." 4/27/16 Valeant 8-K, Ex. 99.1 at 1-2.

[19]     Plaintiffs also allege that scienter can be inferred from the fact that the Tysabri® royalty stream supposedly was sold in 2017 for less than investors expected. ¶ 271. However, as discussed below (*see infra* Sec. II.B), the Tysabri® royalty stream was sold for a value in line with analyst expectations. In any event, the Complaint contains no well-pleaded facts concerning the Individual Defendants' knowledge about the value of the Tysabri® royalty stream at the time of the challenged omissions.

3.     The Complaint Fails to Adequately Plead Scienter Regarding
Alleged Statements or Omissions about Organic Growth

Plaintiffs point to statements by Mr. Papa and Ms. Brown about the Company's organic
growth (¶¶ 132-34, 151-74, 253, 255) but make only the feeblest attempt to plead supposed
circumstantial evidence suggesting these statements were made with intent to defraud.  Plaintiffs
suggest that Mr. Papa and the Director Defendants, by accepting responsibility, in accordance
with the Irish Takeover Rules, for the information in the Company's public statements during the
Mylan tender offer, "must be charged with knowledge of the true facts" (or at least recklessness)
concerning Perrigo's profit forecasts.  ¶¶ 3-4, 56, 93-94, 166, 171-73, 188-89, 260-62.

However, those statements (and others like them, *see* ¶¶ 147-48) do not show scienter for
the same reason that SOX certifications do not show scienter: they do not suggest that "at the
time of certification, defendants knew or consciously avoided any meaningful exposure to the
information that was rendering their . . . certification erroneous." *Intelligroup*, 527 F. Supp. 2d
at 289-90; *see supra* Sec. I.C.2.

There are no witnesses, documents, or other evidentiary sources indicating that anyone at
the Company knew at the time of the Mylan tender offer that any of the Company's statements
about its organic growth (or any other topic) was inaccurate. *See Rahman v. Kid Brands, Inc.*,
2012 WL 762311, at *23 (D.N.J. Mar. 8, 2012) (Linares, J.) (absence of "any confidential
witness, document or other factual source indicating that . . . anyone at the Company[] knew" of
alleged misstatements "earlier than their public disclosure" undermined scienter allegations); *In
re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 930-31 (S.D. Ind. 2008) (no scienter because
plaintiffs "have not cited any internal documents, confidential witnesses, or other sources to
support their allegations . . . .").

34

4.   The Complaint Fails to Adequately Plead Scienter Regarding
        the Anti-Competitive Pricing Practices Allegations

Plaintiffs assert that Mr. Papa and Ms. Brown had "personal knowledge of Perrigo's

generic drug pricing strategy, and the pricing environment of other manufacturers, indicating that

they *would have* inescapably learned of the highly unusual, coordinated price hikes alleged

herein" and that the successful execution of a price-fixing scheme such as the one alleged in the

Complaint allegedly "could not be done without the knowledge and approval of the Company's

highest-ranking executives." ¶ 267.  Critically, these allegations beg the question by assuming

that there was such a price-fixing scheme, of which the Complaint offers no well-pleaded facts

and for which there is absolutely no proof in the public record.

Moreover, inferences that an individual "would have" had knowledge about particular

issues are "precisely the types of inferences which courts, on numerous occasions, have

determined to be inadequate to withstand Rule 9(b) scrutiny." *In re Amarin Corp. PLC, Sec.

Litig.*, 2015 WL 3954190, at *12 (D.N.J. June 29, 2015) (Wolfson, J.) (rejecting "allegations that

a securities-fraud defendant, because of his position within the company, 'must have known' a

statement was false or misleading . . . ."); *see also Party City*, 147 F. Supp. 2d at 316-17

(argument that "Defendants *must have* had knowledge of deficiencies . . . is . . . insufficient to

allege scienter").  Where, as here, "Plaintiffs rely solely on their own conclusions" rather than

documents, witnesses, or other evidence, allegations of scienter are "not sufficiently pled." *In re

Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1078 (W.D. Wash. 2003).

The only fact cited by Plaintiffs supposedly evidencing scienter in connection with the

purported anti-competitive pricing practices is that Douglas Boothe, Perrigo's Executive Vice

President and General Manager of the Rx Pharmaceuticals division, left the Company in July

2016 "a mere two months [before] private antitrust litigation [was filed] against Perrigo related

to the division Boothe led" and "only months after" Mr. Papa's resignation. ¶ 268.  However, as

discussed above with regard to the allegations about Ms. Brown's resignation, the fact that

executives leave a company, in and of itself, is "insufficient to show that they acted with the

requisite scienter to commit the alleged fraud[,]" especially when the executive is not a

defendant in the action.  *Hertz*, 2017 WL 1536223, at *20-21 (resignation of CFO was not

evidence of scienter because "Plaintiffs have not provided any facts linking her resignation to

fraud."); *see also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 162 (D. Conn. 2007) ("[I]t is

hard to see how the resignation of [a non-defendant] executive . . . could create an inference of

scienter with respect to the . . . individuals who have been named."), *aff'd*, 312 F. App'x 400 (2d

Cir. 2009).  Without more, the allegation that an officer resigned due to a supposed scheme to

defraud will never be as plausible as the inference that he or she resigned for the same mundane

reasons that cause employees to resign from a company every day.  *See Zucco*, 552 F.3d at 1002.

Moreover, Mr. Boothe has not headed to the sidelines of corporate America.  Indeed, he is now

the president of the Impax Laboratories, Inc.'s Generics Division.

     5.    <u>The Remaining Allegations Fail to Adequately Plead Scienter</u>

Plaintiffs assert that the fact that the Irish Takeover Panel deemed certain of Perrigo's

statements misleading contributes to an inference of scienter. ¶ 263.  But none of the statements

deemed misleading by the Irish Takeover Panel—each of which are attributable to the Company

and not to any Individual Defendant—are at issue in this case.  According to Plaintiffs, the

relevance of the Irish Takeover Panel's rulings is that Defendants were "on notice . . . to make

accurate, factually substantiated statements . . . ." *Id.*  Being on notice that one should tell the

truth does not contribute to an inference that one did the opposite.

Plaintiffs also allege that the "sheer size of the misrepresentations," the "temporal

proximity between Defendants' false reassurances to investors and contradictory revelations,"

and "the sharpness of the divergences between Class Period reassurances and later revelations" contribute to a strong inference of scienter.  ¶¶ 264-66.  However, such allegations of "timing and magnitude" do not "contribute[] strongly" to an inference of scienter.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622-23 (9th Cir. 2017).  Indeed, "the magnitude of a write down plays a minor role in the scienter analysis" and "temporal proximity of an allegedly fraudulent statement or omission and a later disclosure is insufficient on its own to establish scienter and can only bolster an inference based on other allegations." *Id.*  The PSLRA's heightened pleading requirements for scienter would be meaningless if intentional misconduct could be inferred based solely on such hollow allegations.

