# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ROOFERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PERRIGO CO., PLC, JOSEPH PAPA, JUDY BROWN, LAURIE BRLAS, GARY M. COHEN, MARC COUCKE, JACQUALYN A. FOUSE, ELLEN R. HOFFING, MICHAEL R. JANDERNOA, GERALD K. KUNKLE, JR., HERMAN MORRIS, JR., and DONAL O'CONNOR,<br><br>Defendants. | **Civil Action No. 16-cv-2805-MCA-LDW**<br><br>**Hon. Madeline Cox Arleo**<br><br>**<u>CLASS ACTION</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

---

## LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS .......................................................................................5

    A.    Perrigo Becomes an Irish Company and Makes its Largest Acquisition ..................................................................................5

    B.    Perrigo Receives a Hostile Takeover Bid From Mylan ............................6

    C.    To Defeat Mylan's Hostile Bid, Defendants Make Misrepresentations to Investors ...............................................7

    D.    Defendants Conceal Known Integration Problems with Omega ................8

    E.    Defendants Inflate Growth Projections Despite Known Slowdown..........10

    F.    Anti-competitive Practices Boost Perrigo's Generic Rx Results..............11

    G.    False Accounting and Overt Misrepresentations Hide Deterioration in Tysabri Royalty Stream .....................................13

    H.    Defendants' Misrepresentations Successfully Fend Off Mylan's Hostile Bid ...............................................................14

    I.    Investors Gradually Learn the Truth................................................15

ARGUMENT.......................................................................................................17

I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT ALL DEFENDANTS VIOLATED §10(B) OF THE EXCHANGE ACT....................17

    A.    Applicable Pleading Standards Do Not Favor Dismissal .........................17

    B.    The Complaint Adequately Alleges §10(b) Violations Regarding Omega .................................................................19

        1.    The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Omega ................19

            a.    Defendants' "Multi-Year Plan" Defense Fails .................21

            b.    Defendants' Misrepresentations Concerning Omega Are Not Protected by the PSLRA Safe Harbor or the "Bespeaks Caution" Doctrine ............................23

        2.    The Complaint Alleges a Strong Inference of Scienter Concerning Omega Misrepresentations.........................24

            a.    Defendants knew information contradicting their statements to investors ......................................24

            b.    Omega is a "Core Operation" ...........................................29

            c.    There is no plausible competing inference .......................29

    C.    The Amended Complaint Adequately Alleges §10(b) Violations

Regarding Organic Growth Statements ...................................................30

1. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Organic Growth ...........................................................................30

2. The Complaint Alleges a Strong Inference of Scienter Concerning Organic Growth Misrepresentations ..........................34

D. The Complaint Adequately Alleges a §10(b) Claim Regarding Collusive Pricing in Perrigo's Generic Rx Business .................................35

1. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Collusive Pricing in Perrigo's Generic Rx Business.....................................35

2. The Complaint Alleges a Strong Inference of Scienter Concerning Generic Rx Pricing Misrepresentations.....................42

E. The Complaint Sufficiently Alleges §10(b) Violations Regarding the Tysabri Royalty Stream ......................................................................45

1. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding the Tysabri Royalty Stream...............................................................................45

2. The Complaint Alleges a Strong Inference of Scienter Concerning the Tysabri Royalty Stream Misrepresentations ........50

F. Defendants' Additional §10(b) Arguments Fail .........................................56

1. Motive, Though Not Required, Is Alleged ....................................56

2. The Complaint Expressly Identifies the Maker of Each Misrepresentation............................................................................57

3. The Complaint Alleges Misrepresentations, Not Mismanagement ...............................................................................59

II. THE AMENDED COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF §14(E) ......................................................................................60

III. THE AMENDED COMPLAINT ADEQUATELY ALLEGES §20(A) VIOLATIONS ...................................................................................................61

IV. THE AMENDED COMPLAINT ADEQUATELY ALLEGES VIOLATIONS UNDER THE ISRAEL SECURITIES LAW, 1968....................62

CONCLUSION....................................................................................................62

**TABLE OF AUTHORITIES**

**PAGES**

CASES

*In re Aetna Inc. Sec. Litig.*,
    34 F. Supp. 2d 935 (E.D. Pa. 1999) ........................................................22, 23, 29

*In re Akorn Sec. Litig.*,
    240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ............................................................53

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006)....................................................................26

*Applied Digital Data Sys. Inc. v. Milgo Elec. Corp.,*
    425 F. Supp. 1145 (S.D.N.Y.)................................................................................60

*In re Avant-Garde Computing, Inc. Sec. Litig.*,
    Civil No. 85-4149 (AET), 1989 WL 103625 (D.N.J. Sep. 5, 1989)......................59

*Aviva Partners, LLC v. Exide Techs.*,
    No. 05-3098 (MLC), 2007 WL 789083 (D.N.J. March 13, 2007) .........................28

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
    456 F. Supp. 2d 576 (S.D.N.Y. 2006)....................................................................41

*In re Bausch & Lomb, Inc. Sec. Litig.*,
    592 F. Supp. 2d 323 (W.D.N.Y. 2008) ..................................................................27

*In re Bio-Tech. Gen. Corp. Sec. Litig.*,
    380 F. Supp. 2d 574 (D.N.J. 2005) ..................................................................26, 45

*In re Blood Reagents Antitrust Litig.*,
    756 F. Supp. 2d 623 (E.D. Pa. 2010) ..............................................................39, 40

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)....................................................................44

*In re Bristol-Myers Squibb Sec. Litig.*,
    2005 WL 2007004 (D.N.J. Aug. 17, 2005) ............................................................24

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)..................................................................................19

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011).....................................................................................38

*California Pub. Emps. Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)..............................................................................27, 28

iv

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ...............................................................4, 24, 29

*Carmack v. Amaya Inc.*,
    Civil Action No. 16-1884, 2017 WL 2610673 (D.N.J. June 15, 2017) ...................................18

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010) ..........................................................36, 41, 44

*In re Cigna Corp. Sec. Litig.*,
    2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) .........................................................22

*In re CommVault Sys., Inc. Sec. Litig.*,
    2016 WL 5745100 (D.N.J. Sept. 30, 2016) .........................................................42

*In re Daou Sys. Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .....................................................................28

*DeMarco v. Depotech Corp.*,
    149 F. Supp. 2d 1212 (S.D. Cal. 2001) ............................................................42

*In re Diamond Foods, Inc.*,
    No. C 11-05386, 2012 U.S. ........................................................................55

*In re Domestic Drywall Antitrust Litig.*,
    163 F. Supp. 3d 175, 252 (E.D. Pa. 2016) .........................................................39

*In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*,
    Civ. No. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013) ....................................39, 40, 41

*Dudley v. Haub*,
    No. 2:11-cv-05196 (WJM), 2013 WL 1845519 (D.N.J. Apr. 30, 2013) .....................22, 23, 47, 49

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...............................................................................18

*In re DVI, Inc. Sec. Litig.*,
    No. 2:03-cv-05336, 2010 WL 3522086 (E.D. Pa. Sep. 3, 2010) ..................................58, 59

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................................44

*In re Enzymotec Sec. Litig.*,
    Civil Action No. 14-1566 (JLL) (MAH), 2015 WL 8784065 (D.N.J. Dec. 15, 2015) .... passim

*Fain v. U.S. Techs.*,
    Nos. 16-2436, 16-3796, 2017 WL 3727435 (3d Cir. Aug. 30, 2017) .........................53, 54, 56

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ........................................................................51

*Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*,
  No. 16-cv-01820 (JGK), 2017 WL 3261609 (S.D.N.Y. July 28, 2017) ..................53

*Galati v. Commerce Bancorp, Inc.*,
  220 F. App'x 97 (3d Cir. 2007) ................................................................................32

*Ganino v. Citizens Util. Co.*,
  228 F.3d 154 (2d Cir. 2000) .....................................................................................32

*Gargiulo v. Demartino*,
  527 F. Supp. 2d 384 (E.D. Pa. 2007) .......................................................................23

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .......................................................................35

*Gewirtz v. Opko Health, Inc.*,
  230 F. Supp. 3d 440, 445 (E.D. Pa. 2017) ...............................................................55

*Hayes v. Gross*,
  982 F.2d 104 (3d Cir. 1992) .....................................................................................59

*Healey v. Catalyst Recovery of Penn., Inc.*,
  616 F.2d 641 (3d Cir. 1980) .....................................................................................59

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  No. 13-7050, 2017 WL 1536223 (D.N.J. April 27, 2017)............................... passim

*In re Hutchinson Tech., Inc. Sec. Litig.*,
  536 F.3d 952 (8th Cir. 2008) ....................................................................................40

*In re Infineon Techs. Ag. Sec. Litig.*,
  No. C 04-4156 JW, 2006 WL 1329887 (N.D. Cal. May 22, 2006)..........................36

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010).....................................................................................38

*Institutional Investors Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)........................................................................... passim

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ....................................................................29, 35

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)........................................................................................57, 58, 59

*John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*,
   119 F.3d 1070 (3d Cir. 1997)..................................................18

*Jui-Yang Hong v. Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017).......................22

*In re Key Energy Servs. Sec. Litig.*,
   166 F. Supp. 3d 822, 872 (S.D. Tex. 2016).........................40

*Kohut v. KBR, Inc.*,
   No. H-14-1287, 2015 WL 11995250 (S.D. Tex. Sep. 3, 2015)..............57

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008).............................56

*In re LeapFrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987, 1001-1008 (N.D. Cal. 2016)................22

*Lewis v. McGraw*,
   619 F.2d 192 (2d Cir. 1980)......................................60

*Li v. Aeterna Zentaris, Inc.*,
   Civil Action No. 3:14-7081 (PGS)(TJB),
   2016 WL 827256 (D.N.J. June 29, 2016)...................45, 61, 62

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
   No. 13 CV 214 (HB), 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014)............55

*In re Lucent Techs., Inc. Sec. Litig.*,
   217 F. Supp. 2d 529 (D.N.J. 2002) .......................... passim

*Mauss v. NuVasive, Inc.*,
   No. 13-cv-2005, 2015 WL 10857519 (S.D. Cal. Aug. 28 2015)...........41

*Mauss v. NuVasive, Inc.*,
   No. 13-cv-2005 JM (JLB), 2014 WL 6980441 (S.D. Cal. Dec. 9, 2014)............41

*In re Merck & Co., Sec., Derivative & "ERISA" Litig.*,
   No. 1658 (SRC), 2011 WL 344199 (D.N.J. Aug. 8, 2011) .......................32, 33, 48

*In re Mirant Corp. Sec. Litig.*,
   No. 1:02-CV-1467-RWS, 2009 WL 48188, at *19 (N.D. Ga. Jan. 7, 2009).........41

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d 901 (D.N.J. 1998) ..........................60

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007) ..........................58, 59

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
    720 F. Supp. 2d 517 (D.N.J. 2010) ..................................................................27

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ............................................................27

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed. App'x 10 (2d Cir. 2011).....................................................................43

*Okla. Firefighters Pension & Ret. Sys. v. Ixia*,
    50 F. Supp. 3d 1328, 1365 ................................................................................55

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)......................................................................................50

*Opengate Capital Grp. LLC v. Thermo Fisher Sci. Inc.*,
    No. 13-1475-GMS, 2014 WL 2610643 (D. Del. July 8, 2014) ..................19, 57, 58

*P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp.*,
    47 F. Supp. 2d 546 (D.N.J. 1999) .....................................................................60

*In re Par Pharm. Sec. Litig.*,
    Civil Action No. 06-cv-3226 (PGS), 2009 WL 3234273 (D.N.J. Sep. 30, 2009) ..................45

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015)..........................................................52

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d 968, 976 (N.D. Ohio 2015).......................................................38

*In re Propranolol Antitrust Litig.*,
    16-cv-09901 (JSR), 2017 WL 1287515 (S.D.N.Y. April 6, 2017).............38, 39, 40

*In re PTC Therapeutics, Inc., Sec. Litig.*,
    No. 16-1124 (KM) (MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ...................... passim

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013)........................................................................18, 29

*Ratz v. Photomedex*,
    No. 13-6808, 2014 WL 12617439 (E.D. Pa. Sep. 12, 2014) ...................................51

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
    No. 00-5965 (JCL), 2005 WL 1366025 (D.N.J. June 7, 2005) ..............................53

*S.E.C. v. Kelly*,
    663 F. Supp. 2d 276 (S.D.N.Y. 2009)............................................................45, 46

*Santa Fe Indus. Inc. v. Green*,
    430 U.S. 462, 476 (1977).................................................................................59

*In re Sofamor Danek Group., Inc.*,
    123 F.3d 394 (6th Cir. 1997) ....................................................................32

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
    00 Civ. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 30, 2000) ....................................36

*Steamfitters Local 449 Pension Fund v. Alter*,
    No. 09-4730, 2011 WL 4528385 (E.D. Pa. Sep. 30, 2011) .............................................24, 59

*Steinberg v. Ericsson LM Tel. Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ....................................................27

*In re Stonepath Grp., Inc. Sec. Litig.*,
    2006 WL 890767 (E.D. Pa. Apr. 3, 2006) ...........................................................28

*Superior Offshore Int'l, Inc. v. Bristow Group*,
    738 F. Supp. 2d 505 (D. Del. 2010)....................................................................40

*Tellabs II*, 513 F.3d 702 (7th Cir. 2008) ............................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................... passim

*In re Tibco Software, Inc. Sec. Litig.*,
    2006 WL 2844421 (N.D. Cal. Sept. 29, 2006) ....................................................27

*Underland v. Alter*,
    No. 10-3621, 2011 WL 4017908 (E.D. Pa. Sep. 9, 2011) .................................................50, 58

*United States v. Feeney*,
    984 F.2d 1053 (9th Cir. 1993) ....................................................................44

*United States v. O'Hagan*,
    521 U.S. 642 (1997)...........................................................................61

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015)...............................................43, 44

*In re Valeant Pharm. Int'l, Inc. Sec. Litig.*,
    Civil Action No. 15-7658 (MAS) (LHG), 2017 WL 1658822 (D.N.J. Apr. 28, 2017).....42, 45

*Valspar Corp. v. E.I. DuPont De Nemours and Co.*,
    No. 16-1345, *slip op.* (3d Cir. Sep. 14, 2017)........................................................38

*Van Noppen v. Innerworkings, Inc.*,
    136 F. Supp. 3d 922, 947 (N.D. Ill. 2015) ...........................................................27

*In re Viropharma, Inc. Sec. Litig.*,
  21 F. Supp. 3d 458, 472 (E.D. Pa. 2014) ("*Viropharma II*")...........................31, 57

*In re Viropharma, Inc. Sec. Litig.*,
  No. 02-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003).......................................42

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  No. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015)............................ passim

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93, 115 (D. Mass. 2014) ................................................................44

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996).......................................................................................24

*Wilson v. Bernstock*,
  195 F. Supp. 2d 619 (D.N.J. 2002) .........................................................................29

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007).........................................................................5, 6, 7, 49

*Winer Family Trust v. Queen*,
  2004 WL 2203709 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007).................49

*Witriol v. Conexant Sys. Inc.*, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006) ..........................26

*Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205-06 (D. Or. 2006)............27

**STATUTES**

15 U.S.C. §78u-4(b)(2) ................................................................................................18

Private Securities Litigation Reform Act of 1995 ("PSLRA")..................................18, 19, 23, 46

**RULES**

Federal Rule of Civil Procedure 8 ...............................................................................18

Federal Rule of Civil Procedure 9(b)....................................................................18, 46

Federal Rule of Civil Procedure 12(b)(6) ............................................................17, 19

Federal Rule of Civil Procedure 28 ....................................................................7, 8, 9, 10

**REGULATIONS**

17 C.F.R. 210.4-01(a)(1)..............................................................................................49

**OTHER AUTHORITIES**

J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, Wall St. J. (July 5, 2016)....................................................................................................................37

Lead Plaintiff Perrigo Institutional Investor Group ("Plaintiff") hereby opposes the motions to dismiss filed by the Perrigo Defendants and by Marc Coucke as follows:[1]

## PRELIMINARY STATEMENT

In April 2015, Perrigo was in a fight for its very existence.  On April 8, 2015, after Perrigo rejected friendly overtures, Mylan N.V. ("Mylan") announced that it would make a hostile tender offer directly to Perrigo's shareholders.  ¶¶1, 92.  Mylan's cash and stock proposal valued Perrigo shares at $205, a premium of approximately 25% and far higher than Perrigo shares had ever traded.  ¶92.  Threatened, Defendants mounted a vigorous takeover defense, convincing shareholders to reject Mylan's offer through what a Wells Fargo analyst called "*unrealistic and aspirational earnings guidance*" and what one of Perrigo's largest investors described as "*aggressive promises of drastic improvements*."  ¶¶15, 232, 239.  Unfortunately, as prominent stock commentator Jim Cramer concluded, Defendants' statements in opposition to the Mylan bid were "*clearly untrue.*"  ¶11.

