<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ROOFER'S PENSION FUND,** | |
| *Plaintiff*, | **Civil Action No. 16-2805** |
| v. | **OPINION** |
| **PAPA, et al.,** | |
| *Defendant.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

      **THIS MATTER** is before the Court by way of Defendants Perrigo Company PLC ("Perrigo"), Joseph Papa, Judy Brown, Laurie Brlas, Gary M. Cohen, Jacqualyn A. Fouse, Ellen R. Hoffing, Michael Jandernoa, Gerland K. Kunkle, Jr., Herman Morris, Jr., and Donal O'Connor's Motion to Dismiss, ECF. No. 114, and Defendant Mark Coucke's Motion to Dismiss, ECF No. 119, the First Amended Complaint ("FAC"), ECF No. 89.  Lead Plaintiff Perrigo Institutional Investor Group ("Plaintiff") opposes the motion, ECF No. 126.  Plaintiffs argue that Defendants made material misrepresentations about four areas to prevent the Perrigo shareholders from accepting a bid from Mylan, which had made a final tender offer.  For the reasons set forth herein, Defendants' Motions are **GRANTED** in part and **DENIED** in part.

**I.     BACKGROUND**

      This is a federal securities class action brought on behalf of purchasers of the common stock of Perrigo between April 21, 2015, and May 3, 2017, both dates inclusive (the "Class Period"), and owners of common stock as of November 13, 2016, seeking to recover damages caused by Defendants' alleged violations of securities laws.  Am. Compl. ¶ 1.  More specifically,

this action arises from alleged misrepresentations that Defendants made to investors while fighting

a hostile takeover bid by Mylan, a pharmaceutical conglomerate, and throughout the Class Period.

Id. ¶ 1.   Generally, Plaintiffs contend that Perrigo intentionally violated accounting rules in its

treatment of a royalty stream it acquired prior to the Class Period and misrepresented the stream's

value, misrepresented the pricing policy and competitiveness of the company's generic division in

order to hide a price fixing scheme that garnered them hundreds of millions of dollars in collusive

revenue, inflated organic growth rates despite knowing that organic growth had slowed

substantially in the quarters preceding the Class Period, and misrepresented the success of

Perrigo's integration of Omega Pharma N.V. ("Omega"), the company's largest acquisition to

date.   As a result of their knowing misrepresentations and omissions, Plaintiffs contend that

Defendants fended off the Mylan bid and reaped personal profits.

### A.  The Parties

Lead Plaintiff Perrigo Institutional Investor Group is comprised of Migdal Insurance

Company Ltd. ("Migdal Insurance"), Migdal Mafeket Pension and Provident Funds Ltd. ("Migdal

Mafeket" and, with Migdal Insurance, "Migdal"), Clal Insurance Company Ltd. ("Clal

Insurance"), Clal Pension and Provident Ltd. ("Clal Pension"), Atudot Pension Fund for

Employees and Independent Workers Ltd. ("Atudot" and, with Clal Insurance and Clal Pension,

"Canaf-Clal"), and Meitav DS Provident Funds and Pension Ltd ("Meitav").  FAC ¶ 26.  Migdal

is one of the largest insurance and pension managers in Israel, and each of the Migdal entities

purchased Perrigo stock during the Class Period and purchased Perrigo securities on the Tel Aviv

Stock Exchange during the Class Period.  FAC ¶ 27.  Canaf-Clal is made up of Israeli investment

entities, each of which purchased Perrigo shares during the Class period and purchased Perrigo

securities on the Tel Aviv Stock Exchange during the Class Period.  FAC ¶ 28.  Meitav, an affiliate

of a leading investment management firm in Israel, purchased Perrigo shares during the Class Period and purchased Perrigo securities on the Tel Aviv Stock Exchange during the Class Period. Id. ¶ 29.

Defendant Perrigo is the world's largest manufacturer of over-the-counter ("OTC") healthcare products and is a significant supplier of generic pharmaceuticals, infant nutrition products, branded pharmaceuticals in Europe, and animal health products. Id. ¶ 30. A predecessor to Perrigo operated as a U.S. company until 2013, when it combined with an Irish entity, Elan, and became Perrigo Company PLC. Id. Perrigo's common stock is dual listed on the New York Stock Exchange ("NYSE") and Tel Aviv Stock Exchange ("TASE"). Id. ¶ 31.

Defendant Joseph Papa ("Papa") joined Perrigo as its President and Chief Executive Officer ("CEO") and served in that capacity until April 25, 2016. Id. ¶ 32. Papa was also a director of Perrigo between November 2006 and April 2016. Id. Defendant Laurie Brlas ("Brlas") joined Perrigo's board of directors in August 2003 and served as director at all time relevant to this action. Id. ¶ 33. In April 2016, Brlas became Chair of Perrigo's Board of Directors. Id. Defendant Judy Brown ("Brown") served as Perrigo's Chief Financial Officer ("CFO") from July 2006 until her resignation on February 27, 2017. Id. ¶ 34. Defendant Gary M. Cohen ("Cohen") joined Perrigo's board of directors in January 2003 and served as a director at all times relevant hereto. Id. ¶ 35. Defendant Marc Coucke ("Coucke") was the co-founder, Chairman and CEO of Omega and served as the Executive Vice President and General Manager of Perrigo's Branded Healthcare ("BCH") division and as the representative of Mylecke Management, Art & Invest NV ("Mylecke"), one of the entities involved in the sale of Omega to Perrigo, from the closing of the Omega acquisition to April 2016. Id. ¶ 36. Coucke also served as a director of Perrigo between November 2015 and April 2016. Id. Defendant Jacqualyn A. Fouse, Ph.D. ("Fouse") joined Perrigo's board of

directors in November 2012 and served as a director until April 2016.  Id. ¶ 37.  Defendant Ellen

R. Hoffing ("Hoffing") joined Perrigo's board of directors in July 2008 and served as a director of

Perrigo until her resignation on May 2, 2017.   Id. ¶ 38.   Defendant Michael R. Jandernoa

("Jandernoa") joined Perrigo's board of directors in January 1981 and served a director until his

resignation in February 2017.  Id. ¶ 39.  Jandernoa formerly served as Perrigo's Chief Executive

Officer between 1988 and 2000, and its Chairman of the Board from 1991 to 2003.  Id.  Defendant

Gerald K. Kunkle, Jr. ("Kunkle") joined Perrigo's board of directors in October 2002 and served

as a director of Perrigo until his resignation in February 2017.  Id. ¶ 40.  Kunkle served as the Lead

Independent Director on Perrigo's board of directors from August 2009 through April 2016.  Id.

Defendant Herman Morris, Jr. ("Morris") joined Perrigo's board of directors in November 2014

and served as a director at all times relevant hereto.  Id. ¶ 41.  Defendant Donal O'Connor

("O'Connor") joined Perrigo's board of directors in November 2014 and served as a director at all

times relevant hereto.  Id. ¶ 42.  O'Connor was previously a director of Elan Corporation, PLC

("Elan") from May 2008 until Perrigo's acquisition of Elan in December 2013.  Id.  Defendants

Papa, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, and O'Connor were the directors

of Perrigo during the Mylan offer and are collectively referenced herein as "Director Defendants."

Id. ¶ 43.  Together with Brown and Coucke, the Director Defendants comprise the "Individual

Defendants."

### B. Defendants' Alleged Misrepresentations and Omissions to Defeat Mylan Bid

On April 8, 2015, Mylan announced an unsolicited bid to purchase Defendant Perrigo for

cash and stock worth $205 per share.  Id.  After twice increasing its bid, Mylan proceeded with a

formal tender offer, which was announced on September 14, 2015.  Id.  To discourage Perrigo

shareholders from accepting this tender offer, Defendants allegedly made material

4

misrepresentations and omissions to overvalue the company in four key areas: (1) the deteriorating value of Perrigo's largest financial asset, a royalty stream for the drug Tysabri; (2) Perrigo's organic growth; (3) collusive pricing in Perrigo's most profitable division, generic drugs; and (4) the integration of Perrigo's largest acquisition, Omega Pharma.  Id. at 1.

### 1. Tysabri Royalty Stream

Following Perrigo's combination with Elan, Perrigo acquired Elan's major asset—a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis manufactured and sold by Biogen Inc.  Id. ¶ 48.  Perrigo accounted for the royalty interest as an intangible asset.  Id. at 122.   Plaintiffs allege that this accounting treatment violated Generally Accepted Accounting Principles ("GAAP"), which required Perrigo to account for the acquired royalty stream as a financial asset.  Id. ¶ 49.  By improperly accounting for the Tysabri royalty stream as an operating asset and consequently failing to make disclosures required for intangible assets, Plaintiffs allege that Defendants concealed the deterioration in the value of the Tysabri royalty stream.  Id.  Following from this argument, Plaintiffs claim that Defendants' statements of GAAP compliance were materially misleading.  Plaintiffs also allege that Defendants affirmatively misrepresented the fair value of the royalty stream by claiming that its "fair value exceeded the carrying value," when, in reality, the fair value had fallen substantially below the carrying value. Id. ¶ 219.

### 2. Anti-Competitive Pricing Practices in Generic Rx Divisions

While Perrigo was principally known as a manufacturer of store brand OTC products, the operating segment with the greatest impact on earnings was not its consumer healthcare (CHC) division, but Generics Rx.  Id. ¶ 66.  For the six quarters prior to the Class Period, the Generic Rx division contributed more to Perrigo's adjusted net operating earnings than any other segment.  Id.

Plaintiffs allege that Generic Rx division's contributions are attributable to collusion with other manufacturers of generic drugs or to pre-existing price fixing conspiracies.  Id. ¶ 69.  According to Plaintiffs, "[i]nstead of engaging in price competition that usually drives generic drug prices relentlessly downward toward the cost of production, Perrigo and other generics manufacturers colluded to raise contemporaneously prices for many generic products by 300%-500% or more." Id. ¶ 6.

An economic expert retained by Plaintiffs determined that there was strong indicia of collusion, including dramatic price hikes contemporaneous with competitors following industry conferences and "startling absence of price variance following these hikes," in many of Perrigo's most important generic drugs: desonide cream and ointment, econazole cream, permethrin cream, tretinoin cream, clobetasol gel and foam, and halobetasol cream and ointment.  Id. ¶ 70-91. Plaintiffs' allege that Defendants repeatedly omitted the price collusion scheme and anticompetitive practices in describing Perrigo's generic drug pricing strategy, claiming instead that that the company's policy was to keep pricing "flat to up slightly."  Id.  ¶¶ 176-204. Additionally, Plaintiffs claim that Defendants affirmatively misrepresented the competitiveness of the market for generic drugs and omitted their participation in the anticompetitive pricing scheme in order to continue reaping financial benefit.  Id.

