**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ROOFERS' PENSION FUND, on behalf of itself and all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>PERRIGO COMPANY PLC and JOSEPH C. PAPA, and JUDY BROWN,<br><br>　　　　　　　Defendants. | Civ. A. No.: 16-cv-2805-MCA-LDW<br><br>CLASS ACTION |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

---

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS ...................................................................... 3

    Common misrepresentations and omissions regarding Omega ......................... 3

    Common misrepresentations and omissions regarding Generic Rx pricing ............... 4

    Perrigo thwarts Mylan's hostile tender offer ...................................... 5

    The truth is revealed in a series of partial disclosures ........................... 6

PROCEDURAL HISTORY ...................................................................... 7

ARGUMENT ................................................................................ 8

    I.    THE PROPOSED CLASSES SHOULD BE CERTIFIED UNDER RULE 23 ..... 8

        A. All Four Requirements Of Rule 23(a) Are Satisfied ....................... 9

            1.  The proposed Classes are so numerous that joinder is impracticable ........ 9

            2.  Common questions of law and fact exist ................................ 10

            3.  Plaintiff's claims are typical ........................................ 11

            4.  Plaintiff and its Counsel will adequately protect absent Class members ... 13

        B. This Litigation Should Be Maintained As A Class Action Under
           Rule 23(b)(3) ........................................................ 15

            1.  Common questions predominate ......................................... 15

                 a.  Reliance is presumed under the fraud-on-the-market doctrine ........... 15

                   (1) *Cammer* 1: Perrigo was actively traded on NYSE and TASE ....... 18

                   (2) *Cammer* 2: Perrigo was widely covered by analysts .................... 19

                     (3) *Cammer* 3: Numerous market makers facilitated efficient trading
                        of Perrigo shares .......................................... 20

i

(4) *Cammer* 4: Perrigo was eligible for Form S-3 registration ............ 21

(5) *Cammer* 5: Perrigo's stock price reacted to company-specific news demonstrating a cause-and-effect relationship...................... 21

(6) *Krogman/Unger* factors also demonstrate market efficiency......... 22

   b.  Reliance is also presumed under *Affiliated Ute* .................................. 23

   c.  Individual damage calculations will not defeat predominance........... 24

  2.  Class adjudication is superior to other available methods ....................... 24

II.   POMERANTZ AND BERNSTEIN LITOWITZ SHOULD BE APPPOINTED CLASS COUNSEL.............................................................................................. 25

CONCLUSION....................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) ................................ 23

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......................................8, 13, 15

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)........................ 8, 9, 16, 17

*Basic v. Levinson,* 485 U.S. 224 (1988)................................................................. 16

*Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ..................................... *passim*

*Church v. Consol. Freightways, Inc.*, No. C-90-2290 DLJ, 1991 WL 284083
   (N.D. Cal. 1991)................................................................................... 18

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, Civil Action
   No. 12-5275, 2015 WL 5097883 (D.N.J. Aug. 31, 2015) ......................... *passim*

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................ 8

*Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011) ....................... 9

*Gerber v. Computer Associates Intern., Inc.*, 1995 WL 228388 (E.D.N.Y. 1995) ................. 9

*Halliburton Co. v. Erica P. John Fund. Inc.*, 134 S. Ct. 2398 (2014)............................ 16, 17

*Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418
   (N.D. Cal. Dec. 22, 2016) ........................................................................ 6

*Herbst v. Int'l Tel. & Tel. Corp.*, 495 F.2d 1308 (2d Cir. 1974) ........................... 18

*Hull v. Glob. Dig. Sols., Inc.*, Civil Action No. 16-5153 (FLW), 2018 WL 4380999
   (D.N.J. Sept. 14, 2018) ........................................................................... 22

*Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149 (W.D. Miss. 1977).................................... 12, 13

*In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640 (C.D. Cal. 2018) ............................ 6

*In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011) ................................ *passim*

*In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008) ............................19, 25

*In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT, 2013 WL 2456104
   (D. Del. June 6, 2013).......................................................................... 5, 8

*In re Honeywell Int'l*, 211 F.R.D. 255 (D.N.J. 2002) ............................................................. 13

*In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2009) ......................... 15

*In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262 (D.N.J. 2007) ........................................ 10

*In re JPMorgan Chase*, 12 Civ. 03852 (GBD), 2015 WL 10433433
    (S.D.N.Y. Sept. 29, 2015) ................................................................................................... 24

*In re Merck & Co., Sec. Derivative & ERISA Litig.*, MDL No. 1658 (SRC),
    2013 WL 396117 (D.N.J. Jan. 30, 2013) .............................................................. 2, 15, 25

*In re NFL Players Concussion Injury Litig.*, 821 F.3d 410 (3d Cir. 2016) ........................... 10

*In re PHLCORP Sec. Tender Office Litig.*, No. 88 Civ. 0306 (PNL), 1989 WL 251578
    (S.D.N.Y. Nov. 16, 1989) ................................................................................................... 12

*In re Schering-Plough Corp./ENHANCE Sec. Litig.*, Civil Action No. 8-397,
    2012 WL 4482032 (D.N.J. Sept. 25, 2012) ...................................................................... 18

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) .............................. 13, 14

*Johnston v. HBO Film Mgmt.*, 265 F.3d 178 (3d Cir. 2001) ................................................. 23

*J. I. Case Co. v. Borak*, 377 U.S. 426 (1964) .......................................................................8

*Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) .............................................17, 21, 22

*Li v. Aeterna Zentaris*, Civil Action No. 14-cv-7081 (PGS)(TJB), 2018 WL 1143174
    (D.N.J. Feb. 28, 2018)........................................................................................................ 24

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) ........................................ 9, 10

*Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353 (3d Cir. 2015) ....................................... 24

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001).... 11, 12

*Roofer's Pension Fund v. Papa*, Civil Action No. 16-2805, 2018 WL 3601229
    (D.N.J. July 27, 2018) ................................................................................................ *passim*

*Roofer's Pension Fund v. Papa*, Civil Action No. 16-2805, 2017 WL 1536222
    (D.N.J. Apr. 27, 2017) ............................................................................................... *passim*

*Schuler v. Meds. Co.*, Civil Action No. 14-1149 (CCC), 2016 WL 3457218
    (D.N.J. June 23, 2016) ........................................................................................................ 15

*Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480 (E.D. Pa. 1977) ..................................... 24

*Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887
    (S.D.N.Y. Aug. 1, 2006) ...................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ......................................... 8

*Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662
    (C.D. Cal. Jan. 5, 2017) ...................................................................................... 19

*Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005) ............................................................17, 22

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) ................................................................ 21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................. 10

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, Civil Action No. 13-6731,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ....................................................21

*Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314 (3d Cir. 2016)................................... 8, 15

*Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634 (S.D. Ohio 2017)............................................... 20

*Wilson v. LSB Indus.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115
    (S.D.N.Y. Aug. 13, 2018) ....................................................................................20

*Wulc v. Gulf & W. Indus., Inc.*, 400 F. Supp. 99 (E.D. Pa. 1975)........................................... 13

## Other

W. Rubenstein, A. Conte & H. Newberg, Newberg on Class Actions, § 22:1
    (4th ed. 2002) ......................................................................................................2

Lead Plaintiff Perrigo Institutional Investor Group ("Plaintiff")[1] respectfully submits this memorandum in support of its motion for class certification pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), seeking an Order certifying this action as a class action and certifying the Classes defined herein, appointing Plaintiff as the Class Representative, and appointing Plaintiff's choice of counsel, Pomerantz LLP ("Pomerantz") and Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz"), as Class Counsel, and Lowenstein Sandler LLP ("Lowenstein Sandler") as Liaison Counsel.

## PRELIMINARY STATEMENT

Plaintiff's claims are ideally suited for class adjudication.  Plaintiff, a group of institutional investors, was injured by the same course of conduct as all other Class members: material misrepresentations and omissions that Defendants made to the market regarding Perrigo Co., plc's ("Perrigo") failed integration of its most important acquisition, Omega N.V. ("Omega"), and anticompetitive practices inflating the results for Perrigo's most profitable division, Generic Rx.  Trial of Plaintiff's claims will focus on issues and evidence common to all Class members—falsity, reliance, materiality, scienter, and loss causation.

"[I]t is well-settled that the class action is a particularly appropriate vehicle for adjudication of federal securities cases."  *City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, Civil Action No. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015).  Without certification, many Class members would be deprived of relief.  "[T]he Supreme Court as well as every circuit that has confronted the issue of class certification in the area of securities litigation has recognized its utility and necessity in a society where geographically

---

[1] Lead Plaintiff Perrigo Institutional Investor Group is Migdal Insurance Company Ltd. ("Migdal Insurance"), Migdal Makefet Pension and Provident Funds Ltd. ("Migdal Makefet" and, with Migdal Insurance, "Migdal"), Clal Insurance Company Ltd. ("Clal Insurance"), Clal Pension and Provident Ltd. ("Clal Pension"), Atudot Pension Fund for Employees and Independent Workers Ltd. ("Atudot" and, with Clal Insurance and Clal Pension, "Canaf-Clal"), and Meitav DS Provident Funds and Pension Ltd ("Meitav").

dispersed shareholders cannot individually challenge violations by powerful and wealthy corporate defendants because of their small holdings and the unyielding costs of securities litigation." *In re Merck & Co., Sec. Derivative & ERISA Litig.*, MDL No. 1658 (SRC), 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013) (quoting 7 W. Rubenstein, A. Conte & H. Newberg, Newberg on Class Actions, § 22:1 (4th ed. 2002)).

Plaintiff seeks certification of three Classes, each of which satisfies Rule 23. Plaintiff's constituents are members of each Class:

- <u>U.S. Purchaser Class</u>: All persons who purchased Perrigo's publicly traded common stock between April 21, 2015, and May 2, 2017, both dates inclusive (the "Class Period"), on the New York Stock Exchange ("NYSE") or any other trading center within the United States, and were damaged thereby;

- <u>TASE Purchaser Class</u>: All persons who purchased Perrigo's publicly traded common stock during the Class Period on the Tel Aviv Stock Exchange ("TASE"), and were damaged thereby; and

- <u>Tender Offer Class</u>: All persons who owned Perrigo common stock as of November 12, 2015 and held such stock through at least 8:00 a.m. on November 13, 2015, when the tender offer of Mylan, N.V. ("Mylan") expired unsuccessfully (whether or not a person tendered their shares).

(Collectively, referenced herein as "Class members.") Excluded from all three Classes are: (a) Defendants; (b) any current or former officers or directors of Perrigo; (c) the immediate family members of any Defendant or any current or former officer or director of Perrigo; and (d) any entity that any Defendant owns or controls, or owned or controlled during the Class Period.

As detailed below, each Class warrants certification because each satisfies both Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation, and also Rule 23(b)(3)'s requirements of predominance and superiority.

## STATEMENT OF FACTS

Perrigo is a global manufacturer of over-the-counter healthcare products, generic prescription drugs, and other consumer products. ¶51.[2] During the Class Period, Perrigo, its former Chief Executive Officer Joseph Papa ("Papa"), and its former Chief Financial Officer Judy Brown ("Brown") all made misrepresentations to investors to defeat a hostile tender offer from rival Mylan N.V. ("Mylan"), and subsequently to stem declines in Perrigo's share price. *See, e.g.*, ¶¶1, 5-6, 132-150, 176-204.

**Common misrepresentations and omissions regarding Omega**

Just prior to the Class Period, on March 30, 2015, Perrigo closed the largest and most complex acquisition in its corporate history. ¶53. Although the Omega acquisition gave Perrigo a foothold in continental Europe, where it previously lacked a presence, it also saddled Perrigo with immense integration and performance problems. ¶¶53, 57-62. As Defendants knew during the Class Period but concealed from investors, Omega was not itself integrated and could not be easily integrated with Perrigo. ¶¶54, 62. Omega operated in 35 countries under decentralized management, and had not integrated its own enterprise software, so that different country offices ran different systems. ¶53.

When speaking to investors about Omega, Defendants omitted crucial adverse information and made common misrepresentations to all investors. They claimed to have "successfully integrated" Omega, when in reality the integration was floundering. *See, e.g.*, ¶¶133, 141, 143. Defendants also falsely touted Omega's performance, when in fact it was crumbling. *See, e.g.*, ¶¶132-33, 135. *See also Roofer's Pension Fund v. Papa*, Civil Action No. 16-2805, 2018 WL 3601229, at *13-15 (D.N.J. July 27, 2018).

---

[2] Except where otherwise noted, paragraph ("¶__") references are to the numbered paragraphs of Plaintiff's Amended Complaint for Violation of Securities Laws ("Complaint"), ECF No. 89.

