UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROOFERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No. 2:16-cv-02805-MCA-LDW |
| Plaintiffs, | ) ) ) | ECF Case Document Electronically Filed |
| v. | ) ) | |
| JOSEPH C. PAPA, *et al.*, | ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN OPPOSITION TO
## LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

GREENBAUM, ROWE, SMITH & DAVIS LLP
Alan S. Naar
99 Wood Avenue South
Iselin, New Jersey 08830
(732) 476-2530

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
James D. Wareham (*pro hac vice*)
James E. Anklam (*pro hac vice*)
801 17th Street, NW
Washington, DC 20006
(202) 639-7000

Samuel P. Groner (*pro hac vice*)
One New York Plaza
New York, New York 10004
(212) 859-8000

*Attorneys for Defendant Perrigo Company plc*

SULLIVAN & CROMWELL LLP
John L. Hardiman (*pro hac vice*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice*)
125 Broad Street
New York, New York 10004
(202) 558-4000

*Attorneys for Defendant Judy Brown*

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky (*pro hac vice*)
Aric H. Wu (*pro hac vice*)
Marshall R. King
200 Park Ave
New York, New York 10166
(212) 351-4000

*Attorneys for Defendant Joseph C. Papa*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ................................................................................................ 3

ARGUMENT ..................................................................................................... 8

I.   LEAD PLAINTIFFS FAIL TO ESTABLISH THAT COMMON ISSUES WILL PREDOMINATE. ................................................................. 9

    A.   Individualized Issues of Reliance Prevent Certification. ...................... 9

        1.   Lead Plaintiffs Have Failed to Demonstrate Entitlement to the "Fraud on the Market" Presumption of Reliance. ............ 9

            a.   Lead Plaintiffs Fail to Show that the TASE is an Efficient Market for Perrigo shares. ................................. 10

            b.   Lead Plaintiffs Did Not Rely on Perrigo's Statements in Declining to Tender Their Shares............ 14

        2.   The *Affiliated Ute* Presumption Does Not Apply to Cases Involving a Mix of Misrepresentations and Omissions............ 16

    B.   Individualized Issues Faced by Tendering Shareholders Predominate Over Issues Faced by Non-Tendering Members of the Tender Offer (14(e)) Class. .......................................................... 17

    C.   Lead Plaintiffs Have Not Established that They Can Calculate Class-Wide Damages for their Proposed Classes. .............................. 20

        1.   Lead Plaintiffs Fail to Demonstrate That Damages for the Tender Offer (14(e)) Class Can be Determined on a Class-Wide Basis. ................................................................... 20

        2.   Lead Plaintiffs Fail to Show that Damages for the U.S. Purchaser Class and the TASE Purchaser Class Can Be Determined on a Class-Wide Basis. ......................................... 24

II.  LEAD PLAINTIFFS FAIL TO MEET THE REQUIREMENTS OF RULE 23(a)................................................................................................. 29

A.    Lead Plaintiffs Are Inadequate..........................................................29

    1.    Each Lead Plaintiff Increased Its Holdings in Perrigo Common Stock after Learning of the Alleged Fraud. ..............29

    2.    Discovery in This Proceeding Strongly Suggests that Lead Plaintiffs are Simply Mouthpieces for "Lawyer Driven" Litigation Impermissible Under Rule 23(a) and the PSLRA. ...............................................................................31

B.    Lead Plaintiffs' Claims Are Not Typical of the Proposed Classes. ...............................................................................................34

    1.    Lead Plaintiffs Admitted to Having a Unique Relationship with Mylan............................................................35

III.    LEAD PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THE PROPOSED COMMENCEMENT DATE FOR THE CLASS PERIOD IS APPROPRIATE...........................................................38

IV.    CONCLUSION..................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
  406 U.S. 128 (1972)..................................................................................................16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).........................................................................................9, 14, 19

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d. Cir 2006) ...................................................................................29

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) ...................................................................................31

*In re BP p.l.c. Securities Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)............................................................26

*Byrd v. Aaron's Inc.*,
  2017 WL 1093286 (W.D. Pa. Mar. 22, 2017) ........................................................29

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989)..............................................................................10

*Carr v. Int'l Game Tech.*,
  2012 WL 909437 (D. Nev. Mar. 16, 2012) .............................................................35

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ...................................................................................32

*City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*,
  867 F.3d 434 (3d Cir. 2017) ...............................................................................8, 9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................................20

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004)...........................................................................29

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)...........................................................................................19, 26

*In re DVI, Inc. Sec. Litig.*,
  639 F.3d 623 (3d Cir. 2011) .................................................................10

*In re Fed. Home Loan Mortg. Corp.*,
  281 F.R.D. 174 (S.D.N.Y. 2012) ......................................................9, 10

*Griffin v. GK Intelligent Sys.*,
  196 F.R.D. 298 (S.D. Tex. 2000).........................................................34

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................14, 19

*Hull v. Global Dig. Sols., Inc.*,
  2017 WL 6493148 (D.N.J.) .............................................................16, 17

*Hundahl v. United Ben. Life Ins. Co.*,
  465 F. Supp. 1349 (N.D. Tex. 1979) ....................................................18

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ............................................................9, 20

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset
  Servicing & Securitization, LLC*,
  616 F. Supp. 2d 461 (S.D.N.Y. 2009) ..................................................31

*Johnston v. HBO Film Mgmt. Inc.*,
  265 F.3d 178 (3d Cir. 2001) ...............................................................16

*In re Kosmas Energy Ltd. Sec. Litig.*,
  299 F.R.D. 133 (N.D. Tex. 2014)..........................................................34

*In re Lucent Techs. Sec. Litig.*,
  194 F.R.D. 137 (D.N.J. 2000)...............................................................32

*In re Monster Worldwide, Inc. Sec. Litig.*,
  251 F.R.D. 132 (S.D.N.Y. 2008) ..........................................................31

*In re Mylan N.V. Sec. Litig.*,
  2018 U.S. Dist. LEXIS 52084 (S.D.N.Y. March 28, 2018) ...........................7, 37

*Neale v. Volvo Cars of N. Am., LLC*,
  794 F.3d 353 (3d Cir. 2015) ................................................................20

*In re Nice Sys. Sec. Litig.*,
  188 F.R.D. 206 (D.N.J. 1999)..................................................................31

*In re Peregrine Sys. Sec. Litig.*,
  2002 WL 32769239 (S.D. Cal. Oct. 9, 2002).....................................36

*Reinig v. RBS Citizens, N.A.*,
  912 F.3d 115 (3d Cir. 2018) ..............................................................18

*Rocco v. Nam Tai Electronics, Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) ......................................................30

*Roofer's Pension Fund v. Papa, et. al.*,
  2018 WL 3601229 (D.N.J. July 27, 2018) ..........................................8

*In re Safeguard Scientifics*,
  216 F.R.D. 577 (E.D. Pa. 2003)........................................................29

*In re Salomon Analyst Metromedia Litig.*,
  236 F.R.D. 208 (S.D.N.Y. 2006) ................................................16, 17

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ..........................................................9, 35

*Shiring v. Tier Techs., Inc.*,
  244 F.R.D. 307 (E.D. Va. 2007).......................................................36

*In re Vivendi Universal, S.A. Sec. Litig.*,
  123 F. Supp. 3d 424 (S.D.N.Y. 2016) ..............................................15

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)........................................................................1, 8

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .............................................................31

**Statutes**

Fed. R. Civ. P. 23 ....................................................................*passim*

Securities Exchange Act of 1934, § 10, 15 U.S.C. § 78j................*passim*

Securities Exchange Act of 1934, § 14, 15 U.S.C. § 78n...............*passim*

SEC Rule 10b-5, 17 CFR 240.10b-5 ........................................................................33

Defendants Perrigo Company plc ("Perrigo" or the "Company"), Joseph Papa, and Judy Brown (collectively with Perrigo, the "Defendants"), respectfully submit this memorandum of law and accompanying exhibits in opposition to Lead Plaintiffs' Motion for Class Certification.[1] Dkt. 163 and 163-1.

