John L. Hardiman (*pro hac vice*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Defendant Judy Brown*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROOFERS' PENSION FUND, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 2:16-cv-02805-MCA-LDW |
| | ) | ECF Case |
| Plaintiffs, | ) | Document Electronically Filed |
| | ) | |
| v. | ) | |
| | ) | |
| PERRIGO COMPANY PLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## JUDY BROWN'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** ........................................................................................................3

**ARGUMENT** ...........................................................................................................22

I.      **PLAINTIFFS' CLAIMS AGAINST MS. BROWN BASED ON HER STATEMENT ABOUT OMEGA MUST BE DISMISSED**.........................24

      A.    Plaintiffs Have No Evidence That Ms. Brown's June 23, 2015 Statement Was False ...................................................................24

      B.    Plaintiffs Have No Evidence That Ms. Brown Acted with Scienter.....................25

II.     **PLAINTIFFS' CLAIMS AGAINST MS. BROWN BASED ON HER STATEMENTS ABOUT GENERIC DRUG PRICES MUST BE DISMISSED**.........................................................................................32

      A.    Plaintiffs Have No Evidence That Ms. Brown Acted with Scienter When She Spoke about Generic Drug Prices .................................................32

      B.    At Least Five of Ms. Brown's Alleged Misstatements About Generic Drug Prices Are Inactionable ...........................................................38

III.    **THE CONTROL PERSON CLAIM AGAINST MS. BROWN MUST BE DISMISSED**........................................................................................39

**CONCLUSION** .......................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aetna Inc.,*
2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ...............................................................27

*In re Anadigics, Inc., Securities Litigation,*
2011 WL 4594845 (D.N.J. Sept. 30, 2011) ...........................................................32

*Bell* v. *City of Philadelphia,*
275 F. App'x 157 (3d Cir. 2008) ..........................................................................31

*In re Bio-Technology General Corp. Securities Litigation,*
380 F. Supp. 2d 574 (D.N.J. 2005) .......................................................................29

*Belmont* v. *MB Investment Partners, Inc.,*
708 F.3d 470 (3d Cir. 2013) ...........................................................................23, 40

*In re Bristol-Myers Squibb Securities Litigation,*
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ......................................................26, 27

*In re Celgene Corp. Securities Litigation,*
2019 WL 6909463 (D.N.J. Dec. 19, 2019)............................................................37

*City of Edinburgh Council* v. *Pfizer, Inc.,*
754 F.3d 159 (3d Cir. 2014)............................................................................23, 40

*DeRobbio* v. *Harvest Communities of Sioux City, Inc.,*
2002 WL 31947203 (D.N.J. Oct. 30, 2002)...........................................................30

*In re Digital Island Securities Litigation,*
357 F.3d 322 (3d Cir. 2004)..................................................................................22

*Fan* v. *StoneMore Partners LP,*
927 F.3d 710 (3d Cir. 2019)............................................................................23, 24

*Fleming* v. *Impax Labs. Inc.,*
2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ............................................. 33-34, 37

*Fosbre* v. *Las Vegas Sands Corp.,*
2017 WL 55878 (D. Nev. Jan. 3, 2017)................................................................29

*Glover* v. *DeLuca,*
2006 WL 2850448 (W.D. Pa. Sept. 29, 2006)......................................................29

*Hall* v. *Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...........................................................................36

*In re Ikon Office Solutions, Inc.*,
    277 F.3d 658 (3d Cir. 2002) ................................................................ *passim*

*In re Ikon Office Solutions, Inc. Securities Litigation*,
    131 F. Supp. 2d 680 (E.D. Pa. 2001) ...............................................................23

*In re Interpool, Inc. Securities Litigation*,
    2005 WL 2000237 (D.N.J. Aug. 17, 2005) ........................................................26

*Janus Capital Group, Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011) ..........................................................................................1

*In re Level 3 Communications, Inc. Securities Litigation*,
    2010 WL 5129524 (D. Colo. Dec. 10, 2010) ....................................................28

*In re Level 3 Communications, Inc. Securities Litigation*,
    667 F.3d 1331 (10th Cir. 2012) .......................................................................29

*Lovallo* v. *Pacira Pharmaceuticals, Inc.*,
    2015 WL 7300492 (D.N.J. Nov. 18, 2015) ..................................................38, 39

*In re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*,
    2012 WL 3779309 (D.N.J. Aug. 29, 2012) ......................................................40

*In re Merck & Co., Inc. Securities, Derivative & "ERISA" Litigation*,
    2015 WL 2250472 (D.N.J. May 13, 2015) ...........................................24, 30, 32

*In re NAHC, Inc. Securities Litigation*,
    306 F.3d 1314 (3d Cir. 2002) ..........................................................................25

*OFI Risk Arbitrages* v. *Cooper Tire & Rubber Co.*,
    2015 WL 4036179 (D. Del. July 1, 2015) .........................................................30

*P. Schoenfeld Asset Management L.L.C.* v. *Cendant Corp.*,
    47 F. Supp. 2d 546 (D.N.J. 1999) ....................................................................23

*Roofers' Pension Fund* v. *Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018) .................................................. *passim*

*Shogen* v. *Global Aggressive Growth Fund, Ltd.*,
    2007 WL 1237829 (D.N.J. Apr. 26, 2007) ............................................2, 23, 26

*Tse* v. *Ventana Medical Systems, Inc.*,
    123 F. Supp. 2d 213 (D. Del. 2000) ...........................................................24, 29

*Utesch* v. *Lannett Co.*,
    316 F. Supp. 3d 895 (E.D. Pa. 2018) ............................................................35, 36, 37

*Utesch* v. *Lannett Co.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ....................................................................35

*In re ValueVision International Inc. Securities Litigation*,
    896 F. Supp. 434 (E.D. Pa. 1995) .........................................................................23

*The Winer Family Trust* v. *Queen*,
    2004 WL 2203709 (E.D. Pa. Sept. 27, 2004) ......................................................28

*The Winer Family Trust* v. *Queen*,
    503 F.3d 319 (3d Cir. 2007)...........................................................................28, 30

**Statutes and Rules**

Fed. R. Civ. P. 56..........................................................................................................24

Section 10(b) of the Securities Exchange Act of 1934 ....................................... *passim*

Section 14(e) of the Securities Exchange Act of 1934 ........................................3, 4, 23

Section 20(a) of the Securities Exchange Act of 1934 ................................3, 23, 39, 40

## PRELIMINARY STATEMENT

More than two years ago, this Court dismissed several of Plaintiffs' claims against Defendant Judy Brown, the former chief financial officer ("CFO") of Perrigo Co. ("Perrigo"). The Court allowed Plaintiffs to proceed to discovery on two narrow theories. Since that decision, Perrigo has produced over 395,000 documents, including approximately 6,500 of Ms. Brown's emails, and Plaintiffs have deposed 28 witnesses, including Ms. Brown for two days. After all of that discovery, Plaintiffs unearthed no evidence that Ms. Brown knowingly or recklessly made any misstatement to Perrigo's investors. Plaintiffs thus have not developed a genuine issue of material fact that would justify taking their claims against Ms. Brown to trial. Those claims instead should be dismissed.

Plaintiffs' surviving claims against Ms. Brown are based on two theories: (i) Plaintiffs' allegation that on June 23, 2015, Ms. Brown misrepresented the present success of Perrigo's integration of Omega Pharma N.V. ("Omega"), a European pharmaceutical company it acquired less than three months earlier, and (ii) Plaintiffs' allegation that Ms. Brown made several statements about pricing of products sold by Perrigo's generic drugs division ("Generic Rx") without disclosing the existence of a price-fixing conspiracy that allegedly affected those prices. Plaintiffs' claims based on both of these theories should be dismissed for all of the reasons discussed in the separate brief submitted today by Perrigo. Because Ms. Brown can only be liable for her own statements, *see Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U.S. 135, 141 (2011), she writes separately to show that (i) Plaintiffs cannot prove any of her statements were false or that she acted with scienter, and (ii) at least five of her statements are inactionable because Plaintiffs' own theory assumes that the market already knew the truth supposedly concealed by those statements.

***Omega.***  Plaintiffs have no evidence that Ms. Brown misled investors on June 23, 2015 when she said that Perrigo was "in line" with its "integration process," and they certainly have no evidence that she acted with scienter.  To prevail against Ms. Brown, Plaintiffs "must show that [Ms. Brown] knew [her] representations were false, or that they were made recklessly."  *Shogen* v. *Global Aggressive Growth Fund, Ltd.*, 2007 WL 1237829, at *11 (D.N.J. Apr. 26, 2007).  Neither is true here.  When Ms. Brown spoke, she had a reasonable basis to believe that Perrigo's integration of Omega was moving forward as the evidentiary record indisputably shows that in May and June 2015 ███████████████████████████ ████████████████████████████████, and integration updates she received from that time period showed that key projects were moving forward.  By contrast, there is no evidence Ms. Brown reviewed any information suggesting that the integration process was failing as of June 23, 2015.

