*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF NEW JERSEY*

—————————————————          *CIVIL ACTION NUMBER:*
*ROOFER'S PENSION FUND,*
*Individually and on Behalf*          *2:16-cv-02805-JXN-LDW*
*of All Others Similarly*
*Situated,*                           *ORAL ARGUMENT*

    *Plaintiffs,*

    *v.*

*JOSEPH C. PAPA, et al,*

    *Defendants.*
—————————————————

    *Martin Luther King Building & U.S. Courthouse*
    *50 Walnut Street*
    *Newark, New Jersey 07101*
    *Thursday, April 7, 2022*
    *Commencing at 10:03 a.m.*

*B E F O R E:*          *THE HONORABLE JULIEN XAVIER NEALS*
                       *UNITED STATES DISTRICT JUDGE*

*A P P E A R A N C E S:*

LOWENSTEIN SANDLER, LLP
BY:  MICHAEL B. HIMMEL, ESQUIRE
One Lowenstein Drive
Roseland, New Jersey 07068
For the Lead Plaintiffs

Melissa A. Mormile, Official Court Reporter
melissa_mormile@njd.uscourts.gov
(973)776-7710

1  **A P P E A R A N C E S: - CONTINUED**

2

3      POMERANTZ, LLP
       BY:  JOSHUA B. SILVERMAN, ESQUIRE
            THOMAS PRZYBYLOWSKI, ESQUIRE
4      600 Third Avenue
       New York, New York 10016
5      For the Lead Plaintiffs

6

7      BERNSTEIN LITOWITZ BERGER & GROSSMAN, LLP
       BY:  JAMES A. HARROD, ESQUIRE
8           JESSE JENSEN, ESQUIRE
       1251 Avenue of the Americas
9      New York, New York 10020
       For the Lead Plaintiffs

10

11     GREENBAUM ROWE SMITH & DAVIS
       BY:  ALAN S. NAAR, ESQUIRE
12     99 Wood Avenue South
       Woodbridge, New Jersey 07095
13     For the Defendant Perrigo Company

14

15     FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP
       BY:  JAMES D. WAREHAM, ESQUIRE
            KATHERINE ST. ROMAIN, ESQUIRE
16          JAMES E. ANKLAM, ESQUIRE
            SAMUEL GRONER, ESQUIRE
17     801 17TH Street NW
       Washington, DC 20006
18     For the Defendant Perrigo Company

19

20     GIBSON DUNN & CRUTCHER, LLP
       BY:  REED BRODSKY, ESQUIRE
21          DAVID CROWLEY-BUCK, ESQUIRE
       200 Park Avenue
22     New York, New York 10166
       Counsel for the Defendant Joseph C. Papa

23

24

25

*United States District Court*
*District of New Jersey*

1    **A P P E A R A N C E S:** - CONTINUED

2

3        SULLIVAN & CROMWELL, LLP
         BY:  JOHN L.  HARDIMAN, ESQUIRE
4            MICHAEL DEVLIN, ESQUIRE
         125 Broad Street
5        New York, New York 10004
         Counsel for the Defendant Judy Brown

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

ARGUMENT                                                PAGE

SUMMARY JUDGMENT/LOSS CAUSATION

BY MR. WAREHAM                                        7, 175

BY MR. HARDIMAN                                      50, 161

BY MR. BRODSKY                                       65, 166

BY MR. SILVERMAN                                     96, 182

BY MR. HARROD                                       139, 188

DAUBERT MOTIONS

BY MR. GRONER                                          191

BY MR. HARROD                                          199

```
 1              (PROCEEDINGS held remotely before The Honorable JULIEN
 2    XAVIER NEALS, United States District Judge, and The Honorable
 3    LEDA DUNN WETTRE, United States Magistrate Judge, at 11:03
 4    a.m.)
 5              THE COURTROOM DEPUTY:  All rise, the Honorable Julien
 6    Xavier Neals presiding.
 7              THE COURT:  This is by far the fullest house I have
 8    seen since the pandemic started.
 9           Please be seated.
10           Counsel, your appearances, please.
11           MR. SILVERMAN:  Good morning, your Honor.  Josh
12    Silverman, of Pomerantz LLP on behalf of the plaintiffs.
13           MR. HARROD:  Good Morning, your Honor.  James Harrod,
14    of Bernstein Litowitz Berger & Grossman, also for the
15    plaintiffs.
16           MR. PRZYBYLOWSKI:  Morning, your Honor, Thomas
17    Przybylowski, from Pomerantz LLP on behalf of the plaintiffs.
18           MR. JENSEN:  Good Morning, your Honor.  Jesse Jensen
19    from Bernstein Litowitz, on behalf of the plaintiffs.
20           MR. HIMMEL:  Good Morning, your Honor.  Michael
21    Himmel, of Lowenstein Sandler, liaison counsel for the
22    plaintiffs.
23              THE COURT:  Good morning.
24           MR. WAREHAM:  Good morning, your Honor.  Jamie
25    Wareham, from Fried Frank, with my partner James Anklam; my
```

 1   partner Sam Groner; my colleague, Kate St. Romain, on behalf of

 2   Perrigo.

 3          THE COURT:  Good Morning.

 4          MR. NAAR:  Good Morning, your Honor.  Alan Naar,

 5   Greenbaum Rowe Smith & Davis, also for Perrigo.

 6          THE COURT:  Good Morning.

 7          MR. BRODSKY:  Good morning, your Honor.  Reed Brodsky,

 8   from Gibson Dunn on behalf of Joseph Papa as well.

 9          MR. HARDIMAN:  Good morning, your Honor.  John

10   Hardiman, of Sullivan & Cromwell.  We represent Judy Brown.

11   Michael Devlin is with me as well.

12          THE COURT:  Good Morning.

13      Just by quick recap -- well, for housekeeping purposes,

14   before you speak, if you could just identify yourself, because

15   there's a number of you, and I know my court reporter has a

16   good memory, but nobody's memory is that good.

17      If you're comfortable from counsel table, feel free.

18   You may just have to adjust in terms of the microphone so the

19   court reporter may, at times, ask you to get closer to the mic

20   if there is trouble hearing.  But also feel free to use the

21   lectern if you're more comfortable at the lectern.

22      Just to recap, we have Perrigo's motion for summary

23   judgment.  Motion to exclude the expert testimony of Purcell

24   Clark and Nye.  Joseph C. Papa's motion for summary judgment.

25   And Judy Brown's motion for summary judgment.  I also note that

1    Perrigo also, again, has the initial filing.

2         Counsel, I know that we had received communication in

3    terms of the time allotted for argument.

4         I'm going to leave it to you as to how you wanted to

5    proceed in the order of how you wanted to address the motions.

6    So as I would anticipate I would think that maybe Perrigo would

7    be starting.  What was the preference?  Were you going to

8    address the summary judgment and the exclusion motion together?

9         MR. WAREHAM:  Your Honor, our preference would be to

10   speak to the motion for summary judgment.  Both the individual

11   defendants and the company.  And then have opposition to that

12   motion.  A little bit of rebuttal.

13        And then have a clean break between that motion and the

14   Daubert motions on the three experts.

15        THE COURT:  That's fine.

16        MR. WAREHAM:  Thank you, your Honor.

17        THE COURT:  That's fine.

18        So the floor is yours.

19        MR. WAREHAM:  I'm old, your Honor, so I will use the

20   lectern.

21        Good morning, may it please the court.  My name is Jamie

22   Wareham from Fried Frank on behalf of Perrigo.  My partner Sam

23   Groner and I will today present on behalf of the defendants, at

24   sometimes all defendants, and other times, just for Perrigo.

25        I want to begin by thanking Judge Wettre for her

1  important and rather remarkable efforts and assistance to

2  getting this case to where it could now be dismissed.

3       With the Court's indulgence I will go through falsity,

4  scienter, and loss causation; the three elements of 10b-5 that

5  the plaintiffs have failed to meet.

6       As logic dictates that then my colleagues from Gibson

7  Dunn and Sullivan & Cromwell will address similar issues with

8  respect to scienter and falsity for their individual clients.

9       And then as I said, I would like to have maybe a few

10  minutes of rebuttal.

11       We propose, your Honor, to -- after the summary judgment

12  motion -- have Mr. Groner present on the question of exclusion

13  of the three experts.

14       So plaintiffs, your Honor, bring claims against Perrigo

15  under the Exchange Act 10b-5 and under 14(e).

16       Both claims fail.

17       There are also tag-a-long 20A claims called control

18  person claims, that also fail and you will hear about that from

19  the individual defendants.

20       In July, your Honor, the Court substantially narrowed

21  this case.  Plaintiffs originally pled four independent

22  theories and now only two remain.  The first remaining theory

23  is premised on the false notion that Perrigo engaged in

24  collusive pricing with respect to competitors for six generic

25  topical drugs, specified in the complaint.

1          In particular, plaintiffs claims the defendants intended

2    to, and did defraud investors, by failing to disclose this

3    supposed price-fixing scheme with respect to these individual

4    drugs.

5          Now, Judge Arleo barely, your Honor, allowed this claim

6    to proceed to discovery.  She quotes, the scienter allegations

7    related to the price-fixing scheme narrowly surpassed the bar

8    for pleading scienter.  Narrowly, your Honor.  You will see now

9    how widely they have failed.

10         Two years of intense, expensive, intervening discovery

11   ably overseen by Judge Wettre revealed why Judge Arleo was so

12   skeptical to begin with about these so-called price-fixing

13   claims.  They present no admissible evidence -- none -- that

14   Perrigo was involved in a price-fixing scheme with respect to

15   any drug, never mind the six in the complaint.

16         From the outside of this case, your Honor, what the

17   plaintiffs really hoped was that the United States Department

18   of Justice Criminal Division of the anti-trust section was

19   going to bring charges against Perrigo or some of its

20   employees.

21         They were simply *Waiting for Godot* and like the play,

22   Godot never showed and Godot was not going to show.  There are

23   going to be no criminal charges that come out of the DOJ that

24   have anything to do with respect to Perrigo's product.

25   Frankly, your Honor, there is no admissible evidence that

1   anyone at Perrigo fixed prices of anything at any time.

2        Not just for generic Rx products, but for any kind of

3   drugs.  Of course, your Honor, neither DOJ nor any civil

4   litigant has ever alleged, suggested, intimated that Mr. Papa

5   or Ms. Brown did anything with respect to collusive pricing.

6        Plaintiff's second remaining theory is as infirm as the

7   first.  It's that Perrigo made misrepresentations and material

8   omissions with scienter regarding success of Perrigo's

9   then-present integration of Omega Pharma.  Omega Pharma was a

10  large European enterprise that Perrigo acquired on March 30,

11  2015.

12       Plaintiffs seek to ward off dismissal by claiming in

13  their amended complaint that they make allegations that it

14  plainly does not make with respect to performance.  They are

15  trying to now amend their complaint through pleadings.

16       That's, of course, impermissible as a matter of law.

17  They ask this Court to do it -- the Third Circuit has never

18  done as well, your Honor, and that is to adopt the corporate

19  scienter theory.  They implicitly recognized that they have

20  failed to prove, or allege sufficiently, scienter with respect

21  to Mr. Brown, Ms. Brown, and Mr. Papa.

22       And they are now proceeding to ask this Court to do what

23  the Third Circuit has refused to do.  And plaintiffs finally,

24  your Honor, mischaracterize true statements about Perrigo's

25  actual integration of Omega shortly after the March 15th --

1   March 30, 2015 closing of the $4 billion transaction.

2          Let me begin with the pricing claims, your Honor.  I

3   will put up an exhibit to my left and my right which, after all

4   28 fact deposition transcripts have been scoured and after

5   two-and-a-half million pages have been scoured, produced in

6   discovery, I am going to show you a page that shows all the

7   direct evidence of collusive pricing in this record.

8          The first time in my career, your Honor, I'm putting up

9   this following page, a blank page.  There is no direct evidence

10  of collusion.  None.  There are no suggestions that there is

11  evidence that requires no inferences, as *Baby Foods* requires

12  that these -- to be direct evidence that must require no

13  inference whatsoever.  It must be, your Honor, a solemnized

14  covenant to conspire under *Valspar*.

15         It's even stronger stated, your Honor, in *Intervest* case

16  in which to prove anything approaching a collusion in a

17  price-fixing case there must be a smoking gun.  There are no

18  smoking guns.  There is nothing.

19         Plaintiffs allegations, rather, rest on the allegation

20  that parallel price increases by Perrigo and some of its

21  competitors for the market specified, that is topical, generic

22  drugs, are, quote, strong indicia of collusion.

23         That assertion is incorrect.  Not only as a matter of

24  logic, but as a matter of law.  Plaintiffs claims rest as they

25  cannot now on supposition, on inference, on conjecture, on

1    speculation.  We're beyond that phase, your Honor.

2         We are at the phase, your Honor, that the Court in the

3    Third Circuit said, it is time for the plaintiffs to put up or

4    shut up.

5         In *Brown v. Williamson,* your Honor, the Supreme Court

6    held that parallel-pricing behavior, without more, does not,

7    does not support collusion.  This is especially true in

8    naturally occurring oligopolistic markets.  For example,

9    certain markets in the pharmaceutical industry and, for

10   example, this particular set of markets with respect to topical

11   prescription generic drugs.

12        The Third Circuit, your Honor, has specifically rejected

13   antitrust claims based on the parallel pricing theory for

14   oligopolistic markets.  It has done so twice in past seven

15   years and three times since 1999.  It's done so in *Baby Foods*,

16   your Honor.  It's done so in *Chocolate*, your Honor.  And it's

17   done so in *Valspar.*

18        The *Valspar*, *Chocolate*, *Baby Foods* case rendered the

19   claims for price fixing dead on arrival, DOA.  As the Third

20   Circuit held in *Valspar*, your Honor, parallel-pricing is only

21   probative of price fixing in cases involving nonoligopolistic

22   markets, markets totally unlike the markets before the Court.

23   There is no dispute that these markets are oligopolistic, even

24   plaintiff's supposed expert, Mr. Clark, conceded as much during

25   his deposition.

1          Of course, the hallmarks of any oligopolistic market are

2     that there are very few competitors and second, that there are

3     strong barriers to entry.  Such as the case for topical generic

4     drug products.  These markets are classic examples of naturally

5     occurring oligopolistic markets, both the specialized

6     manufacturing requirements for these products, very

7     complicated, very expensive.  And the very rigorous FDA

8     approval processes make it difficult for new companies to enter

9     into this market.

10          Mr. Papa spoke repeatedly, as did others in the company,

11    to investors and to the market and analysts about the fact that

12    this type of strategy was central to the generic drug strategy

13    of Perrigo.  Namely, that they were going to be in products

14    that had strong barriers to entry.  And they had a competitive

15    advantage there.  They want to participate in oligopolistic

16    markets and they told the market just as much.

17          Now in oligopolistic markets, the Third Circuit told

18    *Valspar* that parallel pricing by competitors is, quote, your

19    Honor, a necessary fact of life.  It is what it is.  We

20    understand the plaintiffs don't seem to like oligopolistic

21    markets.  Tough.  They are legal.  In these markets, companies

22    track and account for efforts of their own pricing decisions

23    with competitors, and they look at what others are doing.  And

24    of course they do that lawfully.

25          This, quote, mutual awareness by competitors, which the

1    Third Circuit identified in *Baby Foods* and recognized in more

2    detail in *Valspar*, leads to interdependent pricing.  Even

3    though each company's pricing decisions and pricing policies

4    are made independently.

5          The bottom line here is, that the existence of parallel

6    pricing increases in naturally occurring oligopolistic markets

7    is typical.  It is expected.  It is normal.  It is lawful.  And

8    that's what *Valspar* holds, your Honor.  Because the drugs at

9    issue here are sold in oligopolistic markets, the Third Circuit

10   in *Valspar* requires plaintiffs to demonstrate parallel-pricing

11   increases went beyond mere independence -- interdependence and

12   were so usual that in the absence of advanced agreement, no

13   reasonable forum would have engaged in them.

14         Plaintiffs made no such showing.  They fail to prove

15   anything beyond the mere existence of conscious

16   parallel-pricing, the hallmark of an oligopolistic market.

17   Lawful.  Conscious.  Parallel-pricing.  As Judge Arleo

18   explained in her July 2018 opinion, the Third Circuit considers

19   a nonexclusive list of so-called plus factors to identify

20   potential or illegal collusion as separate and distinct from

21   legal parallel-pricing.

22         The factors are, quote, evidence that the defendants had

23   a motive to enter into a conspiracy.  Second, evidence that

24   the defendants acted contrary to its own interest.  And third,

25   evidence implying a traditional conspiracy, an actual agreement

1    to fix prices.

2         Now, cases involving oligopolistic markets, unlike other

3    type of markets, focus only on the third-plus factor and

4    de-emphasize the first two factors.  They do so precisely

5    because these factors, according to *Valspar*, largely restate

6    the phenomenon of interdependence, which is always present in

7    oligopolistic markets.  The third-plus factor is, thus, where

8    the rubber meets the road, and it requires evidence of a

9    traditional, classic, agreed-upon conspiracy, like discussed at

10   the front end of this argument.  Solemnized smoking guns.

11        The factor focuses on noneconomic evidence that there

12   was an actual agreement among competitors not to compete.  That

13   is exactly what plaintiffs had to prove.  That is what

14   precisely what plaintiffs have failed to prove.

15        The only direct evidence at all related to the concept,

16   the topic of collusion is evidence brought forth by the

17   defendants, not by the plaintiffs.  And during discovery, the

18   plaintiffs deposed eight witnesses from the Rx division,

19   current and former, from Perrigo.  All eight unequivocally

20   denied speaking to competitors about pricing in any way, shape,

21   or form, never mind about price fixing.

22        During deposition of Perrigo's corporate designee, that

23   designee testified it was Perrigo's policy not to speak to

24   competitors about price issues.  Each deponent from Rx

25   reiterated that prohibition and their aware of that prohibition

1    and they stay to that course on that prohibition.  In *Valspar*,

2    *Chocolate*, and *Baby Foods*, the Third Circuit affirmed district

3    court's grants of summary judgment to defendants where

4    plaintiffs failed to prove the third plus factor, an agreement

5    to fix prices existed, as these plaintiffs have failed to

6    prove.

7         Now, lacking any direct evidence, a blank page, these

8    plaintiffs try to take contortionist activities to take

9    inadmissible evidence and circumstantial evidence and shoehorn

10   it into a survival.  Among these scattershot efforts,

11   plaintiffs complain about Perrigo's attendance at trade

12   association events and other social and business interactions

13   with competitors.  They argue that these events gave Perrigo

14   opportunities to conspire.

15        As I mentioned earlier, your Honor, we're past the

16   opportunity stage.  We're at the smoking gun stage.  We're at

17   the put up or shut up stage.  And we're not at the inference

18   stage, we are long past that.  The Third Circuit in *Valspar*

19   made crystal clear that having an opportunity to conspire does

20   not equal to actual conspiracy.  The Third Circuit emphasized

21   evidence that employees of competitors were in the same place

22   at the same time without any evidence of specific conversations

23   concerning an agreement to set prices, is sufficient to support

24   an inference of collusion, never mind proof of collusion.

25        Perrigo has presented evidence that employees knew and

 1    understood and stuck to the guidelines.  Plaintiffs have

 2    produced no evidence that any employee ever discussed pricing

 3    with respect to products.  I will get to one other point on

 4    that later with a deceased former employee about whether -- now

 5    ancient discussions, all the way back to 2010, 2011.

 6         During discovery, Perrigo presented reams of admissible

 7    evidence that its employees had no discussions with competitors

 8    about any Perrigo products.  In none of the 2 and a half

 9    million documents produced are there any emails between Perrigo

10    and competitors about pricing.  Perrigo's corporate

11    representative testified that all interactions between

12    competitors at industry conferences were entirely social and

13    involved nothing specific.  Each current or former Rx employee

14    deposed by plaintiffs testified exactly the same.  None

15    prevaricated, none.

16         Plaintiffs impermissibly speculate that collusion may

17    have somehow happened based on the mere proximity of price

18    increases to trade shows and industry events.  This is a silly

19    argument, your Honor, because plaintiffs understand, and the

20    record reflects, that the Perrigo employees attended more than

21    50 trade shows during the three-year relevant period.  50.  One

22    event every three weeks.  Thus, any price increase, any price

23    decrease, any decision to maintain the price, would have to

24    happen in close proximity to one of these 50 events.

25         Plaintiffs do not like oligopolistic markets and they

1    claim to or actually do not understand them either.

2         Let me briefly discuss, your Honor, plaintiff's claims

3    about Perrigo's social and business interactions.  They are

4    very similar to the claims about trade shows and other

5    competitor discussions.

6         Again, plaintiffs focus on the etherial opportunity to

7    collude during these interactions, not on any admissible

8    evidence than actual collusion took place.  None.  The record

9    has provided only legitimate reasons for these parallel

10   discussions unrelated to collusion.  The Perrigo employees

11   occasionally did interact with competitors, your Honor, as it

12   happens in almost every industry in it America.

13        If you look at the sworn testimony, you will see that

14   these conversations and communications had to do with small

15   talk with former employees and former colleagues.  Had to do

16   with inquiries about potential job opportunities because there

17   is some movement in the industry between the competitors, and

18   it had to do with communications with respect to legitimate

19   joint ventures and product development activities that happened

20   sometimes between Perrigo and other makers of topical Rx

21   generic drugs.  Nothing more.  Nothing less.  Nothing about

22   pricing.  Nothing about price fixing.  Nothing controversial at

23   all.

24        The Third Circuit, your Honor, has addressed this very

25   state of affairs.  It did so in the *Tose v. First Pennsylvania*

*Bank* case where it made clear that opportunity alone does not

create an inference of collusion.  Never mind evidence of

collusion, it is not even an inference.  In toast, the Third

Circuit affirmed summary judgment for defendants like these

defendants and noted in the opinion that, quote, human

experience does not support the inference of actual conspiracy

from the basic fact of opportunity to conspire through social

and business relationships.  These allegations, circumstantial

evidence, all amount to nothing.

Plaintiffs contort their effort to try to rely on this

evidence to stave off summary judgment.  And it continues, your

Honor, when they complain about the size of the price increases

that are involved in the products that they brought in their

complaint, the six products.  But the size of the product

increase in oligopolistic markets demonstrates nothing, never

mind collusion.

Plaintiffs pause that the price increases here are the

different magnitude than price hikes that were discussed in the

Third Circuit opinions of *Valspar*, *Chocolate*, and *Baby Foods*.

But the holdings in those cases, your Honor, had nothing to do

with the size of price increases.  They didn't address that

concept at all.  So in comparison between though three cases

in this case is pure speculation.

Moreover, your Honor, there are cases out there which

we've cited in which even higher price increases in

```
 1    oligopolistic markets have been deemed to be insubstantial to
 2    bring a claim for price fixing.  We rely on, for example, your
 3    Honor, the Sixth Circuit case in Erie County, Ohio for that
 4    proposition.  In sum, the deposition testimony and the document
 5    in your evidence completely devoid of facts supporting
 6    plaintiff's theory that Perrigo used trade means and social
 7    events as opportunities to even discuss, let alone fix prices
 8    for generic drugs.
 9         They move even farther down the circumstantial evidence
10    chain, your Honor, to what I think, maybe, is their silliest
11    argument.  The argument that monitoring of price increases and
12    monitoring of price activity amongst competitors is somehow
13    indicative of collusion.
14         After millions of dollars spent on discovery, including
15    28 facts depositions, plaintiffs are still talking about
16    implications because they can't find any proof.  Again, we are
17    beyond the implication phase.  It is time to put up or shut up.
18         Of great importance is as a matter of law.  It is untrue
19    that monitoring of competitor's prices is illegal or unlawful
20    or anyway suggestive of collusion.  For example, your Honor, my
21    partners and I pay close attention to what Milbank, Tweed does
22    with respect to associate salaries, as does Mr. Hardiman's
23    firm, Sullivan & Cromwell, as does Mr. Brodsky's firm Gibson
24    Dunn.  And Fried Frank, Gibson Dunn, Sullivan & Cromwell follow
25    the leader and raise our associate prices to the same level.
```

We don't call each.  We don't talk to each other.  There is no

collusion.  It's -- we're monitoring our competitor's pricing

and we are responding in nature and in kind.

Nothing unusual about that particularly in an

oligopolistic market.  And that's where single firms pricing

actions will have a noticeable impact on the market prices of

its rivals.  That's the nature of the market.  As the Third

Circuit described in *Baby Foods*, it's just, quote, common sense

to obtain as much information as possible about competitors

pricing.

Plaintiffs complain about simple common sense.  The

Third Circuit recognizes in that oligopolistic markets people

are going to pay close attention to price movements of their

competitors.

Courts have even found that very intense efforts to

monitor competitors's pricing does not undercut a finding of

unilateral action of lawful action.

As plaintiffs admit in paragraph 70 of the amended

complaint.

(Reporter Clarification.)

MR. WAREHAM:  There are public records that track

these prices and they are available for purchase.  There are

websites -- there are data sites that give people in the

generic Rx topical drug market information about other people's

prices.  And that's not a surprise.  And indeed, your Honor, in

1   *Valspar*, the Court recognized that efforts to gain pricing

2   information is not probative of conspiracy, but rather, this is

3   important, undermines conspiracy.

4          Why does it undermine conspiracy that people in

5   oligopolistic market would track the other people's prices?

6   Because if Perrigo were actually a participant in some kind of

7   price fixing scheme, why would they need to monitor prices?

8   Why would it need to ask customers for pricing information, you

9   would also know.  As the *Valspar* Court said, it would already

10  know about the specifics of its own conspiracy.  In sum,

11  efforts to monitor prices belie conspiracy, they don't suggest

12  one.

13         Now, even further down, inadmissible circumstantial

14  evidence chain proceed the plaintiffs.  Unable to put forth any

15  direct or any circumstantial evidence, plaintiffs then turn

16  toward inadmissible hearsay from other adversarial proceedings

17  in effort to breathe life into their ill-fated claims.

18  Plaintiffs attempt to rely on a civil complaint which is a mere

19  set of allegations filed by various state agencies alleging

20  anti-trust violations within the generic pharmaceutical

21  industry.

22         This complaint is referred to an all-people's paper,

23  your Honor, as the State AG complaint, and I will refer to it

24  as that today.  First, plaintiffs regurgitate allegations

25  weighed out in the State AG complaint.  All States with an AG

1   complaint, including those regarding communications between

2   Perrigo and its competitors are, per se, flat out, inadmissible

3   hearsay.  Courts in the circuit have held squarely the

4   complaints in other actions and the charges and allegations

5   they contain are hearsay under the Federal Rule of Evidence.

6   That is in the *TI construction* case, your Honor.

7          Plaintiffs cannot and do not dispute the fact that the

8   State AG complaint is hearsay.  Rather, they try to rely on an

9   exception to the hearsay rule and contend that the State AG

10  complaint is somehow admissible under the exception 803(8) of

11  the Federal Rules of Evidence.  803(8) allows into to evidence

12  records or statements of public officials in a civil case if

13  they set out factual findings from illegally authorized

14  investigation and are trustworthy.  There are many reasons the

15  State AG complaint fails under 803(8) and I will go through a

16  few of them.

17         First, allegations of complaint are not factual

18  findings.  They are just not.  They are mere ly allegations.

19  And we cite the 2016 *Gumwood* case for that very clear

20  proposition, your Honor.

21         Additionally, to qualify for an 803(8) hearsay

22  exception, the statements must be trustworthy.  But where a

23  document is prepared in contemplation of litigation, there is

24  always the risk of a lack of trustworthiness, a risk of bias.

25  A complaint like the Stage AG complaint is a quintessential

1  example of a biased document.

2      It is, by its very nature, is not a product of fair

3  adversarial discovery and lacks appropriate safeguards for

4  defendants.  We rely on a *WM Highfields* case for that

5  proposition and those quotes are from that case, your Honor.

6      This is precisely why the case efforts to bring the

7  State AG case into this case failed.  It is unreliable.  It is

8  not trustworthy.  It is adversarial.  Plaintiffs seek to add

9  some heft to a very weak argument by submitting a half a page,

10  three-paragraph affidavit from a former Sandoz employee named

11  Anthony Thomassy.

12      This effort, like other things I said twice before, your

13  Honor, is silly.  The Thomassy affidavit asserts that

14  information attributed to Mr. Thomassy in the State AG

15  complaint is true, but it's really of no moment.  It has no

16  consequence.  In the offered affidavit Mr. Thomassy identifies

17  himself as CW6.  That usually stands in these cases for

18  confidential witness No. 6.  Plaintiffs then focus on

19  allegation s in the State AG complaint related to the

20  logistics, but not the substance, of communications between CW6

21  and a deceased former employee who is in the sales department

22  by the name of Tony Polman.  I indicated I would address

23  Mr. Polman and I will do that a few times here.

24      As noted in our papers, he is a disgraced former

25  employee who took his own life on February 23, 2018, in

1    connection with criminal events totally unrelated to Perrigo.

2    These allegations of communication between Mr. Thomassy and

3    Mr. Polman took place in 2010 and 2011.  That's 11 or 12 years

4    ago, your Honor.  It is six years before the class period in

5    this case even began.

6         Moreover, all of the alleged communications involved in

7    the State AG complaint had to do with drugs that are not in the

8    case.  They are just not in the case.  Plaintiffs never amended

9    the complaint, your Honor, bring the drugs in.  They never

10   amended the complaint, your Honor, to change the time of

11   relevance in the class period.

12        No, Mr. Polman's alleged communication with CW6, or any

13   other competitor, are not evidence of price collusion by

14   Perrigo.  And that's because Mr. Polman had no authority to set

15   prices at Perrigo.  The record on that is very, very clear.

16   None of the documents that the plaintiffs cite is evidence of

17   this supposed authority suggest this.  They are contorted.

18   They are speculative.  They are misstated.

19        Indeed, the pricing authority at Perrigo rested with one

20   single executive, a man by the name of John Wesolowski,

21   W-E-S-O-L-O-W-S-K-I.  Mr. Wesolowski reported to Mr. Douglas

22   Boothe, B-O-O-T-H-E.  And both men testified under oath that

23   they did not know Mr. Polman was supposedly speaking with CW6,

24   11 or 12 years ago, let alone any content of any discussions

25   that Mr. Polman might have had 11 or 12 years ago.

1          And, of course, your Honor, the record is clear that

2   there is no evidence that the CW6 fellow -- whoever it might

3   be -- actually communicated with any executive at Perrigo that

4   had pricing authority.  And that's critical.  Plaintiffs

5   attempt to use Mr. Thomassy's affidavit to boot strap the

6   allegations of the State AG complaint about alleged

7   communications that are demonstrably, and as a matter of law,

8   irrelevant to the issues of the case.  We rely on this case,

9   your Honor, which is quite important and I hope the Court can

10  take time to review it, called *United Food v. Pilgrim's Pride*

11  for the proposition that what Mr. Polman did or did not do 11

12  or 12 years ago cannot save off dismissal.

13          Now, United Food is a very recent district court case,

14  your Honor, and it could be found at 2022 Westlaw 684169.  The

15  *United Foods*, your Honor, the defendants had even pled guilty

16  to earlier price fixing, but the *United Foods* court granted

17  defendants' motion to dismiss where, quote, nearly all of the

18  alleged conduct in the complaint related to bid-rigging schemes

19  that preceded the class period.  Much of it by many years.

20          Even if Perrigo had pled guilty 10 or 11 years ago to

21  price fixing, which it did not, it would not be any evidence of

22  this case and would have no bearing on this case, and this

23  Court, like the *United Foods* court, should be free to dismiss

24  the case at the pleadings stage.

25          Now, they continue down the slide of circumstantial

1  evidence -- in the lacking direct evidence -- when they try to

2  survive a motion for summary judgment by raising statements

3  made in a differed prosecution agreement between the DOJ and

4  that same pharmaceutical company that Mr. Thomassy works for, a

5  company named Sandoz, S-A-N-D-O-Z.

6       Plaintiffs do not and cannot dispute that the Sandoz

7  differed prosecution agreement is, on its face, inadmissible

8  hearsay.  The law is clear.  Deferred prosecution agreements

9  are contractual agreements to resolve criminal investigations

10  and are inadmissible hearsay.  We offer the *In Re:  Oil Spill*

11  case, your Honor, in support of that proposition.

12       In an ill-conceived effort to bypass the hearsay rules,

13  plaintiffs offer a one-page affidavit executed by a Sandoz

14  employee, with no responsibility for sales or marketing of

15  products, named Edward Stueck, S-T-U-E-C-K.  Mr. Stueck's

16  affidavit contains no substantive information about Perrigo,

17  none.

18       Rather it states, quote, the company B in the DPA --

19  that's deferred prosecution agreement -- and the attached

20  statement of facts refers to Perrigo, and quote, in that DPA

21  Sandoz admits, accepts, and acknowledges that the facts set

22  forth in the statement of facts are true and accurate.

23       Now, the Stueck affidavit creates no issue of general --

24  of genuine material fact that it is capable of surviving a

25  motion for summary judgment, pardon me.  Here's why.

1          The affidavit does not explain how Mr. Stueck has

2  personal knowledge of any of the supposed communications

3  between Sandoz and Perrigo, if there were any.  Nor does it

4  explain how Mr. Stueck came to understand company B was

5  Perrigo.  He is in the law department.  He never sold anything.

6  He never met anybody from Perrigo according to the record.

7  There is no evidence that he had any conversations with anybody

8  who had conversations with Perrigo.

9          Second, the plaintiffs don't deny that Stueck's supposed

10 understanding that Perrigo was company B comes from some

11 amorphous unknown person at DOJ, as Stueck has no personal

12 knowledge.  He is regurgitating what he is told by some unknown

13 person at DOJ.  Plaintiffs argue that hearsay statements can be

14 considered on a motion for summary judgment if they are, quote,

15 capable of being admissible at trial.  But Stueck can never

16 testify at trial.  His statements would be, per se, hearsay and

17 as a matter of fact, inadmissible.

18         Finally, further undercutting plaintiff's theory is that

19 the Sandoz DPA relates only to one of the six drugs at issue in

20 this case, the drug called desonide ointment.  None of the

21 Perrigo statements alleged in the complaint have anything to do

22 with the desonide ointment.  Nothing.  No reference to desonide

23 ointment by any of the speakers of the company, ever, on the

24 record and none identified in the amended complaint.

25         Rather, the complaints -- allegations that they

1   challenge on the fraud theory address pricing strategies across

2   all of Perrigo's portfolios, including the Rx unit.

3        Sales of desonide ointment are infinitesimal percentage

4   of Perrigo sales.  Desonide ointment were 1.09 percent of total

5   product sales for the Rx unit in 2014.  And, of course, the Rx

6   unit is a small fraction of the multi-billion-dollar Perrigo.

7   I started at the beginning, your Honor, by referencing the

8   *Waiting for Godot* play and plaintiffs for years hoped --

9   probably wished, probably even prayed -- that the DOJ would

10  bring some sort of criminal action.

11       DOJ obtained, your Honor -- and certainly Judge Wettre

12  knows this well -- discovery stays in this case five times in

13  2019 to 2020.  In the almost five years since plaintiffs filed

14  their June 17th amended complaint, DOJ brought several cases

15  against companies that, unlike Perrigo, actually broke the law.

16       But there is no evidence in this record of any effort

17  by, or consideration of DOJ, to indict Perrigo or any of its

18  executives.  No evidence of discussions with antitrust

19  authorities about potential DPAs, or prosecution of Perrigo.

20  There is no tolling agreement with the DOJ.  The statute of

21  limitations has long expired.  Let me repeat your Honor, like

22  Godot, the DOJ ain't coming.

23       Now this is important for the following reasons.  Judge

24  Arleo's July 2018 opinion specifically recognized the weakness

25  of plaintiff's collusive pricing claim.  She allowed the claim

1    to proceed to discovery in large measure because of the

2    pendency of this now-dead DOJ investigation.  She wrote, quote,

3    the mere fact that the investigation is somewhat probative of

4    scienter.

5         I would say that the lack of an investigation is also

6    probative of scienter the opposite way.

7         The lack of any DOJ action against Perrigo confirms that

8    Judge Arleo's initial doubts about antitrust claims were well

9    founded.

10        Now, not -- it is not dead enough already with respect

11   to this collusion claims, but the record is full of evidence as

12   to why the price increases the plaintiffs worry about were

13   actually put in place.  And plaintiffs have the burden to prove

14   that there were no reasons -- only illegal reasons -- for the

15   price increases and of course, they failed to meet that burden.

16        We as the defendants have demonstrated during discovery

17   the actual noncollusive reasons for the price increases at

18   issue here.  And the processes by which Perrigo determined

19   those price increases.

20        Perrigo's pricing determination is generally -- and in

21   particular for the six products in this case -- were shown in

22   discovery to be attributable to independent business reasons.

23   We had in Perrigo an adversary pricing committee for the Rx

24   business that studied and reviewed and suggested pricing

25   decisions.

1          Perrigo's pricing committee analyzed many factors to

2    determine whether to recommend increases or decreases or

3    maintain pricing for each product.  The recommendations were

4    then made to Mr. Wesolowski and the ultimate authority -- the

5    record is clear -- laid with Mr. Wesolowski.  The pricing

6    committee considered a lot of things in making the

7    recommendations, including competitor dynamics, similar to the

8    discussion we had about the law firms, what were other people

9    doing.  The pricing committee considered supply and demand,

10   number of prescriptions being written, number of people in the

11   market, changes in the dynamic for treatments.

12          It considered customer relations, could you raise prices

13   and not irritate clients?  Could you cut prices and cause

14   damage to the market?  It considered the number of

15   prescriptions written.  It continued -- considered the possible

16   volume loss of sales if you took one step left or right on the

17   pricing.

18          And, of course, it very heavily considered the cost of

19   goods sold, because as I mentioned earlier, some of these goods

20   are quite expensive to make and, indeed, the most expensive

21   facility in the top of the drug market is a New York facility

22   that is owned and operated by Perrigo.

23          Now, the depth of Perrigo's deliberations about price

24   increases demonstrates the absence of an agreement to collude.

25   Indeed, in the *Chocolate* case, your Honor, the Third Circuit

1    found that, quote, defendants extensive unilateral discussions

2    reflect not considered action, but the exercise of independent

3    business judgment and divergent pricing tactics driven by

4    practical efforts to maximize competitive advantage.

5          There was no collusion.  The prices were moved based on

6    independent review and consideration by a committee with final

7    decisions from the head of that business unit.

8          Now, Plaintiffs assert that emails and documents reflect

9    that it frequently declined to bid or ceded business to

10   competitors in order to maintain, quote, a fair share agreement

11   with its competitors.  This is, again, a distaste for the

12   oligopolistic nature of this market and probably professed lack

13   of understanding of the very same market.

14         Because courts have held that ceding business -- or

15   customers is not necessarily against the company's self

16   interest.  And certainly not an indication of collusion.

17   Indeed, the *Erie County, Ohio v. Morton Salt* case holds just

18   that.

19         Of greater specificity in the Third Circuit, the *Valspar*

20   court held that plaintiffs failed to meet their burden with

21   very similar emails and very similar arguments.  The emails in

22   *Valspar* mentioned, quote, not undercutting a competitor's price

23   increase.  Quote, Letting other companies have market share

24   and, quote, all major global players should be disciplined with

25   pricing implementation.

1        The Third Circuit held in *Valspar* that those emails were

2   evidence of nothing.  They were not evidence of collusion at

3   all.  Rather, emails of this type showed competitors

4   implementing pricing strategies in response to each,

5   interdependent pricing, and a nonocclusive attempt to avoid

6   market-wide profit decreases.

7        That's just standard for oligopolistic markets.  And

8   contrary to plaintiff's theory, this is exactly what occurred

9   here; the exact same type of discussions and communications

10  internally at Perrigo were already rejected in the *Valspar*

11  case.

12       Now, they complain in the complaint -- and more likely

13  and more often in their papers -- about broad statements having

14  to do with the competitive nature of the market and they claim

15  in words and substance that those were untrue statements.

16       Now, even if plaintiffs could somehow prove that Perrigo

17  agreed to fix the prices for certain generic drugs, and of

18  course they cannot, they have only put at issue very broad

19  statements about the competitiveness of the general market in

20  which Perrigo operated.  And these statements were all

21  demonstratively true on this well-developed record.  And of

22  course, true statements cannot sustain securities fraud

23  liability at any stage.  Particularly, the summary judgment

24  stage.

25       Plaintiffs do not allege a single challenged Perrigo

1    statement mentioning or in any way alluding to any of the six

2    products actually in the case.  Perrigo marketed approximately

3    800 generic prescription products, your Honor, across 1400

4    SKUs.  Perrigo sold products to at least 150 different

5    customers and competed with more than 90 different competitors.

6         Plaintiffs have offered no evidence that the markets for

7    any of Perrigo's hundreds of other generic prescription

8    products were not competitive.  Plaintiffs failed to understand

9    or pretend not to understand the fundamental features of

10   oligopolistic markets like the market for topical prescription

11   drugs.

12        Your Honor, here is the net/net regarding the collusion

13   claims.  The parties have spent a majority of their summary

14   judgment papers briefing these issues.  Having done so, it is

15   clear that plaintiffs have not met their burden of proof to

16   show that a triable issue of fact remains.  They have not even

17   come close.  We've gone through extensive and massively

18   expensive discovery, spanning multiple years.  Plaintiffs have

19   found no evidence of actual collusion.  None.

20        We have distilled plaintiff's alleged circumstantial

21   evidence of collusion and the law discrediting it, your Honor,

22   into a single demonstrative chart that takes their theories and

23   summarizes some of the cases I reported and discussed and put

24   it in one little demonstrative to help the Court post the

25   hearing.  And I would like to have my colleague -- permission

1    for my colleague to approach, to present that to the Court, and

2    of course, to distribute copies to the counsel for the

3    plaintiffs and for the other defendants as well.

4         THE COURT:  Thank you, Counsel.  Yes.

5         MR. WAREHAM:  In some, what the plaintiffs complain

6    about is nothing more than common behavior found in

7    oligopolistic markets.  And, your Honor, case law and logic

8    refute plaintiff's attempts to head to trial on such a spartan

9    record.

10        Now, I'm going to turn to the second surviving theory,

11   which is the one that centers on the disclosures around the

12   then current integration between Omega, which was a

13   European-owned drug company that did business in 39 countries,

14   and Perrigo.  That's the deal that closed, your Honor, on March

15   30, 2015.

16        In the Court's July 2018 ruling on a motion to dismiss,

17   Judge Arleo permitted plaintiffs to proceed only on a narrow

18   category of alleged misstatements or omissions related to the

19   then present success of that very same integration.  The Court

20   correctly dismissed four working statements protected under

21   the Private Securities Litigation Reform Act -- Private

22   Securities Litigation Reform Act, safe harbor, and claims based

23   on Omega's under performance within four specific geographic

24   markets.  And the Court held that the complaint failed to

25   adequately plead those claims.

1          With respect to Omega, plaintiff challenge statements

2    made by defendants were made between April 21, 2015, and

3    January 5, 2016.

4          But none of those statements were false or misleading

5    and none were made with the intent to defraud.  I will discuss

6    these points rather generally and my colleagues at Gibson Dunn

7    and Sullivan & Cromwell will go more specifically into those

8    failures.

9          First, plaintiffs take issue with statements concerning

10   whether Omega acquisition was accretive to Perrigo's growth

11   rate.  Now, the record reflects very clearly that the Omega

12   transaction was, indeed, accretive and it was accretive from

13   day one.  Thus, plaintiffs cannot get over the hump with

14   respect to the truth of those statements.  They are not false.

15   They are true.

16         The accretive nature of Omega is illustrated by Omega's

17   stand-alone value as a multibillion dollar company already

18   participating in the European marketplace, where Perrigo at the

19   time essentially had no real presence.

20         When Perrigo announced this results, your Honor, for the

21   period ending June 2015, the very first quarter after the

22   closing of the acquisition of Omega by Perrigo, they reported

23   34 percent top-line growth.  34 percent top-line growth.  That

24   was driven primarily by the addition of Omega to the Perrigo

25   family.  It defies common sense to argue that the Omega

1    transaction was not accretive.

2           And, your Honor, public companies often do

3    non-accretive, so-called diluted deals.  They buy companies

4    that require long times of growth, lots of cap backs, lots of

5    investment, lots of patience, but that's not the type of

6    transaction that Mr. Papa entered into here.  He enter into

7    a day one accretive transaction, and that's clear as a bell.

8           Now, the plaintiffs also allege that defendants failed

9    to adequately disclose that there were serious impediments to

10   Perrigo's integration of Omega, and these allegations lacked

11   evidentiary support.  They turn on supposition, on speculation,

12   on contortions.

13          Now, the first of these challenged statements about the

14   integration and its lack of success was made 22 days after the

15   acquisition closed on April 21, 2015.  It's no surprise that at

16   that point there was no evidence of any serious impediment to

17   integration because it was in its infancy.  A recent decision

18   by the Seventh Circuit, your Honor, which came down after

19   briefing was completed in this case is of significant value to

20   the Court's ability to resolve this case to dismiss this case.

21          In *City of Taylor Police and Fire Retirement Systems v.*

22   *Zebra Technology Corporation*, the Seventh Circuit affirmed the

23   dismissal of a securities case that alleged that a corporation

24   had, quote, defrauded investors by making bad predictions

25   during an integration process.  That case was decided on August

1    10, 2021 and it could be found, your Honor, at 8F.  4th 592.

2         In Zebra the plaintiffs allege that the defendants

3    statements in March of 2015 that integration was progressing as

4    planned relies in light of defendants' later statements that

5    acknowledge greater than expected complexities with certain

6    aspects of integration.  In other words, these statements

7    talked about in the Zebra case are very, very similar to the

8    statements that plaintiffs complain about here.

9         In a unanimous decision, the Seventh Circuit explained

10   that plaintiffs could not show scienter because the most

11   reasonable inference under the circumstances was that more

12   information became available to executives as integration

13   progressed.  How could you take things you learn in 2016 and

14   have those things impact your state of mind in 2015?  You

15   can't.

16        Our case is really quite similar to the Seventh Circuit

17   case.  The statements made just after the closing of Omega that

18   it was pleased its with initial integration projects were true

19   at the time and they were most certainly not made with the

20   intent to defraud.

21        Numerous cases, your Honor, since this briefing process

22   was completed have shed a lot of doubt on this whole concept of

23   integration and whether it ought to be something that is

24   actionable going forward.  The case law is different now than

25   it was when Judge Arleo made her decision to barely allow the

 1   integration claim to sneak over the line and to get to

 2   discovery.

 3        For example, in the In Re:  Ferrellgas --

 4   F-E-R-R-E-L-L-G-A-S -- Partners case, *Ferrellgas Partners* case

 5   which would be found at 2018 Westlaw 2081859, the Court held

 6   that a company's integration-relate statements cannot give rise

 7   to a securities fraud claim because, quote, Integration is far

 8   too loose an uncertain term on which I wish to premise a claim

 9   of the securities fraud.  I'm not convinced at all that that

10   case been out there for Judge Arleo to review we would be here

11   today at all.  And there were other cases since this briefing

12   was completed that similarly kind of put shade on, if that's

13   the right phrase, on this whole concept of using amorphous

14   concept of integration to proceed in the securities fraud case.

15        In the *Friedman v. Endo* case at 218 Westlaw 446 189, and

16   also in the *Steamfitters Industry Pension Fund* case at 2019

17   Westlaw 189, 0764, the courts are really starting to move

18   towards eliminating and calling basically anything about

19   integration inactionable, eliminating integration from the

20   jurisprudence of securities fraud.

21        Now, plaintiffs also challenged a number of statements

22   as misleading for failing to disclose supposed difficulties

23   realizing potential revenue synergies arising from the Omega

24   acquisition because of, quote, EU regulations, European Union

25   regulations.  There is absolutely zero evidence in the record

1  substantiating any problems with respect to EU regulations at

2  Perrigo after the acquisition of Omega.  None.

3       To the contrary, the documents and testimony demonstrate

4  conclusively that various teams at Perrigo and Omega were

5  collaborating effectively to identify and to analyze

6  opportunities to sell Perrigo products in Europe through

7  Omega's distribution channelled and to sell Omega's product in

8  the United States through Perrigo's distribution channels.

9       In the amended complaint, your Honor, the plaintiffs

10  relied on alleged statements, and when I say alleged, you will

11  hear why in a minute, from a former employ named Christine

12  Kincaid, K-I-N-C-A-I-D, to barely sneak over the line, your

13  Honor, remember, your Honor.  So Judge Arleo looks at these

14  allegations from this woman, Christine Kincaid, and she allows

15  barely this issue of Omega integration to move to the discovery

16  stage.

17       And Judge Arleo specifically mentioned her when she

18  sustained the count.  And she says, quote, The plaintiffs

19  relied heavy on the information given by Christine Kincaid.  We

20  are going to learn a little bit more about Christine Kincaid in

21  a second.

22       She tells under oath a wildly different story than her

23  alleged version of the truth is in the amended complaint.  And

24  she basically guts and debunks all of the plaintiff's

25  allegations with respect to EU, this, integration, that.  She,

1   of course, had been an employee, your Honor, for all of four

2   months in Perrigo.

3        Now, the plaintiffs -- putting up a screen on the

4   screen.  It's going to go up here as well?  Just there?  Okay.

5        On the slide, we memorialize the plaintiff's allegation

6   that Ms. Kincaid reported directly to the C-Suite of executive

7   of the company.  That's flat out false.  She didn't report to

8   the executive, to Mr. Papa.  She didn't report to Ms. Brown.

9   In fact, the record is that she never had any communications

10  with Mr. Papa.  She maybe ran into Ms. Brown someplace

11  in the hallway, but she never was present when the decisions

12  were made on integration matters, and she did not interact with

13  Mr. Papa at all.  And she did not interact with Mr. Papa and

14  Ms. Brown on integration.

15       We really don't know what knowledge the plaintiffs had

16  about Ms. Kincaid when they put these statements which were

17  refuted by her under-oath testimony.  Now, in the amended

18  complaint, they attribute to Ms. Kincaid allegations that there

19  were no integration issues and major integration impediments

20  related to the acquisition of Omega.

21       This allegation, your Honor, is also just flat

22  demonstratively false.  Ms. Kincaid stated under oath that she

23  did not hear that things were going wrong with the integration

24  of Omega.  She heard nothing about it.  And we put up the

25  allegation of the complaint on this exhibit and the truth.

1          Now, I alluded earlier to this EU regulation issue,

2    which was important, clearly, to Judge Arleo.  The amended

3    complaint attributes to Ms. Kincaid the supposed fact that EU

4    regulations would make it difficult to replace Omega's EU

5    suppliers with Perrigo's U.S.-based supply chain.

6          I don't often say in open Court this is false, but this

7    is false.  During her deposition, Ms. Kincaid absolutely

8    disavowed discussing revenue synergies or supply chain

9    synergies, including implications of Omega switching from

10   EU-based suppliers to Perrigo's U.S.-based suppliers with

11   anybody but Perrigo at any time, never mind anybody speaking to

12   the market.

13         Now, Ms. Kincaid's true testimony as opposed to the

14   misleading representations in the amended complaint make it

15   abundantly clear that the plaintiffs have failed to

16   substantiate their allegations of, quote, serious present

17   problems with integration.

18         Recognizing implicitly that they had failed to prove

19   scienter, intent, knowledge, with respect to Mr. Papa or

20   Ms. Brown, the plaintiffs then go down the chain of pure

21   supposition and they ask you to adopt the corporate scienter

22   doctrine which the Third Circuit has never adopted.  They don't

23   dispute the fact that it's never adopted, but they ask you to

24   get out in the future and to be Nostradamus and predict that

25   they will some day, for some reason, somehow.

1           Now, the Court had opportunity as recently as August

2    2021, again, after the briefing was completed in this case, to

3    decide whether it as the Third Circuit would adopt a corporate

4    scienter doctrine.  And it declined again in 2021 to adopt that

5    doctrine.

6           In any event, even if their Nostradamus predictions are

7    correct, and if the Third Circuit were to adopt some variation

8    of the corporate scienter doctrine some day for some reason, it

9    would not apply here because that doctrine requires a

10   connection between the person who acted with scienter and the

11   statements at issue.  Here plaintiffs have demonstrated no

12   connection between anyone other than Ms. Brown and Mr. Papa for

13   whom there is no scienter to the statements they challenge in

14   the amended complaint.

15          Final point with respect to the main argument.  The

16   failures to meet the loss causation burden that the *Dura* case

17   in the Supreme Court -- D-U-R-A -- mandates that they must

18   meet.

19          Start with the easiest one.  The 14(e) claim.  The 14(e)

20   claim is dead on arrival.  Dead as a door nail.  The plaintiffs

21   claim that they lost opportunity of a successful tender offer

22   by Mylan not that they had any actual out-of-pocket damages.

23          So their claims under 14(e) turn exclusively on the

24   supposition that the Mylan transaction would have gone forward

25   and if they would have gotten the so-called benefit of that.

1   But they must meet a standard they have not met.  They must

2   show that those damages are not wholly speculative.  And that's

3   what the law requires.

4        Here, had the alleged concealed facts been disclosed, it

5   is wholly speculative whether the plaintiffs would have reaped

6   the benefit of any tender offer to begin with.  That's because

7   plaintiffs theory of loss rests on the rather irrational and

8   internally inconsistent premise that disclosure of the alleged

9   concealed facts would have had an impact on a decision by

10  Perrigo shareholders whether to tender their shares, but

11  somehow would have had no impact on the bidder, no impact

12  whatsoever on Mylan's decision, whether to pay anything at all

13  or certainly not the price that they put forward.

14       And so if you don't have a -- if the transsection itself

15  is wholly speculative, the damages are wholly speculative and

16  14(e) must fail under loss causation.

17       Now, plaintiffs 14(e) claims assume Mylan would have

18  offered the very same tender price it did, even after Perrigo

19  had disclosed the so-called cleansing announcements we talked

20  about with respect to Omega and generic topical drugs.  The

21  plaintiffs claim that the damage to them -- with respect to

22  those claims -- equals $63 a share.  So that's their own

23  theory.

24       It's wrong for lots of reasons, but why would a company

25  worth $63 a share get the same price from Mylan, less a share,

1   get the same price from Mylan that the company worth $63 more a

2   share because was the truth was withheld.  It makes no sense.

3        Absolutely, Mylan with a bare minimum have offered a

4   lower price per share.  How much?  Who knows.  I just can't

5   speculate.

6        Far more likely, Mylan would have withdrawn the bid if

7   the supposed fraudulent things were brought to their attention.

8   And, of course, more important than anything else is plaintiffs

9   have no evidence to the contrary.

10        Now, to try to bootstrap this argument -- bolster this

11   rather illogical argument about Mylan would have gone forward

12   with the deal had they known the truth, but the shareholders

13   would not have -- it's internally inconsistent.

14        And they say, though however, your Honor, that the

15   original tender offer from Mylan was legally binding and, thus,

16   that's their proof that Mylan would indeed have paid that full

17   offer, even though the company was worth at leas $63 a share

18   less, if the truth had been known.

19        The plaintiffs cite Mylan's April 24, 2000 offer --

20   April 24, 2015 offer -- which is Exhibit 292 -- for that

21   proposition.  But we can read.  We've got the smart kids over

22   here.  We can read the Mylan tender offer and it's not

23   nonbinding.  Not even close to nonbinding.  If the Court were

24   to study page 10 of that document, there is a list of

25   conditions to that offer.

1          And on page 14, Mylan makes it clear that its offer was

2    contingent upon, quote, Mylan not having discovered that any

3    financial, business, or other publicly disclosed information

4    concerning the Perrigo group was materially misleading,

5    contains a material misrepresentation of fact, or omits the

6    State a fact necessary to make the information contained

7    therein not materially misleading.  Has the standard out for

8    things of this nature.

9          About as nonbinding as completely binding -- excuse me.

10   It is completely nonbinding deal because they had a total out,

11   a total contingency to get out on the very type of facts the

12   plaintiffs complain about.

13         There is no question that Mylan would have reduced or

14   withdrawn its offer.  Of course, we have a view on that from

15   supposed expert, a guy named Dr. Nye, N-Y-E.  You will hear

16   about his lack of viability as an expert from Mr. Groner, but

17   he is helpful to us in this one respect, your Honor.

18         He testified in his deposition that he didn't see how

19   anyone in their right mind could think that Mylan, upon knowing

20   that Perrigo had been lying about the prospects associated with

21   its generic Rx division and its integration performance Omega

22   would have completed the deal.  Their own expert says the deal

23   would have never gone forward.

24         And in a thing that I've not witnessed -- and Mr.

25   Hardiman and I talked about this in the collective; we're

1  old -- but our collective seven years of experience, we haven't

2  witnessed quite the effort that we saw by the plaintiff to

3  change that testimony through an errata sheet.

4       They recognize the statement kills their 14(e) claims,

5  that's why they are dead on arrival, amongst other reasons, and

6  they try to make it less damaging by changing Mr. Nye's words,

7  by flat changing testimony.  And I will put up his fatal

8  concession as a slide.  I will put up plaintiff's effort to

9  come back from the grave.

10      Plaintiffs changed Dr. Nye's testimony from saying, he

11  does not see how anyone in their right mind could think that

12  Mylan would have completed the deal, to him saying that, he

13  doesn't see how anyone in their right mind could know whether

14  Mylan would have completed the deal.

15      Now, even the errata sheet is the death, now, for the

16  14(e) claim, because it is wholly speculative as to whether

17  they would have completed it or not through their own expert's

18  testimony.  Wholly speculative is the bar they have to get over

19  to sustain a loss causation a burden of proof, which is on

20  them.  And so even their own expert told the truth the first

21  time, frankly.  Even when you contort his testimony, it doesn't

22  save the day; the 14(e) claim has gone to go.

23      Now, there are other loss causation issues outside the

24  14(e) context, your Honor.  Those having to do with the 10b-5

25  portion of the complaint.  And they fail to meet their burden

1    to show why there is a loss causation with respect to 10b-5

2    claims as they have with respect to the 14(e) claim.

3         They acknowledge that a corrective disclosure must

4    relate to the same subject as the misrepresentation at issue.

5    Here, however, even just plain reading, allows the Court to

6    understand that the alleged corrective disclosures claim they

7    do not relate to the same subject matter of the complained

8    about and challenged statements.  We explain in great detail in

9    our papers why they cannot prove loss causation, with respect

10   to their 10b-5 claims, but I will focus on one glaring example.

11        On April 22, 2016, there were reports that Mr. Papa was

12   resigning as Perrigo's CEO.  Plaintiffs claims -- and I think

13   rather bizarrely -- that Mr. Papa's resignation revealed the

14   defendants previous statements about Perrigo's integration of

15   Omega were false and misleading.  There is no records in these

16   statements to Omega.

17        There is no suggestion that Mr. Papa who gets an

18   unbelievably valuable deal to go run Valeant, a big drug

19   company in trouble, was leaving to take that unbelievable job

20   because of problems at Omega.  It's a massive jump and it's

21   indicative of the type of speculation that is replete in their

22   pleadings and in their complaint.

23        There is nothing new about Omega disclosed on April 22

24   2016, and their very consistent failure to connect so-called

25   corrective disclosures to the same subjects as the alleged

1  misrepresentations doom them under the loss causation element

2  they must plead under 10b-5.

3       Now, Dr. Nye also fails to account for negative

4  developments in other aspects of plaintiff's business --

5  Perrigo's business, excuse me -- on the same dates of these

6  challenged statements, including other aspects of Omega and

7  segments unrelated to generic drugs, or Omega.  These are

8  things that also contribute to the share price decline.  This

9  is known as his failure to disaggregate.

10      So to summarize quickly, if Perrigo were to put out a

11 statement that said X, Y, or Z about its generic drug business

12 and the stock went down and on the same day it said

13 disappointing results in the over-the-counter market,

14 disappointing results in some other segment, disappointing

15 results in Rx, the share price decline has to be studied and

16 examined and segregated.

17      You can't say that when there is three or four reasons

18 for a price decline on a given day, all of that damage

19 associates and relates to one of your complaints.  And that's

20 basically what Dr. Nye does.  He's got the disaggregation

21 phobia in spades.  He basically says, Any time the stock goes

22 down, has any disclosure at all that touches on stuff in this

23 case, that the 100 percent of that stock price decline is

24 attributable to that.  It is just illogical.

25      And Mr. Groner will go to that as why that is part and

1    parcel of why he should be excluded.  Dr. Nye tries to take

2    statements about underperformance Omega as corrective of the

3    allegedly misleading statements about integration.  But as

4    we've gone through, your Honor, underperformance is not in this

5    case.  It was only in the case for a little bit with respect to

6    four geographic markets, and those claims were dismissed by

7    Judge Arleo.

8          There has been no amendment to bring performance to this

9    case.  Plaintiffs try, in their papers, to convolute and

10   collate integration and performance because they know they have

11   not carried the day with respect to integration claims, but we

12   take the Court through our papers how unavailing that effort

13   is.

14         So for these reasons and others we disclosed in our

15   briefs, plaintiff's failure to prove loss causation is another

16   reason summary judgment should be granted for the defendants.

17         I now turn the podium over to counsel to the individual

18   defendants.

19         Thank you very much, your Honor.

20           THE COURT:  Thank you.

21           MR. HARDIMAN:  I will have some slides, would you like

22   a copy of them up at the bench to follow along?

23           THE COURT:  Yes, please.

24           MR. HARDIMAN:  My name is John Hardiman.

25           I will try not to go over old ground and cover the two

1   surviving theories that exist against Ms. Brown.

2        The first are eight alleged misstatements regarding

3   generic Rx pricing.

4        And the other is one, just one, alleged misstatement

5   regarding the present success of Perrigo's integration of

6   Omega.

7        A couple of preliminary matters, your Honor, there is no

8   dispute that Ms. Brown can only be held liable for statements

9   she made.  Not statements of anybody else, not statements of

10  the company.

11       There is also no dispute that in assessing scienter, the

12  only documents that are relevant are those that she saw.  The

13  plaintiff's brief confuses that, mix and matches a lot of

14  documents, but I think our brief does a pretty good job of

15  clearing that up.  I urge you to take a look at that.

16       Starting with the generic Rx pricing, of course, the

17  critical elements that the plaintiffs have the burden of

18  proving are falsity and scienter.  And they just haven't done

19  it at all with respect to Ms. Brown.

20       Going to slide 5, as I think Mr. Wareham has ably

21  pointed out, when it comes to price fixing there is simply no

22  there there, in this case.  And if there is something below

23  there -- there being no there there, -- that's what it is with

24  respect to Ms. Brown.

25       If we go to slide 7, since Mr. Wareham already covered

1   why there is no price fixing in the case, there is simply no

2   evidence that the Ms. Brown had any knowledge whatsoever of any

3   price fixing going on anywhere.  Even if it existed, there is

4   no evidence that Ms. Brown knew anything about it.  There is

5   nothing direct.  There is nothing circumstantial.  Direct,

6   there is no person in this case who was deposed who said

7   anything like Judy Brown knew about price fixing.  There is no

8   document in this case which says anything, like, Judy Brown

9   knew about price fixing.

10          To drive the point home more -- as Mr. Wareham said and

11  I agree with him -- this entire claim was intended to piggyback

12  on actions of the government.  The Attorney General's

13  litigation and the Department of Justice.  Plaintiffs admit

14  that in the entire complaint by the State Attorney General, Ms.

15  Brown is not even mentioned.

16          In the affidavits that had been submitted by plaintiffs

17  from former employees of Sandoz, Ms. Brown is not mentioned.

18  In the Sandoz-deferred prosecution agreement which they point

19  to, Ms. Brown is nowhere mentioned.  Of course, the Department

20  of Justice brought no claims against Ms. Brown, but even more

21  importantly, while they blocked the depositions of many people

22  in this case because they thought they might have information

23  regarding their investigation, they permitted the deposition of

24  Ms. Brown to go through.

25          They indicate not only did they have no claim to bring

against her, they didn't think she knew anything about price

fixing.  She simply didn't factor in the matter at all.

Now, faced with this overwhelming effort, plaintiffs try

in their papers to come up with some circumstantial case

against Ms. Brown.

Their expert, Mr. Clark, who Mr. Groner will talk about,

opined that price fixing could have happened at 19 industry

conferences.  Of course, just because there is an industry

conference doesn't mean there is any price fixing, but

Mr. Clark opines maybe that's where things happened.

Ms. Brown only went to two of these conferences.  And

she was deposed for two days and they never asked her what

happened at the conference.  They never asked anybody else what

was Ms. Brown doing at the industry conferences.  Well, if they

were trying to imply that Ms. Brown somehow did something

untoward at these conferences, they've got to try and make

their case.  By not asking her a question about it or anybody

else, that's not behavior trying to make a case.  That's

behavior trying to avoid summary judgment and it shouldn't

work.

The other thing they point to is whether or not

Ms. Brown knew anything about pricing decisions at all.

Undisputed, Perrigo had a pricing committee.  Ms. Brown wasn't

on it.  Undisputed, John Wesolowski who was the senior vise

president of the commercial operations was the ultimate

1    decision-making authority.

2          Now, in trying to get some iota of a case, plaintiffs

3    focus on some testimony from Mr. Wesolowski and also his boss,

4    Doug Boothe, which they claim suggests that pricing decisions

5    were past by Ms. Brown for sign-off.

6          Now, even if that were true, it's by no means any

7    evidence that she knew anything about price fixing.  Just the

8    fact that you know something about prices doesn't mean you know

9    anything about price fixing.  But of course, the testimony

10   doesn't say that.  What Mr. Wesolowski said was that he

11   believed that his boss, Mr. Boothe, in situations where a

12   pricing increase might create a penalty, which sometimes

13   happens -- sometimes you have a deal with a customer and you

14   decide to raise the prices and that triggers some sort of

15   penalty payment to the customer.

16         He said, in those situations, Doug Boothe might give a

17   heads-up to the financial department that there will be an

18   impact on revenue by the price increase.

19         What Boothe said was that he might speak to somebody in

20   Ms. Brown's organization -- she was the CFO -- just to give

21   them that sort of heads-up because of the impact on revenue.

22   There is nothing that can be drawn from that, that Ms. Brown

23   was somehow involved in knowing about price fixing.

24         Now, if you take a look at the statements they focus on,

25   they are totally vanilla statements to the effect of, you know,

1    we face price competition in the market.  If you look at the

2    underlying documents that she saw before making those

3    statements, they are totally consistent with what she said.

4    This is the rare 10b-5 case where the underlying documents and

5    the statements made publicly are totally consistent.

6         What plaintiffs seem to be trying to argue is that,

7    well, because there was a price-fixing conspiracy, which of

8    course they haven't proven, and because Ms. Brown spoke about

9    pricing and knew about the price-fixing conspiracy, which of

10   course they haven't proven, the mere fact that she spoke about

11   pricing had to be misleading because she didn't mention the

12   price-fixing conspiracy.

13        That sort of convoluted argument has been tried before

14   and rejected.  I refer you to the *Utesch* case which we cite in

15   our briefs which the court said just because somebody is talk

16   about pricing obviously doesn't mean they know that somebody

17   acting in criminal behavior.  That is quite a leap to make, but

18   that's the leap that you are being asked to make, your Honor,

19   in order to keep Ms. Brown in this case on the price-fixing

20   claim.

21        One other thing, I won't spend a lot of time on it, but

22   I just want to mention it.  In the plaintiff's response brief

23   to our motion for summary judgment appeared for the first time

24   in this case a reference to a statement Ms. Brown made on

25   October 22, 2015.  The statement which is in slide 15 is nearly

all of our revenues are insulated from the current pricing

drama you see playing out in the pharmaceutical industry today.

Now, it is beyond me what exactly case they are making

based on that statement.  And of course, I can't look at the

complaint for any explanation because they don't plead anything

about this statement in their complaint.  They don't plead she

said anything on October 22nd at all that's important.  For

that reason alone, any discussion of this statement should be

rejected.

But what she was talking about, what their own expert

said she was talking about was you might remember a few years

ago Martin Shkreli was all over the news because he had raised

the price of, I think it was, an aids drug by some astronomical

number.  That was the pricing drama going on that she is

referring to.  It's got nothing to do with price fixing at

Perrigo.  Oh, my god, if the pricing drama was price fixing at

Perrigo, it would be public, we wouldn't be here in a 10b-5

fraud case.

The plaintiffs do cite you to the fact that in other

cases followed by some of the opt-out plaintiffs, this

statement has been referenced unlike their complaint which

doesn't reference it at all.  But in those cases, the opt-out

plaintiffs contend that this statement was suggesting something

completely the opposite of what's being suggested here that

there was, in fact, price competition that Perrigo was facing,

1   not that it indicated that there was lack of competition, which

2   is the case with a price-fixing conspiracy.

3        In sum, your Honor, as I think you probably picked up

4   from my presentation here, I don't think Ms. Brown can be

5   dismissed from this price-fixing part of this case fast enough.

6   It is offensive that she is in it.  There are simply nothing

7   that these people have developed in four years to tie her to a

8   price-fixing conspiracy.

9        The other allegation against her isn't much better,

10  and it has to do with one statement she made with regarding

11  integration.  I mean, I will give them this, she, unlike

12  knowing about price fixing, she did know there was integration,

13  but that's about the only thing that distinguishes the merits

14  of this claim versus the merits of the price-fixing claim.

15       If -- let's go to slide 21.

16       Now, slide 21 is the statement, and this is the only

17  statement that she made with respect to integration that is an

18  issue in this case.  This is the entirety of what their

19  securities fraud claim against Ms. Brown is based on.  And it's

20  the statement, We close the transaction on March 30th.  So

21  we're about nine weeks in right now, and we are online, I would

22  say we are in line with our going online integration process.

23  Back office is working smoothly.  We are bringing them on to

24  all of our back office systems.

25       That's it.

1        Saying, essentially, nine weeks into the transaction, I

2   think we're online with integration.

3        I would echo what Mr. Wareham said that I think there is

4   a very strong argument that's not the kind of statement you can

5   premise a securities fraud claim on at all.  Not only is there

6   the case that Mr. Wareham cited saying integration is far too

7   loose a term on which the basis to base of security fraud is

8   claimed, but I also refer you to the *Nokia* case from March 29,

9   2021, where the Southern District of New York said statements

10  touting the progress of the integration are nonactionable

11  puffery.

12       A couple of timing issues which I think are important

13  when considering this comment.  The merger occurred on March

14  30th.  That's when Perrigo bought Omega, March 30th.  The

15  integration, quite obviously, cannot begin until March 30th,

16  because that's when the companies are put together.

17       Nevertheless, plaintiffs cite over and over again

18  documents that were developed in the preclosing stage when the

19  parties were getting together trying to figure out what had to

20  be integrated as a sign that there was some problem with

21  integration.  How could there be a problem with integration

22  before you start to integrate?  Five of the ten documents that

23  cite are from this preintegration period.

24       And if you take a look at the documents, it will be

25  pretty evident, you know, how, frankly, silly this is.

1      I mean, plaintiffs cite a March 2015 email in which my

2  client, Ms. Brown, states that Omega's extraordinary accounting

3  charges were an immediate flag for a discussion and probably a

4  painful part of finalizing goals for this year.  That's what

5  she says a month before the integration begins.  What she's

6  saying is, we need to address extraordinary accounting charges.

7      Now, why did that have to be addressed.  Well, that was

8  explained by Ms. Brown and Mr. Winowiecki and other witnesses

9  in the case.  Omega was a European company and operated under a

10  different accounting system, IRFS.  Once they became a Perrigo

11  subsidiary, they had to operate under GAAP.  And one difference

12  between IRFS and GAAP is the way extraordinary charges are

13  treated.

14      Another thing they cite, a February 2015 email six weeks

15  before the merger closes, in which somebody who works for

16  Ms. Brown says, Oh, maybe it does not have a forecasting

17  process.  Ms. Brown said, Well, that's not unusual for European

18  companies.  They usually don't do quarterly forecasts.

19      And so what they talk about in this document and other

20  documents is when we're merged, we are going to have to bring

21  them into our forecasting process.  Neither of those things

22  shows there is a problem with integration, those are just the

23  things you got to deal with to do the integration.  For you to

24  determine whether you're online with the integration, there

25  needs to be a line.  And that's what they were doing before the

1    merger occurred.

2         Another timing issue, and Mr. Wareham touched on this,

3    obviously, since this case has everything with to do with what

4    Ms. Brown knew when she made this statement on June 23, 2015,

5    things that occurred after June -- when she made that statement

6    on June 23, 2015, are irrelevant.  Plaintiffs are in love with

7    a retrospective that Perrigo did in May of 2016, 10 months

8    later.  This says things that we could have done things better

9    in integration.  Hey, great.  Companies go back and look at

10   things all the time.  That's got nothing to do with what

11   Ms. Brown knew on the day she spoke on June 23rd.

12        As the *OFI Risk Arbitrages* case said, Relying on a later

13   filed document or statement is an attempt to prove fraud by

14   hindsight which Third Circuit has long rejected.

15        Now, let's talk about what she actually knew during the

16   period from March 30th when the companies closed their

17   transaction to June 23rd, nine weeks later when she made the

18   statement at issue, the only statement at issue, on

19   integration.

20        Well, here is the May 8, 2015 document, slide 30.

21   And look at what the May 8th document is talking about at the

22   top.  The two topics we just went over a few minutes ago with

23   the two issues that they raised that occurred preintegration.

24        IRFS as gap conversion project progressing.  Good news,

25   on the issue that was identified preclosing.  Continue to have

1    dialogue with Omega on monthly and quarterly reporting.  Again,

2    attacking the issue that was identified preintegration,

3    preclosure, pardon me, that needed to be addressed during

4    integration.

5         So on May 8th she gets good news.  May 12th, five weeks

6    before her statement, she gets an email that says, I just

7    finished a very positive call with Barbara regarding the

8    finance integration work streams with Omega.  Barbara is

9    Omega's CFO.  So she gets an email on May 12th saying, I just

10   talk to Barbara, CFO at Omega, very positive.

11        June 8th, now less than -- a little more than two weeks

12   before her statement on June 23rd.  An email to Judy Brown from

13   somebody at Perrigo again, Very positive approach on progress

14   on integration.  There is only one mildly negative statement

15   that in the IETSEAP space, Perrigo was looking to take more

16   control than originally agreed.  But that's not a statement

17   that the integration is not happening.  That's a statement that

18   they are overintegrating, if anything.  Perrigo is taking

19   control of the company they bought.  All good news if you are a

20   person wondering how is the integration going.

21        June 22nd, the day before her statement, gets an email

22   that the employees at Omega, the rank and file, they are

23   excited to feel like things are changing outside of the

24   increased reporting requirements, smile, meaning because they

25   have to talk to more people now, and that they are part of a

1     larger organization.

2         Also on June 22nd, the day before she speaks, she gets a

3     document from her second in command, Ron Winowiecki, entitled,

4     Success to date, about integration.  Financial reporting,

5     that's our old issue about IRFS and GAAP.  FP&A, treasury, risk

6     management, SOX.  Who after looking at all of this wouldn't

7     feel they could at least say, things are online.  The record

8     totally supports Ms. Brown's statement.

9         What do plaintiffs point to?  They point to two things.

10    The first is that there was a meeting on June 27th in which

11    Mr. Coucke, who is the former head of Omega -- and I should

12    point out, Omega is -- he basically controlled Omega.  I think

13    there was some public shareholders.  It was basically a private

14    company he controlled.  And what he was -- sold his company to

15    a public company in the United States.  It's a different thing.

16    He wasn't going to be in charge anymore.

17        And he had an outburst at a meeting that it was attended

18    by Ms. Brown.  And according to testimony from Tom Farrington

19    who was one of the people who was there, he erupted around

20    nothing is working right with integration in an outburst

21    followed by comments by Ms. Brown.

22        So that sound bite appears in their brief over and over

23    and over again.

24        But the good news is that we have context because on the

25    same day Mr. Coucke wrote an email explaining exactly what he

1   was upset about.

2        And the email says things like, Since close, never a

3   normal day, what we agreed on before signing with respect to

4   functioning culture of Omega is not honored.  Perrigo corporate

5   wants to change us, not to make us better because you are the

6   boss.  It's always the Perrigo way.  Look at the list where

7   Perrigo already tried to change Omega.

8        You don't see in this memo things like, you know, The

9   IRFS and GAAP isn't going right, or, Back office isn't working,

10  or, A little worried about the forecasting.  What you see is

11  somebody complaining that, well, what he sold into was

12  happening.  Perrigo is taking over.  He is not complaining that

13  integration isn't happening.  He is complaining he is being

14  integrated out of relevance.  Not an unusual tantrum for

15  somebody who is used to being in control and not anymore, but a

16  tantrum nonetheless, and nothing that undercuts the enormous

17  positive information she had gotten on the nuts and bolts of

18  integration, which was the basis for what she said on June

19  23rd.

20        The only other document that they really focus on is a

21  document from June 22nd -- and this is slide 37 -- in which I

22  think is Mr. Winowiecki says that, cash flow is off 70 million

23  Euros in Quarter 2.  And that Quarter 2 would have been --

24  Quarter 2 would have been the first quarter when Omega was

25  within Perrigo.  He does not say there, nor has anybody else

1    anywhere, that it had anything to do with integration.

2         In fact, in the very document where he says this, there

3    is a separate section on integration.  So this is a different

4    issue entirely having nothing to do with integration.  And I

5    know Mr. Wareham talked about the fact whether this is a case

6    about performance or integration, with respect to Ms. Brown and

7    her statement, it's kind of beside the point, because the only

8    thing that they are focusing on from Ms. Brown, again, is one

9    statement that she made regarding integration, whether there's

10   online, whether it was online.

11        With that, your Honor, just to sum up, the price fixing,

12   I mean, there is just nothing to connect Ms. Brown there.  The

13   integration really the same story, she was involved in

14   integration.  She wasn't involved in pricing at all, but the

15   overwhelming record is that she received positive news and of

16   course, proving scienter is the plaintiff's burden.  So in this

17   situation, a tie goes to the defendant.

18        Thank you, your Honor.

19        I don't know if you have any other questions.

20            THE COURT:  Thank you, Counsel.

21            MR. BRODSKY:  Would you like a break, your Honor?

22            THE COURT:  I'll leave it up to the parties when you

23   want to think it would be a good time for a break.  I don't

24   need a break.

25            MR. SILVERMAN:  You're up there.

1          MR. BRODSKY:  Thank you so much.  We have a PowerPoint

2     as well.

3          Thank you so much.  Court Reporter, my name is Reed

4     Brodsky from Gibson Dunn on behalf of Joseph Papa.

5          Your Honor, as we get this, hopefully, get the

6     PowerPoint connected, I did want to take a step back and give

7     you guide posts as to what I was hoping to accomplish in a

8     short period of time, now that you have heard a lot regarding

9     the lack of merit in many of the plaintiff's claims.

10          We put in strong briefs, I think, that covered the law

11     and cover a lot of the issues.  What sometimes doesn't come

12     across on the page are the documents themselves.  And that's a

13     challenge that you have in a case here where the documents are

14     the best friends of Mr. Papa, Ms. Brown, and Perrigo.  This is

15     a case where we want you to look at the documents, and I'm

16     going to go through some and put them on the screen.

17          Because when the plaintiffs describe the documents,

18     almost every time they're shifting the meaning or they're

19     playing with the language and they are trying to suggest to you

20     that it is a trial court issue.  It is an issue of fact for a

21     jury.  When in reality, based on the standard, they don't meet

22     the standard.  None of their claims are backed up by anything

23     more than a scintilla of speculation.  It does not meet the

24     standard and thus, summary judgment is appropriate.

25          So what I hope to do is in 30 seconds or, so give you a

1    short background about Mr. Papa.  And then talk a little bit

2    about the lack of motive evidence.  When we started this case,

3    they had theories of motive and now they have gone by the

4    wayside and their theories of motive have completely been

5    eviscerated.  They are actually theories of innocence.

6        And finally, address the two issues that are the

7    remaining narrow theories they allege against Mr. Papa that he

8    made allegedly materially false statements, with respect to

9    price fixing and materially false statements with respect to

10   Omega integration.

11       So if you can put up the first slide.  Mr. Papa is

12   somebody who has an unblemished record.  This is literally his

13   first case which he has ever been accused, by anybody, of

14   securities fraud and making false statements, and it is very

15   disheartening to him personally.

16       And he began as a pharmacist.  He worked his way up in

17   the industry for 35-plus years in the pharmaceutical,

18   healthcare, and specialty industry.  An industry where people

19   are dedicated to the improvement of people's lives.  The notion

20   that somebody would suggest to him that he made a false

21   statement intentionally in a misleading way is just

22   preposterous, but let's address that.

23       He was the CEO and chairman of the bord Perrigo from

24   October 2006 to April 2016.  He had a number of units reporting

25   to him.  Perrigo marketed over 10,900 products.  They had a

massive number of products in their portfolio.  There were over

13,000 individuals worldwide and they operated in over 30

countries.  You are going to see -- because we will show it to

you -- the documents they point to, or the email they point to

that they pull out to suggest that somehow he knew about

something.  Then you are going to see what he actually said.

        And I hope, your Honor, you'll see that it's meritless

what they're saying.  It is not perjury.  He is now presently

the CEO and chairman of the board of Bausch Health, which was

May 2016 to the present.  So again, the two narrow theories on

slide 3, this is what they're left with after the motion to

dismiss was partially granted.  Mr. Papa's statements

concerning competitiveness and pricing in the generic drug

market.  And statements regarding the present success of the

integration of Omega.

        Now, just as a general point, his statements were

factually accurate.  It's provably accurate.  We don't have the

burden to prove they are accurate, but I think I will show you

today they were actually factually accurate.  And so their

claim that they were somehow misleading or materially false is

contrary to the record evidence.

        And Mr. Papa did not act with scienter with respect to

the challenged statements.

        I will quickly move over slide 5 which I think your

Honor knows very well that mere allegations, bare assertions,

 1   suspicions are not sufficient to defeat a motion for summary

 2   judgment.  They need to present something that is more than

 3   merely colorable.  Something that's significantly probative.

 4   And that, they can't come close to.

 5         Again, on the next slide we just want to highlight is,

 6   they have to prove and show and demonstrate significant

 7   evidence that shows his knowledge, his intent, and if they want

 8   to show a form of recklessness, it is a very strong form of

 9   recklessness in the Third Circuit.  It is an extreme departure

10   from the standards of ordinary care.

11         Now, in the Third Circuit they don't have to prove

12   motive, but evidence of motive might be helpful.

13         And when they started this case, they said -- Mr. Papa

14   was motivated in two respects to lie to the public, which is

15   absolutely wrong.  The first they said that he had a desire to

16   fend off the Mylan hostile tender offer and that was evidence

17   of motive.

18         Now the Court has already rejected this at page 18 of

19   Roofer's Pension 2018 Westlaw 3601229.  The Court said such

20   allegations, quote, Fall woefully short of demonstrating

21   scienter, end quote, because they do not suggest any, quote,

22   concrete and personal benefit.

23         There is nothing in the record since that time that has

24   helped them in that respect.  In fact, what the record shows

25   is, had Mr. Papa supported the Mylan tender offer, he would be

1    far more wealthy today.  It was against his own financial

2    interest in what he believed to be the right thing to do, given

3    his stock position in Perrigo.

4         And then second, the plaintiffs have alleged this other

5    motive -- where they insist on it, and I think they still

6    insist on it today, although we will have to see what they say

7    today -- that he had some usual stock sales that somehow were

8    evidence of motive.  I want to give you a brief overview and go

9    into those.

10        He did not engage in unusual stock sales.  Quite to the

11   contrary.  During the relevant period his overall holdings

12   increased -- increased, not decreased -- increased by 9.8

13   percent during the class period.  I call that motive contrary

14   to what they think.  Had he been selling the stock during the

15   period of making allegedly false statements, that resonates

16   with some proof of motive, but here we're talking about

17   somebody who increased their ownership of stock during the

18   alleged period that he is -- that they allege that he is making

19   false statements.

20        In addition, if you compare his trading during the class

21   period to before, he took steps to stop his trading during the

22   class period.  And I want to go through, briefly, that timeline

23   because I think it is very, very compelling.

24        On slide 8 we have in March 2015 Mr. Papa entered into a

25   Rule 10b5-1 trading plan.  I am sure your Honor knows this, at

1    the time an executive of a public company has no access to

2    material nonpublic information pursuant to an FCC rule, they

3    may initiate a plan in which they have no control over once the

4    plan is initiated.

5         And they can't change the plan if they want to buy and

6    sell, that plan has to be initiated.  They can't change the

7    plan when they have material nonpublic information.

8         So he initiated a plan at a time he didn't have material

9    nonpublic information in March of 2015, that would only trigger

10   sells of Perrigo stock when it reached the price of $150 per

11   share.

12        In April of 2015, Mylan made an unsolicited offer and

13   what did he do?  Now, he could have let that plan run.  The

14   stock was moving up fast.  He could have benefited from letting

15   his trading plan go.  Why?  At the time that he initiated the

16   trading plan, he had no idea that Mylan would come in with this

17   tender offer.  But what did he do?  I think this is very

18   telling.

19        He canceled it because, quote -- and he testified about

20   this and no one has challenged him about it, because you can't

21   challenge the stubborn fact that he canceled.  He said he,

22   quote, Didn't feel that the CEO trading during that time period

23   would be appropriate.  That tells you everything you need to

24   know about the character of Mr. Papa.

25        If we move onto the next slide, August 25, 2015, he sold

vesting shares for tax liabilities.  Now, that as under the

case law is heavily against an inference of scienter, there are

cases that we cite in our brief for that.  It was 11,000 and

his holdings increased by 11,490 shares as a result.

November 13, 2015, Perrigo shareholders defeat the Mylan

hostile tender offer and that's when he enters into a new plan.

December 28th, Mr. Papa sells shares pursuant to the 10b5-1

plan, the only date of sale by Mr. Papa during the class

period, the first sale of share in 21 months and the total

shares sold on this date were one-tenth of the total number of

shares in the 25 months before the class period.

Finally, leading into the fourth quarter, before the

fourth quarter results are announced, he cancels his trading

plan because, quote, He felt that the right thing to do was not

to make any additional 10b5-1 trades until all the information

became publicly available.  This is significant in terms of

determining scienter.

We respectfully submit that this is now probative

evidence and an insight into his mind as he is making the

statements during the class period.  These are stubborn facts

that I think the plaintiffs have a hard time grappling with.

Let's go to what they are actually trying to claim.  First,

with respect to generic Rx competition and allegations of price

fixing.

Going to slide 13, you've already heard the evidence.

1    There is an absence of any evidence of price-fixing scheme.

2    Let's assume in a hypothetical fantasy world, there was some

3    evidence of a price-fixing scene.  Hearsay upon hearsay,

4    speculation, whatever it may be.  Assuming that was accurate,

5    none of the direct evidence involves -- alleged direct

6    evidence, hearsay upon hearsay -- involves Mr. Papa.  The

7    plaintiffs had claimed that Mr. Papa was, quote, Involved in

8    the pricing decisions.  These are their claims.  That's been

9    proven untrue.

10         None of the several episodes in which they rely on for

11   alleged price fixing that their expert has put forth involve

12   Mr. Papa.  And the documents they rely on for circumstantial

13   evidence, they don't come close to supporting any reasonable

14   inference that Mr. Papa knew about price fixing.

15         So stepping back, I won't reiterate and belabor the

16   point, but there has been no allegation by any federal or state

17   law enforcement authority, in the country, in the world,

18   alleging wrongdoing against Mr. Papa.

19         And they have admitted that.

20         And then the affidavits on slides 15 that they rely on

21   which was already addressed, they concede that the two

22   affidavits offer no evidence with respect to Mr. Papa.

23         So what do they rely on?  Let's look at the actual

24   documents, because we embrace these.  These are evidence of

25   innocence.

1      In their brief they cite these documents.  So let's put

2  them up.  Slide 16, they rely on plaintiff's Exhibit 271.  But

3  there is no proof of Mr. Papa's awareness of price fixing and

4  the proof of how much they stretch the meaning of words and

5  they ask your Honor to overlook them is this document.

6      In this document Exhibit 271, your Honor, they point to

7  the words, this is a board -- he is not on the email, but he

8  did receive these board slides.  And one of the slides that

9  they point to -- this is the slide -- slide 16 of Exhibit 271

10 says, Pricing environment more difficult.  And it says, Drug

11 pricing now in the news.  They point to those statements and

12 they say, That's evidence he knew about price fixing.  I'm

13 sorry.  Where?

14     Like if I got that document, I would be struggling how

15 in the world am I supposed to know from pricing environment

16 more difficult, or drug pricing now in the news, that somehow

17 people in Perrigo might be fixing prices, or somebody in the

18 their world they might be fixing prices.  They have to come up

19 with evidence that's significantly probative that Mr. Papa knew

20 or recklessly disregarded there was price fixing.  That

21 document does not prove that.

22     Let's go to the next document because I think it's very

23 telling -- your Honor, we're talking about millions of pages of

24 documents, as I understand it, they reviewed and produced.

25 We're talking about depositions upon depositions upon

1  depositions.  They have combed the earth for evidence against

2  Mr. Papa knowing about price fixing and this is the exhibit

3  they rely on in their brief.

4      Exhibit 272.  And what is Exhibit 272?  It is a single

5  customer of the millions of customers of Perrigo who writes a

6  letter to Mr. Papa.  This is in November 12, 2014.  And that

7  gets sent -- his secretary, Genni Plyley at the time, sends it

8  to Mr. Papa who has a practice -- as he testified -- of giving

9  any of the letters to the various departments to handle.  What

10 does this person said?  This person says that they were using a

11 desonide cream, a form of cortisone that is more powerful.

12 Desonide cream and the cost from 2013 to 2014 for 60 grams went

13 up from $42 to $241, a six-fold increase.

14     Now, I'm sorry.  That cannot be, as a matter of law,

15 evidence of someone being aware of price fixing.  It just can't

16 be.  A jury should not look at that and decide whether or not

17 that's price fixing.  This is for a Court to decide.  This is a

18 thousand steps too far from alleging that someone knew about

19 price fixing.

20     If this is about someone who knows about price fixing,

21 somebody could write a letter to this Court and suggest I saw a

22 suspicious character outside of this Court, come into the

23 Court, several times a week, and is that supposed to be

24 evidence of some kind of criminal conspiracy?  If the Court

25 looks at the letter and says, I'll pass it on to the marshals?

1   This is not evidence of knowledge of any kind of price fixing.

2        Next slide 18, Mr. Papa was not involved in pricing

3   decisions.  I believe this is undisputed.  The pricing

4   decisions were made for the generic unit, was made by a senior

5   vice president advised by a pricing committee.  The testimony

6   confirms that Mr. Papa wasn't a member of that pricing

7   committee.  And the pricing committee did not regularly share

8   its specific pricing decisions with the executive committee.

9   And what is some of the best proof of this?

10        I mean if we take a look at slide 19, this is the

11  corporate representative himself of Perrigo who said that, the

12  level of detail regarding pricing decisions was, quote, simply

13  not appropriate for somebody at the executive level.

14        I mean, I think that says it all.  There is zero

15  evidence that Mr. Papa was involved in pricing decisions.  And

16  I haven't seen it.  I haven't heard it.  And I'm troubled that

17  they are not voluntarily dismissing this, with respect to

18  Mr. Papa.

19        Now, he did receive monthly and quarterly reports from

20  business units.  But none of those reports have any evidence of

21  a price-fixing scheme.  He did attend four conferences of the

22  19 conferences that their expert said was an opportunity to

23  collude.  That's what the expert said.  19 industry

24  conferences.  You go to a conference.  It is an opportunity to

25  collude.

1           Personally, I don't think that's evidence of anything

2   because people go to conferences all the time.  People go to

3   judicial conferences.  People go to lawyer conferences.  People

4   go to conferences for all sorts of reasons.

5           That can't be evidence of wrongdoing because you go to a

6   conference.  Put that aside, even assuming it is some kind of

7   evidence -- which it's not -- he went to four conferences of

8   the 19 and they were in 2013 and 2014, prior to the class

9   period.

10          Now, Plaintiffs asked Mr. Papa zero questions about

11  these conferences.  I barely think they asked him any questions

12  about price fixing at all.  Your Honor, they asked for two days

13  of Mr. Papa's testimony.  That's the class plaintiffs and the

14  opt-out plaintiffs.  Two days.

15          We had no objection.  If they asked for three days, we

16  would have given them three days, no objection.  You want any

17  question to Mr. Papa, go ahead, here is your opportunity.  He

18  was one of the last deponents to be deposed.  You built up your

19  entire record.  You loaned your documents.

20          And how long did they ask him questions?  14 hours they

21  asked for.  We gave them all 14.  Five.  They took five hours

22  out of 14.  I had to ask them the question at the end of the

23  five hours, I was so shocked sitting there that they didn't ask

24  any questions about the relevant issues here.  They didn't want

25  to know from the one person who can tell them what a document

 1    meant or what he believed?  It was shocking.

 2         And I think because they didn't want to know his

 3    answers.  They want to rely on these little bits and pieces

 4    from documents without actually getting to the truth.  I had to

 5    ask him the single question, were you aware of -- were you

 6    involved in pricing?  Which of course, he said no.

 7         Now, I think this pretty much finishes the price-fixing

 8    issue.  And it's just really troubling that they continue to

 9    pursue it.  Mr. Papa did make statements about the

10    competitiveness of the market.  So let's put that up on slide

11    20.

12         He said, obviously, it's a competitive market out there.

13    Now, I think that's true.  I mean, there are, as I understand

14    it, over 90 companies competing with Perrigo at this time.  I

15    would call that competitive.  I don't think these statements

16    that it's obviously a competitive market out there, or at the

17    bottom, I'm not going to make any specific comments on a

18    customer or product.  How in the world can that be evidence

19    that Mr. Papa is aware of price fixing?  It is obviously not.

20         And at the same time, if we go to slide 21, Plaintiffs

21    don't focus on this, but Mr. Papa made statements about the

22    generics market, in which based on his knowledge and his

23    experience and what he was exposed to, he understood that these

24    products in the generic space were exposed to less competition

25    due to relatively longer and more expensive development,

1  clinical trial and approval processes.  I mean, that makes

2  sense.  That's logical.  And so if prices were going up in a

3  less competitive market, that made sense.

4       On August 5th they point to this on page -- slide 22,

5  that Mr. Papa said, Our team has done a great job at looking at

6  pricing.  And that -- across that portfolio we think there is

7  still opportunities to do pricing.

8       They claim that's misleading, your Honor.  That's

9  misleading.  Our team has done a great job at looking at

10 pricing.

11      It sounds like an opinion to me about trying to give a

12 compliment to your team.  And then so across that portfolio we

13 think that there is still opportunities to do pricing.  I think

14 it's okay to look for opportunities to do pricing even in a

15 market that's hard to do pricing.  Because there are less

16 competitors doing it.

17      On slide 23 he was then shown this document.  This is a

18 month and a half later.  It was September 13th.  And this is

19 what the plaintiffs point to as proof that when he said our

20 team has done a great job looking at pricing and we think there

21 is opportunities to do pricing, that he was misleading the

22 market intentionally.

23      They point to this email in which he is copied on it.

24 It contains a slide deck.  And on one of the slides it says,

25 business dynamics.  And there is a bullet that says, Minimal

1   price increase opportunities.

2         Well, that meant they were looking for opportunities.

3   And there were minimal price increase opportunities.  Entirely

4   consistent with what he said six weeks before or so.  And

5   that's what he testified to, but they are pointing to it as if

6   it's misleading and it boggles the mind as to how they have

7   that theory, why that works.

8         Turning next to this issue, and this issue is one that

9   we've struggled with because Mr. Papa has been consistent from

10  the beginning of this case.  They have been consistent in

11  misreading his statements.  And this has happened over and over

12  again, so I'm glad we get a final chance to show your Honor

13  what the evidence shows.

14        They claim that Mr. Papa represented to the market --

15  this is on, I believe, slide 24 -- that Mr. Papa represented to

16  the market a pricing goal, specific each of the six generic Rx

17  products at issue.  And they claim that he represented a goal

18  for the broader generic Rx market.  I mean that's what they

19  allege.  Repeatedly, as Mr. Papa testified, when he talked

20  about pricing, he talked about it on a portfolio-wide basis.

21        Now, don't take my word for it.  We're about to turn to

22  the evidence that shows it over and over and over again.  And

23  they disregard this, so I'm hoping today they will confront

24  this and they will address this with your Honor.  And they will

25  explain to your Honor why on February 5, 2015, when Mr. Papa

said, first comment I offer is that across the total Perrigo
portfolio, our goal is always to keep pricing flat to slightly
up.

I'd like them to explain to you today why that doesn't
mean it is across the total portfolio.  May 12, 2015, Bank of
America conference.  I challenge them to explain why this
statement, our approach in our total business is to keep our
pricing flat to up, slightly.  Why he is not talking about the
total business?

June 2, 2015, he says it again.  We -- the approach we
take on pricing is really a portfolio approach, across all the
Perrigo segments.  I think he is being quite clear, but let's
see if there is something else.

Next slide, 26, June 2, 2015, this is during the class
period, now in any individual category like Rx there may be
more upside.  I will say over the last several years, to be
fair, there has been more pricing upside in the Rx category
than perhaps some of the other categories.  But we still take
that kind of total portfolio view of keeping pricing flat to up
slightly as a view.

And the Goldman Sachs conference, January 5, 2016,
again, bookends to this entire class period.  He is again
saying, it is across the total portfolios.

What do they do?

Your Honor, in their brief, and I really wish I had

1   blown up their brief, but you know what?  I will turn to the

2   page.  It is their opposition brief to the motion for summary

3   judgment.  It's on page 55 and these pages, absolutely shocking

4   to me when I read them.  Page 55 and 56.  And we will put it

5   up, and we will blow up the evidence of what they are trying to

6   persuade your Honor to do.

7        They turn to these words right here on page 55 of their

8   brief, their opposition brief at page 55.  And they say these

9   are the words that Mr. Papa said.  And they say, quote,

10  defendants Papa and Perrigo said the strategy was applied not

11  just on a portfolio-wide basis, but at product, category, and

12  business segment levels.

13       And that's the words they quote to your Honor.

14       Page 55.  They go on to say, defendants argue that Papa

15  meant something other than what he actually said.  Now they are

16  telling your Honor that Mr. Papa, when he says it is across the

17  portfolio pricing, he is not telling the truth.  And this a

18  jury question.  In fact, their next sentence, however, quote,

19  That is an issue for trial.  Okay.  What did they leave out for

20  your Honor?

21       Let's go to the next slide.

22       How about the previous paragraph, your Honor, where it

23  explains exactly what he is talking about which they don't

24  point you to?  Quote, On the question on pricing, certainly we

25  see that out in the marketplace, but I would remind the

1  audience today that what we've always said about pricing is

2  that our pricing across our total book of business is flat to

3  up slightly.

4        Let them come up and explain why they left that out on

5  page 55.  Why they think that's a triable issue, when in that

6  paragraph and the one right below it, he says very clearly, I'm

7  talking about our look at our total portfolio and that explains

8  exactly the statement that they cherry-picked out, -- which now

9  you can see means whether we're talking about any specific

10 product, or any specific category, or any segment of our

11 business; the overall comment, the overall portfolio comment --

12 is flat to up slightly for our pricing.

13       Can there be any reasonable doubt about that?  If this

14 is a reasonable doubt standard, there would be no question we'd

15 win.  It is a much lower standard for us.  Much higher burden

16 them to show somehow this is significantly probative when they

17 cherry pick a portion of the statement and they think that's up

18 to the jury to decide.

19       Your Honor, they completely are taking out of the

20 meaning of the plain language.  Now, let me go to the next

21 issue, which is Omega integration.

22       They can't prevail on these claims with respect to Omega

23 integration for substantially the same reasons that they can't

24 prevail on their other claims, because they are just taking

25 things out of context and they are not looking at the record

1   evidence.  But we have the record evidence and we want to give

2   it to your Honor.

3        The plaintiffs have failed to establish that any of

4   Mr. Papa's statements somehow were false or misleading, or

5   presented somehow a false or misleading picture by suggesting

6   somehow he omitted that there were serious impediments to

7   integration.

8        Okay.  Let's test out their theory.

9         If we turn to slide 30, I would like to talk about

10  slide 30 and 31 briefly.

11       Because in the context of Omega integrations, they keep

12  saying the public -- because they care about the public, what

13  did the public know during the class period?  I mean, as a

14  federal prosecutor, when I was prosecuting securities fraud,

15  that's what I cared about.  What does the public know?  Did

16  they receive the information they needed to assess the total

17  mix of information to figure out whether or not somebody should

18  buy or sell a security?

19       Okay.  They say Omega integration was troubling.  They

20  say it was troubling --

21       They say Omega integration, people should have been told

22  it was plagued with systemic problems.  Now, really, the

23  problems they were plagued with, which we are about to see, are

24  HR problems, IT problems, not commercial problems.  I mean,

25  between us, what does the investor care about, whether the IT

1   is integrating, whether the HR departments are getting

2   together, or whether the commercial synergy is effective?  The

3   investor cares whether or not the commercial synergies are

4   effective.

5        But put that aside.  Even if you put that aside, on

6   slide 30 and 31 we've excerpted out from the public filings

7   what they want to avoid focusing on, February 5, 2015,

8   Perrigo's Form 10K; April 29, 2015, Perrigo's Form 10Q;

9   August 13, 2015, Perrigo's annual statements; February 25,

10  2016, Form 10KT.

11       What does it do?  It warns every investor that Omega

12  integration combining two businesses is complex.  It's costly.

13  It is time consuming.  It has lots of difficulties.  It is

14  unpredictable.  It could be challenging.  What investor doesn't

15  know this after reading all of these public filings?

16       Let's look at what they actually point to and at this

17  point, I think I would like to hand up to your Honor the stack

18  of documents, the -- I have two copies.  Everybody -- my worthy

19  colleagues to the right and my worthy colleagues to the left

20  all have copies of this because these are the statements and

21  documents that the plaintiffs rely on for support that Mr. Papa

22  made false and misleading statements.

23       And I think we identified them all.  They will tell us

24  later today if we didn't, but I would like them to explain why

25  these show Mr. Papa was being misleading.

1          They focus on Mr. Papa's statement on April 21, 2015,

2     slide 33, and they say that Mr. Papa was deceiving the

3     marketplace when he said 22 days after the March 30th closing

4     of the acquisition of Omega, quote, We are very pleased with

5     our initial integration projects with Omega.  So there is a lot

6     of good activities happening with the integration team.

7          They say that was false and misleading for him to say we

8     are very pleased and a lot of good activities are happening.

9          Okay.  Let's look at their proof.

10          They point to this document on slide 34, a canceled -- a

11     January 2015 email, preclosing, and they say that Mr. Papa

12     should have learned about this, that somebody at Perrigo -- at

13     Omega was canceling a weekly call to plan integration that they

14     were going to start in March.  This is one of their documents

15     they say proves Mr. Papa was somehow misleading.

16          I'm sorry.  It does not.  All it does is talk about

17     planning and somebody canceling a weekly call.  That does not

18     mean that Mr. Papa's statements in April were false about being

19     pleased.

20          Slide 35, they cite an email, again, prior to March 30th

21     closing, in which they say in this email, and we handed up a

22     copy to your Honor, that it raises concerns because they are

23     missing budget from the last year.  So in 2014 they missed

24     budget.

25          I'm sorry.  That does not make Mr. Papa's statement, We

are very pleased with our initial integration project with
Omega, a lot of good things are happening with the integration
team.  I don't see the connection.  There is zero connection to
that.

So let's go to the next document they point to,
slide 35 -- that's slide 36.  They point to this document.

They say -- and let me get this exactly accurate.  This
is an email that raises unspecified -- so it is from
Thomas Farrington to Joseph Papa, Thomas Farrington being in IT
department.  I think he had the title of chief information
officer.  He was involved in integration, and he emails
Joseph Papa on April 8, 2015, Omega integration concerns, and
he says, Joe, Mike, and that refers to Mike Stewart, and I had
a few meetings today on a few matters.  He referenced that some
integration concerns were shared by Barbara and Marc -- that's
Marc Coucke and Barbara being his -- one of his executives --
that you and he had some discussion around.

They point to that and they say, Well, when Mr. Papa
says he was pleased with all the activities with integration,
that meant he was lying.

There is no connection there.  There was no connection.

What was the testimony?  Mr. Farrington testified he
didn't know what those matters were referring too, but what he
thought in his testimony was that Mr. Coucke complained about a
lot of the added work.  Mr. Hardiman already talked about how

1   Mr. Coucke had temper tantrums, and now he is complaining about

2   a lot of work.

3          Mr. Papa testified he didn't recall the specifics, but

4   he did recall concerns about functional group integration.

5          What was that?  HR, IT, not commercial problems.

6          So let's go to the document they rely on.

7          Slide 37, in the packet we gave you, your Honor, and we

8   urge your Honor to look at the packet, this is their document

9   that they rely on.  It is an April 10, 2015, PowerPoint that

10  Mr. Papa received, and they say this PowerPoint proves that

11  Mr. Papa was lying when he said good things, good activities

12  are happening with integration or that there are, you know, a

13  lot of initial integration projects.

14         Really?  I mean, I will just point out one slide within

15  the slide, slide 37.  This is slide 23, bottom left-hand

16  corner.

17         When I look at that, I look at a list of a lot of

18  integration projects.  When I look at some of the headline news

19  here about some of the progress they are making, what I see is

20  a lot of good activities happening with the integration team.

21  What Mr. Papa said was true, and what they are doing is

22  misleading.

23         Slide 38, it is the same -- it is the April 14, 2015,

24  PowerPoint, and it identifies positive results of initial

25  integration projects, something Mr. Papa received, and we've

1   highlighted the slides.

2        Again, I challenge and ask the plaintiffs to point out

3   why that is not proof that Mr. Papa was making a truthful

4   statement and he wasn't being materially misleading.

5        Finally, I will put this up because they point to this

6   repeatedly.  This is the one they rely on repeatedly,

7   your Honor, and this is on slide 39.  It is in your packet.  It

8   is Thomas Farrington's May 26, 2016, document.

9        Now, why is it important?

10       Mr. Papa is no longer at Perrigo.  So he had left, and

11  the chief information officer, I believe is the chief

12  information officer involved in IT, Thomas Farrington, who

13  testified, was doing sort of a postmortem with the benefit of

14  hindsight and he singularly focused on IT because that's his

15  area.  Commercial stuff he doesn't know about, but IT, back

16  office, that's his thing, and he had some criticisms for

17  Joe Papa.

18       Joe Papa is the missing guy in the room.  He is no

19  longer there.  He is over at Bausch Health, otherwise,

20  previously known as Valeant, and he is criticizing some of

21  Joe's decision-making, but nowhere does he say anywhere here

22  that there were serious impediments.  Nowhere does he say

23  anywhere here there is anything to do with commercial

24  integration.  Again, this is 2020 hindsight after the fact.

25  That's what they rely on.

1          Now, they also point to the statement on slide 40.

2    Mr. Papa's statement, which people have already gone over so I

3    will just be very brief on it, 22 days after closing, Mr. Papa

4    confirms and says to the public that Omega has been accretive

5    to our growth rate.

6          Your Honor, I do want to briefly describe Omega is in

7    Europe, many, many countries, I believe over 30.  Perrigo

8    didn't have a presence in Europe.  They had a presence in the

9    United States.  They had a presence in other countries, but

10   they had no presence in Europe.  This was an opportunity to

11   take Perrigo's products and have a distribution throughout

12   Europe, and then Omega was a billion-dollar plus company to

13   have Omega products distributed in the United States and

14   elsewhere in the country and what he said has been accretive to

15   our growth rate was true.  It was accretive to the growth rate

16   and on slides 41, 42, 43, we prove it.

17         I will go quickly to slide 43.

18         Slide 43 was a document Mr. Papa received on April 19th,

19   and it proves that it was accretive.  It has the proof right

20   there.  So when Mr. Papa is making the statement on April 21st,

21   a few days after receiving this document, that it was

22   accretive, how could somebody say he doesn't have knowledge

23   that it is accretive?  I mean, the document he receives says

24   Omega is accretive.

25         So when Mr. Papa made the statement, even if they could

1   somehow prove that wasn't true -- I believe it is factually

2   true -- even if they somehow prove it wasn't true, Mr. Papa

3   believed it.  He received the information that said it.  I

4   would like them to point out to your Honor, when they come back

5   up here, on slide -- this slide, this particular slide, I

6   believe it's 43, I would like them to explain to your Honor why

7   Mr. Papa receiving this email saying Omega is accretive doesn't

8   completely wipe away their argument that Mr. Papa was somehow

9   materially misleading when he repeated it to the public a few

10   days later.

11        Finally, we have some other slides, some additional

12   remarks that Mr. Papa makes over and over again, the same sort

13   of information.  I'm not going to -- I realize I'm short on

14   time.

15        On slide 47, I don't need to restate how Mr. Hardiman

16   very effectively portrayed and accurately portrayed

17   Mr. Coucke's temper tantrum.  It was a temper tantrum.  It was

18   about how he didn't want to be given a lot of work.  He was

19   tired of being told by, you know, the new boss, the new people

20   in charge, what to do.  That's all it was.

21        Mr. Papa testified on slide 48, we excerpted it, about

22   the challenges of integration.  What he said and made very

23   clear was that commercial groups were the ones that generate

24   the revenue and that was going well.  That's what the investors

25   were focused on.

1          Slide 49, they claim this was a false statement.

2     Mr. Papa made this statement on September 17, 2015.  He said,

3     We supplemented it with our manufacturing infrastructure so we

4     brought some manufacturing expertise.

5          There is -- that is accurate.

6          On slide 50, Mr. Papa focused on the long-term.  He said

7     to the public from September 17th, that Morgan Stanley

8     conference, the Perrigo/Omega integration will take two, three,

9     four years.  It is not going to be done right away, and he was

10    very clear about that.  They were very clear about that in the

11    public filings.

12         On slide 51, on the same call, Mr. Papa provided an

13    example of Perrigo's supplementation Omega with manufacturing

14    expertise.  I will spare you the details, your Honor, but he

15    explains to the public why he believes Omega is going to

16    provide this.  You know, he is going to supplement Omega with

17    manufacturing expertise because he was able to acquire some

18    other brands from another company and use Omega's distribution

19    network to further sell it.

20         So it was a true statement.

21         Finally, your Honor, and we proved it with some of our

22    slides, the plaintiffs offer some evidence with respect to

23    Ms. Kincaid.  I think Mr. Wareham explained why that's no

24    longer valid, and then I would like to just turn to one final

25    slide on 55.

1          The plaintiffs -- this is another one of those things

2     where if you don't really look carefully at the documents, you

3     might miss how I think the plaintiffs are misinterpreting -- is

4     that a nice way of putting it -- misinterpreting the record.

5          Here is an example where the plaintiffs claim that

6     Mr. Papa removed slides from a board presentation that

7     Mr. Coucke was going to make in the class period in the summer

8     of 2015, and that was somehow nefarious and that somehow

9     prevented Mr. Coucke from giving full information to the board.

10    I'm not a hundred percent sure.

11         What actually happened?  Well, if we look at the record,

12    and we put the exhibits in the bottom of the page,

13    Mr. Farrington emailed Mr. Papa July 30, 2015.  This is the

14    same Mr. Farrington who after the fact had the postmortem from

15    the IT perspective, and he said, Given the 30-minute window,

16    they don't have much time with the board.  I suggest we

17    eliminate these slides and begin at slide 20.

18         Okay.  Proof.  Contemporaneous evidence, it was

19    Mr. Farrington and not Mr. Papa who suggested removing the

20    slides.

21         Next, Mr. Farrington testified, Despite the removal of

22    the slides, we presented the information as I am reviewing the

23    deck that Marc presented as well as the points that we had a

24    minimum raised verbally with Marc.

25         And who presented it?  It was Mr. Coucke who presented

1   it, and Mr. Coucke fully agreed with these slides he says to

2   Tom, not to Joe but to Tom, talking about the slides.  So it is

3   just another short example of where the plaintiffs have

4   misconstrued the factual record.

5          Your Honor, it is very easy for somebody to say,

6   you know, these documents, we point to this evidence.  We point

7   to this statement.  Leave it up to the jury, but that's not the

8   standard.  That's what they are asking you to do.

9          Mr. Papa has been in this industry, healthcare industry,

10  for decades.  He doesn't deserve to be accused of this at the

11  outset, but that's fine.  That's what discovery is for, to test

12  the waters, to depose people, to collect the evidence and then

13  to question Mr. Papa, and now they have done that.  They have

14  had that opportunity, and they don't have the evidence to meet

15  the summary judgment standard.

16         We would ask your, Honor, really, really important, we

17  would ask your Honor to dismiss all the claims against

18  Mr. Papa, all the claims.  He should not be before this Court.

19  He should not be any longer a defendant in this case.

20         Your Honor, I'm happy to answer any questions.  I thank

21  you so much for your time.

22            THE COURT:  Thank you, Counsel.  No questions at this

23  time.

24         I note when counsel came up he mentioned to the group

25  about a break.  It seems like this will probably be a good time

1   for a break.

2          It is 12:26.  I don't know what ideas the parties had

3   for a break.  Do you want 45 minutes for a break and make it a

4   lunch break and come back at that time?

5          MR. SILVERMAN:  That's fine, your Honor.

6          THE COURT:  And we're going to make ourselves

7   available for you today.  So you don't have to be so concerned

8   about time frames in terms of when we will be finishing today.

9          THE COURTROOM DEPUTY:  All rise.

10          (Luncheon Recess taken from 12:27 to 1:30 p.m.)

11          THE COURTROOM DEPUTY:  All rise.

12          THE COURT:  Please be seated.

13      Are we ready to proceed?

14          MR. SILVERMAN:  Yes, your Honor.  Good Afternoon, your

15   Honor.  Josh Silverman for the plaintiffs.  I'll address most

16   of the liability issues before us this afternoon.

17      My colleague, Mr. Harrod, will address loss causation

18   and Daubert issues.

19      First, I would like to thank your Honor for giving us

20   the time today to explore these issues, and to thank you for

21   your patience in wading through the several hundred pages of

22   briefing and statements of fact, not to mention the roughly

23   14,000-page record.

24      To thank Judge Wettre, who is no longer here, but I

25   would like to pass on our thanks to her for shepherding the

1    case through discovery and trying to assist the parties in

2    attempts to mediate.

3         Prior to our break, defendants spent about two,

4    two-and-a-half hours telling your Honor what sounded very much

5    to me like how they would present their summation at trial to a

6    jury.  They talked extensively about what inferences should be

7    drawn from the documents, what defendants, or Mr. Coucke,

8    really meant when they wrote the words that are in the

9    documents in the record.  Or why defendants' self-serving

10   denials of wrongdoing should be weighed more heavily than

11   contrary evidence in the record.

12        They even asked for an inference to be drawn in their

13   favor based on the amount of deposition time for Mr. Papa.  Of

14   course, they didn't mention to your Honor the reason his

15   deposition was cut short was because he answered, I don't

16   recall, 120 times; I don't recall or I don't remember, and he

17   answered, I don't know, 65 times.

18        My guess is that he will find a cure to his memory

19   ailment by the time we get to trial, but if not, the jury is

20   the deliberative body that is charged with assessing his

21   reaction to the questions and determining whether that's honest

22   or dishonest.  Credibility is always an issue for the jury.

23        Defendants also described through their cherry-picked

24   evidence what sounded very much like a different company than

25   the record actually shows.  They did not mention at all that

1    Perrigo wrote down over $2 billion for Omega.  Instead they

2    described it as almost trivial IT problems and HR problems in

3    integration.

4         Well, those problems don't require a $2 billion

5    write-down.  The record here reveals something far greater.

6    They also glossed over that Perrigo's own competitor said it

7    conspired with Perrigo to fix prices, to rig bids, to allocate

8    markets.  That's not something you saw in any of the cases that

9    were cited by either party in the respective briefs on

10   collusion.

11        They also ignored that Papa and Brown were both told

12   before the class period that the windfall pricing that had

13   driven generic prescription drug results, making it the most

14   profitable division at Perrigo, would peak by 2015, just as it

15   actually turned out to do.  They hid all of this information

16   from investors.  They spoke to investors extensively about

17   these topics, but hit all the damaging information.

18        We understand that defense counsel have their own spin.

19   They have their own story to tell.  They have their own

20   inferences that they believe should be drawn from the evidence,

21   but that's exactly what trials and juries are for.  It is not

22   what summary judgment is for.

23        As the Third Circuit has made clear, Rule 56 serves a

24   very limited purpose.  It cannot apply, whereas here the

25   nonmovant has proved more than a mere scintilla of evidence

1  supporting its claims.  That is the *E.D. v. Sharkey* case.

2       It cannot be use to draw inferences in favor of the

3  movements.  All inferences must go to the nonmovant at summary

4  judgment.  That is the *Marino* case, also in *Nathanson*.  It

5  cannot be use to resolve credibility issues or to weigh

6  evidence, *Marino* again.  And it cannot be granted if there is a

7  disagreement over what inferences can be drawn, even if the

8  facts are undisputed.  That is the *Nathanson* case.

9       Here the facts are deeply disputed.  Credibility needs

10 to be assessed.  It is a very big issue, especially for

11 somebody like Joe Papa and Judy Brown.  The evidence must be

12 weighed; that can only be done at trial.  A few highlights of

13 the evidence that was either spun in a way that is unnatural

14 and unreasonable, and that we think that jury will be given its

15 plain meaning, or was unmentioned altogether by my

16 counterparts.

17      Even before the class period defendants were warned

18 about problems with Omega.  The pre-acquisition due diligence

19 by PricewaterhouseCooper -- that was a company hired by

20 Perrigo -- suggested that Omega's revenue was inflated by about

21 200 million Euros.  That is something PWC called in a report to

22 Ms. Brown negative revenue sensitivities, that's Exhibit 259.

23      Perrigo also developed with its banker, JP Morgan,

24 something it called a deal model, which documented the baseline

25 expectations and told Perrigo, as it integrated the company,

1   whether Omega was performing according to the metrics that the

2   board of directors at Perrigo considered, when it approved

3   making a bid for Omega in November of 2014.

4        But it didn't meet those.  And it did not meet the deal

5   model before the class period or during the class period.  The

6   deal model itself is expressed in Exhibit 360.  It is

7   documented there.  Something that was sent to Papa and Brown,

8   so they had actual knowledge of this baseline and it was

9   something, of course, that Papa considered as a director when

10  -- in late 2014 when the board was deciding to bid for Omega.

11       By February 2015, emails sent to Papa and to Brown

12  admitted that Omega's performance had deteriorated severely and

13  that Omega was not meeting the deal model.  It is Exhibit 162.

14  And defendants concede in the paragraph 49 of their statement

15  of facts -- I was surprised to see this -- but they concede

16  that Perrigo's vice president of finance, Ron Winowiecki told

17  Brown that his biggest concern -- that was his words at the

18  time -- his biggest concern what that upon integration, Omega

19  would no longer be able to boost its earnings with what he

20  called extraordinary items.  That's Exhibit 35.

21       As my counterpart said, the reason why they couldn't do

22  that is that GAAP does not allow that kind of accounting

23  manipulation.  A few days later, Brown responded to Mr.

24  Winowiecki -- this is in February 2015 -- that she could not

25  agree more about that concern.  And she called it -- she called

1   Omega's use of extraordinary items to boost its accounting an
2   immediate flag.  That was her words at the time.
3        She said it required the involvement of Joe Papa.  That
4   was her words at the time.  And she said it would probably be a
5   painful part of finalizing goals.  All of that is in Exhibit
6   164.
7        Now, over the coming month PricewaterhouseCooper and
8   Perrigo's interm finance staff debated extensively about
9   Omega's inflated revenue.  It's documented in a lot of the
10  documents before your Honor, such as 83, 192, 441.  All of this
11  was omitted from investors when they made their positive
12  statements about Omega.
13       Now, on May 6, 2015, Perrigo's vice president of
14  finance, Mr. Winowiecki, sent an email to Papa and Brown,
15  warning that Omega's second quarter 2015 EBIT was going to be
16  13.6 percent below the deal model.  They didn't come out and
17  tell investors Omega is not performing the way that we
18  expected.  They continued to make positive statements.  And
19  that is documented in Exhibit 53.
20       Now, we get to very close to where Ms. Brown made her
21  statements about things being in line and going smoothly.
22       She made those on June 23, 2015.  Let's talk about what
23  actually happened, and what a reasonable jury can consider, and
24  what inferences they can draw because, remember, they are
25  obligated -- that the Court is obligated at this stage in the

1   litigation to draw all reasonable inferences in favor of

2   Plaintiffs, the nonmovant.

3        On June 17th, six days before Ms. Brown's statement,

4   Omega CEO Coucke erupted in a Perrigo executive committee that

5   both Papa and Brown attended.  What he said at that committee

6   was that, quote, Nothing was working right with the

7   integration, end quote.  He didn't say commercial integration

8   is going swell, but we have the tiny IT problem or a tiny HR

9   problem.  He said nothing was working right.  A reasonable jury

10  can take that plain statement for its plain meaning.

11       Farrington, who was at the meeting, confirmed these

12  statements.  Let's be clear about what Mr. Farrington's role

13  was.  He was the chief information officer; that is true.  That

14  was one of the hats he wore, but the other hat he wore is that

15  he was the head of the integration management office.  And he

16  was hand-picked by defendant Papa to be effectively Perrigo's

17  integrations czar for the Omega integration.

18       The fact that Mr. Farrington confirmed, and Mr. Coucke

19  said at a meeting attended by Ms. Brown and Mr. Papa, that

20  nothing was working right with the integration completely

21  undermines Ms. Brown's claim to this Court that there is no

22  evidence that anybody actually raised integrations concerns to

23  her.  She asserts on page 11 of her reply brief.

24       The very next day, June 18, 2015, Farrington and Coucke

25  agree that Perrigo and Omega need marriage counseling.  That is

Exhibit 60, and I think there is another copy in the record at

Exhibit 180.

In that same exchange Coucke says, that the integration

problems have made it impossible to run his business.  Thus,

linking both the integration and the performance.  It is the

integration problems that are hurting the business itself.

Mr. Coucke said that.  There is no evidence whatsoever to the

contrary.  And even if there was mixed evidence -- which there

isn't here -- all inferences at this stage need to be drawn in

plaintiff's favor.  That's what the Third Circuit requires.

He also said, Mr. Coucke also said, Omega was out of

oxygen fighting off Perrigo's demands for unusual integration

measures.  We know this was forwarded to Ms. Brown because the

metadata from the production where they produce the documents

to the plaintiffs indicates that Ms. Brown was the custodian of

this document.

Five days later, Ms. Brown speaks to investors at an

analyst conference.  Instead of telling them the truth that

there were some hitches in integration, she says integration is

proceeding in line.  And she says that back office

integration -- and that, of course, is the thorny issue of

resolving Omega's accounting into GAAP compliance and building

a forecast process that was missing -- was going smoothly.

Those were her words as set forth in Exhibit 63.

Two days later, two days, Ms. Brown writes to Omega CEO

1    Mr. Coucke suggesting that she fly to meet him at Brussels --

2    in Brussels, where he resided -- to discuss, quote, concerns he

3    raised at the EC -- that's executive committee -- and also with

4    her one on one.  That is Exhibit 206.

5         A reasonable jury can consider to you don't need to fly

6    halfway around the globe to discuss concerns if there were no

7    concerns.  You don't need to fly halfway around the globe to

8    discuss integration problems if it's going smoothly, and it's

9    in line.  It wasn't.

10        July 12, 2015, only a couple weeks later.  An email to

11   Brown warned Omega's cash flow was a business problem and that

12   it manipulated Q2 earnings with a factoring scheme to conceal

13   an earnings miss.  That's Exhibit 212.  Four days later,

14   Perrigo held an integration reset meeting with Omega in London,

15   that was discussed in advance with both Papa and Brown.  That

16   discussion is documented in Exhibit 386.

17        Of course, a reasonable jury can consider and the

18   inference must be drawn at this stage, that you don't need to

19   reset a process that is going in -- that is in line or going

20   smoothly.  That's not what a reset is.  Written materials from

21   the reset meeting described integration as, quote, chaos, and,

22   quote, promises broken.  The exact opposite of what Ms. Brown

23   described to investors.  It warned that there was a lack of

24   trust.  That's Exhibit 195.

25        What did Mr. Farrington say, who was at this meeting?

1    He said that the meeting gave Perrigo, quote, Clear indications

2    of problems relative to controls, risks, and scaling at Omega,

3    but Perrigo, quote, Did not act on our convictions, end quote.

4    That's Exhibit 84.

5            On July 20, 2015, four days later, they have the

6    quarterly business unit review.  That is attended by Brown and

7    Papa.  And at that review that discussed multiple accounting

8    anomalies according to Exhibit 213.  Those anomalies were

9    identified through the integration of Omega's accounting into

10   Perrigo's financial reporting controls.  That is what led to

11   the internal audit that I will be discussing with your Honor a

12   little bit later.

13           On July 23rd, three days later, Mr. Winowiecki, the vice

14   president of finance, emails brown about how severely Omega was

15   deviating from the deal model.  He noted that the deal model

16   called for 12 percent growth in 2015, but Omega wasn't growing

17   at all.  It was at negative 9 percent in Q1.  That's Exhibit

18   390.

19           Now, if Perrigo's own documents say Omega was in -- was

20   at -9 percent in Q1, how could Omega -- how could Perrigo

21   possibly claim to investors after Q1 that it was accretive to

22   growth.  It wasn't growing according to Perrigo's own analysis.

23   That's Exhibit 390.

24           Now, only two weeks later on August 5, 2015, on a

25   conference call with investors, defendant Papa says, that

Perrigo has already, quote, Delivered on our Omega integration plan.  A reasonable jury need not accept this lie as truth.  In fact, as Perrigo's own documents admitted in May 2016, even by that time Omega was never fully integrated.  That's Exhibit 83.  And while speaking positively about Omega, Papa hid from investors the very concerns discussed internally only weeks before about Omega's accounting manipulations.

Another presentation dated September 14, 2015, showed that Omega's revenues and operating income had worsened in August.  That's Exhibit 309.  Now, remember, all of this time between April and November, Perrigo is doing one main thing.  It is fighting off a takeover bid, a hostile takeover bid from Mylan.  And defendants say, well, that Judge Arleo did not accept that as a motive for scienter at the pleading stage.  It's true she didn't accept it as an independent motive.  But now the record's developed evidence that Mylan -- that fighting Mylan, in fact, was the main focus of the company.  It was something that Brown and Papa spent an enormous amount of time on.  And we will see later on that Mr. Coucke himself says that Omega was asked by Perrigo to stretch its guidance to fight off the Mylan bid.

Things grew even worse in October.  Kirsten Young would not expertise Perrigo's guidance.  Now, this matters because of the takeover bid.  The Irish takeover rules, they require that an accounting firm expertise guidance as well as the board of

1   directors, and that they faithfully revealed to investors what

2   the assumptions are that go to that guidance, et cetera.

3   That's Exhibit 397, is the communication describing

4   Mr. Winowiecki's concerns to Ms. Brown.

5          October 8, 2015, Brown pressed Coucke about whether

6   Omega's miss was related to having previously used the Belgian

7   generics unit to do sales.  And Coucke responded that the

8   situation with the Belgium generic unit, quote, Has been

9   discussed in detail several times with Joe Papa on our weekly

10  calls.  And he also said with respect -- this is with respect

11  to the dialogue between Omega and Perrigo, he said Omega,

12  quote, Can't be more transparent.  That's Exhibit 371.

13         Perrigo was not equally transparent with its investors.

14  It said nothing about the accounting manipulations at Omega.

15  It said nothing about the integration problems that were

16  described to it.

17         October 15, 2015, only one week later, Coucke wrote to

18  Joe Papa begging him, quote, Not to push nonrealistic guidance,

19  and warning Papa that they were engaged in, quote, Extreme

20  guidance stretching, end quote.  It is Exhibit 238.

21         This pushback made Brown furious.  She wrote in an email

22  to Papa and others that she had no idea what Omega was going to

23  put into the numbers that had to be expertised the following

24  week.  And that she was, quote, personally feeling very

25  exposed, Exhibit 182.

1           On the 18th, October 18, 2015, four days before Perrigo

2    published its official guidance, a draft internal audit report

3    confirming the accounting manipulations was distributed to Papa

4    and to Brown.  It's Exhibit 213.  It found that at the end of

5    the second quarter, 2015, remember, this was the only quarter

6    that they could mention that had results which were even

7    nominally accretive.

8           It found that quarter was manipulated by what -- what

9    the internal auditors called a loading practice.  That is a

10   fancy word for channel-stuffing with its generic distributor

11   for Bellco.  And that manipulation was done because, quote,

12   Perrigo expected a big quarter from Omega, end quote.  Exhibit

13   213.

14          So Perrigo applied the pressure and got the result that

15   its pressure caused.  The following day, October 19, 2015, only

16   three days before the guidance was published, Papa and Brown

17   discussed the internal audit findings.  And on the 20th, only

18   two days before, they met with the audit committee to discuss

19   those findings.  That's Exhibit 402 and Exhibit 216.

20          Nevertheless, when they published their guidance, they

21   said absolutely nothing about this.  Incredibly, it all --

22   Perrigo also hid these problems from Ernst & Young, the

23   auditors it hired to expertise the guidance, the external

24   auditors.  And the deposition in this case, because somebody

25   from Ernst & Young said as their representative witness, the

1    Ernst & Young partner who was involved in this said he was

2    astounded when he heard that -- saw the audit committee

3    findings saying that's the first he ever heard of it.  That is

4    Exhibit 167, is his deposition.

5           Not telling the truth about what was going on at Omega

6    served its purpose, Perrigo defeated the hostile tender offer

7    on November 13, 2015.  And wouldn't you know it, Brown and Papa

8    immediately sought to sell their personal shares at prices even

9    lower than they had just told investors what's too low for

10   investors to depart with their own shares.  Papa said about

11   dumping shares at $140, as you can see in his form 4s that are

12   in the record at Exhibit 6 and 196 and deposition testimony and

13   Exhibit 169, pages 107 to 110.  Brown likewise said that she

14   planned to, quote, Sell all vested, restricted, and performance

15   shares right after the Mylan offer collapsed.  That's Exhibit

16   299.

17          The next month, early December 2015, Winowiecki and

18   Brown and Papa discussed the likelihood of an impairment at

19   Omega.  Quite frankly, it looks like it should have been -- it

20   should have taken place earlier.  A jury is entitled to draw

21   the inference, and your Honor should at this stage, that it was

22   time to coincide after the end of the Mylan tender offer.

23          The following days after those initial discussions,

24   which were documented in Exhibit 410, Brown said she was

25   apoplectic about Omega, and Papa was catatonic about Omega.

1   Perrigo's finance vice president said it looks horrible and

2   that he had been warning about Omega since Q1 2015.  In other

3   words, he told them about the problems with Omega before the

4   beginning of the class period.  That is Exhibit 409.

5          From all of this evidence, a reasonable jury can

6   determine that Perrigo and Papa and Brown knew that Omega was

7   far worse than their optimistic statements described it to

8   investors.  Defendants wants to put their own spin on a

9   particular sentence or two of this very damning evidence or to

10  say that one document should be read in the context of another

11  statement from another document.  Well, they can put that spin

12  on it at trial.  Drawing inferences in the movant's favor is

13  absolutely prohibited on a motion for summary judgment as the

14  Third Circuit makes clear in these cases.

15         This is only a part of the evidence we outline in our

16  brief at pages 23 to 31, showing that Papa and Brown were

17  informed of the actual integration and performance problems at

18  Omega that they withheld from investors.  That's classic

19  evidence of scienter.  Additionally, Perrigo's integration are

20  Tom Farrington, admitted in the candid postmortem that Joe Papa

21  was not only aware of the problems with Omega integration, but

22  he was a driver of it.  That is Exhibit 181.

23         He said that Papa decided to forego crucial integration

24  controls that were called must-haves that were adopted by

25  Perrigo's executive committee in June 2014, then included deep

1    due diligence.  According to Farrington's postmortem report,

2    these were standards that Perrigo had decided it would always

3    do for acquisitions, but, quote, Didn't do in this case at the

4    CEO's direction.  That's Exhibit 181.

5         Defendants tried to reimagine this document in their

6    briefs.  They say it was just aspirational or a gold standard,

7    but that's not the words that the actual document use.  The

8    document called them must-haves, not might haves or

9    want-to-haves or try-to-haves.  It said there were things that

10   Perrigo had decided it would, quote, Always do.  Not might do

11   some of the time or if convenient.  A reasonable jury is

12   entitled to take Perrigo's own words at their plain meaning.

13   A reasonable jury can also consider that Brown even counselled

14   Papa on how to manipulate the truth for Wall Street.

15        A text she met Papa right after they met with the audit

16   committee to discuss Omega's accounting manipulations said,

17   quote, Please think through your Wall Street answer as to

18   whether this signals you plan to retire soon.  And of course,

19   we can never, and I emphasize that word because she used all

20   caps in her text, we can never reference the reason underlying

21   from weekend calls, even in one by one.  That is Exhibit 289.

22        This scienter evidence, of course, has to be weighed by

23   a jury.  Scienter is a jury issue under the law in this circuit

24   unless viewing all evidence and drawing all inferences in favor

25   of the nonmovant no reasonable trier of fact could find the

1   element of scienter satisfied.  It doesn't require a smoking

2   gun as counsel said four or five times.  That's not the case

3   here.  There is plenty of evidence from which a jury can draw a

4   reasonable inference of scienter.

5          And let me be clear.  They said strong inference time

6   and time again in their briefs, but that's not the standard

7   either.

8          The Bristol-Myers Squibb case that both sides cited to

9   your Honor, that's at 2005 U.S. District Lexus 18448 at pages

10  starred 43 to 44, reviews Third Circuit controlling law and

11  says that a PSLRA implemented a heightened pleading standard

12  that refers to strong inference, but that didn't alter the

13  substantive standard at trial.  The substantive standard it

14  recognized was merely that a plaintiff, quote -- must, quote,

15  Supply a basis from which to draw reasonable inference that

16  defendants recklessly or knowingly issued a materially false

17  and misleading statement.  That's the standard before your

18  Honor.

19         Defendants also speak about corporate scienter

20  extensively in their briefs, and we also use that term in our

21  briefs.  But really, at the pleadings stage corporate scienter

22  is a doctrine that's often used by courts in their

23  descriptions.  But at the proof stage, it's really just another

24  word for indirect or circumstantial evidence.  Of course, there

25  is tons of cases that both sides have cited that scienter can

1   be shown by both direct and circumstantial evidence.  There is

2   no question about that, and the Supreme Court has made that

3   absolutely clear.

4        So while there are certain -- almost all of our

5   scienter, especially with respect to the Omega side of it, is

6   thrown through direct evidence of what Brown and Papa were

7   shown.  A jury is also entitled to consider circumstances under

8   which Brown and Papa routinely relied on the advice of other

9   Perrigo executives who were on documents saying that they had

10  knowledge of wrongdoing or of facts contrary to their

11  statements to investors.  That's something that a jury can

12  consider as circumstantial evidence as long as the attenuation

13  is not so attenuated that it's unreasonable.

14       On the generic drug cite, defendants also covered up

15  problem with generic drugs.  We assert three categories of

16  misrepresentations on the generic drug site.  Number one, they

17  concealed that they relied on unsustainable super competitive

18  practices.  Number two, that they misrepresented Perrigo's

19  generic drug pricing strategy.  And number three, that they

20  misrepresented the competitive environment to hide the fact

21  that they were not actually competing on many key drugs.

22       None of these three categories hinge on proof of a

23  Sherman Act violation.  They cite a lot of Sherman Act cases.

24  This isn't a Sherman Act case.  We allege securities fraud in

25  violation of 10b-5.  Some of that security -- and 14(e).  Some

1   of that securities fraud involves the concealment of

2   unsustainable super competitive practices and illegal

3   practices.

4        But they didn't -- they didn't come out and tell

5   investors, We're engaged in this crazy pricing scheme, but it's

6   just part of an oligopoly.  It is not technically illegal.

7   They just didn't say that at all.  So they didn't tell the

8   truth whether it was legal or illegal.

9        In terms of the -- and all of these three categories are

10  also broader than the six to nine drugs that the defendants

11  reference.  In terms of the concealment of unsustainable and

12  anticompetitive conduct, the evidence shows that at least in

13  2013 to 2015, and it probably started as early as 2010.

14  Counsel is right, that some of this does date back.  But it

15  really came to a head in 2013 to 2015 that Perrigo relied on

16  massive super competitive price hikes to spike operating

17  profits in it's most profitable decision, prescription generic

18  drugs.

19       And when I say prescription generic drugs, your Honor,

20  to be clear, I'm not talking about the Omega generic unit.

21  Right now I am talking about domestic generic drugs, and I

22  think so were my counterparts when they spoke about the generic

23  unit.  I am just not going to repeat that phrase over and over.

24       Record evidence shows that defendants understood these

25  ploys were unsustainable regardless of whether they were

1   illegal or legal.  On April 13, 2015, days before the class

2   period, Papa and Brown conducted a three-day review, including

3   what they called a domestic pricing review.  That showed that

4   before the class period Perrigo anticipated that the windfall

5   domestic generic prescription drug pricing profits would peak

6   in Q3, 2015.  The pricing as a factor would peak in Q3, 2015,

7   and turn and stay negative beginning in early 2016.  Exhibit

8   183.

9       And are there review slides that Papa and Brown

10   personally reviewed or approved for this exercise, highlighted

11   their pricing would turn negative by 2016 as well such as

12   Exhibit 242.

13       As 2015 progressed, pricing deteriorated just as they

14   expected before the class period, but didn't tell investors.

15   Exhibit 245, July 2015 document sent to Brown and Papa showed

16   that pricing was several millions worse than only a few months

17   earlier.  Exhibit 241.  September 2015 update warned Brown and

18   Papa that there were minimal pricing opportunities in generic

19   prescription drugs.

20       Well, you heard Mr. Brodsky get up there.  I believe it

21   was Mr. Brodsky, and he said, there is a way to infer this

22   that's non-culpable.  If you say that minimal pricing

23   opportunities doesn't mean the same thing as no pricing

24   opportunities, then we were free to hide this to investors and

25   to speak as positively as we wanted about generic drug pricing.

1           Well, a jury doesn't have to accept his inference, and
2    at this stage, your Honor, cannot.  This is not the stage in
3    the litigation where you select the inference that is where you
4    are at liberty to adopt an inference in favor of the movement
5    opposing the non-movement where both inferences are reasonable.
6    It's equally reasonable and I think far more reasonable for a
7    jury to think that when somebody is asked a pointed question
8    about the sustainability of pricing and they are told
9    internally that there is minimal pricing opportunities, that
10   they don't go out and lie about it.  That they either tell the
11   investors, We're not at liberty to answer that question at this
12   time, or they say it looks like the pricing opportunities are
13   minimal.  That's the information he had.  That's the
14   information he hid from investors.
15          Exhibits 243, 244, 246, 295 are multiple additional
16   reports that were sent to Brown and Papa in September and
17   October 2015 warning of pricing deterioration in generic
18   prescription drugs just as they had expected.
19          Now, the evidence overwhelmingly shows that Perrigo's
20   conduct was illegal at times as well as super competitive.
21   Again, it's not necessary for our claims to advance to a jury,
22   but we think a jury will find that they were both
23   unsustainable, super competitive and illegal.
24          There is both direct and circumstantial evidence.  The
25   direct evidence, Sandoz, and Sandoz is a company that embodies

1  two of Perrigo's competitors, Sandoz and a company called

2  Fougera, which merged into Sandoz in approximately 2012.

3  Sandoz admitted that it fixed prices, rigged bids and allocated

4  markets with Perrigo.  They didn't just say that about desonide

5  cream, as counsel said.  They said they did that -- they

6  conducted those illegal practices on products including

7  desonide.  That's powerful evidence that wasn't present in any

8  of the collusion cases that defendants cite.  That will be

9  presented by a live witness at trial but for the summary

10  judgment record, it can be found at Exhibit 120, and, Tom, if

11  you could, put up the thing on Sandoz.

12      It would be presented by live witness at trial but for

13  the time being, we have a summary judgment record that has

14  Sandoz's deferred prosecution agreement.  That's Exhibit 120,

15  an affidavit from Sandoz saying that their deferred prosecution

16  agreement statements were accurate and that they would -- and

17  that Perrigo was the company identified as company B and that

18  they would present a witness at trial to testify to those

19  facts.  We also have a letter agreement with Sandoz's counsel

20  saying they will present a witness at trial to testify to those

21  facts.  That's Exhibit 161.

22      The record also contains additional direct evidence from

23  the admission of sales -- a sales executive for Sandoz and

24  Fougera and another company called Aurobindo at other times,

25  Tony Thomassy that said he had hundreds of improper

1   communications with Perrigo around and about price increases.

2   That is Exhibit 116.  And what Mr. Thomassy was referring to

3   was confirming the evidence that is the findings of the state

4   attorney's general that are documented in their complaint.

5          Let's speak a little bit about that complaint.

6          Perrigo itself injected the state attorney general

7   complaint into the summary judgment record.  It presented the

8   complaint for the Court's consideration from its opening brief.

9   We believe that this is proper and that the Court should

10  consider the summary -- the state AG complaint at this

11  juncture.  At summary judgment, the question isn't whether a

12  document itself is admissible.  We don't foresee asking

13  your Honor to admit this document at trial but rather to have

14  people testify about the findings.  At summary judgment, the

15  proponent of evidence need only describe the form of evidence

16  that, quote, is capable of being admissible at trial.  That is

17  the *Fraternal Order of Police* case at 842 F. 3. 231 from the

18  Third Circuit.

19         We don't -- there is no need for your Honor to rule on

20  the admissibility at this time but whether the Court, in fact,

21  decides to admit it at trial should be made in consideration of

22  the precise context for which the party seeks to address it at

23  trial, but we think there is at least four ways that this can

24  come in -- the factual parts of this can come in at least,

25  number one, for impeachment.

1          You heard counsel talk extensively about their claims

2    that the Department of Justice and regulators never went after

3    Perrigo.  Well, if they want to open the door and ask the jury

4    to infer that Perrigo was somehow cleansed of its sins, that it

5    was somehow exonerated by regulators, we are entitled to

6    introduce evidence that is nowhere near the truth, that 48

7    state attorney general and the attorney general of the District

8    of Columbia and a couple places like Guam, et cetera, have

9    brought -- where all the highest law enforcement officers in

10   their respective jurisdictions, the fact that all of them have

11   brought charges against Perrigo completely impeaches any idea

12   that it has been exonerated for price fixing.

13          The second way it comes in, Federal Rule of Evidence

14   703.  That's because it is of the type of evidence that is

15   normally considered and relied upon by experts in forming their

16   opinions.  Our generic drug expert, Todd Clark, relied on it.

17   Defendants' damages expert, Paul Gompers, also cited a number

18   of antitrust cases that -- and both complaints, unadjudicated

19   complaints and investigations in his report, and defendants set

20   that forth in their own statement of facts that they tell

21   your Honor is the undisputed information upon which your Honor

22   should consider summary judgment at paragraphs 365 to 382.

23   Even the Third Circuit considers unadjudicated pending

24   antitrust cases in considering the cases before it.

25          For example, in *Chocolate*, it is cited in expert report

1  extrapolating the facts from a still pending Canadian antitrust

2  case.  That's 801 F.3d. At page 402 to 404.

3      It is also true that this can come in under Federal Rule

4  of Evidence 803, 8(A)3, which excludes from hearsay a record of

5  a public office if it sets forth factual findings from a

6  legally authorized investigation unless the opposing party

7  demonstrates the findings lack trustworthiness.

8      The proponent need only establish the foundation for the

9  record by showing that it does, in fact, set forth findings

10  resulting from an investigation made pursuant to authority

11  granted by law and as this district has said, once the

12  foundation is established, the evidence will be admitted unless

13  the opposing party shows that it is untrustworthy.  That is

14  *GAMMA VINS*, 334 F. Supp 2nd 662.

15      So what are the three components?  Public office.  No

16  one disputes that the state AG complaint is from a public

17  office.  They are by definition public offices.

18      Was the investigation authorized?  No one disputes that

19  state attorney generals are authorized to look into price

20  fixing in their respective states, and no one disputes that as

21  part of the investigation here phone records and text records

22  were provided to the state attorney general.  They analyzed

23  those records.  They created a database allowing them to be

24  cross referenced, and they publish findings in their complaint

25  indicating how those calls were made and from whom they are

1  made, from whom they are received, what time to the second.

2  Those are findings.  Those are factual.  Those are not saying

3  we believe this constitutes X, Y or Z.  They're saying, We

4  conducted this investigation of the phone records and here is

5  what we found.

6      Defendants offer no plausible alternative explanation

7  that it can be anything other than findings from a public body

8  filing an authorized investigation.  In fact, it would make no

9  sense that the state attorney general would be able to link up

10 those calls had they not done the groundwork in their

11 investigation, which brings us to the trustworthiness.

12     Defendants haven't made any showing that they were not

13 trustworthy.  The fact that virtually every state attorney

14 general signed onto the complaint, including from this good

15 state, is indicia of trustworthiness.  And witnesses, such as

16 Andrea Felix, consistently testified that they could not have

17 dispute -- they could not dispute having made the

18 communications identified to them in the state attorney general

19 complaint.

20     Mr. Thomassy agreed that the allegations ascribed to him

21 in the state attorney general complaint as CW6 were accurate.

22 On dozens of occasions, Perrigo admitted that the

23 communications set forth in the state attorney general

24 complaint took place.  That is documented in footnote 22 of our

25 brief and in Exhibit 88, which is Perrigo's request to --

1    request -- Perrigo's response to request for admission.

2         Defendants cite a few cases suggesting that not every

3    complaint from a government agency falls within that exception

4    to Federal Rule of Evidence to the hearsay rule.  That is a red

5    herring because that is not at all what we argue; although,

6    some courts have held that regulatory complaints presumptively

7    fall under Federal Rule 803, such as *U.S. v. Gluck*, which we

8    cite on page 52, that's not necessary to reach here.  This case

9    involves a limited context where a complaint that has been

10   factually verified by repeated witnesses and by the company

11   itself as to certain allegations that they deemed worthy of

12   responding to sets forth the detailed determinations of an

13   investigation from law enforcement, that those portions are

14   capable of being admitted under 803(A)3.

15        Finally, your Honor, the fourth way that this could be

16   introduced as evidence is through the defendants own

17   admissions.  As I mentioned, your Honor, defendants admitted in

18   their responses to request for admission that hundreds of these

19   phone calls identified to the second in the state AG's

20   complaint actually took place.

21        So what do we have here in addition to the actual

22   findings of the state AG, the actual direct evidence from

23   Sandoz and Mr. Thomassy about fixing prices and rigging bids

24   and allocating customers.  We have a lot of circumstantial

25   evidence as well indicating collusion.

1          The Third Circuit in *Valspar* made clear that where as

2   here direct evidence is provided, no circumstantial evidence is

3   required, but we also provide extensive circumstantial evidence

4   showing that Perrigo, in fact, colluded with other drug

5   manufacturers.  That's on page 44 to 53 of our brief.

6          Our expert, Mr. Clark, who literally wrote the book on

7   generic prescription drugs in the United States -- it's called

8   The Generic Handbook, has opined that the evidence he reviewed

9   shows hallmarks of collusion and is inconsistent with actual

10  competition, even within an oligopoly.  That is Exhibits 102,

11  and 158 is his reply report.

12         Perrigo's internal documents show that it frequently

13  declined to bid.  A May 2014 contract form for Permethrin, for

14  example, says, Per J.W. -- that's John Wesolowski -- we need to

15  give up the product due to market share.  A July 2014 email

16  stated that Perrigo did not want to win customer account for

17  desonide because we have taken enough business.

18         An October 2014 email telling a customer, from Perrigo

19  to a customer, McKesson, said that Perrigo would not bid for

20  that customer's business even after requested because it,

21  quote, Would really upset our competitor, end quote.  That is

22  Exhibit 253.

23         Now, a reasonable jury can look at this, and it might

24  accept the spin that's proffered by the defendants.  I don't

25  think that's the natural reading of these documents, but it

might also say that all of these times that Perrigo told --
said internally, candidly, it wasn't going to bid or even told
a customer that it could not risk upsetting its competitor, all
of that is consistent with a tacit fair share agreement, which
is exactly what the evidence shows here.  Perrigo couldn't show
legitimate reason.

And I know that counsel said repeatedly that there were
margin issues, that there was, I think he said, an expensive
factory in New York, but here is what he didn't tell your
Honor.  When they were pressed for details at the 30(b)(6)
deposition, that is where it's binding, not where a counsel can
get up and just testify as if he was a witness, but where a
corporate representative needs to tell the truth and bind the
company, the 30(b)(6) witness testified that Perrigo wasn't
able to tell why it implemented any of its particular price
hikes.  That's Exhibit 170 at pages 166 to 167.

A reasonable jury could also consider circumstantial
evidence of collusion, the magnitude of the price hikes, three,
five, 700 percent.  That is not something that a business owner
would dream to do without a reason to believe that its
competitors would go along and not undercut its pricing.

This is a very different case from those like *Chocolate*
and *Flat Glass* and *Baby Foods* and *Valspar* in the Third Circuit
that involve tiny price hikes.  And in *Valspar*, the
Third Circuit distinguished between the magnitude hikes.  It

1   distinguished between abrupt and radical price rises, which is

2   what we see here, and those that are just an uptick in

3   preestablished industry practice.

4       I believe in *Valspar* they were dealing with roughly 16

5   price hikes that in the aggregate dealt with -- boosted prices

6   31 percent.  We're talking about an overnight change that's ten

7   times in magnitude.  Even defendants don't dispute that a

8   reasonable jury could view a 300, 500, 700 percent overnight

9   price increase as abrupt or radical.

10      Jurors come in with a world of experience.  They don't

11  see -- they know that prices go up sometimes, but they don't

12  see the price of a loaf of bread going from $3 to $21

13  overnight.  They don't see the price of a sedan they are

14  looking at going from 20,000 to 140,000 overnight.  Price hikes

15  of this magnitude don't happen under normal circumstances and a

16  reasonable jury is not required to pretend that they do.

17      Perrigo cites two cases in its reply brief.  They

18  mention briefly about the magnitude but neither holds that a

19  radical and abrupt price hike can't be evidence of collusion.

20  First in the *Blomkest Fertilizer* case, that involved a consent

21  decree that required prices to be raised because the prior

22  prices were dumping -- were deemed to be dumping prices in

23  violation of the federal antidumping laws.

24      There is nothing like that here.  There is no consent

25  decree requiring Perrigo to raise it.  It decided to raise it.

1   The *Erie County* is other case that they cited.  That case

2   involved bidding for road salt in Ohio, and it determined that

3   the price increases there were mostly due to the State's

4   bidding rules and unusual demand.  The holding was limited to

5   those unique facts.

6        It never adopted any rule that the magnitude of price

7   hikes cannot be circumstantial evidence of collusion, and at

8   any rate, it was an Ohio case and doesn't undercut the Third

9   Circuit's discussion in *Valspar* about the magnitude having some

10  bearing.

11       A reasonable jury could also consider the huge risk that

12  Perrigo took of incurring massive penalties when it implemented

13  price hikes.  This is the opposite situation that the Third

14  Circuit considered in *Valspar*, where the Third Circuit noted

15  there was no or minimal risk under the contracts that *Valspar*

16  had with -- that the defendants in that case had with their

17  customers.

18       Here, if the price hikes didn't stick, Perrigo could

19  lose tens of millions of dollars on a single drug that's

20  described by our expert in Exhibit 158.  It is admitted by

21  defendants' expert, perhaps at least, as to the mechanism in

22  Exhibit 100.  It is discussed by Perrigo's former vice

23  president of -- former CFO of the generic prescription drug

24  unit, Mr. Gallagher, in his deposition which was Exhibit 172 at

25  page 206.

1     A reasonable jury could conclude that Perrigo took this

2     massive risk because it understood that it's competitors would

3     go along.  Now, if defendants feel that there is an innocuous

4     version of why Perrigo would take this risk, they can argue

5     that to the jury.  The jury is entitled to consider the natural

6     effect of Perrigo's actions.

7          Additionally, a jury can consider this wasn't a

8     situation like in *Chocolate* or the Third Circuit noted that

9     compressed margins would make it irrational for a competitor to

10    undercut a price hike.  Here it was the exact opposite.  While

11    Perrigo's experts did not get into the actual gross margins,

12    our expert did.

13         Mr. Clark examined the gross margins for all the

14    products that he detailed in his report.  That's Exhibit 102.

15    And he found that they were all very high margin products, as

16    much as 96 percent, and that's before the price hike.  So the

17    price hike wasn't a situation where the gross margins had

18    compressed because of the new factory or because of a supply

19    shortage.  By the way, a supply shortage is supposed to be

20    reported to the FDA, and nobody has offered any evidence here

21    that any supply shortage was provided to the FDA about any of

22    the drugs we are talking about.

23         If there is no collusion, a competitor could easily

24    undercut a price hike without facing any margin pressure here.

25    The margins were already very high they could say, we are going

1   to drop from let's say, 90 percent to 80 percent and undercut

2   Perrigo and take the entire market.  That didn't happen here.

3        So the fact it didn't happen suggests -- is something

4   that a reasonable jury could find probative, circumstantial

5   evidence of collusion.  A reasonable jury could also consider

6   circumstantial evidence the fact that similar price hikes did

7   not occur in similarly structured generic prescription drug

8   markets.

9        Now, Mr. Wareham indicated to your Honor and on this

10  limited point, I agree, that topical generic prescription drugs

11  are more difficult to manufacture than, let's say, a pill.  But

12  there are other generic -- and as a result, it takes a little

13  more testing.  There are not quite as many competitors.  But

14  there are other generic prescription drug markets that are

15  similar in structure.  Our expert, Mr. Clark has identified two

16  of them; Ophthalmics, the eye drugs and injectables.

17       Neither of those demonstrated the same kind of abrupt

18  and massive price spikes as you found in markets in which

19  Perrigo competed.  Reasonable jury could also consider that

20  many of the price hikes occurred right after industry meetings.

21  I realize that defendants say that there is innocuous spin,

22  that this might not have meant anything.

23       But a jury doesn't have to turn its eye to the fact

24  that, for example, on February 22nd, 23rd in 2013, Papa and

25  Brown both attended the annual -- GPhA meeting, I'm sorry, let

1  me spell that out.  Capital G.  Capital P.  Lower case H.

2  Capital A.  G-P-h-A.  That's in Exhibit 160.

3       Three days later, Perrigo's internal documents indicated

4  it considered, quote, Pricing opportunities.  There goes that

5  word again, including hikes for permethrin, desonide,

6  Halobetasol, Clindamycin and hydrocortisone valerate.  Exhibit

7  284.

8       A reasonable jury doesn't have to imagine that has to be

9  a coincidence.  They can infer based on the proximal, the

10  temporal proximity.  Perrigo's -- especially because Perrigo

11  can't come up with any legitimate reason specifically why it

12  hiked any of those drugs.

13       Finally, Perrigo's own documents indicate that it

14  planned on losing very, very little market share despite

15  massive price hikes.  For example, Exhibit 269 identifies zero

16  to two percent anticipated share losses for price hikes

17  exceeding 100 percent.  A reasonable jury could infer from this

18  that Perrigo knew its so-called competitors would play ball.

19       Now, with respect to the pricing strategy, Perrigo's

20  misrepresentations were equally misleading.  Defendants don't

21  dispute that, at an individual drug level, Perrigo's massive

22  price spikes were not flat to slightly up.  And a reasonable

23  jury could, and we think will conclude, that spiking the drug

24  by 300 to 700 percent in price is not flat and it is not

25  slight.

1    Instead, defendants argue that if you construe sentences

2    from this document with another sentence that's a couple lines

3    earlier that if you spin it a particular way, you can erase the

4    words that were actually said and construe it as only applying

5    on a portfolio level.  But that's not what the actual words

6    that were used said.

7    The exact words that Papa used are cited in our brief.

8    They are in the record at Exhibit 76 and he said that it didn't

9    matter whether you are talking had about on a granular level

10   about a specific product or specific category.  The answer is

11   the same.  The exact words are, quote, Whether we're talking

12   about any specific product or any specific category or any

13   segment of our business, the overall comment is flat to

14   slightly up for our pricing.  A reasonable jury can take these

15   words for their plain meaning.

16   We don't think Papa's inference is plausible.  But that

17   is a trial argument.  It is not a summary judgment argument.

18   At summary judgment, all inferences have to be drawn in the

19   nonmovant's favor, all reasonable inferences.  It is

20   unquestionable that taking words for their plain meaning, the

21   actual words that defendants use before adopting a strategy for

22   litigation, that that is a reasonable inference.

23   That is for the jury to choose as the Third Circuit made

24   clear in *Nathanson* and *Marino*.  With respect to the competitive

25   environment, for example, Mr. Papa said on May 12, 2015 -- it

1  is in Exhibit 124 -- the generic prescription drugs operated in

2  what he called, quote, obviously a competitor environment.  And

3  other times defendants described it as heavily competitive.

4  But a reasonable jury could find that massive parallel price

5  hikes by so-called competitors are the exact opposite of heavy

6  competition.

7       They could find that declining to bid because you did

8  not want to upset a competitor is the exact opposite of heavy

9  competition and Perrigo argues that should get a free pass,

10  because it was competitive on certain other drugs.  That's like

11  a basketball team saying we only shave points on a couple

12  games, so, you know, what was the big deal?

13       Most importantly here, Perrigo's statements to investors

14  did not say that only some of its generics operated in

15  competitive environment and others did not.  It made that

16  comment generally.  It made a sweeping comment.  It did not

17  qualify it in any way.  Again, a reasonable jury can properly

18  take Perrigo's words for their plain meaning.  If defendants

19  want to argue an alternate inference, they are free to do so,

20  but undermining precedent, that is a jury issue.

21       The scienter for the generic prescription drug

22  misstatements is also well-supported by record evidence.

23  Besides the plain inferences from Sandoz's confession that it

24  rigged bids and fixed prices with Perrigo, they are at least

25  five additional reasons why a reasonable jury could find that

1    Perrigo and Papa and Brown were, at least reckless, if not

2    intentionally misleading, in their false statements to

3    investors.

4         First, Papa and Brown held themselves out to investors

5    and analysts as being knowledgeable about generic prescription

6    drug pricing, the pricing strategy, and the competitive

7    environment.  As Judge Arleo noted in her motion to dismiss

8    opinion, she found that supported an inference of scienter.

9    She said they repeatedly responded to pointed analyst questions

10   regarding prices in the generic prescription drug division and,

11   quote, in their answers, indicated personal knowledge.

12        She also said -- explained, in the context of specific

13   inquiries, defendants' omissions of actual circumstances that

14   were contrary to their answers presents an obvious risk of

15   misleading investors.  We believe it will be equally obvious to

16   the jurors who will be charged with determining this at trial.

17   But that was at the pleadings stage.  Record evidence has borne

18   out those allegations.

19        For example, on August 5, 2015, as shown in Exhibit 241,

20   Papa claimed to investors that he knew whether pricing was

21   sustainable and how the Perrigo's team was doing on pricing

22   decisions.  I think they put up a small portion of that in one

23   of their slides where Papa said that the success was due to

24   Perrigo's team doing good on pricing decisions -- or making

25   good pricing decisions.

1          If Papa claims to know both the sustainability of

2   pricing -- of the pricing windfalls and the cause for those

3   pricing windfalls, he is holding himself out to investors as

4   being knowledgeable.  Now, either he was or he wasn't.  Either

5   he actually investigated these topics and knew the truth when

6   he spoke falsely to investors, or is reckless in claiming to

7   have that knowledge without investigation.

8          We also see this on October 22, 2015, with Ms. Brown,

9   where she claimed to know whether or not Perrigo was insulated

10  from pricing pressures.  That's Exhibit 76.  And counsel says

11  that that relates to Martin Shkreli, and it may.  It may.  But

12  it was because Mr. Shkreli raised, as counsel admitted, the

13  price of it's drugs by a massive amount.  Well, that is the

14  exact same practice that Perrigo was doing.

15         That is the exact same practice that was causing an

16  unsustainable drama that she said that Perrigo was insulated

17  from.  So either she investigated this at that time that she

18  made that statement or she had not.  But shes should not have

19  held herself out as having knowledge of insulation if she

20  didn't.

21         The second reason that -- additional reason why a

22  reasonable jury could find that defendants had scienter in

23  their generic drug statements is that, the record shows that

24  Papa and Brown were regularly briefed about generic

25  prescription drug pricing.  In late 2014, both were advised

1  about how the economics of the large price increases worked,

2  that they would be some penalties, and it would be unprofitable

3  if the competitive environment didn't cause the price increase

4  to stick.  If someone had to roll that back, they would be

5  stuck with the penalties and they wouldn't get the benefit of

6  the price increase.

7       They knew that well before the class period that was

8  described in Exhibit 278, a presentation that the email

9  attachment says -- or the transmittal email expressly says was

10 sent to Joe and Judy; that is Joe Papa and Judy Brown.

11      November 12, 2014.  Even before the class period, a

12 customer sent Papa a letter regarding a six-fold increase in

13 desonide.  That is Exhibit 272.

14      So these were not unknown to the defendants.  These were

15 well known to the defendants.  They just chose not to speak

16 honestly about them.  And as we already discussed, the pricing

17 review that Papa and Brown conducted on April 13, 15, 2015,

18 warned that generic prescription drug pricing would cease to be

19 a tailwind by the third quarter of 2015, and would become a

20 headwind soon after that.  That is Exhibit 183 and 242.

21      Papa and Brown were sent reports in July 2015, that's

22 Exhibit 245.  September 2015, Exhibit 241.  October 2015,

23 exhibits 243, 244 246, 295, all showing that pricing was

24 unsustainable and that pricing opportunities were evaporating.

25 Pap and Brown also both personally reviewed and approved the

1   scripted comments that Brown presented regarding being

2   insulated.

3        That review is documented in Exhibit 276, which is the

4   transmittal of a draft of that statement to defendant Papa.

5   Judge Arleo stated that she believed that statement to be

6   palpably reckless, and defendants can't explain why a

7   reasonable jury couldn't reach the same inference.

8        Just after giving these warnings, Papa published to

9   investors guidance claiming that the facts known to him -- he

10  said this as part of his guidance -- the facts known to him

11  indicated that the competitive environment would remain

12  unchanged.  That is Exhibit 69.  In truth, he was told the

13  exact opposite.  From the beginning of the class period and

14  worsening through the summer and early fall of 2015, he was

15  repeatedly warned that the competitive environment was changing

16  and for the worse.  More competition.

17       The third element that defendants could -- I'm sorry,

18  that a reasonable jury could consider when contemplating

19  defendants -- the circumstantial evidence the defendants'

20  recklessness, at least scienter with respect to the generic

21  drug statements, is record evidence showing that Papa and Brown

22  were actually involved -- albeit at a high level -- in generic

23  prescription drug pricing decisions.

24       Doug Boothe -- the head of Perrigo's generic

25  prescription drug division -- testified that because of the

risk of upfront penalties that might not be recouped, the price

hike decision sometimes required input, quote, from the CFO or

the CEO.  That's Papa and Brown.

John Wesolowski also testified that the normal part of

approving a price hike was that Mr. Boothe -- here is the exact

words he said -- quote, would normally take that to Judy Brown

and then it would cascade back.  That was Exhibit 171.  Her

claims to not have been informed need not be credited by a

reasonable jury.  They are directly contrary to the evidence.

And Perrigo's 30(b)(6) witness also admitted that price

increases very well could have been raised with Perrigo's

executive committee, which included both Papa and Brown.

As Perrigo -- as Brown admitted at deposition, the

competition on key products and pricing pressure for Perrigo's

generic drugs was an issue that she and Perrigo's management

team kept, quote, front and center.  That is Exhibit 166.

That's her words.

The fourth thing that a reasonable jury could consider

is the -- in the scienter is the magnitude of the price hikes,

that they would not go unnoticed in an organization.  Price

hikes of hundred percent to 800 percent or more, they are huge

in magnitude.  It is a stark contrast to the price hikes of one

to two percent that Perrigo said it aimed for in other parts of

its business.

A reasonable jury could conclude that if Papa or Brown

1    decided not to inquire about why Perrigo was able to achieve

2    such enormous price hikes is because they didn't want to know

3    the details so they could maintain plausible deniability.

4    After all, if they did not think that there was anything wrong

5    with the way that they went about these price hikes, they

6    would, of course, want to study these price hikes and try to

7    implement them in other parts of their business.

8         All businesses want to have a better margin structure if

9    they can improve their pricing.  That's just a windfall to the

10   bottom line.  Any reasonable manager would want to know that if

11   there wasn't a reason to not know it, and that reason, of

12   course, is plausible deniability.  It is just a matter of

13   common sense.  A jury is not required to dismiss common sense

14   when they go -- when they enter the jury room.

15        Additionally, Papa and Brown each attended industry

16   events during the time that Sandoz described its price fixing

17   with Perrigo.  The GPhA meeting -- capital G, capital P, lower

18   H, capital A -- described in Exhibit 160, three days later,

19   Perrigo hiked prices on desonide and, of course, when you go to

20   the deferred prosecution agreement with Sandoz, Sandoz says, We

21   fixed prices with Perrigo about desonide, including desonide.

22   We rigged bids and allocated markets on drugs including

23   desonide.

24        Defendants cite some cases where meeting attendance was

25   found not to be convincing, and none of those cases involve a

1   competitor where -- that admitted having engaged in price

2   fixing and market rigging at the time of the meetings.

3        Defendants also argue that there were dozens of meetings

4   so any price hike would be close to a meeting.  That is a

5   strained inference that a jury is not bound to accept.  A

6   reasonable jury could also see this the opposite way.  If

7   so-called competitors were actually competing, why would they

8   need to meet dozens of times at industry meetings?  This is an

9   additional piece of the scienter puzzle.

10       Each of these items on its own is sufficient to get to a

11  jury, but together they easily allow a jury -- they provide

12  very strong evidence of scienter easily allowing a jury to find

13  a reasonable inference that Papa and Brown and Perrigo were at

14  least reckless in their statements to investors.

15       Finally, I would like to make two additional points, and

16  then I know we've gone later than anyone expected, and I will

17  be very brief.

18       Tom, if you could, put up the scope slide.

19       Number 1, there's been a lot of statements that were

20  made from the other side about claims that this action was

21  somehow gutted and made into a very tiny action.  In fact, our

22  main two categories -- we brought four categories of

23  misrepresentations in the amended complaint, the two most

24  significant were upheld virtually in their entirety.  This

25  was -- we don't need to guess about what a particular word in a

1    footnote of the opinion might mean.  We have an order.

2         None of the orders say they were dismissed and the

3    orders in this case say the exact opposite for class notice,

4    which went out to tens -- to about 100,000 potential class

5    members.  It was agreed to by everyone at this table, and

6    everyone at this table and Judge Arleo also agreed that it

7    accurately and concisely described the claims -- clearly and

8    concisely states the nature of the claims in this action.  That

9    is ECF 292.

10        The notice that she made that about said that this

11   lawsuit involves both performance and integration of Omega,

12   misrepresentations involving the performance and integration of

13   Omega, and with respect to generic drugs, that Perrigo's

14   pricing strategy, noncompetitive practices, and the competitive

15   environment for Perrigo's generic prescription drug unit.  It

16   doesn't say anything about being limited to only six drugs.  It

17   doesn't say anything about being limited to only noncompetitive

18   practices that can also be charged under the Sherman Act.  It

19   says nothing of the sort.

20        Secondly, there has been -- the second brief point I

21   would like to make is that defendants went on and on about what

22   they claim to be a lack of motive.  It is true that we do not

23   have all of the underlying documents that we now have that tell

24   the truth about Perrigo's motive in the -- during the time of

25   this fighting in the Mylan acquisition.  We don't have all of

1   the documents describing how Papa and Judy Brown spent days and

2   days and days and days, a huge amount of their time meeting

3   with investors trying to persuade them to ditch the

4   Mylan tender offer as described in our papers.

5        We didn't have the evidence that Papa and Brown

6   themselves sold their own shares for lower than the Mylan

7   tender offer, undermining their statements to investors that

8   that offer was too low, but, most importantly, we don't have

9   the Omega executive committee minutes.  Remember, Omega is part

10  of Perrigo at this point.  Perrigo's president, John

11  Hendrickson, said at this meeting, signed on to these minutes,

12  that these minutes concede that, quote, Perrigo -- this is an

13  actual quote, your Honor -- Perrigo overpromised because of

14  Mylan's situation, end quote, Exhibit 236.  That's why we're

15  here.

16       Perrigo chose not to tell the truth because it had a

17  distinct problem fighting the Mylan tender offer and investors

18  bored the brunt of that dishonesty.  That is the nature of our

19  case.  That is the claims we intend to present at trial and a

20  reasonable jury can decide whether our inference is the

21  inference to draw or defendants' inference is the inference to

22  draw from the record documents.  But there is far more than a

23  mere scintilla of evidence and any suggestion to the contrary

24  is simply wrong.

25       At this point, I would be happy to answer any questions

1    your Honor may have or I will turn it over to Mr. Harrod to

2    address loss causation.

3            THE COURT:  No questions at this point, Counsel.

4    Thank you.

5            MR. SILVERMAN:  Thank you.

6            MR. HARROD:  Good afternoon, your Honor, James Harrod

7    for the plaintiffs.

8            I'm going to start -- I planned to start with a

9    different subject, but I'm going to start and mirror my

10   argument with what Mr. Wareham started with, and that's on our

11   14(e) claim.  It is a Williams Act claim related to the tender

12   offer and the alleged false statements that the defendants made

13   in defense of that tender offer.

14           As Mr. Silverman just talked about, Perrigo and its

15   executives, the defendants here, really did not want the tender

16   offer to be successful and they fought it, and here our claim

17   alleges violations of section 14(e) of the Securities Exchange

18   Act in connection with that tender offer.

19           These claims seek to compensate Perrigo's investors.  As

20   a result of the misstatements that were made by the defendants,

21   the shareholders of Perrigo were deprived of the opportunity to

22   participate on a fair basis in that tender offer that Mylan

23   made.  These misrepresentations caused Mylan's tender offer to

24   fail.

25           Our damage and loss causation analysis tracks that

1 outcome and the purpose of the statute, which provides a

2 conservative -- and our damages assessment here provides a very

3 conservative measure of those damages.

4  Defendants argue that there are no damages on the 14(e)

5 claim.  We completely disagree, and the damages under 14(e) are

6 purposely designed to effectuate the remedial purpose of this

7 statute.  This statute is designed to ensure that

8 misrepresentations are not made in connection with tender

9 offers.  It's designed to provide those damaged investors with

10 compensation for what they would have received in the absence

11 of defendants' statements interfering with the acceptance of

12 the tender offer.

13  Judge Arleo held in the motion to dismiss whether the

14 shareholder had a fair opportunity to make that decision, the

15 decision to tender or not, based on the information, the

16 disclosures available is the critical question.

17  The *Rudinger* case that Perrigo cited also supports the

18 conclusion that if a defendant is liable for a violation, they

19 bear the risk on the damages flowing from that liability.

20 Specifically in denying the summary judgment, the *Rudinger*

21 Court said, Once a plaintiff establishes damage from a lost

22 opportunity, the defendant must bear the risk of its uncertain

23 amount.  Otherwise, the securities laws could be violated with

24 impunity in any situation in which the violation does not cause

25 out-of-pocket loss.

1         Mr. Wareham talked about speculation and the damages

2    here being speculative and the loss causation being

3    speculative.  They are not, and that's not just because they

4    didn't cause an out-of-pocket loss but because we have a very

5    concrete methodology for establishing both the loss causation

6    and the damages here.  We cite the *Rudinger* case that I just

7    quoted from at 87 of our opposition brief.

8         Okay.  So I'm just going to go through the facts related

9    to the Mylan tender offer briefly.  I think it is important to

10   understand them in the context of understanding how the

11   defendants' misrepresentations caused the loss or the injury

12   that the shareholders suffered.

13        Mylan launched a tender offer for Perrigo that was

14   ultimately valued at $174.36 per share.  That tender offer

15   value is based on the exchange of 2.3 Mylan shares plus $75 for

16   one share of Perrigo.  So if the tender offer had succeeded on

17   November 13, 2015, the shareholders of Perrigo tendered their

18   shares would have received compensation equivalent to $174 and

19   change.  The tender offer expired on November 13, 2015.  The

20   one condition to completion of the tender offer and the receipt

21   of that compensation by Perrigo shareholders was that

22   50 percent of the Perrigo shareholders agreed to tender their

23   shares.  So they are saying we will give you our Perrigo

24   shares.  You will give us, as of that date, something that

25   would have been valued at $174.

1        This is where Perrigo's defense of this came in.  They

2   needed to ensure that less than 50 percent of the shares be

3   tendered and in doing so, that would cause the tender offer to

4   fail.  They were successful in doing that.  Forty percent of

5   Perrigo's shareholders tendered their shares.

6        In the measure of damages that we propose as a result of

7   the tender offer failing to be consummated is the difference

8   between what they would have received on November 13th and the

9   price the Perrigo shares traded at immediately after the tender

10  offer failed, and so that difference is 100 -- the tender offer

11  compensation is $174.  On November 13, 2015, on the day the

12  tender offer failed, Perrigo shares traded at $140.53 at the

13  opening.  There is a difference of $33.82 per share.

14       So what we're saying is if you had tendered your shares,

15  if the defendants had not insinuated themselves improperly by

16  lying to you about the conditions of their company, you would

17  have immediately got a benefit of $33.82 per share.  I want to

18  highlight, and our expert report goes through this in some

19  detail, but that is a very conservative measure of damages.

20  The spread between or the premium that the tender offer

21  provided was higher at different points in time.  We chose this

22  because, A, it is not speculative.  You can look at the

23  numbers.  They are concrete and they are objective, and you can

24  conclude.  You can do the arithmetic.  Anybody can do this

25  arithmetic.

1          So what I want to talk about next is that the defendants
2    have come up with a counterfactual scenario.  They are saying
3    that the tender offer would have never gone through had Mylan
4    known the true facts.
5          We have evidence that we can present by our expert and
6    in the record showing that we believe the tender offer would
7    have gone through.  Our expert, Dr. Nye, opines as much.  He
8    looked at the fact that 40 percent of the shares tendered and
9    he then concluded that there are a number of lawsuits,
10   including the one that we're here today, and there is a number
11   of individual lawsuits.  Those people are making the same claim
12   that these shareholders in this class action are making, that
13   they were deprived of the opportunity to participate in the
14   tender offer because of the misrepresentations in violation of
15   section 14(e).  If you add up the number of shares that are
16   represented by those lawsuits, it eclipses 50 percent.  So
17   those people are saying we would have tendered.  We couldn't
18   tender, and we were deprived of the benefit of this.  So you
19   would get the 50 percent.
20         In addition to that fairly objective quantification of
21   the fact that we would have eclipsed the 50 percent sharehold,
22   Dr. Nye looks at the facts and the pricing of the two company
23   shares and concludes it would have been economically rational
24   for you to tender your shares because you would have achieved
25   an immediate economic benefit.  In fact, as we talked about,

1  both Mr. Brodsky and Mr. Silverman talked about the fact that

2  Mr. Papa had agreed to sell his shares at $150 per share.  So

3  he believed, certainly, that 150 was a fair value for his

4  shares.  He could have gotten more than that and other

5  shareholders could have gotten more than that in connection

6  with the tender offer.

7       Our other expert, Mr. Purcell, an investment banker,

8  opines in that the absence misrepresentations, the tender offer

9  would have also succeeded.

10      So there were no -- and there were no impediments to the

11 tender offer succeeding.  Mylan, very interestingly, despite

12 what we have heard earlier today, Mylan agreed to engage in

13 this binding tender offer without conducting any due diligence.

14 It agreed to, basically, buy these shares of Perrigo without

15 getting any nonpublic information, very common in these kinds

16 of corporate transactions for people to have nondisclosure

17 agreements, to be provided with many, many reams and rooms full

18 of data that they could pour over that's nonpublic to

19 understand exactly what it is that they are choosing to buy.

20      It's important that Mylan chose not to do that here, and

21 they didn't.

22      So if we look at that evidence and we conclude that

23 there were economic reasons why the tender offer should have

24 succeed, and if the tender offer had succeeded, these

25 shareholders would have achieved that $33.86 benefit.

1          Defendants disagree with this.  And their primary

2     disagreement with it is based on what I will kindly refer to as

3     a hypothetical.  And the hypothetical presumes, like I said

4     before, that if Mylan had told the truth -- or if, sorry.  If

5     defendants had told the truth, Mylan would have never launched

6     the tender offer.  But their hypothetical assumes they don't

7     violate the statues.

8          And so what we say is, if you violate the statute and we

9     have a finding of liability, you are now responsible for the

10    damages that ensue from that liability.

11         Their assumption is, I think, circular.  It also

12    conflates the questions of liability and causation, which is

13    improper.  And it basically would allow any defendant in this

14    situation to get out of any guilt on a Williams Act claim by

15    just saying, Well, you can't unscramble this egg, you can't

16    know that the purchaser would have preceded with the

17    transaction.

18         Their basis for this hypothetical is entirely

19    hypothetical.  There is no testimony in the record from anyone,

20    from anyone at Perrigo, from anyone at Mylan, from anyone at

21    any other place suggesting that if the things that we say were

22    misrepresented were told to Mylan, that they wouldn't have done

23    the tender offer.  It is pure speculation.  It is entered by

24    their expert, Dr. Subraminian.  And interestingly, his

25    statement, his conclusion that Mylan would not have conducted

1   the tender offer as they did is, in fact, speculation about

2   Mylan's state of mind which they criticize our expert,

3   Dr. Purcell -- or Mr. Purcell, that he should be excluded

4   because he wants to testify, which he doesn't, about the state

5   of mind of certain of the defendants.

6        So if Purcell can't testify about the state of mind of

7   the defendants, Dr. Subramanian certainly can't testify without

8   any record support as to what Mylan would or would have not

9   done.

10        The other thing that I want to point out is the idea

11   that Mylan would have been impeded by certain of this

12   information is contradictory to what the defendants said when

13   they were defending themselves against the tender offer.

14        One of Perrigo's defenses, and I will just quote one

15   thing, is a release on November 10, 2015, Mylan had chosen to

16   hide the ball.  And it had resorted to half truths and empty

17   promises, and scare tactics.  We cite that at paragraph 36 of

18   our statement of facts.

19        Perrigo had repeatedly and earlier cited Mylan's ethical

20   challenges and difficulty with basically operating above board

21   throughout the process.  So the idea that they would now say

22   that this company would be completely put off by the minor

23   things that they say they are doing, which they don't admit

24   that they were doing, doesn't really make any sense or hold

25   together.

1       What they are really saying is, if there is no

2  liability, there can be no loss causation.  And we agree,

3  except for the fact that we think there is liability on this

4  claim, and therefore, we have presented a measure of damages

5  that are, certainly, appropriate.

6       And the fact -- the fact of whether or not the tender

7  offer would have been completed is a question for the trier of

8  fact.  Just like all of the other things that Mr. Silverman

9  talked about.  We cite in our opposition, the *Daimler Chrysler*

10 *AG* case from the district of Delaware, 2003, which holds that.

11      Defendants, the last thing I'm going to cover on this is

12 the idea that our expert, Dr. Nye, said that -- or the

13 contention that he said that Mylan would have never done the

14 tender offer if they had known the truth.  That's not what he

15 said.  And he said he would not know what Mylan would have

16 done, and he said he didn't have any understanding of that.

17      But also, based on defendants' contention regarding

18 expert's testifies regarding the state of mind of other people,

19 whether or not Dr. Nye -- notwithstanding our disagreement with

20 their characterization of his testimony, even if that were his

21 testimony, they say you are not allowed to testify about the

22 state of mine of somebody else.  And so what the value of that

23 other than a nice gotcha point in an argument and in a brief,

24 I'm not sure, but we don't think it has any value.

25      I'm going to move on to the 10(b), the open market

1   claims.  In that context, I want to talk generally about loss

2   causation and what's required for loss causation on those

3   claims.

4        I want to first say that it's important really to

5   consider what's actually required here.  In loss causation is

6   the measurement or the process by which information that was

7   previously misrepresented or omitted comes to be known by the

8   market.  And that can come in one of many forms.  What this

9   *Semerenko* case from this Third Circuit says, it just requires a

10  showing that the alleged misrepresentations were a substantial

11  cause of the inflation and in the securities subsequent

12  declined value.

13       So there has to be a substantial relationship between

14  the misrepresentations and the news that causes the stocks to

15  decline in value.  Importantly, this affects some of

16  defendants' arguments, because we hear about this repeatedly in

17  their briefs.  There is no requirement that a corrected

18  disclosure be a mirror image of the prior misrepresentations.

19  If you said -- just to give a very basic example -- the car was

20  black and it turned out the car had rust on it, could be a

21  corrective disclosure of that potential statement.  It doesn't

22  have to be the car was white.

23       That kind of mirror image disclosure is not what's

24  required under the Securities laws.  In the *Merck* case from

25  this district from 2011 says that -- supports the idea that no

1   mirror-image requirements are embedded in the juris prudence on

2   loss causation.

3       Defendants, you know, seek to apply a very different

4   standard, a standard where everything is objective and there is

5   no room for interpretation of facts at summary judgment.

6   That's improper.

7       They say in their reply brief at page 27, oddly on their

8   motion for summary judgment, that Plaintiffs have the burden of

9   proving loss causation but that we have failed to do so.  It

10  may be true, and in fact, I think it is true that we would have

11  the burden at trial.  But they have the burden now of showing

12  that there are no issues of material fact related to loss

13  causation.  And there are.

14      We have detailed evidence from the record.  We have

15  Dr. Nye's very detailed reports supporting contentions of loss

16  causation and damages.  And specifically for each -- we have

17  seven corrective disclosure dates in the case, your Honor.

18  Those are dates in which news released a cause Perrigo share

19  price to decline materially.

20      On each of those dates, based on economic studies that

21  Dr. Nye has conducted, we show that there is a statistically

22  significant decline on those dates.  After controlling for the

23  market and the peers of Perrigo, meaning that, this is a

24  statistical measure of the movement in Perrigo stock that

25  controls for other market and industry factors.  So it is just

the news affecting Perrigo.  The defendants do not contest

this.  In fact, their expert, Dr. Gompers did not conduct an

event study to determine whether or not any of our experts'

statistics were wrong.  They concede that they are correct.

      And since we have provided that information, we have the

evidence to prove loss causation.  We have the evidence to

prove damages.  And so in this scenario there's no way that

summary judgment can be granted on loss causation.

      They, again, cite the *McCabe* case in their reply at 27,

and in that case, the difference is that the plaintiffs did not

cite any -- they did not make any allegations regarding loss

causation.  They didn't say that news came out that corrected a

prior misstatement and that's what caused the price of their

securities to decline.  This case is totally different.

      Here we have the seven corrective disclosures we're

talking about.  And one thing that I really want to emphasize,

because a lot of what we heard earlier today was that the

defendants really didn't misrepresent anything.  They were

really tell ing the truth.

      Well, the thing is, is that the stock price reactions to

the information that we set forth in our complaint and in our

papers in support of -- opposition of summary judgment and

certainly in Dr. Nye's reports reflect something very

different.

      On the disclosures at issue here, we have a 9.9 percent

decline, a 17 percent decline, another 9 percent decline.  So

what that reflects in general is that the market and

investors -- very smart people who studied these companies in

great detail -- saw the news that Perrigo released and said,

Huh, I'm going to have to reduce the value of your firm by 17

percent today.  That's controlling for the market.  That's just

the Perrigo-specific drop.

     That doesn't happen unless something in that news

release shocked people.  Made them think, something that I

didn't know came out today, and that's because the defendants

didn't tell the them the truth.  So that's why we see a 17

percent drop on the April 25, 2016, disclosure.

     I'm going to go through a couple of examples to sort of

talk about some of the things that Mr. Wareham talked about.

I'm not going to talk about each one of the seven disclosures,

unless your Honor would like me to.  I think it's highly

unlikely that you would want that.

     But I will do some and I think they will be illustrative

of the others dates.

          THE COURT:  You predicted correct.

          MR. HARROD:  Okay.  So I will start with the first

collective disclosure state in the case.  That was February

18th of 2016.  And on that date, Perrigo disclosed its fourth

quarter fiscal year 2015 financial results.  Those results were

significantly below investors and analysts expectations.

1    Specifically, they were poor earnings in the announcement of an

2    impairment of the value of the Omega assets.  Mr. Silverman

3    talked about that.

4         This was the first of several impairment charges,

5    meaning that the value of that asset that they had bought,

6    which was the biggest acquisition that had ever made, was going

7    to be worth less than they expected.  So it's an indication

8    that that transaction is not panning out in the way that they

9    expected, and that the value that the shareholders of Perrigo

10   put into the acquisition of Omega is now worthless.  That's

11   what that signals.

12        So there were comments related to that by Perrigo and by

13   the CEO, Mr. Papa, expressly linking the poor earnings in the

14   impairment of Omega assets to issues with the integration and

15   operation of Omega.  Perrigo stock fell by 10 percent.  That's

16   after isolating the market and peer factors.  That's a very

17   large decline.

18        This was a partial disclosure of the problems at Omega.

19   Dr. Nye, and if you look at his reports, there is excruciating

20   painstaking detail in them.  He looks at news, analyst reports,

21   he compares them.  He weighs the relationship between the prior

22   misrepresentations and the news that's coming out and does a

23   detailed analysis of that.  I will spare you reading through

24   that.  But if you were to look at it, I'm sure that you would

25   see the amount of detail and thought that went into that.

 1          So he looked at analyst commentary on the February 18th

 2    disclosure.  And he determined that there wasn't any other news

 3    that day that affected the stock.  This goes to the point, and

 4    I will get to this more, about confounding information.  And I

 5    think Mr. Wareham might have referred to it as a phobia

 6    disaggregation.  That means that if there is multiple pieces of

 7    information affecting the stock on a certain day, Dr. Nye

 8    concludes that he doesn't need to parse that out.  Meaning that

 9    if there is some pieces of information that are negative, that

10    area about one aspect of the business that's unrelated to the

11    fraud, he has to remove the effect of that.

12          He says he can do that, and he can do it.  He just says

13    for these disclosures, not that he is afraid to do it, but that

14    he doesn't need to, because the information affecting, causing

15    the decline on these dates is all about things that are at

16    issue in this case.

17          Defendants disagree with that, and that's fine.  They

18    can tell that story to the jury.  But they can't get summary

19    judgment on it.

20          So Perrigo argues specifically to this case that the

21    narrow interpretation of the case related to integration of

22    Omega is not implicated by those disclosures.  We have detailed

23    statements in the record why that's wrong.  We disagree with

24    it.  There is no need to disaggregate it.  We believe we have

25    more than readily established loss causation on February 18th.

1    I will do a couple more dates.

2         The next corrective disclosure is another one that Mr.

3    Wareham talked about.  This is news that comes out after the

4    close of the financial market on April 21st.  It is information

5    indicating that Mr. Papa's going to leave the company, he is

6    going to go take on a job at Valeant.

7         And our interpretation of this information is that the

8    disclosure was -- was indicated to investors of further

9    worsening conditions at Omega, and that Mr. Papa was leaving

10   because his project of making this European acquisition was not

11   going well.  Again, defendants do not contest the statistical

12   analysis on this date.  They agree that it's statistically

13   significant and that the company stock went down by 5.8

14   percent.

15        They argue it is not a corrective disclosure because

16   Papa's resignation was not the subject of any of the alleged

17   misrepresentations.  Again, I will turn you back to what I said

18   earlier.  There is no mirror image requirement.  Information

19   about complex multinational companies that have multiple lines

20   of business with CEO's moving around and tender offers that are

21   being launched and failing, the information is dynamic.  It

22   doesn't mean one thing.  They look at this and they are saying

23   we have report that Mr. Papa is leaving.

24        They look at that and say well, Mr. Papa is closely

25   associated with the purchase of Omega.  In fact, he was the

executive at Perrigo that was, by far, most closely associated
with it.  In the prior earnings release that I talked about, he
was the one who said I will stick around and basically I'm
going to right the ship at Omega.

So about two months later he's like I'm leaving, I'm
out, I will take over Valeant and see what they can do.  So
unsurprisingly, the investors are like, that doesn't seem too
good.  That seems like maybe if he said he was going to stick
around and fix it, he should stick around and fix it.  He
didn't; he left.  The stock dropped.

Analysts covering the company looked at this and said,
the mere thought -- this is just one quote -- that he would
consider a new role could lead one to conclude that Perrigo is
far from being fixed and that Papa may see moderating growth
prospects at Perrigo.  So he had hitched his wagon to the idea
that Omega would achieve growth.  That obviously wasn't
happening, he left.  The market interpreted that correctly,
frankly, and he ended up leaving.

The defendants on this date make a specific argument
about confounding information.  They say that the reason why
the stock dropped, at least in part was, because of concerns
regarding the new CEO, Mr. Hendrickson -- who was the
president -- was going to replace him and he's might not be as
good as Papa.

Dr. Nye analyzed this and said well, the two issues of

1    Mr. Papa's leadership and what they represented to investors
2    and the role of his successor, and the qualifications of his
3    successor are inextricably intertwined.  Those two things are
4    related in such a way that can't be disentangled.  He said, not
5    that he couldn't disaggregate the effect of that confounding
6    information, but that it wasn't necessary.
7         I am going to talk about a disclosure that just happens
8    three days later on April 25, 2016.  I want to focus in
9    particular here on the defendants' arguments about confounding
10   information, because this is a really critical disclosure date,
11   in terms of what the types of arguments they are presenting on
12   this subject are.
13        On April 25th, Perrigo announced preliminary results for
14   the first quarter of 2016.  They were substantially below
15   investors expectations and they reduced -- the company also at
16   that time reduced its earning's guidance for the rest of 2016.
17   Perrigo explained that the poor results and reduced guidance
18   were caused by bad generic Rx pricing reductions, poor BCH
19   performance -- which is Brand and Consumer Healthcare, that's
20   what they started to call Omega -- and several indicators of
21   impairment at Omega/BCH.  Dr. Nye, again, concludes that these
22   disclosures partially revealed information about defendants'
23   prior false statements.
24        This drop is the one that I referenced earlier on a
25   company-specific basis, 17.7 percent.  The stock fell almost 18

1  percent after controlling for the market and the peers.  This

2  is a very, very big drop.

3       Defendants raise a few arguments here.  They again say

4  that this is not revelatory of the misrepresentations because

5  this is not -- this is not about Omega integration.  It is

6  about performance.  Both -- Mr. Silverman addressed that point,

7  showed you what Judge Arleo had ordered in connection with

8  class certification.  We have more of that in our brief.

9       Dr. Nye did a detailed assessment of why this was

10 related to the Omega misrepresentations that had been made.  He

11 does the same for the generic pricing issues.  They say -- the

12 defendants say with respect to this, that we need to give

13 consideration and effect to the confounding information which

14 they say was related to the fact that they were -- Perrigo in

15 this day confirmed that Mr. Papa was leaving.

16      And they also disclosed -- in addition to the

17 information that I talked about earlier regarding Omega and

18 generics -- that their other divisions, the CHC division, was

19 having delayed product launches.  And I just want to point this

20 out because I do think its important.  What Dr. Nye looks at

21 is, he looks at what that information means and what the

22 significance of it would have been to investors.

23      He says that the analysts, as a proxy for the broader

24 market, the commentary that they made, their negative reactions

25 were overwhelmingly related to competitive pressures in

1   generics in the weaker-than-expected Omega performance.  He

2   says that the two pieces of information -- that they are citing

3   as being confounding -- is being unrelated to the fraud.  That

4   need to be taken out of the loss causation analysis on this

5   date are Papa's departure.  He said the market already knew

6   that, they adjusted it when it was first announced on the 21st,

7   no one came out and said it wasn't true.

8        So the market had fully ingested or taken account that

9   fact as of the date of earnings, on the 25th.  He had also said

10  not a single analyst report cited the CHC, the delay in the CHC

11  product launches in any way as a result of -- as being a factor

12  in the re-evaluation of the firm, as of the announcement of

13  that information on April 25th.

14       So, again, Nye says I can disaggregate this.  I can use

15  valuation principles.  I can look at the cash flows that would

16  be attributed to something like those delayed product launches.

17  I can measure that.  I didn't.  I don't have to because that

18  information didn't cause the stock price to go down on that

19  day.  And so defendants make virtually the same arguments

20  regarding our May 12th and August 10th disclosures in 2016.  I

21  want to focus just lastly the two disclosures from 2017.

22  Because defendants make a distinct argument with respect to

23  those two disclosures.

24       What happened on March 3, 2017 and May 3, 2017, were two

25  pieces of information related to the government's investigation

1  in the generic antitrust area, and in particular what that

2  meant for Perrigo.

3       On March 3rd, Bloomberg reported -- during the trading

4  day -- that U.S. prosecutors are examining the prices of skin

5  treatments made by Perrigo and a handful of other companies as

6  part of a sweeping criminal investigation into possible

7  collusion and the generic drug business.

8       According to the May report, it is based on a court

9  document.  That news came out at 10:25 in the morning.  If you

10  look at an intraday chart showing the ticks during the trading

11  day, Perrigo stock immediately declined ultimately by around

12  four percent beginning with the information that was released

13  there.

14       On May 3rd after the close of the markets on May 2nd --

15  May 3rd being the next day -- the stock drops, but on May 2nd

16  the Wall Street Journal reported -- first, Perrigo released an

17  information that the Department of Justice had executed a

18  search warrant at its corporate headquarters in connection with

19  the generic drug investigation.

20       The Wall Street Journal reported that evening on May

21  2nd -- so this is before the market opens on the 3rd -- that

22  the execution of search warrants may suggest investigators are

23  stepping up the probe, searching for evidence to support

24  allegations of collusion.

25       So on each of these dates, Dr. Nye concludes that the

1   increased regulatory scrutiny was, unsurprisingly, the result

2   of the very same fraudulent conduct alleged by plaintiff.

3   Accordingly, as the glare of the DOJ was a direct and

4   foreseeable consequence of the risk inherent to the company's

5   allegedly collusive price-fixing scheme.

6        So we provided evidence regarding the relationship

7   between price fixing and the company statements and this was a

8   correction of those statements.  And we have established

9   through Dr. Nye's studies that the stock declined both days in

10   a statistically significant fashion.

11        So defendants' arguments in response to these two

12   corrective dates is different.  Their argument is that the

13   market already knew about this information.  This is what's

14   referred to generally as a truth-on-the-market defense.

15        Defendants here bear the burden to show equivocally that

16   the information on these two corrective disclosure dates was

17   conveyed today the public with a degree of intensity and

18   credibility sufficient to counterbalance, effectively, any

19   misleading information created by the alleged misstatements.

20        So what that means in this context is, their prior

21   information would have told the investors and the public that

22   they were going to be -- there was going to be news reports

23   that the generic drug investigation was ramping up, and that

24   the Department of Justice was going to execute a search warrant

25   on their headquarters.

1          So we don't think beyond the legal standard, which makes

2   it very difficult for them to win such an argument on summary

3   judgment, that the fact that they purport to say were in the

4   public as of those dates because they were conveyed

5   unequivocally to the public with a degree of intensity and

6   credibility.  They have not met that standard.

7          So your Honor, that's all I had on loss causation for

8   now.

9          I think it probably makes sense, unless you disagree,

10  for us to either take a short break or for me to turn to

11  argument back over to defendants and I think that they are

12  going to -- they made motions to challenge our experts and it

13  probably makes sense for them to argue first on those.

14          THE COURT:  We will take a five-minute break, and then

15  we will come back.  It is 3:18.  Let's say 3:25.

16          MR. HARROD:  Thank you, your Honor.

17          THE COURTROOM DEPUTY:  All rise.

18          (Recess taken at 3:18 to 3:26 p.m.)

19          THE COURTROOM DEPUTY:  All rise.

20          THE COURT:  Thank you, please be seated.

21          MR. HARDIMAN:  John Hardiman for Judy Brown, again.

22  Your Honor, if I get -- and this is probably something Mr.

23  Wareham said, but I'll say it anyhow -- if I get their theory

24  here, as long as they say there is a price hike and then they

25  attach to it, actually, adverbs like astronomical, really high;

1    they get to go to a jury.  And that's not what the rule is, all
2    right.
3         This case is all supposition which is become blindly
4    obvious from that response.  And that is what summary judgment
5    is meant to weed out and not permit to go to a jury.  So a jury
6    isn't given misleading evidence, supposition, and speculation
7    in an effort to try and push the plaintiffs to some sort of
8    settlement.  That's why this case has got to go.  It surely has
9    to go against Judy Brown.
10        I said there was no evidence against her own price
11   fixing, and I must have been right, because what happened when
12   the plaintiffs were speaking is you will hear -- they kind of
13   change the case.  The case is, and always has been -- as Judge
14   Arleo said -- a case about hiding a price-fixing scheme.
15        As I said to you before and I'll say again, there is no
16   evidence Judy Brown knew anything about the price fixing
17   scheme, the fact that may have know the prices went up, or that
18   there may be penalties that some prices went up.  How does that
19   possibly translate to knowing there is criminal behavior going
20   on within the organization?
21        And what they do, what they did was sort of drift away
22   from that and there was all this talk about, you know, they
23   withheld the fact they were in a competitive market?  What?
24   That is completely the opposite of a price-fixing scheme.  A
25   price-fixing scheme means that there is no competition, because

1   everyone agrees what the prices are --

2                    (Reporter clarification.)

3          MR. HARDIMAN:  Completely the opposite what they are

4   starting to try to work in the case now, but that's not the

5   case they pled.

6          They didn't plead a case that Ms. Brown or Perrigo kept

7   from the shareholders the extensive competition in the market.

8   They pled completely the opposite, and by the way, if you look

9   at Ms. Brown's statements, the statements they are premising

10  this case on, the cases would say -- the statements would say

11  there's a lot of competition in the market.

12         I still don't what they are arguing about with respect

13  to being insulated from the pricing drama.  I mean, yes,

14  Shkreli's prices were high.  He wasn't involved in a

15  price-fixing conspiracy.  No one alleged that.

16         I have to say, your Honor, this idea -- the last refuge

17  of scoundrels, right, which is -- okay, they didn't know

18  because they didn't want to know.  Wait a minute.

19         Judy Brown, Joe Papa these are people that work really

20  hard to get big jobs at a big company.  You're going to tell me

21  that it's logical to reasonable inference when they have no

22  evidence of any price fixing for them to say in a company

23  selling 800 generic products to assume that in six or so there

24  might be criminal behavior, and their reaction to that is going

25  to be good work guys, keep going?

1          People go to jail for that, okay?  That is a totally

2    unreasonable inference.  That is them not doing their job.

3    They brought a case that accused my client of a really bad

4    thing and it was their job to come up with evidence to show

5    that was true, and they didn't do it.  And then they get to go

6    to a jury by saying well, maybe, well, she didn't know, but she

7    didn't want to know.  That is preposterous.

8          One thing that really doesn't address my client, but I

9    just have to mention it because it is just so dumb, this

10   argument that Brown and Papa sold their stock at a lower price

11   than what Mylan was offering indicates that they really thought

12   the Mylan price was okay is ridiculous.

13         When you or I sell stock, ten shares of stock, we get

14   what the market gives us but when you're selling a whole

15   company, that's a bigger deal.  Because when you sell a

16   company, you are selling control of the company and you've got

17   to get a control premium for that company.

18         In mergers and acquisitions law -- believe me, we have

19   enough law today.  I don't need to get into that.  In mergers

20   and acquisitions law, you have a duty to get the highest price

21   possible.  The plaintiffs know that.  Their firms wrote that

22   law, and, therefore, this comparison between what I sell

23   something on the market and what I'm selling an entire company

24   is ridiculous and when people say things like that, your Honor,

25   you should question all of their arguments.

1          Now going to integration, again, it was a very

2    undisciplined presentation.  As I warned at the outset of my

3    argument, a lot of their arguments went into time periods that

4    have nothing to do with what Mrs. Brown knew on June 23rd when

5    she spoke.  They talk about the problems of the impairment in

6    2016.  None of that has anything to do with the issues on

7    June 23rd.

8          They said at one point that she knew in the

9    preintegration process before the closing that revenue was

10   overstated at Omega.  That is the IRFS GAAP problem that we

11   spoke about.  Under the IRFS rules, you record revenue

12   differently than under GAAP.  Therefore, it had to be fixed.

13   And as you saw from the documents I showed you, it was fixed

14   and it was getting fixed by the time she talked on June 23rd.

15   As a matter of fact, he admitted that the statements she made,

16   the modest statement, We're online, back office is online, he

17   admitted that the back office stuff she is referring to is the

18   IRFS GAAP issue.  And, yes, the documents show quite clearly

19   that that was getting remedied.

20         By the way, I never asked you -- I didn't ask you to

21   take any inference from any document.  I asked you to read them

22   because if you read them, they come out our way.

23         The Coucke document, I already told you the only way I

24   think that can reasonably be read.  They referred to a document

25   the next day in which Mr. Coucke said that what I think we need

1   is marriage counseling.  Precisely my point.  The issue wasn't

2   that the things that needed to be integrated, the nuts and

3   bolts of putting the companies together wasn't working.  His

4   problem was that it was working with Perrigo, basically, taking

5   over and he needed to talk to people about that, which is, by

6   the way, why, obviously, the CFO got on the plane to go meet

7   with him because the guy was upset and he was having a tantrum,

8   not because -- that doesn't indicate anything was going wrong

9   with respect to putting the companies together.  On the day

10  before she spoke, she had a memo from her staff saying all the

11  succusses to date with respect to integration and those were

12  the things that were the nuts and bolts of getting done about

13  integration.  That's all I've got.

14          Thank you, your Honor.

15            THE COURT:  Thank you, Counsel.

16            MR. BRODSKY:  Your Honor, I'll try to be relatively

17  short.

18          Mr. Silverman went through a litany of document after

19  document after document.  Didn't quote from almost all of them.

20  Misquoted it or misstated what it was.  Didn't give you the

21  timing of exactly what statement was at issue by Mr. Papa or

22  Ms. Brown and what was known at that time and mixed up time

23  periods, but I'll go through a few examples to point that out.

24  I would just ask your Honor what we did in our presentation was

25  actually show the documents and the words on the page because

1  the words on the page of the documents, they all go in favor by

2  the plain language of the defendants.  The interpretations they

3  are insisting people can make, well, they have those

4  interpretations.  The first thing I'd like to do, though, is

5  Mr. Silverman besmirched Mr. Papa by suggesting that they

6  didn't go past five hours because he said I don't recall a

7  number of times.

8      And you know what I thought we would do?  Let's go

9  through the first ten times he said I don't recall.  Let's look

10 at what he actually said because I'd urge you to do that.  He

11 tried to suggest Mr. Papa wasn't giving the answers, that he

12 was trying to avoid answers.  Let's go through the first half.

13     The first time he was asked:  What was your position at

14 the time of the deposition you are referring to?

15     I don't recall to the best of my recollection, and then

16 he gives the answer.  Well, that's one I don't recall.  One out

17 of one is an attempt to answer the question.

18     Number 2, in a personal capacity, yes, he said as part

19 of my company, the company has been involved.

20     Are you asking me specifically in a personal capacity?

21 Yes.

22     He said, I don't recall being involved in any additional

23 lawsuits beyond those that had been part of the company.

24     That's true.  That's a true statement.  Two out of two.

25     Let's go to the next I don't recall.

1          Two out of two reasonable I don't recalls, if you can
2   get there.
3          Yes.  When was the last time you spoke to
4   Bradley Joseph?
5          I don't recall speaking with Bradley Joseph since my
6   departure from the Perrigo company.
7          That's true.  He did not speak to Bradley Joseph, and he
8   didn't recall.  That's three out of three reasonable I don't
9   recalls.
10          Let's go to the fourth.
11          Down below, how large was Watson during the time he
12   served as president?
13          I don't recall the specific numbers, sir.
14          And then he was asked, was is it something that you
15   considered to be a large pharmaceutical company?
16          Answer:  I don't know how you define large.  I believe
17   it to be a good company.  I don't know.
18          How can that be considered a nonresponsive answer?
19          Let's go to the next I don't recall.
20          While you were at Watson, did you work with anyone who
21   later worked at Perrigo?
22          I don't recall anyone from Watson Pharmaceuticals coming
23   and joining the Perrigo company.
24          Not a false answer, a true answer.
25          To your knowledge, did you work with anyone at Watson

 1   who later worked for another company?

 2        I don't recall any specific individuals.  I'm sure there

 3   was some people.

 4        I could go on and on.  Every I don't recall -- almost

 5   every I don't recall was I don't recall, but here is what I can

 6   tell you.  I don't recall, but if you have my calendar.  I

 7   don't recall, but let me give you the information I have.

 8        So they didn't spend five hours with -- more than

 9   five hours with him because they didn't want to ask the hard

10   questions and they didn't like the responses.

11        Let's go through a few documents.

12        If we put up -- they mentioned Exhibit 386, and they

13   said Exhibit 386 was a significant document.  Mr. Silverman ran

14   through these one after the other so fast, so rapid, I could

15   hardly understand what he was saying.

16        July 14, 2015, he offers this document from

17   Mr. Farrington to Joseph Papa and others.  It's about the

18   integration reset.

19        I encourage your Honor.  He interpreted it as some kind

20   of evidence that there was wrongdoing or that there was some

21   serious problem at Omega.  I urge your Honor to look at that

22   document and look through it because he is wrong.  It's -- it

23   doesn't exist.

24        And, in fact, let's assume he is right.  Let's assume it

25   showed some issue with Omega, some problems with the

1    integration process.  That document is dated July 14th.

2         Let's go to the disclosure on slide 31 of our

3    presentation, and let's look what happens on August 13, 2015,

4    in terms of a disclosure.  Quote, We face risks associated with

5    successful integration of our recently acquired Omega business,

6    and it gives all the issues or problems one can encounter.

7         I challenge them to talk to your Honor about these risks

8    that were disclosed.  I challenge them to answer certain

9    questions, and they didn't want to do that.

10        Let's go to the next one.

11        They put -- if we can, go to my slide 44.

12        They mentioned this really quickly.  They threw it out

13   there.  They suggested that Mr. Papa was saying on this date of

14   August 5th that the integration was delivered, that they,

15   quote, It was over.  Integration was over, Omega integration.

16        He used the words, and we highlighted it in our

17   presentation as he talks, I would like to start by thanking

18   Perrigo employees for their diligent focus, and he says,

19   delivered on our Omega integration plans.

20        We all know here, because of all the disclosures before

21   this and after it by Mr. Papa in the SEC filings, that they

22   kept saying that the integration is going to take two or three

23   years.  That does not mean we're done with the integration.  We

24   just closed in March, and we're completely finished.  That's

25   not a reasonable inference to be drawn from the evidence.  That

1   is a Hail Mary.  That is not even colorable under the summary

2   judgment standard.

3          Let's go to another one.  I can't go through them all,

4   but I'm just going to go quickly to another one.

5          Slide 27, this is another one they put up there and this

6   is one where they doubled down, your Honor, on what I would say

7   is, at best, a very significant material omission from page 55

8   of their opposition brief.  They doubled down on your Honor and

9   said, You should draw -- look at this plain language, and you

10  should decide this is a jury question as to whether Mr. Papa

11  said the overall comment is flat to up slightly is a reference

12  to a specific product or specific category.  I respectfully

13  submit that epitomizes their entire case.

14         And if you go to the next slide, if your Honor looks at

15  the plain language, and that is what, thankfully, a United

16  States District Court judge has the power to do, you,

17  your Honor, have the power to look at the plain language and

18  decide that their interpretation is so far beyond the pale of

19  unreasonableness that it cannot belong in a courtroom in front

20  of a jury, and that is why district court judges are

21  gatekeepers to evidence.

22         Plaintiff lawyers, defense lawyers don't get to decide

23  what juries get to see and in this particular instance, their

24  interpretation is not even within the realm of reasonable.  I

25  think it epitomizes many things about their view of the

1    evidence.

2         I don't think they had an answer for your Honor as to

3    why they excerpted all of that language above from page 55 of

4    their brief.  I wish they did.

5         I would like to go to my slide 22 because I think they

6    misspoke unintentionally, I assume, when they described as

7    Mr. Silverman said that Mr. Papa said pricing was sustainable.

8    That's a quote from him as I heard him say it.  Now there is a

9    transcript so people can look back.

10        That is not Mr. Papa's words.  He was at a conference,

11   Mr. Papa, speaking and Mr. Goodman from UBS Securities asked

12   him how sustainable you feel like those increases are?  Thanks.

13   Asked about the generics business, how sustainable are the

14   price increases?  He never uses the word sustainable.  In fact,

15   Mr. Papa's answer avoids using that, and, essentially -- the

16   language is right there -- says, Our team has done a good job

17   looking at pricing and will continue to look at it.

18        Last two lines, We think there is something that we'll

19   be talking about in the future for pricing.  There is no, we

20   think it's sustainable.

21        So it's not reasonable for any lawyer to claim Mr. Papa

22   said words he did not say.

23        They -- Mr. Silverman also said that Mr. Boothe and

24   another corporate representative said Mr. Papa was involved in

25   pricing decisions.  Mr. Boothe's transcript, page 27 to 28,

actually said in a general question of who was involved in

pricing, at the very end, sometimes there might be input from

the CFO or CEO.  That is not evidence that there was input with

respect to any particular date, time, drug.

        And then the other corporate representative said, and

they didn't quote him right, quote, Very well could have been

raised with Mr. Papa referring to pricing.

        Your Honor, if a witness got up on the stand and was

asked a question before a jury, could you very well have been

informed of something?  Your Honor would sustain that

objection.  It's like asking somebody is it possible that this

could have occurred?  Anything is possible.  Is it possible

Mr. Papa could have been consulted?  Could have happened.

That's not admissible evidence, and so they are relying on

inadmissible evidence.

        Mr. Silverman also said that Mr. -- I could not believe

my ears.  He actually said you could draw an inference, he

thought, a reasonable inference from the fact that Mr. Papa

attended some industry conferences years ago prior to the class

period and somehow you could draw some inference that he knew

about some kind of price hike and price fixing from it.  I

mean, that's pure speculation.  That's not a reasonable

inference.

        Then there's the issue of selling shares.

        I got so confused by this because I thought -- and two

1    final issues, one, they said that Mr. Papa, I think they also

2    said Ms. Brown, sold shares after December or around December

3    2015, maybe early 2016, lower than the Mylan tender offer

4    price.  So if I -- and that's evidence that somehow they had a

5    the motive to do something wrong with respect to the tender

6    offer or to give the market misinformation.

7          Now, if I have their facts right, they are saying that

8    Mr. Papa and Ms. Brown decided, let's defeat the tender offer

9    which will give us $150 a share, make us rich.  We will walk

10   out of here with a fortune.  They had so many shares.  They

11   never have to work again.  But you know what we're going to do?

12   We're going to fight the tender offer under our fiduciary duty

13   to represent all shareholders.  We're going to give up all of

14   that money so that we could try to sell it at a lower price

15   later.

16         That is the scheme?  That's the plan?  It belies common

17   sense.  Once again, I respectfully submit, they have the

18   stubborn fact they have to deal with that Mr. Papa stopped his

19   10b5-1 plan.  He didn't have to, and didn't sell shares when

20   the Mylan tender offer price drove the stock price through the

21   roof and he gave up a fortune of money.  That's a stubborn fact

22   they can't get around that undercuts any idea of motive.

23         And then finally, I think I heard somebody say up here

24   that if the stock price drops on any day, then it's not because

25   a company is disclosed something legitimately that they just

1   learned or that's happened over the last quarter.  It's that

2   some fraud happened.  And that's not the law, your Honor.  If

3   that were the law, then any company on any given week, because

4   it happens every week, when their stock price drops 10 percent,

5   20 percent, there had to have been fraud.

6        That is the kind of conclusory thinking that's not

7   proper, and before any district court, especially at the motion

8   for summary judgment stage.

9        Your Honor, thank you very much for your time today.

10  You have been incredibly patient.  I don't know if you have any

11  questions?

12          THE COURT:  No questions.  Thank you, Counsel.

13          MR. BRODSKY:  Thank you, your Honor.

14          MR. WAREHAM:  Thank you, your Honor.

15       Mr. Silverman referenced this class notice concept, that

16  the class notice can expand the case.  Plaintiff's

17  characterization of the class notice's brief description of the

18  case as binding.  It's interesting because they don't cite a

19  case to that effect in their brief, and that's because there is

20  no such case in the land.

21       And, of course, the Court was very clear in issuing the

22  class notice.  That the controlling document for purpose of

23  that notice was the amended complaint.  The Court held on

24  November 11, 2019, as reflected in the class notice order, the

25  classes may pursue the following claims as set forth in the

1   amended complaint and consistent with the Court's opinion and

2   order of July 27, 2018.  The complaint clearly alleges nothing

3   about Omega's performance.  The Court's motion to dismiss the

4   opinion did not permit the plaintiffs to pursue claims about

5   Omega's performance.

6          Now, unsurprisingly this is quite consistent with

7   operative case law.  The operative complaint controls -- and is

8   the document where the complaint and notices of class members

9   are to look.  And any confusion about those documents go to the

10  amended complaint.  And the Court in the *EOC v. State PUC* case

11  makes it crystal clear.  Any conflict tie goes to the amended

12  complaint.  Logical.  It makes total sense.  Consistent with

13  every case in the land.

14         Plaintiffs wanted to conclude or now want to include

15  claims about Omega's performance in their case.  That time is

16  long past.  They could have amended the complaint.  They did

17  not.

18         Now, as a technical matter and brief point with respect

19  to this class notice, there are two class notices, your Honor.

20  One goes to the shareholders in Israel and one goes to the

21  shareholders in the United States.  And they are inconsistent.

22  The one in Israel doesn't talk about performance, and the one

23  in the United States has, as the plaintiff's said, does talk

24  about performance.  It also says, for any conflict, go look at

25  the amended complaint.  Again, there is a reason they cite no

1    case in support of this bizarre theory, none exists.

2         Now, Mr. Silverman said, your Honor, with respect to the

3    Sherman Act that the plaintiffs need not demonstrate unlawful

4    collusive pricing to survive this motion for summary judgment.

5    But, your Honor, in the complaint, the plaintiffs allege that,

6    quote, defendants failed to disclose uncharged illegal conduct.

7    That's their argument.

8         And the record lacks any evidence at all of illegal

9    conduct.  The plaintiffs have failed today show any basis for

10   securities fraud claim.  Judge Arleo made it clear in her

11   motion to dismiss opinion that plaintiffs securities fraud

12   claims must fall, whereas here there is no evidence of

13   collusion.

14        She wrote, and this is clear, the allegations here and

15   the misrepresentations and omissions identified in the amended

16   complaint concerning collusive pricing are sufficient to

17   withstand a motion to dismiss.  That's it.  Criminal issues,

18   collusive pricing, not some state of the market, not some

19   competitive babble that we're hearing now in the papers.  It's

20   not part of the case.

21        Now, with respect to loss causation in Mr. Harrod's

22   presentation on loss causation, first he made the statement at

23   one point in time that some argument was circular.  Let me give

24   you the most circular argument I've heard today, and I've heard

25   a lot from this side of the table.  And that is that on the

1   10b-5 side of the case, they claim that these so-called

2   misrepresentations equal $63 worth of overstatement in

3   Perrigo's price.

4        And yet, on their 14(e) claims, they claim to get the

5   benefit of that.  That the 174 that they are using as the

6   Perrigo trading price is the measure of damages.  Well, how can

7   that be?  How can you say on the one hand the price is inflated

8   $63 and on other side say, I get the benefit of the inflation.

9   Talk about circular.

10       We also talk in our papers at some length about the

11  realities of 14(e) claims, your Honor.  And the way they are

12  really supposed to be handled, and it's not in cases like this,

13  postoperatively.  The Supreme Court held in a leading case

14  under section 14(e) that in corporate control contests the

15  stage of preliminary injunctive relief rather than post control

16  lawsuits is the time when relief can best be given.

17       That's the *Piper v. Chris-Craft* case, your Honor, at 430

18  U.S. 1.  And indeed, in this very case, Mylan, when it proposed

19  its tender offer, brought a section 14(e) claim against

20  Perrigo.  They did so in the fall of 2015.  During the pendency

21  of the tender offer itself.  And Mylan saw an injunctive relief

22  based on the allegation, quote, If Perrigo shareholders were to

23  refuse to tender their shares based upon Perrigo's false and

24  misleading statements, they would be irreparably injured by

25  losing the opportunity to make an informed decision on Mylan's

1 offer.

2     Sound familiar?  It kind of sounds what they are saying

3 postoperatively.

4     Now, Mylan sought an order in joining and directing

5 Perrigo to provide corrective disclosures to their

6 shareholders.  And enjoining them from making further false and

7 misleading statements.  That went down to the southern district

8 of New York, not too far away.  They denied Mylan's request for

9 that injunctive relief.  They did so on October 29, 2015.

10     In this entire country's history, and the plaintiffs

11 cannot cite one, there are no cases where a Court has ever

12 permitted to proceed past the summary judgment stage a 14(e)

13 claim premised on the notion that if only the allegedly

14 concealed information would have been disclosed, a tender offer

15 would have succeeded rather than failed.

16     We are not aware of one because there isn't one.

17     A few conclusory comments, your Honor, in connection

18 with the motion for summary judgment.

19     There is a dearth of disputed admissible evidence.  I

20 think that's clear through today's argument.  That's just a

21 fact.

22     Now, no torture effort to squeeze civil adversarial

23 complaints or confidential settlements with no connection to

24 Perrigo and Spartan conclusion affidavits to a narrow hearsay

25 exception can save this case, can change the lack of evidence.

1  No number of supposed experts with a history of being excluded

2  for offering the same form of inadmissible statements as

3  offered here can save this case.

4       No one's seen an unprecedented use of the errata sheet

5  to reverse clear testimony gutting a claim can alter this

6  landscape.  Plaintiff's heavy reliance on the so-called witness

7  like Ms. Kincaid, who could not pick Mr. Papa or Ms. Brown out

8  of a crowd of two, and who under oath testified the exact

9  opposite of what they were representing in the complaint she

10 was going to say can save this case.

11      You might have recognized, your Honor, the only words --

12 the only people using the word Kincaid were myself.  We never

13 herd the name Christine Kincaid from those folks, and you know

14 what, I would be bloody embarrassed myself.

15      No matter of time with some lawyer telling the Court

16 minimal means no can save this case.  Minimal doesn't mean no.

17 Minimum means minimum.

18      No amount of guesswork about how we might try the case,

19 we might open the door, we might wow this hearsay evidence and

20 circumstantial evidence to come in because we are stupid enough

21 to let that happen, guess what might happen in front of a jury

22 can save this case.

23      Promises to deliver witnesses, your Honor, who did not

24 show up.  Their witnesses under subpoena did not show up.

25 These are the two fellows from Sandoz who know little about

1   much.  Can deliver this case from summary judgment.  And are

2   they going, maybe they will come, maybe they won't.  But what

3   they will testify to if anything was events that are now 11,

4   and 12 years old about a dead man.  That doesn't move this case

5   an inch.  Doesn't survive this motion.

6        Now, attempts to rely on events that took place long

7   before an event or long after an event in an effort to

8   misconstrue a defendants' state of mind cannot substitute for

9   missing evidence.  Blatant mischaracterization of Mr. Papa's

10  statements about portfolio wide pricing strategy salvaged

11  nothing.  We have seen that very clearly from Mr. Brodsky.

12       Now, no Nostradamus like prediction about what the Third

13  Circuit might someday do with respect to corporate scienter.

14  They are going to first adopt it even though they haven't done

15  it in years, and then they are going to pick the one avenue in

16  which plaintiffs can survive on a corporate scienter.  That's

17  going to happen.  Let's go to the jury so that we can let the

18  Third Circuit get off its hind legs and do something it hasn't

19  done forever.  That's not how cases get to the jury.

20       I saw here today something that worried me.  They are so

21  clearly misrepresenting the state of this market, and so

22  clearly complaining about things that are normal in a naturally

23  occurring oligopolistic market that I feel a jury

24  nullification.  I fear that they are trying to say to somebody,

25  a loaf of bread got multiplied by 500 percent.  This is -- a

1   loaf of bread is not a topical generic Rx product.  Okay?  It

2   is a loaf of bread.  And jurors are not to be misled in ways

3   like that.

4        The law on the Third Circuit's point of view with

5   respect to oligopolistic markets is crystal clear.  It is in

6   *Valspar*, it is in *Baby Foods*, and it's in *Chocolate*.  And to

7   let a jury kind of take a whack at nullifying those I think

8   would be a gross injustice.

9        Now, these theories that they have left barely, barely,

10  barely survived a motion to dismiss.  And after years of noisy

11  and wasteful discovery, it is time to put up or shut up.  And

12  plaintiffs must defend, your Honor, the claims they pled.  Not

13  ones they wished they pled.

14       Two critical documents govern what's in this case.  The

15  operative complaint, the amended complaint which they wrote,

16  and the Judge's opinion narrowing that and sending to your

17  Honor these two issues.  The integration -- present sense of

18  integration of Perrigo into -- Omega into Perrigo and the

19  price-fixing conspiracy on six products.  No number of cries to

20  please, please, please, your Honor, let us go to a jury, can

21  save this case.

22       Stripped of this entire set of contortion

23  and speculations, your Honor, this is really a pretty bloody

24  easy case.  I ask you right now to, please, silence these

25  plaintiffs and to dismiss this case.

1              THE COURT:  Thank you, Counsel.

2              MR. WAREHAM:  Thank you, your Honor.

3              MR. SILVERMAN:  Thank you, your Honor.  Given this

4  late hour, I don't know how this will be taken, but I'm not so

5  easily silenced.  I have been called over the last half hour

6  and earlier this morning dumb.  My argument is silly.  That I'm

7  arguing a last refuge of scoundrels.  That we are

8  undisciplined.  I don't have the same kind of pejorative

9  comments for my adversaries.  I think they actually put forth

10 some very creative, strained inferences.  But there are

11 creative arguments that I think, you know, will be something

12 that will have to grapple with in front of the jury.  But that

13 is the place --

14             I'll be real quick on the substance.

15             First, Mr. Hardiman misstated our competitive

16 environment claims.  They've been the same since day 1.  It's

17 real simple.  Perrigo said to instill in a confidence in

18 investors that the generic drug price profitable was

19 sustainable.  They told investors that they achieved that

20 profitability despite operating in a competitive environment.

21 Sometimes they said obviously competitive.  Sometimes they had

22 they said heavy competition.

23             But that suggested to investors that there is

24 sustainable profitability when instead they are relying on

25 unsustainable pricing opportunities.  That's the nature of the

1   claim.  It was in the amended complaint.  It was in the class

2   notice.  It was not rejected by Judge Arleo.  It's still -- it

3   has been part of the case since day 1.

4        Second, there was a comment by, I believe, both

5   Mr. Hardiman and Mr. Brodsky that denigrating Mr. Coucke as if

6   he was just some guy who was a little bit begrudged.  Well, he

7   wasn't some guy.  He was the CEO of Omega.  You can't integrate

8   Omega without its CEO.  What a CEO has to say is a very high

9   level, important commentary on the nature of the integration.

10        He was also a Perrigo director during most of his -- the

11   time between when he -- Omega was acquired and when it left.

12   So he was a guy with a lot of influence and power there.

13        Mr. Brodsky spent a lot of time arguing about inferences

14   to try to rehabilitate Papa, whether or not he was credible at

15   his deposition.

16        That just shows you we are now in the prohibited

17   territory from the Third Circuit.  You don't -- you don't

18   decide credibility at summary judgment.  The Third Circuit says

19   that's within the exclusive province of the jury.

20        In terms of what was an integration reset, he says infer

21   that it's -- that the term "integration reset" means something

22   other than reset, and it's consistent with it being online.

23        I don't think that's a very convincing argument, but,

24   again, that's an inference.  A jury decides whether to accept

25   that inference, however strained it may be or not.

1          With respect to the class notice, the class notice

2    didn't expand the case one bit.  It just -- as all the parties

3    here agreed and as Judge Arleo agreed, it consists -- it

4    concisely described the claims at issue in the case as it

5    existed at that time.  They have always been there.

6          Now, Ms. Kincaid, they are right.  I didn't mention

7    Ms. Kincaid, and there is a reason for that.  I don't expect

8    that she will be a witness at trial.  She -- at the pre-motion

9    to dismiss stage, at the amended complaint stage, she came

10   forward and she said a lot of stuff.  We got her -- she, in

11   fact, was asked to verify that in writing.  We sent her this is

12   what we think you said, and she said approved indicating that's

13   what she did, in fact, say, and she admitted that at

14   deposition.

15         But she also did have all kinds of stories that may make

16   her a little less credible than we initially thought.  We don't

17   anticipate that she will be a big part of our case or theirs,

18   but if they call her, they will -- the jury will hear that she

19   agreed to every single word that's in the amended complaint

20   from her.

21         There's also been lot of assertions in this that the

22   defendants respective denials of their own misconduct somehow

23   are what matter here.  They may be convincing in front of a

24   jury, but they are not what matters at summary judgment.

25         Outside the securities context, the Third Circuit had to

visit this issue just a few weeks ago in a case called

*Zamichieli v. Pennsylvania Department of Corrections*, 2022

U.S.F. Lexus 6473 at star 12 to 13.  That's Third Circuit,

March 14, 2022.  The Third Circuit held that a jury was free to

disbelieve a defendants' self-serving assertion of his and his

fellow defendants' states of mind in light of circumstantial

evidence supporting intent.

That's what we have here.  We have some direct evidence,

some circumstantial evidence, but we have loads of evidence.

They just prefer that it not reach a jury, and I can understand

why.  I can understand why.

The fact that the CEO of Omega is saying that the

integration, that nothing is going right, doesn't make their

client's comments seem honest when they tell investors it is in

line and going smoothly.  I can see why, but that's for the

jury to decide.

Finally, with the expect -- with the attempt to divorce

integration and performance, number one, there is no order from

Judge Arleo that says performance is out of this case.  There

is no order on the -- the one reference that they cite is from

a footnote, not from an order, not from a holding of her

opinion.  It is a footnote that says when she is considering

the holistic inference of scienter, which as we described from

the Bristol-Myers Squibb case, it's a totally different

standard than the jury considers at trial or your Honor has

1    before him at this summary judgment stage, but when she

2    considered that, when she weighed that under the PSLRA's

3    heightened pleading standard requirement, she didn't find the

4    allegations of underperformance in a couple markets convincing.

5         But here is what we now know.  We now know that

6    performance was temporarily juiced.

7         Why do we know that?  Because Perrigo's own documents,

8    as well as Omega's, show that.  The internal audit report shows

9    that, that in Q2, 2015 it was spiked.  And it says that Q2,

10   2015 was manipulated by loading practices.  So we know that

11   that related, and it was the very integration of the two firms

12   accounting that revealed all of those practices.

13        So you can't divorce integration from that respect.  You

14   also can't divorce integration and performance because the

15   integration problems were exactly what caused, according to

16   Omega, the performance declines.

17        The Omega CEO, Coucke, said in July 2015 that because of

18   integration problems, they had made it -- that Perrigo had made

19   it impossible to run the business.  We're out of oxygen, he

20   said.  That's Exhibit 180.

21        In Exhibit 195, the Omega presentation that was given to

22   Brown and Papa and Farrington described Omega Pharma's

23   situation as declining vastly and lists integration activities

24   as causes of problems.

25        Exhibit 197, Omega's CEO, Coucke, advised Papa that,

1    quote, The actual bad results of Omega are due to all reasons I
2    am warning for months.
3          What had he been warning for months, that the
4    integration attempts of Perrigo were causing problems
5    interfering with his -- the operation of his business and
6    starving the company of oxygen.  They are one in the same.  Our
7    claims have been consistent throughout this.  All of the Omega
8    and generic drug claims that we describe in our summary
9    judgment brief and all that are described in the class notice
10   have been with us all along.  These aren't an expansion in any
11   way, shape or form.
12         So this comes back to the central issue here.
13         Are we here to decide inferences?  Are we here to accept
14   one party's spin over another?  Absolutely not.  That would be
15   error.  The Third Circuit has made that clear.  We must allow
16   the jury to decide between the reasonable inferences.  We must
17   allow the jury to decide credibility.  We must allow the jury
18   to weigh evidence.  That is what Rule 56 requires, and I will
19   leave the loss causation issues to Mr. Harrod.
20         Thank you, your Honor.
21          THE COURT:  Thank you.
22          MR. HARROD:  I will be very brief, your Honor.
23         I think -- I can't remember which one of the -- if it
24   was Mr. Brodsky -- I think it was Mr. Brodsky said that I said,
25   Every time a stock drops, it indicates there was prior fraud.

1        I don't think that that's what I said.  Like you said,

2   we can look at the transcript and see what I said, but let me

3   just be clear.  A big stock drop means that the market wasn't

4   expecting the information, and in the circumstances that we're

5   talking about here with the seven corrected disclosures, we

6   allege and connect those to the misrepresentations.

7        The market was undoubtedly surprised.  Their expert, who

8   is a superstar professor at Harvard -- you could ask him.  He

9   will tell you -- doesn't contest that the information reaching

10  the market on the seven corrected disclosure dates was

11  surprising, that it caused a statistically significant decline.

12  So that's the one thing I wanted to respond to about that.

13       Mr. Wareham talked about -- I guess he talked about the

14  circular area of the 14(e) claim and about how we could have

15  gotten injunctive relief, and he said that there are no cases

16  upholding a 14(e) claim under these circumstances.

17       If you look at their brief, I will concede that there

18  are not a lot of 14(e) cases under this circumstance, but the

19  law and the statute is very clear.  You can't make

20  misrepresentations in connection with a tender offer.  If you

21  do, you basically bought the damages that come from that.

22  That's what our theory is.

23       He doesn't have a case.  They don't have a case finding

24  that a situation like this one cannot be successful for the

25  plaintiffs in the context of a 14(e) claim.  So that's that.

1          With respect to the question of we could have gotten

2     injunctive relief during the pendency of the tender offer,

3     well, if you look at the sequence of events and the timing of

4     when things became known to the investors, our claims that they

5     violated 14(e) didn't become known.

6          The first corrective disclosure is in 2016.  So if he

7     thinks that I had some ability to bring a claim in 2015 making

8     these allegations about misrepresentations before these people

9     told the market about them, I would like to know how I could

10    have done that.  But there would have been no way for me to get

11    injunctive relief in 2015 about events that the defendants are

12    alleged to have withheld held from the investors.  So I don't

13    think that that argument gets them very far.

14         I appreciate your Honor's time and patience this

15    afternoon.

16         Thank you.

17             THE COURT:  Thank you, Counsel.

18             MR. WAREHAM:  Your Honor, we would propose to move the

19    Daubert motions, if that's acceptable.

20             THE COURT:  That's acceptable.

21             MR. WAREHAM:  Thank you very much.

22             THE COURT:  How long do you anticipate we will need

23    for the Daubert motions?

24             MR. GRONER:  I will try to get him down to like

25    ten minutes --

```
 1           THE COURT:  Okay.
 2           MR. GRONER:  -- considering it's late in the day.
 3       Thank you, your Honor.
 4           THE COURT:  I think that time will come.
 5           MR. GRONER:  Good afternoon, your Honor.
 6           THE COURT:  Good afternoon.
 7           MR. GRONER:  My name is Samuel Groner.
 8           The admissibility of expert testimony is governed by
 9   Federal Rule of Evidence 702 and Daubert v. Merrell Dow
10   Pharmaceuticals.
11           The Third Circuit held in the In Re:  Zoloft case that
12   any step in the expert's analysis that renders the analysis
13   unreliable under the Daubert factors renders the expert's
14   testimony inadmissible.
15           Furthermore, experts may only offer an opinion on a
16   subject about which they possessed, quote, specialized
17   expertise.  That quote is from the Elcock v. Kmart case from
18   the Third Circuit.  I am going to walk through each of the
19   plaintiff's experts and show why they don't meet the standards.
20           First let me discuss William Purcell.
21           Plaintiffs seek to use Mr. Purcell to spin out their
22   version of the facts through the mouth of a so-called expert.
23   Mr. Purcell claims he is an investment banking and financial
24   expert offering testimony about information that investors find
25   important.  However, Mr. Purcell's reports largely consist of
```

1  discussion of topics outside the scope of permissible expert

2  testimony.

3       First, on pages 58 to 59 of our opening brief, we

4  provide a long list of examples of Mr. Purcell improperly

5  speculating about the defendants' state of mind, knowledge, or

6  intent.  Because Mr. Purcell's reports are full of speculation

7  about defendants' supposed knowledge, the proper remedy here is

8  exclusion.  That is the approach the Court took in the 2008

9  *Highland Capital Management LP v. Schneider* decision cited in

10  our brief in which the Court excluded Mr. Purcell's testimony

11  for attempting to, quote, opine on a party's state of mind.

12       In the 2008 *Highland* decision, the Court explained that,

13  quote, Purcell cannot state assumptions or make inferences

14  regarding the knowledge of certain employees because such

15  inferences lie outside the bounds of expert testimony.

16       That's not the only time Mr. Purcell's opinions have

17  been excluded for this exact reason.  In *VSI Holdings v. SPX*,

18  also cited in our brief, the Court excluded testimony from

19  Mr. Purcell about what either parties intent was and, quote,

20  whether either party was honest.  Once again here,

21  Mr. Purcell's opinions on these topics should be excluded.

22       Second, Mr. Purcell's opinions should be excluded

23  because he opines on whether defendants' statements were false

24  or misleading, and I'm not going to go through each statement,

25  but on page 60 of our opening brief, we list the spots where he

1    does that.

2         The quotations are not ambiguous.  Mr. Purcell

3    repeatedly opined that Perrigo made false and misleading

4    statements and omitted information that he believes was

5    necessary for Perrigo's public statements not to be misleading.

6    Mr. Purcell's similar testimony was excluded in the *Brown*

7    *Jordan International v. Carmicle* case, again, cited in our

8    briefs, in which the Court found Mr. Purcell's legal

9    conclusions were a quote, inappropriate subject of expert

10   opinion.  So we're seeking to exclude him for doing the exact

11   same things that Courts have excluded him for doing before.

12        Exclusion of testimony by an expert that a challenged

13   statement was false or misleading is particularly appropriate

14   in a securities case where one of the ultimate issues in the

15   case is whether the statement is false or misleading.  The

16   Court in the *SEC v. ITT Educational Services* case, that's cited

17   on page 60 of our opening brief held just that.  That experts,

18   quote, may not testify that the disclosures were misleading

19   because the jury will make those determinations.

20        And, finally, one final point with regard to

21   Mr. Purcell's testimony, he opines on the applicable disclosure

22   standard.

23        As the Court held in the *ITT* case, a company's

24   obligation to disclose information is governed by a standard

25   and defined by the law.  An expert testimony regarding the

1    standard encroaches on the Court's role of instructing the

2    jury.

3         The Court in the *ITT* case made clear that an expert's

4    opinion regarding whether defendants' complied with that

5    standard is not appropriate.  Yet here, Mr. Purcell improperly

6    offers opinions on both the applicable disclosure standard and

7    whether the defendants satisfied it.

8         Mr. Purcell opined that defendants are governed by a,

9    quote, Full disclosure, close quote, standard, meaning they

10   must -- and, again, I'm quoting -- quote, Tell everything.  Let

11   it all hang out.

12        That's a clear misstatement of the law.  In *TSC*

13   *Industries v. Northway*, the Supreme Court specifically advised

14   against using this full disclosure standard.  The Supreme Court

15   warned that if that standard was used, companies might --

16   again, this is a quote from Supreme Court -- The company might

17   bury the shareholders in an avalanche of trivial information.

18        In the *ITT* case, the Court excluded opinions nearly

19   identical to those offered here by Mr. Purcell.  The expert in

20   *ITT* advanced the same full disclosure standard and opined that

21   the defendants did not achieve full disclosure.  The Court

22   excluded that testimony, explaining that it did not need an

23   expert to set forth what defendants were legally obligated to

24   disclose, and it was improper for an expert to opine regarding

25   whether defendants complied with legal obligations.

1          I will speak very briefly about Dr. Nye and Mr. Clark.

2    Those will be even briefer than the discussion about

3    Mr. Purcell.

4          With regard to Dr. Nye.  Dr. Nye gives opinions on

5    section 14(e) loss causation and on section 10b-5 loss

6    causation.

7          With regard to his 14(e) opinions, section 14(e)

8    prohibits fraudulent, deceptive, and manipulative acts in

9    connection with a tender offer.  Where, as here, a tender offer

10   fails determining what losses to investors were caused by the

11   tender offer's failure requires evaluation of two things.

12         One, the chances that the tender offer would have been

13   successful had the information that was allegedly concealed

14   been known to the market.  And two, the price at which the

15   tender offer would have been completed, if it was completed at

16   all, in the but-for world.

17         Dr. Nye lacked the expertise necessary to conduct these

18   analyses.  Dr. Nye admitted during his deposition that he is

19   only, quote, Qualified to assess the definition of a tender

20   offer and how it relates to the potential change of ownership

21   which he believed was, quote, pretty straightforward.  So he

22   could testify he said about the definition of a tender offer.

23   What is a tender offer.

24         But he testified that he, quote, Is not an expert in the

25   legal and fine-tuned details of tender offers and does not,

1    quote, Get into the weeds on the subject.  An expert is

2    supposed to be getting into the weeds on the subject.

3         He testified that he has never published, taught, or

4    taken courses on tender offers.  No court has ever accepted him

5    an expert on 14(e) claims.  In light of these facts, it is

6    unsurprising that Dr. Nye fails to identify a methodology to

7    evaluate whether Mylan would have made the tender offer and, if

8    so, at what price, if Mylan would have known the purported

9    truth that defendants supposedly concealed.

10        Let me now turn briefly to Dr. Nye's section 10(b)

11   analysis.  Most significantly, Dr. Nye fails to disaggregate

12   the effects of confounding information from his events study.

13   For example, Dr. Nye should have treated the April 2016 news

14   reports about Mr. Papa's departure to become the CEO of

15   Valeant, and Mr. Hendrickson's appointment to take Mr. Papa's

16   place as CEO of Perrigo, as confounding information unrelated

17   to the fraud rather than as fraud-related information.

18        And on May 12, 2016 and August 10, 2016, the market

19   learned that Perrigo's over-the-counter business, about which

20   nothing is alleged in the complaint, Perrigo's over-the-counter

21   business in the United States -- what's referred to as the CHC

22   business in some of the papers -- is completely distinct from

23   the Omega business or from the Rx pharmaceuticals business.

24        Yet on those dates, the company gave negative

25   information about the over-the-counter CHC business, in

1    addition to the negative information about those other topics,

2    and yet Dr. Nye -- as was alluded to by Mr. Harrod before --

3    assumes that the entirety of the price -- of the stock drop was

4    due to the information that they allege in their complaint, and

5    that none of it was due to the information about the CHC

6    business.  But under well-accepted methodology that even their

7    expert accepts, he supposed to disaggregate the different

8    factors.

9         Let me now turn very, very briefly to Mr. Clark.

10        Mr. Clark is the plaintiff's expert with regard to the

11   Rx pricing.  The fundamental reason why Mr. Clark's methodology

12   is unreliable is that he fails to take into account that the

13   markets for the drugs at issue are oligopolistic.  During his

14   deposition, Mr. Clark belatedly admitted that these markets are

15   oligopolistic.  Yet in his reports, Mr. Clark did not account

16   for that fact.  We're not saying, as the plaintiffs say in

17   their papers, that he had to do a certain type of analysis.

18        We're saying that his failure to take into account the

19   oligopolistic nature of the markets means that his methodology

20   is just wrong.

21        He stated during his deposition, in trying to explain

22   why he doesn't talk about oligopoly in his opening report at

23   all, that he, quote, doesn't think it comes into play.  But as

24   Mr. Wareham discussed earlier, the Third Circuit has repeatedly

25   made clear that whether a market is oligopolistic not only

comes into play, but it a critical factor in determining

whether parallel price increases suggest collusion.

As Mr. Wareham explained in the *Valspar*, *Chocolate*, and

*Baby Foods* cases, the Third Circuit has specifically rejected

antitrust claims premised on parallel-pricing theory in

oligopolistic markets.  That is because as the Third Circuit

held in *Valspar*, parallel pricing can only demonstrate price

fixing in cases involving non-oligopolistic markets.

Mr. Clark's failure to take into account that the

markets at issue here are oligopolistic means his methodology

is unreliable.  For example, Mr. Clark stated in his opening

report that because for most of the studied drugs, quote,

Competitors maintained actual pricing that was highly

correlated for a substantial period following a large price

increase that, quote, Such pricing suggests collusion; or at

least the absence of vigorous price competition.

But the whole point is that highly correlated pricing

for a substantial period of time is the parallel pricing that

*Valspar* and all of the Third Circuit cases have said does not

show collusion.  So the fact that he is not in an oligopolistic

market -- so the fact that Mr. Clark thinks it does show

collusion and thinks that the fact it is an oligopolistic

market does not come into play shows that his methodology is at

odds with the way the Third Circuit thinks about the meaning of

parallel pricing in an oligopolistic market.

1          In *Concord Boat Corporation v. Brunswick Corp.*, the

2    Eighth Circuit held that an expert's opinion, quote, should not

3    have been admitted because it did not incorporate all aspects

4    of the economic reality of the market and because it did not

5    separate lawful from unlawful conduct.  Because of the

6    deficiencies in the foundation of the opinion, the expert's

7    resulting conclusions were mere speculation, close quote.

8          Similarly, in *Williamson Oil v. Philip Morris*, the

9    Eleventh Circuit uphold the exclusion of testimony of an expert

10   who, like Mr. Clark here, quote, Did not differentiate between

11   legal and illegal pricing behavior and instead simply grouped

12   both of these phenomena under the umbrella of illegal

13   conclusive price fixing.  The Court explained in that case, the

14   Williamson case, that the expert's failure to, quote,

15   Distinguish conscious parallelism from cartel behavior makes

16   his subsequent opinion inadmissible as he finds inferences of

17   collusion where the law finds none.  The Court concluded that

18   because of this failure, the expert's opinions, quote, Could

19   not have aided a finder of fact to determine whether the

20   behavior was or was not legal.  Similarly, Mr. Clark finds

21   inferences of collusion where the law finds none.

22         For these reasons as well as the others discussed in our

23   briefs, the Court should grant the Daubert motions and exclude

24   the testimony of plaintiff's expert witnesses.

25         Thank you, your Honor.

1          THE COURT:  Thank you, Counsel.

2          MR. HARROD:  Thank you, your Honor.  I'll -- in view

3     of the time and the Court's extreme patience throughout today,

4     I will try to be as brief as I can be.

5          I want to recognize from the outset that it should

6     not -- we have many disagreements with the defendants' experts,

7     as we do on the merits of the case.  We also respect that the

8     bar for both summary judgment and for excluding experts under

9     Daubert is very high.  So we should not be misread as to

10    believing that we are ceding to any of the positions that they

11    espouse either on the merits or with respect to the expert

12    testimony.

13         So with that, I want to talk about the fact that the

14    defendants' identify purportedly, with respect to three of the

15    experts, methodological flaws that make their testimony

16    unreliable, but admissibility under Rule 702 does not require

17    that a Court agree with an expert or find her opinion's

18    convincing.  It boils down to three requirements, that is

19    qualification, reliability and fit.  They only challenge

20    qualification as to Dr. Nye.  They challenged reliability as to

21    all three, and I don't believe the challenge fit as to any of

22    them.

23         And, largely, as on the merits of the summary judgment

24    motions, these reflect disagreements with our experts'

25    conclusions and to a lesser extent, they manifest as criticisms

1    of their methodologies.

2         But defendants' challenges are actually inconsistent

3    with the Court here exercising the gatekeeping function to

4    preclude offering these parties to the jury.  Reliability does

5    not require that expert opinion be supported by the best

6    foundation, methodology, or research.  That is from the

7    *Wojciechowski* case, and the reliability standard requires that

8    the experts' opinions rest on good grounds.  Experts are

9    granted wide latitude in determining what data is needed to

10   reach a conclusion.  These are all authorities that are cited

11   in our briefs.

12        At this stage, the Court's role is not to determine

13   whether the testimony is correct but only whether it falls

14   outside the range where experts might reasonably differ.  So

15   the disagreements here don't reach that standard.

16        I'm going to start with Mr. Purcell.

17        He is an investment banker.  He is offering the

18   perspective of his profession on the structure and process of

19   Perrigo's response and its opposition to Mylan's hostile tender

20   offer and the importance of information related to plaintiff's

21   allegations, the importance of the information that was

22   provided to the investors in light of plaintiff's allegations.

23   Those are complicated issues of disclosures and financial

24   markets and a corporate transaction spanning a period of, I

25   think, seven months or six months.  The jurors will undoubtedly

1   benefit from Mr. Purcell's 50 years of experience in these

2   matters and in describing why an investor would have looked at

3   this information and what about that information would have

4   been important.

5        Mr. Groner identified a few cases where Mr. Purcell had

6   been excluded, but as we put forth in his CV, he was -- he's

7   testified in over 200 cases.  He served as an expert for both

8   the Securities Exchange Commission and Department of Justice.

9   His testimony here is reliable, and it fits the issues in the

10  case.

11       The defendants concerns really here go to the weight

12  or -- the weight of the evidence that's to be provided by

13  Mr. Purcell, and he is not -- and I want to reiterate this and

14  I will get into the specifics of the points that they touched

15  on, he is not providing opinions on legal issues of materiality

16  or conclusions regarding the state of mind of the defendants.

17  He will not instruct the jury.  Only your Honor will be able to

18  instruct the jury in this case.  Therefore, there is no basis

19  to exclude Purcell's proffered opinions, which, as I said

20  before, will be really helpful to the jury.

21       Regarding state of mind, Mr. Purcell is not testifying

22  about the suggestive state of mind of any defendant.  He is

23  simply indicating -- and they criticize him for using the word

24  known, and he is using that in the colloquial sense of this

25  person received information and it was in their possession.

1  They knew it.  He is not using that word as a basis for a legal

2  conclusion as to someone's scienter, which, obviously, relates

3  to their knowledge of facts that were misrepresented or hidden.

4       This kind of testimony is appropriate, and he is not,

5  you know, he is not reaching a legal conclusion.

6       With respect to falsity, Purcell's purported testimony

7  assumes that plaintiffs will establish falsely and the

8  defendants statements were false and misleading.  That is not

9  his conclusion; that's an assumption.  He is offering an

10  opinion on the importance of that information to investors.

11  Regarding disclosure standards, Mr. Purcell is not offering a

12  legal definition or conclusion regarding those standards.  His

13  full disclosure standard is one of industry ethics.  It's from

14  the Library of Investment Banking, which is cited at Exhibit

15  138 at page 35.

16       He is describing the financial and investment importance

17  of the information at issue.  This is totally proper.  Experts

18  may opine on industry standards in their application of the

19  facts.  That is from the *Reilly v. Vivint Solar* case.  We cite

20  additional -- that case and additional cases in our opposition

21  at page 114.

22       Given these considerations and the ability to limit

23  Purcell's testimony to the extent it is necessary and for the

24  Court to instruct the jury at trial, there is absolutely no

25  basis to exclude his opinions under -- as unreliable under the

1    Daubert standard.

2          Moving on to Dr. Nye, we have offered Dr. Nye as an

3    expert on loss causation and damages.  He is -- just to talk

4    about his qualifications -- because they have apparently come

5    under scrutiny here -- he is an Ivy League-educated PhD

6    economist.  His academic and research credentials are

7    unsalable, at least until today, and he has been accepted an

8    expert in similar cases to offer similar testimony many times

9    over.

10          Defendants limited challenge to Dr. Nye's qualification

11   concern only his opinions on the tender offer.  In our brief we

12   cite, at 97, several cases showing Dr. Nye's qualifications

13   here are adequate, in particular, because Dr. Nye possesses the

14   skill or knowledge that is far greater than the average layman.

15          He is not opining that -- their criticism of him largely

16   stems from the idea that he is not an expert in the legal

17   mechanisms of tender offers.  That's -- first of all, he is

18   not.  I'm not sure that that is an appropriate province for an

19   expert to opine on anyway because those would be legal issues,

20   and he is not opining on them.

21          He is opining on the subject of the economic impact of

22   the tender offer and the causation, the likelihood that the

23   tender offer would have been accepted in the absence of

24   defendants' misrepresentations.

25          As an economist who studies public markets and looks at

cause and effect of information that reaches public markets and
measuring that effect, Dr. Nye is undoubtedly qualified to
testify on these subjects.

The fact that they only challenge him with respect to
the tender offer based on the fact that he is not a person who
says I am an expert in the legal structure of tender offers
should be rejected.

Going to the reliability of his analysis under 14(a),
they criticize him, essentially, for what I think is a
disagreement between the parties in this case, and I think the
plaintiffs obviously have the better argument, but I think at
the end of the day what he is doing on the 14(e) claim is an
analysis, that in the absence of the misrepresentations, the
tender offer would have gone forward.

We set forth in our brief that Dr. Nye's 14(e) analysis
builds upon the 10(b) analysis in this case, meaning that there
were misrepresentations that were made to the investors, and he
looked at very specific analyses to come to the conclusion that
in the absence of the misreps the tender offer would have gone
through.  He looks at the number of share s that were tendered.
He looks at the number of the shares that are now seeking a
remedy based on the misrepresentations in connection with the
tender offer, concludes that that amount of shares exceeds the
50 percent threshold and the tender offer would have gone
through.  He looks at analyst reports and commentary, and he

concludes, based on that and the fact that he finds that the
consideration to be paid in the tender offer, provided an
immediate economic benefit, that all of those things are
sufficient to reach the conclusion that the tender offer would
have gone through in the absence of the fraud.  And so then he
calculates on a nonspeculative basis how one would measure the
damages there.

On the 10(b) side there are criticism -- and I talked
about this in our argument about loss causation, so I will try
not to repeat anything that I have said -- is, basically, that
he doesn't disaggregate, that they say that there is this
confounding unrelated information.  Mr. Groner talked about the
CHC Division, the over-the-counter division of Perrigo.

He didn't -- I think the words that were used is he
assumes that that didn't affect the stock price.  That is not
true.

If you look at Dr. Nye's reports, he doesn't assume at
all.  He looks at the public information that is out there
about the company, what the company said, what securities
analysts who follow the company said, what news reports say.
And he looks at that and says, I'm a professional economist.
I'm going to look at this, and I can try to interpolate from
that information what factors, what information that reached
the market on a particular day changed the price of the stock.

For that day that they were talking about and the other

1   days they were talking about, it is not that he doesn't -- that

2   he assumed he doesn't have to disaggregate.  He reaches the

3   conclusion based on that analytical process that he does not

4   need to.  So the idea that he should be excluded under Daubert

5   for that has to be rejected.

6          Finally, I am going to touch on Mr. Clark for a few

7   minutes.

8          The primary challenge that we heard about today is that

9   he doesn't take properly into account the fact that the

10  defendants have posited that Perrigo's generics business

11  operated in an oligopolistic market.  Whatever the analytical

12  conclusions that are reached for that should not govern the

13  process of whether or not his analysis and his conclusions are

14  reliable because they are -- and, in fact, we would pose that

15  Mr. Clark actually did consider and he did consider the fact

16  that Perrigo's generics business operated in an oligopolistic

17  market.

18         First of all, we need to be clear that the defendants

19  themselves never described the market that they were operating

20  in as a premise for what Mr. Clark was doing as an oligopoly.

21  They never characterized that in any way.

22         They characterized it as competitive.  They said the

23  pricing would be flat to slightly up, which we have talked

24  about that ad nauseam.  I won't belabor it anymore, but while

25  Mr. Clark does not use the term oligopolistic in his initial

report, his analysis concludes that the features of the market

for generic topicals that we are talking about in this case

are, in fact, the same ones that their experts and they point

to as reflecting an oligopoly.  He says -- and his report is

Exhibit 102.  This is at page 5 of his report -- the market for

generic drugs and, in particular, topical generic drugs

contains several structural elements that makes it conducive to

anticompetitive behavior, including highly concentrated

markets, pricing elasticity, fungible products among

competitors, informal and formal mechanisms for dissemination

of pricing in market share information among competitors.

These are among the same characteristics that they say make the

market for these products oligopolistic.

         Moreover, Clark did specifically consider the market

report in his reply.  And even when considering the defendants,

what defendants referred to as oligopoly concluded that the

evidence here demonstrates substantial indicia of collusion --

                    (Reporter clarification.)

         MR. HARROD:  So what he looked at there is he is

basically saying, I accept that you may have an oligopoly here.

I look at your pricing behavior and what happened with your

products, and the oligopoly does not explain that.

         So he took into account the thing that the defendants

say he did not.  He looks at including -- the evidence that he

points to showed that the features -- or the actions that

 1  Perrigo took are not explained by oligopoly include -- these

 2  are just a few examples -- that Sandoz, for one, admitted to

 3  engaging in anticompetitive conduct with Perrigo, including

 4  rigging bids and fixing prices.  So that's one piece of

 5  evidence that exists in support of the conclusion that the

 6  behavior is not just explained by oligopoly.

 7       Second one, evidence that Perrigo declined customer

 8  business or declined to bid for business to appease a

 9  competitor or to avoid taking market share, so that is the kind

10  of behavior that exists in addition to an oligopoly that

11  Perrigo engaged in.  And despite -- and this is something that

12  Mr. Silverman talked about.  He looked at other markets where

13  there were oligopolistic features, ophthalmic and injectable

14  generic drugs also exhibit the same type of features the

15  defendants point to.  Those markets did not experience the same

16  type of pricing actions and changes as did generic prices that,

17  you know, Perrigo and its competitors were engaged in.

18       So I just want to make one point.  The defendants'

19  expert on the subject, Dr. -- I think he's a doctor --

20  Dr. Lackdawalla, he doesn't talk about Perrigo's public

21  statements.  He doesn't look at the record evidence.  He

22  doesn't talk about their actual practices.

23       He creates, basically, a spherical, you know, completely

24  sterile universe where he can examine a lot of these features

25  in an environment that doesn't include the evidence.

1        Dr. Clark's reports talk a lot about things that Perrigo

2    did.  He looks at the record, emails, deposition testimony, and

3    analyzes that.  Their expert does not do that.

4        So I feel like, if anything, Dr. Clark's report and

5    conclusions are highly reliable and, in fact, more reliable

6    than the defendants' expert.

7        The fact that Dr. Clark disagrees with their conclusions

8    is not a basis to exclude him under Daubert.  They talked about

9    the *Williamson* case.  And here the difference is, and we --

10   here Clark addresses the market structure, as I said, including

11   that it has these oligopolistic features, which is the

12   criticism in *Williamson*, and concludes that those structural

13   features cannot explain the price changes.

14       Your Honor, I'm going to go back to counsel table.

15       I thank you very much for listening all day today and to

16   the courtroom staff for bearing with us.

17       Thank you.

18        THE COURT:  Thank you, Counsel.

19        MR. WAREHAM:  Your Honor, one last thing, if I may?

20        THE COURT:  One last thing.

21        MR. WAREHAM:  I want to thank the Court for your

22   courtesy and indulgence, and I want to thank your staff for all

23   the help with the equipment, all the patience.  I certainly

24   want to thank the court deputy and probably most importantly, I

25   want to thank the court reporter because there are lot of fast

1    talkers here, and it's been really quite a pleasure to be here.

2         Thank you all very much.

3         THE COURT:  Counsel, thank you both, also, for your

4    cooperation because I understand with the transition.  This is

5    a quite old case and justice delayed is justice denied, as my

6    judge used today tell me when I clerked a million years ago.

7    So we're going to endeavor to try and get this decision out to

8    you as soon as possible.

9         But I do want to commend you on the argument because you

10   were able to synthesize 152 pages of facts and thousands of

11   pages of documents and, basically, aid us to point us in the

12   right direction in terms of how to decide this.

13        I do remember my days on the other side over there as

14   well, so I appreciate your efforts, and thank you.

15        MR. SILVERMAN:  Thank you, your Honor.

16        THE COURTROOM DEPUTY:  All rise.

17      (Whereupon the proceedings are adjourned at 4:43 p.m.)

18              *         *         *

19        FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

20

21        I certify that the foregoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23

24   /S/ Melissa A. Mormile RDR, CCR, CRCR        4/7/2022

25   Official Court Reporter                      Date

## $

**$140** [1] - 107:11
**$140.53** [1] - 142:12
**$150** [3] - 70:10, 144:2, 174:9
**$174** [3] - 141:18, 141:25, 142:11
**$174.36** [1] - 141:14
**$21** [1] - 123:12
**$241** [1] - 74:13
**$33.82** [2] - 142:13, 142:17
**$33.86** [1] - 144:25
**$42** [1] - 74:13
**$63** [6] - 44:22, 44:25, 45:1, 45:17, 178:2, 178:8
**$75** [1] - 141:15

## /

**/S** [1] - 211:24

## 0

**07068** [1] - 1:19
**07095** [1] - 2:12
**07101** [1] - 1:11
**0764** [1] - 39:17

## 1

**1** [4] - 136:19, 178:18, 183:16, 184:3
**1.09** [1] - 29:4
**10** [9] - 26:20, 38:1, 45:24, 60:7, 87:9, 146:15, 152:15, 175:4, 196:18
**10(b** [4] - 147:25, 196:10, 205:16, 206:8
**10,900** [1] - 66:25
**100** [4] - 49:23, 124:22, 127:17, 142:10
**100,000** [1] - 137:4
**10004** [1] - 3:4
**10016** [1] - 2:4
**10020** [1] - 2:9
**10166** [1] - 2:22
**102** [3] - 121:10, 125:14, 208:5
**107** [1] - 107:13
**10:03** [1] - 1:12
**10:25** [1] - 159:9
**10b-5** [11] - 8:4, 8:15, 47:24, 48:1, 48:10, 49:2, 55:4, 56:17,

111:25, 178:1, 195:5
**10b5-1** [4] - 69:25, 71:7, 71:15, 174:19
**10K** [1] - 84:8
**10KT** [1] - 84:10
**10Q** [1] - 84:8
**10th** [1] - 158:20
**11** [8] - 25:3, 25:24, 25:25, 26:11, 26:20, 100:23, 175:24, 181:3
**11,000** [1] - 71:3
**11,490** [1] - 71:4
**110** [1] - 107:13
**114** [1] - 203:21
**116** [1] - 116:2
**11:03** [1] - 5:3
**12** [13] - 25:3, 25:24, 25:25, 26:12, 74:6, 80:5, 102:10, 103:16, 128:25, 132:11, 181:4, 186:3, 196:18
**120** [3] - 95:16, 115:10, 115:14
**124** [1] - 129:1
**125** [1] - 3:4
**1251** [1] - 2:8
**12:26** [1] - 94:2
**12:27** [1] - 94:10
**12th** [3] - 61:5, 61:9, 158:20
**13** [11] - 71:5, 71:25, 84:9, 107:7, 113:1, 132:17, 141:17, 141:19, 142:11, 170:3, 186:3
**13,000** [1] - 67:2
**13.6** [1] - 99:16
**138** [1] - 203:15
**139** [1] - 4:8
**13th** [2] - 78:18, 142:8
**14** [8] - 46:1, 76:20, 76:21, 76:22, 87:23, 104:8, 169:16, 186:4
**14(a** [1] - 205:8
**14(e** [30] - 43:19, 43:23, 44:16, 44:17, 47:4, 47:16, 47:22, 47:24, 48:2, 139:11, 139:17, 140:4, 140:5, 178:4, 178:11, 178:14, 178:19, 179:12, 189:14, 189:16, 189:18, 189:25, 190:5, 195:5, 195:7, 196:5, 205:12, 205:15
**14(e)** [3] - 8:15,

111:25, 143:15
**14,000-page** [1] - 94:23
**140,000** [1] - 123:14
**1400** [1] - 34:3
**14th** [1] - 170:1
**15** [4] - 55:25, 72:20, 105:17, 132:17
**150** [2] - 34:4, 144:3
**152** [1] - 211:10
**158** [2] - 121:11, 124:20
**15th** [1] - 10:25
**16** [3] - 73:2, 73:9, 123:4
**160** [2] - 127:2, 135:18
**161** [2] - 4:5, 115:21
**162** [1] - 98:13
**164** [1] - 99:6
**166** [3] - 4:6, 122:16, 134:16
**167** [2] - 107:4, 122:16
**169** [1] - 107:13
**17** [4] - 91:2, 151:1, 151:5, 151:11
**17.7** [1] - 156:25
**170** [1] - 122:16
**171** [1] - 134:7
**172** [1] - 124:24
**174** [1] - 178:5
**175** [1] - 4:4
**17th** [1] - 29:14, 91:7, 100:3
**17TH** [1] - 2:17
**18** [5] - 68:18, 75:2, 100:24, 106:1, 156:25
**180** [2] - 101:2, 187:20
**181** [2] - 108:22, 109:4
**182** [2] - 4:7, 105:25
**183** [2] - 113:8, 132:20
**18448** [1] - 110:9
**188** [1] - 4:8
**189** [2] - 39:15, 39:17
**18th** [4] - 106:1, 151:23, 153:1, 153:25
**19** [6] - 53:7, 75:10, 75:22, 75:23, 76:8, 106:15
**191** [1] - 4:11
**192** [1] - 99:10
**195** [2] - 102:24, 187:21
**196** [1] - 107:12
**197** [1] - 187:25
**199** [1] - 4:12
**1999** [1] - 12:15
**19th** [1] - 89:18

## 1:30

**1:30** [1] - 94:10

## 2

**2** [9] - 17:8, 63:23, 63:24, 80:10, 80:14, 96:1, 96:4, 167:18
**2.3** [1] - 141:15
**20** [4] - 77:11, 92:17, 103:5, 175:5
**20,000** [1] - 123:14
**200** [3] - 2:21, 97:21, 202:7
**2000** [1] - 45:19
**20006** [1] - 2:17
**2003** [1] - 147:10
**2005** [1] - 110:9
**2006** [1] - 66:24
**2008** [2] - 192:8, 192:12
**2010** [3] - 17:5, 25:3, 112:13
**2011** [3] - 17:5, 25:3, 148:25
**2012** [1] - 115:2
**2013** [5] - 74:12, 76:8, 112:13, 112:15, 126:24
**2014** [13] - 29:5, 74:6, 74:12, 76:8, 85:23, 98:3, 98:10, 108:25, 121:13, 121:15, 121:18, 131:25, 132:11
**2015** [88] - 10:11, 11:1, 35:15, 36:2, 36:21, 37:15, 38:3, 38:14, 45:20, 55:25, 59:1, 59:14, 60:4, 60:6, 60:20, 69:24, 70:9, 70:12, 70:25, 71:5, 79:25, 80:5, 80:10, 80:14, 84:7, 84:8, 84:9, 85:1, 85:11, 86:12, 87:9, 87:23, 91:2, 92:8, 92:13, 96:14, 98:11, 98:24, 99:13, 99:15, 99:22, 100:24, 102:10, 103:5, 103:16, 103:24, 104:8, 105:5, 105:17, 106:1, 106:5, 106:15, 107:7, 107:17, 108:2, 112:13, 112:15, 113:1, 113:6, 113:13, 113:15, 113:17, 114:17, 128:25, 130:19,

131:8, 132:17, 132:19, 132:21, 132:22, 133:14, 141:17, 141:19, 142:11, 146:15, 151:24, 169:16, 170:3, 174:3, 178:20, 179:9, 187:9, 187:10, 187:17, 190:7, 190:11
**2016** [26] - 23:19, 36:3, 38:13, 48:11, 48:24, 60:7, 66:24, 67:10, 80:21, 84:10, 88:8, 104:3, 113:7, 113:11, 151:12, 151:23, 156:8, 156:14, 156:16, 158:20, 165:6, 174:3, 190:6, 196:13, 196:18
**2017** [2] - 158:21, 158:24
**2018** [7] - 14:18, 24:25, 29:24, 35:16, 39:5, 68:19, 176:2
**2019** [3] - 29:13, 39:16, 175:24
**2020** [2] - 29:13, 88:24
**2021** [4] - 38:1, 43:2, 43:4, 58:9
**2022** [4] - 1:12, 26:14, 186:2, 186:4
**206** [2] - 102:4, 124:25
**2081859** [1] - 39:5
**20A** [1] - 8:17
**20th** [1] - 106:17
**21** [7] - 36:2, 37:15, 57:15, 57:16, 71:9, 77:20, 85:1
**212** [1] - 102:13
**213** [3] - 103:8, 106:4, 106:13
**216** [1] - 106:19
**218** [1] - 39:15
**21st** [3] - 89:20, 154:4, 158:6
**22** [10] - 37:14, 48:11, 48:23, 55:25, 78:4, 85:3, 89:3, 119:24, 131:8, 172:5
**22nd** [5] - 56:7, 61:21, 62:2, 63:21, 126:24
**23** [7] - 24:25, 60:4, 60:6, 78:17, 87:15, 99:22, 108:16
**231** [1] - 116:17
**236** [1] - 138:14
**238** [1] - 105:20

**23rd** [9] - 60:11, 60:17, 61:12, 63:19, 103:13, 126:24, 165:4, 165:7, 165:14
**24** [3] - 45:19, 45:20, 79:15
**241** [3] - 113:17, 130:19, 132:22
**242** [1] - 113:12, 132:20
**243** [2] - 114:15, 132:23
**244** [2] - 114:15, 132:23
**245** [2] - 113:15, 132:22
**246** [2] - 114:15, 132:23
**25** [5] - 70:25, 71:11, 84:9, 151:12, 156:8
**253** [1] - 121:22
**259** [1] - 97:22
**25th** [3] - 156:13, 158:9, 158:13
**26** [2] - 80:14, 88:8
**269** [1] - 127:15
**27** [5] - 149:7, 150:9, 171:5, 172:25, 176:2
**271** [3] - 73:2, 73:6, 73:9
**272** [3] - 74:4, 132:13
**276** [1] - 133:3
**278** [1] - 132:8
**27th** [1] - 62:10
**28** [3] - 11:4, 20:15, 172:25
**284** [1] - 127:7
**289** [1] - 109:21
**28th** [1] - 71:7
**29** [3] - 58:8, 84:8, 179:9
**292** [2] - 45:20, 137:9
**295** [2] - 114:15, 132:23
**299** [1] - 107:16
**2:16-cv-02805-JXN-LDW** [1] - 1:4
**2nd** [4] - 118:14, 159:14, 159:15, 159:21

**3**

**3** [5] - 67:11, 116:17, 123:12, 158:24
**30** [11] - 10:10, 11:1, 35:15, 60:20, 65:25, 67:2, 83:9, 83:10, 84:6, 89:7, 92:13
**30(b)(6** [3] - 122:10,

122:14, 134:10
**30-minute** [1] - 92:15
**300** [2] - 123:8, 127:24
**309** [1] - 104:10
**30th** [7] - 57:20, 58:14, 58:15, 60:16, 85:3, 85:20
**31** [5] - 83:10, 84:6, 108:16, 123:6, 170:2
**33** [1] - 85:2
**334** [1] - 118:14
**34** [3] - 36:23, 85:10
**35** [4] - 85:20, 86:6, 98:20, 203:15
**35-plus** [1] - 66:17
**36** [2] - 86:6, 146:17
**360** [1] - 98:6
**3601229** [1] - 68:19
**365** [1] - 117:22
**37** [3] - 63:21, 87:7, 87:15
**371** [1] - 105:12
**38** [1] - 87:23
**382** [1] - 117:22
**386** [3] - 102:16, 169:12, 169:13
**39** [2] - 35:13, 88:7
**390** [2] - 103:18, 103:23
**397** [1] - 105:3
**3:18** [2] - 161:15, 161:18
**3:25** [1] - 161:15
**3:26** [1] - 161:18
**3rd** [4] - 159:3, 159:14, 159:15, 159:21

**4**

**4** [1] - 11:1
**4/7/2022** [1] - 211:24
**40** [2] - 89:1, 143:8
**402** [2] - 106:19, 118:2
**404** [1] - 118:2
**409** [1] - 108:4
**41** [1] - 89:16
**410** [1] - 107:24
**42** [1] - 89:16
**43** [5] - 89:16, 89:17, 89:18, 90:6, 110:10
**430** [1] - 178:17
**44** [3] - 110:10, 121:5, 170:11
**441** [1] - 99:10
**446** [1] - 39:15
**45** [1] - 94:3
**47** [1] - 90:15
**48** [2] - 90:21, 117:6

**49** [2] - 91:1, 98:14
**4:43** [1] - 211:17
**4s** [1] - 107:11
**4th** [1] - 38:1

**5**

**5** [9] - 36:3, 51:20, 67:24, 79:25, 80:21, 84:7, 103:24, 130:19, 208:5
**5.8** [1] - 154:13
**50** [13] - 1:11, 4:5, 17:21, 17:24, 91:6, 141:22, 142:2, 143:16, 143:19, 143:21, 202:1, 205:24
**500** [2] - 123:8, 181:25
**51** [1] - 91:12
**52** [1] - 120:8
**53** [2] - 99:19, 121:5
**55** [9] - 81:3, 81:4, 81:7, 81:8, 81:14, 82:5, 91:25, 171:7, 172:3
**56** [3] - 81:4, 96:23, 188:18
**58** [1] - 192:3
**59** [1] - 192:3
**592** [1] - 38:1
**5th** [2] - 78:4, 170:14

**6**

**6** [3] - 24:18, 99:13, 107:12
**60** [6] - 74:12, 101:1, 192:25, 193:17
**600** [1] - 2:4
**63** [1] - 101:24
**6473** [1] - 186:3
**65** [2] - 4:6, 95:17
**662** [1] - 118:14
**684169** [1] - 26:14
**69** [1] - 133:12

**7**

**7** [3] - 1:12, 4:4, 51:25
**70** [2] - 21:18, 63:22
**700** [3] - 122:19, 123:8, 127:24
**702** [2] - 191:9, 200:16
**703** [1] - 171:14
**76** [2] - 128:8, 131:10

**8**

**8** [4] - 60:20, 69:24,

86:12, 105:5
**8(A)3** [1] - 118:4
**80** [1] - 126:1
**800** [3] - 34:3, 134:21, 163:23
**801** [2] - 2:17, 118:2
**803** [2] - 118:4, 120:7
**803(8** [4] - 23:10, 23:11, 23:15, 23:21
**803(A)3** [1] - 120:14
**83** [2] - 99:10, 104:4
**84** [1] - 103:4
**842** [1] - 116:17
**87** [1] - 141:7
**88** [1] - 119:25
**8F** [1] - 38:1
**8th** [3] - 60:21, 61:5, 61:11

**9**

**9** [3] - 103:17, 103:20, 151:1
**9.8** [1] - 69:12
**9.9** [1] - 150:25
**90** [3] - 34:5, 77:14, 126:1
**96** [2] - 4:7, 125:16
**97** [1] - 204:12
**973)776-7710** [1] - 1:25
**99** [1] - 2:12

**A**

**a.m** [2] - 1:12, 5:4
**ability** [3] - 37:20, 190:7, 203:22
**able** [7] - 91:17, 98:19, 119:9, 122:15, 135:1, 202:17, 211:10
**ably** [2] - 9:11, 51:20
**above-entitled** [1] - 211:22
**abrupt** [4] - 123:1, 123:9, 123:19, 126:17
**absence** [10] - 14:12, 31:24, 72:1, 140:10, 144:8, 198:16, 204:23, 205:13, 205:19, 206:5
**absolutely** [10] - 39:25, 42:7, 45:3, 68:15, 81:3, 106:21, 108:13, 111:3, 188:14, 203:24
**abundantly** [1] - 42:15
**academic** [1] - 204:6

**accept** [9] - 104:2, 104:14, 104:15, 114:1, 121:24, 136:5, 184:24, 188:13, 208:20
**acceptable** [2] - 190:19, 190:20
**acceptance** [1] - 140:11
**accepted** [4] - 196:4, 197:6, 204:7, 204:23
**accepts** [2] - 27:21, 197:7
**access** [1] - 70:1
**accomplish** [1] - 65:7
**according** [9] - 15:5, 28:6, 62:18, 98:1, 103:8, 103:22, 109:1, 159:8, 187:15
**accordingly** [1] - 160:3
**account** [10] - 13:22, 49:3, 121:16, 158:8, 197:12, 197:15, 197:18, 198:9, 207:9, 208:23
**accounting** [14] - 59:2, 59:6, 59:10, 98:22, 99:1, 101:22, 103:7, 103:9, 104:7, 104:25, 105:14, 106:3, 109:16, 187:12
**accretive** [17] - 36:10, 36:12, 36:16, 37:1, 37:3, 37:7, 89:4, 89:14, 89:15, 89:19, 89:22, 89:23, 89:24, 90:7, 103:21, 106:7
**accurate** [10] - 27:22, 67:17, 67:18, 67:19, 72:4, 86:7, 91:5, 115:16, 119:21
**accurately** [2] - 90:16, 137:7
**accused** [3] - 66:13, 93:10, 164:3
**achieve** [3] - 135:1, 155:16, 194:21
**achieved** [3] - 143:24, 144:25, 183:19
**acknowledge** [2] - 38:5, 48:3
**acknowledges** [1] - 27:21
**acquire** [1] - 91:17
**acquired** [3] - 10:10, 170:5, 184:11
**acquisition** [12] - 36:10, 36:22, 37:15,

39:24, 40:2, 41:20,
85:4, 97:18, 137:25,
152:6, 152:10,
154:10
**acquisitions** [3] -
109:3, 164:18,
164:20
**act** [2] - 67:22, 103:3
**Act** [11] - 8:15, 35:21,
35:22, 111:23,
111:24, 137:18,
139:11, 139:18,
145:14, 177:3
**acted** [2] - 14:24,
43:10
**acting** [1] - 55:17
**ACTION** [1] - 1:3
**action** [9] - 21:17,
29:10, 30:7, 32:2,
136:20, 136:21,
137:8, 143:12
**actionable** [1] - 38:24
**actions** [6] - 21:6,
23:4, 52:12, 125:6,
208:25, 209:16
**activities** [8] - 16:8,
18:19, 85:6, 85:8,
86:19, 87:11, 87:20,
187:23
**activity** [1] - 20:12
**acts** [1] - 195:8
**actual** [24] - 10:25,
14:25, 15:12, 16:20,
18:8, 19:6, 30:17,
34:19, 43:22, 72:23,
98:8, 108:17, 109:7,
120:21, 120:22,
121:9, 125:11,
128:5, 128:21,
130:13, 138:13,
188:1, 198:13,
209:22
**ad** [1] - 207:24
**add** [2] - 24:8, 143:15
**added** [1] - 86:25
**addition** [7] - 36:24,
69:20, 120:21,
143:20, 157:16,
197:1, 209:10
**additional** [11] -
71:15, 90:11,
114:15, 115:22,
129:25, 131:21,
136:9, 136:15,
167:22, 203:20
**additionally** [4] -
23:21, 108:19,
125:7, 135:15
**address** [15] - 7:5, 7:8,
8:7, 19:21, 24:22,

183:9
**adversary** [1] - 30:23
**advice** [1] - 111:8
**advised** [4] - 75:5,
131:25, 187:25,
194:13
**affairs** [1] - 18:25
**affect** [1] - 206:15
**affected** [1] - 153:3
**affecting** [3] - 150:1,
153:7, 153:14
**affects** [1] - 148:15
**affidavit** [9] - 24:10,
24:13, 24:16, 26:5,
27:13, 27:16, 27:23,
28:1, 115:15
**affidavits** [4] - 52:16,
72:20, 72:22, 179:24
**affirmed** [3] - 16:2,
19:4, 37:22
**afraid** [1] - 153:13
**Afternoon** [1] - 94:14
**afternoon** [4] - 94:16,
139:6, 190:15,
191:5, 191:6
**AG** [16] - 22:23, 22:25,
23:8, 23:9, 23:15,
23:25, 24:7, 24:14,
24:19, 25:7, 26:6,
116:10, 118:16,
120:22, 147:10
**AG's** [1] - 120:19
**agencies** [1] - 22:19
**agency** [1] - 120:3
**aggregate** [1] - 123:5
**ago** [10] - 25:4, 25:24,
25:25, 26:12, 26:20,
56:12, 60:22,
173:19, 186:1, 211:6
**agree** [7] - 52:11,
98:25, 100:25,
126:10, 147:2,
154:12, 200:17
**agreed** [15] - 15:9,
33:17, 61:16, 63:3,
93:1, 119:20, 137:5,
137:6, 141:22,
144:2, 144:12,
144:14, 185:3,
185:19
**agreed-upon** [1] -
15:9
**agreement** [17] -
14:12, 14:25, 15:12,
16:4, 16:23, 27:3,
27:7, 27:19, 29:20,
31:24, 32:10, 52:18,
115:14, 115:16,
115:19, 122:4,
135:20

**agreements** [3] - 27:8,
27:9, 144:17
**agrees** [1] - 163:1
**ahead** [1] - 76:17
**aid** [1] - 211:11
**aided** [1] - 199:19
**aids** [1] - 56:13
**ailment** [1] - 95:19
**aimed** [1] - 134:23
**ain't** [1] - 29:22
**al** [1] - 1:8
**Alan** [1] - 6:4
**ALAN** [1] - 2:11
**albeit** [1] - 133:22
**all-people's** [1] -
22:22
**allegation** [8] - 11:19,
24:19, 41:5, 41:21,
41:25, 57:9, 72:16,
178:22
**allegations** [30] - 9:6,
10:13, 11:19, 19:8,
22:19, 22:24, 23:4,
23:17, 23:18, 25:2,
26:6, 28:25, 37:10,
40:14, 40:25, 41:18,
42:16, 67:25, 68:20,
71:23, 119:20,
120:11, 130:18,
150:11, 159:24,
177:14, 187:4,
190:8, 201:21,
201:22
**allege** [11] - 10:20,
33:25, 37:8, 38:2,
66:7, 69:18, 79:19,
111:24, 177:5,
189:6, 197:4
**alleged** [30] - 10:4,
25:6, 25:12, 26:6,
26:18, 28:21, 34:20,
35:18, 37:23, 40:10,
40:23, 44:4, 44:8,
48:6, 48:25, 51:2,
51:4, 69:4, 69:18,
72:5, 72:11, 139:12,
148:10, 154:16,
160:2, 160:19,
163:15, 190:12,
196:20
**allegedly** [6] - 50:3,
66:8, 69:15, 160:5,
179:13, 195:13
**alleges** [2] - 139:17,
176:2
**alleging** [3] - 22:19,
72:18, 74:18
**allocate** [1] - 96:7
**allocated** [2] - 115:3,
135:22

**allocating** [1] - 120:24
**allotted** [1] - 7:3
**allow** [7] - 38:25,
98:22, 136:11,
145:13, 188:15,
188:17
**allowed** [3] - 9:5,
29:25, 147:21
**allowing** [2] - 118:23,
136:12
**allows** [3] - 23:11,
40:14, 48:5
**alluded** [2] - 42:1,
197:2
**alluding** [1] - 34:1
**almost** [8] - 18:12,
29:13, 65:18, 96:2,
111:4, 156:25,
166:19, 169:4
**alone** [5] - 19:1, 20:7,
25:24, 36:17, 56:8
**alter** [2] - 110:12,
180:5
**alternate** [1] - 129:19
**alternative** [1] - 119:6
**altogether** [1] - 97:15
**ambiguous** [1] - 193:2
**amend** [1] - 10:15
**amended** [24] - 10:13,
21:18, 25:8, 25:10,
28:24, 29:14, 40:9,
40:23, 41:17, 42:2,
42:14, 43:14,
136:23, 175:23,
176:1, 176:10,
176:11, 176:16,
176:25, 177:15,
182:15, 184:1,
185:9, 185:19
**amendment** [1] - 50:8
**America** [2] - 18:12,
80:6
**Americas** [1] - 2:8
**amorphous** [2] -
28:11, 39:13
**amount** [9] - 19:9,
95:13, 104:18,
131:13, 138:2,
140:23, 152:25,
180:18, 205:23
**analyses** [2] - 195:18,
205:18
**analysis** [15] - 103:22,
139:25, 152:23,
154:12, 158:4,
191:12, 196:11,
197:17, 205:8,
205:13, 205:15,
205:16, 207:13,
208:1

29:1, 59:6, 66:6,
66:22, 79:24, 94:15,
94:17, 116:22,
139:2, 164:8
**addressed** [5] - 18:24,
59:7, 61:3, 72:21,
157:6
**addresses** [1] -
210:10
**adequate** [1] - 204:13
**adequately** [2] -
35:25, 37:9
**adjourned** [1] - 211:17
**adjust** [1] - 6:18
**adjusted** [1] - 158:6
**admissibility** [3] -
116:20, 191:8,
200:16
**admissible** [10] - 9:13,
9:25, 17:6, 18:7,
23:10, 28:15,
116:12, 116:16,
173:14, 179:19
**admission** [3] -
115:23, 120:1,
120:18
**admissions** [1] -
120:17
**admit** [5] - 21:18,
52:13, 116:13,
116:21, 146:23
**admits** [1] - 27:21
**admitted** [21] - 72:19,
98:12, 104:3,
108:20, 115:3,
118:12, 119:22,
120:14, 120:17,
124:20, 131:12,
134:10, 134:13,
136:1, 165:15,
165:17, 185:13,
195:18, 197:14,
199:3, 209:2
**adopt** [7] - 10:18,
42:21, 43:3, 43:4,
43:7, 114:4, 181:14
**adopted** [4] - 42:22,
42:23, 108:24, 124:6
**adopting** [1] - 128:21
**advance** [2] - 102:15,
114:21
**advanced** [2] - 14:12,
194:20
**advantage** [2] - 13:15,
32:4
**adverbs** [1] - 161:25
**adversarial** [4] -
22:16, 24:3, 24:8,
179:22
**adversaries** [1] -

**analyst** [6] - 101:18, 130:9, 152:20, 153:1, 158:10, 205:25
**analysts** [6] - 13:11, 130:5, 151:25, 155:11, 157:23, 206:20
**analytical** [2] - 207:3, 207:11
**analyze** [1] - 40:5
**analyzed** [3] - 31:1, 118:22, 155:25
**analyzes** [1] - 210:3
**ancient** [1] - 17:5
**Andrea** [1] - 119:16
**Anklam** [1] - 5:25
**ANKLAM** [1] - 2:16
**announced** [4] - 36:20, 71:13, 156:13, 158:6
**announcement** [2] - 152:1, 158:12
**announcements** [1] - 44:19
**annual** [2] - 84:9, 126:25
**anomalies** [2] - 103:8
**answer** [14] - 93:20, 109:17, 114:11, 128:10, 138:25, 167:16, 167:17, 168:16, 168:18, 168:24, 170:8, 172:2, 172:15
**answered** [2] - 95:15, 95:17
**answers** [5] - 77:3, 130:11, 130:14, 167:11, 167:12
**Anthony** [1] - 24:11
**anti** [2] - 9:18, 22:20
**anti-trust** [2] - 9:18, 22:20
**anticipate** [3] - 7:6, 185:17, 190:22
**anticipated** [2] - 113:4, 127:16
**anticompetitive** [3] - 112:12, 208:8, 209:3
**antidumping** [1] - 123:23
**antitrust** [8] - 12:13, 29:18, 30:8, 117:18, 117:24, 118:1, 159:1, 198:5
**anyhow** [1] - 161:23
**anyway** [2] - 20:20, 204:19
**apoplectic** [1] -

107:25
**appearances** [1] - 5:10
**appeared** [1] - 55:23
**appease** [1] - 209:8
**applicable** [2] - 193:21, 194:6
**application** [1] - 203:18
**applied** [2] - 81:10, 106:14
**apply** [3] - 43:9, 96:24, 149:3
**applying** [1] - 128:4
**appointment** [1] - 196:15
**appreciate** [2] - 190:14, 211:14
**approach** [6] - 35:1, 61:13, 80:7, 80:10, 80:11, 192:8
**approaching** [1] - 11:16
**appropriate** [9] - 24:3, 65:24, 70:23, 75:13, 147:5, 193:13, 194:5, 203:4, 204:18
**approval** [2] - 13:8, 78:1
**approved** [4] - 98:2, 113:10, 132:25, 185:12
**approving** [1] - 134:5
**April** [26] - 1:12, 36:2, 37:15, 45:19, 45:20, 48:11, 48:23, 66:24, 70:12, 84:8, 85:1, 85:18, 86:12, 87:9, 87:23, 89:18, 89:20, 104:11, 113:1, 132:17, 151:12, 154:4, 156:8, 156:13, 158:13, 196:13
**Arbitrages** [1] - 60:12
**area** [4] - 88:15, 153:10, 159:1, 189:14
**argue** [13] - 16:13, 28:13, 36:25, 55:6, 81:14, 120:5, 125:4, 128:1, 129:19, 136:3, 140:4, 154:15, 161:13
**argues** [2] - 129:9, 153:20
**arguing** [3] - 163:12, 183:7, 184:13
**ARGUMENT** [2] - 1:5, 4:2

**argument** [33] - 7:3, 15:10, 17:19, 20:11, 24:9, 43:15, 45:10, 45:11, 55:13, 58:4, 90:8, 128:17, 139:10, 147:23, 155:19, 158:22, 160:12, 161:2, 161:11, 164:10, 165:3, 177:7, 177:23, 177:24, 179:20, 183:6, 184:23, 190:13, 205:11, 206:9, 211:9
**arguments** [10] - 32:21, 148:16, 156:9, 156:11, 157:3, 158:19, 160:11, 164:25, 165:3, 183:11
**arising** [1] - 39:23
**arithmetic** [2] - 142:24, 142:25
**Arleo** [21] - 9:5, 9:11, 14:17, 35:17, 38:25, 39:10, 40:13, 40:17, 42:2, 50:7, 104:13, 130:7, 133:5, 137:6, 140:13, 157:7, 162:14, 177:10, 184:2, 185:3, 186:19
**Arleo's** [2] - 29:24, 30:8
**arrival** [3] - 12:19, 43:20, 47:5
**ascribed** [1] - 119:20
**aside** [3] - 76:6, 84:5
**aspect** [1] - 153:10
**aspects** [4] - 38:6, 49:4, 49:6, 199:3
**aspirational** [1] - 109:6
**assert** [2] - 32:8, 111:15
**assertion** [2] - 11:23, 186:5
**assertions** [2] - 67:25, 186:5
**asserts** [2] - 24:13, 100:23
**assess** [2] - 83:16, 195:19
**assessed** [1] - 97:10
**assessing** [2] - 51:11, 95:20
**assessment** [2] - 140:2, 157:9
**asset** [1] - 152:5
**assets** [2] - 152:2, 152:14

**assist** [1] - 95:1
**assistance** [1] - 8:1
**associate** [2] - 20:22, 20:25
**associated** [4] - 46:20, 154:25, 155:1, 170:4
**associates** [1] - 49:19
**association** [1] - 16:12
**assume** [7] - 44:17, 72:2, 163:23, 169:24, 172:6, 206:17
**assumed** [1] - 207:2
**assumes** [4] - 145:6, 197:3, 203:7, 206:15
**assuming** [2] - 72:4, 76:6
**assumption** [2] - 145:11, 203:9
**assumptions** [2] - 105:2, 192:13
**astounded** [1] - 107:2
**astronomical** [2] - 56:13, 161:25
**attach** [1] - 161:25
**attached** [1] - 27:19
**attachment** [1] - 132:9
**attacking** [1] - 61:2
**attempt** [6] - 22:18, 26:5, 33:5, 60:13, 167:17, 186:17
**attempting** [1] - 192:11
**attempts** [4] - 35:8, 95:2, 181:6, 188:4
**attend** [1] - 75:21
**attendance** [2] - 16:11, 135:24
**attended** [8] - 17:20, 62:17, 100:5, 100:19, 103:6, 126:25, 135:15, 173:19
**attention** [3] - 20:21, 21:13, 45:7
**attenuated** [1] - 111:13
**attenuation** [1] - 111:12
**Attorney** [2] - 52:12, 52:14
**attorney** [10] - 116:6, 117:7, 118:19, 118:22, 119:9, 119:13, 119:18, 119:21, 119:23
**attorney's** [1] - 116:4
**attributable** [2] -

30:22, 49:24
**attribute** [1] - 41:18
**attributed** [2] - 24:14, 158:16
**attributes** [1] - 42:3
**audience** [1] - 82:1
**audit** [7] - 103:11, 106:2, 106:17, 106:18, 107:2, 109:15, 187:8
**auditors** [3] - 106:9, 106:23, 106:24
**August** [12] - 37:25, 43:1, 70:25, 78:4, 84:9, 103:24, 104:10, 130:19, 158:20, 170:3, 170:14, 196:18
**Aurobindo** [1] - 115:24
**authorities** [2] - 29:19, 201:10
**authority** [8] - 25:14, 25:17, 25:19, 26:4, 31:4, 54:1, 72:17, 118:10
**authorized** [5] - 23:13, 118:6, 118:18, 118:19, 119:8
**available** [5] - 21:22, 38:12, 71:16, 94:7, 140:16
**avalanche** [1] - 194:17
**Avenue** [4] - 2:4, 2:8, 2:12, 2:21
**avenue** [1] - 181:15
**average** [1] - 204:14
**avoid** [5] - 33:5, 53:19, 84:7, 167:12, 209:9
**avoids** [1] - 172:15
**aware** [6] - 15:25, 74:15, 77:5, 77:19, 108:21, 179:16
**awareness** [2] - 13:25, 73:3

## B

**B-O-O-T-H-E** [1] - 25:22
**babble** [1] - 177:19
**Baby** [10] - 11:11, 12:15, 12:18, 14:1, 16:2, 19:19, 21:8, 122:23, 182:6, 198:4
**backed** [1] - 65:22
**background** [1] - 66:1
**backs** [1] - 37:4
**bad** [4] - 37:24, 156:18, 164:3, 188:1

**ball** [2] - 127:18, 146:16
**Bank** [2] - 19:1, 80:5
**banker** [3] - 97:23, 144:7, 201:17
**Banking** [1] - 203:14
**banking** [1] - 191:23
**bar** [3] - 9:7, 47:18, 200:8
**Barbara** [5] - 61:7, 61:8, 61:10, 86:15, 86:16
**bare** [2] - 45:3, 67:25
**barely** [8] - 9:5, 38:25, 40:12, 40:15, 76:11, 182:9, 182:10
**barriers** [2] - 13:3, 13:14
**base** [1] - 58:7
**based** [23] - 12:13, 17:17, 32:5, 35:22, 42:10, 56:4, 57:19, 65:21, 77:22, 95:13, 127:9, 140:15, 141:15, 145:2, 147:17, 149:20, 159:8, 178:22, 178:23, 205:5, 205:22, 206:1, 207:3
**baseline** [2] - 97:24, 98:8
**basic** [2] - 19:7, 148:19
**basis** [14] - 58:7, 63:18, 79:20, 81:11, 110:15, 139:22, 145:18, 156:25, 177:9, 202:18, 203:1, 203:25, 206:6, 210:8
**basketball** [1] - 129:11
**Bausch** [2] - 67:9, 88:19
**BCH** [1] - 156:18
**bear** [3] - 140:19, 140:22, 160:15
**bearing** [3] - 26:22, 124:10, 210:16
**became** [4] - 38:12, 59:10, 71:16, 190:4
**become** [4] - 132:19, 162:3, 190:5, 196:14
**began** [2] - 25:5, 66:16
**begging** [1] - 105:18
**begin** [6] - 7:25, 9:12, 11:2, 44:6, 58:15, 92:17
**beginning** [6] - 29:7,

79:10, 108:4, 113:7, 133:13, 159:12
**begins** [1] - 59:5
**begrudged** [1] - 184:6
**behalf** [8] - 5:12, 5:17, 5:19, 6:1, 6:8, 7:22, 7:23, 65:4
**Behalf** [1] - 1:4
**behavior** [14] - 12:6, 35:6, 53:18, 53:19, 55:17, 162:19, 163:24, 199:11, 199:15, 199:20, 208:8, 208:21, 209:6, 209:10
**belabor** [2] - 72:15, 207:24
**belatedly** [1] - 197:14
**Belgian** [1] - 105:6
**Belgium** [1] - 105:8
**belie** [1] - 22:11
**belies** [1] - 174:16
**believes** [2] - 91:15, 193:4
**bell** [1] - 37:7
**Bellco** [1] - 106:11
**belong** [1] - 171:19
**below** [6] - 52:22, 82:6, 99:16, 151:25, 156:14, 168:11
**bench** [1] - 50:22
**benefit** [13] - 43:25, 44:6, 68:22, 88:13, 132:5, 142:17, 143:18, 143:25, 144:25, 178:5, 178:8, 202:1, 206:3
**benefited** [1] - 70:14
**BERGER** [1] - 2:7
**Berger** [1] - 5:14
**BERNSTEIN** [1] - 2:7
**Bernstein** [2] - 5:14, 5:19
**beside** [1] - 64:7
**besmirched** [1] - 167:5
**best** [6] - 65:14, 75:9, 167:15, 171:7, 178:16, 201:5
**better** [5] - 57:9, 60:8, 63:5, 135:8, 205:11
**between** [31] - 7:13, 17:9, 17:11, 18:17, 18:20, 19:22, 23:1, 24:20, 25:2, 27:3, 28:3, 35:12, 36:2, 43:10, 43:12, 59:12, 83:25, 104:11, 105:11, 122:25, 123:1, 142:8,

142:20, 148:13, 152:21, 160:7, 164:22, 184:11, 188:16, 199:10, 205:10
**beyond** [8] - 12:1, 14:11, 14:15, 20:17, 56:3, 161:1, 167:23, 171:18
**bias** [1] - 23:24
**biased** [1] - 24:1
**bid** [14] - 26:18, 32:9, 45:6, 98:3, 98:10, 104:12, 104:21, 104:24, 121:13, 121:19, 122:2, 129:7, 209:8
**bid-rigging** [1] - 26:18
**bidder** [1] - 44:11
**bidding** [2] - 124:2, 124:4
**bids** [6] - 96:7, 115:3, 120:23, 129:24, 135:22, 209:4
**big** [9] - 48:18, 97:10, 106:12, 129:12, 157:2, 163:20, 185:17, 189:3
**bigger** [1] - 164:15
**biggest** [3] - 98:17, 98:18, 152:6
**billion** [5] - 11:1, 29:6, 89:12, 96:1, 96:4
**billion-dollar** [1] - 89:12
**bind** [1] - 122:13
**binding** [5] - 45:15, 46:9, 122:11, 144:13, 175:18
**bit** [8] - 7:12, 40:20, 50:5, 66:1, 103:12, 116:5, 184:6, 185:2
**bite** [1] - 62:22
**bits** [1] - 77:3
**bizarre** [1] - 177:1
**bizarrely** [1] - 48:13
**black** [1] - 148:20
**blank** [2] - 11:9, 16:7
**blatant** [1] - 181:9
**blindly** [1] - 162:3
**blocked** [1] - 52:21
**Blomkest** [1] - 123:20
**bloody** [2] - 180:14, 182:23
**Bloomberg** [1] - 159:3
**blow** [1] - 81:5
**blown** [1] - 81:1
**board** [10] - 67:9, 73:7, 73:8, 92:6, 92:9, 92:16, 98:2, 98:10,

104:25, 146:20
**Boat** [1] - 199:1
**body** [2] - 95:20, 119:7
**boggles** [1] - 79:6
**boils** [1] - 200:18
**bolster** [1] - 45:10
**bolts** [3] - 63:17, 166:3, 166:12
**book** [2] - 82:2, 121:6
**bookends** [1] - 80:22
**boost** [2] - 98:19, 99:1
**boosted** [1] - 123:5
**boot** [1] - 26:5
**Boothe** [8] - 25:22, 54:4, 54:11, 54:16, 54:19, 133:24, 134:5, 172:23
**Boothe's** [1] - 172:25
**bootstrap** [1] - 45:10
**bord** [1] - 66:23
**bored** [1] - 138:18
**borne** [1] - 130:17
**boss** [4] - 54:3, 54:11, 63:6, 90:19
**bottom** [5] - 14:5, 77:17, 87:15, 92:12, 135:10
**bought** [4] - 58:14, 61:19, 152:5, 189:21
**bound** [1] - 136:5
**bounds** [1] - 192:15
**Bradley** [3] - 168:4, 168:5, 168:7
**Brand** [1] - 156:19
**brands** [1] - 91:18
**bread** [4] - 123:12, 181:25, 182:1, 182:2
**break** [12] - 7:13, 64:21, 64:23, 64:24, 93:25, 94:1, 94:3, 94:4, 95:3, 161:10, 161:14
**breathe** [1] - 22:17
**brief** [43] - 51:13, 51:14, 55:22, 62:22, 69:8, 71:3, 73:1, 74:3, 80:25, 81:1, 81:2, 81:8, 89:3, 100:23, 108:16, 116:8, 119:25, 121:5, 123:17, 128:7, 136:17, 137:20, 141:7, 147:23, 149:7, 157:8, 171:8, 172:4, 175:17, 175:19, 176:18, 188:9, 188:22, 189:17, 192:3, 192:10, 192:18, 192:25,

193:17, 200:4, 204:11, 205:15
**briefed** [1] - 131:24
**briefer** [1] - 195:2
**briefing** [6] - 34:14, 37:19, 38:21, 39:11, 43:2, 94:22
**briefly** [9] - 18:2, 69:22, 83:10, 89:6, 123:18, 141:9, 195:1, 196:10, 197:9
**briefs** [12] - 50:15, 55:15, 65:10, 96:9, 109:6, 110:6, 110:20, 110:21, 148:17, 193:8, 199:23, 201:11
**bring** [10] - 8:14, 9:19, 20:2, 24:6, 25:9, 29:10, 50:8, 52:25, 59:20, 190:7
**bringing** [1] - 57:23
**brings** [1] - 119:11
**Bristol** [2] - 110:8, 186:24
**Bristol-Myers** [2] - 110:8, 186:24
**Broad** [1] - 3:4
**broad** [2] - 33:13, 33:18
**broader** [3] - 79:18, 112:10, 157:23
**Brodsky** [10] - 6:7, 65:4, 113:20, 113:21, 144:1, 181:11, 184:5, 184:13, 188:24
**BRODSKY** [7] - 2:20, 4:6, 6:7, 64:21, 65:1, 166:16, 175:13
**Brodsky's** [1] - 20:23
**broke** [1] - 29:15
**broken** [1] - 102:22
**brought** [11] - 15:16, 19:13, 29:14, 45:7, 52:20, 91:4, 117:9, 117:11, 136:22, 164:3, 178:19
**brown** [40] - 42:20, 43:12, 51:1, 53:22, 53:23, 54:5, 54:22, 55:8, 55:19, 55:24, 57:4, 57:19, 59:8, 59:16, 59:17, 60:4, 60:11, 62:18, 62:21, 64:6, 64:8, 64:12, 65:14, 97:22, 99:20, 100:19, 101:13, 101:15, 101:17, 101:25, 102:22,

103:14, 105:4, 131:8, 163:6, 165:4, 166:22, 174:2, 174:8, 180:7
**Brown** [83] - 3:5, 6:10, 10:5, 10:21, 12:5, 41:8, 41:10, 41:14, 51:8, 51:19, 51:24, 52:2, 52:4, 52:7, 52:8, 52:15, 52:17, 52:19, 52:20, 52:24, 53:5, 53:11, 53:14, 53:15, 59:2, 61:12, 96:11, 97:11, 98:7, 98:11, 98:17, 98:23, 99:14, 100:5, 102:11, 102:15, 103:6, 104:18, 105:5, 105:21, 106:4, 106:16, 107:7, 107:13, 107:18, 107:24, 108:6, 108:16, 109:13, 111:6, 111:8, 113:2, 113:9, 113:15, 113:17, 114:16, 126:25, 130:1, 130:4, 131:24, 132:10, 132:17, 132:21, 132:25, 133:1, 133:21, 134:3, 134:6, 134:12, 134:13, 134:25, 135:15, 136:13, 138:1, 138:5, 161:21, 162:9, 162:16, 163:19, 164:10, 187:22, 193:6
**brown's** [4] - 54:20, 62:8, 100:21, 163:9
**Brown's** - 6:25, 100:3
**Brunswick** [1] - 199:1
**brunt** [1] - 138:18
**Brussels** [2] - 102:1, 102:2
**BUCK** [1] - 2:21
**budget** [2] - 85:23, 85:24
**Building** [1] - 1:10
**building** [1] - 101:22
**builds** [1] - 205:16
**built** [1] - 76:18
**bullet** [1] - 78:25
**burden** [15] - 30:13, 30:15, 32:20, 34:15, 43:16, 47:19, 47:25, 51:17, 64:16, 67:18,

82:15, 149:8, 149:11, 160:15
**bury** [1] - 194:17
**business** [49] - 16:12, 18:3, 19:8, 30:22, 30:24, 32:3, 32:7, 32:9, 32:14, 35:13, 46:3, 49:4, 49:5, 49:11, 75:20, 78:25, 80:7, 80:9, 81:12, 82:2, 82:11, 101:4, 101:6, 102:11, 103:6, 121:17, 121:20, 122:19, 128:13, 134:24, 135:7, 153:10, 154:20, 159:7, 170:5, 172:13, 187:19, 188:5, 196:19, 196:21, 196:22, 196:23, 196:25, 197:6, 207:10, 207:16, 209:8
**businesses** [2] - 84:12, 135:8
**but-for** [1] - 195:16
**buy** [5] - 37:3, 70:5, 83:18, 144:14, 144:19
**BY** [13] - 1:18, 2:3, 2:7, 2:11, 2:15, 2:20, 3:3, 4:5, 4:6, 4:7, 4:8, 4:11, 4:12
**bypass** [1] - 27:12

---

## C

**C-Suite** [1] - 41:6
**calculates** [1] - 206:6
**calendar** [1] - 169:6
**Canadian** [1] - 118:1
**canceled** [3] - 70:19, 70:21, 85:10
**canceling** [2] - 85:13, 85:17
**cancels** [1] - 71:13
**candid** [1] - 108:20
**candidly** [1] - 122:2
**cannot** [23] - 11:25, 23:7, 26:12, 27:6, 33:18, 33:22, 36:13, 39:6, 48:9, 58:15, 74:14, 96:24, 97:2, 97:5, 97:6, 114:2, 124:7, 171:19, 179:11, 181:8, 189:24, 192:13, 210:13
**cap** [1] - 37:4

**capable** [4] - 27:24, 28:15, 116:16, 120:14
**capacity** [2] - 167:18, 167:20
**Capital** [3] - 127:1, 192:9
**capital** [4] - 127:2, 135:17, 135:18
**caps** [1] - 109:20
**car** [3] - 148:19, 148:20, 148:22
**care** [3] - 68:10, 83:12, 83:25
**cared** [1] - 83:15
**career** [1] - 11:8
**carefully** [1] - 92:2
**cares** [1] - 84:3
**Carmicle** [1] - 193:7
**carried** [1] - 50:11
**cartel** [1] - 199:15
**cascade** [1] - 134:7
**case** [191] - 8:2, 8:21, 9:16, 11:15, 11:17, 12:18, 13:3, 19:1, 19:23, 20:3, 23:6, 23:12, 23:19, 24:4, 24:5, 24:6, 24:7, 25:5, 25:8, 26:8, 26:13, 26:22, 26:24, 27:11, 28:20, 29:12, 30:21, 31:25, 32:17, 33:11, 34:2, 35:7, 37:19, 37:20, 37:23, 37:25, 38:7, 38:16, 38:17, 38:24, 39:4, 39:10, 39:14, 39:15, 39:16, 43:2, 43:16, 49:23, 50:5, 50:9, 51:22, 52:1, 52:6, 52:8, 52:22, 53:4, 53:17, 53:18, 54:2, 55:4, 55:14, 55:19, 55:24, 56:3, 56:18, 57:2, 57:5, 57:18, 58:6, 58:8, 59:9, 60:3, 60:12, 64:5, 65:13, 65:15, 66:2, 66:13, 68:13, 71:2, 79:10, 93:19, 95:1, 97:1, 97:4, 97:8, 106:24, 109:3, 110:2, 110:8, 111:24, 116:17, 118:2, 120:8, 122:22, 123:20, 124:1, 124:8, 124:16, 127:1, 137:3, 138:19, 140:17, 141:6,

147:10, 148:9, 148:24, 149:17, 150:9, 150:10, 150:14, 151:22, 153:16, 153:20, 153:21, 162:3, 162:8, 162:13, 162:14, 163:4, 163:5, 163:6, 163:10, 164:3, 171:13, 175:16, 175:18, 175:19, 175:20, 176:7, 176:10, 176:13, 176:15, 177:1, 177:20, 178:1, 178:13, 178:17, 178:18, 179:25, 180:3, 180:10, 180:16, 180:18, 180:22, 181:1, 181:4, 182:14, 182:21, 182:24, 182:25, 184:3, 185:2, 185:4, 185:17, 186:1, 186:19, 186:24, 189:23, 191:11, 191:17, 193:7, 193:14, 193:15, 193:16, 193:23, 194:3, 194:18, 199:13, 199:14, 200:7, 201:7, 202:10, 202:18, 203:19, 203:20, 205:10, 205:16, 208:2, 210:9, 211:5
**cases** [39] - 12:21, 15:2, 19:20, 19:22, 19:24, 24:17, 29:14, 34:23, 38:21, 39:11, 56:20, 56:22, 71:3, 96:8, 108:14, 110:25, 111:23, 115:8, 117:18, 117:24, 120:2, 123:17, 135:24, 135:25, 163:10, 178:12, 179:11, 181:19, 189:15, 189:18, 198:4, 198:8, 198:19, 202:5, 202:7, 203:20, 204:8, 204:12
**cash** [3] - 63:22, 102:11, 158:15
**catatonic** [1] - 107:25
**categories** [6] - 80:18, 111:15, 111:22,

112:9, 136:22
**category** [8] - 35:18, 80:15, 80:17, 81:11, 82:10, 128:10, 128:12, 171:12
**causation** [37] - 8:4, 43:16, 44:16, 47:19, 47:23, 48:1, 48:9, 49:1, 50:15, 94:17, 139:2, 139:25, 141:2, 141:5, 145:12, 147:2, 148:2, 148:5, 149:2, 149:9, 149:13, 149:16, 150:6, 150:8, 150:12, 153:25, 158:4, 161:7, 177:21, 177:22, 188:19, 195:5, 195:6, 204:3, 204:22, 206:9
**CAUSATION** [1] - 4:3
**caused** [8] - 106:15, 139:23, 141:11, 150:13, 156:18, 187:15, 189:11, 195:10
**causes** [2] - 148:14, 187:24
**causing** [3] - 131:15, 153:14, 188:4
**CCR** [1] - 211:24
**cease** [1] - 132:18
**ceded** [1] - 32:9
**ceding** [2] - 32:14, 200:10
**center** [1] - 134:16
**centers** [1] - 35:11
**central** [2] - 13:12, 188:12
**CEO** [18] - 48:12, 66:23, 67:9, 70:22, 100:4, 101:25, 134:3, 152:13, 155:22, 173:3, 184:7, 184:8, 186:12, 187:17, 187:25, 196:14, 196:16
**CEO's** [2] - 109:4, 154:20
**certain** [12] - 12:9, 33:17, 38:5, 111:4, 120:11, 129:10, 146:5, 146:11, 153:7, 170:8, 192:14, 197:17
**certainly** [10] - 29:11, 32:16, 38:19, 44:13, 81:24, 144:3, 146:7,

147:5, 150:23, 210:23
**CERTIFICATE** [1] - 211:19
**certification** [1] - 157:8
**certify** [1] - 211:21
**cetera** [2] - 105:2, 117:8
**CFO** [7] - 54:20, 61:9, 61:10, 124:23, 134:2, 166:6, 173:3
**chain** [5] - 20:10, 22:14, 42:5, 42:8, 42:20
**chairman** [2] - 66:23, 67:9
**challenge** [15] - 29:1, 36:1, 43:13, 65:13, 70:21, 80:6, 88:2, 161:12, 170:7, 170:8, 200:19, 200:21, 204:10, 205:4, 207:8
**challenged** [9] - 33:25, 37:13, 39:21, 48:8, 49:6, 67:23, 70:20, 193:12, 200:20
**challenges** [3] - 90:22, 146:20, 201:2
**challenging** [1] - 84:14
**chance** [1] - 79:12
**chances** [1] - 195:12
**change** [11] - 25:10, 47:3, 63:5, 63:7, 70:5, 70:6, 123:6, 141:19, 162:13, 179:25, 195:20
**changed** [2] - 47:10, 206:24
**changes** [3] - 31:11, 209:16, 210:13
**changing** [4] - 47:6, 47:7, 61:23, 133:15
**channel** [1] - 106:10
**channel-stuffing** [1] - 106:10
**channelled** [1] - 40:7
**channels** [1] - 40:8
**chaos** [1] - 102:21
**character** [2] - 70:24, 74:22
**characteristics** [1] - 208:12
**characterization** [2] - 147:20, 175:17
**characterized** [2] - 207:21, 207:22

**charge** [2] - 62:16, 90:20
**charged** [2] - 95:20, 130:16, 137:18
**charges** [8] - 9:19, 9:23, 23:4, 59:3, 59:6, 59:12, 117:11, 152:4
**chart** [2] - 34:22, 159:10
**CHC** [7] - 157:18, 158:10, 196:21, 196:25, 197:5, 206:13
**cherry** [3] - 82:8, 82:17, 95:23
**cherry-picked** [2] - 82:8, 95:23
**chief** [4] - 86:10, 88:11, 100:13
**Chocolate** [10] - 12:16, 12:18, 16:2, 19:19, 31:25, 117:25, 122:22, 125:8, 182:6, 198:3
**choose** [1] - 128:23
**choosing** [1] - 144:19
**chose** [4] - 132:15, 138:16, 142:21, 144:20
**chosen** [1] - 146:15
**Chris** [1] - 178:17
**Chris-Craft** [1] - 178:17
**Christine** [5] - 40:11, 40:14, 40:19, 40:20, 180:13
**Chrysler** [1] - 147:9
**Circuit** [62] - 10:17, 10:23, 12:3, 12:12, 12:20, 13:17, 14:1, 14:9, 14:18, 16:2, 16:18, 16:20, 18:24, 19:4, 19:19, 20:3, 21:8, 21:12, 31:25, 32:19, 33:1, 37:18, 37:22, 38:9, 38:16, 42:22, 43:3, 43:7, 60:14, 68:9, 68:11, 96:23, 101:10, 108:14, 110:10, 116:18, 117:23, 121:1, 122:23, 122:25, 124:14, 125:8, 128:23, 148:9, 181:13, 181:18, 184:17, 184:18, 185:25, 186:3, 186:4, 188:15, 191:11,

191:18, 197:24, 198:4, 198:6, 198:19, 198:24, 199:2, 199:9
**circuit** [2] - 23:3, 109:23
**Circuit's** [2] - 124:9, 182:4
**circular** [5] - 145:11, 177:23, 177:24, 178:9, 189:14
**circumstance** [1] - 189:18
**circumstances** [6] - 38:11, 111:7, 123:15, 130:13, 189:4, 189:16
**circumstantial** [25] - 16:9, 19:8, 20:9, 22:13, 22:15, 26:25, 34:20, 52:5, 53:4, 72:12, 110:24, 111:1, 111:12, 114:24, 120:24, 121:2, 121:3, 122:17, 124:7, 126:4, 126:6, 133:19, 180:20, 186:6, 186:9
**cite** [29] - 23:19, 25:16, 45:19, 55:14, 56:19, 58:17, 58:23, 59:1, 59:14, 71:3, 73:1, 85:20, 111:14, 111:23, 115:8, 120:2, 120:8, 135:24, 141:6, 146:17, 147:9, 150:9, 150:11, 175:18, 176:25, 179:11, 186:20, 203:19, 204:12
**cited** [18] - 19:25, 58:6, 96:9, 110:8, 110:25, 117:17, 117:25, 124:1, 128:7, 140:17, 146:19, 158:10, 192:9, 192:18, 193:7, 193:16, 201:10, 203:14
**cites** [1] - 123:17
**citing** [1] - 158:2
**City** [1] - 37:21
**CIVIL** [1] - 1:3
**civil** [4] - 10:3, 22:18, 23:12, 179:22
**claim** [55] - 9:5, 18:1, 20:2, 29:25, 33:14, 39:1, 39:7, 39:8,

43:19, 43:20, 43:21, 44:21, 47:16, 47:22, 48:2, 48:6, 52:11, 52:25, 54:4, 55:20, 57:14, 57:19, 58:5, 67:20, 71:22, 78:8, 79:14, 79:17, 91:1, 92:5, 100:21, 103:21, 137:22, 139:11, 139:16, 140:5, 143:11, 145:14, 147:4, 172:21, 177:10, 178:1, 178:4, 178:19, 179:13, 180:5, 184:1, 189:14, 189:16, 189:25, 190:7, 205:12
**claimed** [4] - 58:8, 72:7, 130:20, 131:9
**claiming** [3] - 10:12, 131:6, 133:9
**claims** [62] - 8:14, 8:16, 8:17, 8:18, 9:1, 9:13, 11:2, 11:24, 12:13, 12:19, 18:2, 18:4, 22:17, 30:8, 30:11, 34:13, 35:22, 35:25, 43:23, 44:17, 44:22, 47:4, 48:2, 48:10, 48:12, 50:6, 50:11, 52:20, 65:9, 65:22, 72:8, 82:22, 82:24, 93:17, 93:18, 97:1, 114:21, 117:1, 131:1, 134:8, 136:20, 137:7, 137:8, 138:19, 139:19, 148:1, 148:3, 175:25, 176:4, 176:15, 177:12, 178:4, 178:11, 182:12, 183:16, 185:4, 188:7, 188:8, 190:4, 191:23, 196:5, 198:5
**clarification** [2] - 163:2, 208:18
**Clarification** [1] - 21:20
**Clark** [24] - 6:24, 12:24, 53:6, 53:10, 117:16, 121:6, 125:13, 126:15, 195:1, 197:9, 197:10, 197:14, 197:15, 198:11, 198:21, 199:10, 199:20, 207:6,

207:15, 207:20, 207:25, 208:14, 210:7, 210:10
**Clark's** [4] - 197:11, 198:9, 210:1, 210:4
**class** [43] - 25:4, 25:11, 26:19, 69:13, 69:20, 69:22, 71:8, 71:11, 71:20, 76:8, 76:13, 80:14, 80:22, 83:13, 92:7, 96:12, 97:17, 98:5, 108:4, 113:1, 113:4, 113:14, 132:7, 132:11, 133:13, 137:3, 137:4, 143:12, 157:8, 173:19, 175:15, 175:16, 175:17, 175:22, 175:24, 176:8, 176:19, 184:1, 185:1, 188:9
**classes** [1] - 175:25
**classic** [3] - 13:4, 15:9, 108:18
**clean** [1] - 7:13
**cleansed** [1] - 117:4
**cleansing** [1] - 44:19
**clear** [37] - 16:19, 19:1, 23:19, 25:15, 26:1, 27:8, 31:5, 34:15, 37:7, 42:15, 46:1, 80:12, 90:23, 91:10, 96:23, 100:12, 108:14, 110:5, 111:3, 112:20, 121:1, 128:24, 175:21, 176:11, 177:10, 177:14, 179:20, 180:5, 182:5, 188:15, 189:3, 189:19, 194:3, 194:12, 197:25, 207:18
**Clear** [1] - 103:1
**clearing** [1] - 51:15
**clearly** [9] - 36:11, 42:2, 82:6, 137:7, 165:18, 176:2, 181:11, 181:21, 181:22
**clerked** [1] - 211:6
**client** [3] - 59:2, 164:3, 164:8
**client's** [1] - 186:14
**clients** [2] - 8:8, 31:13
**Clindamycin** [1] - 127:6
**clinical** [1] - 78:1

**close** [15] - 17:24, 20:21, 21:13, 34:17, 45:23, 57:20, 63:2, 68:4, 72:13, 99:20, 136:4, 154:4, 159:14, 194:9, 199:7
**closed** [4] - 35:14, 37:15, 60:16, 170:24
**closely** [2] - 154:24, 155:1
**closer** [1] - 6:19
**closes** [1] - 59:15
**closing** [7] - 11:1, 36:22, 38:17, 85:3, 85:21, 89:3, 165:9
**coincide** [1] - 107:22
**coincidence** [1] - 127:9
**collaborating** [1] - 40:5
**collapsed** [1] - 107:15
**collate** [1] - 50:10
**colleague** [4] - 6:1, 34:25, 35:1, 94:17
**colleagues** [5] - 8:6, 18:15, 36:6, 84:19
**collect** [1] - 93:12
**collective** [3] - 46:25, 47:1, 151:22
**colloquial** [1] - 202:24
**collude** [4] - 18:7, 31:24, 75:23, 75:25
**colluded** [1] - 121:4
**collusion** [44] - 11:10, 11:16, 11:22, 12:7, 14:20, 15:16, 16:24, 17:16, 18:8, 18:10, 19:2, 19:3, 19:16, 20:13, 20:20, 21:2, 25:13, 30:11, 32:5, 32:16, 33:2, 34:12, 34:19, 34:21, 96:10, 115:8, 120:25, 121:9, 122:18, 123:19, 124:7, 125:23, 126:5, 159:7, 159:24, 177:13, 198:2, 198:15, 198:20, 198:22, 199:17, 199:21, 208:17
**collusive** [8] - 8:24, 10:5, 11:7, 29:25, 160:5, 177:4, 177:16, 177:18
**colorable** [2] - 68:3, 171:1
**Columbia** [1] - 117:8
**combed** [1] - 74:1
**combining** [1] - 84:12

**comfortable** [2] - 6:17, 6:21
**coming** [4] - 29:22, 99:7, 152:22, 168:22
**command** [1] - 62:3
**Commencing** [1] - 1:12
**commend** [1] - 211:9
**comment** [9] - 58:13, 80:1, 82:11, 128:13, 129:16, 171:11, 184:4
**commentary** [4] - 153:1, 157:24, 184:9, 205:25
**comments** [7] - 62:21, 77:17, 133:1, 152:12, 179:17, 183:9, 186:14
**commercial** [9] - 53:25, 83:24, 84:2, 84:3, 87:5, 88:15, 88:23, 90:23, 100:7
**Commission** [1] - 202:8
**committee** [19] - 30:23, 31:1, 31:6, 31:9, 32:6, 53:23, 75:5, 75:7, 75:8, 100:4, 100:5, 102:3, 106:18, 107:2, 108:25, 109:16, 134:12, 138:9
**common** [8] - 21:8, 21:11, 35:6, 36:25, 135:13, 144:15, 174:16
**communicated** [1] - 26:3
**communication** [4] - 7:2, 25:2, 25:12, 105:3
**communications** [12] - 18:14, 18:18, 23:1, 24:20, 25:6, 26:7, 28:2, 33:9, 41:9, 116:1, 119:18, 119:23
**companies** [17] - 13:8, 13:21, 29:15, 32:23, 37:2, 37:3, 58:16, 59:18, 60:9, 60:16, 77:14, 151:3, 154:19, 159:5, 166:3, 166:9, 194:15
**company** [67] - 7:11, 13:10, 27:4, 27:5, 27:18, 28:4, 28:10, 28:23, 35:13, 36:17, 41:7, 44:24, 45:1,

45:17, 48:19, 51:10, 59:9, 61:19, 62:14, 62:15, 70:1, 89:12, 91:18, 95:24, 97:19, 97:25, 104:17, 114:25, 115:1, 115:17, 115:24, 120:10, 122:14, 142:16, 143:22, 146:22, 154:5, 154:13, 155:11, 156:15, 156:25, 160:7, 163:20, 163:22, 164:15, 164:16, 164:17, 164:23, 167:19, 167:23, 168:6, 168:15, 168:17, 168:23, 169:1, 174:25, 175:3, 188:6, 194:16, 196:24, 206:19, 206:20
**Company** [2] - 2:13, 2:18
**company's** [5] - 14:3, 32:15, 39:6, 160:4, 193:23
**company-specific** [1] - 156:25
**compare** [1] - 69:20
**compares** [1] - 152:21
**comparison** [2] - 19:22, 164:22
**compelling** [1] - 69:23
**compensate** [1] - 139:19
**compensation** [4] - 140:10, 141:18, 141:21, 142:11
**compete** [1] - 15:12
**competed** [2] - 34:5, 126:19
**competing** [3] - 77:14, 111:21, 136:7
**competition** [15] - 55:1, 56:25, 57:1, 71:23, 77:24, 121:10, 129:6, 129:9, 133:16, 134:14, 162:25, 163:7, 163:11, 183:22, 198:16
**competitive** [30] - 13:14, 32:4, 33:14, 34:8, 77:12, 77:15, 77:16, 78:3, 111:17, 111:20, 112:2, 112:16, 114:20, 114:23, 128:24,

129:3, 129:10, 129:15, 130:6, 132:3, 133:11, 133:15, 137:14, 157:25, 162:23, 177:19, 183:15, 183:20, 183:21, 207:22
**competitiveness** [3] - 33:19, 67:13, 77:10
**competitor** [12] - 18:5, 25:13, 31:7, 96:6, 121:21, 122:3, 125:9, 125:23, 129:2, 129:8, 136:1, 209:9
**competitor's** [3] - 20:19, 21:2, 32:22
**competitors** [35] - 8:24, 11:21, 13:2, 13:18, 13:23, 13:25, 15:12, 15:20, 15:24, 16:13, 16:21, 17:7, 17:10, 17:12, 18:11, 18:17, 20:12, 21:9, 21:14, 23:2, 32:10, 32:11, 33:3, 34:5, 78:16, 115:1, 122:21, 125:2, 126:13, 127:18, 129:5, 136:7, 208:10, 208:11, 209:17
**Competitors** [1] - 198:13
**competitors's** [1] - 21:16
**complain** [7] - 16:11, 19:12, 21:11, 33:12, 35:5, 38:8, 46:12
**complained** [2] - 48:7, 86:24
**complaining** [5] - 63:11, 63:12, 63:13, 87:1, 181:22
**complaint** [77] - 8:25, 9:15, 10:13, 10:15, 19:14, 21:19, 22:18, 22:22, 22:23, 22:25, 23:1, 23:8, 23:10, 23:15, 23:17, 23:25, 24:15, 24:19, 25:7, 25:9, 25:10, 26:6, 26:18, 28:21, 28:24, 29:14, 33:12, 35:24, 40:9, 40:23, 41:18, 41:25, 42:3, 42:14, 43:14, 47:25, 48:22, 52:14, 56:5, 56:6, 56:21, 116:4, 116:5,

116:7, 116:8, 116:10, 118:16, 118:24, 119:14, 119:19, 119:21, 119:24, 120:3, 120:9, 120:20, 136:23, 150:21, 175:23, 176:1, 176:2, 176:7, 176:8, 176:10, 176:12, 176:16, 176:25, 177:5, 177:16, 180:9, 182:15, 184:1, 185:9, 185:19, 196:20, 197:4
**complaints** [7] - 23:4, 28:25, 49:19, 117:18, 117:19, 120:6, 179:23
**completed** [11] - 37:19, 38:22, 39:12, 43:2, 46:22, 47:12, 47:14, 47:17, 147:7, 195:15
**Completely** [1] - 163:3
**completely** [16] - 20:5, 46:9, 46:10, 56:24, 66:4, 82:19, 90:8, 100:20, 117:11, 140:5, 146:22, 162:24, 163:8, 170:24, 196:22, 209:23
**completion** [1] - 141:20
**complex** [2] - 84:12, 154:19
**complexities** [1] - 38:5
**compliance** [1] - 101:22
**complicated** [2] - 13:7, 201:23
**complied** [2] - 194:4, 194:25
**compliment** [1] - 78:12
**components** [1] - 118:15
**compressed** [2] - 125:9, 125:18
**conceal** [1] - 102:12
**concealed** [6] - 44:4, 44:9, 111:17, 179:14, 195:13, 196:9
**concealment** [2] - 112:1, 112:11
**concede** [6] - 72:21,

98:14, 98:15,
138:12, 150:4,
189:17
**conceded** [1] - 12:24
**conceived** [1] - 27:12
**concentrated** [1] -
208:8
**concept** [6] - 15:15,
19:22, 38:22, 39:13,
39:14, 175:15
**concern** [4] - 98:17,
98:18, 98:25, 204:11
**concerned** [1] - 94:7
**concerning** [5] -
16:23, 36:9, 46:4,
67:13, 177:16
**concerns** [12] - 85:22,
86:12, 86:15, 87:4,
100:22, 102:2,
102:6, 102:7, 104:6,
105:4, 155:21,
202:11
**concession** [1] - 47:8
**concisely** [3] - 137:7,
137:8, 185:4
**conclude** [7] - 125:1,
127:23, 134:25,
142:24, 144:22,
155:13, 176:14
**concluded** [3] - 143:9,
199:17, 208:16
**concludes** [8] -
143:23, 153:8,
156:21, 159:25,
205:23, 206:1,
208:1, 210:12
**conclusion** [12] -
140:18, 145:25,
179:24, 201:10,
203:2, 203:5, 203:9,
203:12, 205:18,
206:4, 207:3, 209:5
**conclusions** [8] -
193:9, 199:7,
200:25, 202:16,
207:12, 207:13,
210:5, 210:7
**conclusive** [1] -
199:13
**conclusively** [1] - 40:4
**conclusory** [2] -
175:6, 179:17
**Concord** [1] - 199:1
**concrete** [3] - 68:22,
141:5, 142:23
**condition** [1] - 141:20
**conditions** [3] - 45:25,
142:16, 154:9
**conducive** [1] - 208:7
**conduct** [10] - 26:18,

112:12, 114:20,
150:2, 160:2, 177:6,
177:9, 195:17,
199:5, 209:3
**conducted** [6] - 113:2,
115:6, 119:4,
132:17, 145:25,
149:21
**conducting** [1] -
144:13
**conference** [10] -
53:9, 53:13, 75:24,
76:6, 80:6, 80:21,
91:8, 101:18,
103:25, 172:10
**conferences** [15] -
17:12, 53:8, 53:11,
53:14, 53:16, 75:21,
75:22, 75:24, 76:2,
76:3, 76:4, 76:7,
76:11, 173:19
**confession** [1] -
129:23
**confidence** [1] -
183:17
**confidential** [2] -
24:18, 179:23
**confirmed** [3] -
100:11, 100:18,
157:15
**confirming** [2] -
106:3, 116:3
**confirms** [3] - 30:7,
75:6, 89:4
**conflates** [1] - 145:12
**conflict** [2] - 176:11,
176:24
**confounding** [9] -
153:4, 155:20,
156:5, 156:9,
157:13, 158:3,
196:12, 196:16,
206:12
**confront** [1] - 79:23
**confused** [1] - 173:25
**confuses** [1] - 51:13
**confusion** [1] - 176:9
**conjecture** [1] - 11:25
**connect** [3] - 48:24,
64:12, 189:6
**connected** [1] - 65:6
**connection** [17] -
25:1, 43:10, 43:12,
86:3, 86:21, 139:18,
140:8, 144:5, 157:7,
159:18, 179:17,
179:23, 189:20,
195:9, 205:22
**conscious** [3] - 14:15,
14:17, 199:15

**consent** [2] - 123:20,
123:24
**consequence** [2] -
24:16, 160:4
**conservative** [3] -
140:2, 140:3, 142:19
**consider** [21] - 99:23,
102:5, 102:17,
109:13, 111:7,
111:12, 116:10,
117:22, 122:17,
124:11, 125:5,
125:7, 126:5,
126:19, 133:18,
134:18, 148:5,
155:13, 207:15,
208:14
**consideration** [6] -
29:17, 32:6, 116:8,
116:21, 157:13,
206:2
**considerations** [1] -
203:22
**considered** [16] -
28:14, 31:6, 31:9,
31:12, 31:14, 31:15,
31:18, 32:2, 98:2,
98:9, 117:15,
124:14, 127:4,
168:15, 168:18,
187:2
**considering** [5] -
58:13, 117:24,
186:22, 191:2,
208:15
**considers** [3] - 14:18,
117:23, 186:25
**consist** [1] - 191:25
**consistent** [12] -
48:24, 55:3, 55:5,
79:4, 79:9, 79:10,
122:4, 176:1, 176:6,
176:12, 184:22,
188:7
**consistently** [1] -
119:16
**consists** [1] - 185:3
**conspiracy** [18] -
14:23, 14:25, 15:9,
16:20, 19:6, 22:2,
22:3, 22:4, 22:10,
22:11, 55:7, 55:9,
55:12, 57:2, 57:8,
74:24, 163:15,
182:19
**conspire** [4] - 11:14,
16:14, 16:19, 19:7
**conspired** [1] - 96:7
**constitutes** [1] - 119:3
**construction** [1] -

23:6
**construe** [2] - 128:1,
128:4
**consulted** [1] - 173:13
**Consumer** [1] -
156:19
**consuming** [1] - 84:13
**consummated** [1] -
142:7
**contain** [1] - 23:5
**contained** [1] - 46:6
**contains** [5] - 27:16,
46:5, 78:24, 115:22,
208:7
**contemplating** [1] -
133:18
**contemplation** [1] -
23:23
**contemporaneous** [1]
- 92:18
**contend** [2] - 23:9,
56:23
**content** [1] - 25:24
**contention** [2] -
147:13, 147:17
**contentions** [1] -
149:15
**contest** [3] - 150:1,
154:11, 189:9
**contests** [1] - 178:14
**context** [13] - 47:24,
62:24, 82:25, 83:11,
108:10, 116:22,
120:9, 130:12,
141:10, 148:1,
160:20, 185:25,
189:25
**contingency** [1] -
46:11
**contingent** [1] - 46:2
**continue** [4] - 26:25,
60:25, 77:8, 172:17
**continued** [2] - 31:15,
99:18
**CONTINUED** [2] - 2:1,
3:1
**continues** [1] - 19:11
**contort** [2] - 19:10,
47:21
**contorted** [1] - 25:17
**contortion** [1] -
182:22
**contortionist** [1] -
16:8
**contortions** [1] -
37:12
**contract** [1] - 121:13
**contracts** [1] - 124:15
**contractual** [1] - 27:9
**contradictory** [1] -

146:12
**contrary** [13] - 14:24,
33:8, 40:3, 45:9,
67:21, 69:11, 69:13,
95:11, 101:8,
111:10, 130:14,
134:9, 138:23
**contrast** [1] - 134:22
**contribute** [1] - 49:8
**control** [9] - 8:17,
61:16, 61:19, 63:15,
70:3, 164:16,
164:17, 178:14,
178:15
**controlled** [2] - 62:12,
62:14
**controlling** [5] -
110:10, 149:22,
151:6, 157:1, 175:22
**controls** [5] - 103:2,
103:10, 108:24,
149:25, 176:7
**controversial** [1] -
18:22
**convenient** [1] -
109:11
**conversations** [4] -
16:22, 18:14, 28:7,
28:8
**conversion** [1] - 60:24
**conveyed** [2] - 160:17,
161:4
**convictions** [1] -
103:3
**convinced** [1] - 39:9
**convincing** [5] -
135:25, 184:23,
185:23, 187:4,
200:18
**convolute** [1] - 50:9
**convoluted** [1] - 55:13
**cooperation** [1] -
211:4
**copied** [1] - 78:23
**copies** [3] - 35:2,
84:18, 84:20
**copy** [3] - 50:22,
85:22, 101:1
**corner** [1] - 87:16
**Corp** [1] - 199:1
**corporate** [19] - 10:18,
15:22, 17:10, 42:21,
43:3, 43:8, 63:4,
75:11, 110:19,
110:21, 122:13,
144:16, 159:18,
172:24, 173:5,
178:14, 181:13,
181:16, 201:24
**Corporation** [2] -

37:22, 199:1
**corporation** [1] - 37:23
**correct** [5] - 43:7, 150:4, 151:20, 201:13, 211:21
**corrected** [4] - 148:17, 150:12, 189:5, 189:10
**correction** [1] - 160:8
**Corrections** [1] - 186:2
**corrective** [13] - 48:3, 48:6, 48:25, 50:2, 148:21, 149:17, 150:15, 154:2, 154:15, 160:12, 160:16, 179:5, 190:6
**correctly** [2] - 35:20, 155:17
**correlated** [2] - 198:14, 198:17
**cortisone** [1] - 74:11
**cost** [2] - 31:18, 74:12
**costly** [1] - 84:12
**Coucke** [26] - 62:11, 62:25, 86:16, 86:24, 87:1, 92:7, 92:9, 92:25, 93:1, 95:7, 100:4, 100:18, 100:24, 101:3, 101:7, 101:11, 102:1, 104:19, 105:5, 105:7, 105:17, 165:23, 165:25, 184:5, 187:17, 187:25
**Coucke's** [1] - 90:17
**counsel** [19] - 5:10, 5:21, 6:17, 7:2, 35:2, 50:17, 93:24, 96:18, 110:2, 112:14, 115:5, 115:19, 117:1, 122:7, 122:11, 131:10, 131:12, 210:14, 211:3
**Counsel** [12] - 2:22, 3:5, 35:4, 64:20, 93:22, 139:3, 166:15, 175:12, 183:1, 190:17, 200:1, 210:18
**counseling** [2] - 100:25, 166:1
**counselled** [1] - 109:13
**count** [1] - 40:18
**counter** [5] - 49:13, 196:19, 196:20,

196:25, 206:13
**counterbalance** [1] - 160:18
**counterfactual** [1] - 143:2
**counterpart** [1] - 98:21
**counterparts** [2] - 97:16, 112:22
**countries** [4] - 35:13, 67:3, 89:7, 89:9
**country** [2] - 72:17, 89:14
**country's** [1] - 179:10
**County** [3] - 20:3, 32:17, 124:1
**couple** [9] - 51:7, 58:12, 102:10, 117:8, 128:2, 129:11, 151:13, 154:1, 187:4
**course** [35] - 10:3, 10:16, 13:1, 13:24, 16:1, 26:1, 29:5, 30:15, 31:18, 33:18, 33:22, 35:2, 41:1, 45:8, 46:14, 51:16, 52:19, 53:8, 54:9, 55:8, 55:10, 56:4, 64:16, 77:6, 95:14, 98:9, 101:21, 102:17, 109:18, 109:22, 110:24, 135:6, 135:12, 135:19, 175:21
**courses** [1] - 196:4
**Court** [65] - 1:24, 8:20, 10:17, 10:22, 12:2, 12:5, 12:22, 22:1, 22:9, 26:9, 26:23, 34:24, 35:1, 35:19, 35:24, 39:5, 42:6, 43:1, 43:17, 45:23, 48:5, 50:12, 65:3, 68:18, 68:19, 74:17, 74:21, 74:22, 74:23, 74:24, 93:18, 99:25, 100:21, 111:2, 116:9, 116:20, 140:21, 171:16, 175:21, 175:23, 176:10, 178:13, 179:11, 180:15, 192:8, 192:10, 192:12, 192:18, 193:8, 193:16, 193:23, 194:3, 194:13, 194:14, 194:16, 194:18, 194:21, 199:13,

199:17, 199:23, 200:17, 201:3, 203:24, 210:21, 211:25
**court** [15] - 6:15, 6:19, 7:21, 26:13, 26:16, 26:23, 32:20, 55:15, 65:20, 159:8, 171:20, 175:7, 196:4, 210:24, 210:25
**COURT** [35] - 1:1, 5:7, 5:23, 6:3, 6:6, 6:12, 7:15, 7:17, 35:4, 50:20, 50:23, 64:20, 64:22, 93:22, 94:6, 94:12, 139:3, 151:20, 161:14, 161:20, 166:15, 175:12, 183:1, 188:21, 190:17, 190:20, 190:22, 191:1, 191:4, 191:6, 200:1, 210:18, 210:20, 211:3, 211:19
**court's** [1] - 16:3
**Court's** [9] - 8:3, 35:16, 37:20, 116:8, 176:1, 176:3, 194:1, 200:3, 201:12
**courtesy** [1] - 210:22
**Courthouse** [1] - 1:10
**COURTROOM** [6] - 5:5, 94:9, 94:11, 161:17, 161:19, 211:16
**courtroom** [2] - 171:19, 210:16
**courts** [6] - 21:15, 23:3, 32:14, 39:17, 110:22, 120:6
**Courts** [1] - 193:11
**covenant** [1] - 11:14
**cover** [3] - 50:25, 65:11, 147:11
**covered** [3] - 51:25, 65:10, 111:14
**covering** [1] - 155:11
**Craft** [1] - 178:17
**crazy** [1] - 112:5
**CRCR** [1] - 211:24
**cream** [3] - 74:11, 74:12, 115:5
**create** [2] - 19:2, 54:12
**created** [2] - 118:23, 160:19
**creates** [1] - 27:23, 209:23
**creative** [2] - 183:10,

183:11
**credentials** [1] - 204:6
**credibility** [7] - 95:22, 97:5, 97:9, 160:18, 161:6, 184:18, 188:17
**credible** [2] - 184:14, 185:16
**credited** [1] - 134:8
**cries** [1] - 182:19
**Criminal** [1] - 9:18
**criminal** [10] - 9:23, 25:1, 27:9, 29:10, 55:17, 74:24, 159:6, 162:19, 163:24, 177:17
**critical** [6] - 26:4, 51:17, 140:16, 156:10, 182:14, 198:1
**criticism** [3] - 204:15, 206:8, 210:12
**criticisms** [2] - 88:16, 200:25
**criticize** [3] - 146:2, 202:23, 205:9
**criticizing** [1] - 88:20
**CROMWELL** [1] - 3:2
**Cromwell** [5] - 6:10, 8:7, 20:23, 20:24, 1:30
**cross** [1] - 118:24
**crowd** [1] - 180:8
**CROWLEY** [1] - 2:21
**CROWLEY-BUCK** [1] - 2:21
**crucial** [1] - 108:23
**CRUTCHER** [1] - 2:20
**crystal** [3] - 16:19, 176:11, 182:5
**culpable** [1] - 113:22
**culture** [1] - 63:4
**cure** [1] - 95:18
**current** [4] - 15:19, 17:13, 35:12, 56:1
**custodian** [1] - 101:15
**customer** [11] - 31:12, 54:13, 54:15, 74:5, 77:18, 121:16, 121:18, 121:19, 122:3, 132:12, 209:7
**customer's** [1] - 121:20
**customers** [6] - 22:8, 32:15, 34:5, 74:5, 120:24, 124:17
**cut** [2] - 31:13, 95:15
**CV** [1] - 202:6
**CW6** [6] - 24:17, 24:20, 25:12, 25:23,

26:2, 119:21
**czar** [1] - 100:17

## D

**Daimler** [1] - 147:9
**damage** [5] - 31:14, 44:21, 49:18, 139:25, 140:21
**damaged** [1] - 140:9
**damages** [21] - 43:22, 44:2, 44:15, 117:17, 140:2, 140:3, 140:4, 140:5, 140:19, 141:1, 141:6, 142:6, 142:19, 145:10, 147:4, 149:16, 150:7, 178:6, 189:21, 204:3, 206:7
**damaging** [2] - 47:6, 96:17
**damning** [1] - 108:9
**data** [3] - 21:23, 144:18, 201:9
**database** [1] - 118:23
**Date** [1] - 211:25
**date** [14] - 62:4, 71:8, 71:10, 112:14, 141:24, 151:23, 154:12, 155:19, 156:10, 158:5, 158:9, 166:11, 170:13, 173:4
**dated** [2] - 104:8, 170:1
**dates** [14] - 49:5, 149:17, 149:18, 149:20, 149:22, 151:19, 153:15, 154:1, 159:25, 160:12, 160:16, 161:4, 189:10, 196:24
**Daubert** [11] - 7:14, 94:18, 190:19, 190:23, 191:9, 191:13, 199:23, 200:9, 204:1, 207:4, 210:8
**DAUBERT** [1] - 4:10
**DAVID** [1] - 2:21
**Davis** [1] - 6:5
**DAVIS** [1] - 2:11
**days** [33] - 37:14, 53:12, 76:12, 76:14, 76:15, 76:16, 85:3, 89:3, 89:21, 90:10, 98:23, 100:3, 101:17, 101:25, 102:13, 103:5,

103:13, 106:1, 106:16, 106:18, 107:23, 113:1, 127:3, 135:18, 138:1, 138:2, 156:8, 160:9, 207:1, 211:13
**DC** [1] - 2:17
**de** [1] - 15:4
**de-emphasize** [1] - 15:4
**dead** [7] - 12:19, 30:2, 30:10, 43:20, 47:5, 181:4
**deal** [20] - 35:14, 45:12, 46:10, 46:22, 47:12, 47:14, 48:18, 54:13, 59:23, 97:24, 98:4, 98:6, 98:13, 99:16, 103:15, 129:12, 164:15, 174:18
**dealing** [1] - 123:4
**deals** [1] - 37:3
**dealt** [1] - 123:5
**dearth** [1] - 179:19
**death** [1] - 47:15
**debated** [1] - 99:8
**debunks** [1] - 40:24
**decades** [1] - 93:10
**deceased** [2] - 17:4, 24:21
**deceiving** [1] - 85:2
**December** [4] - 71:7, 107:17, 174:2
**deceptive** [1] - 195:8
**decide** [15] - 43:3, 54:14, 74:16, 74:17, 82:18, 138:20, 171:10, 171:18, 171:22, 184:18, 186:16, 188:13, 188:16, 188:17, 211:12
**decided** [7] - 37:25, 108:23, 109:2, 109:10, 123:25, 135:1, 174:8
**decides** [2] - 116:21, 184:24
**deciding** [1] - 98:10
**decision** [16] - 17:23, 37:17, 38:9, 38:25, 44:9, 44:12, 54:1, 88:21, 112:17, 134:2, 140:14, 140:15, 178:25, 192:9, 192:12, 211:7
**decision-making** [2] - 54:1, 88:21
**decisions** [18] - 13:22,

14:3, 30:25, 32:7, 41:11, 53:22, 54:4, 72:8, 75:3, 75:4, 75:8, 75:12, 75:15, 130:22, 130:24, 130:25, 133:23, 172:25
**deck** [2] - 78:24, 92:23
**decline** [14] - 49:8, 49:15, 49:18, 49:23, 148:15, 149:19, 149:22, 150:14, 151:1, 152:17, 153:15, 189:11
**declined** [8] - 32:9, 43:4, 121:13, 148:12, 159:11, 160:9, 209:7, 209:8
**declines** [1] - 187:16
**declining** [2] - 129:7, 187:23
**decrease** [1] - 17:23
**decreased** [1] - 69:12
**decreases** [2] - 31:2, 33:6
**decree** [2] - 123:21, 123:25
**dedicated** [1] - 66:19
**deemed** [3] - 20:1, 120:11, 123:22
**deep** [1] - 108:25
**deeply** [1] - 97:9
**defeat** [3] - 68:1, 71:5, 174:8
**defeated** [1] - 107:6
**defend** [1] - 182:12
**Defendant** [4] - 2:13, 2:18, 2:22, 3:5
**defendant** [9] - 64:17, 93:19, 100:16, 103:25, 133:4, 140:18, 140:22, 145:13, 202:22
**Defendants** [1] - 1:9
**defendants** [108] - 7:11, 7:23, 7:24, 8:19, 9:1, 14:22, 14:24, 15:17, 16:3, 19:4, 19:5, 24:4, 26:15, 30:16, 32:1, 35:3, 36:2, 37:8, 38:2, 48:14, 50:16, 50:18, 81:10, 81:14, 95:3, 95:7, 95:23, 97:17, 98:14, 104:13, 108:8, 109:5, 110:16, 110:19, 111:14, 112:10, 112:24, 115:8, 117:19,

119:6, 119:12, 120:2, 120:16, 120:17, 121:24, 123:7, 124:16, 125:3, 126:21, 127:20, 128:1, 128:21, 129:3, 129:18, 131:22, 132:14, 132:15, 133:6, 133:17, 133:19, 135:24, 136:3, 137:21, 139:12, 139:15, 139:20, 140:4, 142:15, 143:1, 145:1, 145:5, 146:5, 146:7, 146:12, 147:11, 149:3, 150:1, 150:18, 151:10, 153:17, 154:11, 155:19, 157:3, 157:12, 158:19, 158:22, 160:15, 161:11, 167:2, 177:6, 185:22, 190:11, 194:7, 194:8, 194:21, 194:23, 194:25, 196:9, 202:11, 202:16, 203:8, 204:10, 207:10, 207:18, 208:15, 208:16, 208:23, 209:15
**defendants'** [28] - 26:17, 38:4, 95:9, 117:17, 124:21, 130:13, 133:19, 138:21, 140:11, 141:11, 147:17, 148:16, 156:9, 156:22, 160:11, 181:8, 186:5, 186:6, 192:5, 192:7, 192:23, 194:4, 200:6, 200:14, 201:2, 204:24, 209:18, 210:6
**defending** [1] - 146:13
**defense** [5] - 96:18, 139:13, 142:1, 160:14, 171:22
**defenses** [1] - 146:14
**deferred** [6] - 27:8, 27:19, 52:18, 115:14, 115:15, 135:20
**deficiencies** [1] - 199:6
**defies** [1] - 36:25

**define** [1] - 168:16
**defined** [1] - 193:25
**definition** [4] - 118:17, 195:19, 195:22, 203:12
**defraud** [3] - 9:2, 36:5, 38:20
**defrauded** [1] - 37:24
**degree** [2] - 160:17, 161:5
**Delaware** [1] - 147:10
**delay** [1] - 158:10
**delayed** [3] - 157:19, 158:16, 211:5
**deliberations** [1] - 31:23
**deliberative** [1] - 95:20
**deliver** [2] - 180:23, 181:1
**Delivered** [1] - 104:1
**delivered** [2] - 170:14, 170:19
**demand** [2] - 31:9, 124:4
**demands** [1] - 101:12
**demonstrably** [1] - 26:7
**demonstrate** [5] - 14:10, 40:3, 68:6, 177:3, 198:7
**demonstrated** [3] - 30:16, 43:11, 126:17
**demonstrates** [4] - 19:15, 31:24, 118:7, 208:17
**demonstrating** [1] - 68:20
**demonstrative** [2] - 34:22, 34:24
**demonstratively** [2] - 33:21, 41:22
**deniability** [2] - 135:3, 135:12
**denials** [2] - 95:10, 185:22
**denied** [3] - 15:20, 179:8, 211:5
**denigrating** [1] - 184:5
**deny** [1] - 28:9
**denying** [1] - 140:20
**depart** [1] - 107:10
**department** [4] - 24:21, 28:5, 54:17, 86:10
**Department** [8] - 9:17, 52:13, 52:19, 117:2, 159:17, 160:24, 186:2, 202:8

**departments** [2] - 74:9, 84:1
**departure** [4] - 68:9, 158:5, 168:6, 196:14
**deponent** [1] - 15:24
**deponents** [1] - 76:18
**depose** [1] - 93:12
**deposed** [5] - 15:18, 17:14, 52:6, 53:12, 76:18
**deposition** [22] - 11:4, 12:25, 15:22, 20:4, 42:7, 46:18, 52:23, 95:13, 95:15, 106:24, 107:4, 107:12, 122:11, 124:24, 134:13, 167:14, 184:15, 185:14, 195:18, 197:14, 197:21, 210:2
**depositions** [5] - 20:15, 52:21, 73:25, 74:1
**deprived** [3] - 139:21, 143:13, 143:18
**depth** [1] - 31:23
**deputy** [1] - 210:24
**DEPUTY** [6] - 5:5, 94:9, 94:11, 161:17, 161:19, 211:16
**describe** [4] - 65:17, 89:6, 116:15, 188:8
**described** [20] - 21:8, 95:23, 96:2, 102:21, 102:23, 105:16, 108:7, 124:20, 129:3, 132:8, 135:16, 135:18, 137:7, 138:4, 172:6, 185:4, 186:23, 187:22, 188:9, 207:19
**describing** [4] - 105:3, 138:1, 202:2, 203:16
**description** [1] - 175:17
**descriptions** [1] - 110:23
**deserve** [1] - 93:10
**designed** [3] - 140:6, 140:7, 140:9
**designee** [2] - 15:22, 15:23
**desire** [1] - 68:15
**desonide** [16] - 28:20, 28:22, 29:3, 29:4, 74:11, 74:12, 115:4, 115:7, 121:17, 127:5, 132:13,

135:19, 135:21, 135:23
**despite** [4] - 127:14, 144:11, 183:20, 209:11
**Despite** [1] - 92:21
**detail** [8] - 14:2, 48:8, 75:12, 105:9, 142:19, 151:4, 152:20, 152:25
**detailed** [7] - 120:12, 125:14, 149:14, 149:15, 152:23, 153:22, 157:9
**details** [4] - 91:14, 122:10, 135:3, 195:25
**deteriorated** [2] - 98:12, 113:13
**deterioration** [1] - 114:17
**determination** [1] - 30:20
**determinations** [2] - 120:12, 193:19
**determine** [6] - 31:2, 59:24, 108:6, 150:3, 199:19, 201:12
**determined** [3] - 30:18, 124:2, 153:2
**determining** [6] - 71:17, 95:21, 130:16, 195:10, 198:1, 201:9
**developed** [5] - 33:21, 57:7, 58:18, 97:23, 104:16
**development** [2] - 18:19, 77:25
**developments** [1] - 49:4
**deviating** [1] - 103:15
**DEVLIN** [1] - 3:3
**Devlin** [1] - 6:11
**devoid** [1] - 20:5
**dialogue** [2] - 61:1, 105:11
**dictates** [1] - 8:6
**differ** [1] - 201:14
**differed** [2] - 27:3, 27:7
**difference** [6] - 59:11, 142:7, 142:10, 142:13, 150:10, 210:9
**different** [18] - 19:18, 34:4, 34:5, 38:24, 40:22, 59:10, 62:15, 64:3, 95:24, 122:22, 139:9, 142:21,

149:3, 150:14, 150:24, 160:12, 186:24, 197:7
**differentiate** [1] - 199:10
**differently** [1] - 165:12
**difficult** [6] - 13:8, 42:4, 73:10, 73:16, 126:11, 161:2
**difficulties** [2] - 39:22, 84:13
**difficulty** [1] - 146:20
**diligence** [3] - 97:18, 109:1, 144:13
**diligent** [1] - 170:18
**diluted** [1] - 37:3
**direct** [20] - 11:7, 11:9, 11:12, 15:15, 16:7, 22:15, 27:1, 52:5, 72:5, 111:1, 111:6, 114:24, 114:25, 115:22, 120:22, 121:2, 160:3, 186:8
**directing** [1] - 179:4
**direction** [2] - 109:4, 211:12
**directly** [2] - 41:6, 134:9
**director** [2] - 98:9, 184:10
**directors** [2] - 98:2, 105:1
**disaggregate** [8] - 49:9, 153:24, 156:5, 158:14, 196:11, 197:7, 206:11, 207:2
**disaggregation** [2] - 49:20, 153:6
**disagree** [5] - 140:5, 145:1, 153:17, 153:23, 161:9
**disagreement** [4] - 97:7, 145:2, 147:19, 205:10
**disagreements** [3] - 200:6, 200:24, 201:15
**disagrees** [1] - 210:7
**disappointing** [3] - 49:13, 49:14
**disavowed** [1] - 42:8
**disbelieve** [1] - 186:5
**disciplined** [1] - 32:24
**disclose** [6] - 9:2, 37:9, 39:22, 177:6, 193:24, 194:24
**disclosed** [10] - 44:4, 44:19, 46:3, 48:23, 50:14, 151:23, 157:16, 170:8,

174:25, 179:14
**disclosure** [29] - 44:8, 48:3, 49:22, 148:18, 148:21, 148:23, 149:17, 151:12, 151:22, 152:18, 153:2, 154:2, 154:8, 154:15, 156:7, 156:10, 160:16, 170:2, 170:4, 189:10, 190:6, 193:21, 194:6, 194:9, 194:14, 194:20, 194:21, 203:11, 203:13
**disclosures** [18] - 35:11, 48:6, 48:25, 140:16, 150:15, 150:25, 151:15, 153:13, 153:22, 156:22, 158:20, 158:21, 158:23, 170:20, 179:5, 189:5, 193:18, 201:23
**discovered** [1] - 46:2
**discovery** [17] - 9:6, 9:10, 11:6, 15:17, 17:6, 20:14, 24:3, 29:12, 30:1, 30:16, 30:22, 34:18, 39:2, 40:15, 93:11, 95:1, 182:11
**discrediting** [1] - 34:21
**discuss** [9] - 18:2, 20:7, 36:5, 102:2, 102:6, 102:8, 106:18, 109:16, 191:20
**discussed** [14] - 15:9, 17:2, 19:18, 34:23, 102:15, 103:7, 104:6, 105:9, 106:17, 107:18, 124:22, 132:16, 197:24, 199:22
**discussing** [2] - 42:8, 103:11
**discussion** [8] - 31:8, 56:8, 59:3, 86:17, 102:16, 124:9, 192:1, 195:2
**discussions** [9] - 17:5, 17:7, 18:5, 18:10, 25:24, 29:18, 32:1, 33:9, 107:23
**disentangled** [1] - 156:4
**disgraced** [1] - 24:24

**disheartening** [1] - 66:15
**dishonest** [1] - 95:22
**dishonesty** [1] - 138:18
**dismiss** [15] - 26:17, 26:23, 35:16, 37:20, 67:12, 93:17, 130:7, 135:13, 140:13, 176:3, 177:11, 177:17, 182:10, 182:25, 185:9
**dismissal** [3] - 10:12, 26:12, 37:23
**dismissed** [5] - 8:2, 35:20, 50:6, 57:5, 137:2
**dismissing** [1] - 75:17
**dispute** [10] - 12:23, 23:7, 27:6, 42:23, 51:8, 51:11, 119:17, 123:7, 127:21
**disputed** [2] - 97:9, 179:19
**disputes** [3] - 118:16, 118:18, 118:20
**disregard** [1] - 79:23
**disregarded** [1] - 73:20
**dissemination** [1] - 208:10
**distaste** [1] - 32:11
**distilled** [1] - 34:20
**distinct** [4] - 14:20, 138:17, 158:22, 196:22
**Distinguish** [1] - 199:15
**distinguished** [2] - 122:25, 123:1
**distinguishes** [1] - 57:13
**distribute** [1] - 35:2
**distributed** [2] - 89:13, 106:3
**distribution** [4] - 40:7, 40:8, 89:11, 91:18
**distributor** [1] - 106:10
**district** [8] - 16:2, 26:13, 118:11, 147:10, 148:25, 171:20, 175:7, 179:7
**District** [5] - 5:2, 58:9, 110:9, 117:7, 171:16
**DISTRICT** [3] - 1:1, 1:1, 1:14
**ditch** [1] - 138:3
**divergent** [1] - 32:3
**Division** [2] - 9:18,

206:13
**division** [7] - 15:18, 46:21, 96:14, 130:10, 133:25, 157:18, 206:13
**divisions** [1] - 157:18
**divorce** [3] - 186:17, 187:13, 187:14
**DOA** [1] - 12:19
**doctor** [1] - 209:19
**doctrine** [6] - 42:22, 43:4, 43:5, 43:8, 43:9, 110:22
**document** [52] - 20:4, 23:23, 24:1, 45:24, 52:8, 59:19, 60:13, 60:20, 60:21, 62:3, 63:20, 63:21, 64:2, 73:5, 73:6, 73:14, 73:21, 73:22, 76:25, 78:17, 85:10, 86:5, 86:6, 87:6, 87:8, 88:8, 89:18, 89:21, 89:23, 101:16, 108:10, 108:11, 109:5, 109:7, 109:8, 113:15, 116:12, 116:13, 128:2, 159:9, 165:21, 165:23, 165:24, 166:18, 166:19, 169:13, 169:16, 169:22, 170:1, 175:22, 176:8
**documented** [9] - 97:24, 98:7, 99:9, 99:19, 102:16, 107:24, 116:4, 119:24, 133:3
**documents** [51] - 17:9, 25:16, 32:8, 40:3, 51:12, 51:14, 55:2, 55:4, 58:18, 58:22, 58:24, 59:20, 65:12, 65:13, 65:15, 65:17, 67:4, 72:12, 72:24, 73:1, 73:24, 76:19, 77:4, 84:18, 84:21, 85:14, 92:2, 93:6, 95:7, 95:9, 99:10, 101:14, 103:19, 104:3, 111:9, 121:12, 121:25, 127:3, 127:13, 137:23, 138:1, 138:22, 165:13, 165:18, 166:25, 167:1, 169:11, 176:9, 182:14, 187:7,

211:11

**DOJ** [14] - 9:23, 10:3, 27:3, 28:11, 28:13, 29:9, 29:11, 29:14, 29:17, 29:20, 29:22, 30:2, 30:7, 160:3

**dollar** [3] - 29:6, 36:17, 89:12

**dollars** [2] - 20:14, 124:19

**domestic** [3] - 112:21, 113:3, 113:5

**done** [26] - 10:18, 12:14, 12:15, 12:16, 12:17, 34:14, 51:18, 60:8, 78:5, 78:9, 78:20, 91:9, 93:13, 97:12, 106:11, 119:10, 145:22, 146:9, 147:13, 147:16, 166:12, 170:23, 172:16, 181:14, 181:19, 190:10

**doom** [1] - 49:1

**door** [3] - 43:20, 117:3, 180:19

**doubled** [2] - 171:6, 171:8

**doubt** [3] - 38:22, 82:13, 82:14

**doubts** [1] - 30:8

**Doug** [3] - 54:4, 54:16, 133:24

**Douglas** [1] - 25:21

**Dow** [1] - 191:9

**down** [17] - 20:9, 22:13, 26:25, 37:18, 42:20, 49:12, 49:22, 96:1, 96:5, 154:13, 158:18, 168:11, 171:6, 171:8, 179:7, 190:24, 200:18

**dozens** [3] - 119:22, 136:3, 136:8

**DPA** [3] - 27:18, 27:20, 28:19

**DPAs** [1] - 29:19

**Dr** [48] - 46:15, 47:10, 49:3, 49:20, 50:1, 143:7, 143:22, 145:24, 146:3, 146:7, 147:12, 147:19, 149:15, 149:21, 150:2, 150:23, 152:19, 153:7, 155:25, 156:21, 157:9, 157:20, 159:25, 160:9, 195:1, 195:4,

195:17, 195:18, 196:6, 196:10, 196:11, 196:13, 197:2, 200:20, 204:2, 204:10, 204:12, 204:13, 205:2, 205:15, 206:17, 209:19, 209:20, 210:1, 210:4, 210:7

**draft** [2] - 106:2, 133:4

**drama** [5] - 56:2, 56:14, 56:16, 131:16, 163:13

**draw** [11] - 97:2, 99:24, 100:1, 107:20, 110:3, 110:15, 138:21, 138:22, 171:9, 173:17, 173:20

**drawing** [2] - 108:12, 109:24

**drawn** [9] - 54:22, 95:7, 95:12, 96:20, 97:7, 101:9, 102:18, 128:18, 170:25

**dream** [1] - 122:20

**drift** [1] - 162:21

**Drive** [1] - 1:18

**drive** [1] - 52:10

**driven** [3] - 32:3, 36:24, 96:13

**driver** [1] - 108:22

**drop** [7] - 126:1, 151:7, 151:12, 156:24, 157:2, 189:3, 197:3

**dropped** [2] - 155:10, 155:21

**drops** [4] - 159:15, 174:24, 175:4, 188:25

**drove** [1] - 174:20

**Drug** [1] - 73:10

**drug** [42] - 9:15, 13:4, 13:12, 21:24, 28:20, 31:21, 35:13, 48:18, 49:11, 56:13, 67:13, 73:16, 96:13, 111:14, 111:16, 111:19, 113:5, 113:25, 117:16, 121:4, 124:19, 124:23, 126:7, 126:14, 127:21, 127:23, 129:21, 130:6, 130:10, 131:23, 131:25, 132:18, 133:21, 133:23, 133:25,

137:15, 159:7, 159:19, 160:23, 173:4, 183:18, 188:8

**drugs** [40] - 8:25, 9:4, 10:3, 11:22, 12:11, 14:8, 18:21, 20:8, 25:7, 25:9, 28:19, 33:17, 34:11, 44:20, 49:7, 111:15, 111:21, 112:10, 112:18, 112:19, 112:21, 113:19, 114:18, 121:7, 125:22, 126:10, 126:16, 127:12, 129:1, 129:10, 131:13, 134:15, 135:22, 137:13, 137:16, 197:13, 198:12, 208:6, 209:14

**due** [10] - 77:25, 97:18, 109:1, 121:15, 124:3, 130:23, 144:13, 188:1, 197:4, 197:5

**dumb** [2] - 164:9, 183:6

**dumping** [3] - 107:11, 123:22

**Dunn** [6] - 6:8, 8:7, 20:24, 36:6, 65:4

**DUNN** [2] - 2:20, 5:3

**Dura** [1] - 43:16

**DURA** [1] - 43:17

**during** [34] - 12:24, 15:17, 15:22, 17:6, 17:21, 18:7, 30:16, 37:25, 42:7, 60:15, 61:3, 69:11, 69:13, 69:14, 69:17, 69:20, 69:21, 70:22, 71:8, 71:20, 80:14, 83:13, 98:5, 135:16, 137:24, 159:3, 159:10, 168:11, 178:20, 184:10, 190:2, 195:18, 197:13, 197:21

**duty** [2] - 164:20, 174:12

**dynamic** [2] - 31:11, 154:21

**dynamics** [2] - 31:7, 78:25

## E

**E.D** [1] - 97:1

**early** [5] - 107:17,

112:13, 113:7, 133:14, 174:3

**earning's** [1] - 156:16

**earnings** [7] - 98:19, 102:12, 102:13, 152:1, 152:13, 155:2, 158:9

**ears** [1] - 173:17

**earth** [1] - 74:1

**easiest** [1] - 43:19

**easily** [4] - 125:23, 136:11, 136:12, 183:5

**easy** [2] - 93:5, 182:24

**EBIT** [1] - 99:15

**EC** [1] - 102:3

**ECF** [1] - 137:9

**echo** [1] - 58:3

**eclipsed** [1] - 143:21

**eclipses** [1] - 143:16

**economic** [6] - 143:25, 144:23, 149:20, 199:4, 204:21, 206:3

**economically** [1] - 143:23

**economics** [1] - 132:1

**economist** [3] - 204:6, 204:25, 206:21

**educated** [1] - 204:5

**Educational** [1] - 193:16

**Edward** [1] - 27:15

**effect** [8] - 54:25, 125:6, 153:11, 156:5, 157:13, 175:19, 205:1, 205:2

**effective** [2] - 84:2, 84:4

**effectively** [4] - 40:5, 90:16, 100:16, 160:18

**effects** [1] - 196:12

**effectuate** [1] - 140:6

**effort** [12] - 19:10, 22:17, 24:12, 27:12, 29:16, 47:2, 47:8, 50:12, 53:3, 162:7, 179:22, 181:7

**efforts** [9] - 8:1, 13:22, 16:10, 21:15, 22:1, 22:11, 24:6, 32:4, 211:14

**egg** [1] - 145:15

**eight** [3] - 15:18, 15:19, 51:2

**Eighth** [1] - 199:2

**either** [12] - 18:1, 96:9, 97:13, 110:7, 114:10, 131:4,

131:17, 161:10, 192:19, 192:20, 200:11

**elasticity** [1] - 208:9

**Elcock** [1] - 191:17

**element** [3] - 49:1, 110:1, 133:17

**elements** [3] - 8:4, 51:17, 208:7

**Eleventh** [1] - 199:9

**eliminate** [1] - 92:17

**eliminating** [2] - 39:18, 39:19

**elsewhere** [1] - 89:14

**email** [23] - 59:1, 59:14, 61:6, 61:9, 61:12, 61:21, 62:25, 63:2, 67:4, 73:7, 78:23, 85:11, 85:20, 85:21, 86:8, 90:7, 99:14, 102:10, 105:21, 121:15, 121:18, 132:8, 132:9

**emailed** [1] - 92:13

**emails** [10] - 17:9, 32:8, 32:21, 33:1, 33:3, 86:11, 98:11, 103:14, 210:2

**embarrassed** [1] - 180:14

**embedded** [1] - 149:1

**embodies** [1] - 114:25

**embrace** [1] - 72:24

**emphasize** [3] - 15:4, 109:19, 150:16

**emphasized** [1] - 16:20

**employ** [1] - 40:11

**employee** [8] - 17:2, 17:4, 17:13, 24:10, 24:21, 24:25, 27:14, 41:1

**employees** [11] - 9:20, 16:21, 16:25, 17:7, 17:20, 18:10, 18:15, 52:17, 61:22, 170:18, 192:14

**empty** [1] - 146:16

**encounter** [1] - 170:6

**encourage** [1] - 169:19

**encroaches** [1] - 194:1

**end** [13] - 15:10, 68:21, 76:22, 100:7, 103:3, 105:20, 106:4, 106:12, 107:22, 121:21, 138:14, 173:2, 205:12

**endeavor** [1] - 211:7
**ended** [1] - 155:18
**ending** [1] - 36:21
**Endo** [1] - 39:15
**enforcement** [3] - 72:17, 117:9, 120:13
**engage** [2] - 69:10, 144:12
**engaged** [7] - 8:23, 14:13, 105:19, 112:5, 136:1, 209:11, 209:17
**engaging** [1] - 209:3
**enjoining** [1] - 179:6
**enormous** [3] - 63:16, 104:18, 135:2
**ensue** [1] - 145:10
**ensure** [2] - 140:7, 142:2
**enter** [4] - 13:8, 14:23, 37:6, 135:14
**entered** [3] - 37:6, 69:24, 145:23
**enterprise** [1] - 10:10
**enters** [1] - 71:6
**entire** [9] - 52:11, 52:14, 76:19, 80:22, 126:2, 164:23, 171:13, 179:10, 182:22
**entirely** [4] - 17:12, 64:4, 79:3, 145:18
**entirety** [3] - 57:18, 136:24, 197:3
**entitled** [7] - 62:3, 107:20, 109:12, 111:7, 117:5, 125:5, 211:22
**entry** [2] - 13:3, 13:14
**environment** [14] - 73:10, 73:15, 111:20, 128:25, 129:2, 129:15, 130:7, 132:3, 133:11, 133:15, 137:15, 183:16, 183:20, 209:25
**EOC** [1] - 176:10
**episodes** [1] - 72:10
**epitomizes** [2] - 171:13, 171:25
**equal** [2] - 16:20, 178:2
**equally** [4] - 105:13, 114:6, 127:20, 130:15
**equals** [1] - 44:22
**equipment** [1] - 210:23
**equivalent** [1] -

141:18
**equivocally** [1] - 160:15
**erase** [1] - 128:3
**Erie** [3] - 20:3, 32:17, 124:1
**Ernst** [3] - 106:22, 106:25, 107:1
**errata** [3] - 47:3, 47:15, 180:4
**error** [1] - 188:15
**erupted** [2] - 62:19, 100:4
**especially** [5] - 12:7, 97:10, 111:5, 127:10, 175:7
**espouse** [1] - 200:11
**ESQUIRE** [14] - 1:18, 2:3, 2:3, 2:7, 2:8, 2:11, 2:15, 2:15, 2:16, 2:16, 2:20, 2:21, 3:3, 3:3
**essentially** [4] - 36:19, 58:1, 172:15, 205:9
**establish** [3] - 83:3, 118:8, 203:7
**established** [3] - 118:12, 153:25, 160:8
**establishes** [1] - 140:21
**establishing** [1] - 141:5
**et** [3] - 1:8, 105:2, 117:8
**etherial** [1] - 18:6
**ethical** [1] - 146:19
**ethics** [1] - 203:13
**EU** [7] - 39:24, 40:1, 40:25, 42:1, 42:3, 42:4, 42:10
**EU-based** [1] - 42:10
**Europe** [5] - 40:6, 89:7, 89:8, 89:10, 89:12
**European** [7] - 10:10, 35:13, 36:18, 39:24, 59:9, 59:17, 154:10
**European-owned** [1] - 35:13
**Euros** [2] - 63:23, 97:21
**evaluate** [1] - 196:7
**evaluation** [2] - 158:12, 195:11
**evaporating** [1] - 132:24
**evening** [1] - 159:20
**event** [5] - 17:22, 43:6, 150:3, 181:7

**events** [12] - 16:12, 16:13, 17:18, 17:24, 20:7, 25:1, 135:16, 181:3, 181:6, 190:3, 190:11, 196:12
**Evidence** [6] - 23:5, 23:11, 117:13, 118:4, 120:4, 191:9
**evidence** [184] - 9:13, 9:25, 11:7, 11:9, 11:11, 11:12, 14:22, 14:23, 14:25, 15:8, 15:11, 15:15, 15:16, 16:7, 16:9, 16:21, 16:22, 16:25, 17:2, 17:7, 18:8, 19:2, 19:9, 19:11, 20:5, 20:9, 22:14, 22:15, 23:11, 25:13, 25:16, 26:2, 26:21, 27:1, 28:7, 29:16, 29:18, 30:11, 33:2, 34:6, 34:19, 34:21, 37:16, 39:25, 45:9, 52:2, 52:4, 54:7, 66:2, 67:21, 68:7, 68:12, 68:16, 69:8, 71:19, 71:25, 72:1, 72:3, 72:5, 72:6, 72:13, 72:22, 72:24, 73:12, 73:19, 74:1, 74:15, 74:24, 75:1, 75:15, 75:20, 76:1, 76:5, 76:7, 77:18, 79:13, 79:22, 81:5, 83:1, 91:22, 92:18, 93:6, 93:12, 93:14, 95:11, 95:24, 96:20, 96:25, 97:6, 97:11, 97:13, 100:22, 101:7, 101:8, 104:16, 108:5, 108:9, 108:15, 108:19, 109:22, 109:24, 110:3, 110:24, 111:1, 111:6, 111:12, 112:12, 112:24, 114:19, 114:24, 114:25, 115:7, 115:22, 116:3, 116:15, 117:6, 117:14, 118:12, 120:16, 120:22, 120:25, 121:2, 121:3, 121:8, 122:5, 122:18, 123:19, 124:7, 125:20, 126:5, 126:6, 129:22, 130:17, 133:19, 133:21, 134:9,

136:12, 138:5, 138:23, 143:5, 144:22, 149:14, 150:6, 159:23, 160:6, 162:6, 162:10, 162:16, 163:22, 164:4, 169:20, 170:25, 171:21, 172:1, 173:3, 173:14, 173:15, 174:4, 177:8, 177:12, 179:19, 179:25, 180:19, 180:20, 181:9, 186:7, 186:8, 186:9, 188:18, 202:12, 208:17, 208:24, 209:5, 209:7, 209:21, 209:25
**evident** [1] - 58:25
**evidentiary** [1] - 37:11
**eviscerated** [1] - 66:5
**exact** [15] - 33:9, 102:22, 125:10, 128:7, 128:11, 129:5, 129:8, 131:14, 131:15, 133:13, 134:5, 137:3, 180:8, 192:17, 193:10
**exactly** [13] - 15:13, 17:14, 33:8, 56:3, 62:25, 81:23, 82:8, 86:7, 96:21, 122:5, 144:19, 166:21, 187:15
**examine** [1] - 209:24
**examined** [2] - 49:16, 125:13
**examining** [1] - 159:4
**example** [19] - 12:8, 12:10, 20:2, 20:20, 24:1, 39:3, 48:10, 91:13, 92:5, 93:3, 117:25, 121:14, 126:24, 127:15, 128:25, 130:19, 148:19, 196:13, 198:11
**examples** [5] - 13:4, 151:13, 166:23, 192:4, 209:2
**exceeding** [1] - 127:17
**exceeds** [1] - 205:23
**except** [1] - 147:3
**exception** [5] - 23:9, 23:10, 23:22, 120:3, 179:25

**excerpted** [3] - 84:6, 90:21, 172:3
**Exchange** [3] - 8:15, 139:17, 202:8
**exchange** [2] - 101:3, 141:15
**excited** [1] - 61:23
**exclude** [6] - 6:23, 193:10, 199:23, 202:19, 203:25, 210:8
**excluded** [14] - 50:1, 146:3, 180:1, 192:10, 192:17, 192:18, 192:21, 192:22, 193:6, 193:11, 194:18, 194:22, 202:6, 207:4
**excludes** [1] - 118:4
**excluding** [1] - 200:8
**exclusion** [5] - 7:8, 8:12, 192:8, 193:12, 199:9
**exclusive** [1] - 184:19
**exclusively** [1] - 43:23
**excruciating** [1] - 152:19
**excuse** [2] - 46:9, 49:5
**execute** [1] - 160:24
**executed** [2] - 27:13, 159:17
**execution** [1] - 159:22
**executive** [14] - 25:20, 26:3, 41:6, 41:8, 70:1, 75:8, 75:13, 100:4, 102:3, 108:25, 115:23, 134:12, 138:9, 155:1
**executives** [5] - 29:18, 38:12, 86:16, 111:9, 139:15
**exercise** [2] - 32:2, 113:10
**exercising** [1] - 201:3
**exhibit** [12] - 11:3, 41:25, 74:2, 74:4, 105:20, 106:12, 107:12, 113:7, 113:15, 113:17, 127:6, 209:14
**Exhibit** [74] - 45:20, 73:2, 73:6, 73:9, 74:4, 97:22, 98:6, 98:13, 98:20, 99:5, 99:19, 101:1, 101:2, 101:24, 102:4, 102:13, 102:16, 102:24, 103:4, 103:8, 103:17, 103:23, 104:4,

104:10, 105:3,
105:12, 105:25,
106:4, 106:19,
107:4, 107:13,
107:15, 107:24,
108:4, 108:22,
109:4, 109:21,
113:12, 115:10,
115:14, 115:21,
116:2, 119:25,
121:22, 122:16,
124:20, 124:22,
124:24, 125:14,
127:2, 127:15,
128:8, 129:1,
130:19, 131:10,
132:8, 132:13,
132:20, 132:22,
133:3, 133:12,
134:7, 134:16,
135:18, 138:14,
169:12, 169:13,
187:20, 187:21,
187:25, 203:14,
208:5
**Exhibits** [1] - 121:10
**exhibits** [3] - 92:12,
114:15, 132:23
**exist** [2] - 51:1, 169:23
**existed** [3] - 16:5,
52:3, 185:5
**existence** [2] - 14:5,
14:15
**exists** [3] - 177:1,
209:5, 209:10
**exonerated** [2] -
117:5, 117:12
**expand** [2] - 175:16,
185:2
**expansion** [1] -
188:10
**expect** [2] - 185:7,
186:17
**expectations** [3] -
97:25, 151:25,
156:15
**expected** [10] - 14:7,
38:5, 99:18, 106:12,
113:14, 114:18,
136:16, 152:7,
152:9, 158:1
**expecting** [1] - 189:4
**expensive** [7] - 9:10,
13:7, 31:20, 34:18,
77:25, 122:8
**experience** [6] - 19:6,
47:1, 77:23, 123:10,
202:1, 209:15
**expert** [58] - 6:23,
12:24, 46:15, 46:16,

46:22, 47:20, 53:6,
56:10, 72:11, 75:22,
75:23, 117:16,
117:17, 117:25,
121:6, 124:20,
124:21, 125:12,
126:15, 142:18,
143:5, 143:7, 144:7,
145:24, 146:2,
147:12, 150:2,
189:7, 191:8,
191:22, 191:24,
192:1, 192:15,
193:9, 193:12,
193:25, 194:19,
194:23, 194:24,
195:24, 196:1,
196:5, 197:7,
197:10, 199:9,
199:24, 200:11,
200:17, 201:5,
202:7, 204:3, 204:8,
204:16, 204:19,
205:6, 209:19,
210:3, 210:6
**expert's** [9] - 47:17,
147:18, 191:12,
191:13, 194:3,
199:2, 199:6,
199:14, 199:18
**expertise** [8] - 91:4,
91:14, 91:17,
104:23, 104:25,
106:23, 191:17,
195:17
**expertised** [1] -
105:23
**experts** [16] - 7:14,
8:13, 117:15,
125:11, 161:12,
180:1, 191:15,
191:19, 193:17,
200:6, 200:8,
200:15, 201:8,
201:14, 203:17,
208:3
**experts'** [3] - 150:3,
200:24, 201:8
**expired** [2] - 29:21,
141:19
**explain** [13] - 28:1,
28:4, 48:8, 79:25,
80:4, 80:6, 82:4,
84:24, 90:6, 133:6,
197:21, 208:22,
210:13
**explained** [11] - 14:18,
38:9, 59:8, 91:23,
130:12, 156:17,
192:12, 198:3,

199:13, 209:1, 209:6
**explaining** [2] - 62:25,
194:22
**explains** [3] - 81:23,
82:7, 91:15
**explanation** [2] - 56:5,
119:6
**explore** [1] - 94:20
**exposed** [3] - 77:23,
77:24, 105:25
**expressed** [1] - 98:6
**expressly** [2] - 132:9,
152:13
**extensive** [4] - 32:1,
34:17, 121:3, 163:7
**extensively** [5] - 95:6,
96:16, 99:8, 110:20,
117:1
**extent** [2] - 200:25,
203:23
**external** [1] - 106:23
**extraordinary** [5] -
59:2, 59:6, 59:12,
98:20, 99:1
**extrapolating** [1] -
118:1
**extreme** [2] - 68:9,
200:3
**Extreme** [1] - 105:19
**eye** [2] - 126:16,
126:23

**F**

**F.3d** [1] - 118:2
**face** [3] - 27:7, 55:1,
170:4
**faced** [1] - 53:3
**facility** [2] - 31:21
**facing** [2] - 56:25,
125:24
**fact** [85] - 11:4, 13:11,
13:19, 19:7, 23:7,
27:24, 28:17, 30:3,
34:16, 41:9, 42:3,
42:23, 46:5, 46:6,
54:8, 55:10, 56:19,
56:25, 64:2, 64:5,
65:20, 68:24, 70:21,
81:18, 88:24, 92:14,
94:22, 100:18,
104:3, 104:17,
109:25, 111:20,
116:20, 117:10,
118:9, 119:8,
119:13, 121:4,
126:3, 126:6,
126:23, 136:21,
143:8, 143:21,
143:25, 144:1,

146:1, 147:3, 147:6,
147:8, 149:10,
149:12, 150:2,
154:25, 157:14,
158:9, 161:3,
162:17, 162:23,
165:15, 169:24,
172:14, 173:18,
174:18, 174:21,
179:21, 185:11,
185:13, 186:12,
197:16, 198:20,
198:21, 198:22,
199:19, 200:13,
205:4, 205:5, 206:1,
207:9, 207:14,
207:15, 208:3,
210:5, 210:7
**factor** [8] - 15:3, 15:7,
15:11, 16:4, 53:2,
113:6, 158:11, 198:1
**factoring** [1] - 102:12
**factors** [10] - 14:19,
14:22, 15:4, 15:5,
31:1, 149:25,
152:16, 191:13,
197:8, 206:23
**factory** [2] - 122:9,
125:18
**facts** [31] - 20:5,
20:15, 27:20, 27:21,
27:22, 44:4, 44:9,
46:11, 71:20, 97:8,
97:9, 98:15, 111:10,
115:19, 115:21,
117:20, 118:1,
124:5, 133:9,
133:10, 141:8,
143:4, 143:22,
146:18, 149:5,
174:7, 191:22,
196:5, 203:3,
203:19, 211:10
**factual** [6] - 23:13,
23:17, 93:4, 116:24,
118:5, 119:2
**factually** [4] - 67:17,
67:19, 90:1, 120:10
**fail** [7] - 8:16, 8:18,
14:14, 44:16, 47:25,
139:24, 142:4
**failed** [21] - 8:5, 9:9,
10:20, 15:14, 16:4,
16:5, 24:7, 30:15,
32:20, 34:8, 35:24,
37:8, 42:15, 42:18,
83:3, 142:10,
142:12, 149:9,
177:6, 177:9, 179:15
**failing** [4] - 9:2, 39:22,

142:7, 154:21
**fails** [6] - 23:15, 49:3,
195:10, 196:6,
196:11, 197:12
**failure** [8] - 48:24,
49:9, 50:15, 195:11,
197:18, 198:9,
199:14, 199:18
**failures** [2] - 36:8,
43:16
**fair** [7] - 24:2, 32:10,
80:17, 122:4,
139:22, 140:14,
144:3
**fairly** [1] - 143:20
**faithfully** [1] - 105:1
**fall** [4] - 120:7, 133:14,
177:12, 178:20
**Fall** [1] - 68:20
**falls** [2] - 120:3,
201:13
**false** [33] - 8:23, 36:4,
36:14, 41:7, 41:22,
42:6, 42:7, 48:15,
66:8, 66:9, 66:14,
66:20, 67:20, 69:15,
69:19, 83:4, 83:5,
84:22, 85:7, 85:18,
91:1, 110:16, 130:2,
139:12, 156:23,
168:24, 178:23,
179:6, 192:23,
193:3, 193:13,
193:15, 203:8
**falsely** [2] - 131:6,
203:7
**falsity** [4] - 8:3, 8:8,
51:18, 203:6
**familiar** [1] - 179:2
**family** [1] - 36:25
**fancy** [1] - 106:10
**fantasy** [1] - 72:2
**far** [16] - 5:7, 39:7,
45:6, 58:6, 69:1,
74:18, 96:5, 108:7,
114:6, 138:22,
155:1, 155:14,
171:18, 179:8,
190:13, 204:14
**Farrington** [16] -
62:18, 86:9, 86:22,
88:12, 92:13, 92:14,
92:19, 92:21,
100:11, 100:18,
100:24, 102:25,
108:20, 169:17,
187:22
**Farrington's** [3] -
88:8, 100:12, 109:1
**fashion** [1] - 160:10

**fast** [4] - 57:5, 70:14, 169:14, 210:25
**fatal** [1] - 47:7
**fated** [1] - 22:17
**favor** [9] - 95:13, 97:2, 100:1, 101:10, 108:12, 109:24, 114:4, 128:19, 167:1
**FCC** [1] - 70:2
**FDA** [3] - 13:7, 125:20, 125:21
**fear** [1] - 181:24
**features** [8] - 34:9, 208:1, 208:25, 209:13, 209:14, 209:24, 210:11, 210:13
**February** [11] - 24:25, 59:14, 79:25, 84:7, 84:9, 98:11, 98:24, 126:24, 151:22, 153:1, 153:25
**federal** [3] - 72:16, 83:14, 123:23
**FEDERAL** [1] - 211:19
**Federal** [7] - 23:5, 23:11, 117:13, 118:3, 120:4, 120:7, 191:9
**Felix** [1] - 119:16
**fell** [2] - 152:15, 156:25
**fellow** [1] - 26:2, 186:6
**fellows** [1] - 180:25
**felt** [1] - 71:14
**fend** [1] - 68:16
**Ferrellgas** [2] - 39:3, 39:4
**FERRELLGAS** [1] - 39:4
**Fertilizer** [1] - 123:20
**few** [22] - 8:9, 13:2, 23:16, 24:23, 56:11, 60:22, 86:14, 89:21, 90:9, 97:12, 98:23, 113:16, 120:2, 157:3, 166:23, 169:11, 179:17, 186:1, 202:5, 207:6, 209:2
**fiduciary** [1] - 174:12
**fight** [2] - 104:20, 174:12
**fighting** [5] - 101:12, 104:12, 104:16, 137:25, 138:17
**figure** [2] - 58:19, 83:17
**file** [1] - 61:22
**filed** [3] - 22:19, 29:13,

60:13
**filing** [2] - 7:1, 119:8
**filings** [4] - 84:6, 84:15, 91:11, 170:21
**final** [6] - 32:6, 43:15, 79:12, 91:24, 174:1, 193:20
**finalizing** [2] - 59:4, 99:5
**finally** [14] - 10:23, 28:18, 66:6, 71:12, 88:5, 90:11, 91:21, 120:15, 127:13, 136:15, 174:23, 186:17, 193:20, 207:6
**finance** [6] - 61:8, 98:16, 99:8, 99:14, 103:14, 108:1
**financial** [10] - 46:3, 54:17, 62:4, 69:1, 103:10, 151:24, 154:4, 191:23, 201:23, 203:16
**finder** [1] - 199:19
**findings** [4] - 23:13, 23:18, 106:17, 106:19, 107:3, 116:3, 116:14, 118:5, 118:7, 118:9, 118:24, 119:2, 119:7, 120:22
**fine** [6] - 7:15, 7:17, 93:11, 94:5, 153:17, 195:25
**fine-tuned** [1] - 195:25
**finished** [2] - 61:7, 170:24
**finishes** [1] - 77:7
**finishing** [1] - 94:8
**Fire** [1] - 37:21
**firm** [5] - 20:23, 104:25, 151:5, 158:12
**firms** [4] - 21:5, 31:8, 164:21, 187:11
**first** [44] - 8:22, 10:7, 11:8, 15:4, 18:25, 22:24, 23:17, 36:9, 36:21, 37:13, 47:20, 51:2, 55:23, 62:10, 63:24, 66:11, 66:13, 68:15, 71:9, 71:22, 80:1, 94:19, 107:3, 123:20, 130:4, 148:4, 151:21, 152:4, 156:14, 158:6, 159:16, 161:13, 167:4, 167:9, 167:12,

167:13, 177:22, 181:14, 183:15, 190:6, 191:20, 192:3, 204:17, 207:18
**fiscal** [1] - 151:24
**fit** [2] - 200:19, 200:21
**fits** [1] - 202:9
**five** [15] - 29:12, 29:13, 58:22, 61:5, 76:21, 76:23, 101:17, 110:2, 122:19, 129:25, 161:14, 167:6, 169:8, 169:9
**five-minute** [1] - 161:14
**fix** [7] - 15:1, 16:5, 20:7, 33:17, 96:7, 155:9
**fixed** [8] - 10:1, 115:3, 129:24, 135:21, 155:14, 165:12, 165:13, 165:14
**fixing** [76] - 9:3, 9:7, 9:12, 9:14, 11:17, 12:19, 12:21, 15:21, 18:22, 20:2, 22:7, 26:16, 26:21, 51:21, 52:1, 52:3, 52:7, 52:9, 53:2, 53:7, 53:9, 54:7, 54:9, 54:23, 55:7, 55:9, 55:12, 55:19, 56:15, 56:16, 57:2, 57:5, 57:8, 57:12, 57:14, 64:11, 66:9, 71:24, 72:1, 72:3, 72:11, 72:14, 73:3, 73:12, 73:17, 73:18, 73:20, 74:2, 74:15, 74:17, 74:19, 74:20, 75:1, 75:21, 76:12, 77:7, 77:19, 117:12, 118:20, 120:23, 135:16, 136:2, 160:5, 160:7, 162:11, 162:14, 162:16, 162:24, 162:25, 163:15, 163:22, 173:21, 182:19, 198:8, 199:13, 209:4
**flag** [2] - 59:3, 99:2
**Flat** [1] - 122:23
**flat** [14] - 23:2, 41:7, 41:21, 47:7, 80:2, 80:8, 80:19, 82:2, 82:12, 127:22, 127:24, 128:13,

171:11, 207:23
**flaws** [1] - 200:15
**floor** [1] - 7:18
**flow** [2] - 63:22, 102:11
**flowing** [1] - 140:19
**flows** [1] - 158:15
**fly** [3] - 102:1, 102:5, 102:7
**focus** [13] - 15:3, 18:6, 24:18, 48:10, 54:3, 54:24, 63:20, 77:21, 85:1, 104:17, 156:8, 158:21, 170:18
**focused** [3] - 88:14, 90:25, 91:6
**focuses** [1] - 15:11
**focusing** [2] - 64:8, 84:7
**fold** [2] - 74:13, 132:12
**folks** [1] - 180:13
**follow** [3] - 20:24, 50:22, 206:20
**followed** [2] - 56:20, 62:21
**following** [7] - 11:9, 29:23, 105:23, 106:15, 107:23, 175:25, 198:14
**Food** [2] - 26:10, 26:13
**Foods** [13] - 11:11, 12:15, 12:18, 14:1, 16:2, 19:19, 21:8, 26:15, 26:16, 26:23, 122:23, 182:6, 198:4
**footnote** [4] - 119:24, 137:1, 186:21, 186:22
**FOR** [1] - 1:1
**forecast** [1] - 101:23
**forecasting** [3] - 59:16, 59:21, 63:10
**forecasts** [1] - 59:18
**forego** [1] - 108:23
**foregoing** [1] - 211:21
**foresee** [1] - 116:12
**foreseeable** [1] - 160:4
**forever** [1] - 181:19
**Form** [3] - 84:8, 84:10
**form** [9] - 15:21, 68:8, 74:11, 107:11, 116:15, 121:13, 180:2, 188:11
**formal** [1] - 208:10
**former** [13] - 15:19, 17:4, 17:13, 18:15, 24:10, 24:21, 24:24,

40:11, 52:17, 62:11, 124:22, 124:23
**forming** [1] - 117:15
**forms** [1] - 148:8
**forth** [16] - 15:16, 22:14, 27:22, 72:11, 101:24, 117:20, 118:5, 118:9, 119:23, 120:12, 150:21, 175:25, 183:9, 194:23, 202:6, 205:15
**fortune** [2] - 174:10, 174:21
**forty** [1] - 142:4
**forum** [1] - 14:13
**forward** [7] - 38:24, 43:24, 44:13, 45:11, 46:23, 185:10, 205:14
**forwarded** [1] - 101:13
**Fougera** [2] - 115:2, 115:24
**fought** [1] - 139:16
**foundation** [4] - 118:8, 118:12, 199:6, 201:6
**founded** [1] - 30:9
**four** [17] - 8:21, 35:20, 35:23, 41:1, 49:17, 50:6, 57:7, 75:21, 76:7, 91:9, 102:13, 103:5, 106:1, 110:2, 116:23, 136:22, 159:12
**fourth** [6] - 71:12, 71:13, 120:15, 134:18, 151:23, 168:10
**FP&A** [1] - 62:5
**fraction** [1] - 29:6
**frames** [1] - 94:8
**Frank** [3] - 5:25, 7:22, 20:24
**FRANK** [1] - 2:14
**frankly** [5] - 9:25, 47:21, 58:25, 107:19, 155:18
**Fraternal** [1] - 116:17
**fraud** [25] - 29:1, 33:22, 39:7, 39:9, 39:14, 39:20, 56:18, 57:19, 58:5, 58:7, 60:13, 66:14, 83:14, 111:24, 112:1, 153:11, 158:3, 175:2, 175:5, 177:10, 177:11, 188:25, 196:17, 206:5

**fraud-related** [1] - 196:17
**fraudulent** [3] - 45:7, 160:2, 195:8
**free** [7] - 6:17, 6:20, 26:23, 113:24, 129:9, 129:19, 186:4
**frequently** [2] - 32:9, 121:12
**FRIED** [1] - 2:14
**Fried** [3] - 5:25, 7:22, 20:24
**Friedman** [1] - 39:15
**friends** [1] - 65:14
**front** [6] - 15:10, 134:16, 171:19, 180:21, 183:12, 185:23
**Full** [1] - 194:9
**full** [9] - 30:11, 45:16, 92:9, 144:17, 192:6, 194:14, 194:20, 194:21, 203:13
**fullest** [1] - 5:7
**fully** [3] - 93:1, 104:4, 158:8
**function** [1] - 201:3
**functional** [1] - 87:4
**functioning** [1] - 63:4
**Fund** [1] - 39:16
**FUND** [1] - 1:3
**fundamental** [2] - 34:9, 197:11
**fungible** [1] - 208:9
**furious** [1] - 105:21
**furthermore** [1] - 191:15
**future** [2] - 42:24, 172:19

## G

**G-P-h-A** [1] - 127:2
**GAAP** [9] - 59:11, 59:12, 62:5, 63:9, 98:22, 101:22, 165:10, 165:12, 165:18
**gain** [1] - 22:1
**Gallagher** [1] - 124:24
**games** [1] - 129:12
**GAMMA** [1] - 118:14
**gap** [1] - 60:24
**gatekeepers** [1] - 171:21
**gatekeeping** [1] - 201:3
**general** [15] - 27:23, 33:19, 67:16, 116:4, 116:6, 117:7,

118:22, 119:9, 119:14, 119:18, 119:21, 119:23, 151:2, 173:1
**General** [1] - 52:14
**General's** [1] - 52:12
**generally** [5] - 30:20, 36:6, 129:16, 148:1, 160:14
**generals** [1] - 118:19
**generate** [1] - 90:23
**generic** [76] - 8:24, 10:2, 11:21, 12:11, 13:3, 13:12, 18:21, 20:8, 21:24, 22:20, 33:17, 34:3, 34:7, 44:20, 46:21, 49:7, 49:11, 51:3, 51:16, 67:13, 71:23, 75:4, 77:24, 79:16, 79:18, 96:13, 105:8, 106:10, 111:14, 111:15, 111:16, 111:19, 112:17, 112:19, 112:20, 112:21, 112:22, 113:5, 113:18, 113:25, 114:17, 117:16, 121:7, 124:23, 126:7, 126:10, 126:12, 126:14, 129:1, 129:21, 130:5, 130:10, 131:23, 131:24, 132:18, 133:20, 133:22, 133:24, 134:15, 137:13, 137:15, 156:18, 157:11, 159:1, 159:7, 159:19, 160:23, 163:23, 182:1, 183:18, 188:8, 208:2, 208:6, 209:14, 209:16
**Generic** [1] - 121:8
**generics** [8] - 77:22, 105:7, 129:14, 157:18, 158:1, 172:13, 207:10, 207:16
**Genni** [1] - 74:7
**genuine** [1] - 27:24
**geographic** [2] - 35:23, 50:6
**GIBSON** [1] - 2:20
**Gibson** [6] - 6:8, 8:6, 20:23, 20:24, 36:6, 65:4
**Given** [1] - 92:15

**given** [12] - 40:19, 49:18, 69:2, 76:16, 90:18, 97:14, 162:6, 175:3, 178:16, 183:3, 187:21, 203:22
**glad** [1] - 79:12
**glare** [1] - 160:3
**glaring** [1] - 48:10
**Glass** [1] - 122:23
**global** [1] - 32:24
**globe** [2] - 102:6, 102:7
**glossed** [1] - 96:6
**Gluck** [1] - 120:7
**goal** [3] - 79:16, 79:17, 80:2
**goals** [2] - 59:4, 99:5
**god** [1] - 56:16
**Godot** [5] - 9:21, 9:22, 29:8, 29:22
**gold** [1] - 109:6
**Goldman** [1] - 80:21
**Gompers** [2] - 117:17, 150:2
**goodman** [1] - 172:11
**goods** [2] - 31:19
**gotcha** [1] - 147:23
**govern** [2] - 182:14, 207:12
**governed** [2] - 191:8, 193:24, 194:8
**government** [2] - 52:12, 120:3
**government's** [1] - 158:25
**GPhA** [2] - 126:25, 135:17
**grams** [1] - 74:12
**grant** [1] - 199:23
**granted** [7] - 26:16, 50:16, 67:12, 97:6, 118:11, 150:8, 201:9
**grants** [1] - 16:3
**granular** [1] - 128:9
**grapple** [1] - 183:12
**grappling** [1] - 71:21
**grave** [1] - 47:9
**great** [7] - 20:18, 48:8, 60:9, 78:5, 78:9, 78:20, 151:4
**greater** [4] - 32:19, 38:5, 96:5, 204:14
**Greenbaum** [1] - 6:5
**GREENBAUM** [1] - 2:11
**grew** [1] - 104:22
**GRONER** [6] - 2:16, 4:11, 190:24, 191:2, 191:5, 191:7

**groner** [1] - 206:12
**Groner** [8] - 6:1, 7:23, 8:12, 46:16, 49:25, 53:6, 191:7, 202:5
**gross** [4] - 125:11, 125:13, 125:17, 182:8
**GROSSMAN** [1] - 2:7
**Grossman** [1] - 5:14
**ground** [1] - 50:25
**grounds** [1] - 201:8
**groundwork** [1] - 119:10
**group** [3] - 46:4, 87:4, 93:24
**grouped** [1] - 199:11
**groups** [1] - 90:23
**growing** [2] - 103:16, 103:22
**growth** [11] - 36:10, 36:23, 37:4, 89:5, 89:15, 103:16, 103:22, 155:14, 155:16
**Guam** [1] - 117:8
**guess** [4] - 95:18, 136:25, 180:21, 189:13
**guesswork** [1] - 180:18
**guidance** [14] - 104:20, 104:23, 104:25, 105:2, 105:18, 105:20, 106:2, 106:16, 106:20, 106:23, 133:9, 133:10, 156:16, 156:17
**guide** [1] - 65:7
**guidelines** [1] - 17:1
**guilt** [1] - 145:14
**guilty** [2] - 26:15, 26:20
**Gumwood** [1] - 23:19
**gun** [3] - 11:17, 16:16, 110:2
**guns** [2] - 11:18, 15:10
**guts** [1] - 40:24
**gutted** [1] - 136:21
**gutting** [1] - 180:5
**guy** [6] - 46:15, 88:18, 166:7, 184:6, 184:7, 184:12
**guys** [1] - 163:25

## H

**Hail** [1] - 171:1
**half** [8] - 11:5, 17:8,

24:9, 78:18, 95:4, 146:16, 167:12, 183:5
**halfway** [2] - 102:6, 102:7
**hallmark** [1] - 14:16
**hallmarks** [2] - 13:1, 121:9
**hallway** [1] - 41:11
**Halobetasol** [1] - 127:6
**hand** [4] - 84:17, 87:15, 100:16, 178:7
**hand-picked** [1] - 100:16
**Handbook** [1] - 121:8
**handed** [1] - 85:21
**handful** [1] - 159:5
**handle** [1] - 74:9
**handled** [1] - 178:12
**hang** [1] - 194:11
**happy** [2] - 93:20, 138:25
**harbor** [1] - 35:22
**hard** [4] - 71:21, 78:15, 163:20, 169:9
**Hardiman** [8] - 6:10, 46:25, 50:24, 86:25, 90:15, 161:21, 183:15, 184:5
**HARDIMAN** [7] - 3:3, 4:5, 6:9, 50:21, 50:24, 161:21, 163:3
**Hardiman's** [1] - 20:22
**hardly** [1] - 169:15
**HARRIS** [1] - 2:14
**harrod** [1] - 197:2
**HARROD** [10] - 2:7, 4:8, 4:12, 5:13, 139:6, 151:21, 161:16, 188:22, 200:2, 208:19
**Harrod** [5] - 5:13, 94:17, 139:1, 139:6, 188:19
**Harrod's** [1] - 177:21
**Harvard** [1] - 189:8
**hat** [1] - 100:14
**hats** [1] - 100:14
**haves** [5] - 108:24, 109:8, 109:9
**head** [6] - 32:7, 35:8, 62:11, 100:15, 112:15, 133:24
**headline** [1] - 87:18
**headquarters** [2] - 159:18, 160:25
**heads** [2] - 54:17, 54:21
**heads-up** [2] - 54:17,

54:21
**headwind** [1] - 132:20
**Health** [2] - 67:9, 88:19
**Healthcare** [1] - 156:19
**healthcare** [2] - 66:18, 93:9
**hear** [7] - 8:18, 40:11, 41:23, 46:15, 148:16, 162:12, 185:18
**heard** [15] - 41:24, 65:8, 71:25, 75:16, 107:2, 107:3, 113:20, 117:1, 144:12, 150:17, 172:8, 174:23, 177:24, 207:8
**hearing** [3] - 6:20, 34:25, 177:19
**hearsay** [19] - 22:16, 23:3, 23:5, 23:8, 23:9, 23:21, 27:8, 27:10, 27:12, 28:13, 28:16, 72:3, 72:6, 118:4, 120:4, 179:24, 180:19
**heavily** [4] - 31:18, 71:2, 95:10, 129:3
**heavy** [5] - 40:19, 129:5, 129:8, 180:6, 183:22
**heft** [1] - 24:9
**heightened** [2] - 110:11, 187:3
**held** [24] - 5:1, 12:6, 12:20, 23:3, 32:14, 32:20, 33:1, 35:24, 39:5, 51:8, 102:14, 120:6, 130:4, 131:19, 140:13, 175:23, 178:13, 186:4, 190:12, 191:11, 193:17, 193:23, 198:7, 199:2
**help** [2] - 34:24, 210:23
**helped** [1] - 68:24
**helpful** [3] - 46:17, 68:12, 202:20
**Hendrickson** [2] - 138:11, 155:22
**Hendrickson's** [1] - 196:15
**herd** [1] - 180:13
**herring** [1] - 120:5
**herself** [1] - 131:19
**hid** [4] - 96:15, 104:5, 106:22, 114:14

**hidden** [1] - 203:3
**hide** [3] - 111:20, 113:24, 146:16
**hiding** [1] - 162:14
**high** [7] - 125:15, 125:25, 133:22, 161:25, 163:14, 184:8, 200:9
**higher** [3] - 19:25, 82:15, 142:21
**highest** [2] - 117:9, 164:20
**Highfields** [1] - 24:4
**Highland** [2] - 192:9, 192:12
**highlight** [2] - 68:5, 142:18
**highlighted** [3] - 88:1, 113:10, 170:16
**highlights** [1] - 97:12
**highly** [5] - 151:16, 198:13, 198:17, 208:8, 210:5
**hike** [10] - 123:19, 125:10, 125:16, 125:17, 125:24, 134:2, 134:5, 136:4, 161:24, 173:21
**hiked** [2] - 127:12, 135:19
**hikes** [23] - 19:18, 112:16, 122:16, 122:18, 122:24, 122:25, 123:5, 123:14, 124:7, 124:13, 124:18, 126:6, 126:20, 127:5, 127:15, 127:16, 129:5, 134:19, 134:21, 134:22, 135:2, 135:5, 135:6
**HIMMEL** [2] - 1:18, 5:20
**Himmel** [1] - 5:21
**himself** [4] - 24:17, 75:11, 104:19, 131:3
**hind** [1] - 181:18
**hindsight** [3] - 60:14, 88:14, 88:24
**hinge** [1] - 111:22
**hired** [2] - 97:19, 106:23
**history** [2] - 179:10, 180:1
**hit** [1] - 96:17
**hitched** [1] - 155:15
**hitches** [1] - 101:19
**hold** [1] - 146:24
**holding** [3] - 124:4,

131:3, 186:21
**Holdings** [1] - 192:17
**holdings** [2] - 19:20, 69:11, 71:4
**holds** [4] - 14:8, 32:17, 123:18, 147:10
**holistic** [1] - 186:23
**home** [1] - 52:10
**honest** [3] - 95:21, 186:14, 192:20
**honestly** [1] - 132:16
**Honor** [198] - 5:11, 5:13, 5:16, 5:18, 5:20, 5:24, 6:4, 6:7, 6:9, 7:9, 7:16, 7:19, 8:11, 8:14, 8:20, 9:5, 9:8, 9:16, 9:25, 10:3, 10:18, 10:24, 11:2, 11:8, 11:13, 11:15, 12:1, 12:2, 12:5, 12:12, 12:16, 12:20, 13:19, 14:8, 16:15, 17:19, 18:2, 18:11, 18:24, 19:12, 19:20, 19:24, 20:3, 20:10, 20:20, 21:25, 22:23, 23:6, 23:20, 24:5, 24:13, 25:4, 25:9, 25:10, 26:1, 26:9, 26:14, 26:15, 27:11, 29:7, 29:11, 29:21, 31:25, 34:3, 34:12, 34:21, 35:7, 35:14, 36:20, 37:2, 37:18, 38:1, 38:21, 40:9, 40:13, 41:1, 41:21, 45:14, 46:17, 47:24, 50:4, 50:19, 51:7, 55:18, 57:3, 64:11, 64:18, 64:21, 65:5, 67:7, 67:25, 69:25, 73:5, 73:6, 73:23, 76:12, 78:8, 79:12, 79:24, 79:25, 80:25, 81:6, 81:13, 81:16, 81:20, 81:22, 82:19, 83:2, 84:17, 85:22, 87:7, 87:8, 88:7, 89:6, 90:4, 90:6, 91:14, 91:21, 93:5, 93:16, 93:17, 93:20, 94:5, 94:14, 94:15, 94:19, 95:4, 95:14, 99:10, 103:11, 107:21, 110:9, 110:18, 112:19, 114:2, 116:13, 116:19, 117:21, 120:15, 120:17,

122:10, 126:9, 138:13, 139:1, 139:6, 149:17, 151:16, 161:7, 161:16, 161:22, 163:16, 164:24, 166:14, 166:16, 166:24, 169:19, 169:21, 170:7, 171:6, 171:8, 171:14, 171:17, 172:2, 173:8, 173:10, 175:2, 175:9, 175:13, 175:14, 176:19, 177:2, 177:5, 178:11, 178:17, 179:17, 180:11, 180:23, 182:12, 182:17, 182:20, 182:23, 183:2, 183:3, 186:25, 188:20, 188:22, 190:18, 191:3, 191:5, 199:25, 200:2, 202:17, 210:14, 210:19, 211:15
**Honor's** [1] - 190:14
**Honorable** [3] - 5:1, 5:2, 5:5
**HONORABLE** [1] - 1:14
**honored** [1] - 63:4
**hope** [3] - 26:9, 65:25, 67:7
**hoped** [2] - 9:17, 29:8
**hopefully** [1] - 65:5
**hoping** [2] - 65:7, 79:23
**horrible** [1] - 108:1
**hostile** [5] - 68:16, 71:6, 104:12, 107:6, 201:19
**hour** [2] - 183:4, 183:5
**hours** [7] - 76:20, 76:21, 76:23, 95:4, 167:6, 169:8, 169:9
**house** [1] - 5:7
**housekeeping** [1] - 6:13
**HR** [5] - 83:24, 84:1, 87:5, 96:2, 100:8
**huge** [1] - 124:11, 134:21, 138:2
**human** [1] - 19:5
**hump** [1] - 36:13
**hundred** [2] - 92:10, 94:21, 134:21
**hundreds** [3] - 34:7,

115:25, 120:18
**hurting** [1] - 101:6
**hydrocortisone** [1] - 127:6
**hypothetical** [6] - 72:2, 145:3, 145:6, 145:18, 145:19

**I**

**idea** [12] - 70:16, 105:22, 117:11, 146:10, 146:21, 147:12, 148:25, 155:15, 163:16, 174:22, 204:16, 207:4
**ideas** [1] - 94:2
**identical** [1] - 194:19
**identified** [12] - 14:1, 28:24, 60:25, 61:2, 84:23, 103:9, 115:17, 119:18, 120:19, 126:15, 177:15, 202:5
**identifies** [3] - 24:16, 87:24, 127:15
**identify** [5] - 6:14, 14:19, 40:5, 196:6, 200:14
**IETSEAP** [1] - 61:15
**ignored** [1] - 96:11
**ill** [2] - 22:17, 27:12
**ill-conceived** [1] - 27:12
**ill-fated** [1] - 22:17
**illegal** [14] - 14:20, 20:19, 30:14, 112:2, 112:6, 112:8, 113:1, 114:20, 114:23, 115:6, 177:6, 177:8, 199:11, 199:12
**illegally** [1] - 23:13
**illogical** [2] - 45:11, 49:24
**illustrated** [1] - 36:16
**illustrative** [1] - 151:18
**image** [4] - 148:18, 148:23, 149:1, 154:18
**imagine** [1] - 127:8
**immediate** [4] - 59:3, 99:2, 143:25, 206:3
**immediately** [4] - 107:8, 142:9, 142:17, 159:11
**impact** [8] - 21:6, 38:14, 44:9, 44:11, 54:18, 54:21, 204:21

impairment [6] -
107:18, 152:2,
152:4, 152:14,
156:21, 165:5
impeaches [1] -
117:11
impeachment [1] -
116:25
impeded [1] - 146:11
impediment [1] -
37:16
impediments [5] -
37:9, 41:19, 83:6,
88:22, 144:10
impermissible [1] -
10:16
impermissibly [1] -
17:16
implement [1] - 135:7
implementation [1] -
32:25
implemented [3] -
110:11, 122:15,
124:12
implementing [1] -
33:4
implicated [1] -
153:22
implication [1] - 20:17
implications [2] -
20:16, 42:9
implicitly [2] - 10:19,
42:18
imply [1] - 53:15
implying [1] - 14:25
importance [1] -
20:18, 201:20,
201:21, 203:10,
203:16
important [17] - 8:1,
22:3, 26:9, 29:23,
42:2, 45:8, 56:7,
58:12, 88:9, 93:16,
141:9, 144:20,
148:4, 157:20,
184:9, 191:25, 202:4
importantly [5] -
52:21, 129:13,
138:8, 148:15,
210:24
impossible [2] -
101:4, 187:19
improper [4] - 115:25,
145:13, 149:6,
194:24
improperly [3] -
142:15, 192:4, 194:5
improve [1] - 135:9
improvement [1] -
66:19

impunity [1] - 140:24
inactionable [1] -
39:19
inadmissible [11] -
16:9, 22:13, 22:16,
23:2, 27:7, 27:10,
28:17, 173:15,
180:2, 191:14,
199:16
inappropriate [1] -
193:9
inch [1] - 181:5
include [3] - 176:14,
209:1, 209:25
included [2] - 108:25,
134:12
including [17] - 20:14,
23:1, 29:2, 31:7,
42:9, 49:6, 113:2,
115:6, 119:14,
127:5, 135:21,
135:22, 143:10,
208:8, 208:24,
209:3, 210:10
income [1] - 104:9
inconsistent [5] -
44:8, 45:13, 121:9,
176:21, 201:2
incorporate [1] -
199:3
incorrect [1] - 11:23
increase [13] - 17:22,
19:15, 32:23, 54:12,
54:18, 74:13, 79:1,
79:3, 123:9, 132:3,
132:6, 132:12,
198:15
increased [7] - 61:24,
69:12, 69:17, 71:4,
160:1
increases [22] - 11:20,
14:6, 14:11, 17:18,
19:12, 19:17, 19:21,
19:25, 20:11, 30:12,
30:15, 30:17, 30:19,
31:2, 31:24, 116:1,
124:3, 132:1,
134:11, 172:12,
172:14, 198:2
incredibly [2] -
106:21, 175:10
incurring [1] - 124:12
indeed [8] - 21:25,
25:19, 31:20, 31:25,
32:17, 36:12, 45:16,
178:18
independence [1] -
14:11
independent [5] -
8:21, 30:22, 32:2,

32:6, 104:15
independently [1] -
14:4
indicate [3] - 52:25,
127:13, 166:8
indicated [7] - 24:22,
57:1, 126:9, 127:3,
130:11, 133:11,
154:8
indicates [3] - 101:15,
164:11, 188:25
indicating [5] -
118:25, 120:25,
154:5, 185:12,
202:23
indication [2] - 32:16,
152:7
indications [1] - 103:1
indicative [2] - 20:13,
48:21
indicators [1] - 156:20
indicia [3] - 11:22,
119:15, 208:17
indict [1] - 29:17
indirect [1] - 110:24
individual [8] - 7:10,
8:8, 8:19, 9:3, 50:17,
80:15, 127:21,
143:11
Individually [1] - 1:4
individuals [2] - 67:2,
169:2
indulgence [2] - 8:3,
210:22
Industries [1] - 194:13
Industry [1] - 39:16
industry [24] - 12:9,
17:12, 17:18, 18:12,
18:17, 22:21, 53:7,
53:8, 53:14, 56:2,
66:17, 66:18, 75:23,
93:9, 123:3, 126:20,
135:15, 136:8,
149:25, 173:19,
203:13, 203:18
inextricably [1] -
156:3
infancy [1] - 37:17
infer [5] - 113:21,
117:4, 127:9,
127:17, 184:20
inference [42] - 11:13,
11:25, 16:17, 16:24,
19:2, 19:3, 19:6,
38:11, 71:2, 72:14,
95:12, 102:18,
107:21, 110:4,
110:5, 110:12,
110:15, 114:1,
114:3, 114:4,

128:16, 128:22,
129:19, 130:8,
133:7, 136:5,
136:13, 138:20,
138:21, 163:21,
164:2, 165:21,
170:25, 173:17,
173:18, 173:20,
173:23, 184:24,
184:25, 186:23
inferences [23] -
11:11, 95:6, 96:20,
97:2, 97:3, 97:7,
99:24, 100:1, 101:9,
108:12, 109:24,
114:5, 128:18,
128:19, 129:23,
183:10, 184:13,
188:13, 188:16,
192:13, 192:15,
199:16, 199:21
infinitesimal [1] - 29:3
infirm [1] - 10:6
inflated [3] - 97:20,
99:9, 178:7
inflation [2] - 148:11,
178:8
influence [1] - 184:12
informal [1] - 208:10
information [91] -
21:9, 21:24, 22:2,
22:8, 24:14, 27:16,
38:12, 40:19, 46:3,
46:6, 52:22, 63:17,
70:2, 70:7, 70:9,
71:15, 83:16, 83:17,
86:10, 88:11, 88:12,
90:3, 90:13, 92:9,
92:22, 96:15, 96:17,
100:13, 114:13,
114:14, 117:21,
140:15, 144:15,
146:12, 148:6,
150:5, 150:21,
153:4, 153:7, 153:9,
153:14, 154:4,
154:7, 154:18,
154:21, 155:20,
156:6, 156:10,
156:22, 157:13,
157:17, 157:21,
158:2, 158:13,
158:18, 158:25,
159:12, 159:17,
160:13, 160:16,
160:19, 160:21,
169:7, 179:14,
189:4, 189:9,
191:24, 193:4,
193:24, 194:17,

195:13, 196:12,
196:16, 196:17,
196:25, 197:1,
197:4, 197:5,
201:20, 201:21,
202:3, 202:25,
203:10, 203:17,
205:1, 206:12,
206:18, 206:23,
208:11
informed [4] - 108:17,
134:8, 173:10,
178:25
infrastructure [1] -
91:3
ing [1] - 150:19
ingested [1] - 158:8
inherent [1] - 160:4
initial [9] - 7:1, 30:8,
38:18, 85:5, 86:1,
87:13, 87:24,
107:23, 207:25
initiate [1] - 70:3
initiated [4] - 70:4,
70:6, 70:8, 70:15
injectable [1] - 209:13
injectables [1] -
126:16
injected [1] - 116:6
injunctive [6] -
178:15, 178:21,
179:9, 189:15,
190:2, 190:11
injured [1] - 178:24
injury [1] - 141:11
injustice [1] - 182:8
innocence [2] - 66:5,
72:25
innocuous [2] - 125:3,
126:21
input [3] - 134:2,
173:2, 173:3
inquire [1] - 135:1
inquiries [2] - 18:16,
130:13
insight [1] - 71:19
insinuated [1] -
142:15
insist [2] - 69:5, 69:6
insisting [1] - 167:3
instance [1] - 171:23
instead [5] - 96:1,
101:18, 128:1,
183:24, 199:11
instill [1] - 183:17
instruct [3] - 202:17,
202:18, 203:24
instructing [1] - 194:1
insubstantial [1] -
20:1

**insulated** [5] - 56:1, 131:9, 131:16, 133:2, 163:13
**insulation** [1] - 131:19
**integrate** [2] - 58:22, 184:7
**integrated** [5] - 58:20, 63:14, 97:25, 104:4, 166:2
**integrating** [1] - 84:1
**integration** [145] - 10:9, 10:25, 35:12, 35:19, 37:10, 37:14, 37:17, 37:25, 38:3, 38:6, 38:12, 38:18, 38:23, 39:1, 39:6, 39:14, 39:19, 40:15, 40:25, 41:12, 41:14, 41:19, 41:23, 42:17, 46:21, 48:14, 50:3, 50:10, 50:11, 51:5, 57:11, 57:12, 57:17, 57:22, 58:2, 58:6, 58:10, 58:15, 58:21, 59:5, 59:22, 59:23, 59:24, 60:9, 60:19, 61:4, 61:8, 61:14, 61:17, 61:20, 62:4, 62:20, 63:13, 63:18, 64:1, 64:3, 64:4, 64:6, 64:9, 64:13, 64:14, 66:10, 67:15, 82:21, 82:23, 83:7, 83:19, 83:21, 84:12, 85:5, 85:6, 85:13, 86:1, 86:2, 86:11, 86:12, 86:15, 86:19, 87:4, 87:12, 87:13, 87:18, 87:20, 87:25, 88:24, 90:22, 91:8, 96:3, 98:18, 100:7, 100:15, 100:17, 100:20, 101:3, 101:5, 101:6, 101:12, 101:19, 101:21, 102:8, 102:14, 102:21, 103:9, 104:1, 105:15, 108:17, 108:19, 108:21, 108:23, 137:11, 137:12, 152:14, 153:21, 157:5, 165:1, 166:11, 166:13, 169:18, 170:1, 170:5, 170:14, 170:15, 170:19, 170:22, 170:23, 182:17, 182:18, 184:9,

184:20, 184:21, 186:13, 186:18, 187:11, 187:13, 187:14, 187:15, 187:18, 187:23, 188:4
**Integration** [1] - 39:7
**integration-relate** [1] - 39:6
**integrations** [3] - 83:11, 100:17, 100:22
**intend** [1] - 138:19
**intended** [2] - 9:1, 52:11
**intense** [2] - 9:10, 21:15
**intensity** [2] - 160:17, 161:5
**intent** [7] - 36:5, 38:20, 42:19, 68:7, 186:7, 192:6, 192:19
**intentionally** [3] - 66:21, 78:22, 130:2
**interact** [3] - 18:11, 41:12, 41:13
**interactions** [4] - 16:12, 17:11, 18:3, 18:7
**interdependence** [2] - 14:11, 15:6
**interdependent** [2] - 14:2, 33:5
**interest** [3] - 14:24, 32:16, 69:2
**interesting** [1] - 175:18
**interestingly** [2] - 144:11, 145:24
**interfering** [2] - 140:11, 188:5
**interm** [1] - 99:8
**internal** [7] - 103:11, 106:2, 106:9, 106:17, 121:12, 127:3, 187:8
**internally** [6] - 33:10, 44:8, 45:13, 104:6, 114:9, 122:2
**International** [1] - 193:7
**interpolate** [1] - 206:22
**interpretation** [5] - 149:5, 153:21, 154:7, 171:18, 171:24
**interpretations** [2] - 167:2, 167:4
**interpreted** [2] -

155:17, 169:19
**intertwined** [1] - 156:3
**intervening** [1] - 9:10
**Intervest** [1] - 11:15
**intimated** [1] - 10:4
**intraday** [1] - 159:10
**introduce** [1] - 117:6
**introduced** [1] - 120:16
**investigated** [2] - 131:5, 131:17
**investigation** [18] - 23:14, 30:2, 30:3, 30:5, 52:23, 118:6, 118:10, 118:18, 118:21, 119:4, 119:8, 119:11, 120:13, 131:7, 158:25, 159:6, 159:19, 160:23
**investigations** [2] - 27:9, 117:19
**investigators** [1] - 159:22
**Investment** [1] - 203:14
**investment** [5] - 37:5, 144:7, 191:23, 201:17, 203:16
**investor** [5] - 83:25, 84:3, 84:11, 84:14, 202:2
**investors** [58] - 9:2, 13:11, 37:24, 90:24, 96:16, 99:11, 99:17, 101:17, 102:23, 103:21, 103:25, 104:6, 105:1, 105:13, 107:9, 107:10, 108:8, 108:18, 111:11, 112:5, 113:14, 113:24, 114:11, 114:14, 129:13, 130:3, 130:4, 130:15, 130:20, 131:3, 131:6, 133:9, 136:14, 138:3, 138:7, 138:17, 139:19, 140:9, 151:3, 151:25, 154:8, 155:7, 156:1, 156:15, 157:22, 160:21, 183:18, 183:19, 183:23, 186:14, 190:4, 190:12, 191:24, 195:10, 201:22, 203:10, 205:17
**involve** [3] - 72:11,

122:24, 135:25
**involved** [21] - 9:14, 17:13, 19:13, 25:6, 54:23, 64:13, 64:14, 75:2, 75:15, 77:6, 86:11, 88:12, 107:1, 123:20, 124:2, 133:22, 163:14, 167:19, 167:22, 172:24, 173:1
**Involved** [1] - 72:7
**involvement** [1] - 99:3
**involves** [5] - 72:5, 72:6, 112:1, 120:9, 137:11
**involving** [4] - 12:21, 15:2, 137:12, 198:8
**iota** [1] - 54:2
**IRFS** [8] - 59:10, 59:12, 60:24, 62:5, 63:9, 165:10, 165:11, 165:18
**Irish** [1] - 104:24
**irrational** [2] - 44:7, 125:9
**irrelevant** [2] - 26:8, 60:6
**irreparably** [1] - 178:24
**irritate** [1] - 31:13
**isolating** [1] - 152:16
**Israel** [2] - 176:20, 176:22
**issue** [47] - 14:9, 27:23, 28:19, 30:18, 33:18, 34:16, 36:9, 40:15, 42:1, 43:11, 48:4, 57:18, 60:2, 60:18, 60:25, 61:2, 62:5, 64:4, 65:20, 77:8, 79:8, 79:17, 81:19, 82:5, 82:21, 95:22, 97:10, 101:21, 109:23, 129:20, 134:15, 150:25, 153:16, 165:18, 166:1, 166:21, 169:25, 173:24, 185:4, 186:1, 188:12, 197:13, 198:10, 203:17
**issued** [1] - 110:16
**issues** [31] - 8:7, 15:24, 26:8, 34:14, 41:19, 47:23, 58:12, 60:23, 65:11, 66:6, 76:24, 94:16, 94:18, 94:20, 97:5, 122:8, 149:12, 152:14,

155:25, 157:11, 165:6, 170:6, 174:1, 177:17, 182:17, 188:19, 193:14, 201:23, 202:9, 202:15, 204:19
**issuing** [1] - 175:21
**IT** [10] - 83:24, 83:25, 86:9, 87:5, 88:12, 88:14, 88:15, 92:15, 96:2, 100:8
**items** [3] - 98:20, 99:1, 136:10
**itself** [7] - 44:14, 98:6, 101:6, 116:6, 116:12, 120:11, 178:21
**ITT** [5] - 193:16, 193:23, 194:3, 194:18, 194:20
**Ivy** [1] - 204:5

## J

**J.W** [1] - 121:14
**JACOBSON** [1] - 2:14
**jail** [1] - 164:1
**JAMES** [3] - 2:7, 2:15, 2:16
**James** [3] - 5:13, 5:25, 139:6
**Jamie** [2] - 5:24, 7:21
**January** [3] - 36:3, 80:21, 85:11
**JENSEN** [2] - 2:8, 5:18
**Jensen** [1] - 5:18
**JERSEY** [1] - 1:1
**Jersey** [3] - 1:11, 1:19, 2:12
**Jesse** [1] - 5:18
**JESSE** [1] - 2:8
**job** [10] - 18:16, 48:19, 51:14, 78:5, 78:9, 78:20, 154:6, 164:2, 164:4, 172:16
**jobs** [1] - 163:20
**Joe** [12] - 86:13, 88:17, 88:18, 93:2, 97:11, 99:3, 105:9, 105:18, 108:20, 132:10, 163:19
**Joe's** [1] - 88:21
**JOHN** [1] - 3:3
**John** [8] - 6:9, 25:20, 50:24, 53:24, 121:14, 134:4, 138:10, 161:21
**joining** [2] - 168:23, 179:4
**joint** [1] - 18:19

**Jordan** [1] - 193:7
**JOSEPH** [1] - 1:8
**Joseph** [10] - 2:22, 6:8, 6:24, 65:4, 86:9, 86:12, 168:4, 168:5, 168:7, 169:17
**Josh** [2] - 5:11, 94:15
**JOSHUA** [1] - 2:3
**Journal** [2] - 159:16, 159:20
**JP** [1] - 97:23
**judge** [2] - 171:16, 211:6
**JUDGE** [1] - 1:14
**Judge** [29] - 5:2, 5:3, 7:25, 9:5, 9:11, 14:17, 29:11, 29:23, 30:8, 35:17, 38:25, 39:10, 40:13, 40:17, 42:2, 50:7, 94:24, 104:13, 130:7, 133:5, 137:6, 140:13, 157:7, 162:13, 177:10, 184:2, 185:3, 186:19
**Judge's** [1] - 182:16
**judges** [1] - 171:20
**judgment** [53] - 6:23, 6:24, 6:25, 7:8, 7:10, 8:11, 16:3, 19:4, 19:11, 27:2, 27:25, 28:14, 32:3, 33:23, 34:14, 50:16, 53:19, 55:23, 65:24, 68:2, 81:3, 93:15, 96:22, 97:4, 108:13, 115:10, 115:13, 116:7, 116:11, 116:14, 117:22, 128:17, 128:18, 140:20, 149:5, 149:8, 150:8, 150:22, 153:19, 161:3, 162:4, 171:2, 175:8, 177:4, 179:12, 179:18, 181:1, 184:18, 185:24, 187:1, 188:9, 200:8, 200:23
**JUDGMENT/LOSS** [1] - 4:3
**judicial** [1] - 76:3
**Judy** [15] - 3:5, 6:10, 6:25, 52:7, 52:8, 61:12, 97:11, 132:10, 134:6, 138:1, 161:21, 162:9, 162:16, 163:19
**juiced** [1] - 187:6

**JULIEN** [2] - 1:14, 5:1
**Julien** [1] - 5:5
**July** [15] - 8:20, 14:18, 29:24, 35:16, 92:13, 102:10, 103:5, 103:13, 113:15, 121:15, 132:21, 169:16, 170:1, 176:2, 187:17
**jump** [1] - 48:20
**juncture** [1] - 116:11
**June** [23] - 29:14, 36:21, 60:4, 60:5, 60:6, 60:11, 60:17, 61:11, 61:12, 61:21, 62:2, 62:10, 63:18, 63:21, 80:10, 80:14, 99:22, 100:3, 100:24, 108:25, 165:4, 165:7, 165:14
**juries** [2] - 96:21, 171:23
**juris** [1] - 149:1
**jurisdictions** [1] - 117:10
**jurisprudence** [1] - 39:20
**jurors** [4] - 123:10, 130:16, 182:2, 201:25
**jury** [97] - 65:21, 74:16, 81:18, 82:18, 93:7, 95:6, 95:19, 95:22, 97:14, 99:23, 100:9, 102:5, 102:17, 104:2, 107:20, 108:5, 109:11, 109:13, 109:23, 110:3, 111:7, 111:11, 114:1, 114:7, 114:21, 114:22, 117:3, 121:23, 122:17, 123:8, 123:16, 124:11, 125:1, 125:5, 125:7, 126:4, 126:5, 126:19, 126:23, 127:8, 127:17, 127:23, 128:14, 128:23, 129:4, 129:17, 129:20, 129:25, 131:22, 133:7, 133:18, 134:9, 134:18, 134:25, 135:13, 135:14, 136:5, 136:6, 136:11, 136:12, 138:20, 153:18, 162:1,

162:5, 164:6, 171:10, 171:20, 173:9, 180:21, 181:17, 181:19, 181:23, 182:7, 182:20, 183:12, 184:19, 184:24, 185:18, 185:24, 186:4, 186:10, 186:16, 186:25, 188:16, 188:17, 193:19, 194:2, 201:4, 202:17, 202:18, 202:20, 203:24
**justice** [2] - 211:5
**Justice** [7] - 9:18, 52:13, 52:20, 117:2, 159:17, 160:24, 202:8

### K

**Kate** [1] - 6:1
**KATHERINE** [1] - 2:15
**keep** [5] - 55:19, 80:2, 80:7, 83:11, 163:25
**keeping** [1] - 80:19
**kept** [3] - 134:16, 163:6, 170:22
**key** [2] - 111:21, 134:14
**kids** [1] - 45:21
**kills** [1] - 47:4
**Kincaid** [16] - 40:12, 40:14, 40:19, 40:20, 41:6, 41:16, 41:18, 41:22, 42:3, 42:7, 91:23, 180:7, 180:12, 180:13, 185:6, 185:7
**KINCAID** [1] - 40:12
**Kincaid's** [1] - 42:13
**kind** [22] - 10:2, 21:3, 22:6, 39:12, 58:4, 64:7, 74:24, 75:1, 76:6, 80:19, 98:22, 112:6, 148:23, 162:12, 169:19, 173:21, 175:6, 179:2, 182:7, 183:8, 203:4, 209:9
**kindly** [1] - 145:2
**kinds** [2] - 144:15, 185:15
**King** [1] - 1:10
**Kirsten** [1] - 104:22
**Kmart** [1] - 191:17
**knowing** [5] - 46:19, 54:23, 57:12, 74:2,

162:19
**knowingly** [1] - 110:16
**knowledge** [20] - 28:2, 28:12, 41:15, 42:19, 52:2, 68:7, 75:1, 77:22, 89:22, 98:8, 111:10, 130:11, 131:7, 131:19, 168:25, 192:5, 192:7, 192:14, 203:3, 204:14
**knowledgeable** [2] - 130:5, 131:4
**known** [16] - 45:12, 45:18, 49:9, 88:20, 132:15, 133:9, 133:10, 143:4, 147:14, 148:7, 166:22, 190:4, 190:5, 195:14, 196:8, 202:24
**knows** [5] - 29:12, 45:4, 67:25, 69:25, 74:20

### L

**lack** [13] - 23:24, 30:5, 30:7, 32:12, 37:14, 46:16, 57:1, 65:9, 66:2, 102:23, 118:7, 137:22, 179:25
**Lackdawalla** [1] - 209:20
**lacked** [2] - 37:10, 195:17
**lacking** [2] - 16:7, 27:1
**lacks** [2] - 24:3, 177:8
**laid** [1] - 31:5
**land** [2] - 175:20, 176:13
**landscape** [1] - 180:6
**language** [8] - 65:19, 82:20, 167:2, 171:9, 171:15, 171:17, 172:3, 172:16
**large** [8] - 10:10, 30:1, 132:1, 152:17, 168:11, 168:15, 168:16, 198:14
**largely** [4] - 15:5, 191:25, 200:23, 204:15
**larger** [1] - 62:1
**last** [12] - 76:18, 80:16, 85:23, 147:11, 163:16, 168:3, 172:18, 175:1, 183:5, 183:7,

210:19, 210:20
**lastly** [1] - 158:21
**late** [4] - 98:10, 131:25, 183:4, 191:2
**latitude** [1] - 201:9
**launched** [3] - 141:13, 145:5, 154:21
**launches** [2] - 157:19, 158:11, 158:16
**law** [34] - 10:16, 11:24, 20:18, 26:7, 27:8, 28:5, 29:15, 31:8, 34:21, 35:7, 38:24, 44:3, 65:10, 71:2, 72:17, 74:14, 109:23, 110:10, 117:9, 118:11, 120:13, 164:18, 164:19, 164:20, 164:22, 175:2, 175:3, 176:7, 182:4, 189:19, 193:25, 194:12, 199:17, 199:21
**lawful** [4] - 14:7, 14:17, 21:17, 199:5
**lawfully** [1] - 13:24
**laws** [3] - 123:23, 140:23, 148:24
**lawsuit** [1] - 137:11
**lawsuits** [5] - 143:9, 143:11, 143:16, 167:23, 178:16
**lawyer** [3] - 76:3, 172:21, 180:15
**lawyers** [2] - 171:22
**layman** [1] - 204:14
**Lead** [3] - 1:19, 2:5, 2:9
**lead** [1] - 155:13
**leader** [1] - 20:25
**leadership** [1] - 156:1
**leading** [2] - 71:12, 178:13
**leads** [1] - 14:2
**League** [1] - 204:5
**League-educated** [1] - 204:5
**leap** [2] - 55:17, 55:18
**learn** [2] - 38:13, 40:20
**learned** [3] - 85:12, 175:1, 196:19
**leas** [1] - 45:17
**least** [13] - 34:4, 62:7, 112:12, 116:23, 116:24, 124:21, 129:24, 130:1, 133:20, 136:14, 155:21, 198:16,

204:7
**leave** [6] - 7:4, 64:22, 81:19, 93:7, 154:5, 188:19
**leaving** [6] - 48:19, 154:9, 154:23, 155:5, 155:18, 157:15
**lectern** [3] - 6:21, 7:20
**led** [1] - 103:10
**LEDA** [1] - 5:3
**left** [11] - 11:3, 31:16, 67:11, 82:4, 84:19, 87:15, 88:10, 155:10, 155:17, 182:9, 184:11
**left-hand** [1] - 87:15
**legal** [17] - 13:21, 14:21, 112:8, 113:1, 161:1, 193:8, 194:25, 195:25, 199:11, 199:20, 202:15, 203:1, 203:5, 203:12, 204:16, 204:19, 205:6
**legally** [3] - 45:15, 118:6, 194:23
**legitimate** [4] - 18:9, 18:18, 122:6, 127:11
**legitimately** [1] - 174:25
**legs** [1] - 181:18
**length** [1] - 178:10
**less** [11] - 18:21, 44:25, 45:18, 47:6, 61:11, 77:24, 78:3, 78:15, 142:2, 152:7, 185:16
**lesser** [1] - 200:25
**letter** [5] - 74:6, 74:21, 74:25, 115:19, 132:12
**letters** [1] - 74:9
**letting** [1] - 70:14
**Letting** [1] - 32:23
**level** [8] - 20:25, 75:12, 75:13, 127:21, 128:5, 128:9, 133:22, 184:9
**levels** [1] - 81:12
**Lexus** [2] - 110:9, 186:3
**liabilities** [1] - 71:1
**liability** [6] - 33:23, 94:16, 140:19, 145:9, 145:10, 145:12, 147:2, 147:3
**liable** [2] - 51:8, 140:18

**liaison** [1] - 5:21
**liberty** [2] - 114:4, 114:11
**Library** [1] - 203:14
**lie** [4] - 68:14, 104:2, 114:10, 192:15
**life** [3] - 13:19, 22:17, 24:25
**light** [4] - 38:4, 186:6, 196:5, 201:22
**likelihood** [2] - 107:18, 204:22
**likely** [2] - 33:12, 45:6
**likewise** [1] - 107:13
**limit** [1] - 203:22
**limitations** [1] - 29:21
**limited** [7] - 96:24, 120:9, 124:4, 126:10, 137:16, 137:17, 204:10
**line** [13] - 14:5, 36:23, 39:1, 40:12, 57:22, 59:25, 99:21, 101:20, 102:9, 102:19, 135:10, 186:15
**lines** [3] - 128:2, 154:19, 172:18
**link** [1] - 119:9
**linking** [2] - 101:5, 152:13
**list** [6] - 14:19, 45:24, 63:6, 87:17, 192:4, 192:25
**listening** [1] - 210:15
**lists** [1] - 187:23
**litany** [1] - 166:18
**literally** [2] - 66:12, 121:6
**litigant** [1] - 10:4
**Litigation** [2] - 35:21, 35:22
**litigation** [5] - 23:23, 52:13, 100:1, 114:3, 128:22
**Litowitz** [2] - 5:14, 5:19
**LITOWITZ** [1] - 2:7
**live** [2] - 115:9, 115:12
**lives** [1] - 66:19
**LLP** [8] - 1:17, 2:2, 2:7, 2:14, 2:20, 3:2, 5:12, 5:17
**loading** [2] - 106:9, 187:10
**loads** [1] - 186:9
**loaf** [4] - 123:12, 181:25, 182:1, 182:2
**loaned** [1] - 76:19
**logic** [3] - 8:6, 11:24,

35:7
**logical** [3] - 78:2, 163:21, 176:12
**logistics** [1] - 24:20
**London** [1] - 102:14
**long-term** [1] - 91:6
**look** [52] - 13:23, 18:13, 51:15, 54:24, 55:1, 56:4, 58:24, 60:9, 60:21, 63:6, 65:15, 72:23, 74:16, 75:10, 78:14, 82:7, 84:16, 85:9, 87:8, 87:17, 87:18, 92:2, 92:11, 118:19, 121:23, 142:22, 144:22, 152:19, 152:24, 154:22, 154:24, 158:15, 159:10, 163:8, 167:9, 169:21, 169:22, 170:3, 171:9, 171:17, 172:9, 172:17, 176:9, 176:24, 189:2, 189:17, 190:3, 206:17, 206:22, 208:21, 209:21
**looked** [7] - 143:8, 153:1, 155:11, 202:2, 205:18, 208:19, 209:12
**looking** [9] - 61:15, 62:6, 78:5, 78:9, 78:20, 79:2, 82:25, 123:14, 172:17
**looks** [18] - 40:13, 74:25, 107:19, 108:1, 114:12, 143:22, 152:20, 157:20, 157:21, 171:14, 204:25, 205:20, 205:21, 205:25, 206:18, 206:21, 208:24, 210:2
**loose** [2] - 39:8, 58:7
**lose** [1] - 124:19
**losing** [2] - 127:14, 178:25
**loss** [40] - 8:4, 31:16, 43:16, 44:7, 44:16, 47:19, 47:23, 48:1, 48:9, 49:1, 50:15, 94:17, 139:2, 139:25, 140:25, 141:2, 141:4, 141:5, 141:11, 147:2, 148:1, 148:2, 148:5,

149:2, 149:9, 149:12, 149:15, 150:6, 150:8, 150:11, 153:25, 158:4, 161:7, 177:21, 177:22, 188:19, 195:5, 204:3, 206:9
**losses** [2] - 127:16, 195:10
**lost** [2] - 43:21, 140:21
**love** [1] - 60:6
**low** [2] - 107:9, 138:8
**LOWENSTEIN** [1] - 1:17
**Lowenstein** [2] - 1:18, 5:21
**lower** [9] - 45:4, 82:15, 107:9, 127:1, 135:17, 138:6, 164:10, 174:3, 174:14
**LP** [1] - 192:9
**lunch** [1] - 94:4
**Luncheon** [1] - 94:10
**Luther** [1] - 1:10
**ly** [1] - 23:18
**lying** [4] - 46:20, 86:20, 87:11, 142:16

**M**

**Magistrate** [1] - 5:3
**magnitude** [10] - 19:18, 122:18, 122:25, 123:7, 123:15, 123:18, 124:6, 124:9, 134:19, 134:22
**main** [4] - 43:15, 104:11, 104:17, 136:22
**maintain** [4] - 17:23, 31:3, 32:10, 135:3
**maintained** [1] - 198:13
**major** [2] - 32:24, 41:19
**majority** [1] - 34:13
**makers** [1] - 18:20
**man** [2] - 25:20, 181:4
**Management** [1] - 192:9
**management** [3] - 62:6, 100:15, 134:15
**manager** [1] - 135:10
**mandates** [1] - 43:17
**manifest** [1] - 200:25
**manipulate** [1] - 109:14

**manipulated** [3] - 102:12, 106:8, 187:10
**manipulation** [2] - 98:23, 106:11
**manipulations** [4] - 104:7, 105:14, 106:3, 109:16
**manipulative** [1] - 195:8
**manufacture** [1] - 126:11
**manufacturers** [1] - 121:5
**manufacturing** [5] - 13:6, 91:3, 91:4, 91:13, 91:17
**Marc** [4] - 86:15, 86:16, 92:23, 92:24
**March** [21] - 10:10, 10:25, 11:1, 35:14, 38:3, 57:20, 58:8, 58:13, 58:14, 58:15, 59:1, 60:16, 69:24, 70:9, 85:3, 85:14, 85:20, 158:24, 159:3, 170:24, 186:4
**margin** [4] - 122:8, 125:15, 125:24, 135:8
**margins** [5] - 125:9, 125:11, 125:13, 125:17, 125:25
**Marino** [3] - 97:4, 97:6, 128:24
**market** [86] - 11:21, 13:1, 13:9, 13:11, 13:16, 14:16, 21:5, 21:6, 21:7, 21:24, 22:5, 31:11, 31:14, 31:21, 32:12, 32:13, 32:23, 33:6, 33:14, 33:19, 34:10, 42:12, 49:13, 55:1, 67:14, 77:10, 77:12, 77:16, 77:22, 78:3, 78:15, 78:22, 79:14, 79:16, 79:18, 121:15, 126:2, 127:14, 136:2, 147:25, 148:8, 149:23, 149:25, 151:2, 151:6, 152:16, 154:4, 155:17, 157:1, 157:24, 158:5, 158:8, 159:21, 160:13, 160:14, 162:23, 163:7, 163:11, 164:14, 164:23,

174:6, 177:18, 181:21, 181:23, 189:3, 189:7, 189:10, 190:9, 195:14, 196:18, 197:25, 198:21, 198:23, 198:25, 199:4, 206:24, 207:11, 207:17, 207:19, 208:1, 208:5, 208:11, 208:13, 208:14, 209:9, 210:10
**market-wide** [1] - 33:6
**marketed** [2] - 34:2, 66:25
**marketing** [1] - 27:14
**marketplace** [3] - 36:18, 81:25, 85:3
**markets** [50] - 12:8, 12:9, 12:10, 12:14, 12:22, 12:23, 13:4, 13:5, 13:16, 13:17, 13:21, 14:6, 14:9, 15:2, 15:3, 15:7, 17:25, 19:15, 20:1, 21:12, 33:7, 34:6, 34:10, 35:7, 35:24, 50:6, 96:8, 115:4, 126:8, 126:14, 126:18, 135:22, 159:14, 182:5, 187:4, 197:13, 197:14, 197:19, 198:6, 198:8, 198:10, 201:24, 204:25, 205:1, 208:9, 209:12, 209:15
**marriage** [2] - 100:25, 166:1
**marshals** [1] - 74:25
**Martin** [3] - 1:10, 56:12, 131:11
**Mary** [1] - 171:1
**massive** [10] - 48:20, 67:1, 112:16, 124:12, 125:2, 126:18, 127:15, 127:21, 129:4, 131:13
**massively** [1] - 34:17
**matches** [1] - 51:13
**material** [8] - 10:7, 27:24, 46:5, 70:2, 70:7, 70:8, 149:12, 171:7
**materiality** [1] - 202:15
**materially** [9] - 46:4,

46:7, 66:8, 66:9, 67:20, 88:4, 90:9, 110:16, 149:19
**materials** [1] - 102:20
**matter** [16] - 10:16, 11:23, 11:24, 20:18, 26:7, 28:17, 48:7, 53:2, 74:14, 128:9, 135:12, 165:15, 176:18, 180:15, 185:23, 211:22
**matters** [7] - 41:12, 51:7, 86:14, 86:23, 104:23, 185:24, 202:2
**maximize** [1] - 32:4
**McCabe** [1] - 150:9
**McKesson** [1] - 121:19
**mean** [24] - 53:9, 54:8, 55:16, 57:11, 59:1, 64:12, 75:10, 75:14, 77:13, 78:1, 79:18, 80:5, 83:13, 83:24, 85:18, 87:14, 89:23, 113:23, 137:1, 154:22, 163:13, 170:23, 173:22, 180:16
**meaning** [16] - 61:24, 65:18, 73:4, 82:20, 97:15, 100:10, 109:12, 128:15, 128:20, 129:18, 149:23, 152:5, 153:8, 194:9, 198:24, 205:16
**means** [13] - 20:6, 54:6, 82:9, 153:6, 157:21, 160:20, 162:25, 180:16, 180:17, 184:21, 189:3, 197:19, 198:10
**meant** [8] - 77:1, 79:2, 81:15, 86:20, 95:8, 126:22, 159:2, 162:5
**measure** [9] - 30:1, 140:3, 142:6, 142:19, 147:4, 149:24, 158:17, 178:6, 206:6
**measurement** [1] - 148:6
**measures** [1] - 101:13
**measuring** [1] - 205:2
**mechanism** [1] - 124:21
**mechanisms** [2] - 204:17, 208:10

**mediate** [1] - 95:2
**meet** [16] - 8:5, 30:15, 32:20, 43:16, 43:18, 44:1, 47:25, 65:21, 65:23, 93:14, 98:4, 102:1, 136:8, 166:6, 191:19
**meeting** [15] - 62:10, 62:17, 98:13, 100:11, 100:19, 102:14, 102:21, 102:25, 103:1, 126:25, 135:17, 135:24, 136:4, 138:2, 138:11
**meetings** [5] - 86:14, 126:20, 136:2, 136:3, 136:8
**meets** [1] - 15:8
**Melissa** [2] - 1:24, 211:24
**melissamormile@ yahoo.com** [1] - 1:24
**member** [1] - 75:6
**members** [2] - 137:5, 176:8
**memo** [2] - 63:8, 166:10
**memorialize** [1] - 41:5
**memory** [3] - 6:16, 95:18
**men** [1] - 25:22
**mention** [9] - 55:11, 55:22, 94:22, 95:14, 95:25, 106:6, 123:18, 164:9, 185:6
**mentioned** [11] - 16:15, 31:19, 32:22, 40:17, 52:15, 52:17, 52:19, 93:24, 120:17, 169:12, 170:12
**mentioning** [1] - 34:1
**Merck** [1] - 148:24
**mere** [12] - 14:11, 14:15, 17:17, 22:18, 23:18, 30:3, 55:10, 67:25, 96:25, 138:23, 155:12, 199:7
**merely** [2] - 68:3, 110:14
**merged** [2] - 59:20, 115:2
**merger** [3] - 58:13, 59:15, 60:1
**mergers** [2] - 164:18, 164:19
**merit** [1] - 65:9
**meritless** [1] - 67:7

**merits** [5] - 57:13, 57:14, 200:7, 200:11, 200:23
**Merrell** [1] - 191:9
**met** [7] - 28:6, 34:15, 44:1, 106:18, 109:15, 161:6
**metadata** [1] - 101:14
**methodological** [1] - 200:15
**methodologies** [1] - 201:1
**methodology** [8] - 141:5, 196:6, 197:6, 197:11, 197:19, 198:10, 198:23, 201:6
**metrics** [1] - 98:1
**mic** [1] - 6:19
**Michael** [2] - 5:20, 6:11
**MICHAEL** [2] - 1:18, 3:3
**microphone** [1] - 6:18
**might** [31] - 25:25, 26:2, 52:22, 54:12, 54:16, 54:19, 56:11, 68:12, 73:17, 73:18, 92:3, 108:9, 109:10, 121:23, 122:1, 126:22, 134:1, 137:1, 153:5, 155:23, 163:24, 173:2, 180:11, 180:18, 180:19, 180:21, 181:13, 194:15, 194:16, 201:14
**Mike** [2] - 86:13
**Milbank** [1] - 20:21
**mildly** [1] - 61:14
**million** [5] - 11:5, 17:9, 63:22, 97:21, 211:6
**millions** [5] - 20:14, 73:23, 74:5, 113:16, 124:19
**mind** [23] - 9:15, 15:21, 16:24, 19:2, 19:16, 38:14, 42:11, 46:19, 47:11, 47:13, 71:19, 79:6, 146:2, 146:5, 146:6, 147:18, 181:8, 186:6, 192:5, 192:11, 202:16, 202:21, 202:22
**mine** [1] - 147:22
**Minimal** [1] - 78:25
**minimal** [8] - 79:3,

113:18, 113:22, 114:9, 114:13, 124:15, 180:16
**minimum** [4] - 45:3, 92:24, 180:17
**minor** [1] - 146:22
**minute** [3] - 40:11, 161:14, 163:18
**minutes** [8] - 8:10, 60:22, 94:3, 138:9, 138:11, 138:12, 190:25, 207:7
**mirror** [5] - 139:9, 148:18, 148:23, 149:1, 154:18
**mirror-image** [1] - 149:1
**mischaracterization** [1] - 181:9
**mischaracterize** [1] - 10:24
**misconduct** [1] - 185:22
**misconstrue** [1] - 181:8
**misconstrued** [1] - 93:4
**misinformation** [1] - 174:6
**misinterpreting** [2] - 92:3, 92:4
**misleading** [38] - 36:4, 39:22, 42:14, 46:4, 46:7, 48:15, 50:3, 55:11, 66:21, 67:20, 78:8, 78:9, 78:21, 79:6, 83:4, 83:5, 84:22, 84:25, 85:7, 85:15, 87:22, 88:4, 90:9, 110:17, 127:20, 130:2, 130:15, 160:19, 162:6, 178:24, 179:7, 192:24, 193:3, 193:5, 193:13, 193:15, 193:18, 203:8
**misled** [1] - 182:2
**misquoted** [1] - 166:20
**misread** [1] - 200:9
**misreading** [1] - 79:11
**misrepresent** [1] - 150:18
**misrepresentation** [2] - 46:5, 48:4
**misrepresentations** [27] - 10:7, 49:1, 111:16, 127:20, 136:23, 137:12,

139:23, 140:8,
141:11, 143:14,
144:8, 148:10,
148:14, 148:18,
152:22, 154:17,
157:4, 157:10,
177:15, 178:2,
189:6, 189:20,
190:8, 204:24,
205:13, 205:17,
205:22
**misrepresented** [5] -
111:18, 111:20,
145:22, 148:7, 203:3
**misrepresenting** [1] -
181:21
**misreps** [1] - 205:19
**miss** [3] - 92:3,
102:13, 105:6
**missed** [1] - 85:23
**missing** [4] - 85:23,
88:18, 101:23, 181:9
**misspoke** [1] - 172:6
**misstated** [3] - 25:18,
166:20, 183:15
**misstatement** [3] -
51:4, 150:13, 194:12
**misstatements** [5] -
35:18, 51:2, 129:22,
139:20, 160:19
**mix** [2] - 51:13, 83:17
**mixed** [2] - 101:8,
166:22
**model** [7] - 97:24,
98:5, 98:6, 98:13,
99:16, 103:15
**moderating** [1] -
155:14
**modest** [1] - 165:16
**moment** [1] - 24:15
**money** [2] - 174:14,
174:21
**monitor** [3] - 21:16,
22:7, 22:11
**monitoring** [4] -
20:11, 20:12, 20:19,
21:2
**month** [4] - 59:5,
78:18, 99:7, 107:17
**monthly** [2] - 61:1,
75:19
**months** [10] - 41:2,
60:7, 71:9, 71:11,
113:16, 155:5,
188:2, 188:3, 201:25
**moreover** [3] - 19:24,
25:6, 208:14
**Morgan** [2] - 91:7,
97:23
**Mormile** [2] - 1:24,

211:24
**morning** [9] - 5:11,
5:16, 5:23, 5:24, 6:7,
6:9, 7:21, 159:9,
183:6
**Morning** [7] - 5:13,
5:18, 5:20, 6:3, 6:4,
6:6, 6:12
**Morris** [1] - 199:8
**Morton** [1] - 32:17
**most** [15] - 31:20,
38:10, 38:19, 94:15,
96:13, 112:17,
129:13, 136:23,
138:8, 155:1,
177:24, 184:10,
196:11, 198:12,
210:24
**mostly** [1] - 124:3
**motion** [31] - 6:22,
6:23, 6:24, 6:25, 7:8,
7:10, 7:12, 7:13,
8:12, 26:17, 27:2,
27:25, 28:14, 35:16,
55:23, 67:11, 68:1,
81:2, 108:13, 130:7,
140:13, 149:8,
175:7, 176:3, 177:4,
177:11, 177:17,
179:18, 181:5,
182:10, 185:8
**MOTIONS** [1] - 4:10
**motions** [7] - 7:5,
7:14, 161:12,
190:19, 190:23,
199:23, 200:24
**motivated** [1] - 68:14
**motive** [17] - 14:23,
66:2, 66:3, 66:4,
68:12, 68:17, 69:5,
69:8, 69:13, 69:16,
104:14, 104:15,
137:22, 137:24,
174:5, 174:22
**mouth** [1] - 191:22
**movant's** [1] - 108:12
**move** [8] - 20:9, 39:17,
40:15, 67:24, 70:25,
147:25, 181:4,
190:18
**moved** [1] - 32:5
**movement** [4] - 18:17,
114:4, 114:5, 149:24
**movements** [2] -
21:13, 97:3
**moving** [3] - 70:14,
154:20, 204:2
**MR** [51] - 4:4, 4:5, 4:6,
4:7, 4:8, 4:11, 4:12,
5:11, 5:13, 5:16,

5:18, 5:20, 5:24, 6:4,
6:7, 6:9, 7:9, 7:16,
7:19, 21:21, 35:5,
50:21, 50:24, 64:21,
64:25, 65:1, 94:5,
94:14, 139:5, 139:6,
151:21, 161:16,
161:21, 163:3,
166:16, 175:13,
175:14, 183:2,
183:3, 188:22,
190:18, 190:21,
190:24, 191:2,
191:5, 191:7, 200:2,
208:19, 210:19,
210:21, 211:15
**multi** [1] - 29:6
**multi-billion-dollar** [1]
- 29:6
**multibillion** [1] - 36:17
**multinational** [1] -
154:19
**multiple** [5] - 34:18,
103:7, 114:15,
153:6, 154:19
**multiplied** [1] - 181:25
**must** [24] - 11:12,
11:13, 11:17, 23:22,
43:17, 44:1, 44:16,
48:3, 49:2, 97:3,
97:11, 102:18,
108:24, 109:8,
110:14, 140:22,
162:11, 177:12,
182:12, 188:15,
188:16, 188:17,
194:10
**must-haves** [2] -
108:24, 109:8
**mutual** [1] - 13:25
**Myers** [2] - 110:8,
186:24
**Mylan** [59] - 43:22,
43:24, 44:17, 44:25,
45:1, 45:3, 45:6,
45:11, 45:15, 45:16,
45:22, 46:1, 46:2,
46:13, 46:19, 47:12,
47:14, 68:16, 68:25,
70:12, 70:16, 71:5,
104:13, 104:16,
104:17, 104:21,
107:15, 107:22,
137:25, 138:4,
138:6, 138:17,
139:22, 141:9,
141:13, 141:15,
143:3, 144:11,
144:12, 144:20,
145:4, 145:5,

145:20, 145:22,
145:25, 146:8,
146:11, 146:15,
147:13, 147:15,
164:11, 164:12,
174:3, 174:20,
178:18, 178:21,
179:4, 196:7, 196:8
**Mylan's** [9] - 44:12,
45:19, 138:14,
139:23, 146:2,
146:19, 178:25,
179:8, 201:19

## N

**N-Y-E** [1] - 46:15
**Naar** [1] - 6:4
**NAAR** [2] - 2:11, 6:4
**nail** [1] - 43:20
**name** [7] - 7:21, 24:22,
25:20, 50:24, 65:3,
180:13, 191:7
**named** [5] - 24:10,
27:5, 27:15, 40:11,
46:15
**net/net** [1] - 34:12
**network** [1] - 91:19
**never** [36] - 9:15, 9:22,
10:17, 15:21, 16:24,
19:2, 19:15, 25:8,
25:9, 28:5, 28:6,
28:15, 41:9, 41:11,
42:11, 42:22, 42:23,
46:23, 53:12, 53:13,
63:2, 104:4, 109:19,
109:20, 117:2,
124:6, 143:3, 145:5,
147:13, 165:20,
172:14, 174:11,
180:12, 196:3,
207:19, 207:21
**nevertheless** [2] -
58:17, 106:20
**new** [8] - 13:8, 48:23,
71:6, 90:19, 125:18,
155:13, 155:22
**NEW** [1] - 1:1
**New** [15] - 1:11, 1:19,
2:4, 2:9, 2:12, 2:22,
3:4, 31:21, 58:9,
122:9, 179:8
**Newark** [1] - 1:11
**news** [23] - 56:12,
60:24, 61:5, 61:19,
62:24, 64:15, 73:11,
73:16, 87:18,
148:14, 149:18,
150:1, 150:12,
151:4, 151:8,
152:20, 152:22,
153:2, 154:3, 159:9,

102:5, 102:7,
102:18, 104:2,
116:15, 116:19,
118:8, 121:14,
134:8, 136:8,
136:25, 153:8,
153:14, 153:24,
157:12, 158:4,
164:19, 165:25,
177:3, 190:22,
194:22, 207:4,
207:18
**needed** [6] - 61:3,
83:16, 142:2, 166:2,
166:5, 201:9
**needs** [3] - 59:25,
97:9, 122:13
**nefarious** [1] - 92:8
**negative** [10] - 49:3,
61:14, 97:22,
103:17, 113:7,
113:11, 153:9,
157:24, 196:24,
197:1
**namely** [1] - 13:13
**narrow** [5] - 35:17,
66:7, 67:10, 153:21,
179:24
**narrowed** [1] - 8:20
**narrowing** [1] - 182:16
**narrowly** [2] - 9:7, 9:8
**Nathanson** [3] - 97:4,
97:8, 128:24
**natural** [2] - 121:25,
125:5
**naturally** [4] - 12:8,
13:4, 14:6, 181:22
**nature** [12] - 21:3,
21:7, 24:2, 32:12,
33:14, 36:16, 46:8,
137:8, 138:18,
183:25, 184:9,
197:19
**nauseam** [1] - 207:24
**NEALS** [2] - 1:14, 5:2
**Neals** [1] - 5:6
**near** [1] - 117:6
**nearly** [3] - 26:17,
55:25, 194:18
**necessarily** [1] - 32:15
**necessary** [8] - 13:19,
46:6, 114:21, 120:8,
156:6, 193:5,
195:17, 203:23
**need** [32] - 22:7, 22:8,
59:6, 64:24, 68:2,
70:23, 90:15,
100:25, 101:9,

160:22, 196:13, 206:20
**next** [21] - 68:5, 70:25, 73:22, 75:2, 79:8, 80:14, 81:18, 81:21, 82:20, 86:5, 92:21, 100:24, 107:17, 143:1, 154:2, 159:15, 165:25, 167:25, 168:19, 170:10, 171:14
**nice** [2] - 92:4, 147:23
**nine** [4] - 57:21, 58:1, 60:17, 112:10
**nobody** [1] - 125:20
**nobody's** [1] - 6:16
**noisy** [1] - 182:10
**Nokia** [1] - 58:8
**nominally** [1] - 106:7
**non** [4] - 37:3, 113:22, 114:5, 198:8
**non-accretive** [1] - 37:3
**non-culpable** [1] - 113:22
**non-movement** [1] - 114:5
**non-oligopolistic** [1] - 198:8
**nonactionable** [1] - 58:10
**nonbinding** [4] - 45:23, 46:9, 46:10
**noncollusive** [1] - 30:17
**noncompetitive** [2] - 137:14, 137:17
**nondisclosure** [1] - 144:16
**none** [26] - 9:13, 11:10, 17:8, 17:14, 17:15, 18:8, 25:16, 27:17, 28:20, 28:24, 34:19, 36:4, 36:5, 40:2, 65:22, 72:5, 72:10, 75:20, 111:22, 135:25, 137:2, 165:6, 177:1, 197:5, 199:17, 199:21
**noneconomic** [1] - 15:11
**nonetheless** [1] - 63:16
**nonexclusive** [1] - 14:19
**nonmovant** [4] - 96:25, 97:3, 100:2, 109:25
**nonmovant's** [1] -

128:19
**nonocclusive** [1] - 33:5
**nonoligopolistic** [1] - 12:21
**nonpublic** [5] - 70:2, 70:7, 70:9, 144:15, 144:18
**nonrealistic** [1] - 105:18
**nonresponsive** [1] - 168:18
**nonspeculative** [1] - 206:6
**normal** [5] - 14:7, 63:3, 123:15, 134:4, 181:22
**normally** [2] - 117:15, 134:6
**Northway** [1] - 194:13
**Nostradamus** [3] - 42:24, 43:6, 181:12
**note** [2] - 6:25, 93:24
**noted** [6] - 19:5, 24:24, 103:15, 124:14, 125:8, 130:7
**nothing** [39] - 11:18, 17:13, 18:21, 18:22, 19:9, 19:15, 19:20, 21:4, 28:22, 33:2, 35:6, 41:24, 48:23, 52:5, 54:22, 56:15, 57:6, 60:10, 62:20, 63:16, 64:4, 64:12, 68:23, 100:9, 100:20, 105:14, 105:15, 106:21, 123:24, 137:19, 165:4, 176:2, 181:11, 186:13, 196:20
**Nothing** [1] - 100:6
**notice** [12] - 137:3, 137:10, 175:15, 175:16, 175:22, 175:23, 175:24, 176:19, 184:2, 185:1, 188:9
**notice's** [1] - 175:17
**noticeable** [1] - 21:6
**notices** [2] - 176:8, 176:19
**notion** [3] - 8:23, 66:19, 179:13
**notwithstanding** [1] - 147:19
**November** [12] - 71:5, 74:6, 98:3, 104:11, 107:7, 132:11, 141:17, 141:19,

142:8, 142:11, 146:15, 175:24
**now-dead** [1] - 30:2
**nowhere** [4] - 52:19, 88:21, 88:22, 117:6
**nullification** [1] - 181:24
**nullifying** [1] - 182:7
**NUMBER** [1] - 1:3
**number** [25] - 6:15, 31:10, 31:14, 39:21, 56:14, 66:24, 67:1, 71:10, 111:16, 111:18, 111:19, 116:25, 117:17, 136:19, 143:9, 143:10, 143:15, 167:7, 167:18, 180:1, 182:19, 186:18, 205:20, 205:21
**numbers** [3] - 105:23, 142:23, 168:13
**numerous** [1] - 38:21
**nuts** [3] - 63:17, 166:2, 166:12
**NW** [1] - 2:17
**nye** [1] - 46:15
**Nye** [31] - 6:24, 49:3, 49:20, 50:1, 143:7, 143:22, 147:12, 147:19, 149:21, 152:19, 153:7, 155:25, 156:21, 157:9, 157:20, 158:14, 159:25, 195:1, 195:4, 195:17, 195:18, 196:6, 196:11, 196:13, 197:2, 200:20, 204:2, 204:13, 205:2
**Nye's** [10] - 47:6, 47:10, 149:15, 150:23, 160:9, 196:10, 204:10, 204:12, 205:15, 206:17

---

# O

**oath** [5] - 25:22, 40:22, 41:17, 41:22, 180:8
**objection** [3] - 76:15, 76:16, 173:11
**objective** [3] - 142:23, 143:20, 149:4
**obligated** [3] - 99:25, 194:23

**obligation** [1] - 193:24
**obligations** [1] - 194:25
**obtain** [1] - 21:9
**obtained** [1] - 29:11
**obvious** [3] - 130:14, 130:15, 162:4
**obviously** [12] - 55:16, 58:15, 60:3, 77:12, 77:16, 77:19, 129:2, 155:16, 166:6, 183:21, 203:2, 205:11
**occasionally** [1] - 18:11
**occasions** [1] - 119:22
**occur** [1] - 126:7
**occurred** [7] - 33:8, 58:13, 60:1, 60:5, 60:23, 126:20, 173:12
**occurring** [4] - 12:8, 13:5, 14:6, 181:23
**October** [13] - 55:25, 56:7, 66:24, 104:22, 105:5, 105:17, 106:1, 106:15, 114:17, 121:18, 131:8, 132:22, 179:9
**oddly** [1] - 149:7
**odds** [1] - 198:24
**OF** [1] - 1:1
**offensive** [1] - 57:6
**offer** [94] - 27:10, 27:13, 43:21, 44:6, 45:15, 45:17, 45:19, 45:20, 45:22, 45:25, 46:1, 46:14, 68:16, 68:25, 70:12, 70:17, 71:6, 72:22, 80:1, 91:22, 107:6, 107:15, 107:22, 119:6, 138:4, 138:7, 138:8, 138:17, 139:12, 139:13, 139:16, 139:18, 139:22, 139:23, 140:12, 141:9, 141:13, 141:14, 141:16, 141:19, 141:20, 142:3, 142:7, 142:10, 142:12, 142:20, 143:3, 143:6, 143:14, 144:6, 144:8, 144:11, 144:13, 144:23, 144:24, 145:6, 145:23, 146:1,

146:13, 147:7, 147:14, 174:3, 174:6, 174:8, 174:12, 174:20, 178:19, 178:21, 179:1, 179:14, 189:20, 190:2, 191:15, 195:9, 195:12, 195:15, 195:20, 195:22, 195:23, 196:7, 201:20, 204:8, 204:11, 204:22, 204:23, 205:5, 205:14, 205:19, 205:23, 205:24, 206:2, 206:4
**offer's** [1] - 195:11
**offered** [8] - 24:16, 34:6, 44:18, 45:3, 125:20, 180:3, 194:19, 204:2
**offering** [7] - 164:11, 180:2, 191:24, 201:4, 201:17, 203:9, 203:11
**offers** [8] - 140:9, 154:20, 169:16, 194:6, 195:25, 196:4, 204:17, 205:6
**office** [11] - 57:23, 57:24, 63:9, 88:16, 100:15, 101:20, 118:5, 118:15, 118:17, 165:16, 165:17
**officer** [4] - 86:11, 88:11, 88:12, 100:13
**officers** [1] - 117:9
**offices** [1] - 118:17
**Official** [2] - 1:24, 211:25
**official** [1] - 106:2
**OFFICIAL** [1] - 211:19
**officials** [1] - 23:12
**OFI** [1] - 60:12
**often** [4] - 33:13, 37:2, 42:6, 110:22
**Ohio** [4] - 20:3, 32:17, 124:2, 124:8
**oil** [1] - 27:10
**Oil** [1] - 199:8
**ointment** [5] - 28:20, 28:22, 28:23, 29:3, 29:4
**old** [6] - 7:19, 47:1, 50:25, 62:5, 181:4, 211:5
**oligopolistic** [41] - 12:8, 12:14, 12:23,

13:1, 13:5, 13:15, 13:17, 13:20, 14:6, 14:9, 14:16, 15:2, 15:7, 17:25, 19:15, 20:1, 21:5, 21:12, 22:5, 32:12, 33:7, 34:10, 35:7, 181:23, 182:5, 197:13, 197:15, 197:19, 197:25, 198:6, 198:8, 198:10, 198:20, 198:22, 198:25, 207:11, 207:16, 207:25, 208:13, 209:13, 210:11

oligopoly [11] - 112:6, 121:10, 197:22, 207:20, 208:4, 208:16, 208:20, 208:22, 209:1, 209:6, 209:10

Omega [141] - 10:9, 10:25, 35:12, 36:1, 36:10, 36:11, 36:16, 36:22, 36:24, 36:25, 37:10, 38:17, 39:23, 40:2, 40:4, 40:15, 41:20, 41:24, 42:9, 44:20, 46:21, 48:15, 48:16, 48:20, 48:23, 49:6, 49:7, 50:2, 51:6, 58:14, 59:9, 61:1, 61:8, 61:10, 61:22, 62:11, 62:12, 63:4, 63:7, 63:24, 66:10, 67:15, 82:21, 82:22, 83:11, 83:19, 83:21, 84:11, 85:4, 85:5, 85:13, 86:2, 86:12, 89:4, 89:6, 89:12, 89:13, 89:24, 90:7, 91:13, 91:15, 91:16, 96:1, 97:18, 98:1, 98:3, 98:10, 98:13, 98:18, 99:12, 99:17, 100:4, 100:17, 100:25, 101:11, 101:25, 102:14, 103:2, 103:14, 103:16, 103:19, 103:20, 104:1, 104:4, 104:5, 104:20, 105:11, 105:14, 105:22, 106:12, 107:5, 107:19, 107:25, 108:2, 108:3, 108:6, 108:18, 108:21, 111:5, 112:20, 137:11, 137:13,

138:9, 152:2, 152:10, 152:14, 152:15, 152:18, 153:22, 154:9, 154:25, 155:4, 155:16, 156:20, 157:5, 157:10, 157:17, 158:1, 165:10, 169:21, 169:25, 170:5, 170:15, 170:19, 182:18, 184:7, 184:8, 184:11, 186:12, 187:16, 187:17, 187:21, 187:22, 188:1, 188:7, 196:23

Omega's [25] - 35:23, 36:16, 40:7, 42:4, 59:2, 61:9, 91:18, 97:20, 98:12, 99:1, 99:9, 99:15, 101:22, 102:11, 103:9, 104:7, 104:9, 105:6, 109:16, 176:3, 176:5, 176:15, 187:8, 187:25

Omega/BCH [1] - 156:21

omission [1] - 171:7

omissions [4] - 10:8, 35:18, 130:13, 177:15

omits [1] - 46:5

omitted [4] - 83:6, 99:11, 148:7, 193:4

Once [1] - 140:21

once [5] - 59:10, 70:3, 118:11, 174:17, 192:20

One [2] - 1:18, 210:20

one [111] - 17:3, 17:21, 17:24, 22:12, 25:19, 27:13, 28:19, 31:16, 34:24, 35:11, 36:13, 37:7, 43:19, 46:17, 48:10, 49:19, 51:4, 55:21, 57:10, 59:11, 61:14, 62:19, 64:8, 70:20, 71:10, 73:8, 76:18, 76:25, 78:24, 79:8, 82:6, 85:14, 86:16, 87:14, 88:6, 91:24, 92:1, 100:14, 102:4, 104:11, 105:17, 108:10, 109:21, 111:16, 116:25, 118:16, 118:18, 118:20, 130:22, 134:22,

141:16, 141:20, 143:10, 146:14, 148:8, 150:16, 151:15, 153:10, 154:2, 154:22, 155:3, 155:12, 155:13, 156:24, 158:7, 163:15, 164:8, 165:8, 167:16, 167:17, 169:14, 170:6, 170:10, 171:3, 171:4, 171:5, 171:6, 174:1, 176:20, 176:22, 177:23, 178:7, 179:11, 179:16, 181:15, 185:2, 186:18, 186:20, 188:6, 188:14, 188:23, 189:12, 189:24, 193:14, 193:20, 195:12, 203:13, 206:6, 209:2, 209:4, 209:7, 209:18, 210:19

one's [1] - 180:4

one-page [1] - 27:13

one-tenth [1] - 71:10

ones [3] - 90:23, 182:13, 208:3

online [10] - 57:21, 57:22, 58:2, 59:24, 62:7, 64:10, 165:16, 184:22

open [4] - 42:6, 117:3, 147:25, 180:19

opening [7] - 116:8, 142:13, 192:3, 192:25, 193:17, 197:22, 198:11

opens [1] - 159:21

operate [1] - 59:11

operated [8] - 31:22, 33:20, 59:9, 67:2, 129:1, 129:14, 207:11, 207:16

operating [5] - 104:9, 112:16, 146:20, 183:20, 207:19

operation [2] - 152:15, 188:5

operations [1] - 53:25

operative [3] - 176:7, 182:15

ophthalmic [1] - 209:13

Ophthalmics [1] - 126:16

opine [4] - 192:11,

194:24, 203:18, 204:19

opined [5] - 53:7, 121:8, 193:3, 194:8, 194:20

opines [5] - 53:10, 143:7, 144:8, 192:23, 193:21

opining [3] - 204:15, 204:20, 204:21

opinion [19] - 14:18, 19:5, 29:24, 78:11, 130:8, 137:1, 176:1, 176:4, 177:11, 182:16, 186:22, 191:15, 193:10, 194:4, 199:2, 199:6, 199:16, 201:5, 203:10

opinion's [1] - 200:17

opinions [15] - 19:19, 117:16, 192:16, 192:21, 192:22, 194:6, 194:18, 195:4, 195:7, 199:18, 201:8, 202:15, 202:19, 203:25, 204:11

opportunities [19] - 16:14, 18:16, 20:7, 40:6, 78:7, 78:13, 78:14, 78:21, 79:1, 79:2, 79:3, 113:18, 113:23, 113:24, 114:9, 114:12, 127:4, 132:24, 183:25

opportunity [17] - 16:16, 16:19, 18:6, 19:1, 19:7, 43:1, 43:21, 75:22, 75:24, 76:17, 89:10, 93:14, 139:21, 140:14, 140:22, 143:13, 178:25

opposed [1] - 42:13

opposing [3] - 114:5, 118:6, 118:13

opposite [14] - 30:6, 56:24, 102:22, 124:13, 125:10, 129:5, 129:8, 133:13, 136:6, 137:3, 162:24, 163:3, 163:8, 180:9

opposition [9] - 7:11, 81:2, 81:8, 141:7, 147:9, 150:22, 171:8, 201:19, 203:20

opt [3] - 56:20, 56:22, 76:14

opt-out [3] - 56:20, 56:22, 76:14

optimistic [1] - 108:7

ORAL [1] - 1:5

Order [1] - 116:17

order [10] - 7:5, 32:10, 55:19, 137:1, 175:24, 176:2, 179:4, 186:18, 186:20, 186:21

ordered [1] - 157:7

orders [2] - 137:2, 137:3

ordinary [1] - 68:10

organization [4] - 54:20, 62:1, 134:20, 162:20

original [1] - 45:15

originally [2] - 8:21, 61:16

otherwise [2] - 88:19, 140:23

ought [1] - 38:23

ourselves [1] - 94:6

out-of-pocket [3] - 43:22, 140:25, 141:4

outburst [2] - 62:17, 62:20

outcome [1] - 140:1

outline [1] - 108:15

outset [3] - 93:11, 165:2, 200:5

outside [8] - 9:16, 47:23, 61:23, 74:22, 185:25, 192:1, 192:15, 201:14

over-the-counter [5] - 49:13, 196:19, 196:20, 196:25, 206:13

overall [5] - 69:11, 82:11, 128:13, 171:11

overintegrating [1] - 61:18

overlook [1] - 73:5

overnight [4] - 123:6, 123:8, 123:13, 123:14

overpromised [1] - 138:13

overseen [1] - 9:11

overstated [1] - 165:10

overstatement [1] - 178:2

overview [1] - 69:8

overwhelming [2] -

53:3, 64:15
**overwhelmingly** [2] - 114:19, 157:25
**own** [28] - 13:22, 14:24, 22:10, 24:25, 44:22, 46:22, 47:17, 47:20, 56:10, 69:1, 96:6, 96:18, 96:19, 103:19, 103:22, 104:3, 107:10, 108:8, 109:12, 117:20, 120:16, 127:13, 136:10, 138:6, 162:10, 185:22, 187:7
**owned** [2] - 31:22, 35:13
**owner** [1] - 122:19
**ownership** [2] - 69:17, 195:20
**oxygen** [3] - 101:12, 187:19, 188:6

**P**

**p.m** [3] - 94:10, 161:18, 211:17
**packet** [3] - 87:7, 87:8, 88:7
**page** [35] - 11:6, 11:9, 16:7, 24:9, 27:13, 45:24, 46:1, 65:12, 68:18, 78:4, 81:2, 81:3, 81:4, 81:7, 81:8, 81:14, 82:5, 92:12, 100:23, 118:2, 120:8, 121:5, 124:25, 149:7, 166:25, 167:1, 171:7, 172:3, 172:25, 192:25, 193:17, 203:15, 203:21, 208:5
**PAGE** [1] - 4:2
**pages** [11] - 11:5, 73:23, 81:3, 94:21, 107:13, 108:16, 110:9, 122:16, 192:3, 211:10, 211:11
**paid** [2] - 45:16, 206:2
**painful** [2] - 59:4, 99:5
**painstaking** [1] - 152:20
**pale** [1] - 171:18
**palpably** [1] - 133:6
**pandemic** [1] - 5:8
**panning** [1] - 152:8
**pap** [1] - 132:25
**PAPA** [1] - 1:8

**Papa** [182] - 2:22, 6:8, 10:4, 10:21, 37:6, 41:8, 41:10, 41:13, 42:19, 43:12, 48:11, 48:17, 65:4, 65:14, 66:1, 66:7, 66:11, 67:22, 68:13, 68:25, 69:24, 70:24, 71:7, 71:8, 72:6, 72:7, 72:12, 72:14, 72:18, 72:22, 73:19, 74:2, 74:6, 74:8, 75:2, 75:6, 75:15, 75:18, 76:10, 76:17, 77:9, 77:19, 77:21, 78:5, 79:9, 79:14, 79:15, 79:19, 79:25, 81:9, 81:10, 81:14, 81:16, 84:21, 84:25, 85:2, 85:11, 85:15, 86:9, 86:12, 86:18, 87:3, 87:10, 87:11, 87:21, 87:25, 88:3, 88:10, 88:17, 88:18, 89:3, 89:18, 89:20, 89:25, 90:2, 90:7, 90:8, 90:12, 90:21, 91:2, 91:6, 91:12, 92:6, 92:13, 92:19, 93:9, 93:13, 93:18, 95:13, 96:11, 97:11, 98:7, 98:9, 98:11, 99:3, 99:14, 100:5, 100:16, 100:19, 102:15, 103:7, 103:25, 104:5, 104:18, 105:9, 105:18, 105:19, 105:22, 106:3, 106:16, 107:7, 107:10, 107:18, 107:25, 108:6, 108:16, 108:20, 108:23, 109:14, 109:15, 111:6, 111:8, 113:2, 113:9, 113:15, 113:18, 114:16, 126:24, 128:7, 128:25, 130:1, 130:4, 130:20, 130:23, 131:1, 131:24, 132:10, 132:12, 132:17, 132:21, 133:4, 133:8, 133:21, 134:3, 134:12, 134:25, 135:15, 136:13, 138:1, 138:5, 144:2, 152:13, 154:9, 154:23, 154:24, 155:14, 155:24, 157:15, 163:19, 164:10, 166:21, 167:5, 167:11, 169:17, 170:13, 170:21, 171:10, 172:7, 172:11, 172:21, 172:24, 173:7, 173:13, 173:18, 174:1, 174:8, 174:18, 180:7, 184:14, 187:22, 187:25
**papa** [1] - 13:10
**Papa's** [20] - 6:24, 48:13, 67:12, 73:3, 76:13, 83:4, 85:1, 85:18, 85:25, 89:2, 128:16, 154:5, 154:16, 156:1, 158:5, 172:10, 172:15, 181:9, 196:14, 196:15
**paper** [1] - 22:22
**papers** [13] - 22:24, 33:13, 34:14, 48:9, 50:9, 50:12, 53:4, 138:4, 150:22, 177:19, 178:10, 196:22, 197:17
**paragraph** [6] - 21:18, 24:10, 81:22, 82:6, 98:14, 146:17
**paragraphs** [1] - 117:22
**parallel** [17] - 11:20, 12:6, 12:13, 12:20, 13:18, 14:5, 14:10, 14:16, 14:17, 14:21, 18:9, 129:4, 198:2, 198:5, 198:7, 198:18, 198:25
**parallel-pricing** [7] - 12:6, 12:20, 14:10, 14:16, 14:17, 14:21, 198:5
**parallelism** [1] - 199:15
**parcel** [1] - 50:1
**pardon** [2] - 27:25, 61:3
**Park** [1] - 2:21
**parse** [1] - 153:8
**part** [18] - 49:25, 57:5, 59:4, 61:25, 99:5, 108:15, 112:6, 118:21, 133:10, 134:4, 138:9, 155:21, 159:6, 167:18, 167:23,

177:20, 184:3, 185:17
**partial** [1] - 152:18
**partially** [2] - 67:12, 156:22
**participant** [1] - 22:6
**participate** [3] - 13:15, 139:22, 143:13
**participating** [1] - 36:18
**particular** [15] - 9:1, 12:10, 30:21, 90:5, 108:9, 122:15, 128:3, 136:25, 156:9, 159:1, 171:23, 173:4, 204:13, 206:24, 208:6
**particularly** [3] - 21:4, 33:23, 193:13
**parties** [9] - 34:13, 58:19, 64:22, 94:2, 95:1, 185:2, 192:19, 201:4, 205:10
**partner** [4] - 5:25, 6:1, 7:22, 107:1
**Partners** [2] - 39:4
**partners** [1] - 20:21
**parts** [3] - 116:24, 134:23, 135:7
**party** [5] - 96:9, 116:22, 118:6, 118:13, 192:20
**party's** [2] - 188:14, 192:11
**pass** [3] - 74:25, 94:25, 129:9
**past** [7] - 12:14, 16:15, 16:18, 54:5, 167:6, 176:16, 179:12
**patience** [5] - 37:5, 94:21, 190:14, 200:3, 210:23
**patient** [1] - 175:10
**Paul** [1] - 117:17
**pause** [1] - 19:17
**pay** [3] - 20:21, 21:13, 44:12
**payment** [1] - 54:15
**peak** [3] - 96:14, 113:5, 113:6
**peer** [1] - 152:16
**peers** [2] - 149:23, 157:1
**pejorative** [1] - 183:8
**penalties** [5] - 124:12, 132:2, 132:5, 134:1, 162:18
**penalty** [2] - 54:12, 54:15

**pendency** [3] - 30:2, 178:20, 190:2
**pending** [2] - 117:23, 118:1
**Pennsylvania** [2] - 18:25, 186:2
**PENSION** [1] - 1:3
**Pension** [2] - 39:16, 68:19
**People** [1] - 76:2
**people** [34] - 21:12, 21:23, 22:4, 31:8, 31:10, 52:21, 57:7, 61:25, 62:19, 66:18, 73:17, 76:2, 76:3, 83:21, 89:2, 90:19, 93:12, 116:14, 143:11, 143:17, 144:16, 147:18, 151:3, 151:9, 163:19, 164:1, 164:24, 166:5, 167:3, 169:3, 172:9, 180:12, 190:8
**people's** [4] - 21:24, 22:5, 22:22, 66:19
**Per** [1] - 121:14
**per** [8] - 23:2, 28:16, 45:4, 70:10, 141:14, 142:13, 142:17, 144:2
**percent** [43] - 29:4, 36:23, 49:23, 69:13, 92:10, 99:16, 103:16, 103:17, 103:20, 122:19, 123:6, 123:8, 125:16, 126:1, 127:16, 127:17, 127:24, 134:21, 134:23, 141:22, 142:2, 142:4, 143:8, 143:16, 143:19, 143:21, 150:25, 151:1, 151:6, 151:12, 152:15, 154:14, 156:25, 157:1, 159:12, 175:4, 175:5, 181:25, 205:24
**percentage** [1] - 29:3
**performance** [25] - 10:14, 35:23, 46:21, 50:8, 50:10, 64:6, 98:12, 101:5, 107:14, 108:17, 137:11, 137:12, 156:19, 157:6, 158:1, 176:3, 176:5, 176:15, 176:22,

176:24, 186:18, 186:19, 187:6, 187:14, 187:16
**performing** [2] - 98:1, 99:17
**perhaps** [2] - 80:18, 124:21
**period** [38] - 17:21, 25:4, 25:11, 26:19, 36:21, 58:23, 60:16, 65:8, 69:11, 69:13, 69:15, 69:18, 69:21, 69:22, 70:22, 71:9, 71:11, 71:20, 76:9, 80:15, 80:22, 83:13, 92:7, 96:12, 97:17, 98:5, 108:4, 113:2, 113:4, 113:14, 132:7, 132:11, 133:13, 173:20, 198:14, 198:18, 201:24
**periods** [2] - 165:3, 166:23
**perjury** [1] - 67:8
**Permethrin** [1] - 121:13
**permethrin** [1] - 127:5
**permissible** [1] - 192:1
**permission** [1] - 34:25
**permit** [2] - 162:5, 176:4
**permitted** [3] - 35:17, 52:23, 179:12
**Perrigo** [236] - 2:13, 2:18, 6:2, 6:5, 7:1, 7:6, 7:22, 7:24, 8:14, 8:23, 9:14, 9:19, 10:1, 10:7, 10:10, 11:20, 13:13, 15:19, 16:13, 16:25, 17:6, 17:8, 17:9, 17:20, 18:10, 18:20, 20:6, 22:6, 23:2, 25:1, 25:14, 25:15, 25:19, 26:3, 26:20, 27:16, 27:20, 28:3, 28:5, 28:6, 28:8, 28:10, 28:21, 29:4, 29:6, 29:15, 29:17, 29:19, 30:7, 30:18, 30:23, 31:22, 33:10, 33:16, 33:20, 33:25, 34:2, 34:4, 35:14, 36:18, 36:20, 36:22, 36:24, 40:2, 40:4, 40:6, 41:2, 42:11, 44:10, 44:18, 46:4, 46:20, 49:10, 53:23, 56:16,

56:17, 56:25, 58:14, 59:10, 60:7, 61:13, 61:15, 61:18, 63:4, 63:6, 63:7, 63:12, 63:25, 65:14, 66:23, 66:25, 69:3, 70:10, 71:5, 73:17, 74:5, 75:11, 77:14, 80:1, 80:12, 81:10, 85:12, 88:10, 89:7, 96:1, 96:7, 96:14, 97:20, 97:23, 97:25, 98:2, 100:4, 100:25, 102:14, 103:1, 103:3, 103:20, 104:1, 104:11, 104:20, 105:11, 105:13, 106:1, 106:12, 106:14, 106:22, 107:6, 108:6, 109:2, 109:10, 111:9, 112:15, 113:4, 115:4, 115:17, 116:1, 116:6, 117:3, 117:4, 117:11, 119:22, 121:4, 121:16, 121:18, 121:19, 122:1, 122:5, 122:14, 123:17, 123:25, 124:12, 124:18, 125:1, 125:4, 126:2, 126:19, 127:10, 127:18, 129:9, 129:24, 130:1, 131:9, 131:14, 131:16, 134:13, 134:23, 135:1, 135:17, 135:19, 135:21, 136:13, 138:10, 138:12, 138:13, 138:16, 139:14, 139:21, 140:17, 141:13, 141:16, 141:17, 141:21, 141:22, 141:23, 142:9, 142:12, 144:14, 145:20, 146:19, 149:18, 149:23, 149:24, 150:1, 151:4, 151:7, 151:23, 152:9, 152:12, 152:15, 153:20, 155:1, 155:13, 155:15, 156:13, 156:17, 157:14, 159:2, 159:5, 159:11, 159:16, 163:6,

166:4, 168:6, 168:21, 168:23, 170:18, 178:6, 178:20, 178:22, 179:5, 179:24, 182:18, 183:17, 184:10, 187:18, 188:4, 193:3, 196:16, 206:13, 209:1, 209:3, 209:7, 209:11, 209:17, 210:1
**Perrigo's** [84] - 6:22, 9:24, 10:8, 10:24, 15:22, 15:23, 16:11, 17:10, 18:3, 29:2, 30:20, 31:1, 31:23, 34:7, 36:10, 37:10, 40:8, 42:5, 42:10, 48:12, 48:14, 49:5, 51:5, 84:8, 84:9, 89:11, 91:13, 96:6, 98:16, 99:8, 99:13, 100:16, 101:12, 103:10, 103:19, 103:22, 104:3, 104:23, 108:1, 108:19, 108:25, 109:12, 111:18, 114:19, 115:1, 119:25, 120:1, 121:12, 124:22, 125:6, 125:11, 127:3, 127:10, 127:13, 127:19, 127:21, 129:13, 129:18, 130:21, 130:24, 133:24, 134:10, 134:11, 134:14, 134:15, 137:13, 137:15, 137:24, 138:10, 139:19, 142:1, 142:5, 146:14, 178:3, 178:23, 187:7, 193:5, 196:19, 196:20, 201:19, 207:10, 207:16, 209:20
**Perrigo-specific** [1] - 151:7
**Perrigo/Omega** [1] - 91:8
**person** [11] - 8:18, 28:11, 28:13, 43:10, 52:6, 61:20, 74:10, 76:25, 202:25, 205:5
**personal** [7] - 28:2, 28:11, 68:22, 107:8, 130:11, 167:18,

167:20
**personally** [5] - 66:15, 76:1, 105:24, 113:10, 132:25
**perspective** [2] - 92:15, 201:18
**persuade** [2] - 81:6, 138:3
**Pharma** - 10:9
**Pharma's** [1] - 187:22
**pharmaceutical** [2] - 12:9, 22:20, 27:4, 56:2, 66:17, 168:15
**Pharmaceuticals** [2] - 168:22, 191:10
**pharmaceuticals** [1] - 196:23
**pharmacist** [1] - 66:16
**phase** [3] - 12:1, 12:2, 20:17
**PhD** [1] - 204:5
**phenomena** [1] - 199:12
**phenomenon** [1] - 15:6
**Philip** [1] - 199:8
**phobia** [2] - 49:21, 153:5
**phone** [3] - 118:21, 119:4, 120:19
**phrase** [2] - 39:13, 112:23
**pick** [3] - 82:17, 180:7, 181:15
**picked** [4] - 57:3, 82:8, 95:23, 100:16
**picture** [1] - 83:5
**piece** [2] - 136:9, 209:4
**pieces** [5] - 77:3, 153:6, 153:9, 158:2, 158:25
**piggyback** [1] - 52:11
**Pilgrim's** [1] - 26:10
**pill** [1] - 126:11
**Piper** [1] - 178:17
**place** [11] - 16:21, 18:8, 25:3, 30:13, 107:20, 119:24, 120:20, 145:21, 181:6, 183:13, 196:16
**places** [1] - 117:8
**plagued** [2] - 83:22, 83:23
**plain** [14] - 48:5, 82:20, 97:15, 100:10, 109:12, 128:15, 128:20, 129:18, 129:23,

167:2, 171:9, 171:15, 171:17
**plainly** [1] - 10:14
**plaintiff** [6] - 36:1, 47:2, 110:14, 140:21, 160:2, 171:22
**plaintiff's** [28] - 10:6, 12:24, 18:2, 20:6, 28:18, 29:25, 33:8, 34:20, 35:8, 40:24, 41:5, 47:8, 49:4, 50:15, 51:13, 55:22, 64:16, 65:9, 73:2, 101:10, 175:16, 176:23, 180:6, 191:19, 197:10, 199:24, 201:20, 201:22
**plaintiffs** [139] - 5:12, 5:15, 5:17, 5:19, 5:22, 8:5, 8:14, 8:21, 9:1, 9:17, 10:12, 10:23, 11:19, 11:24, 12:3, 13:20, 14:10, 14:14, 15:13, 15:14, 15:17, 15:18, 16:4, 16:5, 16:8, 16:11, 17:1, 17:14, 17:16, 17:19, 17:25, 18:6, 19:10, 19:17, 20:15, 21:11, 21:18, 22:14, 22:15, 22:18, 22:24, 23:7, 24:8, 24:18, 25:8, 25:16, 26:4, 27:13, 28:9, 28:13, 29:8, 29:13, 30:12, 30:13, 32:20, 33:16, 33:25, 34:6, 34:8, 34:15, 34:18, 35:3, 35:5, 35:17, 36:9, 36:13, 37:8, 38:2, 38:8, 38:10, 39:21, 40:9, 40:18, 41:3, 41:15, 42:15, 42:20, 43:11, 43:20, 44:5, 44:7, 44:17, 44:21, 45:8, 45:19, 46:12, 47:10, 48:12, 50:9, 51:17, 52:13, 52:16, 53:3, 54:2, 55:6, 56:19, 56:20, 56:23, 58:17, 59:1, 60:6, 62:9, 65:17, 69:4, 71:21, 72:7, 76:13, 76:14, 78:19, 83:3, 84:21, 88:2, 91:22, 92:1, 92:3, 92:5, 93:3, 94:15, 101:15, 139:7, 150:10, 162:7, 162:12,

164:21, 176:4,
176:14, 177:3,
177:5, 177:9,
177:11, 179:10,
181:16, 182:12,
182:25, 189:25,
191:21, 197:16,
203:7, 205:11
**Plaintiffs** [10] - 1:6,
1:19, 2:5, 2:9, 27:6,
32:8, 76:10, 77:20,
100:2, 149:8
**plan** [18] - 69:25, 70:3,
70:4, 70:5, 70:6,
70:7, 70:8, 70:13,
70:15, 70:16, 71:6,
71:8, 71:14, 85:13,
104:2, 109:18,
174:16, 174:19
**plane** [1] - 166:6
**planned** [4] - 38:4,
107:14, 127:14,
139:8
**planning** [1] - 85:17
**plans** [1] - 170:19
**plausible** [4] - 119:6,
128:16, 135:3,
135:12
**play** [6] - 9:21, 29:8,
127:18, 197:23,
198:1, 198:23
**players** [1] - 32:24
**playing** [2] - 56:2,
65:19
**plead** [5] - 35:25, 49:2,
56:5, 56:6, 163:6
**pleading** [4] - 9:8,
104:14, 110:11,
187:3
**pleadings** [5] - 10:15,
26:24, 48:22,
110:21, 130:17
**pleased** [6] - 38:18,
85:4, 85:8, 85:19,
86:1, 86:19
**pleasure** [1] - 211:1
**pled** [7] - 8:21, 26:15,
26:20, 163:5, 163:8,
182:12, 182:13
**plenty** [1] - 110:3
**ploys** [1] - 112:25
**plus** [6] - 14:19, 15:3,
15:7, 16:4, 89:12,
141:15
**Plyley** [1] - 74:7
**pocket** [3] - 43:22,
140:25, 141:4
**podium** [1] - 50:17
**point** [56] - 17:3,
37:16, 43:15, 52:10,

52:18, 53:21, 62:9,
62:12, 64:7, 67:4,
67:16, 72:16, 73:6,
73:9, 73:11, 78:4,
78:19, 78:23, 81:24,
84:16, 84:17, 85:10,
86:5, 86:6, 86:18,
87:14, 88:2, 88:5,
89:1, 90:4, 93:6,
126:10, 137:20,
138:10, 138:25,
139:3, 146:10,
147:23, 153:3,
157:6, 157:19,
165:8, 166:1,
166:23, 176:18,
177:23, 182:4,
193:20, 198:17,
208:3, 209:15,
209:18, 211:11
**pointed** [3] - 51:21,
114:7, 130:9
**pointing** [1] - 79:5
**points** [7] - 36:6,
92:23, 129:11,
136:15, 142:21,
202:14, 208:25
**Police** [2] - 37:21,
116:17
**policies** [1] - 14:3
**policy** [1] - 15:23
**Polman** [7] - 24:22,
24:23, 25:3, 25:14,
25:23, 25:25, 26:11
**Polman's** [1] - 25:12
**POMERANTZ** [1] - 2:2
**Pomerantz** [2] - 5:12,
5:17
**poor** [4] - 152:1,
152:13, 156:17,
156:18
**portfolio** [14] - 67:1,
78:6, 78:12, 79:20,
80:2, 80:5, 80:11,
80:19, 81:11, 81:17,
82:7, 82:11, 128:5,
181:10
**portfolio-wide** [2] -
79:20, 81:11
**portfolios** [2] - 29:2,
80:23
**portion** [3] - 47:25,
82:17, 130:22
**portions** [1] - 120:13
**portrayed** [2] - 90:16
**pose** [1] - 207:14
**posited** [1] - 207:10
**position** [2] - 69:3,
167:13
**positions** [1] - 200:10

**positive** [8] - 61:7,
61:10, 61:13, 63:17,
64:15, 87:24, 99:11,
99:18
**positively** [2] - 104:5,
113:25
**possessed** [1] -
191:16
**possesses** [1] -
204:13
**possession** [1] -
202:25
**possible** [8] - 21:9,
31:15, 159:6,
164:21, 173:11,
173:12, 211:8
**possibly** [2] - 103:21,
162:19
**post** [2] - 34:24,
178:15
**postmortem** [4] -
88:13, 92:14,
108:20, 109:1
**postoperatively** [2] -
178:13, 179:3
**posts** [1] - 65:7
**potential** [7] - 14:20,
18:16, 29:19, 39:23,
137:4, 148:21,
195:20
**pour** [1] - 144:18
**power** [3] - 171:16,
171:17, 184:12
**powerful** [2] - 74:11,
115:7
**PowerPoint** [5] - 65:1,
65:6, 87:9, 87:10,
87:24
**practical** [1] - 32:4
**practice** [5] - 74:8,
106:9, 123:3,
131:14, 131:15
**practices** [9] - 111:18,
112:2, 112:3, 115:6,
137:14, 137:18,
187:10, 187:12,
209:22
**prayed** [1] - 29:9
**pre** [2] - 97:18, 185:8
**pre-acquisition** [1] -
97:18
**pre-motion** [1] - 185:8
**preceded** [2] - 26:19,
145:16
**precedent** [1] - 129:20
**precise** [1] - 116:22
**precisely** [4] - 15:4,
15:14, 24:6, 166:1
**preclosing** [3] - 58:18,
60:25, 85:11

**preclosure** [1] - 61:3
**preclude** [1] - 201:4
**predict** [1] - 42:24
**predicted** [1] - 151:20
**prediction** [1] - 181:12
**predictions** [2] -
37:24, 43:6
**preestablished** [1] -
123:3
**prefer** [1] - 186:10
**preference** [2] - 7:7,
7:9
**preintegration** [4] -
58:23, 60:23, 61:2,
165:9
**preliminary** [3] - 51:7,
156:13, 178:15
**premise** [4] - 39:8,
44:8, 58:5, 207:20
**premised** [3] - 8:23,
179:13, 198:5
**premising** [1] - 163:9
**premium** [2] - 142:20,
164:17
**prepared** [1] - 23:23
**preposterous** [2] -
66:22, 164:7
**prescription** [24] -
12:11, 34:3, 34:7,
34:10, 96:13,
112:17, 112:19,
113:5, 113:19,
114:18, 121:7,
124:23, 126:7,
126:10, 126:14,
129:1, 129:21,
130:5, 130:10,
131:25, 132:18,
133:23, 133:25,
137:15
**prescriptions** [2] -
31:10, 31:15
**presence** [5] - 36:19,
89:8, 89:9, 89:10
**present** [20] - 7:23,
8:12, 9:13, 10:9,
15:6, 35:1, 35:19,
41:11, 42:16, 51:5,
67:10, 67:14, 68:2,
95:5, 115:7, 115:18,
115:20, 138:19,
143:5, 182:17
**presentation** [10] -
57:4, 92:6, 104:8,
132:8, 165:2,
166:24, 170:3,
170:17, 177:22,
187:21
**presented** [12] -
16:25, 17:6, 83:5,

92:22, 92:23, 92:25,
115:9, 115:12,
116:7, 133:1, 147:4
**presenting** [1] -
156:11
**presently** [1] - 67:8
**presents** [1] - 130:14
**president** [10] - 53:25,
75:5, 98:16, 99:13,
103:14, 108:1,
124:23, 138:10,
155:23, 168:12
**presiding** [1] - 5:6
**pressed** [2] - 105:5,
122:10
**pressure** [4] - 106:14,
106:15, 125:24,
134:14
**pressures** [2] -
131:10, 157:25
**presumes** [1] - 145:3
**presumptively** [1] -
120:6
**pretend** [2] - 34:9,
123:16
**pretty** [5] - 51:14,
58:25, 77:7, 182:23,
195:21
**prevail** [2] - 82:22,
82:24
**prevaricated** [1] -
17:15
**prevented** [1] - 92:9
**previous** [2] - 48:14,
81:22
**previously** [3] - 88:20,
105:6, 148:7
**price** [181] - 9:3, 9:7,
9:12, 9:14, 11:17,
11:20, 12:19, 12:21,
15:21, 15:24, 17:17,
17:22, 17:23, 18:22,
19:12, 19:17, 19:18,
19:21, 19:25, 20:2,
20:11, 20:12, 21:13,
22:7, 25:13, 26:16,
26:21, 30:12, 30:15,
30:17, 30:19, 31:23,
32:22, 44:13, 44:18,
44:25, 45:1, 45:4,
49:8, 49:15, 49:18,
49:23, 51:21, 52:1,
52:3, 52:7, 52:9,
53:1, 53:7, 53:9,
54:7, 54:9, 54:18,
54:23, 55:1, 55:7,
55:9, 55:12, 55:19,
56:13, 56:15, 56:16,
56:25, 57:2, 57:5,
57:8, 57:12, 57:14,

64:11, 66:9, 70:10, 71:23, 72:1, 72:3, 72:11, 72:14, 73:3, 73:12, 73:20, 74:2, 74:15, 74:17, 74:19, 74:20, 75:1, 75:21, 76:12, 77:7, 77:19, 79:1, 79:3, 112:16, 116:1, 117:12, 118:19, 122:15, 122:18, 122:24, 123:1, 123:5, 123:9, 123:12, 123:13, 123:14, 123:19, 124:3, 124:6, 124:13, 124:18, 125:10, 125:16, 125:17, 125:24, 126:6, 126:18, 126:20, 127:15, 127:16, 127:22, 127:24, 129:4, 131:13, 132:1, 132:3, 132:6, 134:1, 134:5, 134:10, 134:19, 134:20, 134:22, 135:2, 135:5, 135:6, 135:16, 136:1, 136:4, 142:9, 149:19, 150:13, 150:20, 158:18, 160:5, 160:7, 161:24, 162:10, 162:14, 162:16, 162:24, 162:25, 163:15, 163:22, 164:10, 164:12, 164:20, 172:14, 173:21, 174:4, 174:14, 174:20, 174:24, 175:4, 178:3, 178:6, 178:7, 182:19, 183:18, 195:14, 196:8, 197:3, 198:2, 198:7, 198:14, 198:16, 199:13, 206:15, 206:24, 210:13

**price-fixing** [23] - 9:3, 9:7, 9:12, 9:14, 11:17, 55:7, 55:9, 55:12, 55:19, 57:2, 57:5, 57:8, 57:14, 72:1, 72:3, 75:21, 77:7, 160:5, 162:14, 162:24, 162:25, 163:15, 182:19

**prices** [43] - 10:1, 15:1, 16:5, 16:23, 20:7, 20:19, 20:25,

21:6, 21:22, 21:25, 22:5, 22:7, 22:11, 25:15, 31:12, 31:13, 32:5, 33:17, 54:8, 54:14, 73:17, 73:18, 78:2, 96:7, 107:8, 115:3, 120:23, 123:5, 123:11, 123:21, 123:22, 129:24, 130:10, 135:19, 135:21, 159:4, 162:17, 162:18, 163:1, 163:14, 209:4, 209:16

**PricewaterhouseCo oper** [2] - 97:19, 99:7

**pricing** [158] - 8:24, 10:5, 11:2, 11:7, 12:6, 12:13, 12:20, 13:18, 13:22, 14:2, 14:3, 14:6, 14:10, 14:16, 14:17, 14:21, 15:20, 17:2, 17:10, 18:22, 21:2, 21:5, 21:10, 21:16, 22:1, 22:8, 25:19, 26:4, 29:1, 29:25, 30:20, 30:23, 30:24, 31:1, 31:3, 31:5, 31:9, 31:17, 32:3, 32:25, 33:4, 33:5, 51:3, 51:16, 53:22, 53:23, 54:4, 54:12, 55:9, 55:11, 55:16, 56:1, 56:14, 56:16, 64:14, 67:13, 72:8, 73:11, 73:15, 73:16, 75:2, 75:3, 75:5, 75:6, 75:7, 75:8, 75:12, 75:15, 77:6, 78:6, 78:7, 78:10, 78:13, 78:14, 78:15, 78:20, 78:21, 79:16, 79:20, 80:2, 80:8, 80:11, 80:17, 80:19, 81:17, 81:24, 82:1, 82:2, 82:12, 96:12, 111:19, 112:5, 113:3, 113:5, 113:6, 113:11, 113:13, 113:16, 113:18, 113:22, 113:23, 113:25, 114:8, 114:9, 114:12, 114:17, 122:21, 127:19, 128:14, 130:6, 130:20, 130:21, 130:24, 130:25, 131:2, 131:3, 131:10,

131:25, 132:16, 132:18, 132:23, 132:24, 133:23, 134:14, 135:9, 137:14, 143:22, 156:18, 157:11, 163:13, 172:7, 172:17, 172:19, 172:25, 173:2, 173:7, 177:4, 177:16, 177:18, 181:10, 183:25, 197:11, 198:5, 198:7, 198:13, 198:15, 198:17, 198:18, 198:25, 199:11, 207:23, 208:9, 208:11, 208:21, 209:16

**Pricing** [2] - 73:10, 127:4

**Pride** [1] - 26:10

**primarily** [1] - 36:24

**primary** [2] - 145:1, 207:8

**principles** [1] - 158:15

**private** [1] - 62:13

**Private** [2] - 35:21

**probative** [9] - 12:21, 22:2, 30:3, 30:6, 68:3, 71:18, 73:19, 82:16, 126:4

**probe** [1] - 159:23

**problem** [11] - 58:20, 58:21, 59:22, 100:8, 100:9, 102:11, 111:15, 138:17, 165:10, 166:4, 169:21

**problems** [30] - 40:1, 42:17, 48:20, 83:22, 83:23, 83:24, 87:5, 96:2, 96:4, 97:18, 101:4, 101:6, 102:8, 103:2, 105:15, 106:22, 108:3, 108:17, 108:21, 152:18, 165:5, 169:25, 170:6, 187:15, 187:18, 187:24, 188:4

**proceed** [8] - 7:5, 9:6, 22:14, 30:1, 35:17, 39:14, 94:13, 179:12

**proceeding** [2] - 10:22, 101:20

**proceedings** [3] - 22:16, 211:17, 211:22

**PROCEEDINGS** [1] -

5:1

**process** [14] - 37:25, 38:21, 57:22, 59:17, 59:21, 101:23, 102:19, 146:21, 148:6, 165:9, 170:1, 201:18, 207:3, 207:13

**processes** [3] - 13:8, 30:18, 78:1

**produce** [1] - 101:14

**produced** [4] - 11:5, 17:2, 17:9, 73:24

**product** [18] - 9:24, 18:19, 19:14, 24:2, 29:5, 31:3, 40:7, 77:18, 81:11, 82:10, 121:15, 128:10, 128:12, 157:19, 158:11, 158:16, 171:12, 182:1

**production** [1] - 101:14

**products** [30] - 10:2, 13:4, 13:6, 13:13, 17:3, 17:8, 19:13, 19:14, 27:15, 30:21, 34:2, 34:3, 34:4, 34:8, 40:6, 66:25, 67:1, 77:24, 79:17, 89:11, 89:13, 115:6, 125:14, 125:15, 134:14, 163:23, 182:19, 208:9, 208:13, 208:22

**professed** [1] - 32:12

**profession** [1] - 201:18

**professional** [1] - 206:21

**professor** [1] - 189:8

**proffered** [2] - 121:24, 202:19

**profit** [1] - 33:6

**profitability** [2] - 183:20, 183:24

**profitable** [3] - 96:14, 112:17, 183:18

**profits** [2] - 112:17, 113:5

**progress** [3] - 58:10, 61:13, 87:19

**progressed** [2] - 38:13, 113:13

**progressing** [2] - 38:3, 60:24

**prohibited** [2] - 108:13, 184:16

**prohibition** [3] - 15:25, 16:1

**prohibits** [1] - 195:8

**project** [3] - 60:24, 86:1, 154:10

**projects** [5] - 38:18, 85:5, 87:13, 87:18, 87:25

**promises** [3] - 102:22, 146:17, 180:23

**proof** [16] - 16:24, 20:16, 34:15, 45:16, 47:19, 69:16, 73:3, 73:4, 75:9, 78:19, 85:9, 88:3, 89:19, 92:18, 110:23, 111:22

**proper** [4] - 116:9, 175:7, 192:7, 203:17

**properly** [2] - 129:17, 207:9

**proponent** [2] - 116:15, 118:8

**propose** [3] - 8:11, 142:6, 190:18

**proposed** [1] - 178:18

**proposition** [6] - 20:4, 23:20, 24:5, 26:11, 27:11, 45:21

**prosecuting** [1] - 83:14

**prosecution** [9] - 27:3, 27:7, 27:8, 27:19, 29:19, 52:18, 115:14, 115:15, 135:20

**prosecutor** [1] - 83:14

**prosecutors** [1] - 159:4

**prospects** [2] - 46:20, 155:15

**protected** [1] - 35:20

**provably** [1] - 67:17

**prove** [22] - 10:20, 11:16, 14:14, 15:13, 15:14, 16:4, 16:6, 30:13, 33:16, 42:18, 48:9, 50:15, 60:13, 67:18, 68:6, 68:11, 73:21, 89:16, 90:1, 90:2, 150:6, 150:7

**proved** [2] - 91:21, 96:25

**proven** [3] - 55:8, 55:10, 72:9

**proves** [3] - 85:15, 87:10, 89:19

**provide** [6] - 91:16, 121:3, 136:11, 140:9, 179:5, 192:4

**provided** [12] - 18:9, 91:12, 118:22,

121:2, 125:21, 142:21, 144:17, 150:5, 160:6, 201:22, 202:12, 206:2
**provides** [2] - 140:1, 140:2
**providing** [1] - 202:15
**province** [2] - 184:19, 204:18
**proving** [3] - 51:18, 64:16, 149:9
**proximal** [1] - 127:9
**proximity** [3] - 17:17, 17:24, 127:10
**proxy** [1] - 157:23
**prudence** [1] - 149:1
**Przybylowski** [1] - 5:17
**PRZYBYLOWSKI** [2] - 2:3, 5:16
**PSLRA** [1] - 110:11
**PSLRA's** [1] - 187:2
**public** [33] - 21:21, 23:12, 37:2, 56:17, 62:13, 62:15, 68:14, 70:1, 83:12, 83:13, 83:15, 84:6, 84:15, 89:4, 90:9, 91:7, 91:11, 91:15, 118:5, 118:15, 118:16, 118:17, 119:7, 160:17, 160:21, 161:4, 161:5, 193:5, 204:25, 205:1, 206:18, 209:20
**publicly** [3] - 46:3, 55:5, 71:16
**publish** [1] - 118:24
**published** [5] - 106:2, 106:16, 106:20, 133:8, 196:3
**PUC** [1] - 176:10
**puffery** [1] - 58:11
**pull** [1] - 67:5
**Purcell** [21] - 6:23, 144:7, 146:3, 146:6, 191:20, 191:21, 191:23, 192:4, 192:13, 192:19, 193:2, 194:5, 194:8, 194:19, 195:3, 201:16, 202:5, 202:13, 202:21, 203:11
**Purcell's** [13] - 191:25, 192:6, 192:10, 192:16, 192:21, 192:22, 193:6, 193:8, 193:21,

202:1, 202:19, 203:6, 203:23
**purchase** [2] - 21:22, 154:25
**purchaser** [1] - 145:16
**pure** [4] - 19:23, 42:20, 145:23, 173:22
**purport** [1] - 161:3
**purported** [2] - 196:8, 203:6
**purportedly** [1] - 200:14
**purpose** [5] - 96:24, 107:6, 140:1, 140:6, 175:22
**purposely** [1] - 140:6
**purposes** [1] - 6:13
**pursuant** [3] - 70:2, 71:7, 118:10
**pursue** [3] - 77:9, 175:25, 176:4
**push** [2] - 105:18, 162:7
**pushback** [1] - 105:21
**put** [42] - 11:3, 12:3, 16:17, 20:17, 22:14, 30:13, 33:18, 34:23, 39:12, 41:16, 41:24, 44:13, 47:7, 47:8, 49:10, 58:16, 65:10, 65:16, 66:11, 72:11, 73:1, 76:6, 77:10, 81:4, 84:5, 88:5, 92:12, 105:23, 108:8, 108:11, 115:11, 130:22, 136:18, 146:22, 152:10, 169:12, 170:11, 171:5, 182:11, 183:9, 202:6
**putting** [5] - 11:8, 41:3, 92:4, 166:3, 166:9
**puzzle** [1] - 136:9
**PWC** [1] - 97:21

**Q**

**Q1** [4] - 103:17, 103:20, 103:21, 108:2
**Q2** [3] - 102:12, 187:9
**Q3** [2] - 113:6
**qualification** [3] - 200:19, 200:20, 204:10
**qualifications** [3] - 156:2, 204:4, 204:12
**qualified** [1] - 205:2

**Qualified** [1] - 195:19
**qualify** [2] - 23:21, 129:17
**quantification** [1] - 143:20
**Quarter** [2] - 63:23, 63:24
**quarter** [13] - 36:21, 63:24, 71:12, 71:13, 99:15, 106:5, 106:8, 106:12, 132:19, 151:24, 156:14, 175:1
**quarterly** [4] - 59:18, 61:1, 75:19, 103:6
**questions** [16] - 64:19, 76:10, 76:11, 76:20, 76:24, 93:20, 93:22, 95:21, 130:9, 138:25, 139:3, 145:12, 169:10, 170:9, 175:11, 175:12
**quick** [2] - 6:13, 183:14
**quickly** [5] - 49:10, 67:24, 89:17, 170:12, 171:4
**quintessential** [1] - 23:25
**quite** [14] - 26:9, 31:20, 38:16, 47:2, 55:17, 58:15, 69:10, 80:12, 107:19, 126:13, 165:18, 176:6, 211:1, 211:5
**quotations** [1] - 193:2
**quote** [105] - 11:22, 13:18, 13:25, 14:22, 19:5, 21:8, 26:17, 27:18, 27:20, 28:14, 30:2, 32:1, 32:10, 32:22, 32:23, 32:24, 37:24, 39:7, 39:24, 40:18, 42:16, 46:2, 68:20, 68:21, 70:19, 70:22, 71:14, 72:7, 75:12, 81:9, 81:13, 81:18, 81:24, 85:4, 100:6, 100:7, 102:2, 102:21, 102:22, 103:1, 103:3, 104:1, 105:8, 105:12, 105:18, 105:19, 105:20, 105:24, 106:11, 106:12, 107:14, 109:3, 109:10, 109:17, 110:14, 116:16, 121:21, 127:4,

128:11, 129:2, 130:11, 134:2, 134:6, 134:16, 138:12, 138:13, 138:14, 146:14, 155:12, 166:19, 170:4, 170:15, 172:8, 173:6, 177:6, 178:22, 188:1, 191:16, 191:17, 192:11, 192:13, 192:19, 193:9, 193:18, 194:9, 194:10, 194:16, 195:19, 195:21, 195:24, 196:1, 197:23, 198:12, 198:15, 199:2, 199:7, 199:10, 199:14, 199:18
**quoted** [1] - 141:7
**quotes** [2] - 9:6, 24:5
**quoting** [1] - 194:10

**R**

**radical** [3] - 123:1, 123:9, 123:19
**raise** [6] - 20:25, 31:12, 54:14, 123:25, 157:3
**raised** [9] - 56:12, 60:23, 92:24, 100:22, 102:3, 123:21, 131:12, 134:11, 173:7
**raises** [2] - 85:22, 86:8
**raising** [1] - 27:2
**ramping** [1] - 160:23
**ran** [2] - 41:10, 169:13
**range** [1] - 201:14
**rank** [1] - 61:22
**rapid** [1] - 169:14
**rare** [1] - 55:4
**rate** [5] - 36:11, 89:5, 89:15, 124:8
**rather** [15] - 8:1, 11:19, 22:2, 23:8, 27:18, 28:25, 33:3, 36:6, 44:7, 45:11, 48:13, 116:13, 178:15, 179:15, 196:17
**rational** [1] - 143:23
**RDR** [1] - 211:24
**Re** [3] - 27:10, 39:3, 191:11
**re** [1] - 158:12
**re-evaluation** [1] - 158:12

**reach** [6] - 120:8, 133:7, 186:10, 201:10, 201:15, 206:4
**reached** [3] - 70:10, 206:23, 207:12
**reaches** [2] - 205:1, 207:2
**reaching** [2] - 189:9, 203:5
**reaction** [2] - 95:21, 163:24
**reactions** [2] - 150:20, 157:24
**read** [7] - 45:21, 45:22, 81:4, 108:10, 165:21, 165:22, 165:24
**readily** [1] - 153:25
**reading** [4] - 48:5, 84:15, 121:25, 152:23
**ready** [1] - 94:13
**real** [3] - 36:19, 183:14, 183:17
**realities** [1] - 178:11
**reality** [2] - 65:21, 199:4
**realize** [2] - 90:13, 126:21
**realizing** [1] - 39:23
**really** [39] - 9:17, 24:15, 38:16, 39:17, 41:15, 63:20, 64:13, 77:8, 80:11, 80:25, 83:22, 87:14, 92:2, 93:16, 95:8, 110:21, 110:23, 112:15, 121:21, 139:15, 146:24, 147:1, 148:4, 150:16, 150:18, 150:19, 156:10, 161:25, 163:19, 164:3, 164:8, 164:11, 170:12, 178:12, 182:23, 202:11, 202:20, 211:1
**realm** [1] - 171:24
**reams** [2] - 17:6, 144:17
**reaped** [1] - 44:5
**reason** [19] - 42:25, 43:8, 50:16, 56:8, 95:14, 98:21, 109:20, 122:6, 122:20, 127:11, 131:21, 135:11, 155:20, 176:25, 185:7, 192:17,

197:11
**reasonable** [57] -
14:13, 38:11, 72:13,
82:13, 82:14, 99:23,
100:1, 100:9, 102:5,
102:17, 104:2,
108:5, 109:11,
109:13, 109:25,
110:4, 110:15,
114:5, 114:6,
121:23, 122:17,
123:8, 123:16,
124:11, 125:1,
126:4, 126:5,
126:19, 127:8,
127:17, 127:22,
128:14, 128:19,
128:22, 129:4,
129:17, 129:25,
131:22, 133:7,
133:18, 134:9,
134:18, 134:25,
135:10, 136:6,
136:13, 138:20,
163:21, 168:1,
168:8, 170:25,
171:24, 172:21,
173:18, 173:22,
188:16
**reasonably** [2] -
165:24, 201:14
**reasons** [17] - 18:9,
23:14, 29:23, 30:14,
30:17, 30:22, 44:24,
47:5, 49:17, 50:14,
76:4, 82:23, 129:25,
144:23, 188:1,
199:22
**rebuttal** [2] - 7:12,
8:10
**recap** [2] - 6:13, 6:22
**receipt** [1] - 141:20
**receive** [3] - 73:8,
75:19, 83:16
**received** [11] - 7:2,
64:15, 87:10, 87:25,
89:18, 90:3, 119:1,
140:10, 141:18,
142:8, 202:25
**receives** [1] - 89:23
**receiving** [2] - 89:21,
90:7
**recent** [2] - 26:13,
37:17
**recently** [2] - 43:1,
170:5
**Recess** [2] - 94:10,
161:18
**reckless** [4] - 130:1,
131:6, 133:6, 136:14

**recklessly** [2] - 73:20,
110:16
**recklessness** [3] -
68:8, 68:9, 133:20
**recognize** [2] - 47:4,
200:5
**recognized** [6] -
10:19, 14:1, 22:1,
29:24, 110:14,
180:11
**recognizes** [1] - 21:12
**recognizing** [1] -
42:18
**recollection** [1] -
167:15
**recommend** [1] - 31:2
**recommendations** [2]
- 31:3, 31:7
**record** [57] - 11:7,
17:20, 18:8, 25:15,
26:1, 28:6, 28:24,
29:16, 30:11, 31:5,
33:21, 35:9, 36:11,
39:25, 41:9, 62:7,
64:15, 66:12, 67:21,
68:23, 68:24, 76:19,
82:25, 83:1, 92:4,
92:11, 93:4, 94:23,
95:9, 95:11, 95:25,
96:5, 101:1, 107:12,
112:24, 115:10,
115:13, 115:22,
116:7, 118:4, 118:9,
128:8, 129:22,
130:17, 131:23,
133:21, 138:22,
143:6, 145:19,
146:8, 149:14,
153:23, 165:11,
177:8, 209:21,
210:2, 211:22
**record's** [1] - 104:16
**records** [7] - 21:21,
23:12, 48:15,
118:21, 118:23,
119:4
**recouped** [1] - 134:1
**red** [1] - 120:4
**reduce** [1] - 151:5
**reduced** [4] - 46:13,
156:15, 156:16,
156:17
**reductions** [1] -
156:18
**REED** [1] - 2:20
**Reed** [2] - 6:7, 65:3
**refer** [4] - 22:23,
55:14, 58:8, 145:2
**reference** [7] - 28:22,
55:24, 56:22,

109:20, 112:11,
171:11, 186:20
**referenced** [5] - 56:21,
86:14, 118:24,
156:24, 175:15
**referencing** [1] - 29:7
**referred** [6] - 22:22,
153:5, 160:14,
165:24, 196:21,
208:16
**referring** [6] - 56:15,
86:23, 116:2,
165:17, 167:14,
173:7
**refers** [3] - 27:20,
86:13, 110:12
**reflect** [4] - 32:2, 32:8,
150:23, 200:24
**reflected** [1] - 175:24
**reflecting** [1] - 208:4
**reflects** [3] - 17:20,
36:11, 151:2
**Reform** [1] - 35:21,
35:22
**refuge** [2] - 163:16,
183:7
**refuse** [1] - 178:23
**refused** [1] - 10:23
**refute** [1] - 35:8
**refuted** [1] - 41:17
**regard** [4] - 193:20,
195:4, 195:7, 197:10
**regarding** [30] - 10:8,
23:1, 34:12, 51:2,
51:5, 52:23, 57:10,
61:7, 64:9, 65:8,
67:14, 75:12,
130:10, 132:12,
133:1, 147:17,
147:18, 150:11,
155:22, 157:17,
158:20, 160:6,
192:14, 193:25,
194:4, 194:24,
202:16, 202:21,
203:11, 203:12
**regardless** [1] -
112:25
**regularly** [2] - 75:7,
131:24
**regulation** [1] - 42:1
**regulations** [4] -
39:24, 39:25, 40:1,
42:4
**regulators** [2] - 117:2,
117:5
**regulatory** [1] - 120:6,
160:1
**regurgitate** [1] - 22:24
**regurgitating** [1] -

28:12
**rehabilitate** [1] -
184:14
**Reilly** [1] - 203:19
**reimagine** [1] - 109:5
**reiterate** [2] - 72:15,
202:13
**reiterated** [1] - 15:25
**rejected** [10] - 12:12,
33:10, 55:14, 56:9,
60:14, 68:18, 184:2,
198:4, 205:7, 207:5
**relate** [3] - 39:6, 48:4,
48:7
**related** [20] - 9:7,
15:15, 24:19, 26:18,
35:18, 41:20, 105:6,
139:11, 141:8,
149:12, 152:12,
153:21, 156:4,
157:10, 157:14,
157:25, 158:25,
187:11, 196:17,
201:20
**relates** [5] - 28:19,
49:19, 131:11,
195:20, 203:2
**relations** [1] - 31:12
**relationship** [3] -
148:13, 152:21,
160:6
**relationships** [1] -
19:8
**relative** [1] - 103:2
**relatively** [2] - 77:25,
166:16
**release** [3] - 146:15,
151:9, 155:2
**released** [4] - 149:18,
151:4, 159:12,
159:16
**relevance** [2] - 25:11,
63:14
**relevant** [4] - 17:21,
51:12, 69:11, 76:24
**reliability** [5] - 200:19,
200:20, 201:4,
201:7, 205:8
**reliable** [4] - 202:9,
207:14, 210:5
**reliance** [1] - 180:6
**relied** [7] - 40:10,
40:19, 111:8,
111:17, 112:15,
117:15, 117:16
**relief** [7] - 178:15,
178:16, 178:21,
179:9, 189:15,
190:2, 190:11
**relies** [1] - 38:4

**rely** [19] - 19:10, 20:2,
22:18, 23:8, 24:4,
26:8, 72:10, 72:12,
72:20, 72:23, 73:2,
74:3, 77:3, 84:21,
87:6, 87:9, 88:6,
88:25, 181:6
**relying** [2] - 173:14,
183:24
**Relying** [1] - 60:12
**remain** [2] - 8:22,
133:11
**remaining** [3] - 8:22,
10:6, 66:7
**remains** [1] - 34:16
**remarkable** [1] - 8:1
**remarks** [1] - 90:12
**remedial** [1] - 140:6
**remedied** [1] - 165:19
**remedy** [2] - 192:7,
205:22
**remember** [9] - 40:13,
56:11, 95:16, 99:24,
104:10, 106:5,
138:9, 188:23,
211:13
**remind** [1] - 81:25
**remotely** [1] - 5:1
**removal** [1] - 92:21
**remove** [1] - 153:11
**removed** [1] - 92:6
**removing** [1] - 92:19
**rendered** [1] - 12:18
**renders** [2] - 191:12,
191:13
**repeat** [3] - 29:21,
112:23, 206:10
**repeated** [2] - 90:9,
120:10
**repeatedly** [11] -
13:10, 79:19, 88:6,
122:7, 130:9,
133:15, 146:19,
148:16, 193:3,
197:24
**replace** [2] - 42:4,
155:23
**replete** [1] - 48:21
**reply** [6] - 100:23,
121:11, 123:17,
149:7, 150:9, 208:15
**report** [21] - 41:7,
41:8, 97:21, 106:2,
109:1, 117:19,
117:25, 121:11,
125:14, 142:18,
154:23, 158:10,
159:8, 187:8,
197:22, 198:12,
208:1, 208:4, 208:5,

208:15, 210:4
**reported** [8] - 25:21,
34:23, 36:22, 41:6,
125:20, 159:3,
159:16, 159:20
**Reporter** [5] - 1:24,
21:20, 65:3, 163:2,
211:25
**reporter** [4] - 6:15,
6:19, 208:18, 210:25
**REPORTER'S** [1] -
211:19
**reporting** [5] - 61:1,
61:24, 62:4, 66:24,
103:10
**reports** [18] - 48:11,
75:19, 75:20,
114:16, 132:21,
149:15, 150:23,
152:19, 152:20,
160:22, 191:25,
192:6, 196:14,
197:15, 205:25,
206:17, 206:20,
210:1
**represent** [2] - 6:10,
174:13
**representations** [1] -
42:14
**representative** [6] -
17:11, 75:11,
106:25, 122:13,
172:24, 173:5
**represented** [5] -
79:14, 79:15, 79:17,
143:16, 156:1
**representing** [1] -
180:9
**request** [5] - 119:25,
120:1, 120:18, 179:8
**requested** [1] - 121:20
**require** [7] - 11:12,
37:4, 96:4, 104:24,
110:1, 200:16, 201:5
**required** [9] - 99:3,
121:3, 123:16,
123:21, 134:2,
135:13, 148:2,
148:5, 148:24
**requirement** [3] -
148:17, 154:18,
187:3
**requirements** [4] -
13:6, 61:24, 149:1,
200:18
**requires** [11] - 11:11,
14:10, 15:8, 43:9,
44:3, 101:10, 148:9,
188:18, 195:11,
201:7

**requiring** [1] - 123:25
**research** [2] - 201:6,
204:6
**reset** [8] - 102:14,
102:19, 102:20,
102:21, 169:18,
184:20, 184:21,
184:22
**resided** [1] - 102:2
**resignation** [2] -
48:13, 154:16
**resigning** [1] - 48:12
**resolve** [3] - 27:9,
37:20, 97:5
**resolving** [1] - 101:22
**resonates** [1] - 69:15
**resorted** [1] - 146:16
**respect** [68] - 8:8,
8:24, 9:3, 9:14, 9:24,
10:5, 10:14, 10:20,
12:10, 17:3, 18:18,
20:22, 30:10, 36:1,
36:14, 40:1, 40:25,
42:19, 43:15, 44:20,
44:21, 46:17, 48:1,
48:2, 48:9, 50:5,
50:11, 51:19, 51:24,
57:17, 63:3, 64:6,
66:8, 66:9, 67:22,
68:24, 71:23, 72:22,
75:17, 82:22, 91:22,
105:10, 111:5,
127:19, 128:24,
133:20, 137:13,
157:12, 158:22,
163:12, 166:9,
166:11, 173:4,
174:5, 176:18,
177:2, 177:21,
181:13, 182:5,
185:1, 187:13,
190:1, 200:7,
200:11, 200:14,
203:6, 205:4
**respectfully** [3] -
71:18, 171:12,
174:17
**respective** [4] - 96:9,
117:10, 118:20,
185:22
**respects** [1] - 68:14
**respond** [1] - 189:12
**responded** [2] - 98:23,
105:7, 130:9
**responding** [2] - 21:3,
120:12
**response** [6] - 33:4,
55:22, 120:1,
160:11, 162:4,
201:19

**responses** [2] -
120:18, 169:10
**responsibility** [1] -
27:14
**responsible** [1] -
145:9
**rest** [4] - 11:19, 11:24,
156:16, 201:8
**restate** [2] - 15:5,
90:15
**rested** [1] - 25:19
**restricted** [1] - 107:14
**rests** [1] - 44:7
**result** [7] - 71:4,
106:14, 126:12,
139:20, 142:6,
158:11, 160:1
**resulting** [2] - 118:10,
199:7
**results** [13] - 36:20,
49:13, 49:14, 49:15,
71:13, 87:24, 96:13,
106:6, 151:24,
156:13, 156:17,
188:1
**retire** [1] - 109:18
**Retirement** [1] - 37:21
**retrospective** [1] -
60:7
**revealed** [5] - 9:11,
48:13, 105:1,
156:22, 187:12
**reveals** [1] - 96:5
**revelatory** [1] - 157:4
**revenue** [10] - 39:23,
42:8, 54:18, 54:21,
90:24, 97:20, 97:22,
99:9, 165:9, 165:11
**revenues** [2] - 56:1,
104:9
**reverse** [1] - 180:5
**review** [10] - 26:10,
32:6, 39:10, 103:6,
103:7, 113:2, 113:3,
113:9, 132:17, 133:3
**reviewed** [5] - 30:24,
73:24, 113:10,
121:8, 132:25
**reviewing** [1] - 92:22
**reviews** [1] - 110:10
**rich** [1] - 174:9
**ridiculous** [2] -
164:12, 164:24
**rig** [1] - 96:7
**rigged** [3] - 115:3,
129:24, 135:22
**rigging** [4] - 26:18,
120:23, 136:2, 209:4
**rigorous** [1] - 13:7
**rise** [7] - 5:5, 39:6,

94:9, 94:11, 161:17,
161:19, 211:16
**rises** [1] - 123:1
**Risk** [1] - 60:12
**risk** [13] - 23:24, 62:5,
122:3, 124:11,
124:15, 125:2,
125:4, 130:14,
134:1, 140:19,
140:22, 160:4
**risks** [3] - 103:2,
170:4, 170:7
**rivals** [1] - 217:1
**road** [2] - 15:8, 124:2
**role** [5] - 100:12,
155:13, 156:2,
194:1, 201:12
**roll** [1] - 132:4
**Romain** [1] - 6:1
**ROMAIN** [1] - 2:15
**Ron** [2] - 62:3, 98:16
**roof** [1] - 174:21
**ROOFER'S** [1] - 1:3
**Roofer's** [1] - 68:19
**room** [3] - 88:18,
135:14, 149:5
**rooms** [1] - 144:17
**Roseland** [1] - 1:19
**roughly** [2] - 94:22,
123:4
**routinely** [1] - 111:8
**Rowe** [1] - 6:5
**ROWE** [1] - 2:11
**rubber** [1] - 15:8
**Rudinger** [3] - 140:17,
140:20, 141:6
**Rule** [10] - 23:5, 69:25,
96:23, 117:13,
118:3, 120:4, 120:7,
188:18, 191:9,
200:16
**rule** [6] - 23:9, 70:2,
116:19, 120:4,
124:6, 162:1
**rules** [4] - 27:12,
104:24, 124:4,
165:11
**Rules** [1] - 23:11
**ruling** [1] - 35:16
**run** [4] - 48:18, 70:13,
101:4, 187:19
**rust** [1] - 148:20
**Rx** [23] - 10:2, 15:18,
15:24, 17:13, 18:20,
21:24, 29:2, 29:5,
30:23, 46:21, 49:15,
51:3, 51:16, 71:23,
79:16, 79:18, 80:15,
80:17, 156:18,
182:1, 196:23,

197:11

**S**

**S-A-N-D-O-Z** [1] - 27:5
**S-T-U-E-C-K** [1] -
27:15
**Sachs** [1] - 80:21
**safe** [1] - 35:22
**safeguards** [1] - 24:3
**salaries** [1] - 20:22
**sale** [2] - 71:8, 71:9
**sales** [14] - 24:21,
27:14, 29:3, 29:4,
29:5, 31:16, 69:7,
69:10, 105:7, 115:23
**salt** [1] - 124:2
**Salt** [1] - 32:17
**salvaged** [1] - 181:10
**Sam** [2] - 6:1, 7:22
**Samuel** [1] - 191:7
**SAMUEL** [1] - 2:16
**SANDLER** [1] - 1:17
**Sandler** [1] - 5:21
**Sandoz** [23] - 24:10,
27:5, 27:6, 27:13,
27:21, 28:3, 28:19,
52:17, 52:18,
114:25, 115:1,
115:2, 115:3,
115:11, 115:15,
115:23, 120:23,
135:16, 135:20,
180:25, 209:2
**Sandoz's** [3] - 115:14,
115:19, 129:23
**Sandoz-deferred** [1] -
52:18
**satisfied** [2] - 110:1,
194:7
**save** [8] - 26:12,
47:22, 179:25,
180:3, 180:10,
180:16, 180:22,
182:21
**saw** [10] - 47:2, 51:12,
55:2, 74:21, 96:8,
107:2, 151:4,
165:13, 178:21,
181:20
**scaling** [1] - 103:2
**scare** [1] - 146:17
**scattershot** [1] - 16:10
**scenario** [2] - 143:2,
150:7
**scene** [1] - 72:3
**scheme** [14] - 9:3, 9:7,
9:14, 22:7, 72:1,
75:21, 102:12,
112:5, 160:5,

162:14, 162:17, 162:24, 162:25, 174:16
**schemes** [1] - 26:18
**Schneider** [1] - 192:9
**scienter** [44] - 8:4, 8:8, 9:6, 9:8, 10:8, 10:19, 10:20, 30:4, 30:6, 38:10, 42:19, 42:21, 43:4, 43:8, 43:10, 43:13, 51:11, 51:18, 64:16, 67:22, 68:21, 71:2, 71:17, 104:14, 108:19, 109:22, 109:23, 110:1, 110:4, 110:19, 110:21, 110:25, 111:5, 129:21, 130:8, 131:22, 133:20, 134:19, 136:9, 136:12, 181:13, 181:16, 186:23, 203:2
**scintilla** [3] - 65:23, 96:25, 138:23
**scope** [2] - 136:18, 192:1
**scoundrels** [2] - 163:17, 183:7
**scoured** [2] - 11:4, 11:5
**screen** [3] - 41:3, 41:4, 65:16
**scripted** [1] - 133:1
**scrutiny** [2] - 160:1, 204:5
**se** [2] - 23:2, 28:16
**search** [3] - 159:18, 159:22, 160:24
**searching** [1] - 159:23
**seated** [3] - 5:9, 94:12, 161:20
**SEC** [2] - 170:21, 193:16
**second** [18] - 10:6, 13:2, 14:23, 28:9, 35:10, 40:21, 62:3, 69:4, 99:15, 106:5, 117:13, 119:1, 120:19, 131:21, 137:20, 184:4, 192:22, 209:7
**secondly** [1] - 137:20
**seconds** [1] - 65:25
**secretary** [1] - 74:7
**section** [10] - 9:18, 64:3, 139:17, 143:15, 178:14, 178:19, 195:5, 195:7, 196:10

**Securities** [6] - 35:21, 35:22, 139:17, 148:24, 172:11, 202:8
**securities** [20] - 33:22, 37:23, 39:7, 39:9, 39:14, 39:20, 57:19, 58:5, 66:14, 83:14, 111:24, 112:1, 140:23, 148:11, 150:14, 177:10, 177:11, 185:25, 193:14, 206:19
**security** [3] - 58:7, 83:18, 111:25
**sedan** [1] - 123:13
**see** [34] - 9:8, 18:13, 46:18, 47:11, 47:13, 56:2, 63:8, 63:10, 67:3, 67:6, 67:7, 69:6, 80:13, 81:25, 82:9, 83:23, 86:3, 87:19, 98:15, 104:19, 107:11, 123:2, 123:11, 123:12, 123:13, 131:8, 136:6, 151:11, 152:25, 155:6, 155:14, 171:23, 186:15, 189:2
**seek** [5] - 10:12, 24:8, 139:19, 149:3, 191:21
**seeking** [2] - 193:10, 205:21
**seeks** [1] - 116:22
**seem** [4] - 13:20, 55:6, 155:7, 186:14
**segment** [4] - 49:14, 81:12, 82:10, 128:13
**segments** [2] - 49:7, 80:12
**segregated** [1] - 49:16
**select** [1] - 114:3
**self** [3] - 32:15, 95:9, 186:5
**self-serving** [2] - 95:9, 186:5
**Sell** [1] - 107:14
**sell** [12] - 40:6, 40:7, 70:6, 83:18, 91:19, 107:8, 144:2, 164:13, 164:15, 164:22, 174:14, 174:19
**selling** [6] - 69:14, 163:23, 164:14, 164:16, 164:23, 173:24

**sells** [2] - 70:10, 71:7
**Semerenko** [1] - 148:9
**sending** [1] - 182:16
**sends** [1] - 74:7
**senior** [2] - 53:24, 75:4
**sense** [16] - 21:8, 21:11, 36:25, 45:2, 78:2, 78:3, 119:9, 135:13, 146:24, 161:9, 161:13, 174:17, 176:12, 182:17, 202:24
**sensitivities** [1] - 97:22
**sent** [10] - 74:7, 98:7, 98:11, 99:14, 113:15, 114:16, 132:10, 132:12, 132:21, 185:11
**sentence** [3] - 81:18, 108:9, 128:2
**sentences** [1] - 128:1
**separate** [3] - 14:20, 64:3, 199:5
**September** [7] - 78:18, 91:2, 91:7, 104:8, 113:17, 114:16, 132:22
**sequence** [1] - 190:3
**serious** [6] - 37:9, 37:16, 42:16, 83:6, 88:22, 169:21
**served** [3] - 107:6, 168:12, 202:7
**serves** [1] - 96:23
**Services** [1] - 193:16
**serving** [2] - 95:9, 186:5
**set** [15] - 12:10, 16:23, 22:19, 23:13, 25:14, 27:21, 101:24, 117:19, 118:9, 119:23, 150:21, 175:25, 182:22, 194:23, 205:15
**sets** [2] - 118:5, 120:12
**settlement** [1] - 162:8
**settlements** [1] - 179:23
**seven** [8] - 12:14, 47:1, 149:17, 150:15, 151:15, 189:5, 189:10, 201:25
**Seventh** [4] - 37:18, 37:22, 38:9, 38:16
**several** [11] - 29:14, 72:10, 74:23, 80:16,

94:21, 105:9, 113:16, 152:4, 156:20, 204:12, 208:7
**severely** [2] - 98:12, 103:14
**shade** [1] - 39:12
**shape** [2] - 15:20, 188:11
**share** [27] - 32:10, 32:23, 44:22, 44:25, 45:2, 45:4, 45:17, 49:8, 49:15, 70:11, 71:9, 75:7, 121:15, 122:4, 127:14, 127:16, 141:14, 141:16, 142:13, 142:17, 144:2, 149:18, 174:9, 205:20, 208:11, 209:9
**shared** [1] - 86:15
**sharehold** [1] - 143:21
**shareholder** [1] - 140:14
**shareholders** [21] - 44:10, 45:12, 62:13, 71:5, 139:21, 141:12, 141:17, 141:21, 141:22, 142:5, 143:12, 144:5, 144:25, 152:9, 163:7, 174:13, 176:20, 176:21, 178:22, 179:6, 194:17
**shares** [35] - 44:10, 71:1, 71:4, 71:7, 71:10, 71:11, 107:8, 107:10, 107:11, 107:15, 138:6, 141:15, 141:18, 141:23, 141:24, 142:2, 142:5, 142:9, 142:12, 142:14, 143:8, 143:15, 143:23, 143:24, 144:2, 144:4, 144:14, 164:13, 173:24, 174:2, 174:10, 174:19, 178:23, 205:21, 205:23
**Sharkey** [1] - 97:1
**shave** [1] - 129:11
**shed** [1] - 38:22
**sheet** [3] - 47:3, 47:15, 180:4
**shepherding** [1] - 94:25

**Sherman** [5] - 111:23, 111:24, 137:18, 177:3
**shifting** [1] - 65:18
**ship** [1] - 155:4
**Shkreli** [3] - 56:12, 131:11, 131:12
**Shkreli's** [1] - 163:14
**shocked** [2] - 76:23, 151:9
**shocking** [2] - 77:1, 81:3
**shoehorn** [1] - 16:9
**short** [8] - 65:8, 66:1, 68:20, 90:13, 93:3, 95:15, 161:10, 166:17
**shortage** [3] - 125:19, 125:21
**shortly** [1] - 10:25
**show** [27] - 9:22, 11:6, 34:16, 38:10, 44:2, 48:1, 67:3, 67:18, 68:6, 68:8, 79:12, 82:16, 84:25, 121:12, 122:5, 149:21, 160:15, 164:4, 165:18, 166:25, 177:9, 180:24, 187:8, 191:19, 198:20, 198:21
**showed** [9] - 9:22, 33:3, 104:8, 113:3, 113:15, 157:7, 165:13, 169:25, 208:25
**showing** [12] - 14:14, 108:16, 118:9, 119:12, 121:4, 132:23, 133:21, 143:6, 148:10, 149:11, 159:10, 204:12
**shown** [5] - 30:21, 78:17, 111:1, 111:7, 130:19
**shows** [20] - 11:6, 17:18, 17:21, 18:4, 59:22, 68:7, 68:24, 79:13, 79:22, 95:25, 112:12, 112:24, 114:19, 118:13, 121:9, 122:5, 131:23, 184:16, 187:8, 198:23
**SHRIVER** [1] - 2:14
**shut** [4] - 12:4, 16:17, 20:17, 182:11
**side** [7] - 111:5,

136:20, 177:25, 178:1, 178:8, 206:8, 211:13
**sides** [2] - 110:8, 110:25
**sign** [2] - 54:5, 58:20
**sign-off** [1] - 54:5
**signals** [2] - 109:18, 152:11
**signed** [2] - 119:14, 138:11
**significance** [1] - 157:22
**significant** [10] - 37:19, 68:6, 71:16, 136:24, 149:22, 154:13, 160:10, 169:13, 171:7, 189:11
**significantly** [5] - 68:3, 73:19, 82:16, 151:25, 196:11
**signing** [1] - 63:3
**silence** [1] - 182:24
**silenced** [1] - 183:5
**silliest** [1] - 20:10
**silly** [4] - 17:18, 24:13, 58:25, 183:6
**SILVERMAN** [9] - 2:3, 4:7, 5:11, 64:25, 94:5, 94:14, 139:5, 183:3, 211:15
**Silverman** [16] - 5:12, 94:15, 139:14, 144:1, 147:8, 152:2, 157:6, 166:18, 167:5, 169:13, 172:7, 172:23, 173:16, 175:15, 177:2, 209:12
**similar** [12] - 8:7, 18:4, 31:7, 32:21, 38:7, 38:16, 126:6, 126:15, 193:6, 204:8
**Similarly** [1] - 1:4
**similarly** [4] - 39:12, 126:7, 199:8, 199:20
**simple** [2] - 21:11, 183:17
**simply** [9] - 9:21, 51:21, 52:1, 53:2, 57:6, 75:12, 138:24, 199:11, 202:23
**single** [9] - 21:5, 25:20, 33:25, 34:22, 74:4, 77:5, 124:19, 158:10, 185:19
**singularly** [1] - 88:14
**sins** [1] - 117:4
**site** [1] - 111:16

**sites** [1] - 21:23
**sitting** [1] - 76:23
**Situated** [1] - 1:5
**situation** [10] - 64:17, 105:8, 124:13, 125:8, 125:17, 138:14, 140:24, 145:14, 187:23, 189:24
**situations** [2] - 54:11, 54:16
**six** [18] - 8:24, 9:15, 19:14, 25:4, 28:19, 30:21, 34:1, 59:14, 74:13, 79:4, 79:16, 100:3, 112:10, 132:12, 137:16, 163:23, 182:19, 201:25
**six-fold** [2] - 74:13, 132:12
**Sixth** [1] - 20:3
**size** [3] - 19:12, 19:14, 19:21
**skeptical** [1] - 9:12
**skill** [1] - 204:14
**skin** [1] - 159:4
**SKUs** [1] - 34:4
**slide** [64] - 26:25, 41:5, 47:8, 51:20, 51:25, 55:25, 57:15, 57:16, 60:20, 63:21, 66:11, 67:11, 67:24, 68:5, 69:24, 70:25, 71:25, 73:2, 73:9, 75:2, 75:10, 77:10, 77:20, 78:4, 78:17, 78:24, 79:15, 80:14, 81:21, 83:9, 83:10, 84:6, 85:2, 85:10, 85:20, 86:6, 87:7, 87:14, 87:15, 87:23, 88:7, 89:1, 89:17, 89:18, 90:5, 90:15, 90:21, 91:1, 91:6, 91:12, 91:25, 92:17, 136:18, 170:2, 170:11, 171:5, 171:14, 172:5
**slides** [17] - 50:21, 72:20, 73:8, 78:24, 88:1, 89:16, 90:11, 91:22, 92:6, 92:17, 92:20, 92:22, 93:1, 93:2, 113:9, 130:23
**slight** [1] - 127:25
**slightly** [9] - 80:2, 80:8, 80:20, 82:3, 82:12, 127:22, 128:14, 171:11,

207:23
**small** [3] - 18:14, 29:6, 130:22
**smart** [2] - 45:21, 151:3
**smile** [1] - 61:24
**SMITH** [1] - 2:11
**Smith** [1] - 6:5
**smoking** [5] - 11:17, 11:18, 15:10, 16:16, 110:1
**smoothly** [6] - 57:23, 99:21, 101:23, 102:8, 102:20, 186:15
**sneak** [2] - 39:1, 40:12
**so-called** [12] - 9:12, 14:19, 37:3, 43:25, 44:19, 48:24, 127:18, 129:5, 136:7, 178:1, 180:6, 191:22
**social** [5] - 16:12, 17:12, 18:3, 19:7, 20:6
**Solar** [1] - 203:19
**sold** [11] - 14:9, 28:5, 31:19, 34:4, 62:14, 63:11, 70:25, 71:10, 138:6, 164:10, 174:2
**Solemnized** [1] - 15:10
**solemnized** [1] - 11:13
**someday** [1] - 181:13
**someone** [4] - 74:15, 74:18, 74:20, 132:4
**someplace** [1] - 41:10
**sometimes** [10] - 7:24, 18:20, 54:12, 54:13, 65:11, 123:11, 134:2, 173:2, 183:21
**somewhat** [1] - 30:3
**soon** [3] - 109:18, 132:20, 211:8
**sorry** [7] - 73:13, 74:14, 85:16, 85:25, 126:25, 133:17, 145:4
**sort** [10] - 29:10, 54:14, 54:21, 55:13, 88:13, 90:12, 137:19, 151:13, 162:7, 162:21
**sorts** [1] - 76:4
**sought** [2] - 107:8, 179:4
**sound** [2] - 62:22, 179:2
**sounded** [2] - 95:4,

95:24
**sounds** [2] - 78:11, 179:2
**South** [1] - 2:12
**Southern** [1] - 58:9
**southern** [1] - 179:7
**SOX** [1] - 62:6
**space** [2] - 61:15, 77:24
**spades** [1] - 49:21
**spanning** [2] - 34:18, 201:24
**spare** [2] - 91:14, 152:23
**Spartan** [1] - 179:24
**spartan** [1] - 35:8
**speakers** [1] - 28:23
**speaking** [7] - 15:20, 25:23, 42:11, 104:5, 162:12, 168:5, 172:11
**speaks** [2] - 62:2, 101:17
**specialized** [2] - 13:5, 191:16
**specialty** [1] - 66:18
**specific** [21] - 16:22, 17:13, 35:23, 75:8, 77:17, 79:16, 82:9, 82:10, 128:10, 128:12, 130:12, 151:7, 155:19, 156:25, 168:13, 169:2, 171:12, 205:18
**specifically** [13] - 12:12, 29:24, 36:7, 40:17, 127:11, 140:20, 149:16, 152:1, 153:20, 167:20, 194:13, 198:4, 208:14
**specificity** [1] - 32:19
**specifics** [3] - 22:10, 87:3, 202:14
**specified** [2] - 8:25, 11:21
**speculate** [2] - 17:16, 45:5
**speculating** [1] - 192:5
**speculation** [13] - 12:1, 19:23, 37:11, 48:21, 65:23, 72:4, 141:1, 145:23, 146:1, 162:6, 173:22, 192:6, 199:7
**speculations** [1] - 182:23
**speculative** [10] -

25:18, 44:2, 44:5, 44:15, 47:16, 47:18, 141:2, 141:3, 142:22
**spell** [1] - 127:1
**spend** [2] - 55:21, 169:8
**spent** [6] - 20:14, 34:13, 95:3, 104:18, 138:1, 184:13
**spherical** [1] - 209:23
**spike** [1] - 112:16
**spiked** [1] - 187:9
**spikes** [2] - 126:18, 127:22
**spiking** [1] - 127:23
**Spill** [1] - 27:10
**spin** [8] - 96:18, 108:8, 108:11, 121:24, 126:21, 128:3, 188:14, 191:21
**spots** [1] - 192:25
**spread** [1] - 142:20
**spun** [1] - 97:13
**SPX** [1] - 192:17
**squarely** [1] - 23:3
**squeeze** [1] - 179:22
**Squibb** [2] - 110:8, 186:24
**St** [1] - 6:1
**ST** [1] - 2:15
**stack** [1] - 84:17
**staff** [4] - 99:8, 166:10, 210:16, 210:22
**stage** [26] - 16:16, 16:17, 16:18, 26:24, 33:23, 33:24, 40:16, 58:18, 99:25, 101:9, 102:18, 104:14, 107:21, 110:21, 110:23, 114:2, 130:17, 175:8, 178:15, 179:12, 185:9, 187:1, 201:12
**Stage** [1] - 23:25
**stand** [2] - 36:17, 173:8
**stand-alone** [1] - 36:17
**standard** [36] - 33:7, 44:1, 46:7, 65:21, 65:22, 65:24, 82:14, 82:15, 93:8, 93:15, 109:6, 110:6, 110:11, 110:13, 110:17, 149:4, 161:1, 161:6, 171:2, 186:25, 187:3, 193:22, 193:24, 194:1, 194:5, 194:6,

194:9, 194:14,
194:15, 194:20,
201:7, 201:15,
203:13, 204:1
**standards** [6] - 68:10,
109:2, 191:19,
203:11, 203:12,
203:18
**stands** [1] - 24:17
**Stanley** [1] - 91:7
**star** [1] - 186:3
**stark** [1] - 134:22
**starred** [1] - 110:10
**start** [9] - 43:19,
58:22, 85:14, 139:8,
139:9, 151:21,
170:17, 201:16
**started** [7] - 5:8, 29:7,
66:2, 68:13, 112:13,
139:10, 156:20
**starting** [4] - 7:7,
39:17, 51:16, 163:4
**starving** [1] - 188:6
**state** [35] - 18:25,
22:19, 38:14, 72:16,
116:3, 116:6,
116:10, 117:7,
118:16, 118:19,
118:22, 119:9,
119:13, 119:15,
119:18, 119:21,
119:23, 120:19,
120:22, 146:2,
146:4, 146:6,
147:18, 147:22,
151:22, 176:10,
177:18, 181:8,
181:21, 192:5,
192:11, 192:13,
202:16, 202:21,
202:22
**State** [12] - 22:23,
22:25, 23:8, 23:9,
23:15, 24:7, 24:14,
24:19, 25:7, 26:6,
46:6, 52:14
**State's** [1] - 124:3
**statement** [65] - 27:20,
27:22, 34:1, 47:4,
49:11, 55:24, 55:25,
56:4, 56:6, 56:8,
56:21, 56:23, 57:10,
57:16, 57:17, 57:20,
58:4, 60:4, 60:5,
60:13, 60:18, 61:6,
61:12, 61:14, 61:16,
61:17, 61:21, 62:8,
64:7, 64:9, 66:21,
80:7, 82:8, 82:17,
85:1, 85:25, 88:4,

89:1, 89:2, 89:20,
89:25, 91:1, 91:2,
91:20, 93:7, 98:14,
100:3, 100:10,
108:11, 110:17,
117:20, 131:18,
133:4, 133:5,
145:25, 146:18,
148:21, 165:16,
166:21, 167:24,
177:22, 192:24,
193:13, 193:15
**statements** [97] -
10:24, 23:12, 23:22,
27:2, 28:13, 28:16,
28:21, 33:13, 33:15,
33:19, 33:20, 33:22,
35:20, 36:1, 36:4,
36:9, 36:14, 37:13,
38:3, 38:4, 38:6,
38:8, 38:17, 39:6,
39:21, 40:10, 41:16,
43:11, 43:13, 48:8,
48:14, 48:16, 49:6,
50:2, 50:3, 51:8,
51:9, 54:24, 54:25,
55:3, 55:5, 58:9,
66:8, 66:9, 66:14,
67:12, 67:14, 67:16,
67:23, 69:15, 69:19,
71:20, 73:11, 77:9,
77:15, 77:21, 79:11,
83:4, 84:9, 84:20,
84:22, 85:18, 94:22,
99:12, 99:18, 99:21,
100:12, 108:7,
111:11, 115:16,
129:13, 130:2,
131:23, 133:21,
136:14, 136:19,
138:7, 139:12,
140:11, 153:23,
156:23, 160:7,
160:8, 163:9,
163:10, 165:15,
178:24, 179:7,
180:2, 181:10,
192:23, 193:4,
193:5, 203:8, 209:21
**States** [13] - 5:2, 5:3,
9:17, 22:25, 40:8,
62:15, 89:9, 89:13,
121:7, 171:16,
176:21, 176:23,
196:21
**STATES** [2] - 1:1, 1:14
**states** [5] - 27:18,
59:2, 118:20, 137:8,
186:6
**statistical** [2] -

149:24, 154:11
**statistically** [4] -
149:21, 154:12,
160:10, 189:11
**statistics** [1] - 150:4
**statues** [1] - 145:7
**statute** [6] - 29:20,
140:1, 140:7, 145:8,
189:19
**stave** [1] - 19:11
**stay** [2] - 16:1, 113:7
**stays** [1] - 29:12
**Steamfitters** [1] -
39:16
**stems** [1] - 204:16
**step** [3] - 31:16, 65:6,
191:12
**stepping** [2] - 72:15,
159:23
**steps** [2] - 69:21,
74:18
**sterile** [1] - 209:24
**Stewart** [1] - 86:13
**stick** [5] - 124:18,
132:4, 155:3, 155:8,
155:9
**still** [8] - 20:15, 69:5,
78:7, 78:13, 80:18,
118:1, 163:12, 184:2
**stock** [34] - 49:12,
49:21, 49:23, 69:3,
69:7, 69:10, 69:14,
69:17, 70:10, 70:14,
149:24, 150:20,
152:15, 153:3,
153:7, 154:13,
155:10, 155:21,
156:25, 158:18,
159:11, 159:15,
160:9, 164:10,
164:13, 174:20,
174:24, 175:4,
188:25, 189:3,
197:3, 206:15,
206:24
**stocks** [1] - 148:14
**stop** [1] - 69:21
**stopped** [1] - 174:18
**stories** [1] - 185:15
**story** [4] - 40:22,
64:13, 96:19, 153:18
**straightforward** [1] -
195:21
**strained** [3] - 136:5,
183:10, 184:25
**strap** [1] - 26:5
**strategies** [2] - 29:1,
33:4
**strategy** [9] - 13:12,
81:10, 111:19,

127:19, 128:21,
130:6, 137:14,
181:10
**streams** [1] - 61:8
**Street** [7] - 1:11, 2:17,
3:4, 109:14, 109:17,
159:16, 159:20
**stretch** [2] - 73:4,
104:20
**stretching** [1] - 105:20
**stripped** [1] - 182:22
**strong** [9] - 11:22,
13:3, 13:14, 58:4,
65:10, 68:8, 110:5,
110:12, 136:12
**stronger** [1] - 11:15
**structural** [2] - 208:7,
210:12
**structure** [5] - 126:15,
135:8, 201:18,
205:6, 210:10
**structured** [1] - 126:7
**struggled** [1] - 79:9
**struggling** [1] - 73:14
**stubborn** [4] - 70:21,
71:20, 174:18,
174:21
**stuck** [2] - 17:1, 132:5
**studied** [4] - 30:24,
49:15, 151:3, 198:12
**studies** [3] - 149:20,
160:9, 204:25
**study** [4] - 45:24,
135:6, 150:3, 196:12
**Stueck** [6] - 27:15,
27:23, 28:1, 28:4,
28:11, 28:15
**Stueck's** [2] - 27:15,
28:9
**stuff** [4] - 49:22,
88:15, 165:17,
185:10
**stuffing** [1] - 106:10
**stupid** [1] - 180:20
**subject** [11] - 48:4,
48:7, 139:9, 154:16,
156:12, 191:16,
193:9, 196:1, 196:2,
204:21, 209:19
**subjects** [2] - 48:25,
205:3
**submit** [3] - 71:18,
171:13, 174:17
**submitted** [1] - 52:16
**submitting** [1] - 24:9
**subpoena** [1] - 180:24
**Subramanian** [1] -
146:7
**Subraminian** [1] -
145:24

**subsequent** [2] -
148:11, 199:16
**subsidiary** [1] - 59:11
**substance** [3] - 24:20,
33:15, 183:14
**substantial** [5] -
148:10, 148:13,
198:14, 198:18,
208:17
**substantially** [3] -
8:20, 82:23, 156:14
**substantiate** [1] -
42:16
**substantiating** [1] -
40:1
**substantive** [3] -
27:16, 110:13
**substitute** [1] - 181:8
**succeed** [1] - 144:24
**succeeded** [4] -
141:16, 144:9,
144:24, 179:15
**succeeding** [1] -
144:11
**success** [6] - 10:8,
35:19, 37:14, 51:5,
67:14, 130:23
**Success** [1] - 62:4
**successful** [6] -
43:21, 139:16,
142:4, 170:5,
189:24, 195:13
**successor** [2] - 156:2,
156:3
**successes** [1] -
166:11
**suffered** [1] - 141:12
**sufficient** [6] - 16:23,
68:1, 136:10,
160:18, 177:16,
206:4
**sufficiently** [1] - 10:20
**suggest** [12] - 22:11,
25:17, 65:19, 66:20,
67:5, 68:21, 74:21,
92:16, 159:22,
167:11, 198:2
**suggested** [7] - 10:4,
30:24, 56:24, 92:19,
97:20, 170:13,
183:23
**suggesting** [6] -
56:23, 83:5, 102:1,
120:2, 145:21, 167:5
**suggestion** [2] -
48:17, 138:23
**suggestions** [1] -
11:10
**suggestive** [2] -
20:20, 202:22

**suggests** [3] - 54:4, 126:3, 198:15
**Suite** [1] - 41:6
**Sullivan** [5] - 6:10, 8:7, 20:23, 20:24, 36:7
**SULLIVAN** [1] - 3:2
**sum** [4] - 20:4, 22:10, 57:3, 64:11
**summarize** [1] - 49:10
**summarizes** [1] - 34:23
**summary** [53] - 6:22, 6:24, 6:25, 7:8, 7:10, 8:11, 16:3, 19:4, 19:11, 27:2, 27:25, 28:14, 33:23, 34:13, 50:16, 53:19, 55:23, 65:24, 68:1, 81:2, 93:15, 96:22, 97:3, 108:13, 115:9, 115:13, 116:7, 116:10, 116:11, 116:14, 117:22, 128:17, 128:18, 140:20, 149:5, 149:8, 150:8, 150:22, 153:18, 161:2, 162:4, 171:1, 175:8, 177:4, 179:12, 179:18, 181:1, 184:18, 185:24, 187:1, 188:8, 200:8, 200:23
**SUMMARY** [1] - 4:3
**summation** [1] - 95:5
**summer** [2] - 92:7, 133:14
**super** [5] - 111:17, 112:2, 112:16, 114:20, 114:23
**superstar** [1] - 189:8
**Supp** [1] - 118:14
**supplement** [1] - 91:16
**supplementation** [1] - 91:13
**supplemented** [1] - 91:3
**suppliers** [3] - 42:5, 42:10
**Supply** [1] - 110:15
**supply** [6] - 31:9, 42:5, 42:8, 125:18, 125:19, 125:21
**support** [11] - 12:7, 16:23, 19:6, 27:11, 37:11, 84:21, 146:8, 150:22, 159:23, 177:1, 209:5

**supported** [4] - 68:25, 129:22, 130:8, 201:5
**supporting** [5] - 20:5, 72:13, 97:1, 149:15, 186:7
**supports** [3] - 62:8, 140:17, 148:25
**supposed** [17] - 9:3, 12:24, 25:17, 28:2, 28:9, 39:22, 42:3, 45:7, 46:15, 73:15, 74:23, 125:19, 178:12, 180:1, 192:7, 196:2, 197:7
**supposedly** [2] - 25:23, 196:9
**supposition** [6] - 11:25, 37:11, 42:21, 43:24, 162:3, 162:6
**Supreme** [7] - 12:5, 43:17, 111:2, 178:13, 194:13, 194:14, 194:16
**surely** [1] - 162:8
**surpassed** [1] - 9:7
**surprise** [2] - 21:25, 37:15
**surprised** [2] - 98:15, 189:7
**surprising** [1] - 189:11
**survival** [1] - 16:10
**survive** [4] - 27:2, 177:4, 181:5, 181:16
**survived** [1] - 182:10
**surviving** [3] - 27:24, 35:10, 51:1
**suspicions** [1] - 68:1
**suspicious** [1] - 74:22
**sustain** [3] - 33:22, 47:19, 173:10
**sustainability** [2] - 114:8, 131:1
**sustainable** [8] - 130:21, 172:7, 172:12, 172:13, 172:14, 172:20, 183:19, 183:24
**sustained** [1] - 40:18
**sweeping** [2] - 129:16, 159:6
**swell** [1] - 100:8
**switching** [1] - 42:9
**sworn** [1] - 18:13
**synergies** [4] - 39:23, 42:8, 42:9, 84:3
**synergy** [1] - 84:2
**synthesize** [1] - 211:10
**system** [1] - 59:10

**systemic** [1] - 83:22
**Systems** [1] - 37:21
**systems** [1] - 57:24

**T**

**table** [5] - 6:17, 137:5, 137:6, 177:25, 210:14
**tacit** [1] - 122:4
**tactics** [2] - 32:3, 146:17
**tag** [1] - 8:17
**tag-a-long** [1] - 8:17
**tailwind** [1] - 132:19
**takeover** [4] - 104:12, 104:24
**talkers** [1] - 211:1
**talks** [1] - 170:17
**tantrum** [5] - 63:14, 63:16, 90:17, 166:7
**tantrums** [1] - 87:1
**taught** [1] - 196:3
**tax** [1] - 71:1
**Taylor** [1] - 37:21
**team** [12] - 78:5, 78:9, 78:12, 78:20, 85:6, 86:3, 87:20, 129:11, 130:21, 130:24, 134:16, 172:16
**teams** [1] - 40:4
**technical** [1] - 176:18
**technically** [1] - 112:6
**Technology** [1] - 37:22
**temper** [2] - 87:1, 90:17
**temporal** [1] - 127:10
**temporarily** [1] - 187:6
**ten** [5] - 58:22, 123:6, 164:13, 167:9, 190:25
**tender** [90] - 43:21, 44:6, 44:10, 44:18, 45:15, 45:22, 68:16, 68:25, 70:17, 71:6, 107:6, 107:22, 138:4, 138:7, 138:17, 139:11, 139:13, 139:15, 139:18, 139:22, 139:23, 140:8, 140:12, 140:15, 141:9, 141:13, 141:14, 141:16, 141:19, 141:20, 141:22, 142:3, 142:7, 142:9, 142:10, 142:12, 142:20, 143:3,

143:6, 143:14, 143:18, 143:24, 144:6, 144:8, 144:11, 144:13, 144:23, 144:24, 145:6, 145:23, 146:1, 146:13, 147:6, 147:14, 154:20, 174:3, 174:5, 174:8, 174:12, 174:20, 178:19, 178:21, 178:23, 179:14, 189:20, 190:2, 195:9, 195:11, 195:12, 195:15, 195:19, 195:22, 195:23, 195:25, 196:4, 196:7, 201:19, 204:11, 204:17, 204:22, 204:23, 205:5, 205:6, 205:14, 205:19, 205:23, 205:24, 206:2, 206:4
**tendered** [7] - 141:17, 142:3, 142:5, 142:14, 143:8, 143:17, 205:20
**tens** [2] - 124:19, 137:4
**tenth** [1] - 71:10
**term** [6] - 39:8, 58:7, 91:6, 110:20, 184:21, 207:25
**terms** [10] - 6:18, 7:3, 71:16, 94:8, 112:9, 112:11, 156:11, 170:4, 184:20, 211:12
**territory** [1] - 184:17
**test** [2] - 83:8, 93:11
**testified** [22] - 15:23, 17:11, 17:14, 25:22, 46:18, 70:19, 74:8, 79:5, 79:19, 86:22, 87:3, 88:13, 90:21, 92:21, 119:16, 122:14, 133:25, 134:4, 180:8, 195:24, 196:3, 202:7
**testifies** [1] - 147:18
**testify** [13] - 28:16, 115:18, 115:20, 116:14, 122:12, 146:4, 146:6, 146:7, 147:21, 181:3, 193:18, 195:22, 205:3
**testifying** [1] - 202:21

**testimony** [46] - 6:23, 18:13, 20:4, 40:3, 41:17, 42:13, 47:3, 47:7, 47:10, 47:18, 47:21, 54:3, 54:9, 62:18, 75:5, 76:13, 86:22, 86:24, 107:12, 145:19, 147:20, 147:21, 180:5, 191:8, 191:14, 191:24, 192:2, 192:10, 192:15, 192:18, 193:6, 193:12, 193:21, 193:25, 194:22, 199:9, 199:24, 200:12, 200:15, 201:13, 202:9, 203:4, 203:6, 203:23, 204:8, 210:2
**testing** [1] - 126:13
**text** [3] - 109:15, 109:20, 118:21
**thankfully** [1] - 171:15
**thanking** [2] - 7:25, 170:17
**THE** [41] - 1:1, 1:14, 5:5, 5:7, 5:23, 6:3, 6:6, 6:12, 7:15, 7:17, 35:4, 50:20, 50:23, 64:20, 64:22, 93:22, 94:6, 94:9, 94:11, 94:12, 139:3, 151:20, 161:14, 161:17, 161:19, 161:20, 166:15, 175:12, 183:1, 188:21, 190:17, 190:20, 190:22, 191:1, 191:4, 191:6, 200:1, 210:18, 210:20, 211:3, 211:16
**theirs** [1] - 185:17
**themselves** [6] - 65:12, 130:4, 138:6, 142:15, 146:13, 207:19
**then-present** [1] - 10:9
**theories** [9] - 8:22, 34:22, 51:1, 66:3, 66:4, 66:5, 66:7, 67:10, 182:9
**theory** [17] - 8:22, 10:6, 10:19, 12:13, 20:6, 28:18, 29:1, 33:8, 35:10, 44:7, 44:23, 79:7, 83:8, 161:23, 177:1,

189:22, 198:5
**therefore** [4] - 147:4, 164:22, 165:12, 202:18
**therein** [1] - 46:7
**they've** [2] - 53:16, 183:16
**thinking** [1] - 175:6
**thinks** [4] - 190:7, 198:21, 198:22, 198:24
**third** [6] - 14:24, 15:3, 15:7, 16:4, 132:19, 133:17
**Third** [58] - 2:4, 10:17, 10:23, 12:3, 12:12, 12:19, 13:17, 14:1, 14:9, 14:18, 16:2, 16:18, 16:20, 18:24, 19:3, 19:19, 21:7, 21:12, 31:25, 32:19, 33:1, 42:22, 43:3, 43:7, 60:14, 68:9, 68:11, 96:23, 101:10, 108:14, 110:10, 116:18, 117:23, 121:1, 122:23, 122:25, 124:8, 124:13, 124:14, 125:8, 128:23, 148:9, 181:12, 181:18, 182:4, 184:17, 184:18, 185:25, 186:3, 186:4, 188:15, 191:11, 191:18, 197:24, 198:4, 198:6, 198:19, 198:24
**third-plus** [2] - 15:3, 15:7
**THOMAS** [1] - 2:3
**Thomas** [5] - 5:16, 86:9, 88:8, 88:12
**Thomassy** [10] - 24:11, 24:13, 24:14, 24:16, 25:2, 27:4, 115:25, 116:2, 119:20, 120:23
**Thomassy's** [1] - 26:5
**thorny** [1] - 101:21
**thousand** [1] - 74:18
**thousands** [1] - 211:10
**three** [30] - 7:14, 8:4, 8:13, 12:15, 17:21, 17:22, 19:22, 24:10, 49:17, 76:15, 76:16, 91:8, 103:13, 106:16, 111:15,

111:19, 111:22, 112:9, 113:2, 118:15, 122:18, 127:3, 135:18, 156:8, 168:8, 170:22, 200:14, 200:18, 200:21
**three-day** [1] - 113:2
**three-paragraph** [1] - 24:10
**three-year** [1] - 17:21
**threshold** [1] - 205:24
**threw** [1] - 170:12
**throughout** [4] - 89:11, 146:21, 188:7, 200:3
**thrown** [1] - 111:6
**Thursday** [1] - 1:12
**TI** [1] - 23:6
**ticks** [1] - 159:10
**tie** [3] - 57:7, 64:17, 176:11
**timeline** [1] - 69:22
**timing** [4] - 58:12, 60:2, 166:21, 190:3
**tiny** [4] - 100:8, 122:24, 136:21
**tired** [1] - 90:19
**title** [1] - 86:10
**toast** [1] - 19:3
**today** [32] - 7:23, 22:24, 39:11, 56:2, 67:19, 69:1, 69:6, 69:7, 79:23, 80:4, 82:1, 84:24, 86:14, 94:7, 94:8, 94:20, 143:10, 144:12, 150:17, 151:6, 151:10, 160:17, 164:19, 175:9, 177:9, 177:24, 181:20, 200:3, 204:7, 207:8, 210:15, 211:6
**today's** [1] - 179:20
**Todd** [1] - 117:16
**together** [8] - 7:8, 58:16, 58:19, 84:2, 136:11, 146:25, 166:3, 166:9
**tolling** [1] - 29:20
**tom** [1] - 136:18
**Tom** [5] - 62:18, 93:2, 108:20, 115:10
**tons** [1] - 110:25
**Tony** [2] - 24:22, 115:25
**took** [14] - 18:8, 24:25, 25:3, 31:16, 69:21, 76:21, 119:24,

120:20, 124:12, 125:1, 181:6, 192:8, 208:23, 209:1
**top** [4] - 31:21, 36:23, 60:22
**top-line** [2] - 36:23
**topic** [1] - 15:16
**topical** [11] - 8:25, 11:21, 12:10, 13:3, 18:20, 21:24, 34:10, 44:20, 126:10, 182:1, 208:6
**topicals** [1] - 208:2
**topics** [6] - 60:22, 96:17, 131:5, 192:1, 192:21, 197:1
**torture** [1] - 179:22
**Tose** [1] - 18:25
**total** [15] - 29:4, 46:10, 46:11, 71:9, 71:10, 80:1, 80:5, 80:7, 80:9, 80:19, 80:23, 82:2, 82:7, 83:16, 176:12
**totally** [10] - 12:22, 25:1, 54:25, 55:3, 55:5, 62:8, 150:14, 164:1, 186:24, 203:17
**touch** [1] - 207:6
**touched** [2] - 60:2, 202:14
**touches** [1] - 49:22
**tough** [1] - 13:21
**touting** [1] - 58:10
**toward** [1] - 22:16
**towards** [1] - 39:18
**track** [3] - 13:22, 21:21, 22:5
**tracks** [1] - 139:25
**trade** [5] - 16:11, 17:18, 17:21, 18:4, 20:6
**traded** [2] - 142:9, 142:12
**trades** [1] - 71:15
**trading** [10] - 69:20, 69:21, 69:25, 70:15, 70:16, 70:22, 71:13, 159:3, 159:10, 178:6
**traditional** [1] - 14:25, 15:9
**transaction** [12] - 11:1, 36:12, 37:1, 37:6, 37:7, 43:24, 57:20, 58:1, 60:17, 145:17, 152:8, 201:24
**transactions** [1] - 144:16

**transcript** [4] - 172:9, 172:25, 189:2, 211:21
**transcripts** [1] - 11:4
**transition** [1] - 211:4
**translate** [1] - 162:19
**transmittal** [2] - 132:9, 133:4
**transparent** [2] - 105:12, 105:13
**transsection** [1] - 44:14
**treasury** [1] - 62:5
**treated** [2] - 59:13, 196:13
**treatments** [2] - 31:11, 159:5
**triable** [2] - 34:16, 82:5
**trial** [26] - 28:15, 28:16, 35:8, 65:20, 78:1, 81:19, 95:5, 95:19, 97:12, 108:12, 110:13, 115:9, 115:12, 115:18, 115:20, 116:13, 116:16, 116:21, 116:23, 128:17, 130:16, 138:19, 149:11, 185:8, 186:25, 203:24
**trials** [1] - 96:21
**tried** [4] - 55:13, 63:7, 109:5, 167:11
**trier** [2] - 109:25, 147:7
**tries** [1] - 50:1
**trigger** [1] - 70:9
**triggers** [1] - 54:14
**trivial** [2] - 96:2, 194:17
**trouble** [2] - 6:20, 48:19
**troubled** [1] - 75:16
**troubling** [3] - 77:8, 83:19, 83:20
**true** [31] - 10:24, 12:7, 24:15, 27:22, 33:21, 33:22, 36:15, 38:18, 42:13, 54:6, 77:13, 87:21, 89:15, 90:1, 90:2, 91:20, 100:13, 104:15, 118:3, 137:22, 143:4, 149:10, 158:7, 164:5, 167:24, 168:7, 168:24, 206:16
**trust** [3] - 9:18, 22:20,

102:24
**trustworthiness** [4] - 23:24, 118:7, 119:11, 119:15
**trustworthy** [4] - 23:14, 23:22, 24:8, 119:13
**truth** [27] - 36:14, 40:23, 41:25, 45:2, 45:12, 45:18, 47:20, 77:4, 81:17, 101:18, 104:2, 107:5, 109:14, 112:8, 117:6, 122:13, 131:5, 133:12, 137:24, 138:16, 145:4, 145:5, 147:14, 150:19, 151:11, 160:14, 196:9
**truth-on-the-market** [1] - 160:14
**truthful** [1] - 88:3
**truths** [1] - 146:16
**try** [23] - 16:8, 19:10, 23:8, 27:1, 45:10, 47:6, 50:9, 50:25, 53:3, 53:16, 109:9, 135:6, 162:7, 163:4, 166:16, 174:14, 180:18, 184:14, 190:24, 200:4, 206:9, 206:22, 211:7
**try-to-haves** [1] - 109:9
**trying** [16] - 10:15, 53:15, 53:18, 53:19, 54:2, 55:6, 58:19, 65:19, 71:22, 78:11, 81:5, 95:1, 138:3, 167:12, 181:24, 197:21
**TSC** [1] - 194:12
**tuned** [1] - 195:25
**turn** [18] - 22:15, 35:10, 37:11, 43:23, 50:17, 79:21, 81:1, 81:7, 83:9, 91:24, 113:7, 113:11, 126:23, 139:1, 154:17, 161:10, 196:10, 197:9
**turned** [2] - 96:15, 148:20
**turning** [1] - 79:8
**Tweed** [1] - 20:21
**twice** [2] - 12:14, 24:12
**two** [61] - 8:22, 9:10, 11:5, 15:4, 50:25,

53:11, 53:12, 60:22, 60:23, 61:11, 62:9, 66:6, 67:10, 68:14, 72:21, 76:12, 76:14, 84:12, 84:18, 91:8, 95:3, 95:4, 101:25, 103:24, 106:18, 108:9, 111:18, 115:1, 123:17, 126:15, 127:16, 134:23, 136:15, 136:22, 136:23, 143:22, 155:5, 155:25, 156:3, 158:2, 158:21, 158:23, 158:24, 160:11, 160:16, 167:24, 168:1, 170:22, 172:18, 173:25, 176:19, 180:8, 180:25, 182:14, 182:17, 187:11, 195:11, 195:14

**two-and-a-half** [2] - 11:5, 95:4

**type** [11] - 13:12, 15:3, 33:3, 33:9, 37:5, 46:11, 48:21, 117:14, 197:17, 209:14, 209:16

**types** [1] - 156:11

**typical** [1] - 14:7

## U

**U.S** [5] - 1:10, 110:9, 120:7, 159:4, 178:18

**U.S.-based** [2] - 42:5, 42:10

**U.S.F** [1] - 186:3

**UBS** [1] - 172:11

**ultimate** [3] - 31:4, 53:25, 193:14

**ultimately** [2] - 141:14, 159:11

**umbrella** [1] - 199:12

**unable** [1] - 22:14

**unadjudicated** [2] - 117:18, 117:23

**unanimous** [1] - 38:9

**unavailing** [1] - 50:12

**unbelievable** [1] - 48:19

**unbelievably** [1] - 48:18

**unblemished** [1] - 66:12

**uncertain** [2] - 39:8, 140:22

**unchanged** [1] - 133:12

**uncharged** [1] - 177:6

**under** [51] - 8:15, 11:14, 23:5, 23:10, 23:15, 25:22, 35:20, 35:23, 38:11, 40:22, 41:17, 41:22, 43:23, 44:16, 49:1, 49:2, 59:9, 59:11, 71:1, 109:23, 111:7, 118:3, 120:7, 120:14, 123:15, 124:15, 137:18, 140:5, 148:24, 165:11, 165:12, 171:1, 174:12, 178:14, 180:8, 180:24, 187:2, 189:16, 189:18, 191:13, 197:6, 199:12, 200:8, 200:16, 203:25, 204:5, 205:8, 207:4, 210:8

**under-oath** [1] - 41:17

**undercut** [6] - 21:16, 122:21, 124:8, 125:10, 125:24, 126:1

**undercuts** [2] - 63:16, 174:22

**undercutting** [2] - 28:18, 32:22

**underlying** [4] - 55:2, 55:4, 109:20, 137:23

**undermine** [1] - 22:4

**undermines** [2] - 22:3, 100:21

**undermining** [2] - 129:20, 138:7

**underperformance** [3] - 50:2, 50:4, 187:4

**understood** [4] - 17:1, 77:23, 112:24, 125:2

**undisciplined** [2] - 165:2, 183:8

**undisputed** [5] - 53:23, 53:24, 75:3, 97:8, 117:21

**undoubtedly** [3] - 189:7, 201:25, 205:2

**unequivocally** [2] - 15:19, 161:5

**unilateral** [2] - 21:17, 32:1

**unintentionally** [1] - 172:6

**Union** [1] - 39:24

**unique** [1] - 124:5

**unit** [12] - 29:2, 29:5, 29:6, 32:7, 75:4, 103:6, 105:7, 105:8, 112:20, 112:23, 124:24, 137:15

**United** [17] - 5:2, 5:3, 9:17, 26:10, 26:13, 26:15, 26:16, 26:23, 40:8, 62:15, 89:9, 89:13, 121:7, 171:15, 176:21, 176:23, 196:21

**UNITED** [2] - 1:1, 1:14

**units** [2] - 66:24, 75:20

**universe** [1] - 209:24

**unknown** [3] - 28:11, 28:12, 132:14

**unlawful** [3] - 20:19, 177:3, 199:5

**unless** [6] - 109:24, 118:6, 118:12, 151:8, 151:16, 161:9

**unlike** [5] - 12:22, 15:2, 29:15, 56:21, 57:11

**unlikely** [1] - 151:17

**unmentioned** [1] - 97:15

**unnatural** [1] - 97:13

**unnoticed** [1] - 134:20

**unprecedented** [1] - 180:4

**unpredictable** [1] - 84:14

**unprofitable** [1] - 132:2

**unquestionable** [1] - 128:20

**unreasonable** [3] - 97:14, 111:13, 164:2

**unreasonableness** [1] - 171:19

**unrelated** [7] - 18:10, 25:1, 49:7, 153:10, 158:3, 196:16, 206:12

**unreliable** [6] - 24:7, 191:13, 197:12, 198:11, 200:16, 203:25

**unsalable** [1] - 204:7

**unscramble** [1] - 145:15

**unsolicited** [1] - 70:12

**unspecified** [1] - 86:8

**unsurprising** [1] - 196:6

**unsurprisingly** [3] - 155:7, 160:1, 176:6

**unsustainable** [8] - 111:17, 112:2, 112:11, 112:25, 114:23, 131:16, 132:24, 183:25

**untoward** [1] - 53:16

**untrue** [3] - 20:18, 33:15, 72:9

**untrustworthy** [1] - 118:13

**unusual** [6] - 21:4, 59:17, 63:14, 69:10, 101:12, 124:4

**up** [81] - 11:3, 11:8, 12:3, 12:4, 16:17, 20:17, 41:3, 41:4, 41:24, 47:7, 47:8, 50:22, 51:15, 53:4, 54:17, 54:21, 57:3, 64:11, 64:22, 64:25, 65:22, 66:11, 66:16, 70:14, 73:2, 73:18, 74:13, 76:18, 77:10, 78:2, 80:3, 80:8, 80:19, 81:1, 81:5, 82:3, 82:4, 82:12, 82:17, 84:17, 85:21, 88:5, 90:5, 93:7, 93:24, 111:14, 113:20, 115:11, 119:9, 121:15, 122:12, 123:11, 127:11, 127:22, 128:14, 130:22, 136:18, 143:2, 143:15, 155:18, 159:23, 160:23, 162:17, 162:18, 164:4, 166:22, 169:12, 171:5, 171:11, 173:8, 174:13, 174:21, 174:23, 180:24, 182:11, 207:23

**update** [1] - 113:17

**upfront** [1] - 134:1

**upheld** [1] - 136:24

**uphold** [1] - 199:9

**upholding** [1] - 189:16

**upset** [4] - 63:1, 121:21, 129:8, 166:7

**upsetting** [1] - 122:3

**upside** [2] - 80:16, 80:17

**uptick** [1] - 123:2

**urge** [4] - 51:15, 87:8, 167:10, 169:21

**uses** [1] - 172:14

**usual** [2] - 14:12, 69:7

**Utesch** [1] - 55:14

## V

**Valeant** [5] - 48:18, 88:20, 154:6, 155:6, 196:15

**valerate** [1] - 127:6

**valid** [1] - 91:24

**Valspar** [29] - 11:14, 12:17, 12:18, 12:20, 13:18, 14:2, 14:8, 14:10, 15:5, 16:1, 16:18, 19:19, 22:1, 22:9, 32:19, 32:22, 33:1, 33:10, 121:1, 122:23, 122:24, 123:4, 124:9, 124:14, 124:15, 182:6, 198:3, 198:7, 198:19

**valuable** [1] - 48:18

**valuation** [1] - 158:15

**value** [12] - 36:17, 37:19, 141:15, 144:3, 147:22, 147:24, 148:12, 148:15, 151:5, 152:2, 152:5, 152:9

**valued** [2] - 141:14, 141:25

**vanilla** [1] - 54:25

**variation** [1] - 43:7

**various** [3] - 22:19, 40:4, 74:9

**vastly** [1] - 187:23

**ventures** [1] - 18:19

**verbally** [1] - 92:24

**verified** [1] - 120:10

**verify** [1] - 185:11

**version** [3] - 40:23, 125:4, 191:22

**versus** [1] - 57:14

**vested** [1] - 107:14

**vesting** [1] - 71:1

**viability** [1] - 46:16

**vice** [6] - 75:5, 98:16, 99:13, 103:13, 108:1, 124:22

**view** [7] - 46:14, 80:19, 80:20, 123:8, 171:25, 182:4, 200:2

**viewing** [1] - 109:24

**vigorous** [1] - 198:16

**VINS** [1] - 118:14

**violate** [2] - 145:7, 145:8

**violated** [2] - 140:23, 190:5

**violation** [6] - 111:23, 111:25, 123:23, 140:18, 140:24,

143:14
**violations** [2] - 22:20, 139:17
**virtually** [3] - 119:13, 136:24, 158:19
**vise** [1] - 53:24
**visit** [1] - 186:1
**Vivint** [1] - 203:19
**volume** [1] - 31:16
**voluntarily** [1] - 75:17
**VSI** [1] - 192:17

**W**

**W-E-S-O-L-O-W-S-K-I** [1] - 25:21
**wading** [1] - 94:21
**wagon** [1] - 155:15
**wait** [1] - 163:18
**Waiting** [2] - 9:21, 29:8
**walk** [2] - 174:9, 191:18
**Wall** [4] - 109:14, 109:17, 159:16, 159:20
**Walnut** [1] - 1:11
**want-to-haves** [1] - 109:9
**wants** [3] - 63:5, 108:8, 146:4
**ward** [1] - 10:12
**WAREHAM** [14] - 2:15, 4:4, 5:24, 7:9, 7:16, 7:19, 21:21, 35:5, 175:14, 183:2, 190:18, 190:21, 210:19, 210:21
**Wareham** [20] - 5:25, 7:22, 51:20, 51:25, 52:10, 58:3, 58:6, 60:2, 64:5, 91:23, 126:9, 139:10, 141:1, 151:14, 153:5, 154:3, 161:23, 189:13, 197:24, 198:3
**warned** [8] - 97:17, 102:11, 102:23, 113:17, 132:18, 133:15, 165:2, 194:15
**warning** [6] - 99:15, 105:19, 108:2, 114:17, 188:2, 188:3
**warnings** [1] - 133:8
**warns** [1] - 84:11
**warrant** [2] - 159:18, 160:24
**warrants** [1] - 159:22

**Washington** [1] - 2:17
**wasteful** [1] - 182:11
**waters** [1] - 93:12
**Watson** [4] - 168:11, 168:20, 168:22, 168:25
**ways** [2] - 116:23, 182:2
**wayside** [1] - 66:4
**weak** [1] - 24:9
**weaker** [1] - 158:1
**weaker-than-expected** [1] - 158:1
**weakness** [1] - 29:24
**wealthy** [1] - 69:1
**websites** [1] - 21:23
**weed** [1] - 162:5
**weeds** [2] - 196:1, 196:2
**week** [5] - 74:23, 105:17, 105:24, 175:3, 175:4
**weekend** [1] - 109:21
**weekly** [3] - 85:13, 85:17, 105:9
**weeks** [12] - 17:22, 57:21, 58:1, 59:14, 60:17, 61:5, 61:11, 79:4, 102:10, 103:24, 104:6, 186:1
**weigh** [2] - 97:5, 188:18
**weighed** [5] - 22:25, 95:10, 97:12, 109:22, 187:2
**weighs** [1] - 152:21
**weight** [2] - 202:11, 202:12
**well-accepted** [1] - 197:6
**well-developed** [1] - 33:21
**well-supported** [1] - 129:22
**Wesolowski** [9] - 25:20, 25:21, 31:4, 31:5, 53:24, 54:3, 54:10, 121:14, 134:4
**Westlaw** [5] - 26:14, 39:5, 39:15, 39:17, 68:19
**Wettre** [4] - 7:25, 9:11, 29:11, 94:24
**WETTRE** [1] - 5:3
**whack** [1] - 182:7
**whatsoever** [4] - 11:13, 44:12, 52:2, 101:7
**whereas** [2] - 96:24, 177:12

**white** [1] - 148:22
**whole** [4] - 38:22, 39:13, 164:14, 198:17
**wholly** [6] - 44:2, 44:5, 44:15, 47:16, 47:18
**wide** [5] - 33:6, 79:20, 81:11, 181:10, 201:9
**widely** [1] - 9:9
**wildly** [1] - 40:22
**William** [1] - 191:20
**Williams** [2] - 139:11, 145:14
**Williamson** [5] - 12:5, 199:8, 199:14, 210:9, 210:12
**win** [3] - 82:15, 121:16, 161:2
**windfall** [3] - 96:12, 113:4, 135:9
**windfalls** [2] - 131:2, 131:3
**window** [1] - 92:15
**Winowiecki** [8] - 59:8, 62:3, 63:22, 98:16, 98:24, 99:14, 103:13, 107:17
**Winowiecki's** [1] - 105:4
**wipe** [1] - 90:8
**wish** [3] - 39:8, 80:25, 172:4
**wished** [2] - 29:9, 182:13
**withdrawn** [2] - 45:6, 46:14
**withheld** [4] - 45:2, 108:18, 162:23, 190:12
**withstand** [1] - 177:17
**witness** [12] - 24:18, 106:25, 115:9, 115:12, 115:18, 115:20, 122:12, 122:14, 134:10, 173:8, 180:6, 185:8
**witnessed** [2] - 46:24, 47:2
**witnesses** [7] - 15:18, 59:8, 119:15, 120:10, 180:23, 180:24, 199:24
**WM** [1] - 24:4
**woefully** [1] - 68:20
**Wojciechowski** [1] - 201:7
**woman** [1] - 40:14
**wondering** [1] - 61:20
**Wood** [1] - 2:12
**Woodbridge** [1] - 2:12

**word** [11] - 79:21, 106:10, 109:19, 110:24, 127:5, 136:25, 172:14, 180:12, 185:19, 202:23, 203:1
**words** [33] - 33:15, 38:6, 47:6, 73:4, 73:7, 81:7, 81:9, 81:13, 95:8, 98:17, 99:2, 99:4, 101:24, 108:3, 109:7, 109:12, 128:4, 128:5, 128:7, 128:11, 128:15, 128:20, 128:21, 129:18, 134:6, 134:17, 166:25, 167:1, 170:16, 172:10, 172:22, 180:11, 206:14
**wore** [2] - 100:14
**works** [2] - 27:4, 59:15, 79:7
**world** [7] - 72:2, 72:17, 73:15, 73:18, 77:18, 123:10, 195:16
**worldwide** [1] - 67:2
**worried** [2] - 63:10, 181:20
**worry** [1] - 30:12
**worse** [4] - 104:22, 108:7, 113:16, 133:16
**worsened** [1] - 104:9
**worsening** [2] - 133:14, 154:9
**worth** [5] - 44:25, 45:1, 45:17, 152:7, 178:2
**worthless** [1] - 152:10
**worthy** [3] - 84:18, 84:19, 120:11
**wow** [1] - 180:19
**write** [2] - 74:21, 96:5
**write-down** [1] - 96:5
**writes** [2] - 74:5, 101:25
**writing** [1] - 185:11
**written** [3] - 31:10, 31:15, 102:20
**wrongdoing** [5] - 72:18, 76:5, 95:10, 111:10, 169:20
**wrote** [10] - 30:2, 62:25, 95:8, 96:1, 105:17, 105:21, 121:6, 164:21, 177:14, 182:15

**X**

**XAVIER** [2] - 1:14, 5:2
**Xavier** [1] - 5:6

**Y**

**year** [4] - 17:21, 59:4, 85:23, 151:24
**years** [25] - 9:10, 12:15, 25:3, 25:4, 25:24, 25:25, 26:12, 26:19, 26:20, 29:8, 29:13, 34:18, 47:1, 56:11, 57:7, 66:17, 80:16, 91:9, 170:23, 173:19, 181:4, 181:15, 182:10, 202:1, 211:6
**York** [12] - 2:4, 2:9, 2:22, 3:4, 31:21, 58:9, 122:9, 179:8
**Young** [4] - 104:22, 106:22, 106:25, 107:1
**yourself** [1] - 6:14

**Z**

**Zamichieli** [1] - 186:2
**zebra** [1] - 37:22
**Zebra** [2] - 38:2, 38:7
**zero** [5] - 39:25, 75:14, 76:10, 86:3, 127:15
**Zoloft** [1] - 191:11