### D.  Collectively, the Allegations Fail to Raise an Inference of Scienter

As demonstrated above, none of Plaintiffs' allegations raise an inference of scienter. Taken collectively, they fare no better.  "Merely cobbling together a litany of inadequate allegations does not render those allegations particularized in accordance with . . . the PSLRA." *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 386 (D. Del. 2010), *aff'd* 442 F. App'x 672 (3d Cir. 2011); *see also Synchronoss*, 705 F. Supp. 2d at 417 n.66 ("sheer volume" of insufficient allegations cannot compensate for inadequacies of each).  The Complaint's supposed evidence of scienter does not coalesce into a coherent picture where the whole is greater than the sum of its parts.  The allegations, viewed collectively, "fail[] to plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Amarin*, 2015 WL 3954190, at *15; *see also City of Roseville v. Horizon Lines, Inc.*, 442 F. App'x 672, 672 (3d Cir. 2011), (district court's "lengthy discussion" of failure of each scienter-related allegation meant it "did not need to explain at length that the total weight of these allegations was also scant[,]" as "it does not take much to explain that zero plus zero equals zero.").

37

**E.**     **Plaintiffs' Challenges Are Nothing More Than Inactionable Allegations of Mismanagement**

Setting aside the conclusory price fixing allegations, Plaintiffs' fundamental claims are that the Individual Defendants were ineffective at integrating Omega, failed to properly account for the Tysabri® royalty stream, and should have used more recent data to describe organic growth. Those are not claims of fraud. At most, these are allegations of corporate mismanagement, which fall outside the scope of the securities laws. *See Santa Fe*, 430 U.S. at 479 ("Congress by § 10 (b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); *In re Hertz Global Holdings, Inc., Sec. Litig.*, 2015 WL 4469143, at *17 (D.N.J. July 22, 2015) (Arleo, J.) ("[A]llegations that merely suggest corporate mismanagement are insufficient to establish even recklessness.").

The Complaint is rife with mismanagement assertions dressed up as fraud claims. For example, Plaintiffs refer to Defendants' correction in accounting for the Tysabri® royalty stream as an "accounting maneuver" and attribute it to a supposed "cover[] up" (¶¶ 108, 122), but fail to mention that the accounting treatment (which they allege was "easy to apply[,]" ¶ 269) was included in multiple financial statements audited by the Company's auditors at EY, who issued unqualified opinions in each instance. Likewise, they allege that not enough "attention was paid to the Omega integration" because Perrigo's senior executives supposedly were too preoccupied by the Mylan tender offer defense. ¶¶ 59, 62(d). And they frame Perrigo's "conce[ssion]" that "it needed to restructure parts of the BCH unit containing Omega assets" as a failure to disclose those problems previously. ¶ 225. These are mismanagement complaints, not fraud. Plaintiffs cannot transform otherwise inactionable mismanagement claims into securities law violations by alleging that Defendants "failed to disclose" the problems. *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682-83 (D. Colo. 2007) ("[A] plaintiff may not 'bootstrap' a

38

claim for internal corporate mismanagement . . . by alleging that the corporation or its directors

failed to disclose that mismanagement . . . .  To hold otherwise . . .  would be to eviscerate the

obvious purpose of the *Santa Fe* decision.").

## II. THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE MISSTATEMENT OR OMISSION

Beyond the fatal failure to plead any facts giving rise to a strong inference of scienter,

Plaintiffs do not meet the other fundamental requirement in any securities action—to set forth

well-pleaded allegations suggesting that Defendants made an actionable false or misleading

statement or omission.  For this purpose, "use of large block quotes from SEC filings and press

releases, followed by generalized explanations of how the statements were false or misleading[,]

are not sufficient to satisfy the [PSLRA's] heightened pleading requirements."  *Tabor v. Bodisen*

*Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008).  Rather, a complaint must "isolate each

statement alleged to be false and explain why it is false . . . ."  *Hoffman v. Authentec, Inc.*, 2009

WL 3109860, at *12 n.16 (M.D. Fla. Sept. 24, 2009).

### A. Plaintiffs Fail to Plead Any False Statement or Omission Regarding Omega

The Complaint alleges that "Defendants touted synergies with Omega as central to

Perrigo's growth claims" despite supposedly knowing that "there were deep problems with the

Omega integration and the underlying assets . . . ."  ¶ 5.  Plaintiffs assert that Defendants

"concealed" problems with the integration (*id.*) and misled investors by saying that Perrigo was

"in line" with its planned Omega integration and had "delivered on [its] Omega integration plans

and that the back office integration was "working smoothly."  ¶¶ 139-42.  But Plaintiffs point to

no well-pleaded facts suggesting that any of the challenged statements was false.

Mr. Papa repeatedly stressed that Perrigo was expecting the synergies from the Omega

transaction, which closed in March 2015, to occur "by year four" following the transaction, not

immediately.  11/6/14 Conf. Call Tr. at 11-12; *see also* 2/5/15 Conf. Call Tr. at 10-11 (investors

should "think of years two through four—not next year to be clear" as timeframe in which

Perrigo believed revenue synergies from Omega integration would kick in); 6/23/15 Conf. Tr. at

4 (similar).  The challenged statements were not promising Perrigo would not have problems

integrating Omega, but rather stated that the "integration and realization of synergies" was

proceeding "as planned" (¶ 147), *i.e.*, in line with the multi-year timeframe Perrigo had forecast

from the outset.  Perrigo made clear that the synergies were expected to contribute to greater than

$125 million in adjusted gross profit *in 2019*, which, consistent with Mr. Papa's statements, was

four years after the closing of the Omega transaction.  6/2/15 Conf. Call Tr. at 2.  As a matter of

common sense, the success of a merger is measured in the long term—by performance over

years, not the first few quarters after closing.

    The statements from Kincaid and the unnamed witnesses (¶¶ 57-62) principally discuss

supposed problems the Company was having with its Omega integration efforts in the first few

months after the closing of the transaction but do not speak to whether those alleged problems

were so severe that the Company's multi-year plan for achieving synergies with Omega was no

longer realistic.  *See In re LeapFrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1001 (N.D.

Cal. 2016) ("To plead falsity, a complaint must allege contemporaneous statements or conditions

that are *necessarily inconsistent* with the challenged statement.").

    The Individual Defendants "never claimed a perfect integration" but rather that, as of the

Summer and Fall of 2015, the integration was on track to meet the goals set at the outset.  *See*

*Hong*, 2017 WL 1508991, at *15, 17 (statements such as that integration of two companies was

"on track" were not false because "the reasons Plaintiffs offer as to why the statements are false

or misleading [bore] no connection to the substance of the statements themselves and the

Complaint [did] not contain any particularized allegations demonstrating that any of the statements was materially false or misleading when made.").[20]

The Complaint also contains no misleading omissions about Omega.  Plaintiffs allege that the Individual Defendants omitted to mention that "there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega, and management resistance" (¶¶ 134, 140, 142, 146, 148), but, in fact, the Company repeatedly warned that integration could be a multi-year process because of those issues.  In April-October 2015 (the time period of the alleged omissions), Perrigo was in the early stages of the Omega integration and, as noted above, even accepting as true the statements from Kincaid and the unnamed witnesses, it was too early to tell whether the Company's integration plans would be jeopardized.  However, the Company did make it clear to investors that it might "encounter significant unexpected difficulties in integrating" Omega and that the integration would be "a complex, costly, and time-consuming process."  4/29/15 10-Q at 45.[21]

In that same vein, the Company acknowledged in April 2015 that there might be

---

[20]     The Complaint contains no well-pleaded facts suggesting Mr. Coucke's statement that Omega "has optimized its commercial infrastructure to deliver superior results" (¶¶ 137-38) or that Mr. Papa's statement that the Omega acquisition "has been accretive to our growth rate" (¶¶ 132-34) were false.  Moreover, Mr. Coucke's statement and other statements such as that Omega had "an exceptional management team," "hired best-in-class management," and "instituted an efficient management structure" (¶¶ 137-38), are "statements of optimism . . . commonly heard from corporate managers . . . ." that are non-actionable puffery.  *Hertz*, 2017 WL 1536223, at *11; *see also Hong*, 2017 WL 1508991, at *12 (statements describing merger as "exceed[ing] expectations" or "moving in the right direction" were non-actionable puffery; "CEOs and executives of companies that merge with or acquire companies often describe ongoing mergers as smooth, rapid and successful—which courts regularly deem corporate puffery.").