The Complaint alleges in extensive detail the misrepresentations and omissions that Defendants made first as part of their takeover defense, and then doubled down on thereafter. Specifically, the Complaint alleges that Defendants misled investors in the following crucial areas, the falsity of which Perrigo has now largely admitted:

- **Omega integration:**  Perrigo investors regarded the successful integration of Omega Pharma N.V. ("Omega"), the Company's largest and most complex acquisition, as

---

[1] "Perrigo Defendants" are Perrigo Co. plc ("Perrigo"), Joseph Papa, Laurie Brlas, Judy Brown, Gary Cohen, Ellen Hoffing, Michael Jandernoa, Gerald Kunkle, Jr., and Herman Morris, Jr.  The term "Director Defendants" refers collectively to the Perrigo Defendants other than the company and Judy Brown.  Citations to paragraphs ("¶") refer to the numbered paragraphs of Plaintiff's Amended Complaint (Dkt. No. 89).  References to "DM" are to the numbered pages of the Perrigo Defendants' Memorandum in Support of Motion to Dismiss (Dkt. No. 114-16). References to "CM" are to the numbered pages of Defendant Marc Coucke's separate Memorandum in Support of Motion to Dismiss (Dkt. No. 119-1).

critically important.  Accordingly, to fight Mylan's offer, Defendants spoke at length about Omega, falsely claiming that they had *already* "delivered on . . . Omega's integration plan" and promising that Omega would play a key role in Perrigo's growth. ¶141.  In reality, soon after the Mylan tender offer expired, Perrigo *conceded* that Defendants had misrepresented Omega's integration and prospects.  ¶¶225-226, 230, 237-238.  Not only had Perrigo failed to deliver the integration, but Omega was so damaged that Perrigo needed to take impairment write-offs and restructuring charges totaling *more than $2 billion*.  *Id.*   Moreover, well-pled allegations—including information provided by Christine Kincaid, Perrigo's Global Cyber Security Manager during the Mylan takeover bid—show that Defendants *knew* that countless problems plagued the Omega integration, including legal hurdles, technical incompatibility, and underperformance in Omega's key markets.  ¶¶5, 57-61.

- *Organic growth:*  To fight Mylan's takeover bid, Defendants claimed to investors that Perrigo had consistently achieved a 5%-10% organic growth rate, and further folded aggressive growth projections into grossly unrealistic profit forecasts for Q4 2015 and FY 2016.  ¶¶2, 170-172.  Each of the Director Defendants claimed to have compiled these projections and all underlying assumptions "with scrupulous care, accuracy, and objectivity."  ¶4.  They had not.  In reality, Perrigo's organic growth was sputtering:  in the six quarters preceding the Class Period, Perrigo averaged only about 1% organic growth.  ¶¶64-65.  After defeating Mylan's takeover bid, Perrigo's new CEO *conceded* that Defendants had not issued "transparent" and "realistic" projections during the Mylan bid.  ¶13.  Multiple market professionals concluded that Perrigo inflated its forecasts

issued during the Mylan tender offer as a takeover defense.  *See* ¶¶11, 15, 232, 239; *see also infra* at Section I(C)(2), I(F)(1).

- ***Fair value of Tysabri royalty stream:***  Throughout the Mylan offer period, Defendants told investors that Perrigo's largest asset—a royalty stream for the drug Tysabri—was worth an eye-popping $5.8 billion.  *See, e.g.,* ¶¶122, 126, 129.  Perrigo's 2016 quarterly reports went even further, claiming that the asset's fair value ***exceeded*** $5.8 billion.  In fact, though concealed by Defendants' improper accounting, the asset's value was rapidly deteriorating.  ¶¶219, 221, 223.  In February 2017, Perrigo announced that it was selling the royalty stream for just $2.2 billion (plus $0.65 billion if future sales thresholds were met) — ***less than half*** the value represented to investors.  Perrigo has *admitted* that its accounting for Tysabri violated Generally Accepted Accounting Principles ("GAAP"), which required Perrigo to disclose the asset's fair value to investors each quarter and to take a charge against earnings for deterioration in fair value.  ¶¶245-250.  Far from a simple "change" or "revision," *see* DM 9, Perrigo's restatement admits that ***all*** of its Class Period financial statements were materially false and misleading, and that the Company's internal controls were compromised by "material weaknesses."  *Id.*

- ***Generic Rx Price Fixing:***  Defendants touted the high growth and profitability of Perrigo's Generic Rx division, while concealing that the division's results were inflated by hundreds of millions of dollars in revenue obtained by illegal price collusion.  The Complaint details collusive pricing practices for six key topical generic drugs, which Perrigo used to ram through price hikes of 300%-500% that never could have been achieved in a competitive market.  ¶¶63-90, 172-173, 176-189.  These price hikes occurred in coordination with so-called competitors after industry conferences used to

3

arrange pricing among generic drug manufacturers, and demonstrate all of the "plus factors" that reflect illegal price-fixing.  ¶¶72-73, 78, 82, 86, 88, 90.  These well-pled allegations are corroborated by the Department of Justice's ("DOJ") raid of Perrigo's facilities, which required a finding of probable cause.  ¶21.

In addition to identifying each misrepresentation with particularity, the Complaint also alleges a strong inference of scienter.  In particular, it alleges facts demonstrating that Defendants knew "facts or [had] access to information contradicting their public statements," classic evidence of scienter.  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (quotation and citation omitted).  Further, for most statements issued in opposition to the Mylan tender offer, the Director Defendants (including Papa) explicitly represented under the Irish Takeover Rules that they personally accepted responsibility and had taken "all reasonable care" to not "omit anything likely to affect the import" of the disclosures.  *See, e.g.,* ¶¶3-4.  Either they had taken "all reasonable care" and investigated the statements made, in which case they would know they were false and misleading, or they had not taken "all reasonable care" to ascertain whether statements to investors were truthful or complete, in which case they were reckless (and their assurances of care were affirmatively false).

Though the Complaint contains numerous allegations that Defendants knew or had access to information undermining their public statements, Defendants instead focus myopically—and incorrectly—on motive.  The Supreme Court has explicitly held that motive is not necessary to plead scienter, and the Third Circuit has cautioned against placing undue weight on "the presence or absence of certain types of allegations."  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 259 (3d Cir. 2009).  To the extent relevant at all, the Complaint's well-pleaded allegations

demonstrate that the most compelling inference is the one reached independently by multiple seasoned market professionals assessing Defendants' misconduct—that they stretched the truth in order to fight the Mylan takeover bid.  ¶¶11, 15, 231, 232, 239.  Defendants provide no reason why this Court should refuse to credit that inference.

Finally, throughout their briefs, Defendants repeatedly mischaracterize Plaintiff's allegations as hindsight or mismanagement.  Neither is accurate.  The Complaint alleges in detail that Defendants misrepresented or omitted then-known material facts concerning Perrigo's then-existing business conditions and prospects.  That the impact of these misrepresentations was felt over time is not "fraud by hindsight."  *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2015 WL 3755218, at *14 (E.D. Pa. June 16, 2015); *see also infra* at Sections I(B)(1), I(C)(1), I(D)(1), I(E)(1).  Similarly, the Complaint seeks liability not because Defendants mismanaged Perrigo, but because, knowing or recklessly disregarding the actual conditions, they "made . . . material public statement[s] about the state of corporate affairs inconsistent with the existence of the mismanagement."  *Winer Family Tr. v. Queen*, 503 F.3d 319, 333 (3d Cir. 2007) (citation and quotation omitted); *see also infra* at Section I(F)(3).

Notwithstanding Defendants' efforts to mischaracterize the Complaint's well-pleaded allegations, the Complaint unquestionably satisfies all applicable pleading standards. Accordingly, Defendants' motions should be denied.

## STATEMENT OF FACTS

### A.   Perrigo Becomes an Irish Company and Makes its Largest Acquisition

Perrigo is a global healthcare company that has existed for more than one hundred years. For most of this time, Perrigo was a slow-growing manufacturer of store brand or generic over-the-counter ("OTC") remedies like pain relievers, cough medicine, and heartburn relief therapies.

¶44.  After Defendant Papa became CEO in 2007, Perrigo adopted a roll-up strategy and began to grow rapidly.  Between 2007 and 2013, Perrigo acquired numerous companies, mostly manufacturers of OTC remedies or topical generic drugs.  ¶45.  During that time, Perrigo also demonstrated strong organic growth.  ¶63.

In December 2013, Perrigo engaged in a controversial tax avoidance maneuver called an "inversion," whereby it merged into an Irish company, Elan plc, and, through the transaction, became an Irish company itself.  ¶¶44, 46.  While the primary purpose was to avoid United States taxes, Perrigo also acquired Elan's major asset, a stream of royalty payments for Tysabri, a treatment for multiple sclerosis.  ¶48.  However, Perrigo did not acquire any operations related to Tysabri, which was manufactured and sold by another company, Biogen Inc.  *Id.*

On March 30, 2015, Perrigo expanded into Europe by acquiring Omega, one of Europe's largest OTC healthcare companies.  ¶53.  Like Perrigo, Omega operated as a roll-up, growing primarily through acquisition.  However, unlike Perrigo, Omega focused on name brand products rather than store brand or unbranded products.  *Id.*  Omega was far larger and more complex than any company that Perrigo had previously acquired, and posed an integration challenge far more substantial than Perrigo had previously faced.  ¶54.  Omega had annual revenues of approximately $1.6 billion, approximately 2,500 employees, a portfolio of several thousand branded products, decentralized management, and a mishmash of IT systems.  *Id.*  Complicating matters, Omega was not itself integrated, but instead functioned as a separate company in each of the thirty-five countries in which it operated.  *See, e.g.,* ¶62.

### B.    Perrigo Receives a Hostile Takeover Bid From Mylan

On April 8, 2015, after negotiations for a friendly business combination fell apart, Mylan announced that it would launch a hostile tender offer to acquire Perrigo for $205 per share in cash and stock.  ¶92.  This represented a premium of approximately 25% above the price that

Perrigo shares had closed at the prior trading day, and was substantially above any price at which Perrigo shares had traded for the entire history of the Company. *Id.* Defendants strenuously opposed the bid and were willing to do or say anything to defeat the tender offer. *See, e.g.,* ¶¶11, 13, 96-101, 103-104, 108, 231, 232, 239.

Mylan's proposal commenced an offer period under the Irish Takeover Rules, which require directors to expressly take responsibility for statements to investors. ¶¶3, 93. Thus, in each press release and presentation Perrigo made from the beginning of the Class Period through the expiration of Mylan's tender offer, Perrigo's directors expressly stated:

> ***The directors of Perrigo accept responsibility for the information contained in this announcement.*** To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

¶3. Forecasts made to investors were subject to even stricter requirements, which Defendants claimed to have met. Irish Takeover Rule 28 mandates that "[e]very. . .profit forecast (including the assumptions upon which it is based) ***shall be compiled with scrupulous care, accuracy and objectivity.***" ¶4.

## C. To Defeat Mylan's Hostile Bid, Defendants Make Misrepresentations to Investors

The Class Period begins on April 21, 2015, when Perrigo began to make misrepresentations to investors in an attempt to thwart Mylan's hostile bid.[2] ¶96. Specifically,

---

[2] The Class Period set forth in the Complaint, for claims under §10(b) of the Exchange Act and parallel provisions under Israeli law, runs from **April 21, 2015** to **May 3, 2017**, both dates inclusive. ¶273. The Complaint also asserts claims under §14(e) of the Exchange Act on behalf of holders of Perrigo common stock as of the **November 13, 2015** expiration date of Mylan's tender offer (please note that the preamble to the numbered paragraphs of the Complaint references a November 13, 2016 expiration date. That is a typographical error).

they concealed deterioration in Perrigo's growth and falsely claimed that Mylan's $205 bid substantially undervalued the Company.  ¶¶96-98.  Perrigo and its directors published artificially inflated organic growth projections to investors, concealed problems with the Omega integration that impaired its contributions to Perrigo's growth and the value of that business, falsely claimed additional "upside" from Tysabri even though the value of that financial asset had declined and fair value adjustments required by GAAP were not made, and omitted that Perrigo's Generic Rx unit, the largest contributor to earnings, had inflated results through collusive and unsustainable price hikes.  ¶¶99-101.

On April 24, 2015 and April 29, 2015, Perrigo's board rejected revised bids from Mylan worth $227 and $246 per share, respectively, and encouraged shareholders not to tender shares. ¶¶103-104.  Furthermore, although Perrigo's actual organic growth had deteriorated, Defendants issued an investor presentation on August 6, 2015, claiming that organic growth targets remained intact and that they had a "strategy for delivering 5-10% organic growth."  ¶105.  At the same time, unbeknownst to investors, Perrigo was using illegal collusive price spikes to drive returns in its most profitable division, Generic Rx.  ¶106.

### D.    Defendants Conceal Known Integration Problems with Omega

Despite telling investors that they complied with Irish Takeover Rules requiring their profit forecasts (including all underlying assumptions) to be compiled "with scrupulous care, accuracy and objectivity," Defendants Perrigo, Papa, and other Director Defendants issued grossly inflated projections for Omega that were not accurate or objective, were inconsistent with Omega's own projections, and concealed known integration problems.  *See, e.g.,* ¶56.  These Defendants characterized Omega as a key part of Perrigo's overall organic growth, and told investors to assume a 7.5% organic growth rate for the Omega businesses.  *Id.*  In fact, Omega management had independently projected only 3.2% organic growth for 2013-2017.  *Id.*

8

Defendants also were aware of considerable integration and operating challenges with Omega, because Perrigo was exposed to these challenges during extensive due diligence. ¶55. Perrigo was provided confidential information regarding Omega businesses during July 2014. *Id.* That fall, Perrigo conducted additional due diligence into Omega group companies and their "business, operations, assets, liabilities, legal, tax, commercial and accounting and financial condition." *Id.* As part of this due diligence, Perrigo and its advisors were given access to a confidential "data room," participated in a presentation by Omega management on September 25, 2014, conducted additional meetings with management of Omega and Omega group companies, submitted written questions to Omega, and received answers to the same. *Id.*

Christine Kincaid ("Kincaid"), who was Perrigo's Global Cyber Security Manager from June 2015 to December 2015, explained many known integration problems that existed while Defendants were trying to thwart Mylan's takeover bid:

- IT integration between Perrigo and Omega had completely stalled by mid-2015;

- After being tasked with discovering why integration was not advancing, she learned that there was "discord" between Omega's CEO and CFO and the top executives of Perrigo, including Defendants Papa and Brown;

- she personally experienced major integration impediments including disputes arising with regard to EU regulations hindering replacement of Omega's EU suppliers, and understood that Omega's most senior executives were frustrated by Papa's and Brown's refusal to discuss these issues;

- the Omega IT head was personally instructed by Defendant Coucke in mid-2015 to put integration on hold pending resolution of the above-discussed regulatory concerns;

- Defendant Papa had to personally appoint an additional executive, Mary Donovan, to address communication gaps hindering the integration;

- Perrigo had grown suspicious that Omega was assisting Mylan in its takeover bid, and in September 2015, Kincaid was asked to oversee a covert analysis of Omega emails to determine whether Omega executives had assisted Mylan; and

- deep distrust had manifested between Perrigo and Omega's top executives, even as Defendants touted integration of and synergies with Omega's business as a key source of growth. ¶¶57-61.