### 3. Perrigo's Organic Growth Rate

Throughout Defendant Papa's term as CEO, Perrigo claimed an ability to grow organically, as well as through acquisitions.[1]  Id. ¶ 63.  For example, in early 2014, Papa explained that organic growth had accounted for half (8%) of Perrigo's 15-16% revenue growth over the past four years,

---

[1] Perrigo calculates "organic growth" as the year-over-year change in net sales after deducting sales attributable to acquisitions made in the twelve months preceding the given period.  See Am. Compl. ¶ 63 n.9.

and that the company targeted organic revenue growth of 5-10% during any rolling three year period.  Id.  Plaintiffs allege that, by blending older, higher growth periods with newer low-growth periods, Perrigo was able to create the impression of organic growth levels it had not consistently achieved for many quarters.  Id.

Plaintiffs' forensic accounting expert determined that Perrigo's actual organic growth rates during the six quarters preceding the Class Period averaged just over 1% and were even negative for two quarters.  Id. ¶ 64.[2]  Plaintiffs further allege that Perrigo's financial reporting obscured the deterioration in organic growth and prevented investors from making true organic growth calculations on their own.  Id. ¶ 65.  In sum, Plaintiffs allege Defendants were aware that Perrigo's organic growth rate had deteriorated substantially in the six quarters preceding the Class Period, that Defendants nevertheless claimed confidence in the company's ability to meet an organic growth rate of 5-10% going forward, and that Defendants knowingly relied on false information regarding the successful integration of Omega—discussed below—and the competitive market for Perrigo's products in making these misrepresentations.  See id. ¶¶ 151-175.

### 4. Perrigo's Integration of Omega

On November 6, 2014, Perrigo announced it would acquire Omega for $4.5 billion.  Id. ¶ 53.  The acquisition closed on March 30, 2015, just before the beginning of the Class Period in this action.  Id.  Omega was one of the largest OTC healthcare companies in Europe and had a commercial presence in 35 countries.  Id.  Plaintiffs allege that Defendants misrepresented the

---

[2] Plaintiff's expert calculated Perrigo's organic growth rates by first calculating Perrigo's Net Sales without the Tysabri royalty stream, discussed infra, then deducting the sales attributable to acquisitions that were made during the preceding year.  FAC ¶ 64.  Finally, the expert deducted organic revenues from revenues reported in the prior year quarter to determine organic revenue growth and expressed that as a percentage.  Id.

success of integrating Omega and inflated Omega growth prospects despite numerous, known impediments.

To substantiate their allegations, Plaintiffs rely heavily on information given by Christine Kincaid ("Kincaid"), who was Perrigo's Global Cyber Security Manager from June 2015 to December 2015. She indicated that IT integration between Perrigo and Omega had stalled by mid-2015. Id. ¶ 57. Ms. Kincaid also indicated that EU regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain and that Omega's most senior executives unsuccessfully attempted to communicate such and other concerns to Defendants Papa and Brown. Id. ¶ 59. Furthermore, Ms. Kincaid noted that Defendant Papa appointed Mary Donovan, an Irish executive, to bridge communication gaps between Perrigo's U.S. operations and Omega. Id. ¶ 60. Additionally, Ms. Kincaid recounted that her superior, Tom Farringon, directed her to identify and hire a forensic analytics firm to go to Belgium, where it would analyze senior Omega executives' e-mail traffic to ascertain whether any of the executives had revealed material confidential business information to Mylan to aid Mylan's takeover. Id. ¶ 61. The FAC also cites to various Perrigo supervisors and employees recounting operational impediments including poor organizational structure, IT integration problems, management resistance, and underperformance in key Omega markets. Id. ¶ 62.

Plaintiffs allege that Defendants repeatedly misrepresented the success of the Omega integration and its effect on Perrigo's organic growth, while omitting these known impediments to integration. Id. ¶¶ 132-150. The FAC points to various alleged misrepresentations, including Defendants Brown's statement in June 2015 that Perrigo was "in line" with its planned Omega integration process, id. ¶¶ 139-140, and Defendant Papa's statement in August 2015 that Perrigo had "delivered on [its] Omega integration plans", id. ¶¶ 141-142. According to Plaintiffs, the

problems with Omega integration that Defendants "concealed" were "so profound that the Company ultimately had to take impairment charges totaling more than $2 billion, or nearly half of the total purchase price for Omega." Id. ¶ 5.

### C. Aftermath of the Takeover Bid

On November 13, 2015, Mylan's tender offer expired pursuant to its terms after less than 50% of shares were tendered. Id. ¶¶ 107, 111. Plaintiffs allege that Defendants Papa and Brown were awarded millions of dollars in special bonuses following the defeat of the Mylan bid and that they engaged in unusual stock sale at prices artificially inflated by Defendants' fraud, totaling approximately $7 million. Id. ¶¶ 23, 113, 272.

On February 18, 2016, Perrigo reported fourth quarter 2015 revenues, profits, and margins below the projections touted during the Mylan takeover bid. Id. ¶¶ 225-226. Perrigo also revealed that certain Omega assets would need to be restructured and took a $185 million impairment charge while also reducing the Perrigo's 2016 guidance range—its estimate of future earnings—from $10.010 to $9.80. Id. ¶¶ 9, 225-226. On April 22, 2016, reports surfaced that Defendant Papa would leave Perrigo for Valeant Pharmaceuticals International, Inc., and he left the following business day. Id. ¶¶ 10-11, 227-229. Perrigo's shares dropped severely on both dates. Id. Perrigo also lowered its 2016 earning guidance to $8.20-$8.60 per share, a full $1.40 less than claimed three months earlier, and reported that first quarter 2016 earnings would disappoint due to more competitive generic drug pricing. Id. ¶¶ 11, 229. Moreover, Perrigo stated it was considering additional impairment charges for Omega. Id.

On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure. Id. ¶ 234. Following this announcement, Perrigo shares fell $3.71, or 4%, to close at $89.04. Id. ¶ 236. On August 10, 2016, Perrigo announced that it

was cutting guidance again as a result of having to implement "transformational organizational changes" at Omega and additional pricing pressure in the Generic Rx division.  Id. ¶¶ 14, 237-238. Perrigo projected that impairment charges, which were excluded from this guidance, would nearly double from $1.74 per share to $3.29 per share.  Id. ¶ 14.  Consequently, Perrigo shares fell approximately 10% to close at $86.00.  Id.  On December 8, 2016, after Perrigo announced that it needed to restructure the entire branded division, shares declined further, from $83.94 to $81.94. Id. ¶¶ 17, 238.

On February 27, 2017, Perrigo announced that it would sell the Tysabri royalty stream for $2.2 billion cash (plus additional contingent payments of up to $0.65 billion), billions of dollars less than the value allegedly claimed by Perrigo throughout the Class Period.  Id. ¶¶ 18, 240.  That same day, Perrigo disclosed that it could not timely file its Annual Report on Form 10-K for 2010 because it needed to review historical revenue recognition practices for the royalty stream and other potential issues, and disclosed that Defendant Brown was resigning.  Id.  Following these disclosures, Perrigo shares dropped another 12%, or $9.91 per share, to close at $74.77.

On March 3, 2017, Bloomberg reported that Perrigo's generic drug pricing was under investigation by the DOJ, causing shares to drop 3.71%.  Id. ¶¶ 19, 242.  On May 3, 2017, Perrigo's offices were raided by the DOJ, causing its stock to drop over 5%, or $3.88 per share, to close at $72.35.  Id. ¶¶ 20, 243. Shortly after the Class Period, Perrigo issued one of the largest restatements by any public company in decades, in which it purportedly admitted that it violated GAAP in every one of its Class Period financial statements and that its misclassification of the Tysabri royalty stream caused more than $1 billion in errors.  Id. ¶¶ 7, 22 n.1.

### D. Procedural History

Plaintiffs filed the Amended Complaint on June 21, 2017. ECF No. 89. The FAC contains four counts: (1) for violations of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants; (2) for violations of Section 20(a) of the Exchange Act against the Director Defendants and Brown; (3) for violations of Section 14(e) of the Exchange Act against all Defendants; and (4) for violations of the Israel Securities Law, 1968, brought by the TASE Investor Class against all Defendants for purchases made on the TASE. FAC ¶¶ 282-301. Defendants filed the instant Motion to Dismiss on August 21, 2017.

## II.   LEGAL STANDARD

In considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all of the facts in the complaint and draws all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Moreover, dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id. However, the facts alleged must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). That is, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient factual basis such that it states a facially plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court's role on a 12(b)(6) motion is not to determine whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 302 (3d Cir. 2011).

In addition to the customary pleading requirements under Rule 8, plaintiffs must meet the heightened pleading requirements under Rule 9(b) and the Private Securities Litigation Reform

Act ("PSLRA") for Exchange Act claims sounding in fraud.  See City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 168 (3d Cir. 2014).  To allege fraud under Rule 9(b), "a party must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  At a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of a newspaper story'—that is, the 'who, what, when, where and how' of the events at issue."  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 147 (3d Cir. 2004) (citation omitted).

## III.  DISCUSSION

### A. Exchange Act Claims

The Complaint asserts securities fraud predicated on violations of Section 10(b), Section 14(E), and Section 20(A) of the Exchange Act.  Section 14(E) is modeled after Section 10(b) and Section 20(A) is a derivative claim predicating on a finding of liability under Section 10(b).  Thus, the analysis of the Section 10(b) claims is a threshold determination for analyzing whether the remaining Exchange Act claims will proceed.

Section 10(b) punishes fraud in connection with the sale of securities.  To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 167 (3d Cir. 2014).  For purposes of this motion, only the first two elements—material misrepresentation or omission and scienter—are at issue.

The PSLRA imposes additional burdens with respect to allegations involving forward looking statements.  The PSLRA's safe harbor provision, 15 U.S.C. § 77z-2, "immunizes from

liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 254 (3d Cir. 2009).  However, this safe harbor provision does not apply to a '"mixed present/future statement . . . with respect to the part of the statement that refers to the present.'" Id. at 255 (quoting Makor Issues & Rights, Ltd. v. Tellabs, Inc., 513 F.3d 702, 705 (7th Cir. 2008)).  As such, "to the extent plaintiffs [] challenge defendants' alleged omission of present facts with respect to the challenged statements, PSLRA's safe harbor does not apply." Mallen v. Alphatec Holdings, Inc., 861 F. Supp.2d 1111, 1126 (S.D. Cal. 2012) (concluding that defendants' statements that the company had "already begun to realize synergies from the Scient'x acquisition" and "we anticipate that our revenues throughout the balance of 2010 will continue to grow " were not protected by the PSLRA safe harbor for "forward-looking" statements, but dismissing the case on other grounds); see also In re Majesco Securities Litig., 2006 WL 2846281, at *4 (D.N.J. Sept. 29, 2006) (noting "allegations based upon omissions of existing facts or circumstances do not constitute forward-looking statements protected by the safe harbor") (quoting In re MobileMedia Securities Litig., 28 F. Supp. 2d 901, 930 n.18 (D.N.J. 1998)).