Internally, Defendants knew Omega's integration and performance were much worse than reported to investors. ¶¶53-61. Integration of Omega's information technology had completely stalled by mid-2015, in part because of "discord" between Omega's executives and the top executives at Perrigo, including Defendants Papa and Brown. ¶¶57-61. As a result, Perrigo had to delay implementing its critical enterprise software, SAP, at many Omega divisions. ¶62. Perrigo was also ill-prepared to address European Union ("EU") regulations that prevented the Company from replacing Omega's EU suppliers with Perrigo's own U.S.-based supply-chain. ¶59. Making matters worse, Omega's core business was underperforming in several key markets. ¶62. *See also Roofer's*, 2018 WL 3601229, at *23-24.

**Common misrepresentations and omissions regarding Generic Rx pricing**

Perrigo's financial results depended on inflated earnings from its Generic Rx division, which contributed more to Perrigo's bottom line than any other operating division for each of the six quarters prior to the Class Period. ¶66. *See also Roofer's*, 2018 WL 3601229, at *10-12. Referring to it as Perrigo's "star performer," Defendants made the performance of the Generic Rx division a key part of their opposition to Mylan's tender offer. ¶¶66-69.

Defendants did not tell investors that collusive practices inflated the results of this division by hundreds of millions of dollars. *See* ¶¶76, 80, 84, 86, 88, 91. Specifically, Defendants concealed from investors that Perrigo colluded with competitors (or took advantage of pre-existing collusion) to ram through massive price hikes of 300%-500% in many top-selling generic drugs that never could have been achieved in a normal competitive environment. *See, e.g.*, ¶¶69, 73, 75, 78, 82, 86, 88, 90. Defendants also made affirmative misrepresentations to investors, claiming a "flat to up slightly" pricing strategy when in fact their practice was to massively hike prices in generic drugs where anticompetitive pricing could be achieved, in order

4

to mask serious deterioration in the rest of Perrigo's generic drug portfolio.  *See, e.g.*, ¶176.  *See also Roofer's*, 2018 WL 3601229, at *10-12.

Although the full extent of price manipulation is not yet known, at least six of Perrigo's top-selling Generic Rx drugs exhibit strong indicia of price collusion.  ¶¶70-91.  These indicia include: highly concentrated markets, inelastic demand due to third-party payors, constraints to new entrants including regulatory marketing approval requirements, and mechanisms to regularly inform competitors of price increases.  ¶70.  Moreover, each of the six drugs exhibited significant, coordinated price increases in lock-step following industry events attended by Perrigo and its competitors.  ¶¶72-73, 78, 82-83, 86, 88, 90.

**Perrigo thwarts Mylan's hostile tender offer**

Defendants' misrepresentations and omissions succeeded in thwarting Mylan's hostile tender offer.  On November 13, 2015, Mylan's tender offer expired with less than 50% of Perrigo's outstanding shares tendered.  ¶111.  Because Mylan had conditioned its tender offer on reaching that threshold, the tender offer was not consummated.  *Id.  See also Roofer's*, 2018 WL 3601229, at *5.  As a result, all Perrigo shareholders were deprived of the opportunity to receive consideration worth $174.36.  *See* Expert Report of Dr. Zachary Nye ("Nye Report"), attached hereto as Exhibit 1, at ¶69.[3] Thus, all investors lost the opportunity the opportunity to receive more than $33 in premium for each Perrigo share.  *Id*.

---

[3] Dr. Nye is a leading financial economics expert for securities fraud litigation.  He holds an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine.  Nye Report, ¶1.  He frequently opines on market efficiency and his opinions are often cited by Courts in finding market efficiency.  *See, e.g.*, *In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT, 2013 WL 2456104, at *13 (D. Del. June 6, 2013); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 n.3  (N.D. Cal. Dec. 22, 2016) (noting that "Nye faithfully followed the *Cammer* factors"); *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 648 (C.D. Cal. 2018) (describing Dr. Nye's report as "key evidence").

**The truth is revealed in a series of partial disclosures**

Defendants did not come clean with investors after defeating Mylan's tender offer. Instead, investors slowly learned the truth about Omega and Generic Rx pricing over the course of sixteen months between February 2016 and May 2017.  ¶¶225-243.  On February 18, 2016, when reporting Perrigo's first financial results after the failed tender offer, Defendants disclosed that Perrigo had to take a $185 million impairment charge related to Omega and would restructure some Omega assets.  ¶225.  Two months later, having failed to deliver the results he promised from a standalone Perrigo, Defendant Papa resigned on April 25, 2016.  ¶229.  That same day, Perrigo reported disappointing financial results and was forced to lower its earnings guidance for 2016, blaming the weakness on increased competitive pressures in its Generic Rx segment and poor performance at Omega.  ¶¶229-30.  The Company also warned that it would likely need to take additional impairment charges related to Omega.  ¶230.  Stunned by these disclosures, CNBC stock analyst Jim Cramer called the disclosures a "terrible moment for Perrigo," and realized that when Defendant Papa had come on Cramer's show "and talked about how the Mylan bid dramatically undervalued Perrigo. . . . That was clearly untrue."  ¶11.

Only a few weeks later, on May 12, 2016, Perrigo announced another $467 million impairment charge for Omega.  ¶234.  Then, on August 10, 2016, Perrigo announced poor earnings and slashed guidance further, citing "competition and price erosion" in its Generic Rx division and continued problems at Omega requiring additional "transformational organizational changes."  ¶¶237-38.  By the end of the year, on December 8, 2016, Perrigo announced a total restructuring of its branded division (consisting of Omega's former assets) and additional impairment charges, bringing total Omega-related charges to over $2 billion.  ¶¶17, 238.

On March 3, 2017, a Bloomberg report warned that Perrigo had garnered the attention of antitrust regulators, who were investigating collusive practices among generic prescription drug manufacturers. ¶242. After the market closed on May 2, 2017, Perrigo revealed that the U.S. Department of Justice had raided Perrigo's offices in connection with its price-fixing investigation of the generic pharmaceutical industry. ¶¶20, 243.

By the time Perrigo's collusive Generic Rx pricing practices and the failed integration of Omega were fully revealed to the market, Perrigo's stock lost more than 62% of its value. ¶¶21, 244. *See also Roofer's*, 2018 WL 3601229, at *5.

## PROCEDURAL HISTORY

The first complaint in this action was filed on May 18, 2016, alleging violations of §§10(b), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). ECF No. 1. On February 10, 2017, this Court issued an Order appointing Plaintiff as lead plaintiff. ECF No. 64.