## INTRODUCTION

In seeking certification of three separate classes, Lead Plaintiffs ignore their burden to "affirmatively demonstrate" – for each proposed class – their compliance with Rule 23 by a preponderance of the evidence. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

*First*, Lead Plaintiffs fail to demonstrate by a preponderance of the evidence that the market for Perrigo shares on the Tel Aviv Stock Exchange (the "TASE") was efficient. Rather than attempt to independently demonstrate the efficiency of the market for Perrigo shares on the TASE, Plaintiffs' proffered expert, Dr. Zachary Nye, simply posits that the market for Perrigo shares on the TASE was efficient because the market for Perrigo shares on the New York Stock Exchange (the "NYSE") was efficient. As explained by Defendants' expert, Dr. Paul A. Gompers, Dr. Nye's "price parity" theory is deeply flawed, and Dr.

---

[1]     Lead Plaintiffs consist of the following three groups: Migdal Insurance Company Ltd., Migdal Makefet Pension and Provident Funds Ltd. (collectively, "Migdal"), Clal Insurance Company Ltd., Clal Pension and Provident Ltd., Atudot Pension Fund for Employees and Independent Workers Ltd. (collectively, "Canaf-Clal"), and Meitav DS Provident Funds and Pension Ltd ("Meitav").

Nye's review fails to show that the market for Perrigo shares on the TASE was efficient.  Because TASE was not an efficient market for Perrigo stock, no "fraud-on-the-market" presumption of reliance applies to the proposed TASE Purchaser Class, and individualized issues of reliance will predominate.

*Second*, even if Lead Plaintiffs were entitled to a "fraud-on-the-market" presumption of reliance for the proposed TASE Purchaser Class – they are not – Defendants have rebutted it by showing that each Lead Plaintiff continued to purchase Perrigo stock after the alleged "fraud" was publicly disclosed.

*Third*, the proposed Tender Offer (14(e)) Class combines all shareholders alleging violations of Section 14(e) into a single class "whether or not" they tendered in response to Mylan's tender offer, and thus improperly seeks to extend a presumption of reliance to the 40% of Perrigo shareholders that did not rely on the alleged misrepresentations in the first place.  As a result, individualized issues of reliance will also predominate the proposed Tender Offer Class.

*Fourth*, for the proposed Tender Offer Class, Lead Plaintiffs have not carried their burden of presenting a model that can determine damages on a class-wide basis consistent with their theories of liability.  The correct measure of damages for Section 14(e) claims is "the difference between the economic position of each Class Member in a hypothetical world where the alleged misrepresentations had been known (*i.e.*, the 'but-for' scenario) and their economic

position in the actual world."  But Lead Plaintiffs' proposed damages calculations do not acknowledge, much less address, the "but-for" scenarios generated by Mylan's combined cash and stock offer and its "subsequent offer period," which permitted Perrigo shareholders who did not tender the option of electing to do so after the fact if certain conditions were met.  Because Lead Plaintiffs have not provided a reliable model that calculates damages on a class-wide basis, the proposed Tender Offer Class cannot be certified.

*Fifth*, Lead Plaintiffs fail to satisfy Rule 23(a)'s adequacy and typicality requirements for any of the proposed classes because the proposed class representatives have admitted to having a unique relationship with Mylan and to abdicating control over the litigation to class counsel.

For all of the reasons herein, Lead Plaintiffs' motion should be denied.

## BACKGROUND

***Defendants.***  Defendant Perrigo is the world's largest manufacturer of over-the-counter healthcare products for the store brand market.  5/22/17 10-K at 3. Defendant Papa served as Perrigo's President and Chief Executive Officer ("CEO") until April 25, 2016; Defendant Brown served as Perrigo's Chief Financial Officer ("CFO") until February 27, 2017.

***Omega Acquisition.*** On November 6, 2014, Perrigo entered into an agreement to purchase European entity Omega Pharma Invest NV ("Omega") in a

3

transaction that closed on March 30, 2015.  11/12/14 8-K, Ex. 99.1 at 1; 3/30/15 8-K, Ex. 99.1 at 1.   Perrigo told investors about the risks associated with integrating Omega, which represented a major geographical and operational shift in its business.[2]  Perrigo also warned investors that it might not realize the benefits or synergies of the acquisition, which could have a material adverse effect on its operating results.  8/13/15 10-K at 23-24; 2/5/15 10-Q at 43,44; 4/29/15 10-Q at 45-46; 2/25/16 10-KT at 24-25.  During investor calls, Mr. Papa and Ms. Brown stressed that it might take up to four years for synergies from the Omega acquisition to emerge.  11/6/14 Conf. Call Tr. at 11-12; 2/5/15 Conf. Call Tr. at 10-11.   Over time, Omega's financial performance did not meet Perrigo's expectations, and Perrigo took impairment charges as a result.

***Mylan Tender Offer.***  On April 8, 2015 – nine days after the close of the Omega acquisition – Perrigo received an unsolicited, indicative proposal from Mylan N.V. ("Mylan") to purchase Perrigo for a combination of cash and Mylan stock.  4/9/15 8-K at Item 8.01.  Mylan valued its proposal at $205 per share of Perrigo common stock.  4/24/15 8-K, Ex. 99.1.  On April 21, 2015, Perrigo's Board of Directors (the "Board") unanimously rejected Mylan's proposal, concluding that Mylan had "significantly undervalue[d] the Company and its future growth prospects" and that the potential acquisition "was not in the best

---

[2]    Once acquired, Omega was initially known as the BCH unit of Perrigo, then, later, the CHCI unit.

interests of Perrigo's shareholders."  4/21/15 8-K, Ex. 99.1; 4/24/15 8-K, Ex. 99.1.
At no time between Mylan's announcement of its unsolicited proposal to acquire
Perrigo and the Board's rejection of this proposal did Mylan seek or obtain
necessary Mylan shareholder approval for the proposed transaction.[3]

On April 24, 2015, Mylan announced a "legally-binding commitment" to
commence an offer to acquire all issued shares of Perrigo.  Complaint ¶ 103;
4/24/15 Mylan 8-K, Ex. 99.1 at 1.  Mylan revised its offer, eventually settling on a
mixture of $75 in cash and 2.3 Mylan ordinary shares per Perrigo share provided
80% or greater of Perrigo shares were tendered.  4/29/15 8-K, Ex. 99.1 at 1.
However, in April 2015 and for several months thereafter, Mylan did not schedule
a vote of Mylan shareholders to approve any such tender offer.  In late August
2015, Mylan held a shareholder meeting and received approval for Mylan's offer
to Perrigo, which was modified to allow Mylan to proceed as long as 50% or more
Perrigo shares were tendered.  8/20/15 Mylan Form 14A at 3-4; 9/14/15 Mylan
Form 425 at 1.  Mylan formally launched its tender offer on September 14, 2015.
9/14/15 8-K, Ex. 99.2 at 1.  Immediately before the tender day (November 13,
2015), Mylan valued its combined cash and stock offer at approximately $179 per

---

[3]     The proposed transaction would be highly dilutive to Mylan's shares and
required approval by Mylan's shareholders.  *See* 5/5/15 Mylan Prelim. 14A at 5;
7/28/15 Mylan 14A at 51 (explaining that if all Perrigo ordinary shares were
acquired by Mylan pursuant to the tender offer, then former Perrigo shareholders
would own approximately 39% of Mylan ordinary shares).

Perrigo share.  11/10/15 Form 425 at 1 (filed by Mylan).  Throughout the period of Mylan's initial offer and its later formal tender offer, Perrigo's Board and management recommended that Perrigo shareholders reject Mylan's proposal, based, in part, on the belief that Mylan's shares were overpriced.[4]  On November 13, 2015, less than 50% of the holders of Perrigo's shares tendered, and the tender offer failed.  11/13/15 8-K, Ex. 99.1 at 1.