***Generic Rx Pricing.***  Plaintiffs' second theory fails for multiple reasons.  *First*, Plaintiffs cannot prove scienter with respect to Ms. Brown's statements about drug pricing.  As Perrigo explains in its brief, Plaintiffs have no evidence that Perrigo colluded with its competitors to fix prices for its generic drugs.  But even if there were such evidence, Plaintiffs have absolutely no evidence that Ms. Brown knew about—or recklessly disregarded—any price fixing. ████████████████████████████████████████████ ████████████████████████████████████████████ (SUF ¶ 230 (Brown).)[1]  Because she was not on this committee, Ms. Brown did not know the reasons for any pricing changes for a specific drug, and she would have no way to know whether Perrigo

---

[1]     Citations to "Ex. __" refer to the Declaration of Jason S. Kanterman dated April 9, 2021. Citations to "SUF ¶ __" refer to Defendants' Joint Statement of Undisputed and Material Facts Pursuant to Local Civil Rule 56.1.

had fixed prices with its competitors.  Moreover, Plaintiffs claim that the collusion occurred at industry conferences, but acknowledge that Ms. Brown did not attend the vast majority of these conferences.  Plaintiffs' attempt to pull Ms. Brown into their price-fixing claims simply has no evidentiary basis.

*Second*, even if there were some ground to make any price-fixing claim against Ms. Brown, five of the eight alleged misstatements attributed to her are inactionable for the simple reason that they were made after the date Plaintiffs claim the market learned the purported truth about Perrigo's generic drug pricing.  Specifically, Plaintiffs' expert, Dr. Zachary Nye, opines that Perrigo announced financial results on April 25, 2016 that "revealed the Company's reliance on unsustainable supracompetitive pricing in the Generic Rx division." (Ex. 134 (Nye Report) ¶ 74.)  Thus, according to Plaintiffs' own theory, after April 25, 2016, Ms. Brown could not have concealed Perrigo's supposed reliance on supracompetitive pricing because the market already knew about it.

## BACKGROUND

### A.   Plaintiffs' Claims

In June 2017, Plaintiffs filed their Amended Complaint asserting claims under Sections 10(b), 14(e), and 20(a) of the Securities Exchange Act and Israeli law.  (ECF No. 89 ("Compl.") ¶¶ 282-308.)   Plaintiffs based these claims on four categories of alleged misstatements by Defendants:  (i) statements about Perrigo's integration of Omega, the European pharmaceutical company it acquired in 2015; (ii) statements about Perrigo's accounting for the royalty stream from a drug called Tysabri®; (iii) statements about Perrigo's organic growth rates; and (iv) statements about Perrigo's Generic Rx division that supposedly concealed the existence of a price-fixing conspiracy.  (Compl. ¶ 1.)  Plaintiffs' Section 10(b) claims are based on the theory that these alleged misstatements caused artificial inflation in the price of Perrigo's

stock, which eventually declined after the market allegedly learned the purported truth. Plaintiffs' Section 14(e) claims are based on the theory that these same alleged misstatements caused Perrigo's shareholders not to accept a tender offer made by Mylan N.V. ("Mylan").

Defendants moved to dismiss the Complaint in its entirety.  On July 27, 2018, the Court substantially narrowed this case by holding that Plaintiffs failed to adequately plead scienter with respect to statements about Tysabri and organic growth, thereby eliminating two of Plaintiffs' four categories of alleged misstatements.  *Roofers' Pension Fund* v. *Papa*, 2018 WL 3601229, at *20, *22 (D.N.J. July 27, 2018).

The Court ultimately sustained Plaintiffs' claims with respect to Omega and generic drug pricing.  But even with respect to these surviving claims, the Court clarified and narrowed Plaintiffs' theories in important ways.

***Omega.***  The Court made clear that Plaintiffs have not asserted any claims based on Omega's financial performance.  The Complaint accused Defendants of "omitt[ing] that several key Omega markets were already underperforming."  (Compl. ¶¶ 134, 140, 142, 148.) But as Defendants explained in their motion to dismiss, Plaintiffs failed to allege any statements about Omega's performance that could have been rendered misleading by those purported omissions.  (Mem. of Law in Support of Mot. to Dismiss Am. Compl., ECF No. 114-16, at 42.) The Court agreed with Defendants, holding that Plaintiffs "***fail[ed] to allege any specific misrepresentations in connection with underperformance***."  *Roofers'*, 2018 WL 3601229, at *23 n.23 (emphasis added).

The Court also dismissed Plaintiffs' claims based on "purely forward-looking statements" about Omega, finding Perrigo's risk disclosures sufficient under the Private

Securities Litigation Reform Act ("PSLRA") to "insulate Defendants' projections regarding synergies and potential revenue from liability." *Id.* at \*15.

The Court ultimately sustained only one narrow category of Plaintiffs' Omega-related claims:  Those based on "statements regarding the ***present success*** of integration." *Id.* (emphasis added).  The Court sustained these claims because "the PSLRA does not protect statements of ***present*** facts," unlike forward-looking statements. *Id.* (emphasis added).  Plaintiffs attribute to Ms. Brown only one surviving alleged misstatement about Omega.  According to Plaintiffs, on June 23, 2015, Ms. Brown told participants at the Oppenheimer Consumer Conference that Perrigo was "in line with our going online integration process" and its "[b]ack office [wa]s working smoothly."  (Compl. ¶ 139.)

***Collusive Pricing.***  The Court also sustained Plaintiffs' claim that Defendants "misrepresented the pricing policy and competitiveness of the company's generic division in order to hide a price fixing scheme that garnered them hundreds of millions of dollars in collusive revenue." *Roofers'*, 2018 WL 3601229, at \*1.  Although Plaintiffs alleged no direct evidence of collusion, they supported their theory by pointing to increases in the prices of certain Perrigo drugs and a "raid" of Perrigo conducted by the U.S. Department of Justice ("DOJ").  (Compl. ¶¶ 21, 66-91.)  The Court found that Plaintiffs sufficiently pled the existence of a price-fixing scheme by alleging "indicia of collusion," including "dramatic price hikes contemporaneous with competitors" in six of "Perrigo's most important generic drugs." *Roofers'*, 2018 WL 3601229, at \*3.  Based on the "timing of the[se] price hikes" and other allegations, the Court held that Plaintiffs sufficiently pled "underlying misconduct" (*i.e.*, the existence of a price-fixing conspiracy). *Id.* at \*11.

The Court held that Plaintiffs "narrowly surpassed the bar for pleading scienter" against Ms. Brown, pointing to their allegations that she made "statements implying firsthand knowledge" about generic drug pricing, including responses "to pointed analyst questions regarding pricing pressure in the Generic Rx division." *Id.* at \*21-22.  But the Court also found that the DOJ's search of Perrigo's offices was only "somewhat probative of scienter" because there were "no allegations that any of the Individual Defendants knew about the raid and . . . it occurred after both Papa and Brown left the company." *Id.* at \*21.

Plaintiffs attribute to Ms. Brown eight alleged misstatements about Generic Rx pricing.  (Compl. ¶¶ 184, 192, 194, 196, 200, 201, 203.)[2]

***Motive.***   The Court also rejected Plaintiffs' allegations that Ms. Brown had a motive for her alleged fraudulent behavior.  *Roofers'*, 2018 WL 3601229, at \*18.  Indeed, the Court instead found that the "***absence*** of a particularized motive ***weigh[ed] against*** finding scienter." *Id.* (emphases added).

Although Plaintiffs alleged that Ms. Brown made "large and irregular" stock sales in the year before the class period, the Court explained that she actually "sold greater or comparable amounts of Perrigo stock in the 25 months prior to the Class Period than [she] did during the Class Period." *Id.* at \*17.  This pattern of sales was "indicative of a ***lack of scienter***," contrary to Plaintiffs' theory.  *Id.* (emphasis added).

Plaintiffs also asserted that Ms. Brown had a "desire to fend off the Mylan bid." *Id.* at \*17.  In the Court's view, however, this "desire" could "not contribute to an inference of scienter because it d[id] not suggest any concrete and personal benefit . . . resulting from th[e]

---

[2]    As directed by the Court, on December 22, 2020 Ms. Brown filed a pre-motion letter (ECF No. 327) requesting leave to file the instant motion for summary judgment. Plaintiffs responded on January 4, 2021 (ECF No. 330 (the "Response Letter")).

fraud." *Id.* at *18 (internal quotation marks omitted).  The Court explained that "[m]ost, if not all publicly traded companies are interested in . . . avoiding hostile takeovers," and therefore the allegation "falls woefully short of demonstrating scienter."  *Id.* (internal quotation marks omitted).