[21]     Plaintiffs allege that it was misleading for Perrigo to provide a profit forecast for Omega's long-term growth projecting greater growth than Omega's management had forecast before Perrigo acquired Omega (¶ 56, citing 10/22/15 8-K, Ex. 99.1 at 7), but do not mention that the profit forecast, in the very next paragraph after it projected Omega's growth rate, made clear that Perrigo was assuming synergies arising from the Omega acquisition.  10/22/15 8-K, Ex. 99.1 at 7.  In any event, Plaintiffs acknowledge that Omega's projections were public information freely available to shareholders.  ¶ 56 (citing 2013 Omega Annual Report at 42).

"difficulties in achieving anticipated . . . synergies" and "difficulties in the integration of operations and systems" and that, even if the benefits of the acquisition were realized, they might "not be achieved within the anticipated time frame." *Id.*; *see also* 8/13/15 10-K at 23-24 ("The Omega acquisition represents a major shift in our business, both geographically, . . . and operationally . . . . There is no assurance that we will be able to successfully integrate Omega or otherwise realize the expected benefits of the Omega acquisition."). In other words, the Company "disclosed the challenges faced with respect to the integration" and, as such, "Plaintiffs' omission theory fails to state a claim . . . ." *Hong*, 2017 WL 1508991, at *17.[22]

The Complaint also alleges that Defendants "omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey." ¶¶ 134, 140, 142, 146, 148. The Complaint does not, however, plead facts suggesting that Defendants made any statements about Omega's performance in those (or any other) countries that would have been rendered misleading by the alleged omission. *See City of Edinburgh*, 754 F.3d at 174 (where company "made no affirmative statement about" a topic, it did not place that topic "'in play,' so it was under no duty to provide additional details"). Moreover, as noted, there is reason to doubt the unnamed witnesses' reports of this supposed underperformance. *See supra* Sec. I.C.1.

Finally, the Complaint asserts that Defendants "omitted that Omega's senior executives had already warned Perrigo, [Mr.] Papa and [Ms.] Brown of regulatory impediments to their assumption that synergies could easily be achieved by swapping Omega's suppliers which were located in its key markets with Perrigo's U.S.-based supply chain." ¶¶ 144, 146. But the Complaint contains no well-pleaded allegations that this supposed "warning" ever occurred. Just

---

[22]     In light of these disclosures, Plaintiffs' allegation that an inference of scienter can be drawn from the fact that Defendants understood "the difficulty of integrating a large acquisition and achieving merger synergies" (¶ 259) falls flat, as the Company disclosed those very risks.

the opposite—the Complaint states that Omega's senior executives "tried" to pass along their concerns about that topic to Perrigo's senior executives but were unsuccessful in those efforts. ¶ 59; *supra* Sec. I.C.1.  Of great import, the Complaint fails to "plead the who, what, when, where, and how" of these allegations.  *City of Edinburgh*, 754 F.3d at 166.

### B.    Statements and Omissions Regarding the Tysabri® Royalty Stream Are Inactionable

Liability cannot be premised on the Company's admission that the Tysabri® royalty stream was incorrectly classified as an "intangible asset" rather than a "financial asset" (¶ 122) because "the allegedly undisclosed facts were *otherwise* transmitted to the market in a timely manner." *Winer Family Trust v. Queen*, 2004 WL 2203709, at *4, 10 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007).  The Complaint acknowledges that, on May 12, 2016, Mr. Hendrickson described the Tysabri® royalty stream as a "financial asset" (¶ 217), but it leaves out that Mr. Papa also described it as a financial asset at the time of the Elan transaction, well before the Class Period began.  7/29/13 Conf. Call Tr. at 9; *see also* 5/12/16 Conf. Call Tr. at 4, 11, 20 (statements by Mr. Hendrickson referring to Tysabri® royalty stream as a "financial asset" five times during analyst call); *id.* at 19-20 (question from Goldman Sachs analyst Jami Rubin referring to the Tysabri® royalty stream as a "financial asset").

This was not just a matter of semantics.  The Company's financial statements consistently revealed that the Tysabri® royalty stream was separate and apart from the business lines run and operated by the Company, and Perrigo classified the Tysabri® royalty stream in its own category, "Specialty Sciences." *See* 2/6/14 10-Q at 31, 41; 8/13/15 10-K at 3, 10, 31, 57, 94; 2/25/16 10-KT at 4, 11, 31, 60, 108, 114.  Mr. Hendrickson made clear that a separate company, and not Perrigo, marketed and sold Tysabri®, and that it was "not something we're looking to invest a bunch of money in or get into more products related to it." 5/12/16 Conf. Call Tr. at 11.

As such, it was well understood by the investing public that the Tysabri® royalty stream was not part of the Company's core business and that Perrigo's interest in it was merely financial in nature.  For example, in a September 12, 2016 open letter to Perrigo that Plaintiffs cite in the Complaint (¶¶ 15, 239), institutional investor Starboard Value referred to the Tysabri® royalty stream as "purely a financial asset as Perrigo has no involvement in the marketing and sales of Tysabri®."  *See* 9/12/16 Letter at 3.  Similarly, an analyst report referred to the Tysabri® royalty stream as "clearly non-core" to Perrigo's business and stated that it "would be an easy asset to divest considering [Perrigo] is *not involved in the promotion or manufacturing of the product*." 9/19/16 Barclays Report at 11, 16.  Because "the general public ha[d] access to correct information" (*Synchronoss*, 705 F. Supp. 2d at 397), the classification of the Tysabri® royalty stream as an "intangible asset" rather than a "financial asset" did not matter.  ¶ 122; *see also In re Keryx Biopharm., Inc., Sec. Litig.*, 2014 WL 585658, at *11, 12 (S.D.N.Y. Feb. 14, 2014) (complaint "fail[ed] to allege actionable falsity as a matter of law" because publicly available documents "mentioned all of the issues that plaintiffs assert were hidden").