Several former Perrigo and Omega employees corroborated Ms. Kincaid's account of the stalled integration process. ¶62. These other witnesses, who were in positions personally to observe the information provided, emphasized that Omega's lack of a centralized structure or policies hindered integration. *Id.* They confirmed extensive IT integration problems, including delays in the rollout of a major SAP database implementation and failure to implement SAP for financial reporting in many Omega divisions. *Id.* These witnesses further corroborated that Omega management, including Defendant Coucke, resisted integration efforts. *Id.* Diversion of resources and budget to fight the Mylan bid also hindered the integration. *Id.* Moreover, Omega was underperforming in key markets, which was documented in a file circulated each month providing Omega's current sales information and sales quotas for each geographic region. ¶62.

### E.    Defendants Inflate Growth Projections Despite Known Slowdown

As part of the takeover defense, Defendants repeatedly boasted that Perrigo was then growing revenues organically by 5%-10%, and that an independent Perrigo would continue to grow organically at approximately the midpoint of that range in addition to growth from acquisitions. *See, e.g.,* ¶¶151, 153, 155, 157, 159, 161-162, 164, 166, 168, 170, 172. In fact,

Perrigo was not growing organically at 5%-10%, and had not done so for a long time.  Perrigo's

actual organic growth averaged *just over 1%* in the six quarters preceding the Class Period (¶64):

| Quarter ending | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/29/2015 |
|---|---|---|---|---|---|---|
| Actual organic growth rate | 6.5% | **1.7%** | 6.7% | **-9.0%** | **-0.1%** | **0.9%** |

Moreover, Perrigo's forecast that organic growth would rebound to the midpoint of the

5%-10% range, and the assumptions upon which that forecast was based, were not prepared with

the "scrupulous care, accuracy and objectivity" that Papa and the Director Defendants promised

pursuant to the Irish Takeover Rules.  ¶¶ 65, 170-172.  To the contrary, numerous then-existing

facts indicated that Perrigo was not positioned to achieve the aggressive goal it told investors to

expect.  ¶¶64, 173.  For example, according to Perrigo's own description of the calculation, its

profit forecast assumed that there would be no problems with the Omega integration, though

integration problems were known at the time, and assumed that there would be no change in the

competitive environment, even though anticompetitive practices in the generic drug (Generic Rx)

division were coming under increased scrutiny.   ¶¶172-173.   These assumptions were not

objective or accurate, as Perrigo's directors claimed that they were.  ¶171.

F.      **Anti-competitive Practices Boost Perrigo's Generic Rx Results**

For the six quarters prior to the Class Period, Perrigo's Generic Rx division contributed

more to the Company's adjusted net operating earnings than any other segment.  ¶66.  For this

reason, Perrigo and its executives touted the division's "star" performance.  ¶67.  However, this

performance was the result of anticompetitive practices, under which Perrigo marked up the

price of key drugs in coordination with competitors by as much as 500% or more.  ¶69.  In

contrast to the price declines that are typically associated with generic drug markets, Perrigo

relied on collusion with other manufacturers, or in some cases took advantage of pre-existing price-fixing conspiracies, to engage in unprecedented price hikes that could never otherwise be accomplished.  ¶¶68-69.

A detailed analysis of important Perrigo generic drug products demonstrates that they bear all the hallmarks of price-fixing.  ¶¶70-91.  The Generic Rx division operated in markets that were particularly susceptible to collusion because they had a highly concentrated market structure, inelastic demand due to third-party payors, high barriers to entry due to FDA marketing approval requirements, and price information transmission mechanisms that regularly informed competitors of all price increases.  ¶70.  Most importantly, prices in these markets demonstrated sharp, coordinated increases antithetical to behavior normally observed in competitive generic drug markets, which tend to drift downward.  ¶68.

For its most important generic drug products, Perrigo controlled the market with just a few competitors, and was able to sharply implement highly abnormal price hikes just after all "competitors" attended industry conferences.  ¶¶72-73, 78, 82-83, 86, 88, 90.  Fellow manufacturers made tandem adjustments.  *Id.*  For example, Perrigo and its "competitors" all simultaneously boosted prices of generic desonide *sixfold* immediately after attending industry conferences:



¶73.  Doctors noted that the extreme price hikes defied logic.  ¶74.  Similar coordinated price hikes occurred for econazole, permethrin, tretinoin, clobetasol, and halobetasol.  ¶¶78, 82-83, 86, 88, 90.  Once the coordinated price hikes were achieved, prices among the competitors continued to be highly correlated over time, reflecting enforcement of the fixed pricing.  *Id.; see also* ¶73.

Collusive pricing significantly boosted Perrigo's results in 2014 and 2015.  Collusive revenue (that is, additional revenue that would not have been achieved "but for" the collusive price hikes) accounted for hundreds of millions of dollars of Perrigo's financial results that were reported to investors in both of those years.  ¶¶76, 80, 84, 86, 88, 90.  These artificial price increases were not sustainable as regulators increased scrutiny on colluding parties, ultimately leading to a DOJ raid on Perrigo facilities.  *See, e.g.,* ¶21.

### G.   False Accounting and Overt Misrepresentations Hide Deterioration in Tysabri Royalty Stream

Although Perrigo had no operations involving Tysabri and understood it to be a purely financial asset, Perrigo accounted for the royalty stream as if it were part of operations.  ¶¶122-

13

123.  By this manipulation, Perrigo was able to:  (a) boost its operating results (and projections) by including hundreds of millions of dollars of payments having nothing to do with its operations; (b) avoid taking expenses each quarter to mark-to-market the decline in the fair value of the royalty stream; and (c) avoid telling investors the actual fair value of the royalty stream, which would have been reported each quarter had Perrigo complied with GAAP.  *See, e.g.,* ¶¶123, 130.  Perrigo used these obfuscations to tout "Tysabri upside" as a reason to reject the Mylan bid and keep Perrigo an independent company.  ¶126.  Perrigo has since admitted that every financial statement issued in the Class Period was false for the exact reasons alleged in the Complaint.  ¶123.

Defendants also made affirmative misrepresentations claiming an inflated fair value for the Tysabri royalty stream, especially in 2016.  In each of the quarterly statements filed that year, Defendants claimed that the royalty stream's "fair value exceeded the carrying value."  ¶¶219, 221, 223.  This was absolutely false.  As Perrigo now concedes, the "fair value" at the time of these statements was ***far less*** than the carrying value.  ¶¶220, 222, 224.  For example, the fair value at the end of Q3 2016 actually was only $3.55 billion, $2.25 billion less than the value reported to investors at that time.  *See* ¶7.  Even accepting the alternative valuation methodology proposed in Defendants' brief, Defendants still overstated fair value by ***almost $1.5 billion***. *See infra* at Section I(C)(1).

### H.   Defendants' Misrepresentations Successfully Fend Off Mylan's Hostile Bid

Perrigo's misrepresentations and omissions succeeded in swaying investors to reject Mylan's bid.  On November 13, 2015, Mylan's tender offer expired pursuant to its terms after less than 50% of shares were tendered.  ¶¶107, 111.  For their roles in defeating the Mylan bid, Defendants Papa and Brown were awarded millions of dollars in special bonuses and they

engaged in unusual stock sales at prices artificially inflated by Defendants' fraud, totaling approximately $7 million.  ¶¶23, 113, 272.

## I. Investors Gradually Learn the Truth

On February 18, 2016, Perrigo reported fourth quarter 2015 revenue, profits, and margins that were all well below the artificial projections manufactured to thwart the Mylan takeover, which Defendants had claimed were prepared with "scrupulous care, accuracy and objectivity." ¶¶9, 225-226.  Perrigo also revealed that certain Omega assets would need to be restructured, and took a $185 million impairment charge while also slashing the top end of the Company's 2016 guidance range from $10.10 to $9.80.  ¶¶9, 225-26.  As a result, Perrigo shares fell $14.77, or more than 10%, to close at $130.40.  *Id.*  However, Perrigo softened the blow by not revealing the extent of its problems with deteriorating growth and with the Omega integration, by continuing to hide collusive practices boosting generic revenues, and by concealing the plummeting value of the Tysabri royalty stream.

On April 22, 2016, reports surfaced that Defendant Papa would leave Perrigo for Valeant Pharmaceuticals International, Inc., and he left the following business day.  ¶¶10-11, 227-229. Perrigo shares dropped severely on both dates, as analysts and shareholders understood Papa's exit to mean that the problems at Perrigo were even worse than they were told in February.  *Id.* Perrigo also lowered its 2016 earnings guidance to $8.20-$8.60 per share, a full $1.40 less (at midpoint) than claimed only three months earlier, and reported that first quarter 2016 earnings would disappoint due to more competitive generic drug pricing—the natural result of collusion becoming more difficult as regulators focused in on widespread price-fixing in the industry. ¶¶11, 229.  Even worse, Perrigo also stated that it was considering additional impairment charges for Omega.  *Id.*  Stock analyst and former hedge fund manager Jim Cramer noted that these revelations demonstrated Defendant Papa's dishonesty during the Mylan tender offer, explaining

15

that Papa had "talked about how the Mylan bid dramatically undervalued Perrigo. . . . *That was clearly untrue."* ¶11.

On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure, only months after the Company trumpeted the success of the Omega acquisition.  ¶¶12, 236.  On this additional news, Perrigo shares fell $3.71, or 4%, to close at $89.04.  *Id.*  The fall was cushioned by the promise of its new CEO, John Hendrickson, that Perrigo would begin to issue "realistic" forecasts and "try to be as transparent as possible," an acknowledgement that prior guidance had not been "realistic" or "transparent." ¶13.

On August 10, 2016, Perrigo announced that it was cutting guidance yet again as a result of having to implement "transformational organizational changes" at Omega and additional pricing pressure in the Generic Rx division.  ¶¶14, 237-38.  Even worse, Perrigo projected that 2016 impairment charges, which were excluded from this guidance, would nearly double, from $1.74 per share to $3.29 per share.  Consequently, Perrigo shares fell approximately 10% to close at $86.00.  ¶14.  On December 8, 2016, after Perrigo announced that it needed to restructure the entire branded division (consisting mostly of Omega), shares declined further, from $83.94 to $81.94.  ¶¶17, 238.

On February 27, 2017, Perrigo announced that it would sell the Tysabri royalty stream for only $2.2 billion cash (plus additional contingent payments of up to $0.65 billion), billions of dollars less than the value claimed by Perrigo throughout the Class Period.  ¶¶18, 240.  That same day, Perrigo disclosed that it could not timely file its Annual Report on Form 10-K for 2016 because it needed to review historical revenue recognition practices for the royalty stream and other potential issues, and disclosed that Defendant Brown—the person most responsible for

the GAAP violations—was unexpectedly resigning. *Id.*  On these additional disclosures, Perrigo

shares dropped another 12%, or $9.91 per share, to close at $74.77.  ¶¶19, 241.

On March 3, 2017, Bloomberg reported that Perrigo's generic drug pricing was under

investigation by the DOJ, causing shares to drop 3.71%.  ¶¶19, 242.  On May 3, 2017, Perrigo's

offices were raided by the DOJ, causing its stock to drop over 5%, or $3.88 per share, to close at

$72.35.  ¶¶20, 243.  In all, Perrigo's stock declined more than 62% as the market gradually

learned the truth.  ¶¶21, 244.  Shortly after the Class Period, Perrigo issued one of the largest

restatements by any public company in decades, admitting that it violated GAAP in every one of

its Class Period financial statements and that its misclassification of the Tysabri royalty stream

caused more than $1 billion in errors.  ¶¶7, 22 n.1.

## ARGUMENT

## I.     THE COMPLAINT SUFFICIENTLY ALLEGES THAT ALL DEFENDANTS VIOLATED §10(B) OF THE EXCHANGE ACT

### A.     Applicable Pleading Standards Do Not Favor Dismissal

For purposes of "a Rule 12(b)(6) motion to dismiss a §10(b) action, courts must, as with

any motion to dismiss for failure to plead a claim on which relief can be granted, accept all

factual allegations in the complaint as true."  *Tellabs*, 551 U.S. at 322.  To state a claim under

§10(b), a plaintiff must "allege defendants made a misstatement or an omission of material fact

with scienter in connection with the purchase or the sale of a security upon which plaintiffs

reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury."  *Avaya*,

564 F.3d at 251.  Defendants challenge only the pleading of falsity and scienter.[3]  As discussed

below, the Complaint pleads both elements.

---

[3] In a footnote, Coucke questions how loss causation will be proved with respect to a statement
he made regarding Omega.  CM 11 n.9.  This undeveloped argument does not preserve a
pleading challenge.  "[A]rguments raised in passing (such as, in a footnote), but not squarely

While the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule of Civil Procedure 9(b) require more detailed pleading than Rule 8, they do not elevate pleading burdens to the extent suggested by Defendants.  The particularity requirements of the PSLRA and Rule 9(b) simply require that securities litigation plaintiffs "plead the who, what, when, where, and how:  the first paragraph of any newspaper story." *Id.* at 253.  The Complaint does that.

Similarly, though the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), the inference need not be "irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 326.  Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 323.  Scienter may be established either by showing conscious misbehavior or recklessness, and can be satisfied by circumstantial evidence.  *In re PTC Therapeutics, Inc., Sec. Litig.*, No. 16-1124 (KM) (MAH), 2017 WL 3705801, at *15-16 (D.N.J. Aug. 28, 2017); *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 n.8 (3d Cir. 2013) ("Documentary evidence is not required").  Scienter of executives acting within the scope of employment is imputed to the corporation.  *Carmack v. Amaya Inc.*, Civil Action No. 16-1884, 2017 WL 2610673, at *9 (D.N.J. June 15, 2017).

The Supreme Court specified that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically" after accepting all factual allegations as true.  *Tellabs,* 551 U.S. at 326*.*  The issue "is not whether a plaintiff will ultimately prevail, but

---

argued, are considered waived." *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).  Regardless, the Complaint alleges that as the truth concerning Omega was gradually revealed, Perrigo's share price dropped.  ¶¶225-226, 230, 233-238.  This satisfies the pleading standard for loss causation, which is not "burdensome" and requires only that a plaintiff provide "some indication of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

whether the claimant is entitled to offer evidence to support the claims." *Opengate Capital Grp. LLC v. Thermo Fisher Sci. Inc.*, No. 13-1475-GMS, 2014 WL 2610643, at *9 (D. Del. July 8, 2014) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)). Even under the PSLRA, a Rule 12(b)(6) motion is not the stage "to resolve disputed facts or decide the merits of the case." *Id.*

    **B.**    **The Complaint Adequately Alleges §10(b) Violations Regarding Omega**

        **1.**    **The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Omega**

Defendants chose to make Omega a central focus of the takeover defense they raised to investors, repeatedly claiming that integration had been successful and Omega would drive future growth. Consequently, Defendants took on the duty to tell investors the truth about the failed status of integration efforts and internal problems at Omega. "[O]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading." *PTC Therapeutics*, 2017 WL 3705801, at *14 (quotation omitted). Encompassed within the general obligation to speak truthfully "is also an obligation to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated." *Id.* (quotation omitted).

Here, Defendants repeatedly discussed the Omega integration with investors and analysts. ¶¶132-150. Each time, they described the integration in entirely positive terms, while omitting extensive known problems that brought key integration processes to a halt by mid-2015. ¶¶57-62. Even worse, Defendants affirmatively stated that Perrigo had "***delivered*** on our Omega integration plans", ¶141, and that Omega "***has been*** accretive to our growth rate," ¶133. Defendants did not speak in generalities, but claimed highly specific integration milestones had

already occurred.  For example, Defendant Brown stated on June 23, 2015 that "[b]ack office *is working smoothly*.  We *are bringing them on* to all of our back office systems."  ¶139.  Similarly, Defendant Papa stated on September 17, 2015, that "[w]e *supplemented* [Omega's contracted manufacturing] with our manufacturing infrastructure."  ¶145.  On the same day, Perrigo and the Director Defendants issued a letter to investors (which contained assurances of heightened care and factual accuracy required by the Irish Takeover Rules), stating that "we *have successfully integrated* 27 acquisitions" since 2007, Omega included.  ¶¶143, 145.[4]

Even as they claimed otherwise, Defendants knew the integration was a disaster.  For example, by mid-2015, when Defendant Brown claimed to investors that back-office integration was "working smoothly," ¶139, IT integration had completely stalled.  ¶57.  Similarly, just prior to Papa's claim that he had supplemented the supply infrastructure, Omega's senior executives made clear to Papa and other Perrigo executives that supply chain integration would be hindered by EU requirements.  ¶¶58-59.