Section 14(e) of the 1934 Exchange Act provides a cause of action for material misrepresentations and omissions made in connection with a tender offer.  This provision "is modeled after SEC rule 10b–5, and is designed to insure that shareholders confronted with a tender offer have adequate and accurate information on which to base the decision whether or not to tender their shares." Panter v. Marshall Field & Co., 646 F.2d 271, 283 (7th Cir.1981).  The elements of a Section 14(e) claim are the same as a 10b–5 claim, the only difference being that Section 14(e) arises in connection with a tender offer, while rule 10b–5 arises in connection with

13

a purchase or sale of a security.  In re ValueVision Int'l Inc. Sec. Litig., 896 F. Supp. 434, 448

(E.D. Pa. 1995); see also  P. Schoenfeld Asset Mgmt. L.L.C. v. Cendant Corp., 47 F. Supp. 2d

546, 560-61 (D.N.J. 1999) (holding that the elements of a claim under Section 14(e) of the

Exchange Act are "virtually identical"); see also In re Digital Island Sec. Litig., 357 F.3d 322, 328

(3d Cir. 2004) (holding that "scienter is an element of a Section 14(e) claim" and explaining that

"Section 14(e) is modeled on the antifraud provisions of § 10(b) of the [Exchange] Act and Rule

l0b-5 . . ., which require proof of scienter").

Section 20(a), in turn, provides that:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be liable
> jointly and severally with and to the same extent as such controlled person to any
> person to whom such controlled person is liable, unless the controlling person acted
> in good faith and did not directly or indirectly induce the act or acts constituting the
> violation or cause of action.

15 U.S.C. § 78t.

Section 20(a) is a derivative cause of action, predicated upon § 10(b) liability by a

"controlled person," such that a "plaintiff cannot maintain a claim under § 20(a) without meeting

the pleading requirements for a primary violation of the Act."  In re Aetna, Inc. Sec. Litig., CIV.A.

07–4451, 2009 WL 1619636 *28 (E.D.Pa. June 9, 2009) aff'd in part, 617 F.3d 272 (3d Cir.2010)

(citations omitted).  "If no controlled person is liable, no controlling person liability exists."

Belmont v. MB Inv. Partners, Inc., CIV.A. 09–4951, 2010 WL 2348703 *9 (E.D.Pa. June 10,

2010) aff'd, 708 F.3d 470 (3d Cir.2013) (citations omitted).  "[A] plaintiff can survive a motion to

dismiss a controlling person claim upon a showing of a primary violation of the federal securities

laws by a controlled person and control of the primary violator by the defendant."  Id. at *10.

Here, Defendants assert that Plaintiffs have failed to adequately allege either material

misrepresentations or omissions or scienter with regard to the Tysabri royalty stream, generic

14

prescription pricing, organic growth, or the Omega integration.  Defendants contend that these deficiencies defeat all of Plaintiffs Exchange Act claims.  The Court agrees in part and disagrees in part.

### 1. Misrepresentations

To demonstrate a material misrepresentation or omission, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  Further, the statement must have been misleading at the time it was made, as "liability cannot be imposed on the basis of subsequent events."  In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1330 (3d 2002).  A misstatement or omission is material if "there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [act]."  In re Donald J. Trump Casino Sec. Litig.–Taj Mahal Litig., 7 F.3d 357, 369 (3d Cir. 1993) (alterations in original) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  In other words, a misstatement or omission is material if the information "would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor."  Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2000) (internal quotations and citations omitted).

"Material representations must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism. . . ."  EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000).  Such statements "'constitute no more than 'puffery' and are understood by reasonable investors as such.'"  In re Advanta Corp. Sec. Litig., 180 F.3d at 538 (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1428 n. 14 (3d Cir.1997)).

Because materiality is a mixed question of law and fact, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Shapiro v. UJB Financial Corp., 964 F.2d 272, 280 n.11 (3d Cir. 1992) (citation omitted). The Third Circuit has warned that the task of determining materiality can be especially difficult when the statement at issue contains "soft" information, i.e., statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts. Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628, 642 (3d Cir. 1989). However, "complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage." In re Burlington, 114 F.3d at 1426.

### a. Tysabri Royalty Stream

The alleged misrepresentations regarding the Tysabri royalty stream fall into two categories: misrepresentations about fair value exceeding carrying value and misrepresentations arising from statements of GAAP compliance.

### i. Fair Value Exceeding Carrying Value

Plaintiffs claim that Defendants consistently misrepresented that the fair value of the Tysabri royalty stream exceeded carrying value, even while the fair value plummeted due to known adverse clinical and competitive developments. Defendants contend that the alleged misrepresentations are inactionable because the truth was transmitted to the market in a timely manner through publicly available information, thereby giving rise to a "truth on the market defense." The Court disagrees with Defendants.

16

"The 'truth on the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market." The Winer Family v. Queen, No. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004) aff'd sub nom, Winer Family Tr. v. Queen, 503 F.3d 319 (3d Cir. 2007).  Defendants must demonstrate that "the market was aware of curative information" and that the corrective information "has been conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig., No. 05-1151, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011) (quoting In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir.1989)).  "To prevail on a 'truth on the market' defense at th[e] [motion to dismiss] stage of the litigation . . . defendants must establish that defense as a matter of law on the basis of the allegations of the Amended Complaint[.]" In re Res. Am. Sec. Litig., No. 98-5446, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000).  As a general matter, the truth on the market defense is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." Enzymotec, 2015 WL 8784065, at *16 (quoting Ganino v. Citizens Util. Co., 228 F.3d 154, 167 (2d Cir. 2000)).

Each of Perrigo's quarterly reports filed in 2016 on Form 10-Q claimed to have assessed the current fair value of the Tysabri royalty stream, and each reported to investors that "fair value exceeded the carrying value." Am. Compl. ¶¶ 219, 221, 223.  On each of these measurement dates, Plaintiffs allege—and Defendants now admit—the actual fair value was far less than the carrying value.  Id. ¶¶ 247-249.  Defendants contend that the market was aware of the royalty stream's decreased value because Defendants had issued warnings regarding the stream's depreciation and the potential negative impact of new competition entering the market.  ECF No. 114.7 at 10; ECF No. 114.26 at 36, 46.  Analysts purportedly took these warnings into consideration when reporting

on the royalty stream and lowered the stream's value accordingly.  Based on these reports, Defendants contend that the truth was sufficiently conveyed to the market.

The Court is unconvinced.  As alleged, Defendants maintained their claim that the royalty stream's fair value exceeded its carrying value, even after their own warnings and the issuance of the analysts' reports discussed above.  Keeping in mind the fact specific nature of the inquiry, it can hardly be said that Defendants have demonstrated curative information was "conveyed . . . with a degree of intensity and credibility sufficient to counter-balance effectively" their continuing statements regarding fair value.  *Merck*, 2011 WL 3444199, *35 (internal quotation omitted).  Dismissal based on immateriality, therefore, is inappropriate at this juncture.

### ii. GAAP Violations and Statements of Compliance

Plaintiffs claim that Defendants: (1) reported inaccurate financial results to investors by including the royalty stream in Perrigo's operating results; (2) omitted the fair market value of the Tysabri royalty stream; and (3) failed to record mark-to-market changes (i.e. changes in value relating to market price) at the end of each quarter, all of which were done in violation of GAAP and concealed billions of dollars of deterioration.  Id. ¶¶ 206, 208, 210, 212, 214, 216, 218, 220, 222, 224.  Consequently, Plaintiffs allege that Defendants' statements of GAAP compliance were misrepresentations.  Defendants respond that the truth was conveyed to the market through both Defendants' statements identifying the stream as a financial asset and through the company's financial disclosures, thereby undermining materiality.  Moreover, Defendants argue that statements of GAAP compliance are inactionable opinions.

A company may not avoid GAAP requirements by disclosing underlying data to the market.  See Dudley, 2013 WL 1845519, at *12-13 (that company met "other disclosure obligations does not absolve it of its obligation to comply with GAAP").  Thus, the contention that

Perrigo's underlying financial statements and Defendants' disclosures showed the royalty stream was an operating asset—rather than an intangible asset as categorized—is unavailing.

Defendants' argument that their statements of GAAP compliance are inactionable opinions is more compelling. Statements about GAAP compliance are frequently deemed opinions because "GAAP standards are often subjective" and "involve a range of possible treatments." In re Hertz Glob. Holdings, Inc. Sec. Litig., No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017). "While certain GAAP rules have objective application such that compliance would be a statement of fact," Plaintiffs do not identify any objective rules here, arguing only that Defendants' objectively believed the categorization of the royalty stream was erroneous. Defendants' May 22, 2017 Form 10-K notes that the asset's accounting was changed after an "extensive evaluation of the facts **and circumstances and the judgments**" required to determine the appropriate classification, which belies the notion that the accounting treatment was a purely objective decision. Am. Compl. ¶ 123 (emphasis added).

Even if they are opinions, the certifications of GAAP compliance are still actionable if they do not reflect the speaker's subjective belief or if they omit known material information undermining that belief. Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S. Ct. 1318, 1327-1331 (2015). Defendants repeatedly claimed that the Tysabri royalty stream was a financial asset both before and during the Class Period. Plaintiffs attempt to construe these statements as Defendants' admissions that they "understood the royalty stream to be a financial asset not an intangible asset, but nonetheless recorded it as an intangible asset." Pl's. Br. at 50. As discussed in the Court's scienter analysis below, however, this argument fails. Plaintiffs have failed to plead facts which would create a strong inference that Defendants knew their financials

were not GAAP compliant and they have failed to plead that Defendants knowingly or recklessly omitted that fact from their statements.

### b. Generic Drug Pricing

Plaintiffs allege that Defendants included hundreds of millions of dollars of collusive revenue in operating results, falsely represented that the Generic Rx segment was on track to achieve an 8%-12% organic growth rate despite growing regulatory scrutiny, made affirmative misrepresentations falsely describing the competitive environment, and made misleading statements indicating a "flat to up slightly" pricing strategy despite implementing price hikes of 300%-500% in collusive drug markets.  Defendants respond that, as a threshold matter, Plaintiffs have failed to adequately allege any illegal collusion and, more specifically, that the "flat to up slightly" pricing strategy was true with regard to the entire portfolio of products.  The Court agrees with Plaintiffs.