On June 21, 2017, Plaintiff filed the Complaint, again alleging violations of §§10(b), 14(e), and 20(a) of the Exchange Act and Rule 10b-5, as well as parallel provisions under Israel's Securities Law, 1968. ECF No. 89. The Complaint asserts claims on behalf of three putative Classes of investors described herein. *Id.* On August 21 & 25, 2017, Defendants moved to dismiss the Complaint. ECF Nos. 114, 119.

On July 27, 2018, the Court entered an Order sustaining claims related to misrepresentations concerning Omega and Generic Rx pricing, as against Perrigo, Papa, and Brown, and dismissing without prejudice claims related to other misrepresentations and other defendants. ECF No. 136; *Roofer's*, 2018 WL 3601229.

## ARGUMENT

## I.    THE PROPOSED CLASSES SHOULD BE CERTIFIED UNDER RULE 23

For decades, the U.S. Supreme Court has "recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005), *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)).  Courts in this Circuit and District frequently certify class actions in securities cases in order to provide opportunities for redress to injured investors.  *See, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623 (3d Cir. 2011), *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013); *Prudential*, 2015 WL 5097883.  Class certification is "especially appropriate in securities fraud cases wherein there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant." *Heckmann*, 2013 WL 2456104, at *13-14.

To certify a putative class, the Court must determine whether the four threshold requirements of Rule 23(a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997).  In addition, the Court must determine whether the action is maintainable under Rule 23(b)(1), (2), or (3).  *Id.*  Rule 23's requirements need only be proved by a "preponderance of the evidence." *Williams v. Jani-King of Phila. Inc.*, 837 F.3d 314, 319 (3d Cir. 2016).

While the Court must conduct a "rigorous analysis" of a plaintiff's motion to determine if the requisite Rule 23 elements are established, it is not to "engage in free-ranging merits inquiries at the class certification stage." *Amgen*, 568 U.S. at 466.  "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether

the Rule 23 prerequisites for class certification are satisfied." *Id.*   Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as scienter, materiality or loss causation. *See, e.g.*, *Amgen*, 568 U.S. at 465-66; *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011) ("*Halliburton I*"); *Prudential*, 2015 WL 5097883, at *3.

## A.    All Four Requirements Of Rule 23(a) Are Satisfied

### 1.  The proposed Classes are so numerous that joinder is impracticable

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). "There is no minimum number of members needed for a suit to proceed as a class action." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012). However, a showing that the "potential number of plaintiffs exceeds 40" will generally satisfy numerosity. *Id.* Numerosity "is readily met in securities cases involving an issuer whose stock trades publicly on the NYSE." *Prudential*, 2015 WL 5097883, at *8.

Here, the U.S. Purchaser Class and Tender Offer Class have thousands of Class members. During the Class Period, Perrigo had between approximately 140.8 million to 146.4 million shares outstanding, and traded heavily. *See* Nye Report, ¶18. At the time of the tender offer, approximately 146.3 million shares of Perrigo common stock were eligible to participate.[4] *See Gerber v. Computer Associates Intern., Inc.*, No. 91 CV 3610 (SJ), 1995 WL 228388, at *2 (E.D.N.Y. 1995) (numerosity satisfied where 5.7 million shares outstanding on date of tender offer).

---

[4] *See* Schedule TO dated September 14, 2015, ("Mylan has assumed that the number of Perrigo ordinary shares outstanding on the date of consummation of the offer . . . will be the same number [146,279,437] reported in Perrigo's Annual Report on Form 10-K for the year ended June 27, 2015"), available at:

https://www.sec.gov/Archives/edgar/data/1585364/000119312515319009/d45272dsctot.htm.

Similarly, the TASE Purchaser Class includes hundreds if not thousands of investors.  In Israel, Perrigo was one of the most actively-traded stocks on the Tel Aviv Stock Exchange, and was included at all times in the most senior market index, TA-25 (now TA-35).  *Id.* at ¶55.  Perrigo's active TASE trading and the fact that multiple investors have already alleged claims arising from their purchases on the TASE demonstrates that large numbers of potential TASE Purchaser Class members exist.  *See, e.g.*, ¶¶27-29.  Thus, joinder is impracticable for all three Classes.

## 2.  Common questions of law and fact exist

Commonality exists if the class "claims [] depend upon a common contention . . . of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Commonality is not a high burden. *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 427 (3d Cir. 2016).  "For purposes of Rule 23(a)(2), even a single common question will do."  *BMW*, 687 F.3d at 597 (quotation omitted).  Commonality can be found "even when not all members of the plaintiff class suffered an actual injury, when class members did not have identical claims, and, most dramatically, when some members' claims were arguably not even viable." *NFL Players*, 821 F.3d at 427.

In securities fraud actions, "[c]ommonality under Rule 23(a)(2) is met where, notwithstanding some factual differences, the class action claims are based on a common course of conduct of misrepresentations, omissions, or other wrongdoing affecting all class members in the same manner."  *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 279 (D.N.J. 2007).  Here, the exact same course of conduct—including the exact same misrepresentations and omissions by Defendants—injured both Plaintiff and all absent Class members.  ¶¶111, 132-150, 176-204,

225-234.  Moreover, beyond the mechanical application of an approved formula to the individual claims of Class members, "damages as well as loss causation are susceptible of determination through evidence common to the class."  *DVI*, 639 F.3d at 640 n.23.

In this case, common questions of law or fact include whether:

- federal securities laws were violated by Defendants' alleged acts;

- statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts;

- Defendants acted knowingly or recklessly in issuing false and misleading statements;

- Perrigo traded on an efficient market;

- the prices of Perrigo securities during the Class Period were artificially inflated by Defendants' misrepresentations and omissions;

- Papa and Brown were control persons of Perrigo; and

- Class members have sustained damages (and, if so, what is the proper measure of damages for each Class).

### 3.  Plaintiff's claims are typical

Rule 23(a)(3) requires that the claims of a class representative be typical of the claims of absent class members.  Typicality is "undemanding," *Prudential*, 2015 WL 5097883, at *9, and "does not mandate that all putative class members share identical claims."  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 184 (3d Cir. 2001).  This requirement concerns only "whether the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based."  *Id.* at 183 (alterations in original).  "If the

11

claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Id.* at 183-84. Even "relatively pronounced factual differences" will not preclude typicality where there is "a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.* at 184.