*DOJ Antitrust Investigation.*  On March 3, 2017, Bloomberg published an article that identified Perrigo as one of approximately a dozen pharmaceutical companies being investigated by the Department of Justice's Antitrust Division (the "DOJ") in connection with possible collusive pricing activities in generic prescription pharmaceuticals.  *See* Anklam Exh. 31.  On May 2, 2017, federal search warrants were executed at Perrigo facilities and other locations in connection with the DOJ investigation.  5/22/17 10-K at 44-45.  To date, no civil or criminal charges have been brought by government agencies against Perrigo or any of its employees in connection with any antitrust investigations.

---

[4]     The Complaint asserts that Mylan's initial offers in late April 2015 (which required tender of 80% or greater of Perrigo shares) gave Perrigo shareholders an opportunity to sell each Perrigo share for $227-$246, based on Mylan then-share prices of $74.50-$76.06.  Complaint ¶¶ 103, 104.  Five months later (in September 2015), when Mylan formally launched its tender offer (seeking only greater than 50% of Perrigo shares), Mylan's shares had lost approximately one-third of their value, declining to less than $50 per share.

***Securities Fraud Action Against Mylan.***   In February 2017, the Court designated Lead Plaintiffs in this action, including Meitav.   Previously, Meitav joined a group of Mylan investors that successfully sought appointment as lead plaintiff in a securities class action filed against Mylan in the United States District Court for the Southern District of New York.   Anklam Exh. 33 at 1.   Meitav and its co-plaintiffs filed an amended class action complaint against Mylan on March 20, 2017 (three months before the Amended Complaint in this action was filed).   *See In re Mylan N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 52084, *4 (S.D.N.Y. March 28, 2018); Anklam Exh. 33 at 148.   Their complaint alleges that Mylan made material misstatements to investors, including during the seven months in 2015 when Mylan was seeking to acquire Perrigo.   *In re Mylan*, 2018 U.S. Dist. LEXIS 52084 at *5; Anklam Exh. 33 at 1-3.   In the securities fraud action against Mylan, the lead plaintiff group is represented by Pomerantz LLP, the same firm appointed as co-lead counsel in this case.   2018 U.S. Dist. LEXIS 52084 at *1.

***Motion for Class Certification.***   Lead Plaintiffs alleged in the Amended Complaint that Defendants made material misstatements or omissions about "four key areas": (i) the Omega integration; (ii) the Tysabri® royalty stream; (iii) Perrigo's organic growth; and (iv) allegedly "collusive" pricing in connection with Perrigo's generic drugs division.   Complaint ¶ 1.   On July 27, 2018, this Court dismissed all claims with respect to nine of the individual defendants and

dismissed the claims relating to the Tysabri® royalty stream and Perrigo's organic growth with respect to Perrigo, Papa, and Brown. *Roofer's Pension Fund v. Perrigo Co., plc*, 2018 WL 3601229 (D.N.J. 2018).

On November 30, 2018, Lead Plaintiffs moved to certify three independent classes of shareholders, consisting of all persons who:  (i) "purchased Perrigo's publicly traded common stock [during the Class Period] on the New York Stock Exchange ('NYSE')" (the "U.S. Purchaser Class"), (ii) "purchased Perrigo's publicly traded common stock during the Class Period on the Tel Aviv Stock Exchange ('TASE')" (the "TASE Purchaser Class"), and (iii) "owned Perrigo common stock as of November 12, 2015 and held such stock through expiration of Mylan's tender offer" (the "Tender Offer Class").  ECF 163-1 at 2.

## ARGUMENT

Lead Plaintiffs must prove by a preponderance of the evidence that each of the proposed classes meet the requirements of Rule 23(a):  numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345-346 (2011).  In addition, to satisfy Rule 23(b)(3), Lead Plaintiffs must prove, for each proposed class, that common issues predominate over individual issues and that a class action is superior to other methods for adjudicating the controversy.  Fed. R. Civ. P. 23(b); *City Select Auto Sales, Inc. v. BMW Bank of N. Am., Inc.*, 867 F.3d 434, 438-39 (3d Cir. 2017)

(citations omitted).  Further, each proposed class must be "currently and readily ascertainable based on objective criteria."  *City Select Auto Sales, Inc.*, 867 F.3d at 439 (citations omitted).

Class certification is proper only if the court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008).  Rule 23's requirements "are not mere pleading rules" and a class cannot be certified "unless each requirement of Rule 23 is actually met."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 596 (3d Cir. 2009).  Accordingly, courts evaluating the propriety of class certification must "delve beyond the pleadings to determine whether the requirements for class certification are satisfied."  *Id.*

## I.   LEAD PLAINTIFFS FAIL TO ESTABLISH THAT COMMON ISSUES WILL PREDOMINATE.

### A.   Individualized Issues of Reliance Prevent Certification.

#### 1.   Lead Plaintiffs Have Failed to Demonstrate Entitlement to the "Fraud on the Market" Presumption of Reliance.

Lead Plaintiffs purport to rely on a class-wide presumption of reliance through the "fraud on the market" theory.  *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  Without the presumption, individual questions of reliance would predominate over common questions.  *In re Fed. Home Loan Mortg. Corp.*, 281 F.R.D. 174, 177 (S.D.N.Y. 2012).  For the fraud on the market theory to apply, the plaintiff must demonstrate that defendants have (1) publicly made (2) a material

misrepresentation (3) about a stock traded on an efficient market and (4) that the plaintiff purchased the shares between the time the misrepresentation was made and the time the truth was revealed.  *Id.*

> ### a.  Lead Plaintiffs Fail to Show that the TASE is an Efficient Market for Perrigo shares.

In assessing whether a market is "efficient," the Third Circuit looks to the factors described in *Cammer v. Bloom*, 711 F. Supp. 1264, 1279-87 (D.N.J. 1989). These factors are:  (1) the average weekly trading volume of the stock; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade on the stock; (4) the issuer's eligibility to file an SEC registration Form S-3; and (5) the demonstration of a cause-and-effect relationship between unexpected, material disclosures, and changes in stock prices.  *Cammer*, 711 F. Supp. at 1286-87.   "[T]he cause-and-effect relationship between a company's material disclosures and the security price is normally the most important factor in an efficiency analysis."  *See In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 634 (3d Cir. 2011) (internal quotation marks and citations omitted). Indeed, the cause and effect factor is "the foundation of the fraud on the market theory."  *In re Fed. Home Loan Mortg. Corp.*, 281 F.R.D at 178.

Lead Plaintiffs fail to demonstrate that the TASE is an efficient market with respect to trading in Perrigo shares.  *See generally* Expert Report of Paul A. Gompers ("Gompers Report") Gompers Report ¶¶ 9, 23-49.  Dr. Nye does not

attempt to independently demonstrate the efficiency of the market for Perrigo shares on the TASE.  Rather, he asserts that the market for Perrigo shares on the NYSE was efficient and this "directly evidences the informational efficiency of the Israeli market for Perrigo stock" because "price parity implies that the various trading centers for Perrigo stock in the U.S. and in Israel were equally efficient during the Class Period."  Nye Report ¶ 51.  But as Defendants' expert, Dr. Paul A. Gompers, explains, Dr. Nye's analysis of this purported "price parity" is deeply flawed.  *See* Gompers Report ¶¶ 25-27.  Dr. Nye compares the price of Perrigo shares traded on the NYSE and on the TASE during the four hours per week when both markets are open.   Nye Report ¶ 51.  But Dr. Nye fails to analyze TASE market pricing during the thirty six hours per week when TASE is open and U.S. markets are closed.  Gompers Report ¶¶ 26-27.  Even during the few hours when both markets were open at the same time, analysis of the intraday prices examined by Dr. Nye shows that "price parity" often failed to hold between markets.  Gompers Report ¶¶ 48-49.