### B. Omega

Plaintiffs accuse Ms. Brown of making a single misstatement related to the integration of Omega on June 23, 2015.  But there is no evidence Ms. Brown disbelieved that statement when she spoke, nor is there evidence of any reason she would have to disbelieve it.  Instead, the information available to Ms. Brown at the time she spoke—only three months into the integration process—confirmed that Perrigo had made progress on key areas of integration.

### 1. Perrigo Agrees to Purchase Omega

███████████████████████████████████████ and by 2009 it viewed Omega as a potential platform for that expansion.  Management of Perrigo and Omega had only sporadic contact until 2014, when Omega's ownership launched a serious effort to find a buyer for the company.

Perrigo retained several advisors to assist with the potential transaction, including JPMorgan Chase & Co. ("JPMorgan") as a financial advisor, McKinsey to support commercial diligence efforts, and PwC for financial diligence.  (SUF ¶ 25 ███████.) ███████████ ███████████████████████████████ (SUF ¶ 26.) ███████████████ ███████████████████████████████ ███████████ (SUF ¶ 27.)

As part of this diligence process, Perrigo sought to understand the work that would be necessary to integrate Omega. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████ (SUF ¶ 28 (Brown).)  Within Perrigo, responsibility for coordinating financial

diligence fell to one of Ms. Brown's direct reports (and eventually her successor as CFO)—

Ronald Winowiecki, Perrigo's Senior Vice President for Business Finance.

In September and October 2014, Mr. Winowiecki and his team identified several

accounting practices at Omega that differed from Perrigo's own practices.  For instance, the

companies followed different accounting standards:  Omega followed the International Financial

Reporting Standards ("IFRS"), while Perrigo was a U.S. GAAP reporting company.  (SUF ¶ 29

(Brown).)[3]

Moreover, although Perrigo made quarterly forecasts of its own earnings (SUF

¶ 31 (Winowiecki)), Mr. Winowiecki learned that ████████████████████████████

████████████████████████████ (SUF ¶ 31.)[4]  In an email to Ms. Brown, he

described this ████████████████████████████████████████ (SUF

¶ 32.)[5]  When Mr. Winowiecki used the term ████████ ████████████████████

████████████████████████████████████████████████ As for

forecasts, Mr. Winowiecki testified that ████████████████████████████████

████████████████████████████████████████████████

---

[3]    "GAAP" refers to the Generally Accepted Accounting Principles issued by the Financial
      Accounting Standards Board.

[4]    He also noted that ████████████████████████████████
      ████████████████████ (SUF ¶ 30.)

[5]    Mr. Winowiecki also told Ms. Brown that ██████████████████████
      ████████ (SUF ¶ 30.)

███████████████████████████████████████████ (SUF ¶ 32 (Winowiecki).)

Consistent with this testimony, Ms. Brown explained that ████████████████████

████████████████████████████████████████████████████████████████████████████

(SUF ¶ 33 (Brown).)  She understood that ██████████████████████████████████

████████████████████████████████████████ (SUF ¶ 33 (Brown).)

And  Mr. Winowiecki  himself  continued  to  believe  that  ████████████████████

█████████  (SUF ¶ 34.)[6]

      By  the  end  of  its  diligence  review,  Perrigo  decided  to  preserve  Omega's

autonomy  as  much  as  possible,  while  still  integrating  various  reporting  functions  of  the

company.   On  November  4,  2014,  Perrigo  told  its  Board  of  Directors  ████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████  (SUF ¶ 35.)

      On  November  6,  2014,  Perrigo  announced  that  it  had  reached  an  agreement  to

purchase  Omega  for  $4.5  billion.   (SUF ¶ 36.)   Perrigo  told  its  investors  that  the  acquisition

would  "[e]xpand[ Perrigo's]  market  access  across  a  larger  global  platform  with  critical  mass  in

all  key  European  countries."   (*Id.*)   The  press  release  noted,  however,  that  the  acquisition  was

"subject  to  the  satisfaction  of  closing  conditions,  including  customary  regulatory  approvals,"  and

that  Perrigo  "expected  [it]  to  close  in  the  first  quarter  of  calendar  year  2015."   (*Id.*)

---

[6]     Mr. Winowiecki  also  stated  that  ███████████████████████████████████

████████████████████████████████████ (SUF ¶ 34 (Winowiecki).)

### 2.  Perrigo's Pre-Closing Integration Planning

Obviously, Perrigo could not begin to integrate Omega until the transaction closed.  The closing was delayed until approvals were obtained from competition regulators, including the U.K. Competition and Markets Authority.  (SUF ¶ 37.)

While the regulators were reviewing the transaction, Perrigo planned for the eventual integration of Omega.  This included setting the expectations of Omega's management as to what the integration was likely to entail.  On November 20, 2014, for example, ███

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████  (SUF ¶ 40.)  Although Perrigo did not yet own Omega, Ms. Brown's team still took this comment seriously.  Mr. Winowiecki emphasized the ███

████████████████████████████████████  (*Id.*)

On November 24, 2014, Ms. Brown received a planning memorandum that detailed several priority tasks for the financial integration of Omega.  (SUF ¶ 41.)  ███

████████████████████████████████████████████

████████████████████████████████████████████

██████████  (*Id.*)

The same priorities were discussed at an integration workshop between Omega and Perrigo the following month.  On December 4, 2014, Ms. Brown shared a slide deck with Omega management in advance of the workshop, which was to be held on December 15.  (SUF ¶ 42.)  ████████████████████████████████████

████████████████████████████████████████████

(*Id.*)

-10-

When Perrigo encountered resistance from Omega to integration planning during these early stages, it was confronted promptly and successfully.  On January 22, 2015, for example, a Perrigo employee ███████████ told Ms. Brown that ████████████ ███████████████████████████ (SUF ¶ 44.)  Ms. Brown replied that, ████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████ (*Id.*)  She then proposed a conversation with Omega's CEO and CFO to resolve the issue.  (*Id.*)  The record shows that four days later (on January 26, 2015) ████████████████████████████████ (SUF ¶ 45.)  The mere scheduling of this meeting apparently went a long way to cure any confusion because, later that same day, ██████████ told Ms. Brown that ███████████████████████ ████████████████████████████████████ (SUF ¶ 45.)

Notwithstanding this internal progress, on February 5, 2015, Perrigo warned its investors that it could "encounter significant unexpected difficulties in integrating [Omega]." (SUF ¶ 54.)  Perrigo explained that "[t]he combination of two independent businesses is a complex, costly, and time-consuming process," and integration could "result in material unanticipated problems, expenses, liabilities, competitive responses, loss of customer relationships, and diversion of management's attention."  (*Id.*)  This statement provided important background to future Perrigo statements about the integration process.

### 3.    Omega's 2014 Financial Statements

Although Perrigo reviewed Omega's financial results during this interim period before closing, those results did not reflect any benefits from integration because the integration process could not begin until after the closing.  The results were still useful to Perrigo, however,

in part because they helped Perrigo assess what changes it would eventually need to make to Omega's accounting practices.  As Ms. Brown testified, ██████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ (SUF ¶ 39 (Brown).)   ██████████

████████████████████████████████████████████████████████████████████

██████████████████████████ (*Id.*) ██████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████ (*Id.*) ████████████████████████████

             ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████ (SUF ¶ 48.) ██████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.*) ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████ (*Id.*)

     After further review of these results, on February 26, 2015, Mr. Winowiecki told Ms. Brown  that  ████████████████████████████████████████████████████████

████████████████████████████████ (SUF ¶ 49.)  When Mr. Winowiecki used the term ██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

-12-

████████              (SUF ¶ 49 (Winowiecki).)   Ms. Brown had the same understanding of

Mr. Winowiecki's email.   She testified that ████████████████████████████

████████████████████████████████████████████ (SUF ¶ 49

(Brown).)[7]

To resolve these differences in accounting treatment, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (SUF ¶ 51.) ████████████████

████████████████████████████████████████████

████████████████████████████ (*Id.*)

On March 18, 2015, ████████████████████████████████

████████████████████████████ Omega—still operating independently of

Perrigo—published its 2014 annual report.  (SUF ¶ 52.)[8]

### 4.   Perrigo's Early Integration Efforts

On March 30, 2015, Perrigo closed its acquisition of Omega.  (SUF ¶ 53.)  Soon

after the closing, Perrigo began its planned integration of Omega.[9]  The process was indisputably

successful in the early months.

---

[7]      (*See also* SUF ¶ 50 ████████████████████████████████

████████████████████████████████ )

[8]      The results Perrigo received from Omega in February 2015 reported Omega's 2014 EBIT
as approximately 204 million euro.  (SUF ¶ 52.)  Omega's public annual provided
a slightly lower EBIT (approximately 198 million euro).  (SUF ¶ 52.)  The difference is
due to a non-recurring expense of 6.42 million euro reported on the same page of the
annual report and described in a footnote.