Similarly, Plaintiffs' contention that "Perrigo stunned investors by announcing that it would sell the Tysabri® royalty stream for only $2.2 billion cash (plus additional contingent payments of up to $0.65 billion)" (¶ 18) is belied by publicly available information.  Analyst reports showed that the Tysabri® royalty stream was estimated to be worth approximately $2 to $3 billion, in line with the sale price. *See* 8/22/16 Guggenheim Report at 13 (valuing Tysabri® royalty stream at $1.9 billion); 9/19/16 Barclays Report at 16 ("We believe [Perrigo] should be able to get well above $2 billion for its interest in Tysabri."); 9/19/16 J.P. Morgan Report at 3 (describing $2.7 billion as the "High Case" valuation for Tysabri® royalty stream); 9/19/16 RBC Capital Markets Report at 1 (valuing Tysabri® royalty stream at $2.8 billion); 9/13/16 Deutsche

Bank Report at 1 (valuing Tysabri® royalty stream at $3.1 billion).  Investors were hardly

stunned by Perrigo's acceptance of an offer at a price consistent with the market's assessment.

Investors also understood *why* the value of the royalty stream had deteriorated.  Perrigo

made clear that the royalty stream's original value of $5.8 billion was "being amortized over a

useful life of 20 years" (*i.e.*, it was depreciating at a rate of $290 million per year).  2/5/15 10-Q

at 10; ¶ 207.[23]  The Company explained that "management's assessment of future cash flow from

this royalty stream has been *reduced* primarily due to anticipated new competitors entering the

market and unfavorable currency exchange effects."  5/16/16 10-Q at 46.  And it disclosed that

"[i]n February 2016, a competitor's pipeline product, Roche's Ocrelizumab, received

'Breakthrough Therapy Designation in Primary Progressive Multiple Sclerosis' from the FDA,"

it "could potentially be approved in 2017," and it "would compete with Tysabri® and *could have*

*a significant impact on the royalty we receive*." *Id.* at 36, 46.

Unsurprisingly, analysts factored in the anticipated new competitors when assessing the

Tysabri® royalty stream's value.  *E.g.*, 9/13/16 Deutsche Bank Report at 1 (assuming "significant

Tysabri sales declines (~10%) in 2017/18 from competition from Roche's ocrelizumab and 5%

annual erosion thereafter . . . .").  In other words, Defendants "disclose[d] the very information

necessary to make their public statements not misleading[,]" which "negates a finding that

material information was withheld." *Discovery Labs.*, 2006 WL 3227767, at *11.[24]

Finally, the Complaint asserts that the statements in Perrigo's 10-Qs and 10-Ks that its

---

[23]     In light of this disclosure and the others discussed below, Plaintiffs' contention that
Defendants claimed during the Class Period that the Tysabri® royalty stream was worth $5.8
billion (¶ 269) is incorrect.

[24]     The Company's statements that the Tysabri® royalty stream's "fair value exceeded the
carrying value" (¶¶ 219-24) are likewise immaterial in light of the fact that "the general public
ha[d] access to correct information" about the value of the Tysabri® royalty stream.
*Synchronoss*, 705 F. Supp. 2d at 397.

financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')" were false in light of the classification of the Tysabri® royalty stream as an intangible asset rather than a financial asset. ¶¶ 205-08, 211-12, 215-16, 219-24. However, "statements about GAAP compliance . . . are opinions," not facts, because "GAAP standards are often subjective" and "involve a range of possible treatments instead of a single objective set of calculations." *Hertz*, 2017 WL 1536223, at *11; *see also Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 100 (1995) (financial accounting "addresses many questions as to which the answers are uncertain and is a process [that] involves continuous judgments and estimates"). The SEC filings in question made clear that "[t]he preparation of financial statements in conformity with [GAAP] requires management to make estimates and assumptions" and that "actual results could differ from the estimates." 8/13/15 10-K at 83; 2/25/16 10-KT at 94 (same).

Statements of opinion cannot be a basis for liability unless Plaintiffs "plead facts which would create a strong inference" either that Defendants "knew their financials were not GAAP compliant when the statements were issued" or that they "knowingly or recklessly omitted that fact from their statements." *Hertz*, 2017 WL 1536223, at *12. As discussed above, there is no basis to suggest that Defendants acted recklessly in light of the fact that the accounting treatment at issue was included in the Company's financial statements audited by EY over three different fiscal periods, and EY issued unqualified opinions in each instance. The more plausible inference is that the Company issued a restatement after correcting its accounting, not that it was engaged in fraud. *See generally Medicis*, 689 F. Supp. 2d at 1203, 1216, 1217 (stronger inference was that company and its executives "made an innocent accounting mistake"; "the inference that Ernst & Young mistakenly misapplied [an accounting rule] is more compelling

than the opposing inference that Ernst & Young deliberately ignored the provision.").[25]

**C.   Plaintiffs Fail to Plead Any False Statement or
      Omission Regarding Historical Organic Growth**

The Complaint alleges that "Defendants misleadingly claimed 7%-8% average historical

growth during [Mr.] Papa's tenure as CEO, without disclosing that organic growth . . . had

slowed to a trickle during the six quarters prior to the Class Period, and was even negative during

some of those periods." ¶ 2.  In other words, Plaintiffs' complaint is not that Defendants were

untruthful about Perrigo's historical organic growth rate, but rather that, if Defendants would

have analyzed a different time period, the numbers would have come out differently.  Indeed, the

Complaint reproduces (and does not dispute the accuracy of) a chart showing that Perrigo

experienced 5-10% growth in its organic net sales between 2011 and 2014.  ¶ 155.

Plaintiffs offer no explanation for why the Company had an obligation to adjust its

consistent practice of "provid[ing] compound annual growth rates over a rolling three-year

period." 2/5/15 Conf. Call Tr. at 7.  *See In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 n.3

(6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a

company's disclosure of accurate historical data."); *see also Galati v. Commerce Bancorp, Inc.*,

220 F. App'x 97, 102 (3d Cir. 2007) ("Factual recitations of past earnings, so long as they are

accurate, do not create liability under Section 10(b).").  "The disclosure of accurate historical

data does not become misleading even if less favorable results might be predictable by the

company in the future." *Sofamor Danek*, 123 F.3d at 401 n.3.[26]

---

[25]    The fact that EY repeatedly audited the Company's financial statements at issue and
issued unqualified opinions in each instance also rebuts Plaintiffs' suggestion that Defendants
did not "take[] all reasonable care" to "ensure that the description of the Tysabri royalty stream
was 'in accordance with the facts' and "[did] not omit anything likely to affect the import of
such information." ¶ 210.

[26]    Plaintiffs take out of context Mr. Papa's statements about "continu[ing] to execute on our

Moreover, Defendants did in fact disclose the slowdown of organic growth between June

2014 and June 2015. *See* 9/17/15 Schedule 14D-9, Ex. 99(a)(2) at 23 (data showing that whereas

organic growth rose from $2.5 billion in sales in June 2013 to $2.7 billion in sales in June 2014,

as of June 2015 that figure had dropped to $2.6 billion in sales); 8/6/15 Schedule 14D-9, Ex. 99.1

at 10 (same).  Mr. Papa also repeatedly discussed these issues on analyst calls and at

conferences.  *See* 4/21/15 Conf. Call Tr. at 10-11 (in response to analyst's question regarding

challenges in the "last one or two years," answering that questioner was "absolutely right" that

there had been some challenges); 5/6/15 Conf. Tr. at 9 (acknowledging that "we've had some

challenging quarters[,]" that "on balance . . . over the last three years, consumer business has

grown to 6%, so still within the range of what we always talked about, *but it was choppy*," and

that "*there were some quarters that we're below expectations* to be clear"); 1/5/16 Conf. Tr. at 5-

6 (acknowledging questioner's assessment that "sales have been flat for the last year and a half"

and offering explanations for "what happened in the last 12 months to 18 months").[27]  In light of

these disclosures, Plaintiffs have failed to plead any actionable misstatement or omission in

connection with Perrigo's statements about its historical organic growth.