By mid-2015, the two companies had come to such an impasse that Tom Farrington, who Defendant Papa had personally placed in charge of the Omega integration, instructed Ms. Kincaid to try to resolve the roadblock directly with Omega's head of IT.  *Id.*  She was told by Omega's head of IT that the rift was so bad that Defendant Coucke personally instructed the head of IT to put integration on hold pending resolution of major disagreements.  ¶59.  Moreover, in September 2015, as Defendants were assuring investors that Omega was

---

[4] The Complaint describes in detail why these assurances were false when made.  The statements verified by the Director Defendants *did* omit critical information about the Omega integration, and the Director Defendants *had not* taken "all reasonable care" to ensure their statements were correct.  Had they bothered to verify statements regarding Omega integration with Omega management, or even Perrigo's integration team, they could not have escaped facts undermining claims that integration had stalled.  ¶¶57-62.  Similarly, had they bothered to take "all reasonable care" before issuing growth statements about Omega, they could not have escaped that the growth trumpeted to investors vastly exceeded internal projections at Omega.  ¶101.

"successfully" integrated, discord between Perrigo and Omega executives was so high that Perrigo hired an outside firm to analyze emails to determine whether Omega executives were passing confidential business information to Mylan.  ¶61.  Four months later, in December 2015, Perrigo still had "not even come close to completing" systems integration, let alone full-scale integration of Omega. ¶¶62(b).

### a.      Defendants' "Multi-Year Plan" Defense Fails

Defendants attempt to justify their false Class Period assurances regarding Omega by stating they meant only that integration would be accomplished in "years two through four" following the transaction, DM 39-41, but Defendants' words and actions demonstrate otherwise. As an initial matter, on their face, Defendants' statements to investors regarding Omega integration concern then-present facts.  *See, e.g.,* ¶¶133 (Omega "*has been* accretive"); 141 (Perrigo had already "***delivered*** on our Omega integration plans"); 139 ("[b]ack office *is* working smoothly"); 143 ("we ***have successfully integrated*** 27 acquisitions," including Omega); 145 ("[w]e ***supplemented*** [Omega's contracted manufacturing] with our manufacturing infrastructure").  These are clear statements of past and present performance, not predictions. *See In re Enzymotec Sec. Litig.*, Civil Action No. 14-1566 (JLL) (MAH), 2015 WL 8784065, at *11 (D.N.J. Dec. 15, 2015) (statements that company was "'well positioned for future growth' and 'achieving rapid penetration' relate to then-existing conditions as opposed to future projections," and were actionable); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545-46 (D.N.J. 2002) (statement that company was "experiencing" growth, and "is growing" were false and not forward-looking).

Further, Defendants' assertion that as of the late summer and fall of 2015, "it was too early to tell whether the Company's integration plans would be jeopardized," *see* DM 40-41, cannot be reconciled with what they told investors at that time.  Then, Defendants said they had

"delivered," and had "successfully integrated" Omega, even though known problems had already ground key parts of the integration to a halt.   ¶¶57-62, 141, 145.  It was not "too early to tell"; Defendants just did not want to tell investors the truth.  However, while corporate officials need not be clairvoyant, they must reveal material facts known to them.[5]  *See In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (statement that "we are on track with our own schedule," was actionable where company was not "on track.").  Where defendants make statements falsely describing then-existing conditions, the statements are not "forward looking" and a complaint alleging misrepresentations involving those statements does not assert "fraud by hindsight."  *See DFC Global*, 2015 WL 3755218, at *14; *Dudley v. Haub*, No. 2:11-cv-05196 (WJM), 2013 WL 1845519, at *14-15 (D.N.J. Apr. 30, 2013).[6]

Defendants' actions also contradict the positions taken in their briefs.  Rather than claiming that it was "too early to tell" until several years after the Omega acquisition whether the integration was a success or failure, *see* DM 41, Perrigo confirmed the failure of the Omega

---

[5] Defendants incorrectly claim certain of their statements regarding Omega's integration were puffery.  DM 41 n.20.  But the statement that Omega "has been accretive" is concrete and measurable.  *See, e.g., In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (holding statement touting "***successful integration***" and stating that the "***business is on track to meet all the objectives that were set at the time of the merger***" to be false and not puffery, given that the "statement . . . was tied to the very issue about which Plaintiffs complain—the integration[, and] Plaintiffs allege that this statement was materially misleading because the integration was rife with serious problems.").  Likewise, Coucke's claim to have already put in place an "efficient management structure" was demonstrably false, as confirmed by former employees and the fact that extensive restructuring was required thereafter to address inefficiencies.  *See Lucent*, 217 F. Supp. 2d at 556 (rejecting defendants' puffery argument and holding that "[r]ather than acknowledge internal problems, Defendants made statements suggesting that no such problems existed").

[6] None of the cases cited by Defendants rejected statements as here where defendants possessed information undermining what they told investors about then-existing conditions.  *See, e.g., In re LeapFrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1001-1008 (N.D. Cal. 2016) (identifying "forward-looking" "predictions," and truthful disclosures about problems); *Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *16 (N.D. Cal. Apr. 27, 2017) (finding integration statements truthfully represented then-existing facts).

integration less than a year after acquiring Omega when it began taking large restructuring charges and writedowns.  ¶¶225, 230, 234, 264.  Similarly, it was not "too early to tell" that the relationship between senior Omega executives and senior Perrigo executives had broken down.  Ms. Kincaid confirmed this breakdown occurred in 2015, and by Fall 2016, Perrigo and Coucke had initiated confidential arbitration proceedings against each other.  ¶16.

> **b.  Defendants' Misrepresentations Concerning Omega Are Not Protected by the PSLRA Safe Harbor or the "Bespeaks Caution" Doctrine**

Defendants incorrectly claim that certain alleged misrepresentations concerning Omega involved forward-looking statements protected under the PSLRA's safe harbor or the bespeaks caution doctrine.  DM 53-54.  They are wrong.  As discussed above, the vast majority of Defendants' statements concerning Omega were phrased in the past or present tense, and were not forward-looking.  *See, e.g.,* ¶¶133, 139, 141, 145.  Accordingly, neither the safe harbor nor the bespeaks caution doctrine apply.

Contrary to Defendants' claim, statements in ¶¶132 and 147 are not forward looking.  When reviewed in context, neither speaks to the future.  *Id.*  Statements that a company was *presently* on track to achieve previously touted goals or "proceed[ing] as planned" are statements about the present.  For this reason, courts in the Third Circuit have repeatedly rejected Defendants' argument.  *See Aetna*, 34 F. Supp. 2d at 945; *Enzymotec,* 2015 WL 8784065, at *10-11; *DFC Global*, 2015 WL 3755218, at *14; *Dudley*, 2013 WL 1845519, at *12-13.

Moreover, even if forward-looking, the Omega-related statements are still actionable because Plaintiffs "have alleged sufficient facts that if accepted as true, establish knowledge on the part of the Defendants that [the] statements . . . were false or misleading or omitted a material fact." *Gargiulo v. Demartino*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007).  The Complaint alleges that Papa was told about integration problems, both directly and through his appointed

integration czar.  ¶¶57-60.  Thus, Papa's knowledge of the falsity of his statements concerning Omega negates any exculpatory effect that could potentially attach based on the presence of a forward-looking element.

Nor did boilerplate cautionary language shield Defendants.  It is well-established that the "safe harbor or bespeaks caution [doctrine] provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon is one foot away."  *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at \*52 (D.N.J. Aug. 17, 2005) (citation omitted).[7]  Defendants' vague warnings did not describe integration problems that were already known and imminent.  ¶¶57-60.  They provide Defendants no cover for their misrepresentations.

### 2.    The Complaint Alleges a Strong Inference of Scienter Concerning Omega Misrepresentations

#### a.    Defendants knew information contradicting their statements to investors

The Complaint contains numerous allegations demonstrating that Defendants had actual knowledge of the integration problems they concealed from investors, providing an inference of scienter that is far more compelling than any non-culpable inference.  "[I]t is sufficient for Plaintiffs to allege defendants' knowledge of facts or access to information contradicting their public statements; inference of recklessness may also be inferred from refusal to see the obvious, or to investigate the doubtful."  *Steamfitters Local 449 Pension Fund v. Alter*, No. 09-4730, 2011 WL 4528385, at \*8 n.80 (E.D. Pa. Sep. 30, 2011); *see also Campbell Soup*, 145 F. Supp. 2d at 599.

---

[7] *See also Enzymotec*, 2015 WL 8784065, at \*15 (cautionary language insufficient where "risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect."); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996) ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit").

Defendants' own statements confirm that they knew, or recklessly ignored, the concealed integration problems.  Papa and Brown spoke extensively to investors and analysts about the status of the Omega integration, and "implied that they had first-hand knowledge" of the subject. *PTC Therapeutics,* 2017 WL 3705801, at *17-18.   Such acts "tend further to bolster the inference" that Papa and Brown either "knew at the time that [their] statements were false or [were] reckless in disregarding the obvious risk of misleading the public."  *Id.* (quoting *Avaya*, 564 F.3d at 272).   Papa and Brown also told investors they were personally involved with the process.  ¶256.  Papa claimed that he and other senior executives "[have] been working with the Omega team on post close integration," and Brown emphasized to investors that she would personally visit Omega in July 2015, during the integration breakdown described by Ms. Kincaid.  *Id.*

Papa and the Director Defendants further confirmed their knowledge through assurances made to investors under the Irish Takeover Rules.  Each expressly "accept[ed] responsibility" for the aggressive claims regarding Omega integration made in investor presentations and projections, and affirmed that the information provided was "***in accordance with the facts and does not omit anything*** likely to affect the import of such information."  ¶143.  Having made these explicit personal assurances, the Director Defendants (including Papa) cannot now claim that they were unaware of the truth.  *See Lucent*, 217 F. Supp. 2d at 550 (scienter alleged where defendants affirmed that they "personally did a comprehensive operations review" supporting projections).

Former employees cited in the Complaint further confirm that Papa and Brown knew information regarding problems with the Omega integration undermining their statements to investors.   As Ms. Kincaid corroborated, senior-most Omega executives, including Coucke,

repeatedly made Papa and Brown aware of major integration problems and sought to engage them in discussions to resolve these problems.  ¶59.  And Papa's awareness of deep integration problems caused him to personally appoint an additional executive, Mary Donovan, to bridge communications gaps between Perrigo and Omega.  ¶60; *see also* ¶¶57-61.

As Perrigo's Global Cyber Security Officer and the person appointed to investigate why Omega integration had stalled, Ms. Kincaid was ideally situated to describe what was known at Perrigo regarding integration problems.  *See DFC Global*, 2015 WL 3755218, at *16 (allegation that confidential witness was head of compliance established that he was positioned to describe what was known at company regarding compliance violations).  She also worked directly with two of Defendant Papa's personal appointees for the Omega integration.  ¶¶57-61.

Defendants misstate the law in their request that the Court ignore the damning information provided by Ms. Kincaid because she is not alleged to have spoken directly to Brown, Papa, or other Defendants.  DM 24-25.  As the Third Circuit has explained, a "direct link" need not be alleged.  *Avaya*, 564 F.3d at 268-269 (finding scienter where a "Senior Client Executive" and a "Director of Operations for Global Solutions Sales and Support" recounted fraudulent forecasts and financial projections originated from senior executives).  Imposing such a requirement would contradict the Supreme Court's admonition that neither a "smoking gun" nor irrefutable evidence is necessary.  *Id.*  Accordingly, information from former executives situated similarly to Ms. Kincaid is probative of scienter even if they are a level or two removed from an individual defendant.  *See, e.g.*, *DFC Global*, 2015 WL 3755218, at *16 (crediting allegations of senior employee one reporting level removed).[8]

---

[8] Cases cited by Defendants are inapposite.  In each of *Alaska Electric Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 827 (S.D. Cal. 2006), *Witriol v. Conexant Sys. Inc.*, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006), *In re Bio-Tech. General Corp. Securities Litigation*, 380 F.

Far from showing a pleading defect, Defendants' claim that Ms. Kincaid's information is "hearsay," *see* DM 26, 28, raises a trial issue. *See In re New Century*, 588 F. Supp. 2d 1206, 1221 (C.D. Cal. 2008) (sustaining securities fraud claim and holding that defendants' "hearsay [objection] is a non-issue at the pleading stage"). At any rate, Ms. Kincaid's account is not used to prove the truth of integration problems, but rather to explain based on her personal knowledge the dissemination of the information within the senior echelons of Perrigo. Defendants' repeated attempts to denigrate her accounts as "speculation," "rumor," or "gossip" are similarly misplaced. Ms. Kincaid is a named witness with specific knowledge about integration problems she was tasked to address at the most senior levels. Her credibility is a matter for the jury. *See Van Noppen v. Innerworkings, Inc.*, 136 F. Supp. 3d 922, 947 (N.D. Ill. 2015) (rejecting argument that information from *named* witness could be discounted on a motion to dismiss). Moreover, because Perrigo tasked Ms. Kincaid with resolving integration problems, Defendants' contention that she was merely "speculating" regarding those problems makes no sense.[9]

Multiple former employees from several areas of Omega and Perrigo corroborated the information provided by Ms. Kincaid, describing the same, systemic decentralization and

---

Supp. 2d 574, 596 (D.N.J. 2005), *In re Tibco Software, Inc. Securities Litigation*, 2006 WL 2844421, at *2 (N.D. Cal. Sept. 29, 2006), former employees described business problems without providing any facts suggesting that the defendants knew of or recklessly ignored these problems. Similarly, *Steinberg v. Ericsson LM Telecom Co.*, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) and *In re Bausch & Lomb, Inc. Securities Litigation*, 592 F. Supp. 2d 323, 342 (W.D.N.Y. 2008), discuss contact with defendants only as an example of something that would bolster the inference of knowledge, not a necessity.

[9] Here too, Defendants' cited cases are easily distinguishable. *California Public Employees. Retirement System v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004); *National Junior Baseball League v. PharmaNet Development Group Inc.*, 720 F. Supp. 2d 517, 540 (D.N.J. 2010), and *Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1205-06 (D. Or. 2006), all rejected confidential witness information that was "speculative" or "conclusory" regarding a defendants' knowledge. By contrast, witnesses cited in the Complaint reported facts based on their own personal knowledge of conditions concerning the integration in which Papa and Brown claimed to have been personally involved, and Director Defendants claimed to have carefully assessed.

infrastructural incompatibility.  ¶62.  *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (concluding that multiple mutually consistent accounts strengthen the inference of scienter); *Aviva Partners, LLC v. Exide Techs.*, No. 05-3098 (MLC), 2007 WL 789083, at *14 (D.N.J. March 13, 2007) (scienter alleged based "primarily on confidential sources from various . . . divisions, who corroborate one another's assertions").  For example, in addition to Ms. Kincaid and the Omega IT head, Omega's Corporate HR director (who reported to Omega's CFO directly), confirmed that Defendant Coucke and other Omega managers had ceased cooperating with Perrigo on integration as of mid-2015.  ¶62(c).  Other employees provided first-hand accounts of organizational fragmentation, ¶62(a), incompatible and outdated IT systems across Omega, ¶62(b), and underperformance in important Omega markets which was summarized in a report "circulated each month that provided current sales information for Omega brands and divisions," ¶62(e).  Certain of these problems were confirmed by Papa's successor, who admitted in November 2016 that Omega's European businesses were *still* spread across "a number of unique different infrastructures."  ¶62(a).