"When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred."  Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016), reconsideration denied, No. 14-CV-3251, 2016 WL 2642223 (S.D.N.Y. May 6, 2016).  Evidence of parallel conduct, standing alone, is insufficient to state a plausible claim for underlying misconduct.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555.  "To adequately plead an agreement [to fix prices], a plaintiff must plead either direct evidence of an agreement or circumstantial evidence."  Burch v. Milberg Factors, Inc., 662 F. 3d 212, 225 (3d Cir. 2011).[3]  The Third Circuit considers a non-

---

[3] While Defendants correctly note that actionable Section 10(b) claims often stem from a public admission of guilt, such a public admission is not a prerequisite to bringing a securities claim based on underlying illegal activity.

exhaustive list of "plus factors" that tend to demonstrate the existence of collusion.[4]  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 321-22 (3d Cir. 2010).  The "plus factors" include: "(1) evidence that the defendant had a motive to enter into a . . . conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy."  Ins. Brokerage, 718 F.3d at 321-22.

Plaintiffs have pled a motive to collude by describing the downward pricing pressure in competitive generic drug markets, quantifying the market concentration for each impacted drug, establishing that there were high barriers of entry due to FDA requirements, and demonstrating that demand was both theoretically inelastic and actually inelastic in that changes in price would not affect the quantity demanded.  Am. Compl. ¶¶ 68-71, 77, 81, 85, 87, 98.  These market specific factors are sufficient to demonstrate motive.  See In re Propranolol Antitrust Litig., 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017).[5]

Under the second factor, the Amended Complaint alleges that Perrigo's dramatic price increases would have left it vulnerable to market share loss to competitors in the absence of collusion.  ¶¶ 68-69, 73-74, 82, 86, 90;  see also In re Propranolol, 249 F. Supp. at 719  (finding that prices increases were against defendants' self-interest because of both the magnitude of the price increases and because the generic drug at issue was identical across manufacturers and, therefore, a "rational competitor therefore should have kept its price stable and vastly increased its

---

[4] Defendants contend, in a footnote, that the plus factors are irrelevant under the heightened pleading standards applicable to securities fraud cases.  Beyond this conclusory statement, Defendants provide no support for their contention.  Rather than finding the plus factors irrelevant, courts in other jurisdictions that analyze the issue similarly require plaintiffs to plead the plus factors with particularity, an approach the Court will follow here.  See, e.g., In re Tyson Foods, Inc. Sec. Litig., 275 F. Supp. 3d 970, 992 (W.D. Ark. 2017).
[5] Defendants correctly note that In re Propranolol is not binding on this Court, but fail to meaningfully distinguish its reasoning on closely analogous facts.

market share"). Notably, Defendants fail to provide any explanation for the price hikes that would not render them against self-interest for a seller in the generic market.

Pursuant to the third factor, the Amended Complaint alleges weekly informational exchanges regarding pricing through third-party data services, ¶ 70, and participation with competitors in trade meetings immediately preceding the tandem price hikes, ¶¶ 72-73, 78, 82, 86, 88, 90. Without more, participation in trade meetings does not weigh in favor of finding a conspiracy. See Twombly, 550 U.S. at 557 n.12 (suggesting that membership in a trade association is insufficient to establish coordination); In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 409 (3d Cir. 2015) (opining, on summary judgment, that defendants' collective presence at trade show meetings was "insufficient to support a reasonable inference of concerted activity"). However, here, the timing of the price hikes in relation to the trade meetings, the allegations of motive, the unexplained assertion that the price hikes were contrary to Perrigo's interests absent collusion, and the reference to a recent civil complaint brought by the attorneys general of forty states alleging that trade meetings are used to "sow the seeds for . . . illegal agreements," lend greater significance to Defendants' participation in the trade meetings as evidence of conspiracy. See Connecticut v. Aurobindo Pharma USA, Inc., No. 3:16-cv-02056, Amended Complaint, ¶ 7 (D. Conn. Mar. 1, 2017)[6]; see also In re Propranolol, 249 F. Supp. at 722 (crediting a similar allegation in a complaint brought by the attorneys general of twenty states to support a finding of interfirm communications). The Court finds there are sufficient allegations to demonstrate underlying misconduct, even when viewed through the PSLRA's heightened standard, and that dismissal is inappropriate at this juncture.

---

[6] Perrigo is not currently named as a defendant in Connecticut v. Aurobindo, but the amended complaint's allegations describing the nature of these trade meeting is nonetheless relevant to Plaintiff's contentions here.

Defendants' next argue that, even assuming there are sufficient allegations to state a plausible claim for underlying misconduct, any alleged statements identifying Perrigo's pricing for generics as "flat to up slightly" are not misrepresentations when viewed in the context of the entire portfolio of products and that statements regarding the competitive market in the Generic Rx division are puffery.  Plaintiffs contend, and the Court agrees, that once Defendants' chose to speak about generic drug pricing, they could not "omit material facts related to that issue so as to make the disclosure misleading." PTC Therapeutics, 2017 WL 3705801, at *14 (quotation and citation omitted).  Whether a disclosure is required is "best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact." Enzymotec, 2015 WL 8784065, at *15.  Here, Plaintiffs argue that "average" pricing was inflated by enormous and unsustainable price spikes in drugs and that these products contributed $271.8 million in collusive revenue in 2015 and $291.5 million in collusive revenue in 2016—more than a quarter of all Generic Rx revenues.  Thus, according to Plaintiffs, the scheme necessarily masked serious price deterioration in products subject to normal competitive forces if the price spikes only resulted in "flat to up slightly" pricing overall.  See ¶¶ 76, 80, 84, 86, 88, 90.  Giving Plaintiff the benefit of all favorable inferences, the Court will not dismiss the statements regarding "flat to up slightly" pricing at this juncture.

As for the argument of puffery, the Court finds that Defendants' statements regarding competitiveness in the generic market and pricing pressures are likewise actionable.  In re Sotheby's Holdings, Inc. Sec. Litig., 00 Civ. 1041 (DLC), 2000 WL 1234601, at *3 (S.D.N.Y. Aug. 30, 2000) (statement that competition was "intense" despite colluding with competitor was actionable); Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 709 (E.D. Mich. 2010) ("The CCAC also adequately alleges that [d]efendants made express representations to the

contrary in multiple public filings, specifically and repeatedly stating that their market share and earnings were the result of their ability to compete on price, service and quality in a 'highly competitive' packaged ice industry. Thus, the CCAC alleges a direct nexus between the allegedly illegal conduct and the Defendants' allegedly materially false and misleading statements."). Here, the Complaint similarly alleges a direct nexus between the illegal conduct and Defendants' allegedly materially false and misleading statements. See, e.g., Am. Compl. ¶¶ 178 (quoting Defendant Papa stating, "Obviously, it's a competitive market out there"); 184 (noting that Perrigo's August 13, 2015 Annual Report stated the Generic Rx division 'operate[d] in a highly competitive environment' and 'face[d]' vigorous competition"). The allegations here and the misrepresentations and omissions identified in the Amended Complaint concerning collusive pricing are sufficient to withstand a motion to dismiss.

### c. Organic Growth

Defendants contend the Complaint fails to allege any misrepresentations related to Perrigo's organic growth rate. Plaintiffs respond that Defendants told "half-truths" by failing to disclose the company's deterioration in organic growth preceding the Class Period and touted misleading growth projections by relying on revenue improperly derived from the Tysabri royalty stream and the collusive pricing scheme in the Generic Rx division. The Court agrees with Plaintiffs.

Plaintiff's arguments center on Defendants' assertions that Perrigo had "grown about 8% organically," FAC ¶ 161, that organic growth had been "consistent," id. ¶ 151, Perrigo had "demonstrated a reliable ability to grow organically," id. ¶ 166, and that Perrigo had "the ability to keep delivering" organic growth rates of 5%-10%, id. ¶ 151, 153, 155. Plaintiffs contend,

24

without dispute, that Perrigo's organic growth had slowed in the six months preceding the Class Period, even becoming negative at times.  Id. ¶ 64.

Defendants respond by arguing that their organic growth statements were factually accurate and therefore inactionable.  They point to their consistent practice of "provid[ing] compound annual growth rates over a rolling three-year period."  ECF No. 114.34 at 7.  Relying on this consistent practice, Defendants' argue that they have consistently had compound annual growth rates within the 5-10% range, as they claim in the contested representations.  See In re Sofamor Danek Grp., Inc., 123 F.3d 394, 401 n.3 (6th Cir. 1997) ("It is clear that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."); see also Galata v. Commerce Bancorp. Inc., 220 F. App'x 97, 102 (3d Cir. 2007) ("Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b).").

Whether statements regarding Perrigo's past performance are factually accurate does not change the fact that Perrigo was experiencing difficulty maintaining those growth rates at the time Defendants made the contested statements.  The law does not permit corporate executives to mislead investors through half-truths.  By putting the issue of organic growth "in play," Defendants "acquire[d] a duty to disclose information relating to that topic."   In re Viropharma, Inc., Sec. Litig., 21 F. Supp. 3d 458, 472 (E.D. Pa. 2014); see also In re PTC Therapeutics, Inc. Sec. Litig., 2017 WL 3705801, at *14 (D.N.J. Aug. 28, 2017); Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017) ("[O]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading.") (quoting Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 490-91 (3d Cir. 1994)) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation to communicate any additional or qualifying information, then known, the absence of

which would render misleading that which was communicated"). In touting their consistent ability to maintain organic growth rates in the 5-10% range and proclaiming that their "strong durable base" would allow for continued consistent growth, Perrigo assumed a duty to disclose that recent performance fell substantially below the target range. See Am. Compl. ¶¶ 151, 153, 155, 157, 159, 161, 166. Thus, even if the Court determines the past-looking statements are accurate and the forward-looking statements are protected, it would not shield the representations of present success and present ability to deliver on organic growth goals from potential liability. These statements are the heart of Plaintiffs' claim.

Finally, Defendants argue that they did indeed disclose the downturn in performance preceding the Class Period. Defendants point to a single bar on a graph disclosed to investors and to a statement from a conference call with investors. The graph indicates that organic growth declined between 2013 and 2014. As already noted, this type of truth on the market defense is highly fact specific and rarely a basis for dismissal. Moreover, the title of the cited page claims that Perrigo had a "Unique Platform In Place to **Continue to Deliver** M&A Upside to Organic Growth." ECF Nos. 114.15 at 10; 114.18 at 23. (emphasis added). As for the statements in the conference call, while Defendant Papa did respond to a question regarding organic growth and "what happened in the last 12-18 months," he discussed performance generally and never disclosed the severe slowdown in organic growth. ECF No. 114.42 at 5. Neither of these alleged disclosures "conveyed [corrective information] . . . with a degree of intensity and credibility sufficient to counter-balance effectively" the misrepresentations regarding Perrigo's current ability to meet its growth goals. *Merck*, 2011 WL 3444199, *35 (internal quotation omitted). As a result, the Court will not dismiss the claims regarding to organic growth misrepresentations and omissions.