In this case, the claims of both Plaintiff and all absent Class members arise from the same misconduct and the same legal theories. All members of the U.S. Purchaser Class and the TASE Purchaser Class assert violations of §§10(b) and 20(a) of the Exchange Act. *See* Declaration of Amir Licht ("Licht Decl."), attached hereto as Exhibit 2, at ¶59 ("Israeli law grants a §10(b) cause of action to TASE traders who trade in U.S.-listed securities subject to the dual listing regime").[5] Legal standards are also identical for both the U.S. Purchaser Class and the TASE Purchaser Class. *Id.* at ¶¶52-89.

Similarly, all members of the Tender Offer Class assert the same legal theory arising from the common misrepresentations and omissions Defendants made to thwart Mylan's tender offer. The law recognizes no conflict between those Class members who tendered shares despite Defendants' misrepresentations and omissions, and those who did not tender. *In re PHLCORP Sec. Tender Office Litig.*, No. 88 Civ. 0306 (PNL), 1989 WL 251578, at *2 (S.D.N.Y. Nov. 16, 1989) ("It does not appear that the interests of [tenderers and non-tenderers] are adverse."). "[T]hose who made an investment decision not to tender based upon defendants' allegedly fraudulent representations and omissions and those who made a contrary investment

---

[5] Professor Licht is a professor of law at the Interdisciplinary Center Herzliya, a private, non-profit academic institution in Israel. *See* Licht Decl., ¶2. He is an expert on the law applicable to companies that are dual-listed on the Tel Aviv Stock Exchange, having written several articles regarding dual-listing and served as an advisor on that subject to the Israeli Securities Authority and Israel's Ministry of Justice. *Id.*, ¶¶3-4. Professor Licht's work on dual-listed companies has been repeatedly cited with approval by Israeli courts. *See, e.g.*, *Id.*, ¶¶5, 37.

decision based upon those same representations and omissions, are protected equally by §14(e)." *Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149, 163-64 (W.D. Miss. 1977) (quoting *Wulc v. Gulf & W. Indus., Inc.*, 400 F. Supp. 99 (E.D. Pa. 1975)).  Accordingly, Plaintiff's claims are typical of each of the members of the Classes.

### 4.  Plaintiff and its Counsel will adequately protect absent Class members

The final requirement for certification under Rule 23(a) requires evidence that Plaintiff will "fairly and adequately protect the interests of" absent class members.  Adequacy is satisfied if there are no "conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625.[6]  The adequacy inquiry first "tests the qualifications of the counsel to represent the class," then considers any "conflicts of interest between named parties and the class they seek to represent."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).

Here, Plaintiff has selected as its Counsel two of the most experienced and successful firms in securities fraud litigation, Pomerantz and Bernstein Litowitz.  Each has represented investors for decades and secured some of the largest recoveries on behalf of investor classes. *See* Firm resumes, Exhibits A-B to the Declaration of Joshua B. Silverman ("Silverman Decl."), attached as Exhibit 3 hereto.  Indeed, this Court has already noted that Plaintiff's "chosen counsel are . . . sophisticated and experienced in these matters."  *Roofers' Pension Fund v. Papa*, Civil Action No. 16-2805, 2017 WL 1536222, at *7 (D.N.J. Apr. 27, 2017).  Plaintiff has also selected highly experienced Liaison Counsel, Lowenstein Sandler.  *See* Silverman Decl., Exhibit

---

[6] Questions concerning adequacy often overlap with those pertaining to typicality.  *In re Honeywell Int'l*, 211 F.R.D. 255, 260 n.8 (D.N.J. 2002).

C.[7]  All are highly "qualifi[ed] . . . to represent the class."  *Warfarin*, 391 F.3d at 532.

Plaintiff's own adequacy is likewise beyond question.  Each constituent of Plaintiff Perrigo Institutional Investor Group has declared that it is "committed to prosecuting this action as vigorously and aggressively as possible, in order to maximize the potential recovery of the Class."  *See* ECF No. 25-2, at ¶11.  *See also Roofer's*, 2017 WL 1536222, at *7 ("[T]he Perrigo Group has demonstrated that it is an organized group of sophisticated entities with independent general counsel who have lead plaintiff experience in prior securities fraud cases.").  Each has also been regularly advised of the progress of this litigation by Counsel.  *See* Silverman Decl., ¶6.  Further, no conflicts of interest exist between Plaintiff and absent Class members, as all have aligned interests in establishing the same legal theories and factual allegations.  *See, e.g.*, *Roofer's*, 2017 WL 1536222, at *6 (rejecting argument that Plaintiff was subject to any unique defenses rendering it atypical and noting instead that "public statements explaining a trading decision" by Plaintiff "support reliance, instead of cut away at it").

Finally, progress in this litigation confirms that the interests of absent Class members have been, and will continue to be, adequately protected.  Counsel conducted an extensive investigation, consulted with experts, prepared a robust amended Complaint, and successfully opposed Defendants' motion to dismiss, resulting in sustained claims benefitting all absent Class members.  Additionally, after this Court's motion to dismiss decision lifted the stay of discovery imposed by the Private Securities Litigation Reform Act of 1995, Plaintiff and its Counsel have served initial disclosures, document requests, and interrogatories upon Perrigo; subpoenaed relevant information from third parties; negotiated with Defendants for a discovery

---

[7] Assistance is also provided by Israeli counsel, Guy, Bachar & Co. and Eitan Lavie & Co., who help facilitate communications, translate and explain documents to clients, and helped facilitate a stay of the Israeli class action in favor of these proceedings.

confidentiality order and ESI protocol; and participated in status conferences.

**B.    This Litigation Should Be Maintained As A Class Action Under Rule 23(b)(3)**

Class certification pursuant to Rule 23(b)(3) is appropriate where (i) common questions of law or fact predominate over the potential for individual questions and (ii) the class action is superior to other available means of adjudication. Fed. R. Civ. P. 23(b)(3).  Both requirements are satisfied here.

### 1.    Common questions predominate

Predominance "is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem*, 521 U.S. at 625.  The predominance inquiry "turns on the 'nature of the evidence' and whether 'proof of the essential elements of the cause of action requires individual treatment.'"  *Williams*, 837 F.3d at 319 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2009)).   In securities fraud cases, "Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information," and "loss causation for the putative class is also capable of proof through common evidence."  *Merck*, 2013 WL 396117, at *12.  Such questions "are necessarily common to each class member given that Defendants' conduct alone is relevant to their proof."  *Schuler v. Meds. Co.*, Civil Action No. 14-1149 (CCC), 2016 WL 3457218, at *4 (D.N.J. June 23, 2016).  Moreover, as is established below, reliance is presumed under the facts of this case, and mechanical damage tabulations will not predominate over common issues at trial.