Even if Dr. Nye's flawed "price parity" analysis were sufficient to suggest that the TASE operated efficiently with respect to Perrigo stock during its limited overlap with U.S. markets (it is not), Dr. Nye's analysis of the five *Cammer* factors does not support the contention that the TASE operated as an efficient market during the *thirty-six hours per week* when only the TASE was open.  *See generally*

11

Gompers Report ¶¶ 28-43. As discussed in detail in the Gompers' Report, Dr. Nye's analysis of the first four *Cammer* factors fails to point to key data that undermines his conclusion that the TASE somehow satisfies them. *See id.* ¶¶ 28-35. *First*, Dr. Nye's claim that Perrigo shares had a "large weekly trading volume" refers to both shares traded in U.S. markets and on the TASE. *Id.* ¶ 29. When examined separately (as appropriate when measuring whether the TASE is, by itself, an efficient market), Dr. Nye's report reveals that only approximately 5% of the combined trading volume he cites was derived from the TASE and the average weekly turnover for Perrigo shares on the TASE was only 0.40%. *Id.* This percentage is well below the 1% to 2% threshold Dr. Nye cites to encourage this Court to presume market efficiency for both markets combined. *Id. Second*, the analyst coverage of and trading of Perrigo shares cited in support of *Cammer* factor 2 occurred primarily in the United States, which provides little to no support for the contention that the TASE is an efficient market. *Id.* ¶ 31. *Third*, Dr. Nye provides no evidence to support his assertion that trading of Perrigo stock on the TASE was facilitated by market makers. *Id.* ¶ 32-33.

With respect to the "cause and effect" relationship between the TASE and alleged corrective disclosures – the most important of the *Cammer* factors – Dr. Nye ignores evidence that the prices of Perrigo shares on the TASE did not immediately respond to these types of announcements. *See id.* ¶¶ 40-43. For

example, on April 25, 2017, Perrigo posted a press release with its preliminary first quarter results for 2017 after both markets had closed. *Id.* ¶ 40-41.  Dr. Nye's event study identifies a significantly significant positive return for shares traded on both the TASE and the NYSE following that announcement.  *Id.* ¶ 40.  However, Perrigo's share price on the TASE only significantly increased in price *after* the U.S. markets had opened, illustrating that shares traded on the TASE did not independently incorporate Company-specific news. *Id.* ¶¶ 40-41.

Dr. Nye also fails to acknowledge that his event study – which he admits was focused on shares traded on U.S. markets – produces inconsistent results when applied to Perrigo shares traded on the TASE.  *See id.* ¶ 39-40 (noting that Dr. Nye's event study identifies 32 days with statistically significant abnormal returns on U.S. markets, but only 17 days with statistically significant abnormal returns on the TASE).  For example, Dr. Nye found a statistically significant Company-specific return on shares traded on the U.S. market on Tuesday, June 16, 2015, but did not find a corresponding return on Perrigo shares traded on the TASE on that day. *Id.* ¶ 39.

Examination of announcements made on the 502 U.S. trading days included in the proposed Class Period, but ignored by Dr. Nye's event study, further shows that prices of Perrigo shares on the TASE did not respond quickly to alleged corrective disclosures released outside U.S. market hours.  *See* Gompers Report

¶¶ 44-47.  For example, on December 8, 2016, Lead Plaintiffs allege a corrective disclosure announcing Perrigo's decision to restructure its BCH unit, which led to a 2.37% drop in Perrigo's share price.  *Id.* ¶ 45.  The announcement was released at 6:36 a.m. EST, which is during trading hours on the TASE (but before U.S. market open).  *Id.*  But Perrigo's share price on the TASE initially *increased* on December 8, 2016 and only began declining hours later, after the U.S. market had opened.  *Id.* By ignoring fluctuation in Perrigo's share price that occurred following "corrective disclosures" but before the U.S. market had opened, Dr. Nye ignores evidence that is inconsistent with his conclusion that the TASE is an efficient market entitled to the "fraud-on-the-market" presumption of reliance.  *Id.* ¶ 47.

### b.   Lead Plaintiffs Did Not Rely on Perrigo's Statements in Declining to Tender Their Shares.

Even if this Court finds that Lead Plaintiffs have met the initial burden of proving that both markets for the stock at issue are efficient, Defendants can rebut the presumption by "sever[ing] the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, *or his decision to trade at a fair market price*," *Basic* 485 U.S. at 248 (emphasis added) – in other words, by showing that investors "did not rely on the integrity of the market price in trading stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). Accordingly, where Defendants' evidence shows that, for example, the alleged misrepresentations at issue did *not* affect Lead Plaintiffs' decisions to reject

Mylan's tender offer, the presumption does not apply and class certification is inappropriate.[5] *See In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 431-32 (S.D.N.Y. 2016).

That is precisely the case here.  As internal investment memoranda for each plaintiff show, each Lead Plaintiff decided not to tender its shares based on its own assessments of Mylan's lowball offer, Mylan's defective corporate governance, and integration risks.  *See, e.g.*, Anklam Exh. 35 (Bar Tov) at 63:6-15 ("Canaf-Clal had a concern that Mylan's corporate governance was inadequate or problematic" and that was "one of the reasons why [Canaf-Clal] didn't … accept the tender offer"); Anklam Exh. 39 (Beer Even) at 55:2-7 ("at the time [Migdal] w[as] concerned about Mylan's negative corporate governance" and "that [was] something [that] dissuaded" Migdal from tendering).  This clear evidence that each of the Lead Plaintiffs relied on information other than the alleged misrepresentations by Perrigo[6] in rejecting Mylan's tender offer is precisely the type of rebuttal contemplated by the Supreme Court in *Basic*, leaving its presumption of reliance wholly unavailable.

---

[5]    In a tender offer situation, as in this case, the investor is faced with competing statements made by the tenderor (Mylan) and the tenderee (Perrigo). Disentangling which statements by which speaker led to each investor's decision to tender or not is yet another individualized inquiry that Lead Plaintiffs make no attempt to address.

[6]    Lead Plaintiffs make no assertion that the perception of Mylan's flawed corporate governance was false or misleading.

### 2. The *Affiliated Ute* Presumption Does Not Apply to Cases Involving a Mix of Misrepresentations and Omissions.

As an alternative to the fraud-on-the-market theory for both the U.S. Purchaser Class and the TASE Purchaser Class, Lead Plaintiffs inappropriately seek refuge under the presumption of reliance for omissions established by the Supreme Court in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). There, the Court held that positive proof of reliance is not a prerequisite to recovery where the case involves "a failure to disclose." *Id.* at 153. The *Affiliated Ute* presumption is rooted in the evidentiary complications of proving a counterfactual (*i.e.*, proving how a shareholder would have behaved had omitted material information been disclosed). *Id.* at 153-154. But that issue only arises in the narrow category of cases in which a defendant opted to "stand mute" in the face of a duty to disclose, not cases alleging omissions "that would correct or mitigate" alleged misrepresentations. *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 218-219 (S.D.N.Y. 2006). *See Johnston v. HBO Film Mgmt. Inc.*, 265 F.3d 178, 192 (3d Cir. 2001) ("no presumption arises in cases of alleged misrepresentations"); *Hull v. Global Dig. Sols., Inc.*, 2017 WL 6493148, *18 (D.N.J.) (rejecting argument that the *Affiliated Ute* presumption applies where plaintiff failed to plead omissions).

This is not a pure omissions case warranting the *Affiliated Ute* presumption of reliance. Lead Plaintiffs assert that their case is based on "misrepresentations

and omissions," but they only point to affirmative statements made in Perrigo's public filings that Lead Plaintiffs now assert were untrue when made. Lead Plaintiffs "cannot transform the alleged misrepresentations into omissions simply by alleging that Defendants failed to disclose that the allegedly misleading fact was untrue." *Hull*, 2017 WL 6493148 at *18; *see also In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. at 219 (rejecting application of *Affiliated Ute* presumption of reliance where defendants allegedly omitted "information that would correct or mitigate [misrepresentations'] misleading nature").

### B. Individualized Issues Faced by Tendering Shareholders Predominate Over Issues Faced by Non-Tendering Members of the Tender Offer (14(e)) Class.