[9]      After Perrigo closed its acquisition of Omega, it learned that Omega had not performed
well in the first quarter of 2015 (*i.e.*, the last quarter before closing).  ████████████

During this period, Perrigo publicly acknowledged that the integration could face setbacks.  On April 29, 2015, for example, Perrigo's Form 10-Q again disclosed that Perrigo could "***encounter significant unexpected difficulties in integrating [Omega]***."   (SUF ¶ 54 (emphasis in original).)  Although this warning was undoubtedly prudent and consistent with the Company's February 5, 2015 disclosure about integration discussed above, the integration was progressing successfully from the perspective of Ms. Brown, who received periodic updates about the integration.

- ***May 8, 2015.***  ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (SUF ¶ 73.)

- ***May 12, 2015.***  ████████████████████████████████████████ ████████████████████████████████████████ ████████████ (*Id.*)

- ***June 5, 2015.***  An integration update stated that █████████ ████████████ (SUF ¶ 75.) ████████████████████████ (*Id.*)

- ***June 8, 2015.***  Mr. Winowiecki told Ms. Brown about another call on which ████ (SUF ¶ 76.) ████████████████████ (*Id.*)

By mid-June 2015, the integration had progressed far enough that Omega executives began to express frustration at their loss of autonomy to their new parent company.

████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ (SUF ¶ 71 (Brown).)

-14-

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ (SUF ¶ 77 (Brown).)

████████████████████████████████████████

██████████████████████ (SUF ¶ 78.) ████████████████

██████████████████████████████████ (SUF

¶ 79.)  As his email makes clear, ██████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ (*Id.*)

███████████████████████████████████████████████

████ (*Id.*) █████████████████████████████████

█████████████████████████████ (*Id.*)

Unlike  Mr. Coucke—████████████████████—the  rank-and-file  Omega

employees were happy to see their company merge into Perrigo.  On June 22, 2015, Ms. Brown

received an email stating that ██████████████████████████████

█████████████████ (SUF ¶ 80.)

That same day—June 22, 2015—Mr. Winowiecki sent Ms. Brown a draft Global

Finance presentation to be shared within Perrigo.  (SUF ¶ 81.) █████████████

███████████████████████████████████████████████

██████████ (*Id.*) ████████████████████████████████

███████████████████████████████████████████████

██████████████ (*Id.*) ██████████████████████████

█████████████████████ (*Id.*)

On June 23, 2015—three months after Perrigo closed its acquisition of Omega—Ms. Brown spoke at the Oppenheimer Consumer Conference on June 23, 2015.  She told participants that, after "clos[ing] the transaction on March 30," Perrigo was "in line with our going online integration process," and that its "[b]ack office [wa]s working smoothly."  (SUF ¶ 82.)  She did not represent that any part of the integration was complete; in fact, she stated that Perrigo was in the process of "bringing [Omega] onto all of [its] back-office systems." (*Id.*)  She also emphasized that Perrigo planned for Omega to operate with some independence, explaining that "the underlying core of this deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that." (*Id.*)  Ms. Brown made no predictions regarding future integration efforts and did not in any way contradict the company's cautionary words about integration set out in its February 5, 2015 and April 29, 2015 disclosures.  (SUF ¶ 54.)

Ms. Brown believed these statements when she spoke.  As she testified, ██████ ████████████████████████████████████████ (SUF ¶ 83 (Brown).)  As planned, Perrigo was implementing ████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████ (*Id.*)

██  ████████████████████████████████████████

Omega ultimately underperformed Perrigo's expectations, leading to multiple impairment charges.  However, integration was a footnote in the underperformance story; ██ ██████████████████████████  ████████  ████████████████████████████ ████████████████

In May 2016, Perrigo discovered ██████████████████████████ ████████████████████████████████████████████████████████



(SUF ¶ 108.)

(*Id.*)  As Ms. Brown explained,

(SUF ¶ 108 (Brown).)

(SUF ¶ 110.)

(SUF ¶ 111.)  Relying on hindsight,

(SUF ¶ 111.)  Among their conclusions,

(*Id.*)[10]

### C.   Generic Drug Pricing

### 1.   Ms. Brown's Responsibilities As CFO

Plaintiffs pled the existence of a price-fixing conspiracy by alleging that their

unnamed expert had identified "indicia of collusion," including "dramatic price hikes" by

---

[10]                                                                 (SUF

¶ 112.)

(SUF ¶ 112 (Farrington).)

Perrigo for six generic drugs "following industry conferences." (Compl. ¶ 70.)[11]  Ms. Brown

testified that ███████████████████████████████████████████████████

(SUF ¶ 230 (Brown)), and there is not one shred of evidence to the contrary.[12]

Perrigo's Rule 30(b)(6) witness explained that it would be ███████████

███████████████████████████████████████████████████████████

███████████████████████ (SUF ¶ 230 █████████.) ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████ (SUF ¶ 243 ████████; *see also* SUF ¶ 243

(Brown) ███████████████████████████████████████████████████

███████████████████████████████████.)

Perrigo delegated to John Wesolowski (its SVP of Commercial Operations) the

███████████████████████████████████████████████████ (SUF ¶ 228

████████.) ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ (SUF  ¶ 226 ████████.)

███████████████████████████████████████████████████████████

████████ (SUF ¶ 244 (Boothe); ¶ 245 █████████.)



---

11   Plaintiffs' purported expert claims that two other generic products were part of the scheme, but Plaintiffs have never amended their pleadings to include those products.

12   Moreover, as Perrigo's brief explains, analyst reports from 2014 demonstrate that investors were aware of large price increases at Perrigo and other generic pharmaceutical companies.

██████████████████████████████████ (SUF ¶ 229 ████████), and the

████████████████████████████████████████████████████

████████ (SUF ¶ 233 ████████.) ████████████████████████

████████████████████████████████████ (*Id.*)

████████████████████████████████████████

██████████████████████████████████ (*See* Ex. 156 (Response

Letter) at 5.)   This is not true.   Douglas Boothe, the former head of Perrigo's Generic Rx

division, testified that ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (SUF ¶ 246 (Boothe); *see also* SUF ¶ 246 (Wesolowski)

(Mr. Wesolowski understood that ████████████████████████████

████████████████████████.)  Perrigo's director of marketing

confirmed that Ms. Brown was not ████████████████████████

████████████████████████████████████ (SUF ¶ 231

████████.)

        Given her limited role with respect to generic drug pricing, Ms. Brown did not

typically attend conferences or trade shows related to the generic drug industry.  ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (SUF

¶ 193.)

### 2.   Ms. Brown's Alleged Misstatements About Generic Drug Pricing

As Perrigo's CFO Ms. Brown signed filings with the Securities and Exchange Commission ("SEC") that spoke generally about Perrigo's financial performance and the markets in which it competed. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ (SUF ¶ 282.) ███████████████

███████████████████████████████████████████████████

███████████ (*Id.*)

Ms. Brown relied on similar processes when she spoke directly to investors and analysts about general pricing trends in the Generics Rx business.  (SUF ¶ 283.) ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ (SUF ¶ 283

████████; *see* SUF ¶ 283 ██████████ (when preparing for investor presentations, Perrigo's investor relations team ████████████████████████████████

███████████); *see also* SUF ¶ 283 ██████████ (investor relations team ████████████

███████████████████████████).)

Plaintiffs challenge eight statements made by Ms. Brown to Perrigo investors or that were contained in regulatory filings signed by Ms. Brown.  Each conveyed general information about competition and pricing in the Generic Rx market.  According to Plaintiffs, these statements concealed that Perrigo had historically "relied on anti-competitive markets to generate its 'star' performance."  (Compl. ¶ 69.)  Plaintiffs claim that investors learned the truth on April 25, 2016, when Perrigo announced its first-quarter earnings and allegedly attributed its "poor financial results" to "increased competitive pressures in its prescription drug segment."

(Compl. ¶¶ 11, 229-230.)  Plaintiffs' expert Dr. Nye concluded that these disclosures "revealed the Company's reliance on unsustainable supracompetitive pricing in the Generic Rx division." (Ex. 134 (Nye Report) ¶ 74.)

Ms. Brown made three of the challenged statements before April 25, 2016, the date when Plaintiffs claim the market learned the purported truth:

- **August 13, 2015.**  Ms. Brown signed Perrigo's Form 10-K for its fiscal year ending June 27, 2015.  (SUF ¶ 303; Compl. ¶ 184.)  The filing stated that Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products."  (SUF ¶ 303.)

- **February 18, 2016.**  During an investor call on February 18, 2016, Ms. Brown told an analyst that "pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%."  (SUF ¶ 304; Compl. ¶ 192.)

- **February 25, 2016.**  Ms. Brown signed Perrigo's Form 10-KT for the six months ending December 31, 2015.  (SUF ¶ 305; Compl. ¶ 194.)  The filing made the same statements as those challenged in Perrigo's August 13, 2015 filing.  (SUF ¶ 305.)