    **D.**    **Plaintiffs Fail to Plead Any False Statement or Omission**
            **Regarding the Anti-Competitive Pricing Practices Allegations**

Plaintiffs aver that "Perrigo's pricing strategy in the Generic Rx division was not to 'keep

pricing flat to up slightly,'" and argue that Defendants engaged in securities fraud because the

---

base business" and "continu[ing] to deliver on the 5% to 10% compound annual growth rate"
(¶¶ 157-60); in context, Mr. Papa was referring to continuing the growth that the Company had
shown historically and between 2011 and 2014, not the slower growth during the six quarters
preceding the Class Period.

[27]     Plaintiffs assert that "Perrigo's organic growth was not 'consistent'" (¶ 152), but Mr.
Papa never said that growth was positive every quarter, but rather that "Perrigo has a long history
of driving above market shareholder value through consistent growth . . . ." ¶ 151.  Plaintiffs
point to no facts suggesting that Perrigo did not show consistent growth over its long history.

48

pricing for six generic pharmaceutical products, out of hundreds manufactured by Perrigo, was

not "flat to up slightly."  ¶¶ 66-91, 177.  But Defendants never stated that the pricing for each of

its myriad generic products was kept "flat to up slightly."  Instead, Mr. Papa explained that

Perrigo took a "portfolio approach" to pricing—*i.e.*, the "total portfolio" goal was to keep prices

"flat to up slightly[,]" although some prices would "decrease for competitive reasons" while

others would "increase."  6/2/15 Conf. Tr. at 5.[28]  The Complaint is devoid of any facts regarding

Perrigo's "total portfolio" of products, much less facts contradicting Mr. Papa's repeated

statements that the "total portfolio" goal was to keep prices "flat to up slightly."

Moreover, although Plaintiffs allege that Perrigo illegally colluded with other generic

drug manufacturers to artificially inflate the price of drugs (¶¶ 66-91, 176-204), they fail to

adequately plead the existence of a price-fixing scheme.  They do not describe the terms of any

improper agreements among the alleged co-conspirators or any meetings, phone calls, emails, or

other communications discussing price-fixing.  *See Burch v. Milberg Factors, Inc.*, 662 F.3d

212, 225 (3d Cir. 2011) ("To adequately plead an agreement [to fix prices], a plaintiff must plead

either direct evidence of an agreement or circumstantial evidence."); *Superior Offshore Int'l.,*

*Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 516 (D. Del. 2010) ("[C]ommunications between

competitors do not permit an inference of an agreement to fix prices unless those

communications rise to the level of an agreement, tacit or otherwise."), *aff'd*, 490 F. App'x 492

(3d Cir. 2012).  The Complaint certainly does not plead any such allegations "with particularity."

---

[28]     *See also* 5/12/15 Conf. Tr. at 7-8 (explaining that while Perrigo's goal was to keep price
"flat to up slightly" "across our total portfolio," individual product prices might be "raise[d]" or
"br[ought] down"); 10/22/15 Conf. Call Tr. at 13 ("[W]hat we've always said about pricing is
that our pricing across our total book of business is flat to up slightly. While there may be a
product that we do raise the price on, there are other products we're taking price down."); 1/5/16
Conf. Tr. at 10 ("My goal on pricing is . . . trying to keep my pricing flat to up slightly. Now, to
be clear, what that means is that I'm taking some products up and some products to meet
competition, I'm taking them down.").

*In re Mirant Corp. Sec. Litig.*, 2009 WL 48188, at *17 (N.D. Ga. Jan. 7, 2009) ("In cases alleging securities fraud based on the failure to disclose the existence of an underlying illegal scheme, the basis for the illegality must be pled with particularity."). Rather, "Plaintiffs here offer nothing more than conclusory allegations that an anticompetitive scheme existed." *In re AXIS Capital Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006); *see also Mauss v. NuVavsive, Inc.*, 2014 WL 6980441, at *7-8 (S.D. Cal. Dec. 9, 2014) (dismissing Section 10(b) claim premised on alleged false statements about compliance with healthcare laws for failure to plead the "who, what, when, where, and how" of "the purportedly illegal conduct"; complaint "[did] not allege particularized facts to show that [the company] violated any laws").

Lacking any well-pleaded facts suggesting that Perrigo engaged in the supposed price-fixing scheme, Plaintiffs cite the opinion of their own "expert" (¶ 64) to try to generate smoke where there is no heat, never mind fire. They fail. "PSLRA complaints must allege *specific facts* demonstrating material misstatements or omissions made with scienter[,]" and expert opinions "cannot substitute for facts under the PSLRA." *Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006); *see also In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535, at *31-32 (N.D. Cal. Mar. 9, 2007) ("Plaintiffs have provided no persuasive authority in support of their argument that courts have allowed 'expert' opinion . . . without more as factual support for claims of securities fraud brought under the PSLRA.").

The fact that the DOJ executed search warrants at the Company's corporate offices as part of an industry-wide probe (¶¶ 21, 243) provides no evidence of wrongdoing. The "mere occurrence" of a DOJ investigation is "not probative of the existence of an illegal agreement[,]" does "not permit a reasonable inference that any Defendant committed an antitrust violation," does "not enhance the plausibility of Plaintiff's claim[,]" and "is equally consistent with

Defendants' innocence." *Superior Offshore*, 738 F. Supp. 2d at 517.  That is because "[a]n

investigation is not a violation." *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822,

845, 863, 872 (S.D. Tex. 2016) (dismissing Section 10(b) claim and rejecting plaintiffs'

argument that it was misleading for company not to reveal that its growth "was actually driven

by [its] violations of the FCPA" because complaint "failed to allege particularized facts showing

that FCPA violations actually occurred[,]" despite existence of SEC investigation); *see also In re

Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("The mere existence of an

SEC investigation does not suggest that any of the allegedly false statements were actually false .

. . nor does it add an inference of scienter.").  "[C]ompanies do not have a duty to disclose

uncharged, unadjudicated wrongdoing," *UBS*, 752 F.3d at 184, and "the federal securities laws

do not require a company to accuse itself of wrongdoing." *Citigroup*, 330 F. Supp. 2d at 377.