    Defendants' criticisms of these former employees are unfounded.  Each is identified by title, location, and tenure, and for each, the Complaint alleges facts demonstrating that he or she was in a position to know the information provided.  That is all the law requires.  *See, e.g., In re Stonepath Grp., Inc. Sec. Litig.*, 2006 WL 890767, at *3 n.6 (E.D. Pa. Apr. 3, 2006) ("For confidential witnesses, the 'underlying prerequisite [is] that each source is described sufficiently to support the probability that the source possesses the information alleged.'") (quoting *Chubb*, 394 F.3d at 155); *Lucent*, 217 F. Supp. 2d at 559 (scienter alleged where plaintiffs identified "specific communications involving various key personnel that support their allegation that [Defendant] was well aware of. . . problems and . . . inability to meet . . . projections.").

Similarly, Defendants' assertion that "internal documents" are required misstates the law. *See* DM 28. While documents can "bolster" the accounts of witnesses, "[d]ocumentary evidence is not required." *Rahman*, 736 F.3d at 244 n.8. Even cases cited by Defendants concede this point. *See In re Intelligroup Sec. Litig.,* 527 F. Supp. 2d 262, 286 (D.N.J. 2007) (holding that *either* "reports **or** statements containing this information" was sufficient to support scienter) (emphasis added); *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 640 (D.N.J. 2002) (allegations that defendants "participated in specific meetings or conversations in which . . . problems were discussed" can show scienter). Regardless, the Complaint here alleges internal documents "bolstering" the witness accounts. *See, e.g.,* ¶62(e) (Omega sales deterioration in key markets documented in monthly analysis by country and brand).

### b.    Omega is a "Core Operation"

The inference of scienter created by Defendants' knowledge of the information misrepresented to investors is bolstered by the fact that Omega was a core operation for Perrigo. Defendants repeatedly emphasized Omega's importance, stating that Omega accounted for nearly 45% of revenues and was supposed to be Perrigo's "number one" "growth driver[] for 2016 and beyond." ¶¶225, 229. "Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors." *Campbell Soup*, 145 F. Supp. 2d at 599 (quotation and citation omitted).[10]

### c.    There is no plausible competing inference

No plausible non-culpable inference can be drawn from the Complaint's allegations

---

[10] *See also Aetna*, 34 F. Supp. at 953 ("[T]he size and nature of the . . . merger and the positions held by Defendants [], in conjunction with the factual allegations in the Amended Complaint concerning the operational problems . . . following the merger, provide strong circumstantial evidence that Defendants . . . knowingly made the misrepresentations and omissions concerning the success of the integration and its financial impact . . . ."); *Enzymotec*, 2015 WL 8784065, at *18 ("As an initial matter, Lead Plaintiffs have alleged that the matter at issue is central to the core business of the Company, about which Defendants spoke regularly.").

regarding Omega.  Defendants do not and cannot articulate how they could innocently claim to have taken all reasonable care to ensure the accuracy of statements regarding the Omega integration (as their Irish Takeover Rule assurances proclaimed) and yet be unaware that the integration had stalled.  ¶¶57-62.  Similarly, Papa and Brown articulate no innocent basis for how they could possibly be unaware of roadblocks in the integration process that had been directly reported to them, or how they could be uninformed about the actual status of the integration in which they claimed to have personally participated.  *See, e.g.,* ¶¶253, 256.  Nor do Director Defendants articulate a plausible competing inference for telling investors to assume a growth rate for Omega (7.5%) that was more than twice as high as Omega itself calculated (3.2%), especially given Omega's weak performance in key markets.  ¶¶56, 62.

### C.   The Amended Complaint Adequately Alleges §10(b) Violations Regarding Organic Growth Statements

#### 1.   The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Organic Growth

Throughout Papa's stewardship, Defendants boasted about Perrigo's purported "organic growth," that is, its ability to generate greater revenues from existing assets rather than through acquisition.  ¶63.  However, to defeat the Mylan bid, Perrigo, Papa and the rest of the Director Defendants made a series of misrepresentations to give the misleading impression that Perrigo's organic growth was stronger than it actually was.  ¶¶132-150.  They asserted that Perrigo had "grown about 8% organically," ¶161, that organic growth had been "consistent," ¶151, and Perrigo had "demonstrated a reliable ability to grow organically," ¶166.  In presentation after presentation, Defendants guided investors to expect 5%-10% organic growth rates, *e.g.,* ¶¶151, 153, 155, a goal for which Papa claimed Perrigo had "the ability *to keep delivering*," ¶155.

Defendants' claims were blatantly false.  In truth, Perrigo had not consistently "deliver[ed]" that level of organic growth for some time, and its actual organic growth was not

"reliable." ¶¶63-65. Though not disclosed to investors, Perrigo's organic growth varied widely from quarter to quarter and had slowed to a trickle—and even was negative at times—during the six quarters prior to the Class Period. ¶64; *see also supra* at p. 11. Defendants do not contest the accuracy of these calculations.

Papa and the other Director Defendants encouraged investors to trust their organic growth statements by representing on several occasions that they took responsibility for the information provided, and had "taken all reasonable care to ensure" that the statements were "in accordance with the facts and do[] not omit anything likely to affect the import of such information." *See*, *e.g.*, ¶¶166. Even more drastic promises were made with respect to the organic growth assumption folded into the profit forecasts Perrigo issued to investors. For those, Papa and the Director Defendants stated that they employed "scrupulous care, accuracy and objectivity" to ascertain that organic growth would continue at the midpoint of the projected 5%-10% range, or 7.5%. *See* ¶¶ 170-72. These promises were designed to, and did, cause investors to place undue faith in the projections.

Defendants incorrectly claim that referenced past growth rates might be technically true over a longer time period–even if absolutely false over the more recent past. As an initial matter, the law does not permit corporate executives to mislead investors through half-truths, especially when they have expressly promised not to "omit anything likely to affect the import of the information provided." By putting the issue of organic growth "in play," Defendants "acquire[d] a duty to disclose information relating to that topic." *In re Viropharma, Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014) ("*Viropharma II*"); *see also PTC Therapeutics*, 2017 WL 3705801, at *14-15. Critically, unlike the executives in the cases cited at DM 47, Defendants both told investors they were abiding by a higher standard of disclosure under the Irish Takeover

31

Rules <u>and</u> that Perrigo had "the ability to keep delivering" at the higher levels, though it had not actually delivered the stated levels of growth for a long time.

Moreover, unlike *Galati v. Commerce Bancorp, Inc.*, 220 F. App'x 97, 102 (3d Cir. 2007) and *In re Sofamor Danek Group., Inc.*, 123 F.3d 394 (6th Cir. 1997), Defendants' calculations of organic growth were not even technically true. The calculations included huge amounts of Tysabri royalties thereby inflating Perrigo's claimed growth, even though such royalties could not legally be considered revenues because they were not part of operations. ¶¶64, 123. The same is true for the inclusion of revenue and growth derived from collusive pricing in Perrigo's Generic Rx division (as discussed further below).

Unable to dispute the misleading nature of their statements, Defendants posit that a single ambiguous bar on a graph used in an investor presentation cured the extensive, repeated concrete misrepresentations about organic growth identified in the Complaint. As a general proposition, such a truth on the market defense "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Enzymotec*, 2015 WL 8784065, at *16 (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)). To warrant dismissal, a defendant "must establish that defense as a matter of law on the basis of [complaint] allegations." *Id.* (quotation and citation omitted).

The affirmative defense fails here. The material Defendants reference is highly ambiguous, and does not even remotely demonstrate that "corrective information had been conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, No. 1658 (SRC), 2011 WL 344199, at *35 (D.N.J. Aug. 8, 2011) (internal quotation omitted). Specifically, Defendants claim that a downtick in the final

bar of the graph submitted as a page in Groner Decl. Exs. 15 and 18 informed investors that Perrigo had failed to deliver the claimed organic growth in recent periods. *Id.* at Ex. 99.1, p.10 and Ex. 99(a)(2), p. 23. However, the very title of the cited page undermines that notion, touting that Perrigo had a "Unique Platform In Place to **Continue to Deliver** M&A Upside to Organic Growth." *Id.* (emphasis added).[11] Further, Defendants fail to address Perrigo's admission that its improper accounting for Tysabri royalties artificially inflated its purported growth. *Supra* at Section I(C)(1).

Nor does the PSLRA's "safe harbor" immunize Defendants' misrepresentations regarding organic growth. As an initial matter, many of these statements are **not** forward-looking. ¶¶151, 155, 162, 168, 170. Moreover, those which extrapolate claimed historical execution as a basis for estimating future growth contain an embedded representation of past and present fact which is manifestly false and falls outside the safe harbor. Indeed, Defendants' memorandum even quotes one of these statements as context for the proffered guidance: "We are confident in our 5-10% three-year organic revenue CAGR goal, **as executed historically**, and we expect to meet our financial targets in the years to come." ¶166. As the Court in *Enzymotec* explained, under such circumstances the guidance cannot be categorized as purely forward-looking:

> [S]tatements relating to Enzymotec being "well positioned for future growth" . . . or relating to InFat "achieving rapid penetration" or "increased market penetration" . . . relate to then-existing conditions as opposed to future projections. These statements, even if made within the context of truly forward-looking statements, are not entitled to the safe harbor. *See Avaya, Inc.*, 564 F.3d

---

[11] Vague answers given by Papa during analyst calls likewise do not establish "truth on the market." DM 48. The referenced statements speak to performance generally and do not even directly address organic growth, let alone truthfully disclose that Perrigo had no ability to consistently deliver the high organic growth it projected to investors. Such vague references cannot establish a "truth on the market defense." *Enzymotec*, 2015 WL 8784065, at *16; *Merck*, 2011 WL 3444199, at *35.

at 255 ("'[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'") (quoting *Tellabs II*, 513 F.3d at 705).

2015 WL 8784065, at *11.  Additionally, any forward-looking portions of the statements were not accompanied by "risk warnings" that were specific and disclosed actual risks known at the time.

### 2.   The Complaint Alleges a Strong Inference of Scienter Concerning Organic Growth Misrepresentations

Independent observers familiar with Perrigo have already assessed what is the most compelling explanation for Perrigo's false growth projections, and concluded that Defendants distorted the truth in order to defeat the Mylan bid.  ¶11 (Jim Cramer:  Papa's overvaluation of Perrigo "was clearly untrue."); ¶232 (Wells Fargo:  "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid."); ¶239 (Starboard:  "In order to convince Perrigo shareholders to reject Mylan's offer, management and the Board made aggressive promises.").  Defendants cite no reason why this Court should come to a different conclusion, and fail to cite a single case finding a lack of scienter under these circumstances.   Indeed, before adopting a different position for strategic purposes in this litigation, Perrigo admitted that it needed to start issuing "realistic" guidance.  ¶13.  Accordingly, the facts alleged do not support a non-culpable competing inference.

Scienter is further bolstered because each of the Director Defendants claimed to have used "scrupulous care, accuracy and objectivity" in preparing the artificially inflated guidance. *See* ¶¶170-72.  They further personally acknowledged responsibility for virtually every "organic growth" misrepresentation identified in the Complaint, promising investors that they had "taken all reasonable care" to ensure that each statement was "in accordance with the facts and does not omit anything likely to affect the import of such information."  *See* ¶¶151, 162, 164, 166, 170-

72.  Where, as here, a speaker has affirmatively represented that an assurance is based upon personal review, courts do not hesitate to find scienter.  *See Lucent*, 217 F. Supp. 2d at 550.[12] Moreover, Defendants' repeated discussions concerning organic growth imply personal knowledge of the true conditions.  *PTC Therapeutics*, 2017 WL 37058101, at *17; *see also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (finding it "highly improbable" that defendant who publicly described issuer's finances did not inquire into basis for his statements).

### D. The Complaint Adequately Alleges a §10(b) Claim Regarding Collusive Pricing in Perrigo's Generic Rx Business

#### 1. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding Collusive Pricing in Perrigo's Generic Rx Business

Plaintiff's Complaint adequately alleges that Defendants made four categories of misrepresentations and omissions regarding collusive pricing in Perrigo's Generic Rx unit, which was the largest contributor to Perrigo's overall operating profit.  They:

- included hundreds of millions of dollars of collusive revenue in operating results, ¶¶76, 80, 84, 86, 88, 90;

- falsely represented that the Generic Rx segment was then on track to achieve an inflated 8%-12% organic growth rate in order to rebuff Mylan's takeover bid, despite growing regulatory scrutiny into generic drug price collusion, ¶¶170-173, 188;

---

[12]  Neither *Intelligroup* nor any of the other cases cited by Defendants at DM 31-34 address the heightened affirmations made under the Irish Takeover Rules, which were far more stringent than SOX certifications, or otherwise undermine scienter here.  Instead, such cases state that even the lesser SOX certifications could evidence scienter where "defendants knew or consciously avoided any meaningful exposure to the information that was rendering their . . . certification erroneous."  *Intelligroup*, 536 F. Supp. 2d at 930-31.  Here, Director Defendants knew that they had not made the scrupulously careful, accurate and objective assessment they told investors.

- made affirmative misrepresentations falsely describing the competitive environment, *see* ¶¶176, 178, 180, 182, 184, 186, 188, 190; and

- made misleading statements indicating a "flat to up slightly" pricing strategy, when in fact Perrigo's strategy was to implement price hikes of 300%-500% in collusive drug markets, *see, e.g.,* ¶¶176, 178, 180, 190;

Numerous courts have sustained securities claims where defendants made similar misstatements to investors at the same time they were alleged to have been engaged in price fixing. *See, e.g., In re Sotheby's Holdings, Inc. Sec. Litig.*, 00 Civ. 1041 (DLC), 2000 WL 1234601, at *3 (S.D.N.Y. Aug. 30, 2000) (statement that competition was "intense" despite colluding with competitor was actionable); *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010) (statements about ability to gain market share and compete on price, service, and quality were actionable misrepresentations where defendant was alleged to have engaged in antitrust violations); *In re Infineon Techs. Ag. Sec. Litig.*, No. C 04-4156 JW, 2006 WL 1329887, at *6 (N.D. Cal. May 22, 2006) (statements regarding competitive environment and financial projections made during the defendants' alleged participation in a price fixing conspiracy were actionable).

The Complaint identifies with particularity each material misrepresentation and omission regarding pricing and competition, and details the collusive revenues garnered from each impacted drug. ¶¶176-204. The Complaint likewise identifies the makers of each statement, and explains why each was false. *Id.* That is all the law requires. *PTC Therapeutics*, 2017 WL 3705801, at *8. Defendants do not even attempt to explain the drastic price increases Perrigo implemented in tandem with so-called competitors, the near-perfect correlation of prices in the markets identified, or the market structure allowing collusion to take place. DM 49-50. Nor

36

could they:  such extreme price movements are deeply inconsistent with a competitive market.

These well-pled misrepresentations are not undermined by Defendants' argument that "flat to up slightly" pricing claims might be technically true if looking only at the *average* pricing of Perrigo's "total portfolio" of generic drugs.  *See* DM 48-49.  Defendants miss the point.  Once they chose to speak about generic drug pricing, they could not "omit material facts related to that issue so as to make the disclosure misleading."  *PTC Therapeutics*, 2017 WL 3705801, at *14 (quotation and citation omitted).  Whether a disclosure is required "is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete or misleading in light of all of the evidence is a mixed question of law and fact."  *Enzymotec*, 2015 WL 8784065, at *15.

Here, as alleged in the Complaint, the information omitted from Defendants' statements regarding pricing strategy dramatically altered the total mix of information available to investors. Perrigo's "average" pricing was inflated by enormous and unsustainable price spikes in drugs where Perrigo had successfully colluded with competitors.  ¶¶69, 73-74, 78, 82, 86, 88, 90.[13] That these products, ***which contributed $271.8 million in collusive revenue in 2015 and $291.5 million in collusive revenue in 2016,*** accounting for more than a quarter of all Generic Rx revenues, were only able to generate a "portfolio" gain of "flat to up slightly" necessarily means that the collusive price spikes masked serious price deterioration in products subject to normal competitive forces.  *See* ¶¶76, 80, 84, 86, 88, 90.  This information should have been disclosed. *See PTC Therapeutics*, 2017 WL 3705801, at *17-18.

For all other categories of misrepresentations regarding generic drug collusion,

---

[13] As the *Wall Street Journal* article cited in the Complaint makes clear, the impacted drugs were among the Company's top 10 "best-selling" generic products.  *See* J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, Wall St. J. (July 5, 2016), https://www.wsj.com/articles/valeants-new-ceo-brings-familiar-prescription-1467745749.