### d. Omega Integration

Defendants argue that the Complaint fails to plead any false statement or omission regarding Omega.  In particular, Defendants contend that they disclosed the acquisition was still in its early stages, that it was too early to tell whether integration would be successful, and that the integration might prove unsuccessful.  Plaintiffs respond that Defendants described the integration in entirely positive terms, pointing to statements such as that Perrigo had "delivered on [its] Omega integration plans" and that Omega "has been accretive to our growth rate," while omitting known extensive problems that brought key integration processes to a halt by mid-2015.  Am. Compl. ¶¶ 133, 141.  Plaintiffs also identify statements claiming integration milestones, such as the "[b]ack office is working smoothly" and "[w]e supplemented Omega's contracted manufacturing with our manufacturing infrastructure."  Id. ¶¶ 143, 145.  The Court agrees with Plaintiff.

Defendants' first present a multi-year defense, claiming that the Perrigo disclosed it was expecting synergies from the Omega transaction "by year four."  Consequently, the statements describing the integration as successful and Omega as accretive are examples of "status reports," not "victory laps."  Def's. Reply Br. at 5.  Under these circumstances, Defendants argue that "[n]o reasonable investor could have been under the impression that the integration had been successfully completed in just four months, more than three and a half years ahead of schedule." Id. at 6.

As noted earlier, "once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make the disclosure misleading."  PTC Therapeutics, 2017 WL 3705801, at *14.  Here, many of Papa and Brown's statements regarding the success of the merger and its accretive effect are actionable representations of present success.  See e.g., In re Cigna Corp. Sec. Litig., No. CIV.A. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (finding statement that company was

27

"on track" actionable because the allegations in the complaint cast serious doubt on whether it would meet its previously represented schedule benchmark); In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999) (finding defendants' claims that the integration of two companies were "successful" and "on track" could not be dismissed in light of the alleged, serious problems including, among other things, computer system incompatibility); see also In re Akorn, Inc. Sec. Litig., 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) (finding statement that a company was "on track" to meet its integration goals was a materially misleading statement of present fact in light of plaintiff's allegations that serious problems hindered integration).

The Amended Complaint alleges serious, present problems with integration that were omitted from Defendants' statements. The materiality of these omissions is not founded in the notion that a reasonable investor would have believed the merger was completed four years ahead of schedule—as Defendants attempt to paint the issue—but rather in the fact that disclosure of the known impediments to successful integration would have significantly altered the mix of information available to a reasonable investor. The Court cannot determine that these problems are so obviously unimportant to an investor that reasonable minds could not differ on the question of materiality. See In re Aetna Inc. Sec. Litig., 34 F. Supp. 2d 935, 945 (E.D. Pa. 1999).

Next, Defendants contend that Defendant Coucke's statements describing the Omega integration are inactionable puffery. The Court agrees. Plaintiffs challenged Defendant Coucke's June 2015 description of Omega's management team as "exceptional" and "best-in-class," and his statement that "[o]ver the last three years as a private company," Omega: (1) "optimized its commercial infrastructure to deliver superior results"; (2) "streamlined [its] operations"; and (3) "instituted an efficient management structure with real efficient direct short reporting lines between Omega Pharma leadership team and country management." Am. Compl. ¶ 137. The

Court finds that these statements constitute inactionable puffery because they are either statements of opinion that do not alter the mix of information available to investors.  EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 872 (3d Cir. 2000).  Indeed, it appears Plaintiffs concede materiality with respect to all but one statement—Defendant Coucke's representation regarding Omega's efficient management structure.[7]

Courts routinely find statements regarding efficiency to be immaterial because the concept of efficiency inherently requires a "relative and subjective judgment and can neither be quantified nor specified in any way."  In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 180 (D.D.C. 2007) (citation and quotation marks omitted); see also In re Advanta Corp. Sec. Litig., 180 F.3d 525, 537-39 (3d Cir. 1999) (dismissing claims based on statement that defendant "is among the most efficient producers in the credit card industry"), abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308 (2007).

Plaintiff's sole citation in opposition is readily distinguishable.  In In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529 (D.N.J. 2002), the defendants allegedly misled investors by representing that Lucent's optical networking product line was driving its growth when, according to the plaintiff's allegations, "demand had shifted dramatically away from Lucent's existing optical networking products" to a competitor's products, and the company was losing customers rather than winning new business.  Id. at 545.  Unlike in Lucent, where the challenged statement was determinate and quantifiable (i.e., whether Lucent's optical networking products in fact

---

[7] Plaintiffs failed to respond to the puffery argument with respect to the other claims in their Reply Brief.

contributed to its growth), Defendant Coucke's alleged statement that Omega had an "efficient management structure" is inherently qualitative and, thus, not measurable.[8]

Additionally, Defendants claim they provided meaningful risk disclosures, warning stockholders about the exact issues that Plaintiffs now claim hampered the integration process, thereby coming within the protection of the safe harbor.  See ECF No. 114.14 at 45 (describing the integration as "a complex, costly, and time-consuming process"); id. (stating that Perrigo's "ability to realize the anticipated benefits of the Omega acquisition will depend, to a large extent, on its ability to integrate the Perrigo and Omega businesses"); ECF No. 114.16 at 23-24 (stating there was "no assurance that [it] will be able to successfully integrate Omega or otherwise realize the expected benefits of the Omega acquisition").

Despite Defendants' warnings with regard to the success of the integration, the PSLRA does not protect statements of present facts.   See  In re Aetna, 34 F. Supp. 2d at 946 (finding that the bespeaks caution doctrine does not apply to presently known facts and, therefore, does not cover defendant's statement that the company was "on track" to meet all the objectives of the integration).  As a result, Defendants cannot rely on safe harbor to shield themselves from liability for statements such as "[Omega] **has been** accretive to our growth", "[b]ack office **is** working smoothly", "we . . . **are** . . . in line with our going online integration process," Perrigo has "**delivered** on our integration plans," and "[w]e **supplemented** [Omega] with our manufacturing infrastructure."  Am. Compl. ¶¶133, 139, 141, 141, 144, 145 (emphasis added).  However, with regard to purely forward-looking statements, or portions of statements, the Court finds that the

---

[8] Additionally, Plaintiffs fail to demonstrate that Defendant Coucke's statements, which pertained to Omega's efforts in the years leading up to its acquisition by Perrigo, were false.  The reports by former Omega employees concern the post-merger Perrigo-Omega integration.  Because Plaintiffs fail to allege specific evidence of scienter with regard to any other statements on the part of Defendant Coucke, the Court will grant his Motion to Dismiss in its entirety.

warnings were sufficient to insulate Defendants' projections regarding synergies and potential revenue from liability.[9]

In conclusion, the Court not dismiss Plaintiffs' actionable statements regarding the present success of the integration.  The Court will, however, dismiss the claims related to Defendant Coucke's statements and the purely forward-looking revenue and synergy projections described in the Amended Complaint.

### 2. Scienter

To adequately allege scienter, plaintiffs must plead with particularity that each defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud."  In re Hertz Glob Holdings, Inc. Sec. Litig., 2017 WL 1536223, at *15 (D.N.J. Apr. 27, 2017).  In the Third Circuit, "[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud.  In re Anadigics, Inc., Sec. Litig., 2011 WL 4594845, at *32 (D.NJ. Sept 30, 2011), aff'd, 484 F. App'x 742 (3d Cir. 2012).

Scienter allegations must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).  A court considers the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard."  Tellabs, Inc. v. Makor Issues

---

[9] Even if the warnings were not sufficiently tailored, the Court would reach the same conclusion because the scienter allegations—discussed below—do not demonstrate actual knowledge.  See In re Synchronoss Sec. Litig., 705 F. Supp. 2d 367, 402 (D.N.J. 2010) ("Consequently, plaintiff's failure to plead with specificity the facts showing that defendant's forward-looking statements were made by the defendant with defendant's actual knowledge that these statements were false precludes plaintiff's claim, and plaintiff's allegation that the defendant was reckless in defendant's projections is insufficient.").

& Rights, Ltd., 551 U.S. 308, 322 (2007); see also Avaya, 564 F.3d at 273.  The inference of

scienter is sufficiently strong to survive a Rule 12(b)(6) motion to dismiss only if, in light of all of

the allegations in the complaint, it is "cogent and at least as compelling as any opposing inference

one could draw from the facts alleged."  Tellabs, 551 U.S. at 323–24.  Under this standard,

therefore, "a court must consider plausible, nonculpable explanations for the defendant's conduct,

as well as inferences favoring the plaintiff."  Id. at 324.

Before discussing Plaintiffs' specific scienter allegations, the Court will first consider

whether certifications under the Sarbanes-Oxley Act ("SOX") and the Irish Takeover Rules are

probative of scienter—an assertion which arises frequently throughout the Amended Complaint.

Courts have found that SOX certifications themselves are not actionable and, that to support an

inference of scienter, something more is needed. See Zucco Partners, LLC v. Digimarc Corp., No.

06–35758, 2009 WL 311070, at *18 (9th Cir. Feb.10, 2009); Garfield v. NDC Health Corp., 466

F.3d 1255, 1265–66 (11th Cir.2006) (finding a SOX certification probative of scienter only if

plaintiffs show that the person signing the certification was "severely reckless" in certifying the

accuracy of its financial statements); In re Intelligroup, 527 F.Supp.2d at 356–57 (stating that SOX

certifications establish scienter only if the complaint asserts facts indicating that, at the time of

certification, the defendants actually knew or at least turned a "blind eye" to information indicating

that the certifications were erroneous).

The Court finds no reason to deviate from these holdings with regard to either the SOX

certifications or the certifications under the Irish Takeover Rules here.[10]  Such certifications do not

---

[10] While the Irish Takeover Rules require directors to certify that projections are prepared with
"scrupulous care, accuracy, and objectivity," Am. Compl. ¶ 4, that standard is not synonymous
with an extreme departure from the standards of ordinary care "approaching a knowledgeable
participation in the fraud or a deliberate and conscious disregard of facts."  S. Cherry St., LLC v.
Hennessee Grp., LLC, 534 F. Supp. 2d 405, 414-15 (S.D.N.Y. 2007), aff'd, 573 F.3d 98 (2d Cir.

in themselves give rise to an inference of recklessness absent accompanying circumstantial evidence of conscious or reckless behavior.  Consequently, throughout its analysis of scienter, the Court will not consider arguments related to these certifications unless there are accompanying circumstantial allegations giving rise to a cogent and compelling inference of scienter.[11]  See In re Radian Sec. Litig., 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) ("Nothing in the [complaint] otherwise specifically suggests that the defendants knew or turned a 'blind eye' to the fact that [the company's] accounting or disclosure practices were insufficient or that the boilerplate certifications signed by the defendants were actually erroneous. The mere fact that the defendants signed GAAP and SOX certifications, accordingly, does not support the plaintiffs' claim that the defendants knew or must have known that their actions presented a danger of misleading buyers or sellers.").[12]

### a. Motive and Opportunity

Plaintiffs contend that Defendants Papa and Brown—but none of the other Individual Defendants—made "large and irregular" stock sales in the 12 months preceding the Class Period,

---

[11] 2009) ("[E]ven an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes.").