#### a.   Reliance is presumed under the fraud-on-the-market doctrine

Individual proof of reliance will not threaten predominance, because reliance can be

established class-wide through the fraud-on-the-market presumption. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988). That presumption recognizes that in efficient markets, the price of a stock "reflects all public, material information--including material misstatements." *Halliburton Co. v. Erica P. John Fund. Inc.*, 134 S. Ct. 2398, 2405 (2014) ("*Halliburton II*"). Therefore, a buyer of a security in an efficient market may be presumed to have relied on all public material information concerning that security. *Amgen*, 568 U.S. at 1190.

The fraud-on-the-market presumption applies equally to the U.S. Purchaser Class and the TASE Purchaser Class. Israeli law for dual-listed shares adopts wholesale the standards and requirements of the Exchange Act, including the entitlement of investors to rely on the fraud-on-the-market presumption to the same extent available under §10(b). *See* Licht Decl., ¶¶51-88.

In *Basic*, the Supreme Court gave several reasons for adopting the fraud-on-the-market presumption. First, the presumption furthered the public interest in private enforcement of securities laws, by preserving investors' ability to proceed on a class basis. 485 U.S. at 242. Second, it reflected the way that modern securities markets operated, because investors buy and sell anonymously via exchanges rather than in individualized transactions. *Id.* at 244-45. Third, investors rely on the integrity of the market price, and assume that information incorporated into it was true. *Id.* at 247.

To invoke the presumption, a plaintiff must show that: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2413. Here, the public nature of Defendants' misrepresentations and omissions is established because each was made in public statements to all investors. *See* ¶¶132-150, 176-204. Next, materiality need not be proved

at the class certification stage, since it is a common question to be determined at trial (or summary judgment).  *See Amgen*, 568 U.S. at 467-68.  Further, Plaintiff has already established that each of its constituents purchased Perrigo shares before the truth was fully disclosed.  *See* ECF No. 6-4 (identifying transactions).  Finally, Plaintiff proves that Perrigo shares traded in an efficient market during the Class Period.  *See* Nye Report, ¶¶18-59.

As the Supreme Court explained, the fraud-on-the-market presumption considers informational efficiency, not the more rigorous academic strains of market efficiency. *Halliburton II*, 134 S. Ct. at 2410.  The presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."  *Halliburton II*, 134 S. Ct. at 2410 (quotation and citation omitted).  Accordingly, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point."  *Id.* (emphasis in original).  *See also DVI*, 639 F.3d at 635 (perfect efficiency is not required).

To assess market efficiency, courts in this Circuit look to the exchange listing and the five factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).  *See, e.g.*, *Prudential*, 2015 WL 5097883, at *6.  The *Cammer* factors are: "(1) the company's average weekly trading volume; (2) the number of securities analysts following and reporting on the company; (3) the number of market makers in the company's stock; (4) whether the company is eligible to file the Form S-3 Registration Statement with the SEC; and (5) whether there is a demonstrable cause and effect relationship between the release of information about the company and movements in the stock price."  *Id.*  Some courts also consider the three additional factors identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), and *Unger v. Amedisys*, 401 F.3d 316 (5th Cir. 2005): (1) market capitalization; (2) bid-ask spread; and (3)

float.  *See, e.g.*, *Prudential*, 2015 WL 5097883, at *6.  As Dr. Nye establishes, *all* of these factors—from both *Cammer* and *Krogman*/*Unger*—demonstrate that Perrigo shares traded in efficient markets.  *See* Nye Report, ¶¶16-56.  Therefore, reliance is presumed.

Likewise, reliance is presumed for the Tender Offer Class under the fraud-on-the-market presumption.  *See Roofer's*, 2017 WL 1536222, at *5.  Alternately, for the §14(e) claims asserted by the Tender Offer Class, "once [plaintiffs] have sufficiently alleged and subsequently established the objective materiality of . . . misrepresentations in the tender documents," common issues predominate because "individual reliance by each class member need not be established but [is] presumed."  *Church v. Consol. Freightways, Inc.*, No. C-90-2290 DLJ, 1991 WL 284083, at *8 (N.D. Cal. 1991); *accord Herbst v. Int'l Tel. & Tel. Corp.*, 495 F.2d 1308, 1318 (2d Cir. 1974) ("individual reliance is not a part of plaintiff's [§14(e)] case").

### (1) *Cammer* 1: Perrigo was actively traded on the NYSE and the TASE

Large weekly trading volume evidences market efficiency because it "implies significant investor interest in the company[,] . . . [which] in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer*, 711 F. Supp. at 1286.  Therefore, under *Cammer*, weekly turnover equal to 2% or more of outstanding shares justifies a "strong presumption" of efficiency, and weekly turnover of 1% or more justifies a "substantial presumption."  *Id.* at 1293.  Perrigo's average weekly volume during the Class Period exceeded 6.6% of its shares outstanding.  Nye Report, ¶18.  That Perrigo's average weekly trading volume was more than three times the highest threshold described in *Cammer* provides strong evidence of market efficiency.  *See, e.g.*, *In re Schering-Plough Corp./ENHANCE Sec. Litig.*, Civil Action No. 8-397, 2012 WL 4482032, at *5 (D.N.J. Sept. 25, 2012) (weekly trading volume equivalent to 4.18% of outstanding shares was

"well over the threshold justifying a 'strong presumption'").

Perrigo's dual listing on the NYSE and the TASE provides further evidence of efficiency. Both are widely recognized to be open and developed markets. "[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency." *DVI*, 639 F.3d at 634; *see also Teamsters Local 445 Frgt. Div. Pension Fund v. Bombardier, Inc.*, 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ("If . . . a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient."). Similarly, the TASE is an open and developed market, and Perrigo's stock is among the largest and most liquid stocks traded on the TASE. Nye Report, ¶55.

### (2) *Cammer* 2: Perrigo was widely covered by analysts

Significant analyst coverage is "persuasive" evidence of market efficiency, as it demonstrates that the company in question is closely followed by investment professionals who make buy and sell recommendations to investors. *Cammer*, 711 F. Supp. at 1286. Here, more than 30 investment and advisory firms covered Perrigo during the Class Period, issuing over 600 analyst reports. Nye Report, ¶24. *See also In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209 (E.D. Pa. 2008) (coverage by as few as three analysts can satisfy *Cammer* 2). Investors also received information about Perrigo from widespread media coverage and from SEC filings, which were made available without cost. Nye Report, ¶¶25-26.