The proposed Tender Offer Class impermissibly seeks to combine all shareholders alleging violations of Section 14(e) into a single class "whether or not" they tendered in response to Mylan's tender offer. Complaint ¶ 273; Pl. Motion at 12.[7] Even if this Court extended a presumption of reliance to the non-

---

[7] The Supreme Court recently granted certiorari to interpret Section 14(e). *Emulex Corp. v. Varjabedian*, 2019 WL 98542, *1 (U.S. Jan. 4, 2019) (No. 18-459). In *Emulex* the Supreme Court has been asked to review, among other issues: (1) whether the Ninth Circuit erred in adopting a mere negligence standard, rather than requiring scienter as the standard for liability under Section 14(e); and (2) whether Section 14(e) provides for a private right of action. *Emulex Corp. v. Varjabedian*, 2019 WL 764208, *16-19 (Feb. 19, 2019) (No. 18-459) (Petitioners' Merits Br.; Summary of Argument). Oral argument was held on April 15, 2019, with a ruling expected by the end of June. If the Supreme Court decides that there is no private right of action under Section 14(e), that holding would obliterate the Tender Offer Class Section 14(e) claims in this case.

tendering shareholders (which it should not), that presumption should not be extended to the approximately 40% of Perrigo shareholders who rejected Perrigo's recommendations and tendered their shares in response to Mylan's offer.[8]  Absent a presumption of reliance, the Section 14(e) claims of the tendering shareholders would depend upon individual proof not susceptible to "evidence that is common to the class" as demanded by predominance.  *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 127 (3d Cir. 2018).

Courts have distinguished between *relying* and *non-relying* shareholders, concluding that the latter group lacks standing to bring Section 14(e) claims.  *See Spivak v. Petro-Lewis Corp.*, 120 F.R.D. 693, 698 (D. Colo. 1987) (denying certification of class bringing Section 14(e) claims "[r]egardless of whether the plaintiffs might ultimately prevail on their claim of standing" because the issue would consume "considerable time and resources" thereby potentially "detract[ing] from the representation of the class claims"); *see also Hundahl v. United Ben. Life Ins. Co.*, 465 F. Supp. 1349, 1353-54 (N.D. Tex. 1979) ("refus[ing] to extend standing under section 14(e) to persons who clearly did Not [sic] rely on alleged misstatements").  Here, the 40% of Perrigo shareholders who tendered showed their lack of reliance on Perrigo's statements by accepting Mylan's offer.

---

[8]   None of the Lead Plaintiffs tendered their shares, so Lead Plaintiffs are unable to represent the portion of their proposed Tender Offer Class who did tender.

Permitting both tendering and non-tendering shareholders to bring actions under Section 14(e) would overextend the Exchange Act's protections. As the Supreme Court has emphasized, the securities laws are not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). "Allowing recovery in the face of affirmative evidence of nonreliance" – here, the decision to tender despite Perrigo's recommendations to the contrary – would impermissibly convert the securities laws "into a scheme of investor's insurance." *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 252 (1988) (White, J. concurring in part and dissenting in part)); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 286 (2014) (allowing "a plaintiff [to] recover whenever the defendant's misstatement distorted the stock price—regardless of whether the misstatement had actually tricked the plaintiff into buying (or selling) the stock" would render the securities laws "reduced to a scheme of investor's insurance") (internal quotation marks and citations omitted).[9] Issues concerning tendering shareholders' demonstrated absence of reliance on any alleged Perrigo misstatement will predominate over common questions, dooming the certification of a class that includes them.

---

[9]    Earlier cases that Lead Plaintiffs may cite as support for a proposition that all shareholders can bring Section 14(e) claims regardless of reliance simply do not reflect the Supreme Court's emphatic recent rulings insisting on reliance to avoid converting the Exchange Act into a scheme of investor insurance.

19

### C.   Lead Plaintiffs Have Not Established that They Can Calculate Class-Wide Damages for their Proposed Classes.

Lead Plaintiffs have failed to set forth a methodology demonstrating that damages can be determined on a class-wide basis consistent with their theory of liability.   *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (requiring plaintiffs to present such a damages model to satisfy Rule 23(b)(3)'s predominance requirement).   Plaintiffs cannot satisfy Rule 23 with an "assurance to the court that it intends or plans to meet the requirements."   *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008).   Indeed, "[e]very question of class certification will depend on the nature of the claims and evidence presented by the plaintiffs."   *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015).

Here, Lead Plaintiffs' proposed damages calculations for each of the three proposed classes are premised entirely on assumptions that are not rooted in Lead Plaintiffs' theory of liability, which fail to satisfy the requirements of Rule 23 and *Comcast*.

### 1.   Lead Plaintiffs Fail to Demonstrate That Damages for the Tender Offer (14(e)) Class Can be Determined on a Class-Wide Basis.

Lead Plaintiffs complain that the alleged misrepresentations "prevented [them] from fairly assessing Mylan's offer," and that they were "deprived of the opportunity to exchange their Perrigo shares for superior compensation in cash and stock."   Complaint ¶ 300.   For the Tender Offer Class, they seek as damages "the

20

difference between the price for which shares were tendered (or not tendered) and the 'genuine' value of those shares."  Nye Report ¶ 68.  But this methodology is not based on any widely accepted methodology and fails to satisfy *Comcast*.  *See generally* Gompers Report ¶¶ 50-73.

*First*, Dr. Nye fails to account for how Mylan's offer may have changed if Defendants had disclosed the purported truth to the market.  *See id.* ¶¶ 57-61.  As Dr. Gompers explains, from an economic perspective, the correct measure of damages for Lead Plaintiffs' Section 14(e) claims is "the difference between the economic position of each Class Member in a hypothetical world where the alleged misrepresentations had been known (*i.e.*, the 'but-for' scenario) and their economic position in the actual world."  *Id.* ¶ 51.  But Dr. Nye baselessly assumes that in the but-for world in which Defendants disclosed the purported truth, Mylan would have made the same offer of $75 cash and 2.3 Mylan ordinary shares for each Perrigo share.  *Id.*  ¶¶ 57-58.  This contradicts Lead Plaintiffs' own allegations that during the class period "the market prices for Perrigo common stock had been artificially inflated by Defendants' fraudulent course of conduct" (Complaint ¶ 288), and that Perrigo's share price "plummeted" by "astonishing" amounts when the purported truth was revealed (Complaint ¶ 233).  Because it is inconsistent with Lead Plaintiffs' theory of liability, Dr. Nye's methodology fails under *Comcast*.

21

*Second*, Dr. Nye's methodology fails to address the complexities caused by Mylan's combination cash and stock tender offer.  Dr. Nye fails to address that the value of Mylan's own shares – included as compensation for the tender offer – could vary depending on the outcome of the tender offer.[10]  *See id.* ¶¶ 62-68.  As noted by Dr. Gompers, in a but-for scenario where Mylan's tender offer was accepted by Perrigo shareholders, the price of "Mylan's shares would have likely declined . . . [which] would have reduced the overall value of the Mylan shares conveyed to Class Members . . . ."  *Id.* ¶ 64-66.  Dr. Nye's methodology fails to take this into account and instead overstates damages to proposed class members. *Id.*

*Third*, the Mylan tender offer gave Perrigo shareholders the *option* to participate if more than 50% (but less than 80%) of them tendered shares.  *See* Gompers Report ¶¶ 69-73.  Perrigo shareholders would only be forced to sell their shares if more than 80% of Perrigo shareholders tendered to Mylan.  The terms of the tender offer thus created various possible outcomes (in addition to outright rejection):  (1) Perrigo shareholders tender 50%, but less than 80%, and Perrigo remains a standalone company with Mylan as its majority owner; and (2) more

---

[10]     The potential volatility of Mylan's share price is underscored by the securities fraud litigation against Mylan, suggesting that Mylan's own share price may have been artificially inflated throughout the period of its early proposed offers and its later formal tender offer for Perrigo.  *See* Gompers Report ¶ 66, n. 133.

than 80% of Perrigo shareholders tender, giving Mylan the ability to force Perrigo shareholders to tender through a short form merger and acquire total control of Perrigo. *Id.* ¶¶ 70-71. Those different scenarios create issues in calculating damages for the proposed Tender Offer class.