Plaintiffs challenge five additional statements made by Ms. Brown **after** the market supposedly learned of Perrigo's "reliance on unsustainable supracompetitive pricing":

- **May 12, 2016.**  Ms. Brown participated in an investor call on which she stated that "sharp price erosion in a number of topical products" and "continued pricing pressure" had "further impacted [Perrigo's] ability to execute on [its] planned pricing strategies."  (SUF ¶ 306; Compl. ¶ 196.)

- **May 16, 2016.**  Ms. Brown signed Perrigo's Form 10-Q filing for the first quarter of 2016.  The filing stated that the company had "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector."  (SUF ¶ 307; Compl. ¶ 200.)

- **May 24, 2016.**  At the UBS Global Healthcare Conference, Ms. Brown told investors that Perrigo "saw some competitive pressure" and was "seeing a

different pricing dynamic for the remainder of the year."  (SUF ¶ 308; Compl. ¶ 203.)[13]

- ***August 10, 2016.***  Ms. Brown signed Perrigo's Form 10-Q filing for the second quarter of 2016.  The filing made nearly identical statements to those challenged in Perrigo's May 16, 2016 filing.  (SUF ¶ 309; Compl. ¶ 201.)

- ***November 10, 2016.***  Ms. Brown signed Perrigo's Form 10-Q filing for the third quarter of 2016.  The filing made nearly identical statements to those challenged in Perrigo's May 16, 2016 and August 10, 2016 filings.  (SUF ¶ 311; Compl. ¶ 201.)

On February 27, 2017, Ms. Brown announced her resignation from Perrigo.  (SUF ¶ 18.)  She left to accept a job offer with another major pharmaceutical company, Amgen Inc. (her current employer).  (SUF ¶ 18 (Brown).)  After her resignation—on March 3, 2017—Bloomberg reported that the DOJ was investigating generic drug companies, including Perrigo. (Compl. ¶ 20.)  On May 2, 2017—more than two months after Ms. Brown's resignation—Perrigo announced that its offices had been searched by the DOJ as part of a price-fixing investigation.  (Compl. ¶ 21.)  There is no evidence that Ms. Brown's resignation was related to these investigations in any way.

## ARGUMENT

A party moving for summary judgment is "entitled to judgment as a matter of law" if the "non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case on which it bears the burden of proof at trial."  *In re Ikon Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).  Falsity and scienter are essential elements of Plaintiffs' claims here.  *Id.* (elements of Section 10(b) claim); *In re Digital Island Secs. Litig.*, 357 F.3d 322, 328 (3d Cir. 2004) ("Section 14(e) is modeled on the antifraud provisions of

---

[13]   The Complaint incorrectly identifies the date of this conference as June 21, 2016.  (*See* Compl. ¶ 203.)

§10(b) . . . which require proof of scienter." (internal quotation marks omitted)).[14]   To prevail, Plaintiffs must show that Ms. Brown made a "false or misleading statement."  *Fan* v. *StoneMore Partners LP*, 927 F.3d 710, 715-16 (3d Cir. 2019).   They also "must show that [Ms. Brown] knew [her] representations were false, or that they were made recklessly."  *Shogen* v. *Global Aggressive Growth Fund, Ltd.*, 2007 WL 1237829, at *11 (D.N.J. Apr. 26, 2007).

In the Third Circuit, courts "require[] a very strong form of recklessness, one that is 'relatively close to intentional conduct.'"  *In re Ikon Off. Sols., Inc. Sec. Litig.*, 131 F. Supp. 2d 680, 692 (E.D. Pa. 2001), *aff'd* 277 F.3d 658 (3d Cir. 2002).   Recklessness in this context is conduct that is "highly unreasonable," involving "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Ikon*, 277 F.3d at 667 (internal quotation marks omitted).

Although the issue of scienter is often decided by the jury, "summary judgment may be granted in appropriate cases."  *Ikon*, 131 F. Supp. 2d at 692.   For example, courts have granted summary judgment "where the evidence presented permits only an inference of negligence," and where "an inference of scienter is raised but is rebutted by other evidence."  *Id.*;

---

[14]   The elements of a claim under Section 14(e) are largely the same as those for Section 10(b).  *In re ValueVision Int'l Inc. Sec. Litig.*, 896 F. Supp. 434, 448 (E.D. Pa. 1995); *see also P. Schoenfeld Asset Mgmt. L.L.C.* v. *Cendant Corp.*, 47 F. Supp. 2d 546, 560-61 (D.N.J. 1999) (holding that the elements of a claim under Section 14(e) of the Exchange Act are "virtually identical"), *vacated on other grounds*, *Semerenko* v. *Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000).   Plaintiffs also must prove scienter to prevail on their control-person liability claim under Section 20(a), because that claim requires a predicate violation of the Exchange Act as well as "culpable participa[tion]."  *City of Edinburgh Council* v. *Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014); *Belmont* v. *MB Inv. Partners, Inc.*, 708 F.3d 470, 484 (3d Cir. 2013).   Similarly, Plaintiffs' Israeli law claims rise and fall with the Exchange Act claims, and therefore they too require scienter.  (*See* Compl. ¶¶ 303-07 (acknowledging that Israel would "appl[y] U.S. laws and regulations" to a case involving a dual-listed company like Perrigo).)

*see also In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at \*14 (D.N.J. May 13, 2015) (granting summary judgment where the "record lacks evidence which would permit a jury to conclude that . . . [the defendant] knowingly or recklessly deceived the public").

Plaintiffs cannot withstand this motion "merely by making allegations; rather, [they] must go beyond [the] pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." *Ikon*, 277 F.3d at 666.  In short, Plaintiffs "must present significant probative evidence tending to support the complaint."  *Tse* v. *Ventana Medical Sys., Inc.*, 123 F. Supp. 2d 213, 216 (D. Del. 2000) (citation omitted), *aff'd*, 297 F.3d 210 (3d Cir. 2002).  Adding to this burden, Plaintiffs must show that they can "produce ***admissible*** evidence" to support their claims.  Fed. R. Civ. P. 56(c)(1)(B); *see* Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

## I.   PLAINTIFFS' CLAIMS AGAINST MS. BROWN BASED ON HER STATEMENT ABOUT OMEGA MUST BE DISMISSED.

### A.   Plaintiffs Have No Evidence That Ms. Brown's June 23, 2015 Statement Was False.

Plaintiffs cannot prevail at trial because they have no evidence that Ms. Brown made a "misstatement or an omission of a material fact" when she spoke about Omega on June 23, 2015.  *Ikon*, 277 F.3d at 666; *see also Fan*, 927 F.3d at 715 ("statements are only actionable if . . . [they] conveyed a false or misleading impression").  Ms. Brown's June 23, 2015 statement that Perrigo was "in line with our going online integration process" and its "[b]ack office [wa]s working smoothly" (Compl. ¶ 139) was true at the time, and Plaintiffs have no evidence to the contrary.  Accordingly, all of Plaintiffs' claims related to Omega must be dismissed.

Ms. Brown's statement was only false if it misrepresented the state of the integration *at the time she spoke*. "To be actionable, a statement or omission must have been misleading at the time it was made . . . ." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). Indeed, at the pleadings stage, the Court sustained Plaintiffs' Omega-related claims only to the extent they are based on "statements regarding the *present success* of integration." *Roofers'*, 2018 WL 3601229, at *15 (emphasis added).) Accordingly, Plaintiffs cannot prevail against Ms. Brown by showing that the integration proved disappointing *after* she spoke on June 23, 2015. *NAHC*, 306 F.3d at 1330 ("[L]iability cannot be imposed on the basis of subsequent events.").

Here, the evidentiary record shows that Perrigo's integration of Omega was proceeding "in line" with expectations at the time Ms. Brown spoke on June 23, 2015. By that time, Perrigo had already made progress on key integration tasks, ███████████████████ ████████████. (SUF ¶ 75.) In the weeks before Ms. Brown's statement, ███████████████ ████████████████████████████████████████████████ (SUF ¶¶ 74, 76.) By June 22, 2015, ███████████████████████████████████████████████ █████████████████████████████ (SUF ¶ 80.) And the day before Ms. Brown spoke, ████ ████████████████████████████████████████████████████████████████████ █████████████████████████ (SUF ¶ 81.) Plaintiffs cannot on this record demonstrate that Ms. Brown's June 23, 2015 statement was a misrepresentation.

## B.     Plaintiffs Have No Evidence That Ms. Brown Acted with Scienter.

Even if Ms. Brown's June 23, 2015 statement were false—it was not—Plaintiffs cannot prove that Ms. Brown acted with scienter. To prevail at trial, Plaintiffs must show either that Ms. Brown "knew [her] representations were false, or that they were made recklessly."

*Shogen*, 2007 WL 1237829, at *11.  Here, they cannot prove either knowledge of falsity or recklessness.