    "When a securities fraud action rests on the failure to disclose uncharged illegal conduct,

the complaint must state a plausible claim that the underlying conduct occurred." *Menaldi*, 164

F. Supp. 3d at 578.  Because "[P]laintiffs' nondisclosure claims are entirely dependent upon the

predicate allegation that [the Company] participated in an anticompetitive scheme[,]" Plaintiffs'

failure to allege facts "which would establish such an illegal scheme" means that "the securities

law claims premised on the nondisclosure of the alleged scheme are fatally flawed." *AXIS

Capital*, 456 F. Supp. 2d at 585; *see also Mirant*, 2009 WL 48188, at *17 (same).[29]

---

[29]     Moreover, statements such as that "it[']s a competitive market out there" (¶¶ 178-79), the
Generic RX division "operate[d] in a highly competitive environment (¶¶ 184-85), and Perrigo
"operated in a highly competitive environment" and faced "vigorous competition" (¶¶ 194-95)
are "inherently subjective" opinion statements. *Hertz*, 2017 WL 1536223, at *11.  They are
inactionable in light of the lack of "particularized facts to indicate that defendants held a private
opinion different from [their] public opinions." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544
(S.D.N.Y. 2015).  And statements such as "our team has done a great job at looking at pricing"
(¶¶ 182-83), "[o]ur durable business model and future growth prospects are self-evident" ((¶¶
162-63), the Omega transaction "provides a significantly enhanced international platform for

**E.**     **Forward-Looking Statements Are Protected by the PSLRA's Safe Harbors**

A vast majority of the challenged statements are forward-looking. They address the

Company's organic growth goals and other future financial targets and Defendants' belief that

the Omega integration would over time lead to synergies. As forward-looking statements, they

qualify for protection under the PSLRA's safe harbors (15 U.S.C. §§ 78u-5(c)(1)(A) & (B)),

which operate in the alternative—forward-looking statements are not a basis for liability if *either*

safe harbor applies. *See Synchronoss*, 705 F. Supp. 2d at 412 n.59 (PSLRA "offers two

*independent* avenues to the defendant seeking protection"). Here, both safe harbors apply and

both dictate dismissal.

1.     The Challenged Statements Are Protected by the First Safe Harbor

The PSLRA's first safe harbor bars liability if an identified forward-looking statement is

"accompanied by meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the forward-looking statement[s]." 15

U.S.C. § 78u-5(c)(1)(A)(i). "[T]he state of mind of the individual making the statement is

irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."

*OFI Asset Mgmt. v. Cooper Tire & Rubber Co.*, 834 F.3d 481, 502-03 (3d Cir. 2016); *see also*

*Synchronoss*, 705 F. Supp. 2d at 401 n.45 (no liability even if issuer "has actual knowledge that

[its] forward-looking statements are false o[r] misleading" so long as it "accompanies these

forward-looking statements with . . . meaningful and directly-related cautionary language").

Under this safe harbor, it does not matter whether the risks that ultimately materialized

are identical to those about which the company warned. The sole question is whether the

---

additional growth" (¶¶ 153-54), and the Company is "exceptionally well positioned to continue
to deliver superior growth" and has a "strong, durable base" (*id.*) are non-actionable puffery
insofar they are "not determinate, verifiable statements" but rather "the types of vague statements
upon which reasonable investors do not rely." *Hertz*, 2017 WL 1536223, at *11.

company "identifi[ed] important factors that *could* cause actual results to differ materially from those in the forward-looking statement[.]" 15 U.S.C. § 78u-5(c)(1)(A)(i). If so, no liability may attach even if "the particular factor that ultimately cause[d] the forward-looking statement not to come true" was not disclosed. *Karacand v. Edwards*, 53 F. Supp. 2d 1236, 1243 (D. Utah 1999).

The Complaint cites numerous forward-looking statements. Specifically, Plaintiffs claim that Mr. Papa misrepresented Perrigo's growth prospects when he said that:

- The Company has "great confidence that our strong durable base *will* enable us to achieve our *goal* to grow net sales by 5% to 10% into the *future*";

- "We *believe* we have a business that *will* grow 5% to 10%, organically";

- "We are confident in our 5-10% three-year organic revenue CAGR *goal*, as executed historically, and we *expect* to meet our financial *targets* in the years to come"; and

- "[W]e *expect* to meet our financial *targets* in the years to come, creating value for you well in excess of Mylan's offer, and with less risk."

- "We remain confident in our ability to deliver on our 2016 growth *targets*."

¶¶ 153, 157, 166, 174-75. Similarly, Plaintiffs allege that Mr. Papa misled the market when, discussing how the Omega integration would affect the Company's future growth, he said:

> On Omega, we feel very good about the *opportunity* with Omega, and specifically what I would refer to as what we've talked about in the past about revenue synergies. We do *believe* that there are revenue synergies with the product portfolio that we have at Perrigo as we bring the 3,000 Perrigo products and help to bring them to Omega and look for ways that we *could* do line extensions of existing Omega brands. That's something that we have teams underway, already from an integration process, those teams are very active in looking at which ones are the best ones to do, the earliest ones to do and move that forward. We do *believe* that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate.

¶ 132; *see also* ¶¶ 147, 164 (alleging it was misleading for Perrigo's profit forecasts to assume that "integration and realization of synergies in relation to the acquisition of, Omega Pharma . . . *will* proceed as planned and *will* not be subject to unforeseen material delays" and it was misleading for Perrigo's presentation slides to state that Perrigo had "the ability to keep

delivering" organic net sales growth of 5-10% for the next three years and a "[c]lear strategy for

delivering 5%-10% organic growth" as well as "[m]ultiple avenues for additional upside.").

Plaintiffs likewise point to Ms. Brown's forward-looking statements, such as her statement that

the Company "fully intend[s]" to meet its consolidated organic-only "goals" in the future and

that "[l]ooking forward, our goal is to once again deliver an organic net sales CAGR for the next

three years in the 5% to 10% range while off a significantly larger base."  ¶ 155.

 These and other similar statements are prototypical forward-looking statements under the

PSLRA.  *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D).  Moreover, the Company made clear, in the very

documents containing the challenged statements, that statements using terminology such as

"will," "could," "expect," and "believe" (and "other comparable terminology"), as well as other

statements "relat[ing] to future events or the Company's future financial performance," are

"forward-looking statements within the meaning of the federal securities laws." 8/6/15 Schedule

14D-9, Ex. 99.1 at 2; 9/17/15 Schedule 14D-9 at 29; 10/22/15 8-K, Ex. 99.1 at 3; *see also*

4/21/15 Conf. Call Tr. at 2.  Perrigo cautioned investors that its forward-looking statements "are

only predictions and involve known and unknown risks and uncertainties, many of which are

beyond the Company's control . . . ." 9/17/15 Schedule 14D-9 at 29.

 Similarly, the Company warned that "[t]hese and other important factors, including those

discussed under 'Risk Factors' in [its SEC filings] . . . may cause actual results, performance or

achievements to differ materially from those expressed or implied by these forward-looking

statements." *Id.*  To ensure that no investor would place undue reliance upon its forward-looking

statements, Perrigo warned investors about the uncertainties inherent in forward-looking

statements—and listed the topics about which it was making forward-looking statements—on the

very first page, and in the very first paragraph, of each of its 10-Ks and 10-Qs, under a

capitalized, bolded note stating "**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS.**" 2/5/15 10-Q at 1; 4/29/15 10-Q at 1; 8/13/15 10-K at 1; 2/25/16 10-KT at 1; 5/16/16 10-Q at 1; 8/10/16 10-Q at 1.