Defendants rest their arguments on the naked assertion that the Complaint does not adequately allege the underlying wrongdoing. *See* DM 49-50. Defendants' contentions, relegated to a few pages, ignore the detailed allegations of the Complaint (*e.g.*, massive price increases implemented in tandem with so-called competitors, the near-perfect correlation of price movements, and collusion-prone market structure), which must be accepted as true. *Tellabs*, 551 U.S. at 322. Plaintiff needs only "present evidence that ***tends*** to exclude the possibility that the alleged conspirators acted independently." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 976 (N.D. Ohio 2015) (emphasis added). Plaintiff has done so, and Defendants offer no plausible explanation as to how simultaneous price increases of 300%-500% could possibly occur across multiple generic drugs in the absence of collusion. *Id.*

Defendants also avoid the applicable legal standard. Like many other circuits, the Third Circuit considers a non-exhaustive list of "plus factors" that tend to demonstrate the existence of collusion. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321-22 (3d Cir. 2010); *see also Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 226 (3d Cir. 2011). The "plus factors" include: "(1) evidence that the defendant had a motive to enter into a . . . conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Ins. Brokerage*, 718 F.3d at 321-22. A federal court has already ruled that generic drug price-fixing allegations virtually identical to those pled in the Complaint satisfy the "plus factors." *In re Propranolol Antitrust Litig.*, 16-cv-09901 (JSR), 2017 WL 1287515, at *8-9 (S.D.N.Y. April 6, 2017).[14]

---

[14] The Third Circuit's recent decision in *Valspar Corp. v. E.I. DuPont De Nemours and Co.,* No. 16-1345, *slip op.* (3d Cir. Sep. 14, 2017), also applied a "plus factor" analysis to the unique facts of that case. More importantly, it demonstrates that any questions as to the sufficiency of proof for the "plus factors" are best addressed with a full record at the summary judgment stage. *Id.* at 32 (affirming grant of summary judgment after considering extensive record evidence such as

Defendants have a motive to collude where, as here, they operate in a market traditionally characterized by falling prices, that is highly concentrated, has high barriers to entry, and has inelastic demand.  *See In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, Civ. No. 12-711, 2013 WL 812143, at *11-12 (D.N.J. Mar. 5, 2013); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 631-32 (E.D. Pa. 2010).   The Complaint easily alleges these facts, describing the downward pricing pressure in competitive generic drug markets, quantifying the market concentration for each impacted drug, establishing that there were high barriers to entry due to FDA requirements, and demonstrating that demand was both theoretically inelastic (because most price increases fell to third-party payors) and actually inelastic (because sales levels were maintained despite large price increases).  ¶¶68-71, 77, 81, 85, 87, 89.  These allegations are more than sufficient to plead that Defendants were motivated to engage in a price fixing conspiracy.

Under the second "plus factor," an action is considered against the firm's interest if its behavior is inconsistent with a competitive market.  *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 252 (E.D. Pa. 2016).  Here, the Complaint alleges dramatic price increases that, in a competitive market, would have left Perrigo extremely vulnerable to market share loss to competitors.  ¶¶68-69, 73-74, 78, 82, 86, 90.  Without collusion, a "rational competitor" would have "kept its prices stable and vastly increased its market share."  *Propranolol*, 2017 WL 1287515, at *5-7 (finding such allegations adequately pled the second "plus factor").

Pursuant to the third "plus factor," the Complaint alleges both weekly informational exchanges regarding pricing, ¶70, and participation with competitors in trade meetings immediately preceding the tandem price hikes, ¶¶72-73, 78, 82, 86, 88, 90.  According to a joint

---

emails, deposition testimony and expert reports).

amended complaint filed by the attorneys general of forty states, such meetings are used by generic pharmaceutical executives to "sow the seeds for their illegal agreements."  ¶72.  Similar allegations have been acknowledged to show "a high level of interfirm communications," circumstantial evidence of a generic drug price-fixing conspiracy.  *Propranolol*, 2017 WL 1287515, at *7-8; *see also Ductile Pipe*, 2013 WL 812143, at *13 ("[P]articipation in information exchanges in highly concentrated markets involving fungible products with inelastic demand can be indicative of anticompetitive behavior.").

That Perrigo's facilities were raided in a parallel criminal investigation bolsters the Complaint's "plus factor" allegations.  *See* ¶¶ 20-21, 242-243.  Such criminal investigations "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Blood Reagents*, 756 F. Supp. 2d at 631-32 (quotation and citation omitted); *see also Ductile Pipe*, 2013 WL 812143, at *13; *Propranolol*, 2017 WL 1287515, at *8-9.  Defendants' citation to *Superior Offshore International, Inc. v. Bristow Group*, 738 F. Supp. 2d 505, 517 (D. Del. 2010) and similar cases is misplaced.  *See* DM 50-51.  The complaint in *Superior Offshore* alleged no exchange of information, and pled little more than the existence of a government investigation.  738 F. Supp. 2d at 517.  By contrast, the Complaint here pleads each and every "plus factor" demonstrating that Perrigo colluded with other generic manufacturers to illegally increase the price of generic drugs.[15]  Thus, Plaintiff has plausibly alleged the underlying

---

[15] Because the "plus factors" are alleged, *Blood Reagents* and *Ductile Pipe*, each of which found a parallel investigation to be probative, more squarely fit the facts of this case.  Additionally, the meager price movements in *Superior Offshore* are far less anomalous than the massive coordinated increases alleged here.  *Compare* 738 F. Supp. 2d at 507 (price increases of 30% and 50%) *with* ¶69 (price increases here of up to 500% or more).  *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) and *In re Key Energy Servs. Sec. Litig.*, 166 F. Supp. 3d 822, 872 (S.D. Tex. 2016), also cited by Defendants, have no bearing on the allegations at issue here.  Neither case involved price fixing, and neither complaint contained the detailed allegations establishing the "plus factors" set forth in the Complaint.

collusive conduct.

Defendants do not address the directly applicable precedent of *Propranolol, Blood Reagents*, or *Ductile Pipe*, instead citing inapposite cases where the "plus factors" were not sufficiently alleged, or cases that have nothing to do with antitrust. *See* DM 49-51. *In re Axis Capital Holdings Ltd. Securities Litigation*, 456 F. Supp. 2d 576, 585-586 (S.D.N.Y. 2006) failed to allege that steering practices violated antitrust law. *Id.* No such pleading deficiencies exist in the Complaint here, which describes precisely how collusive price hikes violated antitrust laws. *Mauss v. NuVasive, Inc.*, No. 13-cv-2005 JM (JLB), 2014 WL 6980441, at *8 (S.D. Cal. Dec. 9, 2014), involved healthcare kickbacks not antitrust. Moreover, a subsequent decision concluded that the lack of details in that case was cured by a further amendment specifying a level of detail similar to the Complaint here. *See Mauss v. NuVasive, Inc.*, No. 13-cv-2005, 2015 WL 10857519, at *7-11 (S.D. Cal. Aug. 28 2015).

*In re Mirant Corp. Securities Litigation*, also cited by Defendants, expressly stated that dismissal would have been inappropriate had the complaint alleged that the company conspired with its competitors to fix prices or manipulate the supply of energy in violation of antitrust law. No. 1:02-CV-1467-RWS, 2009 WL 48188, at *19 (N.D. Ga. Jan. 7, 2009). The Complaint here includes such allegations. ¶¶67-91; *see also Reddy Ice*, 757 F. Supp. 2d at 706 (holding *Mirant* distinguishable from cases "like the instant case, where [p]laintiffs allege conduct that violates federal antitrust law").

Unable to attack the well-pleaded Complaint allegations, Defendants erroneously take issue with Plaintiff's use of an expert to help compile industry data and calculate collusive revenues. DM 50. However, that Plaintiff retained an expert to assist with the data compilation and calculations demonstrates the thoroughness of its investigation and is entirely appropriate.

Moreover, courts in this district have repeatedly held that even declarations from experts are appropriately attached to complaints.  *See, e.g., Enzymotec*, 2015 WL 8784065 at *19 (permitting use of expert declarations in securities fraud complaint.); *In re CommVault Sys., Inc. Sec. Litig.*, 2016 WL 5745100, at *4 (D.N.J. Sept. 30, 2016) (same).  Where courts have refused to consider expert reports attached to complaints, they still consider expert analysis alleged *in* the complaints.  *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) (considering expertized factual allegations in complaint but not attached report); *In re Viropharma, Inc. Sec. Litig.*, No. 02-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) (same).

## 2.     The Complaint Alleges a Strong Inference of Scienter Concerning Generic Rx Pricing Misrepresentations

*Tellabs* makes clear that the inference of scienter need not be irrefutable, or allege "smoking gun" evidence.  *Id.*, 551 U.S. at 324.  Instead, a complaint need only allege facts that, when taken as true, allow an inference of scienter that is cogent and at least as compelling as any contrary reference.  *Id.*  The allegations in the Complaint surpass that threshold.

As outlined in the Complaint, the Director Defendants claimed knowledge of the matters misrepresented and omitted.  ¶171.  Each affirmed that he or she ascertained with "scrupulous care, accuracy, and objectivity" the competitive environment and the propensity of the Generic Rx unit to be able to continue to deliver 8%-12% organic growth.  ¶¶171-172, 188-189.  The only reasonable inference, accepting these allegations as true, is that each of the Director Defendants understood the actual conditions that were withheld from investors.[16]

_____

[16] Defendant Coucke, who is not defined to be one of the Director Defendants in the Complaint, incorrectly claims that Plaintiff is required to produce "reports" showing that he personally knew about the price fixing scheme when he recklessly signed the Company's Form 10-KT.  CM 12 n.10.  The law does not require a plaintiff to plead such evidence.  *In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, Civil Action No. 15-7658 (MAS) (LHG), 2017 WL 1658822, at *11 (D.N.J. Apr. 28, 2017).  Coucke was familiar with drug markets as the result of founding and leading a drug manufacturer.  ¶36.  There is no plausible reason to think he would be unaware of the pricing

Similarly, the Complaint alleges that Defendants Papa and Brown repeatedly spoke to investors regarding Perrigo's generic drug pricing, and the pricing of other manufacturers, indicating to investors that they had actual knowledge about these topics. *See, e.g.,* ¶178 (Papa stating that: "Obviously, its a competitive market out there" and discussing "what *I've tried to do* with pricing at Perrigo in the eight years."); ¶196 (Brown analyzing "planned pricing strategies" and "competitive dynamics"); *see also* ¶¶180, 182, 186, 190, 192, 267. These assertions of knowledge support a strong inference of scienter. *PTC Therapeutics*, 2017 WL 3705801, at *17-18; *DFC Global.,* 2015 WL 3755218, at *7.

That Defendants Papa and Brown repeatedly responded to pointed analyst questions regarding pricing pressure in the Generic Rx division also supports a finding of scienter. *See, e.g.,* ¶¶178, 180, 182,186, 190. As a result of these exchanges, Papa and Brown unquestionably knew the importance of this information to market participants, and understood the likelihood of misleading investors by concealing that Generic Rx results were inflated by collusive price hikes of 300%-500% in certain drugs. *See Avaya*, 564 F. 3d 242 at 269 (false denials in response to repeated and pointed questions by analysts suggested at least recklessness); *PTC Therapeutics*, 2017 WL 3705801, at *17-18 (repeated statements to investors and analysts implied executives knew subjects about which they spoke, undermining any inference that misrepresentations were inadvertent); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14–15 (2d Cir. 2011) (finding scienter where misrepresentations concerned subject analysts often asked about).

As another district court in this Circuit recently noted, "maybe 'the most powerful evidence of scienter is content and context.'" *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (quoting *Avaya*). "In the context of specific inquiries," the

---

practices alleged when he signed the Form 10-KT misrepresenting the competitive environment for Perrigo's Generic Rx unit and concealing illegal price fixing. ¶¶194-195.

omission of facts contrary to the answers provided presents 'an obvious risk of misleading investors.'" *Id.* (quoting *Avaya*).  Here, Papa and Brown each disregarded this "obvious risk" and repeatedly provided misleading answers in response to pointed analyst questions about generic drug pricing, further demonstrating their scienter.  *Id.*

The Complaint also alleges both financial and legal motives for concealing the alleged price fixing.  As detailed in the Complaint, Perrigo reaped hundreds of millions of dollars from the collusive practices, which would be imperiled by disclosing those practices.  ¶¶76, 80, 84, 86, 88, 91.  *See Avaya*, 564 F.3d at 271 (magnitude of price fixing scheme can support an inference of scienter).  Additionally, exposing the practices could lead to criminal liability.

The parallel criminal investigation into Perrigo's misconduct is "one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter," because it demonstrates the seriousness of the underlying conduct omitted from investors.  *Reddy Ice*, 757 F. Supp. 2d at 695, 713-14 n.8 (crediting allegations of an FBI raid on Reddy Ice's offices); *see also Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008); *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 688 (S.D. Tex. 2002).  The criminal raid identified in the Complaint, *see* ¶21, was no routine "investigation," as Defendants erroneously suggest.  As an industry commentator noted, "Federal investigations happen every day.  Federal raids do not." *Id.*  Unlike a mere investigation, a federal raid requires approval of a search warrant based on probable cause that the government will find evidence of a crime.  *See United States v. Feeney*, 984 F.2d 1053, 1055 (9th Cir. 1993).

Finally, the suspicious resignation of Douglas Booth, Papa's lieutenant in charge of the Generic Rx division, further supports scienter. *See DFC Global*, 2015 WL 3755218, at *16-17

(resignation of a senior executive not named in the complaint supported an inference of scienter).[17]   Booth's departure came only months after Papa's, and preceded by a mere two months private antitrust litigation against Perrigo.  ¶268.

### E. The Complaint Sufficiently Alleges §10(b) Violations Regarding the Tysabri Royalty Stream

#### 1. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions Regarding the Tysabri Royalty Stream

That Perrigo materially misrepresented the value of the Tysabri royalty stream in its financial statements, and that Plaintiff's Complaint adequately details misrepresentations and omissions in the accounting of the Tysabri royalty stream, are beyond dispute.  As set forth in the Complaint, Perrigo's restatement admits that the Company violated GAAP by accounting for the royalty stream as if it was an intangible operating asset, instead of a financial asset.  *See, e.g.,* ¶¶ 7, 254.  Defendants' accounting ruse concealed ***billions of dollars of deterioration*** in the value of the Tysabri royalty stream, which the Company now concedes should have been reported to investors and reflected in Class Period financial statements.  ¶¶ 7, 245-251.  The "mere fact" that Perrigo restated its financial results "is sufficient basis for pleading that those statements were false when made."  *Bio-Technology Gen.*, 380 F. Supp. 2d at  586  (quotation and citation omitted).  Perrigo's restatement also concedes materiality, as financial results are restated "only when errors are material." *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009).

---

[17] *See also In re Valeant Pharm. Int'l, Inc. Sec. Litig.*, 2017 WL 1658822, at *10-11; *Li v. Aeterna Zentaris, Inc.*, Civil Action No. 3:14-7081 (PGS)(TJB), 2016 WL 827256, at *1-2 (D.N.J. June 29, 2016); *In re Par Pharm. Sec. Litig.*, Civil Action No. 06-cv-3226 (PGS), 2009 WL 3234273, at *8-10 (D.N.J. Sep. 30, 2009) (all considering executive resignations or terminations as evidence of scienter).  Plaintiff acknowledges that certain cases have reached the opposite conclusion, especially where the executives were retained as consultants, left after a very short time, or were granted favorable severance. *See, e.g., In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *19-21 (D.N.J. April 27, 2017).  No such circumstances are alleged here.

Defendants do not dispute that the Complaint describes the alleged misrepresentations with particularity, nor could they.  For each impacted accounting period, the Complaint identifies the SEC filings containing the falsified accounting, when each filing was conveyed to the market, who signed each filing, the false and misleading representations in each filing regarding the value of the Tysabri royalty stream, and the actual value of the Tysabri royalty stream that should have been recorded according to Perrigo's post-Class Period restatement.  ¶¶7, 205-224.  The Complaint also identifies *why* each statement was misleading.  *Id.*  These details easily satisfy the particularity requirements of both Rule 9(b) and the PSLRA.  *See PTC Therapeutics*, 2017 WL 3705801, at *8 (particularity standard "requires that plaintiffs plead the 'who, what, when, where and how' of their claims.").