[11] The Court will also disregard facts regarding the Irish Takeover Panel's determination that certain Perrigo statements were misleading, given that none of the statements are at issue here. Plaintiffs attempt to use this determination to establish that Defendants were on notice to make accurate statements, Am. Compl. ¶ 263, but this concept is unrelated to whether the challenged statements were inaccurate.

[12] As discussed more fully throughout the scienter analysis, the Court finds that Plaintiffs have failed to plead any facts demonstrating scienter on behalf of the Individual Defendants apart from Papa and Brown.  Rather, Plaintiffs rely on the SOX certifications and certifications under the Irish Takeover Rules, which are insufficient in themselves to create a strong inference of scienter.  Consequently, the claims against Individual Defendants apart from Papa and Brown will be dismissed without prejudice.  See In re Par Pharm. Sec. Litig., 2008 WL 2559362, at *10 (D.N.J. June 24, 2008) ("Each individual's participation and scienter must be pled separately and with particularity."); Witriol, 2006 WL 3511155, at *3 (dismissing § 10(b) claim where complaint "d[id] not speak to what a particular Defendant knew, or when.").

which "support an inference of scienter."  Am. Compl. ¶ 272.  Plaintiffs also contend that Defendants were motived by the desire to fend off the Mylan bid.  Defendants contend there are no allegations setting forth a personalized motive for the alleged fraudulent behavior.  The Court agrees with Defendants.

Motive is not "an independent means of establishing scienter."  In re Anadigics, Inc., Sec. Litig., 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011).  Scienter will "ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least a likely as not that defendants acted with scienter."  Avaya, 564 F.3d at 277.  Nevertheless, the Third Circuit has determined that a failure to demonstrate that individual defendants had a motive for their wrongful conduct is "significant."  Rahman v. Kid Brands, Inc., 736 F.3d 237, 245 (3d Cir. 2013).  Thus, while motive is neither sufficient nor necessary to finding scienter, its presence can assist the Court's determination and its absence can raise a "compelling inference against scienter."  In re Adolor Corp. Sec. Litig., 616 F. Supp. 2d 551, 573 (E.D. Pa. 2009).

With regard to stock sales, Defendants respond that these sales were not unusual compared to Papa and Brown's conduct in the 25 months prior to the Class Period.[13]  Defendants additionally claim that Papa and Brown actually increased their stock holdings during the Class Period.  Plaintiffs counter that any increase in stock holdings was a result of Defendants receiving restricted stock that they could not sell.  See Am. Compl. ¶ 113.  The Court will not, at this time, resolve the dispute regarding stock holdings.

---

[13] Given that the Class Period is 25 months, the Court will consider the 25 months preceding the Class Period—as argued by Defendants—rather than the 12 months preceding the Class Period—as proposed by Plaintiffs.

However, it appears undisputed that Papa and Brown sold greater or comparable amounts of Perrigo stock in the 25 months prior to the Class Period than they did during the Class Period. This is indicative of a lack of scienter.  In re Pixar Sec. Litig., 450 F. Supp. 2d 1096, 1104-05 (N.D. Cal. 2006) (sale by insider of 150,000 shares during five month class period was not unusual because not "dramatically out of line with . .. prior trading practices," where insider sold 100,000 shares in the two quarters before the class period).  Moreover, it is telling that Plaintiffs fail to allege any unusual sales by any Individual Defendant other than Defendants Papa and Brown.  The fact that only two of the Individual Defendants are alleged to have made insider sales undermines Plaintiff's claim that there was a motive to commit fraud.[14]  Martin v. GNC Holdings, Inc., No. 2:15-CV-01522, 2017 WL 3974002, at *15 (W.D. Pa. Sept. 8, 2017); see also Advanta, 180 F.3d at 540 ("Here, three of the individual defendants sold no stock at all during the class period, raising doubt whether the sales were motivated by an intent to profit from inflated stock prices before the upcoming losses were reported.").[15]

As for Plaintiffs' argument that motive is demonstrated by Defendants' alleged desire to fend off the Mylan bid, the Court is similarly unconvinced.  This type of motive does not contribute to an inference of scienter because it does not suggest any "concrete and personal benefit to the individual defendants resulting from th[e] fraud[,]" as opposed to the types of "motives that are generally possessed by most corporate directors and officers" that "do not suffice."  Rahman v.

---

[14] The failure to allege any particularized motive further bolsters the Court's conclusion that Plaintiffs' generalized scienter allegations are insufficient to support a cause of action against any Individual Defendants other than Papa and Brown.

[15] Defendants also contend that Perrigo's stock buyback is indicative of an absence of scienter. However, the Court finds that Perrigo's stock repurchase plan "weighs neither in favor of nor against an inference of scienter."  In re Viropharma Inc. Sec. Litig., 21 F. Supp. 3d 458, 474 (E.D. Pa. 2014); see also Kohut v. KBR, Inc., No. H-14-1287, 2015 WL 11995250, at *17 n.11 (S.D. Tex. Sep. 3, 2015) (same).

Kid Brands, Inc., 736 F.3d 237, 245-46 (3d Cir. 2013).  Insofar as "[m]ost, if not all publicly traded companies are interested in ... avoiding hostile takeovers," the allegation that executives sought "to avoid a hostile takeover falls woefully short of demonstrating scienter under federal securities law." In re Goodyear Tire & Rubber Co. Sec. Litig., 1993 WL 130381, at *16 (E.D. Pa. April 22, 1993); see also Plevy v. Haggerty, 38 F. Supp. 2d 816, 833 (C.D. Cal. 1998) (rejecting motive to "raise the price of [company] stock to prevent a takeover" as "insufficient as a matter of law" to plead scienter).[16]

If anything it appears that the absence of a particularized motive weighs against finding scienter.  However, as discussed, a plaintiff need not necessarily demonstrate motive and opportunity to adequately support a finding of scienter.  The Court will move on to consider alleged circumstantial evidence of conscious or reckless behavior regarding the alleged misrepresentations in connection with the Tysabri royalty stream, the collusive pricing scheme, and the Omega integration.

**b. Circumstantial Evidence of Conscious Misbehavior or Recklessness**

A plaintiff alleging a strong inference of scienter from circumstantial evidence must sufficiently plead "defendants' knowledge of facts or access to information contradicting their public statements.... [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." In re Campbell Soup Co. Sec. Litig., 145 F.Supp.2d 574, 599 (D.N.J.2001).  However, where plaintiffs choose to establish scienter through circumstantial evidence of conscious misbehavior or recklessness, the strength of

---

[16] Plaintiffs' alleged motive for the price fixing scheme fails for a similar reason.  While Plaintiffs claim that there was a financial and legal motive for hiding the scheme from the public, they do not demonstrate any "concrete and personal benefit" to the Defendants.  Rahman, 736 F.3d at 245-46 (3d Cir. 2013).

the circumstantial allegations must be even greater.  Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc., 720 F. Supp. 2d 517, 553 (D.N.J. 2010) (citing Intelligroup, 527 F.Supp.2d at 285).

"Conscious misbehavior is alleged by 'stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior.'" Aviva Partners LLC v. Exide Techs., No. 05–3098, 2007 WL 789083, at *12 (D.N.J. Mar. 13, 2007) (quotations omitted). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of it."  In re Digital Island Sec. Litig., 357 F.3d 322, 332 (3d Cir. 2004).  A misrepresentation must be "so recklessly made that the culpability attaching to such reckless conduct closely approaches that which attaches to conscious deception."  Id.

### i. Tysabri Royalty Stream

Plaintiffs' circumstantial scienter allegations rest on (1) contemporaneous reports contradicting Defendants' claims regarding the royalty stream's carrying value, (2) the obviousness of the correcting accounting treatment, (3) the massive size of Perrigo's restatement, (4) the concentrated nature of the alleged fraud, (5) Defendant Brown's resignation, (6) motive created by Defendants readying the royalty stream for sale and (7) the prolonged span of the accounting fraud.  Defendants, in addition to addressing each of these claims, point to the fact that an independent accounting company—Ernst & Young ("EY")—audited their financial statements repeatedly throughout the Class Period and issued unqualified opinions.[17]

---

[17] A "clean" or "unqualified" opinion is "the most favorable report an auditor may give, represents the auditor's finding that the company's financial statements fairly present the financial position of the company, the results of its operations, and the changes in its financial position for the period under audit, in conformity with consistently applied generally accepted accounting principles."  In

The Court will first consider EY's unqualified opinion.  Contrary to Plaintiff's assertion, the Court may take into account the role and responsibilities of an independent auditor in the context of a motion to dismiss.  See Phillips, 2016 WL 4523849, at *3 (taking into account on motion to dismiss that company's disclosures "were reviewed and approved by PricewaterhouseCoopers LLP"); In re Hansen Nat. Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (at motion to dismiss stage, "Deloitte & Touche LLP's unqualified opinion [is] highly probative of an absence of scienter").[18]  These unqualified opinions raises a strong inference that any "errors were not so obvious that their publication demonstrates an intent to defraud investors."  Phillips v. Harvest Nat. Res., Inc., 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016).[19]  However, a clean audit opinion does not categorically insulate a defendant from liability, and the Court will consider Plaintiff's other allegations as to scienter.

First, Plaintiffs contend that Defendants had contemporaneous access to information contradicting their claim that the royalty stream's "fair value exceeded carrying value."   Indeed,

---

re Bio–Tech Gen. Corp., No. 02–6048, 2006 WL 3068553, at *1 n. 2 (D.N.J. Oct.26, 2006) (quoting In re WorldCom. Inc. Sec. Litig., 346 F.Supp.2d 628, 643 n. 17 (S.D.N.Y.2004))).

[18] The cases cited by Plaintiffs to support the proposition that it is inappropriate to draw any inference from an audit opinion are readily distinguishable.  First, the court in In re Diamond Foods, Inc., recognized that "[a] clean audit opinion may possibly support the conclusion that defendant did not act with scienter" but held that conclusion was not dispositive where the complaint alleged that the company had "scrubbed its financial statements before providing them to the auditor."  2012 WL 6000923, at *8 (N.D. Cal. Nov. 30, 2012).  In In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig., (S.D.N.Y. Jan. 27, 2014), there were well-pled facts that "the auditors had a history of employment with other Chinese companies with accounting irregularities and failed to follow GAAP."  2014 WL 285103, at *5.  Here, the Amended Complaint does not allege any reason to doubt Perrigo's communications to EY or EY's role in preparing the unqualified opinions.  Finally, in Okla. Firefighters Pension & Ret. Sys. v. Ixia, the court did not reach the auditor issue.  50 F. Supp. 3d 1328, 1365 (C.D. Cal. 2014).