Additionally, because buy-side institutions often maintain their own analysts, broad institutional ownership further demonstrates market efficiency. "[L]arge investors, with more money at stake, may be more likely to inform themselves well before trading." *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *8 (C.D. Cal. Jan. 5, 2017)

(noting that ownership by 122 major institutions supported *Cammer* factor 2). *See also Wilson v. LSB Indus.*, No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *12 (S.D.N.Y. Aug. 13, 2018) (ownership by 251 major institutions implies an efficient market). Here, more than 600 institutional investors held Perrigo stock during each quarter of the Class Period. Nye Report, ¶36.

### (3) *Cammer* 3: Numerous market makers facilitated efficient trading of Perrigo shares

Market makers ensure efficient trading of shares, and thereby promote market efficiency. Use of a designated market maker ("DMM")—especially where supplemented by other market makers—satisfies *Cammer* 3. *See, e.g.*, *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 654 (S.D. Ohio 2017). Here, Perrigo was listed on the NYSE, whose rules enable investors to trade efficiently on new information by requiring the use of a single DMM to provide liquidity at the National Best Bid/Offer a specified percent of the time, and to facilitate price discovery throughout the trading day. Nye Report, ¶29. For Perrigo, more than 160 active market makers supplemented the DMM and provided further liquidity. *Id.* at ¶30.

Similarly, the TASE also facilitates efficient trading of Perrigo shares through a fully automated and anonymous trading platform.[8] Perrigo is one of the largest and most liquid issues on the TASE, with a 6.09% weighting in the highly liquid TA-35 Index.[9] Because price discovery functions efficiently on both the TASE and the NYSE, investors experience no meaningful differences in pricing between the two exchanges during times when both are open. Nye Report, ¶¶55-59. To test price parity between the U.S. and TASE markets, Dr. Nye

---

[8] *See https://info.tase.co.il/Eng/knowledge_center/faq/Pages/faq_beg.aspx.*

[9]*See https://info.tase.co.il/Eng/General/Company/Pages/companyDetails.aspx?subDataType=0&companyID=001612&shareID=01130699.*

measured intraday pricing at 5-minute intervals during all periods where both markets were open, and found that they exhibited a 99.9% correlation with each other.  Nye Report, ¶58.  He also found that there was no statistical evidence of cross-market auto-correlation.  *Id.*  Dr. Nye concluded that this evidence strongly demonstrated that TASE was also an efficient market for Perrigo shares.  ¶¶55-59.

### (4) *Cammer* 4: Perrigo was eligible for Form S-3 registration

Companies meeting the SEC's filing criteria for raising capital via an abridged Form S-3 registration statement are "presumed to be actively traded and widely followed.  Therefore, a company's ability to file an S-3 Registration Statement points to market efficiency."  *Krogman*, 202 F.R.D. at 476.  Perrigo filed a Form S-3 prior to the Class Period, and maintained eligibility criteria during the Class Period.  *See* Nye Report, ¶43.  Thus, the fourth *Cammer* factor also demonstrates market efficiency.

### (5) *Cammer* 5: Perrigo's stock price reacted to company-specific news, demonstrating a cause-and-effect relationship

One of the most convincing ways to demonstrate market efficiency is by illustrating, "over time, a cause and effect relationship between company disclosures and resulting movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  *Cammer* 5, which tests this relationship, is sometimes considered to be the "most important" of the *Cammer* factors.  *See DVI*, 639 F.3d at 634.  However, market efficiency does not require that this (or any other single *Cammer* factor) be satisfied.  *See W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, Civil Action No. 13-6731, 2016 WL 4138613, at *13 (E.D. Pa. Aug. 4, 2016).

To assess this factor, Dr. Nye conducted an event study on daily stock prices.  Nye Report, ¶¶42-48 and Exh. 12.  An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price."

*DFC Global*, 2016 WL 4138613, at *13 (quoting *United States v. Schiff*, 602 F.3d 152, 173 n.29 (3d Cir. 2010)).  "[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by *Cammer*.  *Prudential*, 2015 WL 5097883, at *6.  Event studies also provide substantially more rigorous analysis than was submitted in *Cammer*, which considered only anecdotal evidence of a cause-and-effect relationship.  *See* Affidavit of Norman Poser in *Cammer*, attached as Exh. D to Silverman Decl.

Dr. Nye's event study strongly demonstrates "a cause-and-effect relationship between new, material, Company-specific disclosures and resulting movements in Perrigo's stock price during the Class Period."  Nye Report, ¶46.  Specifically, of the twelve (12) dates examined, nine (9) are associated with Company-specific returns that are statistically significant at or above the 95% confidence level.  *Id.* at ¶48.  This is more than fifteen times the amount of statistically-significant dates that should be expected from a randomly-selected 12-day sample, confirming the strength of Perrigo's Company-specific stock price reaction on event dates.  *Id.*  The same reactions were observed in TASE trading (aside from two dates for which TASE could not be measured because Israeli markets were closed in observance of Israeli holidays).  *Id.* at Exh. 12.  Additionally, the strong 99.9% correlation between U.S. trading and TASE trading confirms that the cause-and-effect relationship applies equally to both markets. *See id.* at ¶¶57-59.

### (6) *Krogman / Unger* factors also demonstrate market efficiency

In addition to the *Cammer* factors, courts often consider a company's market capitalization, bid-ask spread, and float to determine market efficiency.  *See Prudential*, 2015 WL 5097883, at *6 (citing *Krogman* and *Unger*).  These supplemental factors are used to develop a holistic view of market efficiency. *See, e.g.*, *Hull v. Glob. Dig. Sols., Inc.*, Civil Action No. 16-5153 (FLW), 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018).

Here, each of the additional *Krogman / Unger* factors further demonstrates that Perrigo's common stock traded on efficient markets.  Perrigo's market capitalization peaked at $29 billion during the Class Period, more than ten times as large as the median market capitalization for companies listed on the NYSE.  Nye Report, ¶50.  Perrigo's large public float, approximately 81% of which were held by institutional investors, allowed for unconstrained short selling.  Nye Report, ¶36.  Finally, Perrigo's bid-ask spread was comparable if not narrower than the average bid-ask spread among NYSE stocks, further demonstrating that Perrigo shares traded in an efficient market during the Class Period.  *Id.* at ¶¶37-38.