Dr. Nye's analysis fails to acknowledge these complexities. Instead, he begins with the speculative and unreasonable assumption that the Mylan tender offer would have been made and accepted by over 80% of Perrigo shareholders under exactly the same terms if the alleged misrepresentations had been publicly known. Dr. Nye does not perform any analysis to support this assumption underlying his proposed methodology and fails to consider any other "but for" scenarios. For example, Dr. Nye ignores the possibility that more than 50%, but fewer than 80%, of Perrigo shares would be tendered, which Lead Plaintiffs explicitly conceded would have unpredictable effects on the value of Perrigo's and Mylan's shares.[11] *See* Anklam Exh. 37 (Rabbanyan) at 119:7-19 (recognizing that if more than 50%, but less than 80%, of shares tendered, it would be "problematic" for Mylan to achieve "synergy").

---

[11]   If Mylan's tender offer succeeded, Perrigo's former shareholders would own approximately 39% of Mylan's shares. Thus, even if just over 50% of Perrigo's shares were tendered in response to Mylan's tender offer, those Perrigo former shareholders would own approximately 18% to 20% of Mylan's shares. That would constrain all of those Perrigo shareholders from being able to immediately sell their newly acquired Mylan shares and monetize their compensation from the tender offer. Dr. Nye's proposed methodology also fails to explain how to derive the value of Mylan's shares in this scenario.

Calculating damages using Dr. Nye's proposed model is impossible without engaging in individualized inquiries to determine whether a certain number of individual members of the broadly defined Tender Offer Class *would have elected* to participate in the Mylan tender offer.[12]   Damages calculations predicated on such individualized inquiries cannot satisfy the requirement for class-wide damages calculations under Rule 23(b)(3) and *Comcast*.

>   **2.    Lead Plaintiffs Fail to Show that Damages for the U.S. Purchaser Class and the TASE Purchaser Class Can Be Determined on a Class-Wide Basis.**

Lead Plaintiffs assert that members of the U.S. Purchaser Class and the TASE Purchaser Class (both asserting claims under Section 10(b) or its Israeli law equivalent) incurred damages because they "would not have purchased . . . at the prices they paid, or at all, had they been aware that the market prices for Perrigo common stock had been artificially inflated by Defendants' fraudulent course of conduct."  Complaint ¶ 288.  Based on this theory of liability, Lead Plaintiffs assert that class-wide damages incurred by these two classes can be calculated on a class-

---

[12]    Mylan's offer also included a proviso that, if more than 50% of Perrigo shares were tendered, those Perrigo shareholders that had not tendered on November 13, 2015 would be able to tender during the fourteen days that followed at the same price offered.  This creates further issues in calculating damages as it leaves open questions about the value of the Mylan shares that Perrigo shareholders would have received in a successful tender offer "but for" scenario and which, if any, of the non-tendering Perrigo shareholders would have tendered during that fourteen day subsequent offer period in the "but for" scenario where more than 50% but less than 80% of Perrigo shares were tendered.

wide basis by measuring the "price inflation" in the security caused by the alleged misrepresentations and omissions.  Nye Report ¶¶ 62-63.  Lead Plaintiffs assert that price inflation may be measured by "analyzing the change in a security's price caused by a corrective disclosure," but did not perform that analysis here.  *Id.* ¶ 63.

Lead Plaintiffs have not articulated any specific approach for managing damages arising from Section 10(b) for the U.S. Purchaser Class and TASE Purchaser Class.  *See* Gompers Report ¶¶ 78-81.  Instead, Dr. Nye claims that "price inflation" can be measured on a class-wide basis using an event study or other "tools" available to economists.  Nye Report ¶ 63.  Dr. Nye's vague reference to his event study and other potential "tools" that could be used in measuring damages fails to offer necessary specifics on how those "tools" can be used to accurately measure damages *here*.  Gompers Report ¶ 78.  Indeed, Dr. Nye admitted that he has not engaged in a "rigorous or thorough analysis of . . . price inflation" and has not conducted any analysis to determine whether his proposed approach could be used to measure damages in this specific case.  *Id.* ¶ 79-80; *see also* Anklam Exh. 44 (Nye) at 126:19-21.  Dr. Nye has also failed to engage in any specific analysis of whether his method could be used to measure unique damages suffered by the TASE Purchaser Class, operating solely on the assumption that the calculations for the U.S. Purchaser Class and TASE Purchaser Class will be identical despite the significant differences between the markets at issue.  *Id.* ¶ 81.

Lead Plaintiffs ignore their obligation to make clear how the classes will disaggregate the economic loss caused by a corrective disclosure from economic loss caused by other confounding factors, which include allegations that this Court has deemed inactionable. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-343 (2005) ("that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); Gompers Report ¶¶ 87-90. Dr. Nye acknowledges that "[a]n event study *can be used* to isolate Company-specific price movement caused by the revelation of true facts related to the alleged fraud from price movement caused by other factors." Nye Report ¶ 63 (emphasis added). Yet, he fails to explain how a proposed event study would do so in this case. Gompers Report ¶¶ 87-90. Such a generic assertion that an event study could, in theory, be used to calculate damages in a securities class action does not satisfy *Comcast* and cannot be accepted here. *See In re BP p.l.c. Securities Litig.*, 2013 WL 6388408, *17 (S.D. Tex. Dec. 6, 2013) ("[w]ithout a more complete explication of how [p]laintiffs propose to use an event study to calculate class members' damages, and how that event study will incorporate – and, if necessary, respond to – the various theories of liability, the Court cannot certify this litigation for class action treatment").

Dr. Nye's opinion regarding a class-wide damages model contains several other flaws, all of which evidence Lead Plaintiffs' failure to satisfy Rule 23. *First*, Dr. Nye's proposed damages model suffers from inconsistencies with Lead Plaintiffs' theory of liability by failing to address how his model would account for portions of the Amended Complaint that have been (or are later) dismissed. *See* Gompers Report ¶ 91. This Court dismissed claims related to alleged quarterly misrepresentations regarding Perrigo's organic growth. Dr. Nye's event study makes no effort to describe how share price inflation or deflation that occurred on dates when Perrigo spoke about organic growth and also made allegedly false disclosures on other topics can be disaggregated. *Id.* Moreover, the alleged corrective disclosures on April 25, 2016 and August 10, 2016 released information related to both the Omega integration and the generic Rx business. *Id.* If the Court ultimately determines that there is no liability associated with one of the remaining theories, Dr. Nye's proposed methodology will not be able to measure inflation attributable only to the remaining alleged misrepresentations.

*Second*, Dr. Nye's proposed event study is predicated on the assumption that the information released on the alleged corrective disclosure dates was known and could have been disclosed earlier in the Class Period (as early as April 2015). *See id.* ¶¶ 82-83. That assumption is undermined by the information released. For instance, the alleged corrective disclosures on March 3, 2017 and May 2, 2017

concerned the federal government's investigation of alleged collusive pricing with respect to generic prescription pharmaceuticals. *See* Complaint ¶¶ 242-243. There is no information to suggest that, in April 2015, that investigation had even commenced or that Perrigo was involved in any investigation at that time. An event study that assumes that these events could have been disclosed in April 2015 (the beginning of the Class Period) is not reliable unless it can be shown that such information existed and could have been disclosed at that point. The same is true about information regarding Omega's below expectations financial performance in late 2015 and 2016, which could not have been disclosed in April 2015 because the outcome of Omega's business activities in late 2015 and 2016 could not be known in April 2015. *See* Gompers Report ¶ 82-83.