When Ms. Brown spoke on June 23, she believed that Perrigo was "in line" with its "integration process."  (SUF ¶ 82.)  Ms. Brown explained at her deposition that ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ (SUF ¶ 28 (Brown).)  At the time she spoke, ████████████████████ ████████████████████████████ (SUF ¶ 83 (Brown).)

Ms. Brown's belief in the truth of her statement was not reckless.  The Third Circuit has declined to infer recklessness where "the record establishes that [the statement] was not without a good faith belief or reasonable basis."  *Ikon*, 277 F.3d at 668 (affirming summary judgment for defendants).  To establish recklessness, plaintiffs must show that defendants had "knowledge of facts or access to information contradicting their public statements."  *In re Interpool, Inc. Sec. Litig.*, 2005 WL 2000237, at *13 (D.N.J. Aug. 17, 2005).

Defendants can defeat scienter by showing that their statement was consistent with available facts.  For example, in *In re Bristol-Myers Squibb Securities Litigation*, the plaintiffs brought securities claims based on the defendant's representation that one of its drugs was a potential "blockbuster."  2005 WL 2007004, at *13, *65 (D.N.J. Aug. 17, 2005).  The court granted summary judgment for defendant on these claims, holding that no "reasonable jury could find that the speakers . . . were reckless" where the record established that the defendant's "executives . . . were faced with conflicting assessments" about the drug's potential.  *Id.* at *56.  The court declined to find sufficient evidence of scienter even when presented with an internal email stating that the drug "does not readily show blockbuster potential."  *Id.* at *60.  According

to the court, the email must be viewed alongside evidence showing that "*others* at [defendant]
thought that [the drug] *could* be a blockbuster"; viewed in this context, the email did "not permit
the inference that speakers believing one side over the other were reckless in relying upon that
belief."   *Id.* at *60 (emphases in original).   Similarly, in *In re Aetna Inc.*, the defendants
"outlined a strong defense in their summary judgment motion" by showing that their "public
statements about the success of the integration were consistent with the internal monthly reports
detailing the progress of the integration."  2001 WL 20928, at *9 (E.D. Pa. Jan. 4, 2001).

Here, the record confirms that on June 23, 2015, Ms. Brown had a reasonable
basis to believe that Perrigo's integration of Omega was moving forward.  In the weeks before
her statement, ██████████████████████████████████████████████████████
████ (SUF ¶ 74 (May 12, 2015 email describing ██████████████████████████
████████████████████████████); SUF ¶ 76 (June 8, 2015 email describing
Omega's CFO as ████████████████████████████).)  Moreover, on June
5, 2015, Ms. Brown received a report ████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████ (SUF ¶ 75.)   The report stated that ████████████████████████
████████████████████████████████████████████████ (SUF ¶ 75.)
By June 17, 2015, the integration had progressed to such an extent that ██████████████
██████████████████████████████████████████████████████████████████████
████████████ (SUF ¶ 79 (emphasis added).) ████████████████████████████████
██████, Ms. Brown learned on June 22 that ████████████████████████████████
████████████████████████████████████████ (SUF ¶ 80.)  And on
that same day, Ms. Brown received ████████████████████████████████████████

████████████████████████████████████████████  (SUF

¶ 81.)

Plaintiffs cannot prove scienter on this record.  Indeed, even at the pleadings stage, courts routinely dismiss claims supported by more evidence than what Plaintiffs have uncovered in this case after years of discovery.  For example, in *The Winer Family Trust* v. *Queen*, the court dismissed claims based on a CEO's statement that his company had "made excellent progress toward completing renovations" and had "begun installing . . . customized automation equipment" at a newly acquired facility.  2004 WL 2203709, at *12 (E.D. Pa. Sept. 27, 2004), *aff'd*, 503 F.3d 319 (3d Cir. 2007).  Only one day after making this statement, the CEO wrote a confidential letter "identifying . . . issues" and "current plans in correcting these problems."  *Id.*  Even though the confidential letter was far stronger evidence of scienter than anything Plaintiffs can point to here, the court still found that plaintiff "failed to sufficiently allege facts giving rise to a strong inference that [the CEO] acted with scienter," reasoning that his confidential letter was "very optimistic that the plant's operational problems would be overcome in the near future."  *Id.* at *13.

Similarly, in *In re Level 3 Communications, Inc. Securities Litigation*, the court dismissed claims based on an executive's statement that "overall integration effort is tracking within expectations."  2010 WL 5129524, at *3 (D. Colo. Dec. 10, 2010), *aff'd*, 667 F.3d 1331 (10th Cir. 2012).  As the court explained, "[t]hat defendants expressed optimism in their ability to successfully fix those problems does not make their statements knowingly or recklessly false or misleading when made."  *Id.* at *12.  The Tenth Circuit affirmed, declining to find "a strong inference that defendants' statements were intentionally fraudulent or extremely reckless" even

where some of the alleged misstatements "may have been inconsistent with a few internal reports." *Level 3*, 667 F.3d at 1335.

Faced with this factual record, Plaintiffs will likely argue that scienter is an issue that should be left to the jury. They are wrong. As discussed, the record here shows that Ms. Brown reasonably believed her June 23 statement. Plaintiffs now "must present significant probative evidence" in support of their claims. *Tse*, 123 F. Supp. 2d at 216 (internal quotation marks omitted). It is abundantly clear that Plaintiffs lack the evidence they need to satisfy this burden. As explained below, to prevail Plaintiffs would need to identify specific information reviewed by Ms. Brown between March 30, 2015 and June 23, 2015 that cast doubt on the success of the integration. No such evidence exists, and Plaintiffs should not be allowed to proceed to trial without it.

**Information Actually Reviewed By Ms. Brown.** To survive summary judgment, Plaintiffs must identify information ***actually reviewed*** by Ms. Brown. They cannot survive summary judgment by pointing to documents Ms. Brown never saw. For example, in *In re Bio-Technology General Corp. Securities Litigation*, the court dismissed securities claims because plaintiffs failed to allege that "[d]efendants . . . ever reviewed" certain documents. 380 F. Supp. 2d 574, 596 (D.N.J. 2005). As the court explained, the "mere fact" that those documents were "ultimately available for review by the Individual Defendants does not give rise to a strong inference of scienter." *Id.*; *see also Fosbre* v. *Las Vegas Sands Corp.*, 2017 WL 55878, at *10 (D. Nev. Jan. 3, 2017) (granting summary judgment where "plaintiffs present no evidence that [the defendant] saw either of these documents before he made his statement"), *aff'd sub nom. Pompano Beach Police & Firefighters' Ret. Sys.* v. *Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *Glover* v. *DeLuca*, 2006 WL 2850448, at *28 (W.D. Pa. Sept. 29, 2006) (where

"the list of recipients does not include any [d]efendant . . . there is no evidence that any of them was aware of its content, even if their subordinates received it").

**Evidence of Ms. Brown's Knowledge at the Time She Spoke.**  Plaintiffs must identify evidence of what Ms. Brown knew at the time she spoke on June 23, 2015.  That is "the only time-period where [Ms. Brown's] state of mind is relevant to the section 10(b) claim." *Ikon*, 277 F.3d at 670; *see also Merck*, 2015 WL 2250472, at *14 (granting summary judgment based on the "information available to [defendant] at the time the [] statements were made").

This means that Plaintiffs cannot defeat summary judgment by pointing to documents created long after June 23, 2015, ██████████████████████████████ ████████████████████████████████ (*See* SUF ¶ 111; Ex. 156 (Response Letter) at 2-3.)  "Relying on a later-filed [document or statement] is an attempt to prove fraud by hindsight," which "the Third Circuit has long rejected."  *OFI Risk Arbitrages* v. *Cooper Tire & Rubber Co.*, 2015 WL 4036179, at *6 (D. Del. July 1, 2015) (internal quotation marks omitted), *aff'd sub nom. OFI Asset Mgmt.* v. *Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016); *see also Winer Family*, 503 F.3d at 332 (finding "an impermissible attempt to prove fraud by hindsight" when the plaintiff relied on scienter evidence that post-dated the alleged misstatement); *DeRobbio* v. *Harvest Cmtys. of Sioux City, Inc.*, 2002 WL 31947203, at *4 (D.N.J. Oct. 30, 2002) (dismissing 10b-5 claim as an "impermissible attempt to plead 'fraud by hindsight'" where scienter allegations did not relate to "the time of the earlier misleading statements").

**Information Must Relate to the "Present Success" of Integration.**  Plaintiffs must identify information that cast doubt on Ms. Brown's statement about the "present success" of integration on June 23, 2015, as this is the theory sustained by the Court in its decision on Defendants' motion to dismiss.  *Roofers'*, 2018 WL 3601229, at *15.  Only information

reviewed by Ms. Brown after Perrigo closed its acquisition of Omega and began the integration on March 30, 2015 could be probative of what she knew about the "present success" of integration at the time she spoke. And any such information would still fail to support scienter if later information reviewed by Ms. Brown demonstrated that integration had improved by June 23, 2015.