Further, the Company specifically warned investors about risk factors that could cause actual results to differ materially from the predictions, including the very risk factors that Plaintiffs claim materialized during the Class Period. For example, Perrigo repeatedly warned investors that there might be "significant quarter-to-quarter fluctuations in operating results[,]" listed a number of factors that impact those operating results, and noted that those operating results may be materially adversely impacted by any failure to "realize the benefits of business acquisitions and divestitures . . . ." 8/13/15 10-K at 33-34; 2/25/16 10-KT at 33-34 (same). Perrigo went on to list a number of "integration and other challenges" that could cause it not to realize the benefits of an acquisition, including "[u]ncertainties involved in assessing the value, strengths, and potential profitability of, and identifying the extent of all weaknesses, risks, and contingent and other liabilities of the respective parties," the "[p]otential inability to achieve identified operating and financial synergies, or return on investment, from an acquisition in the amounts or on the timeframe anticipated," and that "[i]ntegration activities may detract attention from our day-to-day business, and there might be substantial costs associated with the transaction process or other material adverse effects as a result of these integration efforts." *Id.*

Perrigo also warned that risks associated with the Omega integration "could result in increased costs, decreased net sales, and diversion of management's time and energy, any or all of which could materially impact our business, financial condition, and results of operations." 8/13/15 10-K at 23-24; 2/25/16 10-KT at 25. And it warned that "[m]anagement and employee distraction related to Mylan's unsolicited interest also may adversely impact our ability to

optimally conduct our business and pursue our strategic objectives." 8/13/15 10-K at 25.

For these reasons, the PSLRA's first safe harbor shields the Company from liability in connection with all of these forward-looking statements.[30]

### 2. The Challenged Statements Are Protected by the Second Safe Harbor

The PSLRA's second safe harbor provides that, even if a company did not identify risk factors, forward-looking statements are inactionable unless the complaint pleads *specific facts* suggesting defendants had "*actual knowledge*" that the statement was false. 15 U.S.C. § 78u-5(c)(1)(B); *Key Equity Inv'rs, Inc. v. Sel-Leb Mktg. Inc.*, 2005 WL 3263865, at *7 (D.N.J. Nov. 30, 2005) (Cavanaugh, J.), *aff'd*, 246 F. App'x 780 (3d Cir. 2007). "Actual knowledge" must be pled with particularity "with respect to each act or omission" at issue. 15 U.S.C. § 78u-4(b)(2)(A). A showing of recklessness "is insufficient." *Synchronoss*, 705 F. Supp. 2d at 402.

As discussed in significant detail (*see supra* Sec. I), Plaintiffs plead *no* facts suggesting that the Individual Defendants had "actual knowledge" that any of the challenged statements were false. Allegations such as that "the Directors Defendants cannot escape the inference that they were at least reckless when issuing profit forecasts" (¶ 261) are insufficient under the

---

[30]    In addition to the PSLRA's safe harbors, the forward-looking statements are also protected by the judicially-recognized "bespeaks caution" doctrine. H.R. Conf. Rep. No. 104-369 at 46 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 745 ("The Conference Committee does not intend for the safe harbor provisions to replace the judicial 'bespeaks caution' doctrine . . . ."); *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 325 (D.N.J. 2000) (Hochberg, J.) ("The 'bespeaks caution' doctrine provides an alternative, independent basis for [dismissal]."). Under the "bespeaks caution" doctrine, a forward-looking statement is "immaterial as a matter of law" where, as here, it is accompanied by meaningful cautionary language. *Orrstown*, 2015 WL 3833849, at *15 ("Forward-looking statements not specifically identified as such and therefore protected by the PSLRA's safe harbor provision may nevertheless be protected under the 'bespeaks caution' doctrine . . . ."); *see also Hertz*, 2015 WL 4469143, at *12 ("The PSLRA's focus on cautionary language tracks the judge-made 'bespeaks caution' doctrine, which provides that cautionary language renders the alleged omissions or misrepresentations immaterial as a matter of law"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *9 (N.D. Cal. Sept. 29, 2000) (bespeaks caution doctrine can protect oral forward-looking statements where cautionary language appears in 10-K and 10-Q).

PSLRA to state a securities fraud claim for forward-looking statements. *See* 15 U.S.C. § 78u-5(c)(1)(B). Adding a conclusory allegation of knowledge does not satisfy the PSLRA's particularized pleading requirements. *See* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs*, 551 U.S. at 313-14. Accordingly, the challenged statements are protected by the second safe harbor.[31]

## III.   THE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED

For all of the reasons stated herein, the claims against Mr. Papa and Ms. Brown are without merit. Most significantly, Plaintiffs fail to identify any specific, contrary facts known by Mr. Papa or Ms. Brown at the times they allegedly spoke, and Plaintiffs have therefore failed to create a strong inference of scienter.[32]

Plaintiffs' claims against Ms. Brlas, Mr. Cohen, Dr. Fouse, Ms. Hoffing, Mr. Jandernoa, Mr. Kunkle, Mr. Morris, and Mr. O'Connor should be dismissed for the additional reason that they are not alleged to have made any of the challenged statements. *See Winer*, 503 F.3d at 334-37 ("[e]ach untrue statement or omission must be set forth with particularity as to 'the defendant'"; statements in "group-published documents including annual reports and press releases" are *not* attributable to all of a company's officers and directors); *see also, e.g., Barnard*

---

[31]    Plaintiffs' claims against Mr. Papa for alleged misstatements made after April 25, 2016, *see* ¶¶ 11-14, 16-17, 62, 123, 196-204, 217-24, 234-38, 240, 243, 268, and 269, should be dismissed for the additional reason that he was not with the Company after April 25, 2016, and therefore not a "maker" of any post-April 25, 2016 statements. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011). Similarly, statements or alleged omissions by the Company after February 27, 2017 (the date Ms. Brown announced her resignation) may not be attributed to Ms. Brown. *See* ¶¶ 123, 131, 243, 245.

[32]    The Complaint attributes 17 alleged misstatements to Ms. Brown. Of these, one concerns the integration of Omega (¶ 139), seven concern the value of the Tysabri® royalty stream (¶¶ 205, 207, 211, 215, 219, 221, 223), one concerns Perrigo's organic growth (¶ 155), and eight concern Perrigo's alleged scheme to fix prices for generic pharmaceuticals (¶¶ 184, 192, 194, 196, 200, 201, 203). All claims against Ms. Brown based on these statements should be dismissed because Plaintiffs fail to allege any specific, contrary facts known to Ms. Brown at the time she allegedly made the statements.

*v. Verizon Comm's, Inc.*, 451 F. App'x 80, 85 n.6 (3d. Cir. 2011) (affirming dismissal with prejudice of securities fraud complaint that "fail[ed] to ascribe any given statement to either defendant particularly").  In light of the PSLRA's requirement that plaintiffs must "demonstrat[e] each defendant's involvement in misstatements and omissions[,]" there is no longer a "judicial presumption that statements in group-published documents . . . are attributable" to a company's officers and directors.  *Rahman*, 2012 WL 762311, at *16.