**Misrepresentations regarding fair value exceeding carrying value:**  Each of Perrigo's quarterly reports filed in 2016 on Form 10-Q claimed to have assessed the current fair value of the Tysabri royalty stream and falsely reported to investors that "fair value exceeded the carrying value."  ¶¶219, 221, 223.   This was manifestly false, as Perrigo now admits.  On each of those measurement dates, the actual fair value of the Tysabri royalty stream did not exceed carrying value, but instead was *far less*.  ¶¶247-249.

These misrepresentations could not possibly be cured, as Defendants erroneously suggest, by reference to amortization "depreciating at a rate of $290 million per year."[18] DM 45.  Even if

---

[18] It is not clear that Perrigo's Class Period claims of a $5.8 billion valuation need adjustment for amortization, as Defendants argue in their brief.  For example, although amortization had accrued for five quarters by the time of Perrigo's April 29, 2015 Form 10-Q, that filing stated in the present tense that "[t]he asset's value *is* $5.8 billion," *see* ¶205. Regardless, whether or not amortization is subsequently deducted, the result is precisely the same.  Fair value, under either calculation, did not exceed carrying value, and Class Period statements to the contrary were simply untrue.

the claimed valuation of $5.8 billion was reduced by this amortization, **fair value still would not exceed carrying value**:

|  | Claimed Value | Years amortized[19] | Amount of amortization (at $290M/yr) | Carrying value per Defendants' proposed calculation | Actual fair value admitted in Restatement | Fair value exceeds carrying value |
|---|---|---|---|---|---|---|
| Q1 2016 | $5.8 billion (e.g., ¶215) | 2.25 | $652.5 million | $5.1475 billion | $5.02 billion (¶218) | NO |
| Q2 2016 | $5.8 billion (e.g., ¶215) | 2.5 | $725 million | $5.075 billion | $4.02 billion (¶222) | NO |
| Q3 2016 | $5.8 billion (e.g., ¶215) | 2.75 | $797.5 million | $5.0025 billion | $3.55 billion (¶224) | NO |

Accordingly, Defendants' statements to investors were patently false with or without the adjustments proposed in Defendants' brief.

Defendants' contention that competitive threats and currency challenges were disclosed is similarly misplaced.  Perrigo, Papa (Q1 2016 only) and Brown told investors that even with those headwinds, fair value still exceeded carrying value.  ¶¶219, 221, 223.  As Perrigo now acknowledges, fair value was far less than carrying value at the time these statements were made.  ¶¶247-249.  Moreover, though Perrigo claimed these challenges might cause impairments in the future, they did not take any charges at the time of the statements, even though fair value had already plummeted far below the value claimed to investors.  *See Dudley*, 2013 WL 1845519, at *13 ("warnings that an impairment charge might be taken in the future did not relieve the Company from recording the impairment at the appropriate time").

Defendants' reference to analyst reports also lacks merit.  Such truth on the market defenses are "intensely fact specific," and under these circumstances cannot possibly be established as a matter of law.  *Enzymotec*, 2015 WL 8784065, at *15-16.  Defendants assert that

---

[19] As the Complaint identifies, Perrigo acquired the royalty stream through its acquisition of Elan plc in December 2013.  ¶¶46-48.

investors should have realized that Perrigo and Brown were being untruthful in August 2016 and November 2016 when they asserted that the royalty stream's fair value exceeded its carrying value, *see* ¶¶221 and 223, because a handful of analyst reports dated August 22, 2016 to September 19, 2016 estimated a lower fair value.  *See* DM 44.  As an initial matter, the analyst reports referenced by Defendants are not incorporated in the Complaint or properly before the Court, and there is no evidence that they broadly reflected market understanding.[20]

Additionally, Perrigo and Brown themselves undermined any investor confidence in these analyst estimates, falsely insisting that the royalty stream's fair value **exceeded** its carrying value of more than $5 billion **even as of October 1, 2016**–after each of the cited analyst reports was issued.  ¶¶219, 221, 223.  In other words, at the time, Perrigo and Brown themselves told investors that the very analysts cited in Defendants' brief were wrong.  Accordingly, Defendants cannot demonstrate that the truth was conveyed to the public at all, let alone that it was "conveyed . . . with a degree of intensity and credibility sufficient to counter-balance effectively" Defendants' misrepresentations.  *Merck*, 2011 WL 3444199, *35 (internal quotation omitted).

**Misrepresentations and omissions caused by Defendants' GAAP violations:**  The Complaint also alleges that Perrigo, Papa and Brown:  (1) reported inaccurate financial results to investors by including the royalty stream in Perrigo's operating results; (2) omitted the fair market value of the Tysabri royalty stream; and (3) failed to record mark-to-market changes in fair market value, all of which were done in violation of GAAP and concealed billions of dollars of deterioration in the value of the Company's largest and most important financial asset.  ¶¶206, 208, 210, 212, 214, 216, 218, 220, 222, 224.  Because the financial statements in question

---

[20] As explained in *PTC Therapeutics,* judicial notice of a public document cannot be used to establish "what the investing public actually believed."  2017 WL 3705801, at *3 n.5.

violated GAAP, they are "presumed to be misleading" under federal law.  *See* 17 C.F.R. 210.4-01(a)(1).

Defendants do not contest that presumption, nor do they deny that they violated GAAP in the precise manner alleged in the Complaint.   In fact, Perrigo admitted as much in its restatement.  *See* ¶¶22, 245-251.  Instead, Defendants claim that it was "well understood" that the Tysabri royalty stream was a financial asset, not an operating asset.  DM 43-44.  This argument demonstrates Defendants' culpability.  If they "well understood" the classification of the royalty stream, they should have accounted for it as GAAP required.  But, Defendants were obligated to follow GAAP regardless of what investors understood.  *See Dudley*, 2013 WL 1845519, at *12-13 (that company met "other disclosure obligations does not absolve it of its obligation to comply with GAAP").  Defendants' failure to apply the "well understood" GAAP classification concealed billions of dollars of deterioration in value, and inflated revenue, income and other key metrics.  *See, e.g.,* ¶¶ 22, 206, 208, 210, 212, 214, 216, 218, 220, 222, 224.[21]

Defendants' claim that their statements of GAAP compliance were mere opinions also fails to demonstrate any pleading deficiency.  *See* DM 45-46.  The GAAP rules at issue here "have objective application such that compliance would be a statement of fact."  *Hertz*, 2017 WL 1536223, at *11.   Perrigo acknowledged that it viewed the royalty stream objectively as a financial asset, but simply declined to account for it as such.  ¶¶217, 245.  "[N]onconformance to a stated methodology to arrive at a loan loss reserve amount [or here, a fair value amount] is a

---

[21] Defendants' citation to *Winer Family Trust v. Queen,* 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007) is misplaced.  *See* DM 43.  Nothing in that case even remotely suggests that false financial reporting is subject to a "truth on the market" defense. Instead, *Winer* merely held that any misrepresentation by an executive about the extent of renovation was remedied by a Form 8-K expressly stating that the renovations would cost $8.5-$16 million.  2004 WL 2203709 at *36.  Defendants here were not similarly candid.  They did not disclose that the fair value of the Tysabri royalty stream had dropped far below its carrying value until the sale was announced in February 2017.

measurable objective fact." *Underland v. Alter*, No. 10-3621, 2011 WL 4017908, at \*9 (E.D. Pa. Sep. 9, 2011).

Even if opinions, Defendants' false claims of GAAP compliance while knowingly misclassifying the Tysabri royalty stream as part of its operating assets are actionable. Statements of opinion may give rise to liability either if they do not reflect the speaker's subjective belief <u>or</u> if they omit known material information undermining that belief. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327-1331 (2015). The Complaint alleges both *Omnicare* prongs. According to admissions cited in the Complaint, Perrigo and its most senior executives understood the royalty stream to be a financial asset not an intangible asset, but nonetheless recorded it as an intangible asset. *See, e.g.*, ¶217. Moreover, Defendants' statements omitted that after acquiring Elan, Perrigo simply carried over the historical accounting methodology even though all operating activities related to Tysabri had ceased, and declined to "design or implement controls around the fair value accounting for the Tysabri royalty stream as a financial asset." ¶246.

### 2.   The Complaint Alleges a Strong Inference of Scienter Concerning the Tysabri Royalty Stream Misrepresentations

Plaintiffs' Complaint raises a strong inference that Defendants Perrigo, Brown and Papa were at least reckless in their misrepresentations and omissions regarding the Tysabri royalty stream. In response, Defendants rely extensively on this Court's opinion in *Hertz,* 2017 WL 1536223; *see also* DM 22, 46, 51, 52, 56. But even a cursory examination of *Hertz* demonstrates that it bears no resemblance to this case. In *Hertz*, the company's "overstatements in income were caused by a combination of discrete accounting errors that occurred over fifteen areas." 2017 WL 1536223, \*16. Moreover, the *Hertz* overstatements "did not occur in a few, key

product lines or transactions," but in a host of small line items. *Id.* Consequently, this Court in *Hertz* held that the circumstances suggested a failure of supervision rather than fraud.

Here, unlike *Hertz*, the misstatement occurred within a single, extremely large asset valuation that would not be entrusted to lower-level personnel. Moreover, the Tysabri royalty stream was touted as important to Perrigo's finances. *See, e.g.*, ¶¶99, 114, 205-212. As Perrigo now concedes, the fair value of the Tysabri royalties dropped by nearly $500 million during the pendency of the Mylan bid, and by nearly *$3.5 billion* by the end of the Class Period—more than *twenty times as large* as the total restatement amount in *Hertz*. ¶¶7, 213-224. These facts contribute to a strong inference of scienter.

**Misrepresentations regarding fair value exceeding carrying value:** Defendants' brief demonstrates, rather than undermines, their scienter with respect to 2016 statements affirmatively misrepresenting that the royalty stream's "fair value exceeds the carrying value." *See* ¶¶219, 221, 223. Defendants offer no non-culpable inference for these misrepresentations, and concede in their brief that they had access to multiple analyst reports valuing the royalty streams at amounts far lower than were indicated in Perrigo's 2016 Form 10-Qs. *See* DM 44-45. Despite access to information indicating their fair value statements were off by billions of dollars, in November 2016, Defendants Perrigo and Brown again misrepresented to investors that "fair value exceeded the carrying value." ¶¶223-224. Defendants' contemporaneous access to information contradicting their statements to investors is classic evidence of scienter. *See Ratz v. Photomedex*, No. 13-6808, 2014 WL 12617439, at *1 (E.D. Pa. Sep. 12, 2014); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014).

Perrigo's restatement concessions also underscore its recklessness. Despite telling investors that "fair value exceeded the [$5 billion-plus] carrying value," and despite the fact that

the royalty stream was its largest asset, Perrigo now admits that it never actually bothered to "design or implement controls around the fair value accounting for the Tysabri royalty stream as a financial asset." ¶245. Its misrepresentations stemmed directly from the conscious decision to avoid a proper fair value analysis. *See Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 616 (S.D.N.Y. 2015) (restatement admission that side deals were "not evaluated, or not evaluated correctly" supported inference of scienter when improper accounting for side deals caused restatement).

**Misrepresentations and omissions caused by Defendants' GAAP violations:** While a restatement alone may not always indicate scienter, many facts alleged in the Complaint strongly suggest that Perrigo's restatement reflects at least recklessness. First, the obviousness of the accounting classification supports an inference of scienter. Perrigo and its president admitted that the Tysabri royalty stream was clearly a "financial asset," not part of Perrigo's operations. ¶217. Defendants now concede that any other conclusion would be absurd. *See* DM 43 ("the Tysabri royalty stream was separate and apart from the business lines run and operated by the Company"), 44 (noting that institutional investor described the royalty stream as "purely a financial asset" and that an analyst called it "clearly non-core" because Perrigo was "not involved in the promotion or marketing of the product"). However, as Perrigo admitted in its restatement, it did not even attempt to design or implement controls for valuing the royalty stream as a financial asset. ¶245. *Cf. Hertz*, 2017 WL 1536223, at *12 ("Plaintiffs do not allege that Hertz bypassed a methodology or metric, but that Hertz applied its methodologies incorrectly."). Defendants' decision here not to account for the royalty stream as the financial asset they understood it to be supports a strong inference of scienter.

The massive size of Perrigo's restatement also supports an inference of scienter.  As Audit Analytics noted, Perrigo's restatement, identifying more than a billion dollars in false accounting entries, was one of the largest restatements from any public company in the past two decades.  ¶22.  "The magnitude of any given misstatement or overstatement may help support an inference of scienter."  *Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, No. 00-5965 (JCL), 2005 WL 1366025, at *8 (D.N.J. June 7, 2005); *see also In re Akorn Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("[I]t is long settled that a magnitude of reporting errors lend weight to allegations of recklessness where defendants were in a position to detect the errors.") (quotation and citation omitted); *Fresno Cty. Emps. Ret. Ass'n v. comScore, Inc.*, No. 16-cv-01820 (JGK), 2017 WL 3261609, at *17 (S.D.N.Y. July 28, 2017) ("the size of the purported fraud may contribute to an inference of scienter").  Here, the inflation was more than Perrigo's profits during any year of the Class Period and was more than a third of Perrigo's average annual revenues.  *Compare Fain v. U.S. Techs.*, Nos. 16-2436, 16-3796, 2017 WL 3727435, at *4 (3d Cir. Aug. 30, 2017) (restatement amounting to less than 2% of annual revenues not suggestive of scienter).

The concentrated nature of the accounting fraud also supports an inference of scienter. The misrepresentations here involved a single valuation of a key asset that would not plausibly be relegated to lower level staffers.  Similarly, that the misrepresentations went on for years before correction also suggests that Defendants were at least reckless.  *See Fain,* 2017 WL 3727435, at *4 (noting the short three week timespan between misstatement and correction and holding that "the more likely inference, given the small-balance nature of the accounts, is that lower staffers simply misclassified these bad debts. . .").

Further, Defendant Brown's resignation lends additional support to a holistic analysis. Brown had been with the Company for more than a decade, ¶34, had been the architect of accounting irregularities requiring the restatement of every single Class Period financial report, left on the same day that the Company first admitted that the fair value of the royalty stream was billions of dollars less than reported, and analysts considered her resignation to be "unexpected." ¶¶240-241.  In short, the inference is more plausible that Brown left because she personally had been reckless in reporting billions of dollars in inflated financials, than because "the restatement occurred on [her] watch or because [s]he failed adequately to supervise [her] department."[22]  *See Hertz*, 2017 WL 1536223, at *20.   Similarly, because the false SOX certifications signed by Brown and Papa were made at a time that the Defendants understood the royalty stream to be a financial asset despite accounting for it as an intangible operating asset, they too provide incremental evidence of scienter.

Finally, the fact that Defendants were readying the royalty stream for sale in the second half of 2016 provides a motive for Perrigo to claim an inflated fair value, so as to not dissuade potential buyers.  *See Fain*, 2017 WL 3727435, at *5 (identifying a "pending corporate transaction" as a "specific incentive" relevant to a scienter analysis).

Defendants' attempt to raise a competing inference with respect to prior audit opinions asserts facts beyond the four corners of the Complaint, and requires the resolution of factual

---

[22] Defendants' suggestion that resignations are categorically eliminated from consideration in a holistic analysis absent evidence of "extreme corporate punishment," *see* DM 32, misstates the law.  As the Third Circuit recently explained, such punishment is an "example" of circumstances that might be sufficient for a resignation to demonstrate a strong inference of scienter.  *Fain*, 2017 WL 3727435, at *4.  It is not a necessary condition.  *Id.* (holding terminations did not suggest scienter where one was accompanied by a large severance package and an ongoing consulting relationship and the other with continuing benefits even though employee had only been employed ten days before conduct in question).

disputes that cannot be addressed on a motion to dismiss.  First, Defendants impermissibly reference self-serving explanations contained in a Perrigo Form 8-K attempting to justify its accounting violations.  DM 33 (contending, because Perrigo said so, that Perrigo's decision to falsely account for the Tysabri royalty stream as an intangible asset and not the financial asset it understood the royalty stream to be was "reviewed with EY [Ernst & Young] and agreed to under EY's audit opinions. . ." and was changed only after EY reevaluated its decision).  But "SEC filings may not be considered for the truth of their contents on a motion to dismiss." *Gewirtz v. Opko Health, Inc.*, 230 F. Supp. 3d 440, 445 (E.D. Pa. 2017).