[19] Plaintiffs contend that Perrigo's 2016 Form 10-Q, which included the alleged misrepresentation that "fair value exceeded the carrying value," was not audited.  However, EY did audit Perrigo's February 2016 Form 10-KT, which contained an identical statement.  ECF No. 114.24 at 35.

Defendants' briefing in support of their Motion to Dismiss supports this contention, as it cites to several publicly available analysts' reports indicating that the estimated worth of the royalty stream was substantially less than the value claimed by Perrigo. <u>See</u> Defs.'s Br. at 44. However, here—and as a general matter—the Amended Complaint does not plead particularized facts showing that Defendants actually knew their representations were false or that they acted with an intent to defraud. There are no internal reports, documents, or communications that point to Defendants' knowledge of or conduct concerning either Perrigo's accounting practices or its valuation of the royalty stream. Additionally, there are no confidential witnesses addressing these issues. The mere fact that these reports existed is not as compelling as the competing inference raised by EY's unqualified opinions.

Second, Plaintiffs contend that the obviousness of the correct accounting treatment suggests that Defendants' must have known their categorization of the stream as an intangible asset was erroneous. Against, Defendants' briefing provides some support for this notion, citing to multiple instances where Defendant Papa and independent analysts referred to the royalty stream as a financial asset. However, the fact that EY "did not detect, observe, or otherwise note any improprieties" in Perrigo's accounting is "significant." <u>In re Iconix Brand Grp., Inc.</u>, No. 15-4860, 2017 WL 4898228, at *19 (S.D.N.Y. Oct. 25, 2017). "This is particularly true given [Plaintiff's] claim that [Perrigo's] accounting errors involve 'basic' accounting principles.'" <u>Id.</u> Based on the unqualified opinions, a "compelling inference arises that [Perrigo's] accounting errors were not obvious or unreasonable," especially in light of Plaintiff's failure to allege that EY was in any way "complicit in, or aware of, the alleged accounting fraud." <u>Id.</u> The Amended Complaint does not contain well-pled facts suggesting why Perrigo's executives "would have been so familiar" with the applicable accounting rules "so as to see a problem in the company's accounting before

[Perrigo's] auditors did." Pension Trust Fund for Operating Eng'rs v. Kohl's Corp., 2017 WL 3085083, at *10 (E.D. Wis. Jul. 20, 2017).[20]

Next, Plaintiffs allege that the massive size of Perrigo's restatement and the concentrated nature of the accounting fraud support an inference of scienter. As to the size of the restatement, "[t]he magnitude of any given misstatement or overstatement may help support an inference of scienter . . ., but magnitude alone will not suffice." Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prod. N.V., No. 00-5965, 2005 WL 1366025, at *8 (D.N.J. June 8, 2005) (citations omitted). However, Plaintiffs provides no legal supports for its contention that the "concentrated nature" of the alleged fraud is a basis for inferring scienter. Thus, the Court will consider the size of the alleged fraud as some probative evidence in its collective analysis.

Plaintiffs also point to Defendant Brown's resignation, which "came the same day that Perrigo announced it was investigating 'historical revenue recognition practices' regarding the Tysabri royalty stream" and announced it would sell the stream for substantially less than it had been valued by Perrigo, as indicative of her scienter. Am. Compl. ¶ 271. Defendants contend that Brown's resignation, without more, adds little to Plaintiff's scienter allegations. See In re Hertz Glob. Holdings, Inc. Sec. Litig., No. 13-7050, 2015 WL 4469143, at *21 (D.N.J. July 22, 2015) cf. In re Intelligroup Sec. Litig., 527 F.Supp.2d 262, 347–48 (D.N.J.2007) (finding that the sole fact of officers' resignations was insufficient to support a strong inference of scienter and that "such bare allegations cannot operate even as a meaningful piece of additional evidence" of scienter);

---

[20] Plaintiffs point to Perrigo's alleged admission of material weaknesses in its internal controls to demonstrate scienter. However, "these allegations are improperly based on hindsight and therefore are inactionable" because Plaintiffs fail to allege any facts demonstrating Defendants' knowledge of the weakness in internal controls at the time of the alleged misstatements. Southeastern Pa. Transp. Auth. V. Orrstown Fin. Servs., Inc., 2015 WL 3833849, at *46 (M.D. Pa. June 22, 2015) (subsequent recognition of ineffective internal controls did not establish that when defendants stated internal controls were effective they knew otherwise).

see also In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 F. App'x 465, 470 (3d Cir.2004) (no indication that resignation of officer was related to restatement of financials and accounting irregularities).  However, given the timing of the announcement, the Court finds some probative value in Brown's resignation, albeit less value than if Brown's departure was involuntary or accompanied by some form of corporate sanction.  See W. Palm Beach Police Pension Fund v. DFC Glob. Corp., No. CIV.A. 13-6731, 2015 WL 3755218, at *17 (E.D. Pa. June 16, 2015) ("However, when considering the totality of Plaintiffs' scienter allegations, the Court concludes that the resignation of key executives, including the President and COO responsible for implementing new regulations, bolsters the evidence of conscious or reckless behavior.").

Finally, Plaintiffs allege that "the fact that Defendants were readying the royalty stream for sale . . . provides a motive for Perrigo to claim an inflated fair value, so as not to dissuade potential buyers" and that Perrigo's use of the erroneous accounting categorization "for years" supports an inference of scienter.  Pl's. Br. at 53-53.  The fact that Perrigo used the same accounting treatment for years—from the time it purchased the royalty stream in December 2013 until it announced the correction in 2017—undercuts any alleged motive that may have been created by Defendants preparing the stream for sale.  Additionally, as discussed above, the fact that Perrigo used the same accounting treatment long enough for their financial statements containing the asset classification to be audited multiple times over three different fiscal periods similarly undermines any inference of scienter.

In sum, Perrigo's classification of the Tysabri royalty stream as a financial asset over multiple years and fiscal periods, with the approval of an independent auditor, is strongly probative of a lack of scienter.  Plaintiff's various arguments to the contrary, which are unsupported by internal reports, confidential witnesses, or other specific facts, fail to create an equally plausible

inference of scienter.  In light of this fact, the Court will dismiss Plaintiff's claims regarding the Tysabri royalty stream without prejudice.  See In re Iconix, 2017 WL 4898228, at *17-19 (granting dismissal despite plaintiffs assertion that scienter could be inferred from (i) "numerous GAAP violations," (ii) accounting errors that "occurred over an extended period of time and relate[d] directly to the company's core operations," (iii) "the nature and magnitude of the . . . financial restatements," and (iv) "suspiciously timed resignation of [multiple] senior . . . executives" because (i) the "financial statements and accounting judgments were subject to audit by . . . an independent public accounting firm," which "did not detect, observe, or otherwise note any improprieties . . . over three consecutive audit years," (ii) plaintiffs "cite[d] no internal reports, documents, . . . communications," or confidential witnesses as to defendants' knowledge of misconduct involving the company's accounting practices, and (iii) the complaint lacked "particularized facts connecting the resigning executives to fraudulent conduct.").

### ii.  Generic Drug Pricing

Plaintiffs allege that (1) Defendants Papa and Brown indicated their personal knowledge of the price fixing scheme by repeatedly speaking to investors on the subject, that (2) the size of the scheme is indicative of scienter, that (3) there was a parallel criminal proceeding, and that (4) Douglas Booth's—the executive in charge of the Generic Rx division—resignation is temporally and circumstantially linked to the scheme.  Defendants contend that none of the allegations are sufficient to support an inference of scienter.  The Court disagrees with Defendants.

With regard to Plaintiff's allegation that Papa and Brown's repeatedly answered analysts' questions regarding the pricing of generic drugs, Defendants contend that all alleged misstatements require a defendant to speak out on an issue and, therefore, merely addressing question related to a topic is insufficient to demonstrate scienter.  The "content and context" of Defendants' responses

to these questions may, however, weigh in favor of finding scienter.  In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (quoting Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 269 (3d Cir. 2009)).  Rather than merely speaking on the issue, Papa and Brown—both of whom were high-ranking executives allegedly involved in the pricing decisions at issue—repeatedly responded to pointed analyst questions regarding pricing pressure in the Generic Rx division.  Am. Compl. ¶¶ 178, 182, 186, 190, 192.  Moreover, their answers indicated personal knowledge of the subject.  See, e.g., ¶178 (Papa stating that: "Obviously, it's a competitive market out there" and discussing "what I've tried to do with pricing at Perrigo in the eight years."); ¶196 (Brown analyzing "planned pricing strategies" and "competitive dynamics"); see also In re PTC Therapeutics, Inc. Sec. Litig., 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) (finding that the statements of two executives "implied that they had first-hand knowledge" of the matter at issue, which, while not conclusive, bolstered an inference of scienter).

"In the context of specific inquiries . . . defendants' omission of actual circumstances that were contrary to their answers presents 'an obvious risk of misleading investors.'"  Id. (quoting Avaya).  Additionally, these repeated inquiries would have made Defendants aware of the importance of generic pricing to the investing public.  See New Orleans Employees Ret. Sys. v. Celestica, Inc., 455 F. App'x 10, 14 (2d Cir. 2011) (finding that executives had reason to focus on the subject of alleged misrepresentations because it was a "subject about which investors and analysts often inquired.").  Here, accepting Plaintiff's allegations as true regarding the price-fixing scheme, Papa and Brown's statements and omissions are evidence of scienter.

Plaintiffs also argues that the size of the scheme, from which Perrigo reaped hundreds of millions of dollars, supports an inference of scienter.  The Court agrees.  see Avaya, 564 F. 3d at

271 (finding that the "magnitude of the alleged discounting . . . strengthens the inference of scienter.").

Defendants do not dispute that the Department of Justice raided Perrigo's offices as part of a criminal price-fixing probe.  Am. Compl. ¶ 21.  While the existence of a criminal investigation is not sufficient to give rise to a strong inference of scienter, it can be considered as evidence of scienter.  Washtenaw Cty. Employees Ret. Sys. v. Avid Tech., Inc., 28 F. Supp. 3d 93, 114 (D. Mass. 2014) (collecting cases and holding the same).  However, Defendants note that there are no allegations that any of the Individual Defendants knew about the raid and point out that it occurred after both Papa and Brown left the company.  There mere fact of the investigation is somewhat probative of scienter.