**b.      Reliance is also presumed under *Affiliated Ute***

In addition to the fraud-on-the-market presumption, reliance is also presumed under *Affiliated Ute* because Plaintiff's claims involve the omission of material information from Defendants' disclosures.  *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 192 (3d Cir. 2001).  In such cases, "positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material[.]"  *Affiliated Ute*, 406 U.S. at 153.

The Court need not reach this issue if it finds, as Plaintiff believes it should, that reliance is presumed under the fraud-on-the-market doctrine.  However, to the extent necessary, reliance can also be presumed because, under *Affiliated Ute*, Plaintiff's allegations regarding Omega center on statements that were misleading because of what they omitted: material information regarding the failure of Omega's integration efforts and underperformance in key markets.  *See, e.g.*, ¶¶132-134, 139-150.  *See also Roofer's*, 2018 WL 3601229, at *14 ("The Amended Complaint alleges serious, present problems with [Omega's] integration that were omitted from Defendants' statements.").  Similarly, Plaintiff alleges that Defendants' Generic Rx statements misled investors by failing to disclose that the division's favorable results and pricing existed

only because Perrigo was able to exact massive price hikes in select Generic Rx drugs due to anticompetitive practices by itself and others.  *See, e.g.,* ¶¶176-204.  *See also Roofer's*, 2018 WL 3601229, at *12 ("Plaintiffs contend, and the Court agrees, that once Defendants' chose to speak about generic drug pricing, they could not omit material facts related to that issue so as to make the disclosure misleading." (citation and quotation omitted)).

### c.    Individual damage calculations will not defeat predominance

As the Third Circuit has explained, individual damage calculations do not defeat predominance.  *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 375 (3d Cir. 2015) (ruling that denial of certification on that basis alone is "an abuse of discretion").  *See also Li v. Aeterna Zentaris*, Civil Action No. 14-cv-7081 (PGS)(TJB), 2018 WL 1143174, at *2 (D.N.J. Feb. 28, 2018) (At the class certification stage, "Plaintiffs are not required to produce a detailed damages model.").  While Dr. Nye does not provide a full damages model at this time, he demonstrates that per-share damages can be determined class-wide for each of the three Classes.  Nye Report, ¶¶57-66.  Thus, "the process of computing the amount of individual damages . . . can be reduced to a mechanical task" and "should not be a bar to a class action."  *Simon v. Westinghouse Elec. Corp.*, 73 F.R.D. 480, 486 (E.D. Pa. 1977).

### 2.    Class adjudication is superior to other available methods

"In general, securities suits such as this easily satisfy the superiority requirement of Rule 23."  *In re JPMorgan Chase*, 12 Civ. 03852 (GBD), 2015 WL 10433433, at *8 (S.D.N.Y. Sept. 29, 2015).  Rule 23(b)(3) prescribes the following factors to be considered in assessing "superiority": "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action." Each of these factors demonstrates the superiority of class action adjudication here.

First, the vast majority of Class members have not filed individual actions, and for most the cost of individual litigation would be prohibitively expensive. *See Merck*, 2013 WL 396117, at *13.

Second, Plaintiff does not believe there are any active opt-out cases proceeding outside this jurisdiction. The opt-out cases pending before this Court are coordinated as necessary with the Class Action, enhancing judicial efficiency.

Third, concentration of this litigation in one forum will avoid inconsistent adjudications. By contrast, "[a]bsent a class action, courts could theoretically be inundated with hundreds of lawsuits presenting near-identical factual and legal issues." *DVI*, 249 F.R.D. at 218. This "would result in the needless waste of both private and judicial resources." *Merck*, 2013 WL 396117, at *13-14.

Fourth, Plaintiff expects no unusual difficulties in management. Notice to Class members can be accomplished using well-established notice procedures for securities class actions. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management issues that may arise. *See* Fed. R. Civ. P. 23(c), (d).

## II.   POMERANTZ AND BERNSTEIN LITOWITZ SHOULD BE APPOINTED CLASS COUNSEL

In appointing class counsel, the Court must take into account: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). These considerations all weigh in favor

of appointing Co-Lead Counsel, Pomerantz and Bernstein Litowitz, as Class Counsel.  Both have devoted substantial time and resources to identifying and prosecuting the claims in this Action, investigating the legal and factual bases for those claims, drafting an amended Complaint, defeating in large part Defendants' motions to dismiss, and pursuing discovery.  Pomerantz and Bernstein Litowitz have dedicated a team of experienced attorneys to prosecuting this Action. Moreover, as this Court has observed, both firms have extensive experience prosecuting complex securities-fraud actions, specialize in that area of law, and have achieved substantial recoveries for investors.  *See Roofer's*, 2017 WL 1536222, at *7 (Plaintiff's "chosen counsel are . . . sophisticated and experienced in these matters."). Liaison counsel Lowenstein Sandler is similarly experienced.  *See* Firm resumes, attached to Silverman Decl. as Exh. A to C.  Finally, proposed Class Counsel will commit the necessary resources to achieve a successful recovery for investors.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Classes defined herein; (2) appointing Plaintiff as the Class Representative; (3) appointing Pomerantz and Bernstein Litowitz as Class Counsel, and Lowenstein Sandler as Liaison Counsel; and (4) granting such other and further relief as the Court may deem just and proper.


Dated:   November 30, 2018                             Respectfully submitted,

**LOWENSTEIN SANDLER LLP**

*/s/* Michael T. G. Long

Michael B. Himmel
Michael T.G. Long
65 Livingston Avenue

Roseland, New Jersey  07068
Telephone: (973) 597-2500
Facsimile: (973) 597-2400
mhimmel@lowenstein.com
mlong@lowenstein.com

*Liaison Counsel for Plaintiff*

**POMERANTZ LLP**
Patrick V. Dahlstrom (*pro hac vice*)
Joshua B. Silverman (*pro hac vice*)
Omar Jafri (*pro hac vice*)
10 South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
ojafri@pomlaw.com

Jeremy A. Lieberman (*pro hac vice*)
Jonathan Lindenfeld
600 Third Avenue
New York, New York  10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jlindenfeld@pomlaw.com

*Co-Lead Counsel for Plaintiff*

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
James A. Harrod (*pro hac vice*)
Jesse L. Jensen (*pro hac vice*)
1251 Avenue of the Americas
New York, NY  10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jim.harrod@blbglaw.com
jesse.jensen@blbglaw.com

*Co-Lead Counsel for Plaintiff*