*Third*, Dr. Nye's proposed event study, for the purpose of arriving at damages for those classes asserting Section 10(b) claims, also fails to explain how it will account for changes in the price inflation of Perrigo shares while Mylan's tender offer was pending. Gompers Report ¶¶ 84-86. During that time, Perrigo's stock price would have reflected a probability-weighted average of the value of the expected tender offer consideration *and* Perrigo's standalone value. *Id.* Accordingly, Perrigo's share price was likely influenced by the probability of the tender offer and, because it was a cash/stock offer, on Mylan's share price. *Id.* It is unreasonable for Dr. Nye to assume that price inflation measured on corrective

disclosures alone could accurately estimate price inflation for purposes of Lead Plaintiffs' Section 10(b) claims during the seven-month pendency of Mylan's efforts to acquire Perrigo.[13]

## II.   LEAD PLAINTIFFS FAIL TO MEET THE REQUIREMENTS OF RULE 23(a).

### A.   Lead Plaintiffs Are Inadequate.

To meet the adequacy requirement of Rule 23(a)(4), Lead Plaintiffs must prove that they will "fairly and adequately protect the interests of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 296 (3d. Cir 2006). Conducting this inquiry seeks to "uncover conflicts of interest between named parties and the class they seek to represent" and "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Id.*

#### 1.   Each Lead Plaintiff Increased Its Holdings in Perrigo Common Stock after Learning of the Alleged Fraud.

Courts have held that lead plaintiffs who have increased their holdings in the subject security *after* disclosure of the alleged fraud fail to meet Rule 23(a)(4)'s adequacy requirement. *In re Safeguard Scientifics*, 216 F.R.D. 577 (E.D. Pa.

---

[13]   Despite Dr. Nye's failure to demonstrate that Lead Plaintiffs are entitled to a presumption of reliance or have met their Rule 23 obligation to present a class-wide damages calculation, any rebuttal report Lead Plaintiffs may submit cannot offer new opinions or information to correct these oversights. *See Byrd v. Aaron's Inc.*, 2017 WL 1093286, *4 (W.D. Pa. Mar. 22, 2017) ("[r]ebuttal cannot be used to correct a party's oversights in its case-in-chief") (quoting *Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004)).

2003) (lead plaintiff was deemed inadequate where he had purchased additional shares after the alleged fraud was disclosed); *Rocco v. Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 134-136 (S.D.N.Y. 2007) ("a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative").

Each Lead Plaintiff admitted that it purchased Perrigo stock long after "the truth [of Perrigo's alleged fraud] was revealed."  Each Lead Plaintiff purchased Perrigo stock after (i) the May 2016 initial complaint was filed and the original plaintiff issued a press release announcing the securities fraud action; (ii) filing papers with this Court in July-August 2016 seeking appointment as lead plaintiff;[14] (iii) obtaining appointment as lead plaintiff in February 2017; and (iv) Bloomberg reporting that Perrigo "was in the sights of antitrust regulators" at the DOJ investigating generic drug price-fixing in early March 2017.[15]  This history of Lead Plaintiffs' continued investment in Perrigo well after the securities fraud

---

[14]   *See, e.g.*, Anklam Exh. 40 at 1 (Canaf-Clal purchases of Perrigo stock on November 1, 2016, December 19, 2016, December 20, 2016, and December 21, 2016); 55 (Migdal purchases of Perrigo stock on June 13, 2016, June 15, 2016, and January 26, 2017); *see also* Anklam Exh. 41 at 5 (Meitav purchases of Perrigo stock on June 22, 2016, June 26, 2016, June 28, 2016, July 6, 2016, and July 24, 2016).

[15]   *See* Anklam Exh. 40 at 5 (Canaf-Clal made multiple purchases of Perrigo stock on March 22, 2017); 56 (Migdal made multiple purchases of Perrigo stock on April 25, 2017); *see also* Anklam Exh. 41 at 6-8 (Meitav made multiple purchases of Perrigo stock on March 14, 2017).

allegations had become public in this case undermines their efforts to be Lead Plaintiffs.

**2.     Discovery in This Proceeding Strongly Suggests that Lead Plaintiffs are Simply Mouthpieces for "Lawyer Driven" Litigation Impermissible Under Rule 23(a) and the PSLRA.**

The adequacy requirement of Rule 23(a)(4) is not met where a plaintiff has simply lent its name to a class action controlled by its lawyers. *See, e.g.*, *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 134 (S.D.N.Y. 2008); *In re Nice Sys. Sec. Litig.*, 188 F.R.D. 206, 219 (D.N.J. 1999) (adequacy is "contingent upon . . . a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action"). Careful scrutiny for adequacy is especially appropriate in "complex class action securities cases governed by the PSLRA" in light of "Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001). Indeed, the PSLRA was "intended to curtail the vice of 'lawyer-driven' litigation." *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009); *see also Winer Family Tr. v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) ("The twin goals of the PSLRA are to curb frivolous, lawyer-driven litigation, while preserving the investors' ability to recover on meritorious claims.") (internal citations omitted).

The Third Circuit has explicitly cautioned that the adequacy requirement may prove insurmountable where counsel cobbles together a group of investors for the purpose of obtaining lead plaintiff status.

> If, for example, a court were to determine that the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner.

*In re Cendant Corp. Litig.*, 264 F.3d 201, 267 (3d Cir. 2001).

Testimony from each of Lead Plaintiffs reveal that the instant lawsuit fits the pattern of "lawyer-driven litigation" that cannot withstand Rule 23(a)(4) scrutiny. *First*, none of the representatives presented evidence to suggest that other counsel was considered before filing suit.  *See In re Lucent Techs. Sec. Litig.*, 194 F.R.D. 137, 156 (D.N.J. 2000) (finding it "troubling" that there was "no indication of whether other counsel were interviewed or even considered"); Anklam Exh. 34 (Drucker) at 56:11-14.  Further, none of Lead Plaintiffs had any prior relationship with the Lowenstein Sandler firm, nor did they play any role in selecting local counsel.  Anklam Exh. 36 (Cohen-David) at 54:2-13; Anklam Exh. 38 (Maderer) at 35:19-21.

*Second*, testimony from each of the Lead Plaintiffs reveals how little they have participated in the instant litigation.  Lead Plaintiffs admitted that they had no knowledge about the unidentified fact witnesses cited in the Amended Complaint

to support their allegations and played no role in selecting any of the experts relied upon thus far. *See* Anklam Exh. 36 (Cohen-David) at 51:3-11; Anklam Exh. 38 (Maderer) at 70:13-17, 71:14-21; Anklam Exh. 34 (Drucker) at 60:23–61:9. Meitav did not even know how their expert had been identified. Anklam Exh. 36 (Cohen-David) at 82:4-6. Representatives had no knowledge that lead counsel had subpoenaed at least nine non-parties in this action thus far and showed minimal awareness of discovery disputes that have been ongoing for the past four months. Anklam Exh. 34 (Drucker) at 82:19–83:7; Anklam Exh. 36 (Cohen-David) at 80:10-14; Anklam Exh. 38 (Maderer) at 86:13-18. Indeed, Canaf-Clal struggled to demonstrate more than a general "aware[ness] there are disputes" and even then admitted that it was "not sure that [it was] fully familiar." Anklam Exh. 34 (Drucker) at 83:11-14.

Moreover, testimony revealed that lead counsel has exercised unfettered discretion over the cost of this litigation and has rarely, if ever, provided invoices detailing the time spent or the expenses incurred to the Lead Plaintiffs who purportedly control this lawsuit. Anklam Exh. 36 (Cohen-David) at 59:6-14. When asked, Lead Plaintiffs could not answer how much the lawsuit had cost to date. Anklam Exh. 36 (Cohen-David) at 59:3-5. Lead Plaintiffs also had no awareness of whether its counsel planned to (or had already) engaged contract attorneys to assist in document review, let alone the rates at which such contract

33

attorneys would be engaged.  Anklam Exh. 34 (Drucker) at 68:4-20.  Courts have recently highlighted the serious issues that lead plaintiffs' lack of awareness of such expenses can cause.  *In re Weatherford Intern. Sec. Litig.*, 2015 WL 127847, *1 (S.D.N.Y. Jan. 5, 2015) (criticizing plaintiff's counsel seeking to charge the class hourly rates for staff attorneys that significantly exceed the direct cost to the law firm).  Lead Plaintiffs' admitted ignorance of these problematic practices and the need to protect the class from excessive legal expense further underscores their inadequacy to serve as class representatives here.