Plaintiffs also cannot prove scienter by focusing—as they have done throughout discovery—on Ms. Brown's knowledge of Omega's financial performance rather than the integration. Ms. Brown's purported awareness of ██████████████████████████ in February 2015 (Ex. 156 (Response Letter) at 3)—before the integration even began—is not probative of what Ms. Brown knew about the success of integration in June 2015. Importantly, Plaintiffs do not allege that Ms. Brown misrepresented Omega's performance in the period before it was owned by Perrigo. At the pleadings stage, the Court specifically declined to "credit the allegations regarding [Omega's] underperformance" because Plaintiffs "fail[ed] to allege any specific misrepresentations in connection with underperformance." *Roofers'*, 2018 WL 3601229, at *23 n.23. It is now too late to plead additional misstatements. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Bell* v. *City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (internal quotation marks omitted).

Nor can Plaintiffs assert that Omega's performance somehow informed Ms. Brown of issues with integration. Integration and performance are not the same—a successful integration should result in better performance, but the benefits may not be immediate. But even if Omega's underperformance raised questions about integration—there is no evidence that it did—those questions were not answered by the time Ms. Brown spoke on

June 23, 2015.  *See Merck*, 2015 WL 2250472, at *11 (granting summary judgment where "a jury would have to engage in speculation and conjecture about what Defendants should have extrapolated from the information [the defendant] had at the time").

In summary, in order to overcome their burden here, Plaintiffs must identify specific information reviewed by Ms. Brown between March 30, 2015 and June 23, 2015 that cast doubt on the success of the integration.  Plaintiffs cannot satisfy this burden because no such evidence exists.  Without any evidence of scienter, Plaintiffs' claims must be dismissed.

Plaintiffs' scienter theory is weakened even further by the lack of any evidence of a motive to participate in the alleged fraud.  Although motive is not "an independent means of establishing scienter," *In re Anadigics, Inc., Sec. Litig.*, 2011 WL 4594845, at *32 (D.N.J. Sept. 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012), "a failure to demonstrate that individual defendants had a motive for their wrongful conduct is 'significant.'"  *Roofers'*, at 2018 WL 3601229, at *17 (quoting *Rahman* v. *Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013)).  As discussed above (*supra* at 6-7), the Court has already rejected Plaintiffs' motive theories, and Plaintiffs have no new evidence to offer now.

## II.    PLAINTIFFS' CLAIMS AGAINST MS. BROWN BASED ON HER STATEMENTS ABOUT GENERIC DRUG PRICES MUST BE DISMISSED.

### A.    Plaintiffs Have No Evidence That Ms. Brown Acted with Scienter When She Spoke about Generic Drug Prices.

Plaintiffs cannot prove that Ms. Brown acted with scienter when she spoke about pricing in Perrigo's Generic Rx business.  As Perrigo explains in its brief, Plaintiffs have no evidence of illegal price collusion.  But even if they could prove that Perrigo illegally colluded with its competitors, they certainly have no evidence that Ms. Brown knew of such collusion or recklessly disregarded it.  For this reason, all of Plaintiffs' claims against Ms. Brown related to generic drug pricing must be dismissed.

Ms. Brown's challenged statements truthfully reported pricing trends in Perrigo's Generic Rx division.  Plaintiffs' own purported expert, Todd Clark, has opined that ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ (Ex. 102 (Clark Report) ¶ 190; *see also* SUF ¶ 310.)  Ms. Brown accurately reported these developments when, for example, she stated on February 18, 2016 that "pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%."  (SUF ¶ 304.)

Plaintiffs speculate that Ms. Brown knowingly or recklessly concealed the existence of a price-fixing conspiracy when she made these statements, but there is no evidence she knew anything about alleged price fixing.  The truth is that Ms. Brown ██████████████

███████████████ (SUF ¶ 230 (Brown).)  No Perrigo witness contradicted this.  Perrigo's Rule 30(b)(6) corporate representative confirmed that ███████████████████████████

████████████████████████████████████████████████████ (SUF ¶ 230

███████████.)  Likewise, Perrigo's director of marketing confirmed that ███████████████

████████████████████████████████████████████████████████████

██████████████████████████████ (SUF ¶ 231.)  Ms. Brown did not know Perrigo's reasons for changing the price of any particular drug and thus had no way to know whether Perrigo had fixed prices with its competitors.

As Perrigo's Rule 30(b)(6) witness explained, there are ██████████████████████

████████████████████████████████████████████████████ (SUF ¶ 243

███████████.)  Only the Perrigo employees who actually evaluated those factors and decided on a price could know whether the price had been affected by collusion.  *See Fleming* v. *Impax*

*Labs. Inc.*, 2018 WL 4616291, at *4 (N.D. Cal. Sept. 7, 2018) (complaint failed to "plausibly suggest that individual Defendants directly engaged in unlawful price fixing" where it "expressly attributes actual pricing activity to [the company's] 'generics team'—not to its senior officials"). Ms. Brown was not one of those employees. █████████████████████████████ ████████████████ (SUF ¶ 226 ████████████.)

The report of Plaintiffs' purported expert, Todd Clark, only confirms that Ms. Brown had no substantive role in the conduct at issue here.  Mr. Clark asserts that ████



█████████████████ (Ex. 102 (Clark Report) ¶ 22(e).) ████████████████████

(SUF  ¶ 193.) ████████████████████████

██████████████████████████ (Ex. 102 (Clark Report) ¶¶ 39-44.)

The court in *Utesch* v. *Lannett Co., Inc.* dismissed securities claims based on similar facts. 316 F. Supp. 3d 895, 900, 907 (E.D. Pa. 2018).[15] The plaintiffs in that case brought securities claims against the CEO and CFO of a pharmaceutical company based on their allegedly false representations that the company's "drug pricing was competitive" when in fact it was "price-fixing many of its products." *Id.* at 900. Like Plaintiffs here, the plaintiffs in *Utesch* failed to "identify an explicit agreement to price-fix"; instead, they based their antitrust theory on "price hikes" for certain drugs that supposedly could "only be explained by anticompetitive agreements." *Id.* at 903. But these allegations were not "tether[ed]" to the CEO or CFO "personally," and plaintiffs did not allege that either executive "attended the healthcare conferences or trade shows that purportedly resulted in price hikes." *Id.* As a result, the court held that "none of the antitrust allegations implicate [the CEO or CFO's] knowledge or disregard

---

[15] The court in *Utesch* subsequently found that plaintiffs adequately alleged scienter in their amended complaint. *Utesch* v. *Lannett Co.*, 385 F. Supp. 3d 408, 417, 424 (E.D. Pa. 2019) ("*Utesch II*"). The plaintiffs no longer "rel[ied] on the theory that Defendants misrepresented their own anticompetitive conduct." *Id.* at 417. Instead, they claimed that "Defendants misled investors by stating that price increases were the result of legitimate and competitive market forces," when in fact Defendants knew that "the market was being driven by antitrust violations being committed by Defendants' competitors." *Id.* Unlike here, several of the misstatements in *Utesch II* were in response to questions or developments specifically related to "ongoing investigations into price-fixing." *Id.* at 416. The court found scienter adequately alleged based on Defendants' stating "without equivocation" that "the market was 'highly competitive' . . . in the context of an ongoing set of investigations initiated by multiple law enforcement and oversight bodies." *Id.* at 422. Here, unlike in *Utesch II*, Plaintiffs' claim relies on the theory that Perrigo misrepresented its own allegedly anticompetitive conduct. (Compl. ¶ 6 ("Perrigo and other generics manufacturers colluded to raise contemporaneously prices . . .").) Indeed, Plaintiffs' expert has made this clear, stating that "Plaintiff does not claim that Defendants were merely <u>aware of</u> some suspicious activity outside of the Company," but "contends that Defendants <u>engaged in</u> anticompetitive practices." (Ex. 136 (Nye Reply) ¶ 108 (emphasis in original).) Moreover, none of Ms. Brown's statements specifically addressed any investigation into price-fixing. Indeed, as the Court already recognized "there are no allegations that any of the Individual Defendants knew about the [DOJ] raid," which "occurred after both Papa and Brown left the company." *Roofers'*, 2018 WL 3601229, at *21.

of antitrust problems."   The same is true here:   Plaintiffs have no evidence to "tether" to

Ms. Brown any purported agreement to fix prices.  *Id.*[16]

        Lacking any such evidence, Plaintiffs recently asserted that Ms. Brown must have

acted with scienter because she ████████████████████████████████████████████

████████████████████████████████████████████  (Ex. 156 (Response Letter) at

5.)[17]  Although this argument helped Plaintiffs survive the motion to dismiss, it falls far short of

satisfying Plaintiffs' current burden.  Even at the pleadings stage, courts typically reject attempts

to infer scienter from a defendant's general awareness of the company's operations.  In *Hall* v.