That well-established rule is not affected by the fact that Perrigo press releases, presentations, and letters dated prior to the expiration of Mylan's tender offer stated that "[t]he directors of Perrigo accept responsibility for the information contained in this announcement" and "[t]o the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information." *E.g.*, ¶¶ 3, 166.  Just as "[s]imply showing a defendant signed a 10-K form does not meet the pleading requirements of the PSLRA[,]" *Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*, 2013 WL 3087078, at *27 (D.N.J. June 14, 2013) (Walls, J.), simply showing that the press releases, presentations, and letters contained the language cited above does not satisfy Plaintiffs' obligations to "identify with particularity how each of [these individuals] assisted, if it all, in preparing or approving" those statements. *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 504 F. Supp. 2d 287, 307 (S.D. Ohio 2007) (outside directors' "statement in the Offering Materials that [they] had 'taken all reasonable care to ensure that the information contained [herein] is true and accurate in all material respects' and 'accept responsibility accordingly'" was "insufficient to support [a] Section 10(b) claim because it failed to identify with particularity how each of the [o]utside [d]irectors assisted, if it all, in preparing

or approving the Offering Materials").

Nor, for that matter, are there any well-pleaded facts suggesting that Ms. Brlas, Mr. Cohen, Dr. Fouse, Ms. Hoffing, Mr. Jandernoa, Mr. Kunkle, Mr. Morris, or Mr. O'Connor did *not* in fact take all reasonable care to ensure that the information contained in the press releases, presentations, and letters was accurate.  Put simply, Plaintiffs "have failed to detail specific actions of the individual board members" that could give rise to liability.  *Rescue Mission*, 2013 WL 3087078, at *28.

Moreover, the Complaint makes no attempt to plead that Ms. Brlas, Mr. Cohen, Dr. Fouse, Ms. Hoffing, Mr. Jandernoa, Mr. Kunkle, Mr. Morris, or Mr. O'Connor acted with scienter.  For that reason as well, the claims against them should be dismissed.  *See In re Par Pharm. Sec. Litig.*, 2008 WL 2559362, at *10 (D.N.J. June 24, 2008) (Sheridan, J.) ("Each individual's participation and scienter must be pled separately and with particularity."); *Witriol*, 2006 WL 3511155, at *3 (dismissing § 10(b) claim where complaint "d[id] not speak to what a particular Defendant knew, or when.").

## IV.    THE CONTROL PERSON CLAIM (COUNT II) MUST BE DISMISSED

Count II of the Complaint, which asserts a Section 20(a) control person liability claim against the Individual Defendants, should be dismissed because Plaintiffs "failed to adequately plead a predicate section 10(b) violation . . . ."  *City of Edinburgh*, 754 F.3d at 177.  Moreover, this claim fails for the additional reason that the Complaint lacks well-pleaded facts suggesting "culpable participation" by any Individual Defendant.  *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013); *In re Merck & Co. Sec. Litig.*, 2012 WL 3779309, at *10 (D.N.J. Aug. 29, 2012) (Chesler, J.) (allegations of "culpable participation" are subject to PSLRA's heightened pleading standard).  "Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its

discovery." *Id.* at *10. "To prevail on a control person claim, a plaintiff must establish that the defendant's action or inaction was deliberate and done intentionally to further the fraud." *Id.* The Section 20(a) claim should be dismissed for failure to plead facts of that nature.

## V.    THE ISRAELI LAW CLAIM (COUNT IV) MUST BE DISMISSED

Plaintiffs acknowledge that Israeli law adopts the law of the foreign jurisdiction in the case of a dual-listed company like Perrigo and thus would "appl[y] U.S. laws and regulations." ¶¶ 303-07. Insofar as the U.S. securities law claims fail, the Israeli law claim fails as well.

Alternatively, in the event the Court does not dismiss the Israeli law claim on the merits, it should decline jurisdiction over that claim. *See Roach v. SCI Graterford Med. Dep't*, 178 F. App'x 181, 182 n.1 (3d Cir. 2006) ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction . . . ."); *see also Roman y Gordillo, S.C. v. Bank of N.Y. Mellon Corp.*, 2015 WL 5786460, at *21 n.29 (S.D.N.Y. Sept. 29, 2015) ("same analysis" applies to foreign and state claims). Courts repeatedly have dismissed foreign claims in like circumstances. *See TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, 2008 WL 650385, at *26 (S.D.N.Y. Mar. 7, 2008) (declining to exercise supplemental jurisdiction because "Plaintiff cannot bootstrap claims under [foreign] law into an American court by asserting meritless claims under the federal securities laws"); *Kaplan v. Central Bank of Islamic Republic of Iran*, 961 F. Supp. 2d 185, 206 (D.D.C. 2013) (similar). That is because "[a]t this juncture in the case, there quite simply is no 'hook' on which the Plaintiffs can viably hang their foreign-law claims . . . ." *Empagran, S.A. v. F. Hoffman-La Roche Ltd.*, 453 F. Supp. 2d 1, 12 (D.D.C. 2006).

CONCLUSION

For these reasons, the Complaint should be dismissed with prejudice in its entirety pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

Dated:  August 21, 2017

By: _____

Alan S. Naar

GREENBAUM, ROWE, SMITH
 & DAVIS LLP
Alan S. Naar
99 Wood Avenue South
Iselin, New Jersey 08830
(732) 476-2530
anaar@greenbaumlaw.com

FRIED, FRANK, HARRIS, SHRIVER
 & JACOBSON LLP
James D. Wareham (*pro hac vice*)
James E. Anklam (*pro hac vice*)
801 17th Street, NW
Washington, DC 20006
(202) 639-7000
james.wareham@friedfrank.com
james.anklam@friedfrank.com

Samuel P. Groner (*pro hac vice*)
One New York Plaza
New York, New York 10004
(212) 859-8000
samuel.groner@friedfrank.com

*Attorneys for Defendant
 Perrigo Company plc*

Dated:  August 21, 2017

By: _____

Goutam U. Jois

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky (*pro hac vice*)
Aric H. Wu (*pro hac vice*)
Goutam U. Jois
200 Park Ave
New York, New York 10166
(212) 351-4000
rbrodsky@gibsondunn.com
awu@gibsondunn.com
gjois@gibsondunn.com

61

*Attorneys for Defendant Joseph Papa*

Dated:  August 21, 2017

By: _Brian T. Frawley /ASN_

Brian T. Frawley

SULLIVAN & CROMWELL LLP
John L. Hardiman (*pro hac vice pending*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice pending*)
125 Broad Street
New York, New York 10004
(202) 558-4000
hardimanj@sullcrom.com
frawleyb@sullcrom.com
devlinm@sullcrom.com

*Attorneys for Defendant Judy Brown*

Dated:  August 21, 2017

By: _Jonathan W. Wolfe /ASN_

Jonathan W. Wolfe

SKOLOFF & WOLFE, PC
Jonathan W. Wolfe
Jane J. Felton
293 Eisenhower Parkway
Livingston, NJ 07039
(973) 232-2988
jwolfe@skoloffwolfe.com
jfelton@skoloffwolfe.com

MILBANK, TWEED, HADLEY, & McCLOY
LLP
Alan J. Stone (*pro hac vice application to be
submitted*)
28 Liberty Street
New York, New York 10005
(202) 530-5000
astone@milbank.com

*Attorneys for Defendants Laurie Brlas, Gary M.
Cohen, Jacqualyn A. Fouse, Ellen R. Hoffing,
Michael Jandernoa, Gerald K. Kunkle, Jr.,
Herman Morris, Jr., and Donal O'Connor*

62