As several courts have explained, it is inappropriate to draw <u>any</u> inference from an audit opinion without "evaluat[ing] what communications passed between the company and the auditor" and "what, if anything, was hidden from the auditor," assessments that require discovery and a developed record.  *In re Diamond Foods, Inc.*, No. C 11-05386, 2012 U.S. WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012).  *See also Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 50 F. Supp. 3d 1328, 1365 n.183 (C.D. Cal. 2014) (agreeing that without discovery a plaintiff is unable "to know what communications transpired between PWC and Ixia, and accordingly that PwC's audit opinion cannot negate scienter for purposes of a motion to dismiss").  Moreover, even a clean audit opinion does "not excuse the individual defendants from their own responsibilities to monitor . . . internal controls."  *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 CV 214 (HB), 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014) (sustaining claims against both CFO and audit committee members despite clean audit opinion).

At any rate, Defendants' "audit opinion" arguments are limited to early-Class Period representations regarding the inflated valuation of the Tysabri royalty stream.  The most egregious statements made in Perrigo's 2016 Form 10-Qs, including the fabrication that "fair

value exceeded the carrying value," were not audited at all.  *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (ruling that audit opinion did not absolve the company because "it did not specifically discuss the time periods at issue; it discussed year-end results").

### F.   Defendants' Additional §10(b) Arguments Fail

#### 1.   Motive, Though Not Required, Is Alleged

Defendants' extended motive arguments (*see*, *e.g.*, DM at 14-22) are both legally and factually wrong.  As an initial matter, the Supreme Court has made clear that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325.  Likewise, the Third Circuit explained that "a general rule that motive allegations are . . . necessary [] is unsound." *Avaya*, 564 F.3d at 277.  Instead, scienter "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Id.* at 269.  In light of these clear directives, Defendants' contention that "correspondingly greater" circumstantial allegations are required where motive "is not apparent," *see* DM 22, is misplaced.

Regardless, Plaintiff *does* plead a concrete, specific motive—that Defendants were motivated to defeat Mylan's hostile bid. Numerous other industry professionals reached the exact same conclusion, including Jim Cramer, who publicly stated that Defendant Papa's claim that "the Mylan bid dramatically undervalued Perrigo . . . ***was clearly untrue***."  ¶11; *see also* ¶¶232 (Wells Fargo); 239 (Starboard Value).[23]  Defendants' hypothetical assertion that Papa and Brown may have obtained potential benefits if the takeover was consummated (*see* DM 16) is a red

---

[23] While Defendants cite cases at DM 15-16 holding that motive is not necessarily inferred from general takeover fears, they cite no cases where—as here—independent observers have concluded on their own volition that executives stretched the truth in order to defeat a hostile takeover bid.  At any rate, the Third Circuit has made clear that a "pending corporate transaction" can serve as a "specific incentive" relevant to a scienter analysis.  *Fain*, 2017 WL 3727435, at *5.  The pending hostile takeover bid served exactly that purpose here.

herring.   Defendants do not dispute that Papa and Brown's ***actual*** motive during the takeover period was to derail Mylan's bid and cause investors to reject the deal.  *See, e.g.,* ¶¶11, 13, 96-101, 108, 231, 232, 239.

Nor do the additional assertions Defendants reference undercut the clear motive that neutral observers repeatedly confirmed.  For example, referring to extrinsic evidence, Defendants claim that Papa, Brown and certain other Director Defendants increased their Perrigo stock holdings during the Class Period.  DM 17-18, 20.  Yet, as will be shown at trial, any increases occurred because these Defendants received restricted stock that they could not sell.  *See Opengate Capital*, 2014 WL 3367675, at *5 (a 12(b)(6) motion does not "resolve disputed facts").

Defendants' reference to stock buybacks is equally misplaced.  *See* DM 21-22.  This argument too goes far beyond the Complaint, but if raised at the appropriate juncture, Defendants will face overwhelming proof that the stock buybacks were announced as a tactic to try to defeat the Mylan tender offer.   For purposes of this motion to dismiss, however, Perrigo's stock repurchase plan "weighs neither in favor of nor against an inference of scienter." *ViroPharma II*, 21 F. Supp. 3d at 474 n.23; *see also Kohut v. KBR, Inc.*, No. H-14-1287, 2015 WL 11995250, at *17 n.11 (S.D. Tex. Sep. 3, 2015) (same).

## 2.    The Complaint Expressly Identifies the Maker of Each Misrepresentation

The Complaint identifies which Individual Defendant(s), in addition to Perrigo, made each of the materially false and misleading statements alleged.   "[T]he maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011). Accordingly, for oral misrepresentations, the Complaint identifies the person articulating it.  *See,*

*e.g.,* ¶¶133, 135, 137, 139, 141, 145, 149, 155, 157, 159, 161, 168, 178, 180, 182, 186, 190, 192, 196, 203, 213.   For written misrepresentations, the Complaint identifies the persons with authority over the contents either because they expressly signed the documents, provided attributed quotes, or expressly accepted responsibility under the Irish Takeover Rules for the content of the statements issued.   *See, e.g.,* ¶¶132, 143, 147, 151, 153, 155, 162, 164, 166, 170-172, 174, 176, 184, 188, 194, 200-201, 205, 207, 209, 211, 215, 219, 221, 223.

Even though **all** Director Defendants accepted attribution and responsibility for written statements issued during the Mylan offer period, and claimed to control their contents under the heightened standard of care required by the Irish Takeover Rules, Director Defendants other than Papa now argue that they were not the makers of those statements.  *See* DM 57-59 (asserting that no Director Defendant but Papa was "alleged to have made any of the challenged statements").  However, because **all** Director Defendants claimed responsibility for the identified contents and **all** claimed to have exercised content control under the Irish Takeover Rules, **all** are makers. *Janus,* 564 U.S. at 144; *see also Alter*, 2011 WL 4017908, at *9 (outside directors are considered makers of statements where they "attest to their accuracy and accept responsibility for their contents"); *In re DVI, Inc. Sec. Litig.*, No. 2:03-cv-05336, 2010 WL 3522086, at *5 (E.D. Pa. Sep. 3, 2010) (outside directors made statements when they signed or were given the opportunity to review and approve the statements).[24]  The sole case Defendants cite, *In re National Century*

---

[24] The Court should also reject outside Director Defendants' erroneous assertion that the Complaint does not allege their scienter.  Like Papa, these Director Defendants affirmatively represented that they had "taken all reasonable care" for the statements in question, and the Complaint exhaustively details—as described above—the falsity of those statements.  Either these Defendants investigated the underlying factual bases for those statements and learned that they were false and misleading—as Perrigo has now *admitted* many were—or they recklessly failed to obtain those facts.  The Director Defendants' request that the Court resolve *now* the factual issue of whether they "did not in fact take all reasonable care," *see* DM 59, is completely inappropriate.  *See Opengate Capital*, 2014 WL 3367675, at *5 (a 12(b)(6) motion is not the

*Financial Enterprises, Inc. Investor Litigation*, 504 F. Supp. 2d 287 (S.D. Ohio 2007), is inapposite. *National Century* predates *Janus*, *Alter*, and *DVI*, does not thoroughly address the underlying analysis as those cases do, and involves circumstances and commitments unique to a private debt offering that have no bearing on this case. *Id.*

### 3.    The Complaint Alleges Misrepresentations, Not Mismanagement

While the Complaint does not dispute that the Individual Defendants mismanaged Perrigo, Plaintiff's claims arise from material misrepresentations and omissions, not the fact of mismanagement.  "[A] complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992).  *Santa Fe Indus. Inc. v. Green,* cited by Defendants, acknowledges this distinction. 430 U.S. 462, 476 (1977) (holding that §10(b) is not implicated by allegations of mismanagement or improper business practices standing alone, but is implicated where, as here, "deception, misrepresentation, or nondisclosure" are alleged).  "The Third Circuit has limited the application of the *Santa Fe* case . . . to those situations wherein plaintiffs do not allege material omissions or misstatements by defendants [which are] actionable under the securities laws."  *In re Avant-Garde Computing, Inc. Sec. Litig.*, Civil No. 85-4149 (AET), 1989 WL 103625, at *5 (D.N.J. Sep. 5, 1989) (citing *Healey v. Catalyst Recovery of Penn., Inc.*, 616 F.2d 641, 645-46 (3d Cir. 1980)).  Allegations of material omissions, ***including the failure to disclose corporate integration problems***, are "not encompassed within the

---

stage "to resolve disputed facts or decide the merits of the case.").  Additionally, the Court should reject the plea of these Defendants, unsupported by any caselaw, to disregard the condemnations by the Irish Takeover Panel of other misleading statements they made.  *See* DM 36.  That a neutral observer found these Defendants to be misleading in certain aspects of their takeover defense further demonstrates their propensity to be misleading in the takeover defense statements alleged in the Complaint.  *See* ¶263.

exception to liability for failure to disclose corporate mismanagement." *In re MobileMedia Sec. Litig.,* 28 F. Supp. 2d 901, 926-927 (D.N.J. 1998).

## II.     THE AMENDED COMPLAINT ADEQUATELY ALLEGES VIOLATIONS OF §14(E)

Noting that §14(e) of the Exchange Act has "virtually identical" materiality and scienter elements as a claim under §10(b), Perrigo Defendants do not raise any separate challenges to the sufficiency of the Complaint's claim under §14(e).  *See* DM 12 (quoting *P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp.*, 47 F. Supp. 2d 546, 560-61 (D.N.J. 1999)).  Accordingly, because the Complaint adequately alleges material misrepresentations during the Mylan offer period (April 21, 2015 through November 13, 2015), and adequately alleges scienter, it also states claims actionable under §14(e).

Defendant Coucke's one additional §14(e) argument that a statement attributed to him was not "in connection with" the Mylan offer (CM 11 n.9) is wholly without merit.  The law is well-settled that §14(e)'s "in connection" with a tender offer requirement is satisfied so long as, as of the time the alleged false statement is made, a tender offer has been announced.  *See, e.g.*, *Applied Digital Data Sys. Inc. v. Milgo Elec. Corp.,* 425 F. Supp. 1145, 1154 (S.D.N.Y.) ("[I]t would be anomalous were sections 14(d) and 14(e) not applicable to the offeror or target corporation once a public announcement of an imminent tender or exchange offer was made, for numerous misstatements, omissions and half-truths could be promulgated with relative impunity until the offer was actually filed with and approved by the SEC."); *Lewis v. McGraw*, 619 F.2d 192, 195 (2d Cir. 1980) ("[S]tatements [made prior to the effectuation of the tender offer] may well be made 'in connection with a tender offer' as required by s 14(e). Otherwise, [parties] would be free to disseminate misinformation up to the effective date of the tender offer"). Likewise, as the Supreme Court has emphasized, the "in connection with" language of §14(e) is

broad in scope, reflecting Congressional intent for the Williams Act to make "disclosure, rather than court-imposed principles of 'fairness' or 'artificiality,' . . . the preferred method of market regulation." *United States v. O'Hagan*, 521 U.S. 642, 668 (1997) (ellipses in original).

The broad "in connection with" language is easily satisfied here.  Mylan announced its intention to conduct a tender offer in April 2015.  ¶1.  In June 2015, during the Mylan offer period, Coucke made profoundly false statements regarding the integration and efficiency of Omega after Perrigo itself had touted its ability to integrate and garner upside from Omega as a key reason to reject Mylan's bid.  ¶¶132-135, 137.    Finally, the transcript Coucke references, *see* Groner Decl. Ex. 39, expressly incorporates the disclosures made in the press release of that same date, which in turn admits the applicability of the Irish Takeover Rules due to the pending takeover battle.[25]  Coucke's statements are unquestionably within the broad ambit of §14(e).

## III.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES §20(A) VIOLATIONS

Plaintiff's §20(a) claims must be upheld because the Complaint alleges both underlying violations, *see supra* at Section I, and that Brown and the Director Defendants (including Papa) served in positions of control due to Brown's oversight of financial reporting, Papa's domination of Perrigo until his resignation, and the Director Defendants' oversight of misrepresentations. ¶¶10-11, 93-94, 293.  Defendants' arguments regarding "culpable participation" are misplaced. As Judge Sheridan recently explained, "the overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss." *Aeterna Zentaris*, 2016 WL 827256, at *4 (internal quotation omitted).

Regardless, even if this Court departs from "the overwhelming trend" recognized in *Li*, the Complaint alleges "culpable participation."  Papa orchestrated the fraudulent takeover

---

[25]  *See*   http://perrigo.investorroom.com/2015-06-02-Perrigo-To-Acquire-Portfolio-Of-Leading-OTC-Brands-From-GSK.

defense, and generally dominated Perrigo until he stepped down.  *See, e.g.,* ¶¶48, 108-113.  The Director Defendants each asserted personal responsibility for the false and misleading statements, and falsely claimed to have exercised "all reasonable care" to ensure accuracy and completeness of statements to investors.  *See, e.g.,* ¶¶132, 143, 151, 153, 162, 164, 166, 171-172, 188, 209.  For Brown, the Complaint alleges that she was the architect of the fraudulent Tysabri accounting that hid the deteriorating valuation, and a signatory to Forms 10-Q falsely stating that "fair value exceeded the carrying value," when it was far less.  *See, e.g.,* ¶¶205-224.

## IV.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES VIOLATIONS UNDER THE ISRAEL SECURITIES LAW, 1968

Defendants do not dispute that Israeli law incorporates the same standards and obligations prescribed by United States federal securities laws, but do dispute that this Court should exercise supplemental jurisdiction over such claims so long as federal claims remain in this lawsuit.  *See* DM 60; CM 15-16.  Accordingly, because Plaintiff has adequately pleaded their Exchange Act claims, it has also alleged parallel claims under Israeli law.  Coucke also contends that §10(b) cannot apply to TASE purchases.  CM 15-16.  But the Complaint does not so contend.  Instead, as the Complaint makes clear, the TASE purchaser class alleges violations of ***"parallel provisions under the Israeli Securities Law, 1968,"*** ¶273(b), which allow companies like Perrigo to elect to adopt the reporting requirements of the country of primary listing, ¶304.  Perrigo has made such an election.  *Id.*  Accordingly, while the alleged misrepresentations are violations of the Israeli Securities Law, 1968, they are measured by the standards and obligations of United States law.  *Id.*

## CONCLUSION

Plaintiff's Complaint alleges serious claims substantiated by detailed factual allegations. While Defendants may have counter-arguments to raise at trial, they identify no pleading defects.

Accordingly, Defendants' motions to dismiss should be denied in their entirety, and the parties directed to proceed to discovery without further delay.  Should the Court find any infirmity in the Complaint, Plaintiff respectfully requests leave to file an amended complaint within forty-five (45) days.

DATED:  October 5, 2017

**LOWENSTEIN SANDLER LLP**

*/s/ Michael T.G. Long*
Michael B. Himmel
Michael T.G. Long
One Lowenstein Drive
Roseland, New Jersey  07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
mhimmel@lowenstein.com
mlong@lowenstein.com

*Liaison Counsel*

**POMERANTZ LLP**

Patrick V. Dahlstrom (*pro hac vice*)
Joshua B. Silverman (*pro hac vice*)
Omar Jafri (*pro hac vice*)
10 South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
ojafri@pomlaw.com

Jeremy A. Lieberman (*pro hac vice*)
600 Third Avenue
New York, NY  10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com

*Co-Lead Counsel*

**BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP**

James A. Harrod (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
Angus Ni (*pro hac vice)*
1251 Avenue of the Americas
New York, New York  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jim.harrod@blbglaw.com
jesse.jensen@blbglaw
angus.ni@blbglaw.com

*Co-Lead Counsel*