Turning to the allegations regarding Douglas Boothe, the Court finds little if any probative value in the fact of his resignation.  While Plaintiffs attempts to link the resignation to the collusive pricing scheme by noting that it came only months after Defendant Papa's resignation and preceded private antitrust litigation against Perrigo by two months, Am. Compl. ¶ 268, the Court is not convinced.  The Amended Complaint does not indicate, for example, "whether [Boothe] was nearing retirement age, whether he left to pursue other opportunities, or even the length of his tenure."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1002 (9th Cir. 2009), as amended (Feb. 10, 2009) (finding the "bare fact" of an executive's retirement immediately prior to the disclosure of alleged misconduct during his tenure "cannot support [plaintiff's] allegations of scienter.").   Moreover, Douglas Boothe is not a Defendant in this action, making the fact of his resignation more inconsequential than Defendant Brown's discussed above.  See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 162 (D. Conn. 2007) ("[I]t is hard to see how the resignation of [a non-defendant] executive . . . could create an inference of scienter with respect to the ...

individuals who have been named."), aff'd, 312 F. App'x 400 (2d Cir. 2009).  Thus, Mr. Boothe's departure contributes little to demonstrating a cogent and compelling inference.

Despite the deficiencies in certain elements of Plaintiffs' scienter analysis, the Court must view the allegations collectively in reaching its conclusion. Considering the totality of the allegations, the Amended Complaint raises a strong inference of Defendants' scienter regarding the collusive pricing in the Generic Rx division by noting Papa and Brown's statements implying firsthand knowledge, their responses to specific questioning, the magnitude of the scheme as measured by millions of dollars in revenue, and the existence of a parallel criminal investigation. Although competing plausible inferences that are "at least as likely" must be considered, see Tellabs, 551 U.S. at 328, defendants have failed to make "good faith explanations for these misstatements such as to make the inference of scienter less than strong." See Frater v. Hemispherx Biopharma, Inc., 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014).  The inference of scienter is sufficient to withstand dismissal on the claims against Papa and Brown, in large part due to the context and substance of their response to questioning, but insufficient to withstand dismissal as to the other Individual Defendants against whom the allegations of scienter are far weaker.

### iii. Organic Growth

Defendants contend there are no specific allegations of scienter related to the organic growth statements.  The Court agrees.

Plaintiffs provide two arguments for scienter: (1) independent observers concluded that Defendants misrepresented the truth, (2) Defendants' repeated discussions concerning organic growth implying personal knowledge, and (3) the Director Defendants certified, under the Irish Takeover Rules, that they had undertaken a personal review of the organic growth

representations.  The Court has already rejected the third argument as a sufficient basis to plead scienter.

With regard to the independent observers, the Amended Complaint identifies several analysts, all of whom identified the growth projections as misleading.  See ¶¶ 11 (Jim Cramer: Papa's overvaluation of Perrigo "was clearly untrue"); ¶ 232 (Wells Fargo: "Perrigo management set unrealistic and aspirations earnings guidance in its effort to defend against Mylan's hostile bid."); ¶ 239 (Starboard: "In order to convince Perrigo shareholders to reject Mylan's offer, management and the Board made aggressive promises").  These after-the-fact, generalized assertions are insufficient to plead scienter with regard to any of the Defendants.  Plaintiffs fail to identify any cases where such threadbare allegations were accepted as creating a cogent and compelling inference of conscious misbehavior or recklessness.

As for Plaintiffs' argument that Defendants repeatedly spoke about the subject and implied firsthand knowledge, the Court is not convinced.  Although such allegations can constitute evidence of scienter, the statements here are not as demonstrative of firsthand knowledge as those related to pricing pressures and competitiveness in the Generic Rx division discussed above or those related to the Omega integration discussed below.  Moreover, even if the answers did indicate some level of knowledge, the collective scienter allegations are weaker than the scienter allegations related to the price-fixing scheme, which themselves narrowly surpassed the bar for pleading scienter.  There, in addition to demonstrating repeated answers to analysts' questions regarding pricing pressure and policy in the generic division, Plaintiffs noted a parallel investigation and sizeable revenue derived from the fraudulent scheme.  Here, Plaintiffs fail to provide similarly strong allegations when viewed collectively.  Consequently, the Court will dismiss the claims related to organic growth without prejudice.

### iv. Omega Integration

Plaintiffs allege that (1) Defendants knew information contradicting their statements to investors regarding the Omega integration as evidence by Defendants own statements and by employee-witnesses, that (2) Omega is a "core operation," and that (3) there is no competing inference.  Defendants respond that scienter cannot be inferred from the employee-witnesses and that the core business doctrine is not an adequate basis to plead scienter.

Plaintiffs first allege that Defendants Papa and Brown own statements about the status of the Omega integration are indicative of personal knowledge regarding the alleged problems.  See Am. Compl. ¶ 256.  As discussed above, these statements implying personal knowledge support an inference of scienter.  PTC Therapeutics, 2017 WL 3705801, at *17-18.  Defendants' arguments and case citations do not address the situation here, where Papa and Brown implied firsthand knowledge of the integration.  Rather, they discuss instances where courts rejected reliance on vague allegations regarding corporate officers' general awareness of a company's business and on confidential witnesses' unsubstantiated descriptions of corporate officers' knowledge.

Plaintiffs next cite to various former employees who allegedly confirmed that Papa and Brown were aware of problems with Omega integration undermining their statements to investors.  The problems discussed by these former employees included Omega's underperformance in several key markets and impediments to integration, including technological disparities, the decentralized structure of Omega, and management resistance.  Am. Compl. ¶¶ 140, 142.  Defendants' first contention in opposition to scienter is that none of these alleged problems were inconsistent with Papa and Brown's statements regarding the success of the Omega integration because none were so severe as to throw off the multi-year plan for achieving synergies.  This

argument is not convincing for the actionable statements discussing the present success of integration.

Next, Defendants contend that none of the former employees alleging integration problems had contact with the Individual Defendants. "To plead scienter, it is not sufficient to allege that the integration was problematic . . . [t]he key issue is what the individual Defendants knew about the integration problems. . . . or whether [the problems] were so obvious that the Defendants must have been aware of them." Witriol v. Conexant Sys., Inc., No. 04-6219, 2006 WL 3511155, at *4 (D.N.J. Dec. 4, 2006). In the case of confidential witness allegations, the court must evaluate the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Avaya, 564 F.3d at 263. Both parties agree that there need not be a "direct link" between the allegations and the Defendants to sustain a finding of scienter, id. at 269, but Defendants contend there is no link whatsoever between the statements of former employees and Defendants' knowledge of alleged integration problems.

Based on a review of the allegations, the Court finds that the former-employee witnesses, "whose positions afforded them firsthand knowledge of the underlying facts," provide circumstantial evidence of at least reckless behavior. DFC Glob. Corp., No. CIV.A. 13-6731, 2015 WL 3755218, at *16 (crediting the statements of the "Head of Compliance" for the company, a "store supervisor and manager," and "[o]the confidential witnesses," despite no indication of direct contact with any of the individual defendants.[21]). The one named former employee, Christine

---

[21] Defendants correctly identify that another of the confidential witnesses "recalled several high-level conference calls" with company management, and they attempt to distinguish DFC Global Corp. on that basis. However, the court in DFC Global Corp. neither put special emphasis on this particular allegation nor found the other confidential witnesses' failure to identify a clear link to

Kincaid, served as acting Chief Security Officer, reporting directly to Perrigo's Chief Information Officer, and oversaw IT integration projects in Europe.  Am. Compl. ¶ 57.  Ms. Kincaid recounted a variety of problems with IT integration and learned of "discord" between Omega CEO and CFO and the top executives of Perrigo, including the Individual Defendants.  Id. ¶ 58.  Ms. Kincaid also explained that EU regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain.  Id. ¶ 59.  The Court also considers probative Ms. Kincaid's allegation that Defendant Papa chose to hire an additional representative to bridge communication gaps between Perrigo's U.S. operations and Omega.  Am. Compl. ¶ 60.[22]  Additionally, various unnamed former employees spoke to issues within their sphere of knowledge.  For example, a Senior Marketing Manager for Omega in Turkey from January 2015 to December 2016 reported high turnover, declining business, and lack of direction from Omega headquarters.  Id. ¶ 62a.  An HR Corporate Director between October 2014 and August 2015, who reported directly to the Omega CFO, recalled that Defendant Coucke and other Omega managers were not cooperating with Perrigo in the integration.  Id. ¶62c.[23]  These allegations may not necessarily demonstrate conscious behavior or direct knowledge, but they do support a strong inference of at least reckless behavior.

---

the individual defendants particularly meaningful.  Consequently, the Court finds its scienter analysis persuasive here.

[22] The Court, however, finds little probative value in the allegations regarding the hiring of a forensic team to determine whether confidential information was shared with Mylan, given its attenuated connection to any claims regarding the integration itself.

[23] The Court will not credit the allegations regarding underperformance in individual markets because the Amended Complaint fails to allege any specific misrepresentations in connection with underperformance and fails to quantify the importance of these markets in any meaningful way.  Am. Compl. ¶ 62e.  The Court also finds little probative in the allegations regarding diversion of resources to fight the takeover bid.  Id.  ¶ 62d.

Finally, Defendants contend that Plaintiffs may not use the allegation that Omega is a "core operation" to demonstrate scienter.  Although such allegations are "not sufficient in and of themselves to show scienter," the Court "keeps them in consideration when viewing the entirety" of the Amended Complaint.  In re: Enzymotec Sec. Litig., 2015 WL 8784065, at *18 (D.N.J. Dec. 15, 2015); see also  Mill Bridge V. Inc. v. Benton, No. 08-2806, 2009 WL 4639641, at *31 (E.D. Pa. Dec. 3, 2009) ("[W]hile a court may not infer that a defendant was aware of information merely by virtue of his or her position within a company, where the information relates to the organization's core business, such facts are powerful circumstantial evidence of scienter.").

Considering Plaintiff's allegations collectively, the Court that Papa and Brown's decision to speak on the issue and imply firsthand knowledge, the "core business" allegations, and the former-employee witnesses all support a strong inference of scienter on the part of Papa and Brown.  Defendants fail to articulate an innocent basis for their ignorance of the roadblocks facing integration at the time they made statements regarding the success of the acquisition.[24]

## III.   Conclusion

The Court **GRANTS** Defendant Coucke's Motion to Dismiss and **GRANTS** in part and **DENIES** in part the remaining Defendant's Motion to Dismiss without prejudice.

/s Madeline Cox Arleo

**Hon. Madeline Cox Arleo**
**United States District Judge**

---

[24] For the same reasons discussed throughout, the Court will not dismiss Plaintiffs' Section 20(a) control person liability claim against Defendants Papa and Brown.  Defendants one independent basis for dismissal—the alleged lack of culpable participation—is unavailing.  See Aeterna Zentaris, 2016 WL 827256, at *4 (finding that "the overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss").  Likewise, the Court will not refuse to exercise supplemental jurisdiction over the Israeli law claim articulated in Count Four given the remaining federal claims.