Lead Plaintiffs' passive participation in this litigation hardly comports with either the PSLRA's demand that "class representatives [be] informed, able individuals who are themselves—and not the lawyers—actually directing the litigation" or with the adequacy requirements of Rule 23(a)(4).  *In re Kosmas Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 141 (N.D. Tex. 2014); *see also Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000) (finding that plaintiff failed to meet requirements of Rule 23(a)(4) where proposed class representatives took "little or no supervisory role over lead counsel," did not "participate in litigation decisions," and did not "receive regular cost/expense information").

### B.    Lead Plaintiffs' Claims Are Not Typical of the Proposed Classes.

Rule 23(a)(3) demands that "the claims or defenses of the representative parties" be "typical of the claims or defenses of the class."  In evaluating typicality

under Rule 23(a)(3), courts must evaluate three distinct, though related, concerns: (1) whether the claims of the class representative are the same as those of the class with respect to (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) whether the class representative is subject to a defense that is inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) whether the interests and incentives of the representatives are sufficiently aligned with the class. *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009).

A proposed class representative subject to a unique defense is atypical because such representatives "might devote time and effort to the [unique] defense at the expense of issues that are common and controlling for the class." *Id.* A court need not adjudicate the unique defense to reject a proposed class representative based on failure to satisfy Rule 23(a)(3); rather, "[t]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality." *Id.* (internal citations omitted).

### 1. Lead Plaintiffs Admitted to Having a Unique Relationship with Mylan.

Each of Lead Plaintiffs is atypical of the remaining proposed class members because each potentially relied on information other than the misrepresentations alleged in the Amended Complaint in deciding to not tender in response to Mylan's offer. *See Carr v. Int'l Game Tech.*, 2012 WL 909437, *5 (D. Nev. Mar. 16, 2012)

(finding a plaintiff's claims "are not typical" where the plaintiff "testified that they did not rely on the alleged misrepresentations referred to in the amended complaint . . . in making the decision to invest"); *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 313 (E.D. Va. 2007) ("a plaintiff cannot prevail under §10(b) of the Securities Exchange Act and Rule 10b-5 without proof that the plaintiff justifiably relied on defendants' false statements") (internal citations omitted).  Importantly, whether plaintiffs actually relied on this information "is of no matter" as "[t]he fact that plaintiffs will be subject to such defenses renders their claims atypical of other class members" in violation of Rule 23(a)(3).  *In re Peregrine Sys. Sec. Litig.*, 2002 WL 32769239, at *7 (S.D. Cal. Oct. 9, 2002).

Each of Lead Plaintiffs admitted to attending meetings with high-level Mylan executives while the tender offer was pending.  Each of the Lead Plaintiffs testified to closed-door meetings with Mylan's CEO, Robert Coury.  Anklam Exh. 35 (Bar Tov) at 112:13-23 (describing Coury's "one-on-one with Canaf-Clal" in September or October 2015); Anklam Exh. 37 (Rabbanyan) at 73:3-11 (same); Anklam Exh. 39 (Beer Even) at 53:4-17 (same).  Similar closed-door meetings occurred between Lead Plaintiffs and Mylan's CFO.  Anklam Exh. 37 (Rabbanyan) at 76:17–77:11 (describing meeting between Meitav and Mylan's CFO at Meitav's offices); Anklam Exh. 39 (Beer Even) at 53:4-17 (same).  In addition, one of the Lead Plaintiffs attended *yet another* closed-door meeting with

Mylan's CFO designed for him to "make his company's case for buying Perrigo." Anklam Exh. 42 at 2. These private meetings between Lead Plaintiffs and Mylan executives raise serious questions about whether Lead Plaintiffs relied on information unavailable to other members of the proposed classes when Lead Plaintiffs evaluated whether to accept Mylan's tender offer to acquire Perrigo.

Moreover, as discussed above, one of Lead Plaintiffs (Meitav) is a lead plaintiff in a securities fraud action brought against Mylan, which alleges that Mylan made misrepresentations to its shareholders during the seven-month period in which Mylan attempted to acquire Perrigo using Mylan's shares as part of its consideration. Thus, Meitav is now asserting inconsistent and irreconcilable positions: that Perrigo's shareholders would have been better off accepting Mylan's shares as part of its tender offer for Perrigo in 2015 and that the price of Mylan's shares during 2015 was inflated due to Mylan's own fraud. *In re Mylan N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 52084 at *5; Anklam Exh. 33 at 7-9. This problem is exacerbated by the fact that counsel for Lead Plaintiffs here (Pomerantz LLP) is also representing Meitav in its attacks against Mylan in that securities fraud action. *In re Mylan N.V. Sec. Litig.*, 2018 U.S. Dist. LEXIS 52084 at *1.

Lead Plaintiffs' potential reliance on non-public information learned during these private meetings with Mylan, along with Meitav's prominent role in an conflicting, ongoing securities fraud litigation against Mylan, subjects them to

unique defenses that will become a major focus of litigation.  Lead Plaintiffs are thus atypical of the class in violation of Rule 23(a)(3) and certification must fail.

## III.   LEAD PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT THE PROPOSED COMMENCEMENT DATE FOR THE CLASS PERIOD IS APPROPRIATE.

Lead Plaintiffs proposed class period runs from April 21, 2015 (the date Perrigo's Board rejected Mylan's unsolicited offer) through May 3, 2017 (the date Perrigo announced that its offices had been raided by the Department of Justice), inclusive of both stated dates.  Complaint ¶ 273.  Lead Plaintiffs' proposal ignores, however, that regardless of how Mylan's management may have characterized the nature of their several proposals to acquire Perrigo in April 2015, Mylan could not proceed with any offer that depended upon any significant number of Mylan shares being provided as part of the compensation without approval from Mylan's shareholders.  *See, e.g.*, 5/5/15 Mylan Preliminary 14A at 5 ("the affirmative vote of a majority of the valid votes cast at the extraordinary general meeting and a quorum of at least one third of the issued shares is required for the approval of" the tender offer); 8/28/15 Mylan Form 425 (announcing shareholders had approved Mylan's proposed acquisition of Perrigo Company plc).  Any purported class period should therefore not commence until September 14, 2015, a date after Mylan had received approval from its own shareholders and when Mylan formally launched its tender offer to acquire Perrigo.

## IV.   CONCLUSION

In this case, these Lead Plaintiffs have failed to meet the test for certification of each of the separate classes they ask this Court to certify.  In addition, they fail to demonstrate that they meet the adequacy and typicality requirements of Rule 23(a).  Accordingly, this Court should deny certification.

Dated:  April 17, 2019                    Respectfully submitted,


By:  */s/ Alan S. Naar*
          Alan S. Naar

GREENBAUM, ROWE, SMITH
 & DAVIS LLP
Alan S. Naar
99 Wood Avenue South
Iselin, New Jersey 08830
(732) 476-2530
anaar@greenbaumlaw.com

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
James D. Wareham (*pro hac vice*)
James E. Anklam (*pro hac vice*)
801 17th Street, NW
Washington, DC 20006
(202) 639-7000
james.wareham@friedfrank.com
james.anklam@friedfrank.com

Samuel P. Groner (*pro hac vice*)
One New York Plaza
New York, New York 10004
(212) 859-8000
samuel.groner@friedfrank.com

*Attorneys for Defendant*
  *Perrigo Company plc*


Dated:  April 17, 2019                    By: */s/ Marshall R. King*
                                               Marshall R. King

GIBSON, DUNN & CRUTCHER LLP
Reed Brodsky (*pro hac vice*)
Aric H. Wu (*pro hac vice*)

Marshall R. King
200 Park Ave
New York, New York 10166
(12) 351-4000
rbrodsky@gibsondunn.com
awu@gibsondunn.com
gjois@gibsondunn.com

*Attorneys for Defendant Joseph Papa*

Dated:  April 17, 2019          By:  */s/ Brian T. Frawley*
                                    Brian T. Frawley

SULLIVAN & CROMWELL LLP
John L. Hardiman (*pro hac vice*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice*)
125 Broad Street
New York, New York 10004
(202) 558-4000
hardimanj@sullcrom.com
frawleyb@sullcrom.com
devlinm@sullcrom.com

*Attorneys for Defendants Judy Brown*