*Johnson & Johnson*, for example, the plaintiff alleged that the defendant's CFO "led the

Company's investor relations activities, which 'effectively guaranteed that [the CFO] had access

to the information that defendants withheld from investors during the Class Period."  2019 WL

7207491, at *22 (D.N.J. Dec. 27, 2019).  The court found that plaintiff failed to adequately plead

---

[16]    Plaintiffs have also asserted that ████████████████████████████████
████████████████████████████████████  (Ex. 156 (Response Letter) at 5.)  In fact,
Mr. Boothe's testimony makes clear that ████████████████████████████████████
████████████████████████████████████████████████████████████████
(*Supra* at 19.)  His testimony does not suggest that ██████████████████████████████
████████████████████████████████  In any event, "[a]lleging that [Brown] had
authority to raise prices is not the equivalent of alleging that [Brown] illegally price-fixed
with peer companies."  *Utesch*, 316 F. Supp. 3d at 905.

[17]    Plaintiffs' response to Defendants' pre-motion letter cites only ██████████████
████████████████████████████████████  According to Plaintiffs, Ms. Brown
received ██████████████████████████████████████████████████████████████
████████  (Ex. 156 (Response Letter) at 5.)  At most, this document shows that more than
two years before any of her alleged misstatements about generic drug pricing, Ms. Brown
had information about a planned price increase for certain drugs.  Nothing in the
document suggests that this price increase was the result of collusion with Perrigo's
competitors.   The Response Letter also cites ████████████████████████████████
████████████████████████████████████████████████████████  (Ex. 156
(Response Letter) at 5.)  As discussed in Perrigo's brief, that affidavit should not be
considered at summary judgment.  Further, it says nothing about what Ms. Brown knew.
(SUF ¶¶ 264, 276.)

scienter because a "general awareness of the [] day-to-day workings of the company's business does not establish scienter." *Id.*[18]

In any event, as a factual matter, Ms. Brown's statements simply do not imply that she had firsthand knowledge about how Perrigo set prices for individual drugs—and they certainly do not imply that she knew anything about price fixing. Ms. Brown spoke about general pricing trends and the competitive dynamics facing Perrigo. As an example, Ms. Brown told an analyst on February 18, 2016 that "pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%." (Compl. ¶ 192.) This statement implies that Ms. Brown knew the average prices of drugs in Perrigo's portfolio, not that she knew how prices were set for any of those drugs, much less that she knew Perrigo fixed the prices of the six particular drugs identified by the Complaint. *See Fleming*, 2018 WL 4616291, at *4 (complaint failed to "suggest that Defendants actually orchestrated or knew of the alleged collusive activity" where alleged misstatements "comprise[d] representations regarding Defendants' willingness to monitor the market, maximize product opportunities, and exploit positive pricing").[19]

Like Plaintiffs here, the plaintiffs in *Utesch*, 316 F. Supp. 3d at 900, alleged that the defendants falsely stated their company's "drug pricing was competitive" when it was "price-

---

[18]    *See also In re Celgene Corp. Sec. Litig.*, 2019 WL 6909463, at *20 (D.N.J. Dec. 19, 2019) ("corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter" and "there must be 'some additional allegations of specific information conveyed to management and related to fraud'").)

[19]    Plaintiffs' Response Letter incorrectly asserts that Ms. Brown's ███████ ████████████████████████████ (Ex. 156 (Response Letter) at 6.) Plaintiffs have never identified any evidence demonstrating that Ms. Brown should have, or even could have, uncovered the supposed price-fixing conspiracy. Plaintiffs' theory proves too much; it would essentially mean that no executive should make general comments about pricing just in case, unbeknownst to that executive, certain individuals at the company might be engaged in illegal activity.

fixing many of its products." *Id.* at 900.  To plead scienter, they alleged that "the pricing of the Generic Drugs" was a "core operation" and therefore "knowledge pertaining to their alleged price-fixing can be attributed to its CEO and CFO." *Id.* at 905.  Although the court inferred that the CEO and CFO were "aware of the . . . price increases" based on "the Generic Drugs' importance," it refused to infer that "due to these price increases [they] must have known the reason for the increases was due to a price-fixing conspiracy." *Id.* at 905-906.  The Court should likewise refuse to infer that Ms. Brown was aware of any price-fixing conspiracy here.

### B.   At Least Five of Ms. Brown's Alleged Misstatements About Generic Drug Prices Are Inactionable.

Five of Ms. Brown's eight alleged misstatements are inactionable because they were made after the date when, according to Plaintiffs' own theory, the market learned the purported truth about Perrigo's supposed reliance on supracompetitive pricing.

"When a plaintiff alleges a 'fraud on the market' theory . . . defendants may assert a 'truth on the market' defense and argue that 'a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.'" *Lovallo* v. *Pacira Pharms., Inc.*, 2015 WL 7300492, at *9 (D.N.J. Nov. 18, 2015); *see also Roofers'*, 2018 WL 3601229, at *9 ("The 'truth on the market' defense recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market.").

Here, Plaintiffs assert that on April 25, 2016, the market learned the purported truth about Perrigo's reliance on supposedly supracompetitive pricing.  According to Plaintiffs, Perrigo announced "poor financial results," which it attributed to "increased competitive pressures in its prescription drug segment."  (Compl. ¶¶ 229, 230.)  Plaintiffs' expert, Dr. Nye,

opines that these disclosures "partially revealed the Company's reliance on unsustainable supracompetitive pricing in the Generic Rx division." (Ex. 134 (Nye Report) ¶ 74.)

This theory is fundamentally inconsistent with Plaintiffs claiming fraud based on the five statements Ms. Brown allegedly made ***after*** April 25, 2016. For example, Plaintiffs allege that Ms. Brown misled investors on May 12, 2016, when she stated that "sharp price erosion in a number of topical products" and "continued pricing pressure" had "further impacted [Perrigo's] ability to execute on [its] planned pricing strategies." (SUF ¶ 306; Compl. ¶ 196.)[20] If, as Plaintiffs claim, Perrigo's April 25, 2016 disclosures had already "revealed [Perrigo's] reliance on unsustainable supracompetitive pricing" (Ex. 134 (Nye Report) ¶ 74), then the information was "already known to the market" and Ms. Brown's May 12, 2016 statement could not have misled anyone. *Lovallo*, 2015 WL 7300492, at *9. The same is true for all five of the statements Ms. Brown allegedly made after April 25, 2016. (*See* Compl. ¶¶ 196 (May 12, 2016), 200 (May 16, 2016), 201 (August 10, 2016 and November 10, 2016), 203 (May 24, 2016).)[21]

## III.   THE CONTROL PERSON CLAIM AGAINST MS. BROWN MUST BE DISMISSED.

Plaintiffs' Section 20(a) control person liability claim against Ms. Brown should be dismissed because Plaintiffs have "failed to adequately plead a predicate section 10(b)

---

[20]   As another example, Plaintiffs allege that August 10, 2016 was both the date of a misrepresentation by Ms. Brown and a corrective event date. (*See* Compl. ¶ 201 (alleging misrepresentation in Perrigo's Form 10-Q filing); Ex. 134 (Nye Report) ¶ 97.)

[21]   To prevail on a "truth on the market" defense, Defendants typically must show that "the market was aware of curative information" and that the information was "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information.'" *Roofers'*, 2018 WL 3601229, at *9. Ms. Brown contests Plaintiffs' evidence of loss causation as set forth in Perrigo's brief, but the theory of Plaintiffs' expert is that the information revealed on April 25, 2016 had a material effect on Perrigo's stock price. (Ex. 134 (Nye Report) ¶ 37.)

violation." *City of Edinburgh*, 754 F.3d at 177.  The claim must also be dismissed because there is no evidence of Ms. Brown's culpable participation in the alleged violations.

The Third Circuit has held that Section 20(a) requires proof that the defendant was "a culpable participant in the act or acts constituting the violation or cause of action." *Belmont*, 708 F.3d at 484 (internal quotation marks omitted).  "Culpable participation refers to either knowing and substantial participation in the wrongdoing or inaction with the intent to further the fraud or prevent its discovery." *In re Merck & Co., Inc. Sec., Deriv. & ERISA Litig.*, 2012 WL 3779309, at *9 (D.N.J. Aug. 29, 2012).  As discussed above, there is no evidence that Ms. Brown knew of any fraud, and therefore Plaintiffs cannot prove that she culpably participated in any violation.

## CONCLUSION

For these reasons and those discussed in Perrigo's motion for summary judgment, the Court should grant summary judgment in favor of Ms. Brown and dismiss all of Plaintiffs' claims against her.

Dated:  April 9, 2021

By:  _/s/ Brian T. Frawley_____
John L. Hardiman (*pro hac vice*)
Brian T. Frawley
Michael P. Devlin (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Defendant Judy Brown*

-40-